**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

_____

JOHN DOES #1-4 and MARY DOE,

                              Plaintiffs,                            File No. 2:12-cv-11194

v.

RICHARD SNYDER, Governor of the               HON. ROBERT H. CLELAND
State of Michigan, and COL. KRISTE
ETUE, Director of the Michigan State          MAG. JUDGE DAVID R. GRAND
Police, in their official capacities,

                            Defendants.

_____

**PLAINTIFFS' BRIEF OPPOSING
DEFENDANTS' MOTION TO DISMISS**

## CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ iii

INTRODUCTION ..................................................................................................................... 1

STANDARD OF REVIEW ........................................................................................................ 1

LEGISLATIVE HISTORY AND FRAMEWORK.................................................................... 2

ARGUMENT ............................................................................................................................. 4

I.   SORA 2011 VIOLATES THE EX POST FACTO CLAUSE.................................................. 4

A.  *Kansas v. Hendricks* and *Kennedy v. Mendoza-Martinez* Establish the Framework for
     Analyzing the Validity of SORA 2011 Under the Ex Post Facto Clause. ............................ 4

B.  SORA 2011 is Fundamentally Different from the Alaska Statute which Survived a
     *Hendricks/Kennedy* Analysis in *Smith v. Doe*. ..................................................................... 5

C.  Given the Breadth of the Restrictions Now Imposed, SORA 2011 Is Punishment that
     Cannot Be Imposed Retroactively. ......................................................................................... 8

    1.  *Kennedy* Factor #1: SORA 2011 Imposes Affirmative Obligations, Disabilities, and
         Restraints........................................................................................................................... 10

    2.  *Kennedy* Factor #2: SORA 2011 Imposes Sanctions that Historically Have Been
         Considered Punishment. ..................................................................................................... 13

    3.  *Kennedy* Factor #3: SORA 2011 Typically Requires a Finding of Criminal
         Scienter. .............................................................................................................................. 16

    4.  *Kennedy* Factor #4: SORA 2011 Serves the Traditional Aims of Punishment. ......... 17

    5.  *Kennedy* Factor #5: SORA 2011 Applies Only to Behavior Which Is a Crime......... 17

    6.  *Kennedy* Factor #6: SORA 2011 Is Not Rationally Related to a Non-Punitive
         Interest. ............................................................................................................................... 17

    7.  *Kennedy* Factor #7: SORA 2011 Is Excessive in Relation to Non-Punitive Interests.21

II.  SORA 2011 RESTRICTS FUNDAMENTAL RIGHTS AND IS THEREFORE SUBJECT
     TO STRICT SCRUTINY. .......................................................................................................... 22

A.  SORA 2011 Unconstitutionally Interferes with Plaintiffs' Right to Travel. .................... 23

B.  SORA 2011 Unconstitutionally Interferes with Plaintiffs' Right to Engage in the
     Common Occupations of Life............................................................................................... 24

C.  SORA 2011 Unconstitutionally Interferes with Plaintiffs' Right to Direct the Education
     and Upbringing of their Children.......................................................................................... 26

D.  SORA 2011 Unconstitutionally Interferes with Plaintiffs' Right to Free Speech. ........... 27

III. RETROACTIVE APPLICATION OF SORA 2011 VIOLATES DUE PROCESS.............. 28

IV. MANY PROVISIONS OF SORA 2011 ARE VOID FOR VAGUENESS, ARE IMPOSSIBLE
     TO COMPLY WITH, AND WRONGLY IMPOSE STRICT LIABILITY................................ 31

V.  THE COURT CAN AND SHOULD ASSERT SUPPLEMENTAL JURISDICTION OVER
    PLAINTIFFS' HEADLEE CLAIM........................................................................... 34

CONCLUSION............................................................................................................. 35

INDEX OF EXHIBITS................................................................................................. 37

# TABLE OF AUTHORITIES

**Cases**

*Adair v. State*, 785 N.W.2d 119 (Mich. App. 2010) ....................................................... 35

*Campanella v. Commerce Exch. Bank*, 137 F.3d 885 (6th Cir. 1998).......................... 34

*Commonwealth v. Baker*, 295 S.W.3d 437 (Ky. 2009)............................... 12, 17, 18, 22

*Connally v. General Const. Co.*, 269 U.S. 385 (1926) .................................................. 31

*Cunney v. Bd. of Trs.*, 660 F.3d 612 (2nd Cir. 2011)..................................................... 32

*Dent v. West Virginia*, 129 U.S. 114 (1889) .................................................................. 25

*Doe v. City of Albuquerque*, 667 F.3d 111 (10th Cir. 2012)......................................... 28

*Doe v. District Attorney*, 932 A.2d 552 (Me. 2007) .................................................... 7, 8

*Doe v. Jindal*, __ F.Supp.2d __, 2012 WL 540100 (M.D. Louis. 2012) ...................... 28

*Doe v. Michigan Dept. of State Police*, 490 F.3d 491 (6th Cir. 2007)......................... 31

*Doe v. Schwarzenegger*, 476 F. Supp.2d 1178 (E.D. Cal. 2007).................................. 12

*Elwell v. Township of Lower*, 2006 WL 3797974 (N.J. Super. Ct. 2006) .............. 12, 27

*F.R. v. St. Charles County Sheriff's Dept.*, 301 S.W.3d 56 (Missouri 2010) ............... 12

*Frank v. Dana Corp.*, 646 F.3d 954 (6th Cir. 2011)........................................................ 1

*Gibbs v. United Mine Workers*, 383 U.S. 715 (1966).............................................. 34, 35

*Grayned v. City of Rockford*, 408 U.S. 104 (1972)....................................................... 31

*Hampton v. Mow Sun Wong*, 426 U.S. 88 (1976)......................................................... 25

*I.N.S. v. St. Cyr*, 533 U.S. 289 (2001).................................................................... 29, 30

*Johnson v. Cincinnati*, 310 F.3d 484 (6th Cir. 2003) ............................................. 23, 27

*Kansas v. Hendricks*, 521 U.S. 346 (1997)................................................................. 4, 5

*Kennedy v. Mendoza-Martinez*, 372 U.S. 144 (1963)..................................................... 5

*Lambert v. California*, 355 U.S. 225 (1957) ....................................................................... 33

*Landgraf v. USI Film Products*, 511 U.S. 244 (1994) ................................................... 28, 29

*M.L.B. v. S.L.J.*, 519 U.S. 102 (1996) .................................................................................. 26

*Meyer v. Nebraska*, 262 U.S. 390 (1923) ............................................................................ 24

*Mikaloff v. Walsh*, 2007 WL 2572268 (N.D. Ohio 2007) .......................................... 8, 9, 12, 14

*Morissette v. U.S.*, 342 U.S. 246 (1952) ............................................................................. 33

*Morrissey v. Brewer*, 408 U.S. 471 (1972) .......................................................................... 14

*Owczarek v. Michigan*, 742 N.W.2d 380 (Mich. App. 2007) ............................................... 35

*Padilla v. Kentucky*, 130 S.Ct. 1473 (2010) ....................................................................... 30

*People v. Cole*, __N.W.2d__ (Mich., May 25, 2012) ........................................................ 30

*People v. Dipiazza*, 778 N.W.2d 264 (Mich. App. 2009) .................................................... 21

*Planned Parenthood v. Farmer*, 220 F.3d 127 (3rd Cir. 2000) .......................................... 32

*Poe v. Snyder*, _ F. Supp. 2d __, 2011 WL 6781361 (W.D. Mich. 2011) .......................... 33

*R.L. v. Mo. Dep't of Corr.*, 245 S.W.3d 236 (Mo. 2008) .................................................... 12

*Reno v. American Civil Liberties Union*, 521 U.S. 844 (1997) .......................................... 28

*Schware v. Board of Bar Examiners of New Mexico*, 353 U.S. 232 (1957) ........................ 25

*Severe Records, LLC v. Rich*, 658 F.3d 571 (6th Cir. 2011 ................................................... 2

*Smith v. Doe*, 538 U.S. 84 (2003) ............................................................................... passim

*Stanley v. Georgia*, 394 U.S. 557 (1969) ............................................................................ 27

*State v. Letalien*, 985 A.2d 4 (Me. 2009) ..................................................................... 10, 17

*State v. Pollard*, 908 N.E.2d 1145 (Ind. 2009) ............................................................ 12, 14, 22

*State v. Williams*, 952 N.E.2d 1103 (Ohio 2011) ............................................................ 9, 13

*Trop v. Dulles*, 356 U.S. 86 (1958) ....................................................................................... 7

iv

*Troxel v. Granville*, 530 U.S. 57 (2000) ............................................................ 26

*Truax v. Raich*, 239 U.S. 33 (1915) ................................................................... 25

*U.S. Trust Co. of New York v. New Jersey*, 431 U.S. 1 (1977).................................. 29, 31

*U.S. v. Apollo Energies, Inc.,* 611 F.3d 679 (10th Cir. 2010)...................................... 33

*U.S. v. Barnes*, 278 F.3d 644 (2002).................................................................. 30

*U.S. v. Barton*, 455 F.3d 649 (6th Cir. 2006)....................................................... 29

*U.S. v. Guest*, 383 U.S. 745 (1966).................................................................... 23

*U.S. v. Juvenile Male*, 131 S.Ct. 2860 (June 27, 2011) .............................................. 8

*U.S. v. Juvenile Male*, 590 F.3d 924 (9th Cir. 2009) ............................................ 8, 16

*U.S. v. Wheeler*, 254 U.S. 281 (1920)................................................................. 23

*Veneklase v. Bridgewater Condos, L.C.*, 670 F.3d 705 (6th Cir. 2012) ......................... 34

*Wallace v. State*, 905 N.E.2d 371 (Ind. 2009) ............................................... passim

*Washington v. Glucksberg*, 521 U.S. 702 (1997) ................................................ 22, 23

*Wayne County Chief Exec. v. Governor*, 583 N.W.2d 512, 517 (1998) ......................... 35

*Welch v. Henry*, 305 U.S. 134 (1938) ................................................................ 29

*Whitaker v. Perdue*, 4:06-cv-0140 (N.D. Georgia, March 30, 2007) ...................... 15, 22

*Williams v. Fears*, 179 U.S. 270 (1900) .............................................................. 23

*Willner v. Committee on Character and Fitness*, 373 U.S. 96 (1963)........................... 25

## Statutes

18 U.S.C. § 3563(b)(5)(2)................................................................................. 26

28 U.S.C. § 1367(a) ....................................................................................... 34

28 U.S.C. § 1367(c) .................................................................................... 34, 35

28 U.S.C. § 994............................................................................................. 14

M.C.L. § 28.721 ........................................................................................................ 1

M.C.L. § 28.721a ................................................................................................. 8, 17

M.C.L. § 28.722 ...................................................................................................... 2

M.C.L. § 28.722(b) ............................................................................................... 16

M.C.L. § 28.722(g) ................................................................................................. 3

M.C.L. § 28.723 ...................................................................................................... 2

M.C.L. § 28.725 ...................................................................................................... 2

M.C.L. § 28.725(1) ............................................................................................ 3, 24

M.C.L. § 28.725(1)(e) ........................................................................................... 24

M.C.L. § 28.725(1)(f) ........................................................................................... 28

M.C.L. § 28.725(12) ............................................................................................... 2

M.C.L. § 28.725(6) (2010) ..................................................................................... 2

M.C.L. § 28.725(g) ............................................................................................... 32

M.C.L. § 28.725a(3) ................................................................................... 3, 24, 34

M.C.L. § 28.725a(6) ............................................................................................... 3

M.C.L. § 28.725a(7) ............................................................................................. 34

M.C.L. § 28.725b(3) ............................................................................................... 3

M.C.L. § 28.727(1) ............................................................................................... 28

M.C.L. § 28.727(1)(i) ........................................................................................... 28

M.C.L. § 28.728(1)(e) ........................................................................................... 24

M.C.L. § 28.728(2)(d) ........................................................................................... 25

M.C.L. § 28.729(2) ......................................................................................... 33, 34

M.C.L. § 28.733(e) ............................................................................................... 32

M.C.L. § 28.734 ............................................................................................................ 2

M.C.L. § 28.734(1)(a) ................................................................................................... 25

M.C.L. § 28.734(1)(b) ............................................................................................. 24, 27

M.C.L. § 28.734(2) ................................................................................................ 3, 9, 33

M.C.L. § 28.735(2) ................................................................................................ 3, 9, 33

M.C.L. § 762.11 ........................................................................................................... 30

M.C.L. § 762.14 ........................................................................................................... 31

Mich. Pub. Act 121 (2005) ............................................................................................ 2

Mich. Pub. Act 127 (2005) ............................................................................................ 2

Mich. Pub. Act 17 (2011) .............................................................................................. 2

Mich. Pub. Act 17-18 (2011) ......................................................................................... 2

Mich. Pub. Act 18 (2011) .............................................................................................. 2

Mich. Pub. Act 237 (2004) ............................................................................................ 2

Mich. Pub. Act 238 (2004) ............................................................................................ 2

Mich. Pub. Act 295 (1994) ....................................................................................... 2, 31

Mich. Pub. Act 46 (2006) .............................................................................................. 2

Mich. Pub. Act 542 (2002) ........................................................................................ 2, 8

Mich. Pub. Act 85 (1999) .............................................................................................. 2

Public Act 286 of 1994 .................................................................................................. 2

Public Act 287 of 1994 .................................................................................................. 2

Public Act 295 of 1994 .................................................................................................. 2

Public Act 355 of 1994 .................................................................................................. 2

**Other Authorities**

Amanda Y. Agan, Amanda, *Sex Offender Registries: Fear Without Function?* (December 1, 2008) ................................................................................................................ 18

Andrea Yang, *Historical Criminal Punishments, Punitive Aims and Un-"Civil" Post-Custody Sanctions on Sex Offenders*, 75 U. Cinn. L. Rev. 1299 (2007) ................................. 14

Beckett & Herbert, *Banished: The New Social Control in Urban America* (2010) .................... 14

Blood, Watson*, & Stageberg, Iowa Department of Criminal and Juvenile Justice Planning, *State Legislation Monitoring Report* (2008) ...................................................................... 19

Bob Vasquez, *The Influence of Sex Offender Registration and Notification Laws in the United States*, 54 Crime & Delinquency 175 (2008) .......................................................... 18

Henry M. Hart, *The Aims of the Criminal Law*, 23 Law & Contemp. Probs. 401 (1958) ........... 15

Iowa County Attorneys Association, *Statement on Sex Offender Residency Restrictions in Iowa* (Dec. 11, 2006) ................................................................................................... 20

*Minn. Dep't of Corr., Level Three Sex Offender Residential Placement Issues: 2003 Report to the Legislature* 9 (2003) ....................................................................................... 19

Minnesota Department of Corrections, *Residential Proximity and Sex Offense Recidivism in Minnesota* (2007) .............................................................................................. 19

*Misguided Measures*, ABC News (March 7, 2007) ................................................................ 20

Richard Tewksbury, *Collateral Consequences of Sex Offender Registration*, 21 J. Contemp. Crim. Just. 67 (2005) ......................................................................................... 11

Richard Zevitz & Mary Ann Farkas, *Sex Offender Community Notification: Managing High Risk Criminals or Exacting Further Vengeance?*, 18 Behav. Sci. & Law 375 (2000) ..................... 11

Zandbergen, *et al.*, *Residential Proximity to Schools and Daycares: An Empirical Analysis of Sex Offense Recidivism*, 37 Criminal Justice and Behavior 482 (2010) ......................... 19

**Rules**

Fed. R. Civ. Proc. 12(b)(6) ................................................................................................. 1

## INTRODUCTION

The five plaintiffs have been retroactively required to comply with Michigan's Sex

Offender Registration Act for the rest of their lives. *See* M.C.L. § 28.721, *et seq.*, as amended

July 1, 2011 ("SORA 2011"). Although plaintiffs have been found to be very low risk of

reoffending, *see* Fay-Dumaine Decl. (Exh. 10), for as long as they live, plaintiffs are:

- subject to constant supervision by law enforcement;
- required to report frequently and in person to law enforcement;
- banned from living or working in many areas;
- severely restricted in when they can travel;
- limited in their rights to free speech;
- restricted from maintaining normal family relationships;
- identified publicly and falsely as dangerous; and
- subjected to a vast array of state-imposed restrictions encompassing every facet of their lives.

*See* Obligations, Disabilities, and Restraints Imposed by SORA 2011. (Exh. 1.)

This Court should reject defendants' motion to dismiss, which in essence argues that sex

offender registration is a Constitution-free zone, and that there are no limits on what the state can

do to registrants. Amendments to SORA 2011 have transformed what was once a civil law into a

criminal statute imposing punishment. Courts across the country – including in Ohio, Indiana,

Maine, Alaska, Kentucky, and the Ninth Circuit – have held that the retroactive application of

similar laws violates the Ex Post Facto Clause. Plaintiffs ask this Court to recognize what those

courts have held: the nature of sex offender laws has fundamentally changed.

## STANDARD OF REVIEW

On a motion under Fed. R. Civ. P. 12(b)(6), "[a]ll facts in the complaint must be accepted

as true." *Frank v. Dana Corp.*, 646 F.3d 954, 958 (6th Cir. 2011). The facts alleged must simply

state a claim for relief that is plausible on its face. *Id*. The Court "must review the complaint in

the light most favorable to Plaintiffs, accept their factual allegations as true, and determine

1

whether Plaintiffs undoubtedly can prove no set of facts in support of [their] claims that would entitle [them] to relief." *Severe Records, LLC v. Rich*, 658 F.3d 571, 578 (6th Cir. 2011).

## LEGISLATIVE HISTORY AND FRAMEWORK

Michigan's Sex Offender Registration Act, as first enacted on October 1, 1995, created a non-public database of persons convicted of sex offenses. *See* Mich. Pub. Acts 286, 287, 295, 355 of 1994. Database information was available only to law enforcement. Mich. Pub. Acts 295, Sec. 10(1) (1994). The legislature has since repeatedly amended SORA, each time imposing new burdens. Compl. ¶¶ 84-103; Mich. Pub. Acts 85 (1999); 542 (2002); 237 (2004); 238 (2004); 121 (2005); 127 (2005); 46 (2006); 17-18 (2011). Two sets of changes are particularly important.

First, effective January 1, 2006, registrants cannot reside, work, or "loiter" within 1000 feet of a school. Mich. Pub. Acts 121, 127 (2005). Registrants are barred from living or working in many areas, and the "loitering" prohibition has been applied to bar them from involvement in their children's education. M.C.L. §§ 28.734-35; Attorney General Letter (7/14/06) (Exh. 14).

Second, effective July 1, 2011, the legislature enacted further sweeping changes. Mich. Pub. Acts 17, 18 (2011). The new law classifies registrants into tiers: Tier I must register for 15 years, Tier II for 25 years, and Tier III for life. M.C.L. § 28.725(10)-(13). Tier classification is not based on risk, but is based solely on the conviction. M.C.L. § 28.722(r)-(v). Plaintiffs, though unlikely to reoffend, are classified as Tier III. In addition, SORA 2011 extended the registration period for thousands of registrants (including the plaintiffs) from 25 years to life. *Compare* M.C.L. § 28.725(6) (2010), *with* M.C.L. § 28.725(12) (2011); *see* Compl. ¶ 285 (80% Tier III). SORA 2011 is retroactive, applying not just to those convicted after July 1, 2011, but to all individuals already registered. M.C.L. § 28.723. SORA 2011 even captures those convicted before the registry was created in 1995. M.C.L. § 28.723(1)(b), (1)(c), (3); Compl. at ¶¶ 15-28.

The requirements of SORA 2011 are so extensive that they cannot be fully set out here, and are instead listed in Exh. 1. As Tier III registrants, plaintiffs must report in person every three months, and must do so within a specified 15-day period each quarter, for the rest of their lives. M.C.L. § 28.725a(3). Registrants must provide extensive personal information, a regularly updated photo, fingerprints, and palm prints. *See* Obligations, Disabilities and Restraints, at 3-5, 8 (Exh. 1). In addition to reporting in person at regular intervals, registrants must report *in person* "immediately" (*i.e.,* within three business days) whenever certain information changes. M.C.L. §§ 28.725(1). 28.722(g). There are no good-cause exceptions to these reporting requirements. Violations of SORA 2011 carry a range of criminal sanctions, up to ten years imprisonment; there are no civil sanctions. M.C.L. §§ 28.729, 28.734(2), 28.735(2).

The number of legal restrictions imposed on registrants "has exploded over the last twenty years and especially during the last decade," with ever more severe conditions being added. Prescott Decl. at 10 (Exh. 8). Because plaintiffs are subject to SORA 2011, they must comply not only with that law, but also with a vast array of other restrictions imposed by federal law, other Michigan laws, the laws of other states, and local ordinances. *See* Consequences Triggered by Michigan Sex Offender Registration: A National Sample (Exh. 8, Att. A). These additional restrictions flow from the person's status as a registrant, meaning that "registration requirements have become indistinguishable … from the package of myriad restrictions and obligations that legislatures have enacted in recent years." Prescott Decl. at 10 (Exh. 8).

In sum, Michigan's registry, which was created in 1995 as a non-public law enforcement database, has changed dramatically over the last 17 years. Registration today no longer simply involves publication of conviction information. Rather, it is coupled with a staggering array of criminally-enforced legal restrictions that are contained in SORA 2011 or are triggered by it.

**ARGUMENT**

I.      **SORA 2011 VIOLATES THE EX POST FACTO CLAUSE.**

A.      ***Kansas v. Hendricks* and *Kennedy v. Mendoza-Martinez* Establish the Framework for Analyzing the Validity of SORA 2011 Under the Ex Post Facto Clause.**

There are two possible ways SORA 2011 could have been crafted so that it would not violate the Ex Post Facto Clause. First, it could have been designed as criminal punishment for newly convicted offenders. Of course if SORA 2011 was designed to punish, then it could not apply retroactively, since the Ex Post Facto Clause bars retroactive punishment.

Second, SORA 2011 could have been designed as civil regulation of individuals who are found to be dangerous. The Constitution allows severe restraints to be imposed on persons who are individually determined to be dangerous. *Kansas v. Hendricks*, 521 U.S. 346 (1997) (upholding involuntary commitment of sexually violent persons). Such restraints on liberty are not considered punishment because they "unambiguously require[] a finding of dangerousness." *Id.* at 357. Restraints cannot be based simply on a prior conviction, but must turn on an individualized, regularly-reviewed, procedurally-safeguarded finding that the individual is likely to re-offend. *Id.* at 368-69. Thus, in *Hendricks* the Court held that the state's intent was not punitive because it "permitted immediate release upon a showing that the individual is no longer dangerous." *Id.* Restrictions on liberty are permissible, then, provided there is an individualized showing of dangerousness. But SORA 2011 applies without any case-by-case consideration of whether registrants actually pose a threat to the public.

SORA 2011 violates the Ex Post Facto Clause because it meets neither the standard for criminal punishment (since it is retroactive) nor the standard for civil regulation of dangerous persons (since it imposes severe restrictions without any individualized determination). Defendants, recognizing that SORA 2011 cannot be justified as criminal punishment, argue that

the law should be considered regulatory, despite the absence of individualized assessment, and that therefore the Ex Post Facto Clause does not apply.

As the Supreme Court explained in *Hendricks*, 521 U.S. at 361, when evaluating an ex post facto claim, a court must first determine whether the legislature intended the statute to be civil or criminal. If the purpose is to impose punishment, that ends the inquiry. *Smith v. Doe*, 538 U.S. 84, 92 (2003). But if the legislature intended to enact a regulatory scheme that is civil and non-punitive, the court must further examine whether that scheme is "so punitive either in purpose or effect as to negate the State's intention to deem it 'civil.'" *Hendricks,* 521 U.S. at 361.

In order to determine whether a purportedly civil law is in fact punitive, courts apply the seven-factor test set out in *Kennedy v. Mendoza-Martinez*, 372 U.S. 144 (1963):

> [1] Whether the sanction involves an affirmative disability or restraint, [2] whether it has historically been regarded as a punishment, [3] whether it comes into play only on a finding of scienter, [4] whether its operation will promote the traditional aims of punishment-retribution and deterrence, [5] whether the behavior to which it applies is already a crime, [6] whether an alternative purpose to which it may rationally be connected is assignable for it, and [7] whether it appears excessive in relation to the alternative purpose assigned.

*Id.* at 168-69 (bracketed numbers added). Interwoven into this analysis is the question of whether individualized assessment (as in *Hendricks*) is required for a scheme to qualify as regulatory. In balancing the *Kennedy* factors, courts must recognize that the factors "often point in differing directions," and no one factor is determinative. *Kennedy*, 372 U.S. at 169.

**B.      SORA 2011 is Fundamentally Different from the Alaska Statute which Survived a *Hendricks/Kennedy* Analysis in *Smith v. Doe*.**

In *Smith v. Doe*, 538 U.S. 84 (2003), a fractured Court applied the tests of *Hendricks* and *Kennedy* to find that the retroactive application of an Alaska registration statute did not violate the Ex Post Facto Clause. The majority first concluded under *Hendricks* that Alaska intended to establish a civil, non-punitive scheme. *Id.* at 96. It then applied the *Kennedy* factors. The

5

majority found that in-person reporting was not required; that registrants were "free to move where they wish and to live and work as other citizens, with no supervision" and were "free to change jobs or residences;" that there was "no evidence that the Act has led to substantial occupational or housing disadvantages for former sex offenders that would not have otherwise occurred;" that the "Act does not restrain activities sex offenders may pursue;" and that the consequences of the Act "flow[ed] not from the Act's registration and dissemination provision, but from the fact of conviction." *Id.* at 100-01. The Court concluded that Alaska's registration scheme resulted in only "minor and indirect" consequences that were reasonably related to the state's objectives. *Id.* at 100, 105. Because the Act imposed only the "minor condition of registration," individualized assessments were not required, unlike in *Hendricks*, where the "magnitude of the restraint" mandated case-by-case determinations of dangerousness. *Id.* at 104.

The legal and factual assumptions that were dispositive in *Smith* are no longer true for Michigan's registry today. Taking the allegations as true, the complaint states that, unlike in *Smith*, SORA 2011 (a) severely limits plaintiffs' ability to direct the upbringing of their children, find housing and employment, get an education, travel, engage in free speech, be free from harassment/stigma, and understand what is legally required of them; (b) subjects plaintiffs to *in-person* supervision that is more onerous than what they experienced while serving sentences on probation/parole; and (c) publicly and falsely identifies them as among the most dangerous sex offenders on the registry. Compl. at ¶¶ 116-234, 276-77. The severe harms suffered by plaintiffs flow not from the fact of conviction, but from registration under the Act. Compl. ¶¶ 115-127, 131-144, 151-161, 168-180, 183-190, 196-207, 210-213. Plaintiffs further allege that (a) public registries and geographic restrictions are likely to increase, rather than decrease recidivism, and are therefore counterproductive to their avowed public safety goals; (b) the reporting

requirements, tier classifications, and geographic restrictions bear no reasonable relationship to risk; (c) actuarial risk assessment tools are far better at predicting recidivism risk than the fact of a conviction; and (d) individualized risk assessments show that plaintiffs here pose a very low risk to reoffend. Compl. ¶¶ 235-71. Unlike in *Smith,* the consequences of SORA 2011 are not "minor and indirect," but encompass every facet of plaintiffs' lives. Moreover, the complaint and incorporated expert reports, refute any purported public safety justifications. Compl. ¶ 235.

Defendants proffer their own alternative facts, arguing that registration is no burden: reporting is less onerous than on probation/parole; reporting requirements have not changed much; SORA 2011 does not restrain the activities plaintiffs may pursue; employment is not restricted; plaintiffs are free to move and travel; and there is no scientific support for individualized risk assessment. Motion to Dismiss at 2, 5, 9-11, 16 (Dkt. 14). While defendants may try to prove their alternative facts in the course of this litigation, at this stage in the proceedings the Court must accept plaintiffs' allegations as true. *Doe v. District Attorney*, 932 A.2d 552 (Me. 2007) (disputes about whether the increasingly severe registration consequences changed the statute's effect from civil to punitive precluded dismissal of an ex post facto claim). The facts, as pled, demonstrate that SORA 2011 is substantially different from, and much more punitive than, any registration statute ever upheld by the Supreme Court or the Sixth Circuit.[1]

Because SORA 2011 has never previously been challenged in court, and because the Sixth Circuit has never considered a registry scheme that imposes such sweeping restrictions, this case presents an issue of first impression. As the Ninth Circuit noted in holding that retroactive application of federal registration requirements to juveniles violates the Ex Post Facto

---

[1] In *Trop v. Dulles*, 356 U.S. 86 (1958), the U.S. Supreme Court considered a regime that was, in many ways, strikingly similar to SORA 2011, namely denaturalization. The High Court rejected the government's claims that denaturalization was not punishment: "There may be involved no physical mistreatment, no primitive torture. There is instead the total destruction of the individual's status in organized society. … [the individual has] lost the right to have rights." *Id.* at 101-102. The Michigan law at issue here is at least as destructive.

Clause, while "[i]t would be tempting to conclude…that in light of [*Smith*], sex offender registration does not constitute punishment, … the case before us presents substantially different facts and issues that significantly affect our analysis." *U.S. v. Juvenile Male*, 590 F.3d 924, 931 (9th Cir. 2009), *vacated as moot*, 131 S. Ct. 2860 (June 27, 2011).[2] The Ninth Circuit accorded *Smith* "its full precedential weight," but concluded that the impact of retroactive registration in that case was "different both in nature and degree" from what the Supreme Court had considered in *Smith*. *Id.* at 933. As in *Juvenile Male*, the question is not whether prior registry schemes were constitutional, but whether SORA 2011's extreme restrictions can be made retroactive. *See Doe*, 932 A.2d at 560 (prior decisions upholding Maine's registration statute did not bar ex post facto challenge where "a challenger can demonstrate that, through amendments, the Legislature changed the character and effects of [the law] from civil to criminal").

**C.    Given the Breadth of the Restrictions Now Imposed, SORA 2011 Is Punishment that Cannot Be Imposed Retroactively.**

Under *Hendricks*, the first step in the ex post facto analysis is to determine whether the legislature intended SORA 2011 to be punishment. The current statement of intent, M.C.L. § 28.721a, was not appended to the statute until eight years after the registry was first created. Mich. Pub. Act. 542, Sec.1a (2002). It was enacted by a different legislature than the one which created the registry, or which passed SORA 2011. No legislative declaration was adopted when the geographic restrictions were enacted in 2006, or when the 2011 amendments were added. *See Mikaloff v. Walsh*, 2007 WL 2572268, at*5-7 (N.D. Ohio 2007) (unpub.) (Exh. 16) (Ohio's residency law was punitive because, while legislature had asserted a non-punitive purpose for registration itself, the legislature was silent on the purpose for residency restrictions).

---

[2] The Ninth Circuit's decision was vacated because the Supreme Court found that expiration of the underlying sentence and supervision order made the case moot. The Court did not disturb the Ninth Circuit's legal analysis.

Plaintiffs have appended statements by legislators that suggest a punitive intent. Rep. Nofs described the residency restrictions as "the price they pay" for crime, and Rep. Jones argued for inclusion of first-offense indecent exposure on the registry to "mak[e] sure it has serious consequences." MIRS Reports (Exh. 15). Although a law may ostensibly be regulatory:

> …it would be naive to look no further, given pervasive attitudes toward sex offenders. The fact that the Act uses past crime as the touchstone, probably sweeping in a significant number of people who pose no real threat to the community, serves to feed suspicion that something more than regulation of safety is going on; when a legislature uses prior convictions to impose burdens that outpace the law's stated civil aims, there is room for serious argument that the ulterior purpose is to revisit past crimes, not prevent future ones.

*Smith*, 538 U.S. at 108-09 (Souter, J., *concurring*) (citations omitted).

Significantly, SORA 2011 is codified in Chapter 28 of the Michigan Code, which concerns state police enforcement activities. *Id.* at 94 (manner of codification is probative of legislature's intent). The statute imposes criminal, rather than civil sanctions. M.C.L. §§ 28.729, 28.734(2), 28.735(2). A statute containing sentencing provisions cannot reasonably be described as civil. *Mikaloff*, 2007 WL 2572268, at*5-7 (Exh. 16).

Even if this Court were to find that the legislative intent was civil, SORA 2011 – as it now exists – is so punitive *in effect* that it is punishment. What arguably began as a regulatory scheme designed to aid law enforcement has expanded dramatically. A statute's constitutionality must be reevaluated as that statute evolves over time. *State v. Williams*, 952 N.E.2d 1103 (Ohio 2011) (although sex offender statute had previously been upheld, amendments rendered it unconstitutional).  Indeed, the flexible nature of the *Kennedy* factors evidences the Supreme Court's recognition that there is a sliding scale between purely remedial and purely punitive statutes, so that changes to a law can tip the balance from one to the other. Here, consideration of the *Kennedy* factors demonstrates that SORA 2011 is punitive.

9

1.    *Kennedy* **Factor #1: SORA 2011 Imposes Affirmative Obligations, Disabilities, and Restraints.**

SORA 2011 imposes extensive affirmative obligations, disabilities, and restraints. *See* Exh. 1. Because plaintiffs were retroactively reclassified as Tier III, they are subject to all of these restrictions for life. Compl. ¶¶ 115-230 (SORA 2011 impacts all major areas of plaintiffs' lives, including child-rearing, housing, work, school, travel, speech, and social interaction). As noted above, registration under SORA 2011 also triggers a huge number of additional restrictions under a complex web of other federal, state, or local laws. *See* Consequences Triggered by Michigan Sex Offender Registration: A National Sample (Exh. 8, Att. A). A compendium of just the most significant state laws exceeds 1000 pages. Compl. ¶ 232.

Many of the restrictions imposed by SORA 2011 were never considered in *Smith* because they were not part of the Alaska statute. To the extent that there are similarities between SORA 2011 and the Alaska statute, however, the disabilities and restraints here, unlike those considered in *Smith*, are not "minor and indirect." *Smith*, 538 U.S. at 100.

First, plaintiffs must report *forever in person every three months*, must disclose extensive private information for posting on the Internet, and must re-register in person within three days whenever certain information (such as an email address) changes. These in-person reporting obligations are fundamentally different from the quarterly verification requirements in *Smith*, which the Court specifically noted did not require in-person reporting. *Id.* at 101.

Numerous courts have found that intrusive reporting constitutes an affirmative restraint. The Maine Supreme Court held that successive amendments to that state's registry law had converted it to a criminal statute so that retroactive application violated both the U.S. and Maine Constitutions. *State v. Letalien*, 985 A.2d 4, 12 (Me. 2009). The Court focused on the fact that reporting was "undoubtedly a form of significant supervision by the state." *Id.* at 12.

> [I]t belies common sense to suggest that a newly imposed life-time obligation to
> report to a police station every ninety days to verify one's identification, residence,
> and school, and to submit to fingerprinting and provide a current photograph, is not
> a substantial disability or restraint on the exercise of individual liberty.

*Id.* at 24-25. Similarly, in *Wallace v. State*, 905 N.E.2d 371, 379-80 (Ind. 2009), the Indiana

Supreme Court found its registry statute violated the state constitution's Ex Post Facto Clause

because the law "imposes significant affirmative obligations and a severe stigma…, and compels

affirmative post-discharge conduct (mandating registration, re-registration, disclosure of public

and private information, and updating of that information) under threat of prosecution."

Second, SORA 2011 goes far beyond the Alaska statute upheld in *Smith* because it bars

registrants from living, working, or "loitering" in vast regions of the state, particularly in urban

areas. Such geographic exclusion zones have the practical effect of severely restricting access to

housing and employment, and of limiting the ability to engage in normal human activity. Compl.

¶276-77; Wagner Decl., at 6-11 (Exh. 11). Moreover, unlike in *Smith*, today there is voluminous

evidence that registration "has led to substantial occupational or housing disadvantages." *Smith*,

538 U.S. at 101. *See* Levenson Decl., at 5 (Exh. 9) (discussing how "residential restrictions

profoundly reduce housing options"); Richard Tewksbury, *Collateral Consequences of Sex

Offender Registration*, 21 J. Contemp. Crim. Just. 67, 75 (2005) (study of Kentucky registrants

found 42.7% of respondents lost jobs and 45.3% lost housing after being listed on publicly

accessible registries); Richard Zevitz & Mary Ann Farkas, *Sex Offender Community

Notification: Managing High Risk Criminals or Exacting Further Vengeance?*, 18 Behav. Sci. &

Law 375, 381 (2000) (Wisconsin study found 83% percent reported exclusion of residence and

57% reported loss of employment as a direct result of community notification).

Courts, in striking down the latest registration statutes have repeatedly focused on the

severe impact that registration and geographic restrictions have on housing and employment. In

11

*Commonwealth v. Baker*, 295 S.W.3d 437, 439 (Ky. 2009), the state supreme court held that the retroactive application of a residency restriction violated the Ex Post Facto Clauses of the U.S. and Kentucky Constitutions. The court found it "difficult to imagine that being prohibited from residing within certain areas does not qualify as an affirmative disability or restraint." *Id*. at 445. Similarly in *State v. Pollard*, 908 N.E.2d 1145 (Ind. 2009), the Indiana Supreme Court held that residency provisions violated the state Ex Post Facto Clause. The statute imposed a restraint that, unlike in *Smith*, was "neither minor nor indirect," but rather created "a substantial housing disadvantage" that limited "one's freedom to live on one's own property." *Id.* at 1150. *See also Wallace*, 905 N.E.2d at 380 (registration was a disability because it resulted in lost employment opportunities and housing discrimination); *Juvenile Male*, 590 F.3d at 935 (invalidating registration statute that "seriously jeopardizes the ability of [registrants] to obtain employment, housing, and education"); *Mikaloff*, 2007 WL 2572268, at *8 (unpub.) (residency law "imposes an onerous affirmative disability and restraint") (Exh. 16); *F.R. v. St. Charles County Sheriff's Dept.*, 301 S.W.3d 56 (Missouri 2010) (retroactive application of residency restriction violated state constitution); *R.L. v. Mo. Dep't of Corr.*, 245 S.W.3d 236 (Mo. 2008) (same); *Elwell v. Township of Lower*, 2006 WL 3797974, at 17 (N.J. Super. Ct. 2006) (unpub.) (Exh. 17) (residency and loitering restriction violated Ex Post Facto Clause because it did not consider individual registrants' likelihood to reoffend); *Doe v. Schwarzenegger*, 476 F. Supp.2d 1178, 1181 (E.D. Cal. 2007) (applying residency law "retroactively would raise serious ex post facto concerns").

Third, the *Smith* Court found that the consequences suffered by registrants flowed not from the Act, "but from the fact of conviction, already a matter of public record." *Smith*, 538 U.S. at 101. That is not true here. Plaintiffs' harms result not from their convictions, but from SORA 2011. But for SORA 2011, plaintiffs would not be banned from living, working or

"loitering" in much of the state; be prohibited from watching their children's sports events or graduations; be subjected to continuous reporting; be restricted in their ability to travel or ability to communicate on the Internet; and be identified publicly and falsely as among the most dangerous of offenders. While a conviction for a sex offense will surely have *some* impact on a person's employment, housing, and social opportunities, SORA 2011 does not simply inform potential employers, landlords, and the public of convictions. Rather, it imposes extensive, legally-mandated limitations on employment, housing, and other ordinary activity. Moreover, *all* of the consequences suffered by John Doe #1 (who was convicted of a non-sex offense) and John Doe #2 (whose record is sealed and would not otherwise be known to employers, landlords or the public), are directly attributable to SORA 2011. Compl. ¶¶ 15-45.

    In sum, the pervasive burdens imposed by SORA 2011 bear no resemblance to the "minor and indirect" consequences upheld in *Smith*. The cumulative effect of SORA 2011's obligations and restraints is to convert the Michigan law from a regulatory statute to a punitive one, the same as the Ohio Supreme Court held with respect to that state's latest registry scheme. *Williams*, 952 N.E.2d 1103. The Ohio court, which had upheld an earlier version of the law, concluded:

> No one change compels our conclusion that [the statute] is punitive. It is a matter of degree whether a statute is so punitive that its retroactive application is unconstitutional. When we consider all the changes enacted by [the new statute] in the aggregate, we conclude that imposing the current registration requirements on a sex offender whose crime was committed prior to the enactment of [the law] is punitive.

*Id.* at 1113.

## 2.   *Kennedy* Factor #2: SORA 2011 Imposes Sanctions that Historically Have Been Considered Punishment.

    SORA 2011 imposes sanctions that closely resemble several different historical forms of punishment: probation and parole, banishment, occupational disbarment, and shaming.

    First, the continual in-person reporting requirements are similar to probation or parole,

which are prototypical forms of punishment. *See Morrissey v. Brewer*, 408 U.S. 471, 477

(1972). Residency, occupational, and travel restrictions are also typical of parole/probation

supervision. Courts striking down SORA schemes as ex post facto violations have frequently

compared the supervision of registrants to the supervision of parole/probationers. *See, e.g., Doe*

*v. State*, 189 P.3d 999, 1012 (Alaska 2008); *Pollard*, 908 N.E.2d at 1151; *Wallace*, 905 N.E.2d

at 380; *Mikaloff*, 2007 WL 2572268, at *10 (Exh. 16).

While the *Smith* majority rejected an analogy between Alaska's statute and probation or

parole, it did so because that statute did not require in-person reporting and registrants were

"free to move where they wish and to live and work as other citizens, with no supervision." *Id.*

at 101. By contrast, SORA 2011 requires in-person reporting and limits where registrants can

live and work. Plaintiffs must report significantly more information than while they were on

probation or parole. Moreover, plaintiffs must report in person to law enforcement more

frequently and for far longer than they reported to their probation/parole agents. Compl. ¶¶ 118-

126. Andrea Yang, *Historical Criminal Punishments, Punitive Aims and Un-"Civil" Post-*

*Custody Sanctions on Sex Offenders*, 75 U. Cinn. L. Rev. 1299, 1328 n.199 (2007) (supervision

requirements for registrants may "exceed those of probationers and parolees").

Second, the residency, occupational, and loitering restrictions are akin to banishment.

Although extensively used in the ancient world, "today banishment is considered an archaic and

even primitive form of punishment." Beckett & Herbert, *Banished: The New Social Control in*

*Urban America* (2010), at 10. *See Smith*, 538 U.S. at 98 (banishment is a traditional form of

punishment). While neither the Supreme Court nor the Sixth Circuit has ever considered

whether geographic exclusion zones are comparable to banishment, other federal and state

courts have held they are. *See e.g., Baker*, 295 S.W.3d at 444 (geographic restrictions barring

14

registrants "from residing in large areas of the community" akin to banishment); *Whitaker v. Perdue*, 4:06-cv-0140, at *19 (N.D. Georgia, 3/30/07) (unpub.) (Exh. 18). Here plaintiffs are not just barred from living and working in large portions of the state, but, as a result of the "loitering" restriction, are also at risk of prosecution for engaging in other normal activities – such as taking their children to a playground – within the exclusion zones. Compl. ¶¶ 275-77.

Finally, SORA 2011 resembles traditional shaming punishments. "What distinguishes a criminal from a civil sanction …, it is ventured, is the judgment of community condemnation which accompanies and justifies its imposition." Henry Hart, *The Aims of the Criminal Law*, 23 Law & Contemp. Probs. 401, 404 (1958). The public sex offender registry is a wall of shame, made accessible world-wide. *Wallace*, 905 N.E.2d at 380 (Internet registry similar to shaming).

In *Smith*, the majority rejected analogies to shaming punishments with respect to the Alaska statute, reasoning that the stigma of registration stemmed from the "dissemination of accurate information about a criminal record, most of which is already public." *Smith*, 538 U.S. at 98. The majority emphasized that the public "must take the initial step" of visiting the website, comparing that to a visit to "an official archive of criminal records." *Id.* at 99. By contrast, Michigan's registry does not simply list official conviction information. It labels individuals by tier, thereby singling out some registrants as especially dangerous. Plaintiffs here are branded as Tier III offenders, a designation that falsely suggests that they are among the worst offenders. The state, by publicly labeling plaintiffs as Tier III registrants, directly contributes to lost employment, evictions, shunning, and other social and economic ostracism. *See* Compl. ¶¶ 208-213; Levenson Report, at 6-7 (Exh. 9) (registrants subjected to widespread ostracism).

In addition, registry information is often inaccurate. The registry purports to provide

information on "convicted sex offenders." Public Sex Offender Registry Home Page.[3] But some registrants were convicted of crimes that are not sex offenses; others had their cases dismissed before a final judgment was entered, and were never convicted. *See* Compl. ¶¶ 15-45 (Doe #1 and Doe #2); M.C.L. § 28.722(b). As to them – as the Ninth Circuit said of juveniles – public registration "cannot be compared to a visit to a criminal archive, as such a visit would yield no information about [the individual's record]." *Juvenile Male*, 590 F.3d at 935. Michigan posts inaccurate, non-public criminal history, as well as extensive personal information that would be unavailable in a criminal archive. Exh. 1, at 5-6. Yet this information is available worldwide.

Unlike in *Smith*, today the public need not even visit the website, but can be contacted automatically by e-mail when a registrant moves into the neighborhood. *See* E-Mail Alert Subscription.[4] Numerous web and phone applications provide instant access to registry information, even allowing users to be notified by text or e-mail when they come near a registrant. *See, e.g.* Locate-Safe (sends text alert near a registrant); Sex Offender Search (sends monthly reports of local registrants).[5] Because SORA 2011 (1) stigmatizes plaintiffs as the worst category of sex offenders; (2) requires the recording of non-public (and sometimes inaccurate) criminal history data, as well as extensive personal information; and (3) broadcasts that data and information on the Internet, SORA registration today is more comparable to traditional shaming punishments than to a visit to a criminal records archive.

**3.** *Kennedy* **Factor #3: SORA 2011 Typically Requires a Finding of Criminal Scienter.**

Only individuals found guilty of a crime must register. In most cases this requires *mens rea* (though SORA 2011 also requires registration for age-only offenses without knowledge of

---

[3] *See* http://www.mipsor.state.mi.us.
[4] *See* http://www.mipsor.state.mi.us/Subscribe/AlertSubscription.aspx.
[5] *See* Locate-Safe (http://itunes.apple.com/us/app/locatesafe/id421224446?mt=8) and Sex Offender Search (http://itunes.apple.com/us/app/sex-offender-search/id394721194?mt=8).

the partner's age). This weighs in favor of finding that the law imposes punishment.

**4.      *Kennedy* Factor #4: SORA 2011 Serves the Traditional Aims of Punishment.**

Given the restraints on physical liberty and the stigma attached to registration, SORA

2011 clearly has a retributive effect, and thus serves the traditional aims of punishment. As the

Kentucky Supreme Court explained in holding that a residency restriction violated the Ex Post

Facto Clause, where a restriction is "imposed equally upon all offenders, with no consideration

given to how dangerous any particular registrant may be to public safety, that restriction begins

to look far more like retribution for past offenses than regulation intended to prevent future

ones." *Baker*, 295 S.W.3d at 439. SORA 2011 promotes the traditional aims of punishment

because it "furthers retribution against sex offenders for their past crimes." *Id.* at 445.

**5.      *Kennedy* Factor #5: SORA 2011 Applies Only to Behavior Which Is a Crime.**

SORA 2011 is triggered exclusively by findings of criminal guilt. This factor, too, points

towards a punitive intent. *See Smith*, 538 U.S. at 113 (Stevens, J., dissenting) (contrasting

registration to civil commitment in *Hendricks*, which was upheld as non-punitive because it was

"clear that a conviction standing alone did not make anyone eligible for the burden imposed");

*Letalien*, 985 A.2d at 22 (law invalidated because it applied exclusively to crimes, was not based

on risk assessment, and could not be waived based on proof that registrant presented low risk).

**6.      *Kennedy* Factor #6: SORA 2011 Is Not Rationally Related to a Non-Punitive Interest.**

The asserted purpose of Michigan's SORA is to "prevent[] and protect[] against the

commission of future criminal sexual acts by convicted sex offenders." M.C.L. § 28.721a. The

underlying assumption is that registration and the attendant restrictions will reduce recidivism

and thereby reduce the risk to the public. In the complaint, plaintiffs allege that that assumption

is incorrect, and that in fact registration actually undermines public safety. Compl. ¶¶ 235-271.

17

Plaintiffs have offered empirical evidence from the top researchers in the field showing that public registries are likely to *increase rather than decrease recidivism*, and that sex offense rates in Michigan are as much as 10% *higher* than they would be without SORA 2011. Prescott Decl. at 1-4 (Exh. 8); Levenson Decl., at 3-6 (Exh. 9)  While this may seem counter-intuitive, it reflects the fact that sex offender registration and its consequences exacerbate risk factors for recidivism, such as lack of employment and housing, and prevent healthy reintegration into the community. Compl. at ¶¶ 239-43; Prescott Decl. at 3-8 (Exh. 8); Levenson Decl., at 10 (Exh. 9). For purposes of this motion, the Court must accept these allegations as true.

The empirical research overwhelmingly shows that, at best, public registration makes no difference in recidivism rates, and that it is counter-productive to avowed public safety goals. Compl. ¶ 244; Amanda Y. Agan, *Sex Offender Registries: Fear Without Function?* (12/1/08), *at* SSRN: http://ssrn.com/abstract=1437098 (no decline in sex offense rates after introduction of registry nor does recidivism decrease in states with registries); Bob Vasquez, *The Influence of Sex Offender Registration and Notification Laws in the United States*, 54 Crime & Delinquency 175, 179, 188 (2008) (empirical research indicates that sex offender legislation seems to have no uniform/observable influence on the number of rapes reported).

Similarly, geographic exclusion zones are likely to increase rather than decrease sexual offending, and therefore are not rationally related to public safety goals. *See Baker*, 295 S.W.3d at 445 (residency restrictions have no rational connection to a non-punitive purpose since public safety is not enhanced "by a registrant not being allowed to sleep near a school at night, when children are not present, but being allowed to stay there during the day, when children are present"). Where registrants live is not a significant contributing factor to recidivism. Indeed, the contrary is true: offenders with stable housing and employment are *less* likely to commit new sex

offenses than those who lack stability. *See* Compl. ¶¶ 246-48; Levenson Decl., at 3-6 (Exh. 8)

(residency restrictions do not reduce sex crimes; rather housing instability is associated with

increased recidivism); Prescott Decl., at 8 (Exh. 9) (laws that increase unemployment and

housing instability can increase recidivism); Zandbergen, *et al.*, *Residential Proximity to Schools*

*and Daycares: An Empirical Analysis of Sex Offense Recidivism*, 37 Criminal Justice and

Behavior 482 (2010) (finding no link between where a registrant lives and recidivism against

minors); Blood, Watson*, &* Stageberg, Iowa Department of Criminal and Juvenile Justice

Planning, *State Legislation Monitoring Report* (2008), at 3 (Exh. 19) (residency restriction did

"not appear to have an effect on reducing the number of sex offenses with child victims");

Minnesota Department of Corrections, *Residential Proximity and Sex Offense Recidivism in*

*Minnesota* (2007), at 4 ("Rather than lowering sexual recidivism, housing restrictions may work

against this goal" by fostering conditions that hinder reintegration into society) (Exh. 20); *Minn.*

*Dep't of Corr., Level Three Sex Offender Residential Placement Issues: 2003 Report to the*

*Legislature* 9 (2003) ("Enhanced safety due to proximity restrictions may be a comfort factor for

the general public, but it does not have any basis in fact").

Registration and residency schemes have become so counter-productive that victims'

organizations are questioning their use. As the National Alliance to End Sexual Violence

explains, some measures intended to protect victims:

> put communities at higher risk, while others create a false sense of security....
> [O]ver-inclusive public notification can actually be harmful to public safety by
> diluting the ability to identify the most dangerous offenders and by disrupting the
> stability of low-risk offenders in ways that may increase their risk of re-offense....
> A number of states and locales are considering residency restrictions in which sex
> offenders may not reside within a certain radius of schools, parks, skating rinks,
> certain neighborhoods, *etc.*, and may not utilize resources such as group homes,
> homeless shelters and hurricane shelters. However, there is no evidence that these

laws protect children…. Moreover, residency restrictions are having unintended consequences that decrease public safety.[6]

Law enforcement officials are also denouncing excessive restrictions as undermining public safety. *See, e.g.,* Iowa County Attorneys Association, *Statement on Sex Offender Residency Restrictions in Iowa* (12/11/06) ("There is no demonstrated protective effect of the residency requirement that justifies the huge draining of scarce law enforcement resources in the effort to enforce the restriction.") (Exh. 21); *Misguided Measures*, ABC News (3/7/07) (discussing opposition to residency restrictions by victims groups and law enforcement) (Exh. 22).

Not only are SORA 2011's registration requirements and geographic exclusion zones irrational because they undermine public safety, but the statute's tier classifications, which determine the length of registration, are irrational because they do not correlate to recidivism risk. Compl. ¶¶ 252-71. Tier classifications that are offense-based (determined by the conviction alone) rather than risk-based (determined by risk assessments) inflate risk in many cases, while underestimating risk in others. Levenson Decl., at 2 (Exh. 9). Because SORA 2011 is an offense-based system, it "fail[s] to distinguish between registered offenders who present significant threats to public safety and those who present lower risk." *Id.* Indeed, in many cases "lower-tiered individuals had higher recidivism rates than those who were assigned into ostensibly higher-risk tiers." *Id.*  As a result, "the public's and law enforcement's ability to identify sexually dangerous persons is significantly diluted." *Id.* (Michigan's registry may be the second largest per capita in the country. *See* http://www.missingkids.com/en_US/ documents/sex-offender-map.pdf.) Moreover, lifetime registration is almost never warranted, because recidivism risk falls off sharply over time, both as registrants age and as more time passes since the offense. *Id.* at 10. Therefore, "[r]equiring registration for 25 years to life is…both inefficient and unnecessary." *Id.*

---

[6] National Alliance to End Sexual Violence, *Community Management of Sex Offenders*, available at http://naesv.org/?page_id=87.

Finally, the rationality of SORA 2011 depends on the assumption that anyone convicted of a sex offense is and will remain dangerous. In fact, risk drops off significantly over time, and many registrants are at very low risk to reoffend from the outset. Compl. ¶¶ 254-56, 263-271. Imposing SORA 2011's requirements on individuals who are unlikely to re-offend does not further the state's avowed goals. Indeed, the Michigan Court of Appeals, in holding that registration was cruel or unusual punishment when imposed for teen sex, said that public safety goals are frustrated when the registry "'needlessly captur[es] individuals who do not pose a danger to the public, and who do not pose a danger of reoffending.'" *People v. Dipiazza*, 778 N.W.2d 264, 270 (Mich. App. 2009) (*citing* House Leg. Analysis, HB 4920, 5195, 5240).

In sum, SORA 2011 is not rationally related to the asserted goal of public safety.

### 7.   *Kennedy* Factor #7: SORA 2011 Is Excessive in Relation to Non-Punitive Interests.

Even assuming for the sake of argument that SORA 2011 is rationally related to public safety, the statute is unconstitutionally excessive in relation to those goals. The statute requires extensive in-person reporting; banishes registrants from large portions of the state; requires advance notice for travel; and mandates lifetime monitoring – all without any opportunity for removal from the registry, even in the face of years of model citizenship and clinical assessments that all but rule out any risk of re-offending. Despite the complete lack of evidence that these restrictions reduce recidivism, they are applied to anyone convicted of a listed offense, including those who pose no threat to public safety. *See* Compl. ¶¶ 249-50; Levenson Decl, at 10-12 (Exh. 9) (frequent check-ins or expansive reporting requirements do not reduce recidivism; failure to comply with registration requirements does not predict sexual recidivism).

The excessiveness of laws similar to SORA 2011 has increasingly led courts to conclude that such laws are unconstitutional. For example, the Indiana Supreme Court held that the

registry statute violated the state Ex Post Facto Clause because the avowed public safety goals did not "render as non-punitive a statute that is so broad and sweeping," especially given that the statute applied "without regard to whether the individual poses any particular future risk," and given that there was no mechanism for a registrant to seek relief "even on the clearest showing of rehabilitation." *Wallace*, 905 N.E.2d at 384. Similarly, the Kentucky Supreme Court held: "[g]iven the drastic consequences of Kentucky's residency restrictions, and the fact that there is no individual determination of the threat a particular registrant poses to public safety, we can only conclude that [the law] is excessive with respect to the non-punitive purpose of public safety." *Baker*, 295 S.W.3d at 446. *See Pollard*, 908 N.E.2d at 1153 (by "[r]estricting the residence of offenders based on conduct that may have nothing to do with their crimes against children, and without considering whether a particular offender is a danger to the general public, the statute exceeds its non-punitive purpose"); *Whitaker*, 4:06-cv-0140, at *21 (Exh. 18) ("Act's failure to distinguish among sex offenders and failure to identify those … who are most likely to re-offend, when coupled with the fact that the [housing] instability created by the Act may be harmful to the public, could support a finding that the Act is excessive").

In sum, plaintiffs have alleged facts that show that SORA 2011 is punitive. Indeed, while *Kennedy* only requires a balancing of the factors, all seven of the *Kennedy* factors point towards punitiveness. Plaintiffs should therefore be allowed to proceed with their ex post facto claim.

## II.    SORA 2011 RESTRICTS FUNDAMENTAL RIGHTS AND IS THEREFORE SUBJECT TO STRICT SCRUTINY.

SORA 2011 both compels and restricts conduct across a broad spectrum of activity. While some of these obligations and restrictions do not implicate fundamental rights, others curtail rights that are "deeply rooted in this Nation's history and tradition," *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997), including the rights to travel, to engage in the common

occupations of life, to direct the education and upbringing of children, and to freedom of speech. To the extent that a law affects registrants' fundamental rights, it is invalid unless "narrowly tailored to serve a compelling state interest." *Id.*

**A.** **SORA 2011 Unconstitutionally Interferes with Plaintiffs' Right to Travel.**

"[F]reedom to travel throughout the United States has long been recognized as a basic right under the Constitution." *U.S. v. Guest*, 383 U.S. 745, 747 (1966). Citizens "possess[] the fundamental right, inherent in citizens of all free governments, to peacefully dwell within the limits of their respective states, to move at will from place to place therein, and to have free ingress thereto and egress therefrom." *U.S. v. Wheeler*, 254 U.S. 281, 293 (1920). "[T]he right to remove from one place to another according to inclination, is an attribute of…liberty…secured by the Fourteenth Amendment and by other provisions of the Constitution." *Williams v. Fears*, 179 U.S. 270, 274 (1900). *See Johnson v. Cincinnati*, 310 F.3d 484 (6th Cir. 2003) (local travel).

Restrictions on travel are subject to strict scrutiny. In *Johnson*, 310 F.3d 484, the Sixth Circuit held that an ordinance barring people convicted of drug crimes from "drug exclusion zones" could not survive that test. While the city had a compelling interest in combating drug crime, the ordinance was not narrowly tailored. *Id.* at 503. Instead of providing for:

> neutral, individualized adjudication, the Ordinance relies on only general evidence that individuals arrested and/or convicted for drug activity…typically return to the neighborhood and repeat their offenses. While we credit this general evidence, it is insufficient to override an individual's interest in localized travel…. [W]e find that due process [] demands some individualized consideration before an individual's right to localized travel can be restricted.

*Id.* at 503-504. Here, as in *Johnson*, plaintiffs' travel has been sharply restricted "without any particularized finding that a person is likely to engage in recidivist [] activity." *Id.* at 503.

Plaintiffs have alleged that SORA 2011 unconstitutionally interferes with their right to travel in multiple ways. Compl. ¶¶ 186-201. A person who "intends to temporarily reside at any

place other than his or her residence for more than 7 days" must report in person within three days (21 days for foreign travel), and must state where he or she will stay, and for how long. M.C.L. §§ 28.725(1)(e), (7); 28.728(1)(e). A person may not change travel plans once those plans are reported. M.C.L. § 28.728(1)(e).

In addition, plaintiffs can never take a trip during the first 15 days of January, April, July, and October (their required reporting periods), even if it were to obtain medical treatment or attend to a dying relative in another city. M.C.L. § 28.725a(3). A registrant who plans a trip to return within the specified period, but who faces weather delays or a car accident, has committed a crime. The obligation to report all manner of changes in person within three days poses a further impediment, since if any such change occurs while traveling, the individual needs to return immediately to the registration jurisdiction to report. M.C.L. § 28.725(1). The extreme complexity of registration laws makes lawful out-of-state travel nearly impossible. Registrants must determine what length of stay triggers registration and what obligations are imposed in the other state, a task that is complicated given both the lack of centralized information and the fact that sex offender laws often prohibit ordinary behavior (like visiting a library or park).

Finally, the prohibition on "loitering" within 1000 feet of a school affects freedom of movement. M.C.L. § 28.734(1)(b). Registrants must be continually aware of whether they are within 1000 feet of school property lines, lest they be accused of engaging in any activity that might constitute "loitering" under the statute.

**B.      SORA 2011 Unconstitutionally Interferes with Plaintiffs' Right to Engage in the Common Occupations of Life.**

"Without doubt," the Constitution protects the "right of the individual…to engage in any of the common occupations of life." *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923). Whether one can practice one's profession is "not a matter of grace and favor," *Willner v. Comm. on*

*Character and Fitness*, 373 U.S. 96, 102 (1963), since "the right to work for a living in the common occupations of the community is of the very essence of the personal freedom and opportunity" secured by the Fourteenth Amendment. *Truax v. Raich*, 239 U.S. 33, 42-43 (1915). A person's liberty is implicated by the denial of the right "to follow any lawful calling, business, or profession he may choose;" that right "cannot be arbitrarily taken…, any more than [] real or personal property can be thus taken." *Dent v. West Virginia*, 129 U.S. 114, 121-22 (1889).

To be constitutional, regulations on employment must be related to "the applicant's fitness or capacity to practice" the profession. *Schware v. Board of Bar Examiners*, 353 U.S. 232, 239 (1957). Restrictions based on criminal history should take into account the nature and age of the offense. *Id.* at 241-43. While setting standards for entry into particular occupations is permissible, "broadly denying … substantial opportunities for employment" is not. *Hampton v. Mow Sun Wong*, 426 U.S. 88, 116 (1976). Thus in *Hampton*, the Court invalidated regulations that barred non-citizens from most federal jobs, finding that such "ineligibility for employment in a major sector of the economy … deprives a discrete class of persons of an interest in liberty on a wholesale basis." *Id.* at 102.

Plaintiffs have alleged that SORA 2011 imposes just such a wholesale barrier to employment. First, the law makes it a crime for registrants to work within 1000 feet of a school. M.C.L. § 28.734(1)(a). Plaintiffs have alleged that the exclusion zones severely restrict access to employment. Compl. at ¶¶ 164, 176; Wagner Decl., at 10, 13 (Exh. 11). Second, because SORA 2011 stigmatizes all registrants as dangerous, few employers are willing to hire them, and the plaintiffs have repeatedly lost jobs after employers learned they were on the registry. *See* Compl. at ¶¶ 163, 169-75; Levenson Decl., at 6-7 (Exh. 9). Finally, SORA 2011 penalizes *employers* who hire registrants, by requiring public posting of employer addresses. M.C.L. § 28.728(2)(d).

25

The scope of SORA 2011's wholesale infringement on the right to seek employment comes into sharp relief when contrasted with permissible occupational restrictions on parolees or probationers, who are still serving sentences. In the federal system, for example, courts may impose occupational restrictions, but such restrictions must "bear[] a reasonably direct relationship to the conduct constituting the offense." 18 U.S.C. § 3563(b)(5)(2).

By contrast, plaintiffs here are barred for life from most employment in large geographic areas, regardless of whether their convictions are relevant to the job (or to any risk they might pose to co-workers or the public). Through a combination of geographic exclusion, public stigmatization, and employer disincentives, SORA 2011 severely affects plaintiffs' fundamental right to engage in the common occupations of life. Such sweeping occupational exclusions are not tailored to the state's asserted public safety interests. There is no evidence that geographic restrictions or publication of employer information protects the public. Levenson Decl., at 4 (Exh. 9). Rather, the evidence shows that unemployment increases recidivism, thereby undercutting the state's public safety goals. *Id.* at 7 (Exh. 9); Prescott Decl., at 8 (Exh. 8).

## C.      SORA 2011 Unconstitutionally Interferes with Plaintiffs' Right to Direct the Education and Upbringing of their Children.

"[T]he fundamental right of parents to make decisions concerning the care, custody, and control of their children" is "perhaps the oldest of the fundamental liberty interests recognized by this Court." *Troxel v. Granville*, 530 U.S. 57, 65 (2000). The education and upbringing of children are "among the associational rights this Court has ranked as of basic importance in our society, rights sheltered by the Fourteenth Amendment against the State's unwarranted usurpation, disregard, or disrespect." *M.L.B. v. S.L.J.*, 519 U.S. 102, 116 (1996). Parents have a right not just to be involved in their children's lives, but to "to make decisions concerning the care, custody, and control of their children." *Troxel*, 530 U.S. at 66.

SORA 2011 severely curtails plaintiffs' upbringing and education of their children. Compl. at ¶¶ 127-41 (plaintiffs barred from attending graduations, school plays, sports events, parent/teacher conferences, *etc.*). This curtailment of parental rights arises principally from the statute's prohibition on "loitering" within 1000 feet of a school. M.C.L. § 28.734(1)(b). The state has interpreted the law to bar parents from observing their own children in the very activities that are central to their children's lives. Attorney General Letter (7/14/06) (Exh. 14). The statute also appears to make it a crime for parents to take their children to a playground or park that happens to be located within 1000 feet of a school. Compl. at ¶ 133. Because SORA 2011 contains no exemptions for parent/child relationships, it impermissibly burdens core parental activities.

Restrictions on family relationships must be narrowly tailored. The Sixth Circuit has struck down similar restrictions, holding that a drug exclusion zone unconstitutionally prevented a grandmother from caring for her grandchildren. *Johnson,* 310 F.3d at 506. The challenged ordinance "plainly infringed" on the grandmother's rights, even though it did not directly target family relationships, because it did not provide for "individualized consideration." *Id.* at 505-06. As a New Jersey court has said, in holding that that state's "loitering" law violated due process:

> The geographical restrictions on where the plaintiff … [may] "loiter," substantially intrude[s] upon significant family matters involving private and personal choices about how to raise and care for children, and decision-making about where to reside [by restricting] … a low risk offender, from accompanying his children to the school bus stop, going into a school or to a public park with his children, for fear of being charged with "loitering."

*Elwell*, *supra*, 2006 WL 3797974, at 15 (Exh. 17).

**D.     SORA 2011 Unconstitutionally Interferes with Plaintiffs' Right to Free Speech.**

The First Amendment protects both the right to speak freely and the right to receive information. *Stanley v. Georgia*, 394 U.S. 557, 564 (1969). The First Amendment applies fully to the Internet, which provides "low-cost capacity for communication of all kinds" and is a vital

forum for free speech and information-gathering. *Reno v. American Civil Liberties Union*, 521 U.S. 844, 870 (1997). SORA 2011 restricts plaintiffs' ability to use the Internet because it requires them to report *in person* within three days whenever they establish any new Internet identifier. M.C.L. §§ 28.725(1)(f); 28.727(1)(i)). Registrants who post comments on a news site, establish an ECF account, or review products on Amazon, must immediately report in person.

People do not lose their First Amendment rights just because they are listed as sex offenders. Rather the question is whether SORA 2011's restrictions are narrowly tailored. *See Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973) (laws that "restrict or burden the exercise of First Amendment rights must be narrowly drawn"); *Doe v. City of Albuquerque*, 667 F.3d 111 (10th Cir. 2012) (ban on sex offenders using libraries not narrowly tailored); *Doe v. Jindal*, _ F.Supp.2d _, 2012 WL 540100 (M.D. Louis. 2012) (ban on sex offenders using social networking sites was overbroad). While the state has an interest in preventing illegal on-line sexual communication, SORA 2011 is not narrowly tailored to that goal. The law does not focus on Internet communications that pose a potential danger, but encompasses all Internet speech. And the law unnecessarily requires *in person* reporting of changes to electronic information.

## III.    RETROACTIVE APPLICATION OF SORA 2011 VIOLATES DUE PROCESS.

Retroactive sanctions tied to prior convictions are most commonly evaluated under the Ex Post Facto Clause, which applies to penal legislation. The Due Process Clause, which governs civil as well as criminal laws, "also protects the interests in fair notice and repose that may be compromised by retroactive legislation; a justification sufficient to validate a statute's prospective application under the Clause may not suffice to warrant its retroactive application." *Landgraf v. USI Film Products*, 511 U.S. 244, 266 (1994) (citation omitted). Thus, even if this Court were to conclude that SORA 2011 does not violate the Ex Post Facto Clause, it must also

consider whether retroactive application of the law violates due process. Three aspects of SORA 2011 best demonstrate the due process problems presented by the statute: (a) the application of SORA 2011 to Doe #1 whose conviction for a non-sexual offense predated the creation of the registry; (b) the application of SORA 2011 to Doe #2 whose plea agreement included a promise of privacy; and (c) the retroactive extension of all plaintiffs' registration from 25 years to life.

As the Supreme Court explained in *Landgraf*, 511 U.S. at 266:

> [R]etroactive statutes raise particular concerns. The Legislature's unmatched powers allow it to sweep away settled expectations suddenly and without individualized consideration. Its responsivity to political pressures poses a risk that it may be tempted to use retroactive legislation as a means of retribution against unpopular groups or individuals.

While retrospective civil legislation is generally permissible, the Due Process Clause limits retroactive civil legislation if "the consequences are particularly harsh and oppressive." *U.S. Trust Co. of New York v. New Jersey*, 431 U.S. 1, 45 n.13 (1977) (quotation marks omitted). "Courts are concerned about notice, foreseeability, and fair warning because it is expected that … statutes affect the behavior of the public. Thus, the public must be able to adequately inform itself of a law … before acting." *U.S. v. Barton*, 455 F.3d 649, 654-55 (6th Cir. 2006).

*I.N.S. v. St. Cyr*, 533 U.S. 289 (2001), provides a useful framework. There the Court held that changes to an immigration law, which barred discretionary relief for individuals convicted of certain crimes, could not be retroactively applied. "Plea agreements involve a *quid pro quo* between a criminal defendant and the government." *Id.* at 323. Since defendants "rely[] upon settled practice, the advice of counsel, and perhaps even the assurance in open court" regarding the potential immigration consequences of a plea, the "potential for unfairness in the retroactive application of [the statute] … is significant and manifest." *Id.* Once plea agreements are made, "it would surely be contrary to familiar considerations of fair notice, reasonable reliance, and

29

settled expectations" to impose more severe conviction-based immigration consequences than those considered by the defendant at the time of the plea. *Id.* (citation omitted.)

Sex offender registration, like deportation, is a "severe penalty" that is "intimately related to the criminal process." *Padilla v. Kentucky*, 130 S.Ct. 1473, 1481 (2010). "[F]undamental fairness means that the courts will enforce promises made during the plea bargaining process that induce a criminal defendant to waive his constitutional rights and plead guilty." *U.S. v. Barnes*, 278 F.3d 644, 648 (2002). SORA 2011 violates fair notice, reasonable reliance and settled expectations by retroactively altering the basic consequences of plaintiffs' plea agreements.

In *People v. Cole*, __N.W.2d__ (Mich., May 25, 2012), the Michigan Supreme Court just held that it violated due process to impose lifetime electronic monitoring on a sex offender who was not aware of that sanction at the time of the plea. Because monitoring is a mandatory consequence of the plea, due process requires knowledge of that consequence at the time of the plea. Here too, the plaintiffs – who allege that sex offender registration issues are pivotal in plea negotiations – lacked "the critical information necessary to assess the bargain being considered" at the time of their pleas. *Id.* at *12. *See* Compl. ¶¶ 278-81; Yantus Decl., ¶ 7 (Exh. 12).

Doe #1 was convicted of robbing a McDonalds in 1990, long before the registry was established. Because he threatened a 12-year-old boy, he was also convicted of kidnapping. That offense now requires lifetime registration, even though there was no sexual element to the crime. Compl. ¶¶ 15-28. Because the registry did not even exist when Doe #1 pled, he did not have "fair notice" of the lifetime consequences of his plea.

Doe #2 pled guilty in 1997 under the Holmes Youthful Trainee Act (HYTA), a diversionary statute that allows youth who successfully complete probation to have their cases dismissed and sealed without any conviction ever being entered. M.C.L. §762.11, *et. seq.*;

30

Compl. ¶¶ 29-45. HYTA provides that "all proceedings … shall be closed to public inspection" and the individual shall "not suffer a civil disability or loss of right or privilege." M.C.L. §762.14. When Doe #2 pled guilty, he did so based on the promise that his record would be sealed. The state has violated the basis of the plea.

Defendants argue that under *Doe v. Michigan Dept. of State Police*, 490 F.3d 491, 501 (6th Cir. 2007), SORA's publication requirement supersedes HYTA's privacy promise (though the court noted this was "a close question because the sex-offender registry in fact discloses information about the plaintiffs that is not entirely accurate"). But *Doe* did not, as here, consider a situation where a HYTA plea was made at a time when SORA itself was only available to law enforcement. Mich. Pub. Act 295, Sec. 10 (1994). Unlike in *Doe*, this is not a case of reconciling competing statutory imperatives in effect at the time of the plea, but rather a case where the terms of the plea agreement itself (privacy under *both* HYTA and SORA) have been violated.

Finally, SORA 2011 has retroactively extended the registration periods of all plaintiffs from 25 years to life. Even if this Court were to find that generally changes to registration *conditions* do not rise to the level of a Due Process violation, drastically changing the *length* of registration from 25 years to life without any individualized showing of dangerousness is "harsh and oppressive," and violates due process. *U.S. Trust Co.*, 431 U.S. at 45 n.13.

## IV.   MANY PROVISIONS OF SORA 2011 ARE VOID FOR VAGUENESS, ARE IMPOSSIBLE TO COMPLY WITH, AND WRONGLY IMPOSE STRICT LIABILITY.

> [A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law.

*Connally v. General Const. Co.*, 269 U.S. 385, 391 (1926). A law is void for vagueness "if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). Thus, a statute must (1) be clear enough to provide a person of ordinary intelligence notice of

31

what conduct is prohibited, and (2) provide standards for those who enforce its prohibitions. *Id.* The level of specificity required also depends on the subject: "if a statute is so nonspecific as to create uncertainty regarding the exercise of a constitutionally protected right…a higher degree of clarity is required." *Planned Parenthood v. Farmer*, 220 F.3d 127, 135 (3rd Cir. 2000). Because SORA 2011 restricts fundamental rights while conditioning liability on "confusing and ambiguous criteria" which present "serious problems of notice, discriminatory application, and [a] chilling effect on the exercise of constitutional rights," it is unconstitutional. *Id.* at 135.

Many provisions of SORA 2011 are unclear. An individual must report within three days whenever he "begins to regularly operate any vehicle," but the statute offers no guidance on how often a person can borrow a car before reporting M.C.L. § 28.725(g). Registrants are prohibited from residing, working, or loitering within a "student safety zone," defined as 1,000 feet or less from school property. M.C.L. § 28.733(e). But plaintiffs allege that "[i]t is extremely difficult if not impossible to identify the areas that are inside and outside the exclusion zones, even with sophisticated mapping technology." Wagner Decl. at 3 (Exh. 11). Since parcel boundary data (which is not available) is required for mapping, registrants "would not be able to determine the boundaries of the prohibited areas even if they had the required time, expertise and tools to map the exclusion zone." *Id.* at 5. Moreover, the statute does not explain from what point to what point the 1,000 feet are measured, thereby placing unfettered discretion in the hands of police to determine whether, for example, a registrant may live in a farmhouse located 5,000 feet from a school, if the farm's fields abut school property. The statute "not only fails to give specific notice…but also fails to provide an objective standard" that authorities can consistently apply. *Cunney v. Bd. of Trs.*, 660 F.3d 612, 621 (2nd Cir. 2011) (zoning law void for vagueness as it specified height measurement but did not describe elevation from which height was measured).

Some of the most basic terms in the statute, such as the undefined term "reside", are hopelessly unclear. *See Poe v. Snyder*, _ F. Supp. 2d __, 2011 WL 6781361 (W.D. Mich. 2011) (homeless registrants sought clarification of the meaning of the word "reside" after registrant froze to death for lack of access to shelter located within 1,000 feet of school). The prohibition on "loitering" within a student safety zone is also problematic, despite a statutory definition: "'Loiter' means to remain for a period of time and under circumstances that a reasonable person would determine is for the primary purpose of observing or contacting minors." M.C.L. § 28.733(b). But does that definition encompass the uncle playing catch with a nephew who lives within 1,000 feet of a school, or the grandparent who attends Thanksgiving dinner at that same home? Moreover, since the term "minor" has been interpreted to include a person's own children, must parents – who are necessarily observing their children – determine at all times if they are within 1,000 feet of a school? This is impossible as a practical matter.

This vagueness is exacerbated by the fact that strict liability applies to many violations. M.C.L. §§ 28.729(2); 28.734(2); 28.735(2). (Defendants incorrectly claim SORA 2011 punishes only willful infractions. Motion to Dismiss, at 21 (Dkt. 14).) The law imposes complex requirements, yet punishes even inadvertent noncompliance. Such strict liability is disfavored where there is no criminal intent. *Morissette v. U.S.*, 342 U.S. 246, 255 (1952). In *Lambert v. California*, 355 U.S. 225 (1957), the Court decided this precise issue, finding that a law requiring felons to register violated due process. The law "'punished conduct which would not be blameworthy in the average member of the community,'" and therefore the defendant could not be held strictly liable. *Id.* at 229 (*quoting* Holmes, *The Common Law*, at 50). Strict liability is "constitutionally suspect" when conduct that is "commonly and ordinarily not criminal" results in a criminal violation. *U.S. v. Apollo Energies, Inc.,* 611 F.3d 679, 687 (10th Cir. 2010). While

strict liability is allowable in regulating activities that people would ordinarily expect to be regulated (such as handling explosives), it is not constitutionally permissible for regulating activities that are not commonly criminalized (such as taking one's children to school or failing to report one's new email address). Yet those are strict liability crimes. Thus, even if violations of SORA 2011 are not vague, the imposition of strict liability still renders them unconstitutional.

Most troubling of all is that SORA 2011 combines strict liability with impossibility. For example, failure to maintain a driver's license with a current address is a strict liability offense. M.C.L. §§ 28.725a(7); 28.729(2). Yet Mr. Doe #4 has been unable to comply with the driver's license provisions because SORA 2011 rendered him homeless, and he is unable to update his license without an address. Compl. ¶ 227. Similarly, SORA 2011 imposes strict liability for non-reporting. M.C.L. §§ 28.725a(3); 28.729(2). If an illness, injury, or emergency makes compliance impossible, plaintiffs are still strictly liable for failing to report. Compl. ¶ 226.

## V. THE COURT CAN AND SHOULD ASSERT SUPPLEMENTAL JURISDICTION OVER PLAINTIFFS' HEADLEE CLAIM.

A federal court "*shall* have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." 28 U.S.C. § 1367(a) (emphasis added). In light of the mandatory term "shall," the Sixth Circuit has stated "if there is some basis for original jurisdiction, the default assumption is that the court will exercise supplemental jurisdiction over all related claims." *Campanella v. Commerce Exch. Bank*, 137 F.3d 885, 892 (6th Cir. 1998). A court may decline to exercise supplemental jurisdiction only if one of the four exceptions in 28 U.S.C. § 1367(c) applies. *Veneklase v. Bridgewater Condos, L.C.*, 670 F.3d 705, 716 (6th Cir. 2012).

Defendants argue that the Headlee claims do not arise from a "common nucleus of operative fact." *Gibbs v. United Mine Workers*, 383 U.S. 715, 725 (1966). If that were true, then

34

the Court would not have jurisdiction at all. The *Gibbs* test does not require identical facts between the federal and state claims. Rather, the question is whether "if, considered without regard to their federal or state character, a plaintiff's claims are such that he would ordinarily be expected to try them all in one judicial proceeding." *Id.* In other words, since this litigation, if brought in state court, would be one case, the federal court has supplemental jurisdiction.

Defendants argue for application of the exceptions under § 1367(c)(1) and (c)(4). Contrary to defendants' claims, plaintiffs do not seek an appropriation of state funds. Compl. ¶334(f). The remedy for a Headlee violation is declaratory or injunctive relief, not an order for appropriations. *Wayne County Chief Exec. v. Governor*, 583 N.W.2d 512, 517 (Mich. App. 1998). In exercising its discretion, the Court must look to "considerations of judicial economy, convenience and fairness to the litigants." *Gibbs*, 383 U.S. at 726. Even assuming one of the exceptions applies, the Court should exercise jurisdiction because parallel litigation is wasteful.

Plaintiffs specifically allege that SORA 2011 imposes extensive new obligations on local law enforcement, and that any minimal additional revenue obtained through fees is far below the actual costs. Compl. ¶¶ 286-93. It is absolutely clear that "[c]ollecting 'a large amount of data' or 'much more detailed information' than was previously required constitutes an increase in the level of an activity" under Headlee. *Adair v. State*, 785 N.W.2d 119, 127 (Mich. App. 2010). *Owczarek v. Michigan*, 742 N.W.2d 380 (Mich. App. 2007), is inapposite, because the statute did not impose new obligations on local government, but rather on local employees.

## CONCLUSION

Accepting the plaintiffs' allegations as true, as the Court must at this stage of the litigation, SORA 2011 is so punitive, irrational, and overbroad, that it is unconstitutional. Defendants' Motion to Dismiss should be denied.

35

Respectfully submitted,


Miriam J. Aukerman
American Civil Liberties Union
      Fund of Michigan
Attorneys for Plaintiffs
89 Ionia Avenue NW
Grand Rapids, MI 49503
(616) 301-0930

 **s/ Miriam J. Aukerman**
**maukerman@aclu.org (P63165)**

Michael J. Steinberg
Kary L. Moss
American Civil Liberties Union
      Fund of Michigan
Attorneys for Plaintiffs
60 West Hancock St.
Detroit, MI 48201
(313) 578-6800 ext. 814

**s/ Michael J. Steinberg**
**msteinberg@aclumich.org (P43085)**


**s/ Kary L. Moss**
**kmoss@aclumich.org (P49759)**

William W. Swor
Attorney for Plaintiffs
645 Griswold Street, Ste. 3060
Detroit, MI 48226
(313) 967-0200

**s/ William W. Swor**
**wwswor@wwnet.net (P21215)**


Paul D. Reingold
Michigan Clinical Law Program
Attorneys for Plaintiffs
363 Legal Research Building
801 Monroe Street
Ann Arbor, MI 48109
(734) 763-4319

**s/ Paul D. Reingold**
**pdr@umich.edu (P27594)**


Dated: May 25, 2012

# INDEX OF EXHIBITS[7]

1. Obligations, Disabilities, and Restraints Imposed by SORA 2011

2. Declaration of John Doe #1

3. Declaration of John Doe #2

4. Declaration of John Doe #3

5. Declaration of John Doe #4

6. Declaration of Mary Doe

7. Declaration of I.G.

8. Declaration of Dr. James J. Prescott, J.D., Ph.D., on SORA Effects

9. Declaration of Dr. Jill Levenson, Ph.D., on SORA Studies and Effects

10. Declaration of Dr. Janet Fay-Dumaine, Psy. D., on the Plaintiffs' Risk Level

11. Declaration of Peter Wagner, J.D., on the Impact of Exclusion Zones

12. Declaration of Anne Yantus, J.D., on the Impact of Registration on Plea Bargaining

13. Texas Association of Counties Report on Costs to Local Governments of Implementing the Adam Walsh Act

14. Attorney General Letter (July 14, 2006)

15. MIRS Reports

16. *Mikaloff v. Walsh*, 2007 WL 2572268 (N.D. Ohio 2007)

17. *Elwell v. Township of Lower*, 2006 WL 3797974 (N.J. Super. Ct. 2006)

18. *Whitaker v. Perdue*, 4:06-cv-0140, Order (N.D. Georgia, March 30, 2007)

19. Blood, Watson, & Stageberg, Iowa Department of Criminal and Juvenile Justice Planning, *State Legislation Monitoring Report* (2008)

20. Minnesota Department of Corrections, *Residential Proximity and Sex Offense Recidivism in Minnesota* (2007)

21. Iowa County Attorneys Association, *Statement on Sex Offender Residency Restrictions in Iowa* (Dec. 11, 2006)

22. *Misguided Measures*, ABC News (March 7, 2007)

---

[7] Exhibits 1-13 were attached to the Complaint, and are not resubmitted here.

**Certificate of Service**

This document was filed using the Court's ECF system, which provides same-day e-mail service to all counsel of record.

/s/ Miriam Aukerman
maukerman@aclumich.org – P63165

38