**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

_____

JOHN DOES 1-4 and MARY DOE,

      Plaintiffs,

v.                                   Case No. 12-11194

RICHARD SNYDER and COL. KRISTE ETUE,

      Defendants.

_____/

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' AMENDED MOTION TO DISMISS**

On March 16, 2012, Plaintiffs John Does I-IV and Mary Doe initiated the above-

captioned lawsuit challenging the constitutionality of the Michigan Sex Offender Registry

Act ("SORA" or "Act"), as amended in 2011. Governor Richard Snyder and Colonel

Kriste Etue of the Michigan Department of State Police are named in their official

capacity as Defendants. Plaintiffs seek a declaratory judgment and permanent

injunction. On April 24, 2012, Defendants moved to dismiss the complaint under

Federal Rule of Civil Procedure 12. Plaintiffs responded on May 25, 2012, and

Defendants replied on June 15, 2012. The court heard oral argument on August 8,

2012. For the reasons set forth below, the motion will be granted in part and denied in

part.

## I. BACKGROUND

### A. Statutory History

Michigan first enacted SORA in 1994 in response to Congress's Jacob Wetterling

Act. As initially enacted, the Act established a confidential database available only to

law enforcement containing information about sex offenders.  The statute applied retroactively to individuals who were convicted before October 1, 1995.  Since its adoption SORA has undergone numerous amendments.

In 1997, SORA was amended to require law enforcement agencies to make registry information available to the public during business hours.  A 1999 amendment increased the number of offenses for which registration was required and mandated that a less-detailed version of the registry be made available to the public online.

SORA was again amended in 2002, 2004, and 2006.  These amendments, among other things, increased reporting requirements for registrants; removed the registration requirement for individuals convicted under the HYTA after October 1, 2004; barred registrants from working, residing, or loitering within 1,000 feet of a school; and created a program whereby members of the public could be notified electronically when a sex offender moved into a particular zip code.

The most recent amendment to SORA came in 2011, which significantly altered the statute to comply with the federal Sex Offender Registration and Notification Act ("SORNA"), 42 U.S.C. § 16901 *et seq.*  As amended in 2011, SORA now categorizes registrants into three tiers which determine the length of time individuals must register and the frequency with which they must report.  Tier classifications are based solely on a registrant's offense and do not factor in an individualized determination of risk.  There is no way to reduce one's tier classification or to remove oneself from the list.  SORA 2011 extended the length of registration for most registrants, and individuals who were assigned to Tier III, Plaintiffs included, are now required to register for life.  The 2011 amendment also (1) expanded the in-person reporting requirement to require registrants

2

to report to the police station within three days of establishing any new electronic mail address, instant message address, or other designation used in Internet communications or postings; (2) expanded registrants' reporting obligations before traveling; and (3) increases the number of times registrants must regularly report in-person each year.

### B.  Plaintiffs

All five Plaintiffs are Michigan residents who are required by law to register as sex offenders and comply with the myriad provisions of SORA.  They explain their backgrounds in the complaint.

In 1990, when John Doe I was twenty, he armed himself and attempted to rob his former employer, a fast-food restaurant.  (Compl. ¶ 16.)  In the midst of the robbery, he threatened to kidnap the manager's 12-year-old son, (*Id.* ¶ 17), but the manager and the son escaped.  Later, John Doe I was apprehended and eventually entered a plea of guilty to armed robbery, weapons charges, and kidnapping, and was sentenced to twenty-to-forty years in prison.  (*Id.* ¶¶ 18-20.)  He was released in 2009.  (*Id.* ¶ 22.)  Although John Doe I's criminal offense lacked an overtly sexual component, because he was guilty of kidnapping, he is classified as a Tier III offender under SORA and is required to register as a sex offender for life.  (*Id.* ¶¶ 25-26.)

John Does II-IV all had sexual relationships with young girls.  (*Id.* ¶¶ 30, 47, 57.)  John Doe II was eighteen years old in 1996 and had a sexual relationship with a fourteen year old.  (*Id.* ¶ 30.)  He pled guilty to third degree criminal sexual conduct (which requires sexual penetration) under the Holmes Youthful Trainee Act ("HYTA").  This allowed him to have his case dismissed and his record sealed after completing a

3

two-year trainee period of probation.  (*Id.* ¶¶ 31-32, 35.)  An assignment to trainee

status under HYTA is not a "conviction" of a crime unless the court revokes the status.

(*Id.* ¶ 33.)  Under SORA, John Doe II is classified as a Tier III offender and is required to

register as a sex offender for life.  (*Id.* ¶ 42.)

In 1998, when Doe III was nineteen years old, he had a sexual relationship with a

fourteen-year-old.  (*Id.* ¶ 47.)  He pled guilty to attempted third degree criminal sexual

conduct and was sentenced to four years probation under HYTA.  (*Id.* ¶ 50.)  During his

last year on probation, Doe III failed to register for Michigan's sex offender registry

within the time required and had his status under HYTA revoked.  (*Id.* ¶ 52.)  His

conviction was then entered.  Under SORA, he is classified as a Tier III offender and is

required to register as a sex offender for life.

In 2005, when John Doe IV was twenty-three years old, he had a sexual

relationship with a fifteen-year-old.  (*Id.* ¶ 57.)  He later pled guilty to attempted third

degree criminal sexual conduct and was sentenced to five years probation and

counseling.  (*Id.* ¶¶ 59, 61.)  Under SORA, he is classified as a Tier III offender and

required to register as a sex offender for life.  (*Id.* ¶ 63.)

In 2003, Mary Doe was convicted of having a sexual relationship with a fifteen-

year-old boy and was sentenced to three years in prison  (*Id.* ¶ 65-66.)  She was

released after serving seven months, and her sentence was modified to four years of

probation and 200 hours of community service.  (*Id.* ¶ 73.)  Under the terms of her

judicial release, Mary Doe was required to move from Ohio, where she had been

convicted, to Michigan.  Under SORA, she is classified as a Tier III offender and

required to register as a sex offender for life.  (*Id.* ¶ 76.)

4

### C.  Complaint

Plaintiffs claim that the retroactive nature of SORA and its extensive reporting requirements and prohibitions violate their constitutional rights.  The complaint alleges eight counts: (1) violation of the *Ex Post Facto* Clause; (2) violation of Plaintiffs' fundamental rights to travel; (3) violation of Plaintiffs' fundamental rights to engage in common occupations of life; (4) violation of Plaintiffs rights to direct the education and upbringing of their children; (5) violation of the First Amendment; (6) violation of the Due Process Clause because the Act is retroactive and "harsh and oppressive"; (7) violation of the Due Process Clause because certain provisions are vague and impossible to comply with; and (8) violation of the Headlee Amendment to the Michigan Constitution.

## II.  STANDARD

When ruling on a motion to dismiss pursuant to Rule 12(b)(6), the court must construe the complaint in a light most favorable to the plaintiff and accept all the factual allegations as true.  *Evans-Marshall v. Bd. of Educ.*, 428 F.3d 223, 228 (6th Cir. 2005); *Rossborough Mfg. Co. v. Trimble*, 301 F.3d 482, 489 (6th Cir. 2002).  "[T]he court must draw all reasonable inferences in favor of the plaintiff."  *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007).  However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).

The plaintiff must plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Though decidedly generous, this standard of review does require more than the bare assertion of legal conclusions.

> [A] plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief"
> requires more than labels and conclusions, and a formulaic recitation of a
> cause of action's elements will not do. Factual allegations must be enough
> to raise a right to relief above the speculative level on the assumption that all
> the complaint's allegations are true.

*Id.* at 555 (citing Fed. R. Civ. P. 8(a)). Further, the complaint must "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). In application, a "complaint must contain either direct or inferential allegations respecting all material elements to sustain a recovery under some viable legal theory." *Eidson v. State of Tenn. Dep't of Children's Servs.*, 510 F.3d 631, 634 (6th Cir. 2007) (citation omitted). Therefore, "to survive a motion to dismiss, the plaintiff must allege facts that, if accepted as true, are sufficient to raise a right to relief above the speculative level and to state a claim to relief that is plausible on its face." *Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 609 (6th Cir. 2009) (citations and internal quotation omitted). A court cannot, however, grant a motion to dismiss under Rule 12(b)(6) based upon its disbelief of a complaint's factual allegations. *Twombly*, 550 U.S. at 556.

"In determining whether to grant a Rule 12(b)(6) motion, the court primarily considers the allegations in the complaint, although matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint, also may be taken into account." *Amini v. Oberlin Coll.*, 259 F.3d 493, 502 (6th Cir. 2001) (emphasis omitted) (quoting *Nieman v. NLO, Inc.*, 108 F.3d 1546, 1554 (6th Cir. 1997)).

### III.  DISCUSSION

### A.  *Ex Post Facto* Clause

6

In moving for dismissal of Count I, Defendants argue that Plaintiffs' *ex post facto* claim fails as a matter of law because SORA, as amended in 2011, is not a criminal statute.  The *Ex Post Facto* Clause prohibits retroactive punishment and applies only to criminal statutes and ostensibly civil statutes that are "so punitive in purpose or effect as to negate [the legislature's] intention to deem it civil."  *Kansas v. Hendricks*, 521 U.S. 346, 347 (1997).

The first step in analyzing an *ex post facto* claim is to determine the legislative intent behind the statute; if the purpose is to impose punishment, the *ex post facto* claim is proved.  *Smith v. Doe*, 538 U.S. 84, 92-93 (2003).  If the legislative intent rationally appears to have been other than punitive, the next step is to consider whether the effects of the statute are so punitive as to qualify as *ex post facto* punishment.  *Id.* at 92. In making this determination, courts must consider seven factors outlined by the Supreme Court in *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-69 (1963): (1) whether the sanction involves an affirmative disability or restraint; (2) whether it has historically been regarded as a punishment; (3) whether it comes into play only on a finding of scienter; (4) whether its operation will promote the traditional aims of punishment-retribution and deterrence; (5) whether the behavior to which it applies is already a crime; (6) whether an alternative purpose to which it may rationally be connected is assignable for it; and (7) whether it appears excessive in relation to the alternative purpose assigned.  *Id*.

As to the legislative intent of SORA, Defendants assert that SORA's purpose is to promote public safety and community notification, not to punish offenders, and point to federal precedent recognizing the civil intent of prior versions of SORA.  (Defs.' Br.

7

Supp. Mot. Dismiss 7); *Lanni v. Engler*, 994 F. Supp. 849, 855 (E.D. Mich. 1998) ("[T]he

purpose of the act was to protect the public, and not to punish sex offenders . . . [and]

the historical precedent does not demonstrate an objective punitive purpose.").

Defendants assert that this new amended version is not qualitatively different from the

previous versions, and that the legislative intent is and has always been regulatory, not

punitive.  In their attempt to demonstrate a punitive intent, Plaintiffs point to statements

made by individual legislators and the fact that violation of the statute is punished by

criminal, not civil, sanctions.  (Pls.' Resp. to Defs.' Mot. Dismiss 9.)  Plaintiffs argue also

that the statement of intent attached to the legislation is irrelevant because it was

passed many years ago and not by the legislation that passed the 2011 amendments to

SORA.  (*Id.* at 8.)  The parties differ on whether inclusion in Chapter 28 of the Michigan

Code is evidence of civil or criminal intent.

Legislative intent is determined by considering the statute's text and its structure,

and "considerable deference must be accorded to the intent as the legislature has

stated it."  *Smith*, 538 U.S. at 92-93 (quoting *Flemming v. Nestor*, 363 U.S. 603, 618

(1960)).  The first step in the analysis is to ask "whether the legislature, in establishing

the penalizing mechanism, indicated either expressly or impliedly a preference for one

label or the other."  *Id.* at 93.  The legislature expressly states its intent for SORA

legislation as "to better assist law enforcement officers and the people of this state in

preventing and protecting against the commission of future criminal sexual acts by

convicted sex offenders."  Mich. Comp. Laws § 28.721a.  Plaintiffs ask the court to

consider the individual statements of legislators at the time of enactment, but courts are

wary of considering the "almost always cacophonous" comments of individual legislators

8

in determining legislative intent. *Isle Royale Boaters Ass'n v. Norton*, 330 F.3d 777, 784 (6th Cir. 2003). Instead courts should rely primarily "on the words of the statute itself." *Id.*

The Supreme Court has recognized that the manner of codification and enforcement procedures are also probative of legislative intent. *Smith*, 538 U.S. at 94. SORA 2011 is housed in Chapter 28 of the Michigan Code, which is intended "to provide for the public safety" and to create and maintain the state police. MI ST Ch. 28, Refs & Annos. Plaintiffs assert that the criminal sanctions invoked by violation of the statutory regulations indicate a punitive intent. However, "invoking the aid of the criminal process in aid of a statutory regime does not render the statutory scheme itself punitive." *Smith*, 538 U.S. at 96. The text, structure, and manner of codification all support the interpretation of SORA as a civil statute, and this determination is in accordance with extensive federal precedent considering the intent of previous versions of SORA. *See, e.g.*, *Lanni*, 994 F.Supp 855; *Akella v. Mich. Dep't of State Police*, 67 F. Supp. 2d 716, 734 (E.D. Mich. 1999).

The next step in determining whether SORA can be considered a criminal statute is to analyze whether the effects of the act are so punitive as to constitute punishment, for which the court is guided by the seven factors outlined in *Kennedy*. These factors are "neither exhaustive nor dispositive, but are useful guideposts." *Smith*, 538 U.S. at 97. Only "the clearest proof" will suffice to overcome a stated civil intent. *Id.* at 92.

The court first considers whether the sanction involves an affirmative disability or restraint that is more than minor and indirect. *Smith*, 538 U.S. at 99-100. Plaintiffs argue that the in-person reporting requirement, absent in the statute at issue in *Smith*,

9

qualifies as a non-minor and direct restraint sufficient to differentiate SORA from the Alaska statute in *Smith*.  (Pls.' Resp. to Defs.' Mot. Dismiss 10-13.)  They further submit that SORA does more than notify the public of a conviction; it affirmatively bars registrants from living, working, or loitering in large regions of the state, particularly urban areas, and this significantly restricts access to housing and employment and ability to engage in normal activities.  (*Id.* at 11.)  The implementation of the student safety zone provisions in 2006 prohibited registrants from "loitering" within 1,000 feet of a school, which includes activities such as watching their children's sports matches and graduations.  Mich. Comp. Laws § 28.734(1)(b); (Pls.' Resp. to Defs.' Mot. Dismiss 13.)  Plaintiffs argue that these harms flow not from their statuses as sex offenders but directly from SORA, because the explicit bans on where registrants may live and work and on certain activities are not a natural result of a conviction for a sex offense but an affirmative disability imposed by SORA 2011.  (*Id.*)  Lastly, Plaintiffs assert that John Doe I, who was convicted of a non-sex offense, and John Doe II, whose record is sealed, would not suffer any continuing consequences stemming from their convictions but for SORA.  (*Id.* 13.)

Plaintiffs' arguments are not based on the changes enacted in the 2011 amendment, but instead focus on aspects of the legislation that have been in effect for years and have been altered by the amendment only to the extent that they now apply for life.  The challenged provisions have repeatedly been upheld against *ex post facto* challenges by both state and federal courts.  *See, e.g.*, *Akella*, 67 F. Supp. 2d at 733-34; *People v. Pennington*, 240 Mich. App. 188, 193-94 (Mich. Ct. App. 2000). Significantly, the Act does not impose any physical restraint, the most serious of

disabilities and restraints.  The disabilities and restraints imposed here are less harsh than occupational debarment, which the Supreme Court has held to be non-punitive. *See Hudson v. United States*, 522 U.S. 93, 105 (1997).  Registrants remain free to change employment, move their residence, travel, and move out of the state.

Any disability or restraint imposed by the provisions of the student safety zone are no more than minor and indirect.  The statute exempted those already living or working in such zones and those whose home or place of employment enters the zones due to relocation or establishment of a school there.  These accommodations significantly negate the harshest potential consequences of the Act.  SORA does not restrain the activities of registrants in any way that could be deemed to be more than minor or indirect.  *See Smith*, 538 U.S. at 100.

The next factor in the *Kennedy* analysis is whether the statute imposes sanctions that have historically been considered punishment.  *Id.* at 168-69.  Plaintiffs argue that the conditions imposed by SORA closely resemble probation and parole, banishment and shaming, all of which have traditionally been considered punishment.  Plaintiffs liken the residency, occupational, and loitering restrictions to banishment, citing to lower court and unpublished decisions that have accepted this premise.  (*See* Pls.' Resp. to Defs.' Mot. Dismiss 14-15.)  Plaintiffs' shaming arguments rely on the fact that the registry lists not only official conviction information, but also labels individuals by tier; includes non-public information; and is sometimes sent out automatically when a registrant moves into the area.  Defendants maintain that the requirements are actually significantly less onerous than probation or parole because no questions are asked of registrants, no restrictions on conduct are imposed, and no continuing supervision is

11

involved.  (Defs.' Br. Supp. Mot. Dismiss 9.)  Defendants also argue that SORA is not

akin to traditional shaming punishments because such punishments, including

banishment, involve far more than the dissemination of truthful information, which is not

considered a shaming mechanism.  *See, e.g.*, *Smith*, 538 U.S. at 86; *Cutshall v.*

*Sundquist*, 193 F.3d 466, 475 (6th Cir. 1999).  Shaming punishments either held the

offender up for face-to-face public ridicule from the community, or they banished them.

*Smith*, 538 U.S. at 97.

Here, SORA does not provide any means for the public to humiliate or shame the

offender.  *Id.* at 99.  The Act does go further than merely disseminating truthful

information but it does not go so far as to expel offenders from the community in any

real sense.  Restricting offenders' activities within 1,000 feet of a school zone is not

equivalent to running them out of town.

The third *Kennedy* factor is whether application of the statute requires a finding of

scienter.  In this case, the statute is triggered only upon a finding of criminal guilt for

specified crimes, all of which require a finding of *mens rea* except for the age-only

offenses of which John Doe II and Mary Doe were convicted.  However, the Supreme

Court in *Smith* declined to consider this factor, finding it to be "of little weight" because

the regulation applies only to past conduct which was and is a crime.  *Id.* at 105.

The fourth *Kennedy* factor requires the court to determine whether SORA serves

any traditional aims of punishment.  Significantly, the Supreme Court has stated that a

deterrent effect is insufficient to show a punitive purpose, and "to hold that the mere

presence of a deterrent purpose renders [a statute] 'criminal' . . . would severely

undermine the government's ability to engage in effective regulation."  *Id.* at 102

12

(citation omitted).  Plaintiffs argue that SORA is retributive because it is imposed equally upon all offenders based on their past crime, and no consideration is given to their individual risk.  (Pls.' Resp. to Defs.' Mot. Dismiss 17.)  However, it is permissible for Michigan to rely on broad, offense-based categories in applying SORA, and these categories are not retributive simply because they are not based on individual risk.  *See Conn. Dep't of Public Safety v. Doe,* 538 U.S. 1, 8 (2003); *Smith*, 538 U.S. at 102. SORA may well have a deterrent effect, but Plaintiffs have proffered no facts to show that it is in any way retributive, and without more, a deterrent effect does not lead to a finding of punitive purpose.

The fifth factor is whether the statute applies to behavior that is already a crime. Plaintiffs interpret this factor to relate to the analysis under factor three, pointing to the fact that individuals must be found guilty of a crime to come under the purview of SORA. However, the court interprets this factor to question the behavior prohibited by the statute; for example, living within 1,000 feet of a school zone.  This behavior is not a crime and its proscription in SORA 2011 lends the statute to a regulatory reading. However, the Court in *Smith* instructed that this factor should not be given much weight in a challenge to sex offender registries.  *Smith*, 538 U.S. at 105.

Factor six, whether the statute is rationally connected to a nonpunitive purpose, is a "most significant" factor in the *Kennedy* analysis.  *Id.* at 102.  Defendants insist that the purpose of the act is to protect the public.  (Defs.' Br. Supp. Mot. Dismiss 7.)  There is a clear and obvious connection between the proffered purpose of "public safety and community notification" and the requirements of SORA.  Plaintiffs argue that the connection is irrational because sex offender registry laws do not, in fact, reduce

13

recidivism rates, and as a result actually undermine public safety. (Pls.' Resp. to Defs.' Mot. Dismiss 17.) Whether these assertions are ultimately true goes to the efficacy of the Act, not whether the statute has a connection to a nonpunitive purpose. In our constitutional structure, where both separation of powers and federalism are paramount principles of the structuring of government, it is not for a federal court to tell a state legislature whether a particular law is effective or not. Here, the State has made clear that SORA is intended to assist law enforcement and members of the community in identifying and monitoring a group of offenders who the legislature has found to have extremely high recidivism rates and whose offenses are uniquely harmful to some of the most vulnerable members of our community. In *Smith*, the Supreme Court observed that the risk of recidivism posed by sex offenders is "frightening and high." *Smith*, 538 U.S. at 103. The federal government and the States have decided to address this legitimate public safety concern by creating sex offender registries. This purpose is nonpunitive.

The last consideration in the *Kennedy* analysis is whether the Act is excessive in relation to its non-punitive interests. Plaintiffs' arguments focus on the lifetime reporting requirement for Tier III offenders and the inability to remove oneself from the registry upon a showing of low individual risk. (Pls.' Resp. to Defs.' Mot. Dismiss 22.) In considering this final factor, the inquiry is not "whether the legislature has made the best choice possible to address the problem it seeks to remedy," but "whether the regulatory means chosen are reasonable in light of the nonpunitive objective." *Smith*, 538 U.S. at 105. Plaintiffs argue that the registry includes individuals who neither pose a danger to the public nor are likely to reoffend. This argument does not, however, establish

14

excessiveness, so long as the regulation is reasonable.  Given the high recidivism rates

of sex offenders, and the length of time that often passes between offenses, a lifelong

registration requirement is reasonable and not excessive in relation to its regulatory and

public safety goals.  *See Smith*, 538 U.S. at 104.

The court concludes that SORA, as amended in 2011, is a regulatory, not

criminal statute.  Accordingly, Count I must be dismissed because SORA does not, as a

matter of law, violate the *Ex Post Facto* Clause.

## B.  Due Process Clause

### 1.  Fundamental Rights

Although not entirely clear from the complaint, the court construes Plaintiffs' three

fundamental-rights claims, Counts II, III, and IV, as both procedural and substantive due

process challenges.  In each Count, Plaintiffs allege both that SORA "does not provide

any individualized consideration before restricting" the purported fundamental rights,

(Compl. ¶¶ 297, 302, 306), and that the Act "is not narrowly tailored to serve a

compelling state interest," (*id.* ¶¶ 298, 303, 307).  The court will address both types of

challenges in turn, concluding that Plaintiffs have satisfactorily pled a substantive due

process claim in Count IV of the complaint, but have not stated any other claims in

Counts II-IV upon which relief can be granted.

### a.  Substantive Due Process

"The substantive component of the Due Process Clause protects 'fundamental

rights' that are so 'implicit in the concept of ordered liberty' that 'neither liberty nor

justice would exist if they were sacrificed.'"  *Doe v. Mich. Dep't of State Police*, 490 F.3d

491, 499 (6th Cir. 2007) (quoting *Palko v. Connecticut*, 302 U.S. 319, 325 (1937)).

15

These fundamental rights include "the rights to marry, to have children, to direct the education and upbringing of one's children, to marital privacy, to use contraception, to bodily integrity, and to abortion." *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) (citations omitted). In determining whether a particular right is fundamental, the court must "carefully define the asserted right and then ask whether it is 'deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed.'" *Johnson v. City of Cincinnati*, 310 F.3d 484, 495 (6th Cir. 2002) (quoting *Glucksberg*, 521 U.S. at 721). "Legislation that infringes on a fundamental right is reviewed under the strict-scrutiny test and will be invalidated unless it is 'narrowly tailored to serve a compelling state interest.'" *Id.* (quoting *Reno v. Flores*, 507 U.S. 292, 302 (1993)). Where such a right is not implicated, the statute will withstand scrutiny so long as it is rationally related to a legitimate governmental purpose. *See City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 446 (1985).

The complaint identifies three purported rights infringed on by SORA: (1) the right to travel (Count II); (2) the right to engage in common occupations of life (Count III); and (3) the right to direct the education and upbringing of one's children (Count IV). In determining whether each of these claimed rights is fundamental, the court must not forget the Supreme Court's cautionary statement that it has "always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." *Glucksberg*, 521 U.S. at 720.

*i. Right to Travel*

16

First, Plaintiffs argue that numerous in-person reporting requirements of SORA and the prohibition against loitering in student safety zones infringe on a generalized "right to travel."  Neither the Supreme Court nor the Sixth Circuit has recognized such a generically defined fundamental "right."  Instead the Supreme Court has found a fundamental right to *interstate* travel that is comprised of three distinct components: (1) "the right of a citizen of one State to enter and to leave another state"; (2) "the right to be treated as a welcome visitor rather than an unfriendly alien when temporarily present in the second State"; and (3) "for those travelers who elect to become permanent residents, the right to be treated like other citizens of that State."  *Saenz v. Roe*, 526 U.S. 489, 500 (1999).  And the Sixth Circuit, in the absence of any express statement by the Supreme Court, has also recognized a fundamental right to intrastate travel, which it found to include the "right to travel locally through public spaces and roadways." *Johnson*, 310 F.3d at 498.  Accordingly, whether Count II states a substantive due process claim turns not on the question of whether SORA infringes on a general "right to travel," but instead whether the Act's in-person reporting requirements and loitering prohibition infringe on Plaintiffs' fundamental rights to interstate—and intrastate—travel as these rights have been defined by the Supreme Court and the Sixth Circuit.  As a matter of law, they do not.

As to the in-person reporting provisions, Plaintiffs appear to concede that none of the three components identified as comprising the right to interstate travel are implicated by the provisions.  SORA does not create any actual barriers preventing Plaintiffs from entering or exiting the State, nor does it "directly impair the exercise of the right to free interstate movement."  *Saenz*, 526 U.S. at 501.  Neither does the Act

17

affect Plaintiffs' right to be welcomed as a visitor or become a permanent resident in another state. Plaintiffs instead argue that the inconveniences created by in-person reporting provisions make "lawful out-of-state travel nearly impossible." (Pls.' Resp. to Defs.' Mot. Dismiss 24.)

"Mere burdens on a person's ability to travel from state to state are not necessarily a violation of their right to travel." *Doe v. Moore*, 410 F.3d 1337, 1348 (11th Cir. 2005) (citing *Saenz v. Roe*, 526 U.S. 489, 499 (1999)). In *Shapiro v. Thompson*, the Supreme Court held that "our constitutional concepts of personal liberty unite to require that all citizens be free to travel throughout the length and breadth of our land uninhibited by statutes, rules, or regulations which *unreasonably burden* or restrict this movement." 394 U.S. 618, 629 (1969) (emphasis added). Although the Act imposes some burdens on registrants who wish to travel for extended period of times, the burdens cannot be fairly characterized as substantial or unreasonable.

SORA's requirement that a registrant intending to reside at a temporary residence for more than seven days report the name and address of such residence and the dates the lodging will be used, *see* Mich. Comp. Laws §§ 28.725(1)(e), .728(1)(e), does not, as Plaintiffs contend, make out-of-state travel impossible. It merely requires more advanced planning and less spontaneity on the part of a traveling registrant. In *Moore*, the Eleventh Circuit upheld the constitutionality of a similar temporary residency reporting provision in Florida's sex offender registry statute, finding that any burden imposed on a registrant's right to travel was not unreasonable in view of the state's interest behind the requirement. *See* 410 F.3d at 1348-49; *see also Doe v. Miller*, 405 F.3d 700, 709-14 (8th Cir. 2005) (holding that in-person reporting

18

requirements in Iowa sex offender registry statute did not infringe on right to interstate travel); *Doe v. Nebraska*, 734 F. Supp. 2d 882, 929 (D. Neb. 2010) (holding that in-person reporting requirements in Nebraska sex offender registry statute did not create an actual barrier to travel).  Specifically, the Eleventh Circuit held that "[t]he state has a strong interest in preventing future sexual offenses and alerting local law enforcement and citizens to the whereabouts of those that could reoffend," and without such a reporting requirement "sex offenders could legally subvert the purpose of the statute by temporarily traveling to other jurisdictions for long periods of time and committing sex offenses without having to notify law enforcement."  *Id.  Moore*'s reasoning is persuasive, and the court concludes that the temporary residency reporting provision does not infringe a registrant's right to interstate travel, or intrastate travel for that matter.  Moreover, the temporary residency reporting requirement is reasonably related to the State's legitimate interest in preventing future sexual offenses by maintaining a current and accurate registry.

Plaintiffs also argue that SORA's quarterly reporting requirement, *see* Mich. Comp. Laws § 28.725a(3), is unreasonably burdensome because they "can never take a trip during the first 15 days of January, April, July and October (their required reporting periods), even if it were to obtain medical treatment or attend to a dying relative in another city."  (Pls.' Resp. to Defs.' Mot. Dismiss 24.)  It is unclear how Plaintiffs arrive at this conclusion.  SORA itself certainly does not impose such a bar.  And the plain language of § 28.725a(3) makes clear that a registrant need only report once during the quarterly reporting periods.  *See* Mich. Comp. Laws § 28.725(a)(3) ("A tier III offender shall report not earlier than the first day or later than the fifteenth day of each April, July,

19

October, and January after the initial verification or registration."). Thus, a registrant could, for example, choose to satisfy § 28.725a(3) by reporting on the first day of April and would then have the fourteen days between April 1 and 15 to travel. Plaintiffs' proffered hypothetical that a traveling registrant may face criminal charges if he or she unexpectedly experiences weather delays or a car accident and is thus unable to return to report in time is unpersuasive. Such an unlikely event can be easily avoided with minimal prospective planning on the part of the registrant. No reasonable person can read the quarterly reporting provision of SORA and conclude that it prevents all travel during the enumerated reporting periods. At most, the provision imposes only a *de minimis*, incidental burden on registrants who wish to travel during these periods. It does not infringe upon any right to travel, and it is rationally related to the State's legitimate interest in maintaining an accurate and current registry.

In addition to objecting to the Act's in-person reporting requirements, Plaintiffs argue that SORA's prohibition against "loitering" in student-safety zones substantially burdens their right to travel by restricting their freedom of movement. The loitering prohibition, however, imposes neither a substantial burden on Plaintiffs' right to interstate travel nor to "travel locally through public spaces and roadways," *Johnson*, 310 F.3d at 498. The Act defines "loiter" as "remain[ing] for a period of time and under circumstances that a reasonable person would determine is for the primary purpose of observing or contacting minors," Mich. Comp. Laws § 28.733(b), and "student safety zone" as "the area that lies 1,000 feet or less from school property," *id.* § 28.733(f). With these defined terms in mind, § 28.734(1)(b) does not restrict registrants from

20

entering or traveling through student-safety zones, but instead, it regulates the type of activity registrants may engage in when they are within 1,000 feet of school property.

Plaintiffs' reliance on *Johnson* for the proposition that "due process . . . demands individualized consideration before an individual's right to localized travel can be restricted," 310 F.3d at 504, is misplaced.  In *Johnson*, the City of Cincinnati enacted an ordinance completely excluding individuals "for up to ninety days from the public streets, sidewalks, and other public ways in all drug-exclusion zones if the individual is arrested or taken into custody within any drug-exclusion zone for one of several enumerated drug offenses."  *Id.* at 487 (internal quotation marks omitted).  Finding this absolute bar constitutionally suspect, the Sixth Circuit first observed that "the right to travel locally through public spaces and roadways is essentially a right of access."  *Id.* at 503.  The court went on to conclude that the city ordinance infringed upon the plaintiff's fundamental right to intrastate travel because it denied access to the drug-exclusion zones "without regard to [the plaintiff's] reason for travel in the neighborhood," and meted out absolute exclusion from the zones "without any particularized finding that a person is likely to engage in recidivist drug activity" in the zones.  *Id.*  As the court observed above, the prohibition against loitering in student-safety zones does not deny Plaintiffs' access to the zones, the fundamental concern underlying *Johnson*.  They are free to enter and pass through such zones and must only avoid acting in a lingering manner that would cause a reasonable person to conclude that their primary purpose for being in the zones is to observe or make contact with minors.  The prohibition is qualitatively different than the absolute bar at issue in *Johnson* and is tailored to prohibit only the type of conduct the state has reasonably identified as creating potential harm to

21

children.  The prohibition does not offend due process or substantially burden Plaintiffs'
rights to interstate or intrastate travel.

### ii.  Right to Engage in Common Occupations of Life

In Count III, Plaintiffs claim that SORA infringes on their fundamental right "to
engage in the common occupations of life."  While the "freedom to choose and pursue a
career, 'to engage in any of the common occupations of life,' qualifies as a liberty
interest which may not be arbitrarily denied by the State," *Wilkerson v. Johnson*, 699
F.2d 325, 328 (6th Cir. 1983) (quoting *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923))
(citation omitted), there is no "general right to private employment."  *Cutshall v.
Sundquist*, 193 F.3d 466, 479 (6th Cir. 1999); *c.f. Mederios v. Vincent*, 431 F.3d 25, 32
(1st Cir. 2005) ("The right to 'make a living' is not a 'fundamental right,' for either equal
protection or substantive due process purposes.").  Here, the right to freely *choose* an
occupation cannot serve as a satisfactory constitutional foundation for Plaintiffs to
construct their argument that SORA, by prohibiting them from working within 1,000 feet
of student-safety zones and by stigmatizing them as undesirable and dangerous,
creates "wholesale barrier[s]" to gainful employment.  A barrier to employment in the
economy as a whole is distinct from the freedom to choose a particular career or
profession.  Thus, while one's status as a sex offender no doubt makes employment
more difficult to secure as a practical matter, Plaintiffs have not shown that SORA
implicates the right to "engage in common occupations of life" by barring them from
freely electing a particular career.

This distinction between barriers to employment, on the one hand, and regulation
barring an individual from choosing a particular career or occupation, on the other, is

22

why Plaintiffs' reliance on *Schware v. Bd. of Bar Examiners*, 353 U.S. 232 (1957) and *Hampton v. Mow Sun Wong*, 426 U.S. 88 (1976), is misplaced.  The three purported barriers to employment complained of by Plaintiffs are fundamentally different to the regulation held unconstitutional in *Hampton* and the New Mexico Supreme Court's denial of the plaintiff's application to take the bar examination in *Schware*.  In both instances, the governmental action operated to bar either a discrete class of people or an individual from pursing specific professions or occupations.  *See Hampton*, 426 U.S. at 102; *Schware*, 353 U.S. at 246-47.  For example, in *Hampton*, the Supreme Court held unconstitutional a civil service rule barring all non-citizens from employment in the federal civil service system, concluding that no proffered national interests could justify a rule making ineligible a discrete group of individuals "for employment in a major sector of the economy . . . on a wholesale basis."  426 U.S. at 102.  As the court observes above, SORA neither bars on a wholesale basis, or otherwise, any class of individuals from a particular occupation or sector of the economy, nor does it impose any standards or prerequisites for entering particular occupations.  Instead, SORA contains only one affirmative limitation on registrants seeking employment, that being the prohibition against obtaining work in a student-safety zone.  This geographic restriction has been narrowly tailored to serve the legitimate interest of the State of inhibiting future sexual offenses, particularly against children, while not limiting the ability of Plaintiffs to seek and obtain any type of employment outside the student-safety zones.  *See* Mich. Comp. Laws § 28.734(1)(a).  Although this prohibition imposes restrictions on *where* an individual works, it cannot be said to implicate Plaintiffs' right to choose an occupation or career.

23

Plaintiffs also assert that SORA burdens their ability to secure employment because the Act "stigmatizes all registrants as dangerous" and deters employers from hiring them because the employers' business addresses are posted in the Registry. While individuals identified as sex offenders experience stigmatization, Plaintiffs have not shown that this stigma implicates the fundamental right they claim is violated by SORA, *i.e.*, the right to freely choose and pursue an occupation or career.

Accordingly, the court finds that the complaint has not alleged facts that, when accepted as true, could establish an infringement of the fundamental right to engage in the common occupations of life.

*iii.  Right to Direct Education and Upbringing of Children*

Plaintiffs' final fundamental rights claim is that SORA severely impedes their ability to raise and educate their children because the prohibition against "loitering" in student-safety zones prevents them from "observing their own children in the very activities that are central to their children's lives."  (Pls.' Resp. to Defs.' Mot. Dismiss 27.)  While recognizing the existence of a constitutionally-protected liberty interest in raising and directing the education of one's children, Defendants argue that such a right is not absolute and, in light of the State's compelling interest in protecting children, SORA does not infringe on this fundamental right.

The Supreme Court on numerous occasions has made clear that "the interest of parents in the care, custody, and control of their children . . . is perhaps the oldest of the fundamental liberty interests recognized by [the Supreme Court]."  *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *see also Lassiter v. Dep't Soc. Servs.*, 452 U.S. 18, 27 (1981) ("[A] parent's desire for and right to 'the companionship, care, custody and management

24

of his or her children' is an important interest that 'undeniably warrants deference and, absent a powerful countervailing interest, protection.'" (quoting *Stanley v. Illinois*, 405 U.S. 645, 651 (1972))).  Despite recognizing this abstract liberty interest in familial integrity and association, "the Supreme Court has yet to articulate the parameters of this right." *Kottmyer v. Maas*, 436 F.3d 684, 690 (6th Cir. 2006).  In *Kottmyer*, however, the Sixth Circuit made clear that the right is neither absolute nor unqualified and is limited by a state's "equally compelling governmental interest in the protection of children, particularly where the children need to be protected from their own parents." *Id.* (citing *Myers v. Morris*, 810 F.2d 1437, 1462 (8th Cir. 1987)).

Defendants acknowledge that the prohibition against loitering in student-safety zones bars Plaintiffs from watching, observing, or participating in their children's extracurricular school activities, such as sporting events and plays, because the primary purpose of attending these activities is to observe minors.  They argue, though, that this prohibition is a "minimal and indirect" restriction on Plaintiffs' ability to direct the education and upbringing of their children, and that SORA imposes no other burdens on a registrant's ability to participate and control his or her child's education or upbringing. Accordingly, it is their contention that the loitering prohibition does not infringe upon Plaintiffs' fundamental right to familial association.

Based on the complaint's allegations, the prohibition does, or may do, more than bar Plaintiffs from attending their children's school-related events.  The prohibition appears to prevent Plaintiffs from engaging in a plethora of activities closely related to the upbringing of their children.  For example, registrants who take their children to a park or playground within 1,000 feet of school property or who walk their children to

25

school could, in theory, violate the loitering prohibition, especially in light of the State's

concession that attending a child's play constitutes forbidden loitering, because a

reasonable person could view the primary purpose of these activities to be the

observation of their children interacting with other minors.  And even accepting

Defendants' contention that the prohibition does not infringe on a registrant's ability to

make decisions related to where his or her child attends school or what activities in

which the child will participate, it remains true that the liberty interest recognized by the

Supreme Court comprises more than merely the ability to make some decisions for

one's children.  In *Lassiter*, the Court noted that the right also includes companionship

and care.  452 U.S. at 27.  At least at this stage of the litigation, Plaintiffs have

satisfactorily alleged that the loitering prohibition, which does not contain any exemption

for parental activities, may be proven to infringe upon their fundamental right to direct

and participate in their children's education and upbringing.

Because Defendants have not shown that the provision withstands strict scrutiny,

dismissal of the Count is not appropriate.  To be sure, the State has a compelling

interest in protecting minors from sexual abuse.  But Defendants have not established

that the prohibition is narrowly tailored to this interest.  In their motion, they simply

allege that the provision "passes strict scrutiny because it is narrowly drawn and

rationally related to a compelling government interest."  (Defs.' Br. Supp. of Mot.

Dismiss 17.)  This passing assertion, without more, does not demonstrate that the

loitering prohibition is actually narrowly tailored to the State's interest and fails to explain

why a less restrictive prohibition, one that, for example, includes a limited exemption for

parental activities, would not effectively achieve the State's interest.  Factual

development is warranted.

### b.  Procedural Due Process

To the extent that Counts II, III, and IV challenge SORA as violating procedural

due process because the Act does not provide for any individualized determinations

before restricting liberty or property interests, such a challenge is foreclosed by *Conn.*

*Dep't of Public Safety v. Doe*, in which the Supreme Court held that "[s]tates are not

barred by principles of '*procedural* due process' from deciding to publicly disclose the

registry information of *all* sex offenders—currently dangerous or not."  538 U.S. 1, 7-8

(2003).  The Sixth Circuit confirmed this bar as applied to Michigan's SORA in *Doe v.*

*Mich. Dep't of State Police,* when it held that "[a]ny challenge to the SORA that sounds

in procedural due process is . . . foreclosed."  490 F.3d at 502.

### 2.  Retroactivity

In addition to challenging SORA as violating the *Ex Post Facto* Clause of the

Constitution, Count VI of the complaint alleges that the 2011 amendment to the Act

violates the Due Process Clause because it is "harsh and oppressive" retroactive

legislation.  Plaintiffs identify three particular retroactive aspects of SORA that

purportedly contravene the Due Process Clause: (1) the application of SORA to John

Doe I whose 1990 conviction for a non-sexual offense occurred before the creation of

the Act; (2) the application of SORA to John Doe II whose plea agreement under HYTA

allegedly included a promise of privacy; and (3) the 2011 Amendment's extension of

Plaintiffs' registration periods from twenty-five years to life which applies retroactively to

all registrants.

27

Although the Supreme Court has recognized that "[t]he Due Process Clause . . . protects the interests in fair notice and repose that may be compromised by retroactive legislation . . . [and] a justification sufficient to validate a statute's prospective application under the Clause may not suffice to warrant its retroactive application," *Landgraf v. USI Film Products*, 511 U.S. 244, 266 (1994), "due process is satisfied 'simply by showing that the retroactive application of the legislation is itself justified by a rational legislative purpose.'" *Franklin Cnty. Convention Facilities Auth. v. Am. Premier Underwriters, Inc.*, 240 F.3d 534, 550 (6th Cir. 2001) (quoting *Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 730 (1984)); *c.f. Doe v. Nebraska*, 734 F. Supp. 2d at 932-33 (holding that Nebraska's sex offender registration statute did not violate due process because "[i]t is reasonable to conclude that retroactive application of SORA furthers the public safety purpose of the legislation").

Here, the court finds, as a matter of law, that retroactively applying SORA to John Does I and II is justified by a legitimate legislative purpose.  In view of the Sixth Circuit's holding in *Doe v. Mich. Dep't of State Police*, the State could rationally conclude that to effectuate the stated purpose for creating and maintaining SORA, namely "to better assist law enforcement officers and the people of this state in preventing and protecting against the commission of future criminal sexual acts by convicted sex offenders," Mich. Comp. Laws § 28.721a, the provisions of the Act must apply retroactively to individuals who earlier pled guilty to the offenses enumerated in the Act or who were sentenced under the HYTA.  *See Doe v. Mich. Dep't of State Police*, 490 F.3d at 501 (holding, with some reservations, that (1) although "the

28

interaction of the SORA and the HYTA abrogates [the agreement by the State to seal the records of] youthful trainees charged with sex offenses prior to October 1, 2004[,] . . . [it] does not rise to the level of a substantive due process violation" and (2) that the application of SORA to plaintiffs was constitutional because "the rationale articulated in the statute itself satisfies the rational-basis standard").

However, at this early stage in the litigation, the court is unable to determine whether retroactively extending the registration period of Plaintiffs from twenty-five years to life is justified by a legitimate legislative purpose. Defendants argue that the extension is rationally related to "conforming the State's registry to federal law and that of other State's [sic] creating a more uniform system for law enforcement, and public notification." (Defs.' Br. Supp. Mot. Dismiss 19.) There is no way for the court to know, without venturing far outside the scope of the complaint, whether the extension to the registration period has been done to conform with federal law or to create a more uniform national sex offender registry system. One would assume, for example, that the goal of uniformity would not be a rational legislative purpose if a review of other states' sex offender registry statutes show that registration periods have been shortened or that other states do not require life-time registration. It is premature to make a determination on whether Defendants' justifications for the extensions constitute a rational legislative purpose.

The court will therefore dismiss Count VI as it applies to the retroactive application of the Act to John Does I and II but deny Defendants' motion as it applies to the extension of Plaintiffs' registration periods.

29

### 3. Vagueness, Impossibility, and Strict Liability

In Count VII, Plaintiffs claim that many of SORA's reporting requirements and prohibitions violate due process because they are vague or impossible to comply with, and in many cases, the Act imposes strict liability for any violations.  In seeking dismissal of this Count under Rule 12, Defendants do not specifically address any of the requirements or prohibitions Plaintiffs provide as examples of vagueness, impossibility, or strict liability, and instead summarily reject Plaintiffs' contentions because the reporting provisions have been in effect for several years and Plaintiffs have apparently complied with them.  Defendants also contend that SORA does not impose strict liability for violations of the Act and instead incorporates a willful *mens rea* requirement.  In reviewing the complaint and briefing, the court concludes that Plaintiffs have pled a claim under the Due Process Clause that is plausible on its face.

Courts apply a two-part test to determine whether a law is unconstitutionally vague.  First, the law must give a person "of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).  And second, "[t]he standards of enforcement must be precise enough to avoid 'involving so many factors of varying effect that neither the person to decide in advance nor the jury after the fact can safely and certainly judge the result." *Id.* (citing *Cline v. Frink Dairy Co.*, 274 U.S. 445, 465 (1927)).

Although the complaint proffers approximately a dozen examples of vague reporting requirements and prohibitions, Plaintiffs claim with respect to § 28.725(1)(g), which requires a registrant to "report in person and notify the registering authority . . . immediately after . . . the individual purchases or begins to regularly operate any

30

vehicle," demonstrates why dismissal of Count VII on a Rule 12 motion is not presently warranted. Finding that dismissal is premature, though, in no way suggests that each of the provisions alleged to be vague by Plaintiffs will ultimately prove to be violative of the Due Process Clause. Instead, the court simply concludes that a fuller examination by both the court and the parties is necessary.

The term "regularly," which triggers in-person reporting under § 28.725(1)(g) is not defined in the statute, and both John Doe IV and Mary Doe, who say that they frequently borrow friends' and relatives' vehicles, contend that they are unable to determine at what point their use of borrowed vehicles becomes "regular" so as to require in-person reporting. (Compl. ¶¶ 218, 220.) "Unless they are otherwise defined, the words in a statute 'will be interpreted as taking their ordinary, contemporary, common meaning.'" *Deutsche Bank Nat'l Trust Co. v. Tucker*, 621 F.3d 460, 463 (6th Cir. 2010) (quoting *United States v. Plavcak*, 411 F.3d 655, 660 (6th Cir. 2005)). Merriam Webster's Collegiate Dictionary defines "regularly," in relevant part, as "on a regular basis: at regular intervals." Neither this definition nor the relevant definition of the word "regular," defined as "recurring, attending, or functioning at fixed or uniform intervals," appear to provide an individual of ordinary intelligence a reasonable opportunity to know when he or she must report their use of a vehicle. Nor does the word "regularly," without some additional elaboration of its meaning, constitute a precise enough standard so as to avoid arbitrary enforcement by the State. This second point is illustrated by the complaint's averment that John Doe IV was told by police officials that borrowing a car three times is the threshold for regular operation. (*See* Compl. ¶ 31.) There is no explanation in either the complaint or the attached exhibits, and

31

Defendants offer none in their briefing, of how police could have arrived at the conclusion that the borrowing of a vehicle three times equals regular operation.  If the individual police officers arrived at this conclusion on their own, the reporting provision certainly raises red flags.  On the other hand, and only hypothetically, if police based this three-event standard on some formal guidance published by the State and made available to the public, the vagueness objection to § 28.725(1)(g) may be obviated.  A more robust factual record is essential in this regard.  However, the court cannot dismiss Count VII simply because Defendants contend that the challenged provisions have been in effect for several years and Plaintiffs have allegedly satisfied the provisions.

### C.  First Amendment

Count V states a First Amendment claim that is plausible on its face.  Plaintiffs identify §§ 28.727(1)(i) and 28.725(1)(f) as two provisions that require them to report information about their online accounts and activities.  Section 28.727(1)(i) requires a registrant initially registering under the Act to provide "[a]ll electronic mail addresses and instant message addresses assigned to the individual or routinely used by the individual and all login names or other identifiers used by the individual when using any electronic mail address or instant messaging system."  Section 28.725(1)(f) additionally requires registrants to "report in person and notify the registering authority . . . immediately after . . . [t]he individual establishes any electronic mail or instant message address, or any other designations used in internet communications or postings."

Defendants contend that these provisions neither regulate nor chill registrants' speech.  Addressing this second contention first, whether these provisions chill a

32

registrant's speech is an issue that deserves more considered reflection than the issue

is accorded in the single sentence in Defendants' motion.  The court will not accept a

baldly asserted legal conclusion when the complaint specifically alleges that the

reporting of internet account modifiers has resulted in at least one of the Plaintiffs

refusing to use the internet.  (*See* Compl. ¶ 204) (" [John Doe IV] does not use the

Internet because he would be required . . . to register all email and Internet identifiers,

and would need to report constantly in order to use different websites with different

user-names.").

Additionally, without further information, it is not at all clear to the court how the

provisions interact with registrants' ability to use the internet as a medium to engage in

protected speech.  Particularly of interest is what the State does with the information

provided.  In *Doe v. Nebraska*, the court denied summary judgment to both the plaintiffs

and the defendants on a First Amendment challenge to a similar provision in the

Nebraska sex offender registry statute, concluding that "[t]he parties have not given me

an undisputed record of material that explains how these . . . statutes would actually

work in practice and without such a record I cannot determine the implications of this

statute on Plaintiffs' First Amendment rights."  734 F. Supp. 2d at 911.

Assuming, *arguendo*, that the provisions do constitute content-neutral regulations

on Plaintiffs' speech, the court would then need to determine whether the provisions are

narrowly tailored to serve a significant governmental interest and whether they leave

open alternative channels for communication of information.  *See, e.g.*, *Ward v. Rock

Against Racism*, 491 U.S. 781, 791 (1989).  Here again, additional information on the

actual operation of the provisions is necessary to determine whether they are narrowly

33

tailored. *Doe v. Nebraska* provides an example illustrating the difficulty of determining whether an online-identifiers reporting requirement is narrowly tailored without any background on the implementation of the provisions: "[O]ne wonders whether a sex offender's posting to a blog site maintained by a law professor for the purpose of discussing sentencing issues, where the posting decried sex offender registration laws, would be covered by the statute and thus reportable. If so, one wonders whether the foregoing statute is narrowly tailored." 734 F. Supp. 2d at 912 (footnote omitted).

Without additional briefing and further information on the operation of the provisions, the court is unable to determine whether the provisions implicate registrants' First Amendment rights. Dismissal under Rule 12 is inappropriate because Plaintiffs have, at a minimum, pled factual allegations demonstrating that relief under the Count is plausible on its face.

### D.  State-law Headlee Amendment

Finally, Defendants seek dismissal of Count VIII of the complaint which claims that SORA violates the Headlee Amendment to the Michigan Constitution. Defendants argue that the claim does not satisfy the supplemental jurisdiction requirements of 28 U.S.C. § 1367, and even if it does, the complaint's allegations fail to state a claim under the Amendment. The Headlee Amendment provides, in relevant part, that "[a] new activity or service or an increase in the level of any activity or service beyond that required by existing law shall not be required by the legislature or any state agency of units of Local Government, unless a state appropriation is made and disbursed to pay the unit of Local Government for any necessary increased costs." Mich. Const. art. IX, § 29. Here, Plaintiffs allege that SORA, as amended in 2011, violates the Amendment

34

because it imposes increased requirements and activities on local law enforcement agencies without "mak[ing] or disburs[ing] a state appropriation to local governments that is sufficient to cover the necessary increased costs imposed on local governments under SORA."  (Compl. ¶ 331.)

Even assuming, *arguendo*, that Count VIII states a claim under Headlee and § 1367(a)'s supplemental jurisdiction standard is satisfied, the court will decline to exercise supplemental jurisdiction on the grounds that the claim raises a "novel or complex issue of State law," 28 U.S.C. § 1367(c)(1), and the claim presents other "compelling reasons" to decline jurisdiction under § 1367(c)(4).  The court is well aware of its obligation to exercise the jurisdiction granted to it.  However, Count VIII is unlike any of the other seven counts in the complaint.  Instead of asking the court to review whether SORA violates rights guaranteed by the United States Constitution, Count VIII asks the court to apply a state-law fiscal appropriation and budget-setting provision imposing affirmative duties on the state legislature.  The court is keenly cognizant of federalism concerns raised by setting out to examine whether the Michigan Legislature is complying with appropriation provisions in the Michigan Constitution.  Accordingly, in the context of this case, where the predominant challenge to SORA is based on alleged infringement of individual rights guaranteed by the United States Constitution, the court should, and will, decline supplemental jurisdiction over Count VIII.

## IV.  CONCLUSION

For the reasons set forth above, IT IS ORDERED that Defendants' amended motion to dismiss [Dkt. # 14] is GRANTED IN PART and DENIED IN PART.  It is GRANTED with respect to Counts I, II, III, and VI inasmuch as it applies to the

35

retroactive application of SORA to John Does I and II.  Each of these Counts (or

portions thereof) are DISMISSED WITH PREJUDICE.  It is also GRANTED with respect

to Count VIII, which is DISMISSED WITHOUT PREJUDICE.  It is DENIED with respect

to Counts IV, V, VI inasmuch as it applies to the retroactive extension of registration

periods, and VII.


 s/Robert H. Cleland
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated:  March 18, 2013

I hereby certify that a copy of the foregoing document was mailed to counsel of record
on this date, March 18, 2013, by electronic and/or ordinary mail.


 s/Lisa G. Wagner
Case Manager and Deputy Clerk
(313) 234-5522