UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

JOHN DOES #1-5 and MARY DOE,

                                                    File No. 2:12-cv-11194

                        Plaintiffs,

v.                                                  HON. ROBERT H. CLELAND

RICHARD SNYDER, Governor of the           MAG. JUDGE DAVID R.
State of Michigan, and COL. KRISTE              GRAND
ETUE, Director of the Michigan State
Police, in their official capacities,

                        Defendants.
_____

# FIRST AMENDED COMPLAINT

## PRELIMINARY STATEMENT

1.    Plaintiffs John Does #1-4 and Mary Doe are Michigan residents who have

been retroactively required to comply with Michigan's Sex Offender Registration

Act for the rest of their lives.  *See* M.C.L. § 28.721 *et. seq.*, as amended July 1,

2011 (SORA 2011).

2.    The plaintiffs were all charged or convicted before SORA 2011 came into

effect.

3.    Under SORA 2011, the plaintiffs have been and will be subjected to

constant supervision; required to report frequently in person; banned from living or

1

working in many areas; restricted as to when they can travel; limited in their rights to free speech; hindered from maintaining normal family relationships; identified publicly and falsely as dangerous; and subjected to a vast array of state-imposed restrictions that encompass virtually every facet of their lives. *See* Obligations, Disabilities, and Restraints Imposed by SORA 2011 (Exh. 1). The plaintiffs must comply with these extensive restrictions and obligations for as long as they live, or face criminal sanctions.

4.  The plaintiffs ask this Court to recognize what other courts across the country have increasingly found: that the nature of sex offender registration has fundamentally changed since 2003, when the U.S. Supreme Court upheld a registration scheme that imposed only "minor and indirect" restraints on registrants. *See Smith v. Doe*, 538 U.S. 84, 100 (2003).

5.  Numerous courts have now recognized that the retroactive application of sex offender registration schemes and their associated restrictions violate the constitutional prohibition on ex post facto laws. *See, e.g., U.S. v. Juvenile Male*, 590 F.3d 924 (9th Cir. 2009), *vacated as moot*, 131 S.Ct. 2860 (2011); *State v. Williams*, 952 N.E.2d 1103 (Ohio 2011); *Wallace v. State*, 905 N.E.2d 371 (Ind. 2009); *State v. Letalien*, 985 A.2d 4 (Me. 2009); *Commonwealth v. Baker*, 295 S.W.3d 437 (Ky. 2009); *Doe v. State*, 189 P.3d 999 (Alaska 2008).

6.  SORA 2011 imposes such extensive and punitive restrictions on the

plaintiffs that it violates the constitutional prohibition on ex post facto laws.

7.    In addition, SORA 2011 violates the plaintiffs' fundamental rights to travel, work, speak, and raise their children, without being narrowly tailored to meet a compelling state interest.

8.    SORA 2011 also violates the Due Process Clause because it (a) requires John Doe #1 to register even though he was never convicted of a sex offense; (b) requires John Doe #2 to register on a public registry even though he was promised privacy in his plea agreement; and (c) extends the registration periods for John Does #3-4 and Mary Doe from 25 years to life.

9.    Finally, many provisions of SORA 2011 are void for vagueness.  The plaintiffs are strictly liable for complying with a sweeping and complex law, even though the language of the law does not provide clear notice of what is prohibited or required, either for those subject to it or for those who enforce it, making full compliance with the law impossible.

10.    The plaintiffs seek declaratory and injunctive relief barring retroactive application of the law as applied to them, and limiting the application of SORA 2011 to individuals who are actually dangerous.

## JURISDICTION

11.    Jurisdiction is proper under 28 U.S.C. §§ 1331 and 1343 because the plaintiffs seek redress for the deprivation of rights secured by the U.S.

Constitution.  The plaintiffs' federal claims are brought under 42 U.S.C. § 1983.

12.    The plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201-2202, by Fed. R. Civ. P. 57 and 65, and by the legal and equitable powers of this Court.

13.    State claims may be heard by virtue of the Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

14.    Venue is proper in the Eastern District of Michigan pursuant to 28 U.S.C. § 1391(b).

## THE PLAINTIFFS[1]

### John Doe #1

15.    Plaintiff John Doe #1 resides in the Eastern District of Michigan.

16.    In 1990, when Mr. Doe #1 was 20 years old, he was fired from his job as a maintenance worker at McDonalds.  He believed he was fired unjustly.  Out of anger and revenge, he tried to rob his former employer.

17.    During the attempted robbery, Mr. Doe #1 allegedly threatened to take the manager's 12-year-old son hostage.  The manager and her son escaped, and Mr. Doe #1 was apprehended.

18.    Mr. Doe #1 pled guilty to armed robbery and weapons charges.  He also pled no contest to kidnapping (for the threat to the boy).

---

[1] The plaintiffs' declarations attesting to the facts alleged in the complaint are attached as Exhs. 2-6.

19.    Mr. Doe #1 never engaged in any sexual misconduct during the attempted robbery, nor has any such conduct ever been alleged against him.

20.    Mr. Doe #1 was sentenced to 20 to 40 years in prison.

21.    While incarcerated, Mr. Doe #1 became a model prisoner.  He helped run Chance for Life, a program that trains prisoners how to handle conflict productively.  He was involved in the Warden's Forum, a program where older prisoners mentored younger ones.  He held leadership positions in various prisoner organizations.  He earned the support of his warden for parole.

22.    In November 2009, Mr. Doe #1 was paroled.  He successfully completed his parole in November 2011.

23.    Mr. Doe #1 has led a productive life since his release.  He has been employed for approximately two years as a vocational coach, working with special-needs adults.  He is engaged to be married.

24.    Mr. Doe #1 has not been charged with or convicted of any crime since his convictions stemming from the 1990 restaurant robbery.

25.    Under SORA 2011, individuals convicted of kidnapping a minor are required to register as sex offenders for life, even though the offense lacks any sexual component.  M.C.L. § 28.722(w)(ii).

26.    At the time Mr. Doe #1 was convicted, Michigan did not have a sex offender registry.  He therefore did not receive, and could not have received, any

notice that his conviction for a non-sex offense would subject him to registration as a sex offender.

27.   Had Mr. Doe #1 known that a kidnapping conviction would result in sex offender registration, he would have tried to bargain for an alternate disposition that would not have resulted in registration.

28.   Under SORA 2011, Mr. Doe #1 is classified as a Tier III offender.  He must register and comply with all SORA 2011 requirements for life, even though he has never been accused – let alone been convicted – of any sex offense.

**John Doe #2**

29.   Plaintiff John Doe #2 resides in the Eastern District of Michigan.

30.   In the summer of 1996, when Mr. Doe #2 was 18 years old, he had a sexual relationship with a 14-year old girl.

31.   John Doe #2 pled guilty to criminal sexual conduct III under the Holmes Youthful Trainee Act (HYTA).  HYTA is a record-sealing statute that allows young offenders to have their cases dismissed and the records sealed.

32.   Specifically, HYTA provides that if a youth between the ages of 17 and 21 pleads guilty, the court "without entering a judgment of conviction" may "assign that individual to the status of youthful trainee."  M.C.L. § 762.11(1).  If the youth completes the trainee period – typically a period of probation – then "the court shall discharge the individual and dismiss the proceedings."  M.C.L. § 762.14(1).

33.    An assignment to youthful trainee status "is not a conviction for a crime." M.C.L. § 762.14(2).  Moreover, "all proceedings regarding the disposition of the criminal charge and the individual's assignment as youthful trainee shall be closed to public inspection," M.C.L. § 762. 14(4), meaning that court records in HYTA cases are sealed from the public and do not appear on the person's criminal history.

34.    Mr. Doe #2's plea was based on the state's promise that his case would be dismissed under HYTA and his records sealed.  At no time before his plea was Mr. Doe #2 ever informed that he was required, or might in the future be required, to register as a sex offender.  At no time before his plea was Mr. Doe #2 ever informed that information about his case could be posted on a public Internet-based sex offender registry (which at that time did not exist).

35.    Mr. Doe #2 received no jail time, but was sentenced to two years of probation.  He was discharged from probation early (after 18 months) for good behavior.  He also completed sex offender therapy.  His case was dismissed and his records sealed.

36.    When Mr. Doe #2 was discharged from probation, he went to collect his fingerprints pursuant to the HYTA provisions that sealed his records.  He was informed that he was subject to registration as a sex offender, even though he had not been *convicted* of a sex offense.  His registration period was 25 years, making him eligible for removal at age 44.

7

37.    At the time of Mr. Doe #2's offense, Michigan had just created it's sex offender registry.  Although the statutory scheme required registration of HYTA trainees, the registry was private.  It was available only to law enforcement, and registry information was exempt from Freedom of Information Act requests.  Thus, there was no conflict between HYTA's promise that Mr. Doe #2's records would be sealed, and the maintenance of a non-public law enforcement database.

38.    There was also no requirement that registrants report at regular intervals. It was Mr. Doe #2's understanding that nothing further was required of him after his initial registration.

39.    Mr. Doe #2 went on to lead a productive life.  He served in active duty military service twice, earning an honorable discharge both times, as well as awards for outstanding achievement.  While in the service, he suffered a traumatic brain injury from a grenade.  He now receives disability benefits through the Veterans Administration.

40.    In late spring or summer 2011, law enforcement officials contacted Mr. Doe #2 and told him that he was subject to supervision and reporting as a sex offender.  Mr. Doe #2 had not previously known that he had retroactively become subject to Michigan's supervision and reporting requirements (in addition to the original one-time registration) because of the amendments to the state's SORA.

41.    Despite the fact that Mr. Doe #2's plea was based on an explicit promise

by the state that his records would be kept private, and despite the fact that he was never convicted of a crime under Michigan law, he is now required to comply with SORA 2011.

42. Under SORA 2011, Mr. Doe #2 was retroactively re-classified as a Tier III offender, and he must now register for life.

43. Mr. Doe #2 was four years and one month older than the girl with whom he had sex. Had the age difference between them been less than four years, Mr. Doe #2 would not be subject to sex offender registration. M.C.L. § 28.722(w)(iv).

44. But for the fact that Mr. Doe #2 is publicly listed on the sex offender registry, schools, employers, landlords, and the public would be unaware of his sealed HYTA case or the facts underlying it. That was precisely the deal that was offered and accepted when he agreed to the HYTA disposition of his case.

45. Upon information and belief, Mr. Doe #2 has no criminal convictions. (He does have a military disciplinary action for marijuana use.)

### John Doe #3

46. Plaintiff John Doe #3 resides in the Eastern District of Michigan.

47. In January 1998, when Mr. Doe #3 was 19 years old, he had a sexual relationship with a 14-year-old girl. Mr. Doe #3 had first met the girl at a hair salon where she had washed his hair, and he believed that she was an adult.

48. When the girl's parents became aware of the relationship, they demanded

that Mr. Doe #3 marry the girl, or the parents would go to the police.  Mr. Doe #3's

family and the girl's family met, but Mr. Doe #3 initially refused to marry her.

49.   The girl's family then pressed charges.  Thereafter the families met again,

and Mr. Doe #3 agreed to the marriage.  Once this happened, the girl's family tried

to drop the charges.  The girl admitted to the police, as is documented in the police

reports, that at her father's request she falsely accused Mr. Doe #3 of sexual

assault.  Mr. Doe #3 did not ultimately marry the girl.

50.   Mr. Doe #3 admitted to the police that he had a sexual relationship with

the girl.  He pled guilty to attempted criminal sexual conduct III for having sex

with a minor.  He, too, was sentenced under the Holmes Youthful Trainee Act,

with four years probation.

51.   At the time of Mr. Doe #3's offense, Michigan did not yet have a public,

Internet-based registry.  Mr. Doe #3 was required to register for 25 years, making

him eligible for removal at age 45.  The requirements for quarterly in-person

reporting (during the first 15 days of January, April, July and October) were

introduced after his plea was accepted, but they were nevertheless applied

retroactively to him.

52.   During his last year on probation, Mr. Doe #3 missed the 15-day

registration window.  Although he tried to report near the end of the 15-day period,

the office was closed.  He was therefore unable to report until after the 15 days had

passed.  Based on his failure to report, his status under the Holmes Youthful Trainee Act was revoked, and his conviction was entered.

53.   Under SORA 2011, Mr. Doe #3 was retroactively re-classified as a Tier III offender, and his registration period was extended from 25 years to life.

54. Mr. Doe #3 was four years and ten months older than the girl with whom he had sex.  Had the age difference been less than four years, Mr. Doe #3 would not be subject to registration.

55.   Upon information and belief, Mr. Doe #3 has no other criminal convictions.

## John Doe #4

56. Plaintiff John Doe #4 resides in the Western District of Michigan.

57. In the summer of 2005, when Mr. Doe #4 was 23 years old, he had a sexual relationship with a woman he met at a nightclub.  *See* Declaration of I.G. (Exh. 7). The club was restricted to those aged 18 and older.

58. Mr. Doe #4 did not realize that the woman had used a fake ID to get into the nightclub, and that she was actually 15.  When she became pregnant, Mr. Doe #4 was arrested.  It was only after Mr. Doe #4 was arrested that he learned his partner's actual age.

59. In 2006, Mr. Doe #4 pled guilty to attempted criminal sexual conduct III.

60. Under the terms of the plea agreement, the case was to be dismissed if the

baby's DNA did not match that of Mr. Doe #4.  The girl in the case had had other sexual partners, and it was unclear with whom she had become pregnant.  It turned out that Mr. Doe #4 had fathered the child, and thus the case was not dismissed.

61. Mr. Doe #4 was sentenced to five years probation, which he served successfully.  He also completed sex offender counseling.

62. At the time of his conviction, Mr. Doe #4 was required to register for 25 years, making him eligible for removal at age 49.

63. Under SORA 2011, Mr. Doe #4 was retroactively re-classified as a Tier III offender, and his registration period was extended from 25 years to life.

64. Upon information and belief, Mr. Doe #4's only other criminal convictions are for driving on a suspended license.

### Mary Doe

65. Plaintiff Mary Doe resides in the Eastern District of Michigan.

66. In 2003, while living in Ohio, she was convicted of unlawful sexual conduct with a minor for having a sexual relationship with a 15-year-old male.

67. She was sentenced to three years in prison.

68. At the time, Ohio's SORA was risk-based rather than offense-based.  A person's registration requirements, including the length and frequency of reporting obligations, were determined through an individualized adjudication of risk.

69. Based on a psychological evaluation, the court concluded that Ms. Doe was

neither a "sexual predator" nor a "habitual offender."  She was assigned to the lowest risk level of the registry, which required address verification once a year for ten years.

70. Although Ohio has since moved to an offense-based registration scheme similar to Michigan's SORA 2011 (in order to comply with the same federal Adam Walsh requirements that led to the adoption of SORA 2011), the Ohio Supreme Court has held that people like Ms. Doe (who received individualized risk-based hearings) cannot be retroactively reclassified under an offense-based scheme.  The court held that such legislative reclassification of individuals who have been adjudicated by the judiciary violates the separation of powers.  *See State v. Bodyke*, 933 N.E.2d 753 (Ohio 2010).

71. The Ohio Supreme Court also held that Ohio's new law – which requires extensive reporting and lengthens registration periods similar to SORA 2011 – cannot be applied retroactively without violating the ex post facto clause.  *See State v. Williams*, 952 N.E.2d 1103 (Ohio 2011).

72. Thus, in Ohio, Ms. Doe could not be required to register for more than ten years, nor could she be subjected to more significant restrictions than those imposed under the terms of her initial registration order.

73. In May 2004, after serving less than eight months, Ms. Doe was granted judicial release.  Her sentence was modified to four years of probation and 200

hours of community service.  She successfully completed both probation and sex offender therapy, and was discharged from probation in April 2008.

74. When Ms. Doe received judicial release in 2004, she was required under the terms of her probation to move to Michigan, where she lived with her parents. Under Michigan law at the time, she was required to register quarterly for 25 years, becoming eligible for removal at age 54.

75. Ms. Doe and her ex-husband have shared parenting time with their 13-year-old daughter.  The daughter attends school in Michigan.  Ms. Doe remarried in 2010, and her husband works in Michigan.  Ms. Doe's family, including her elderly parents and her extended family, all live in Michigan.  For these reasons, Ms. Doe wishes to live in Michigan.

76. Under SORA 2011, Ms. Doe was retroactively re-classified as a Tier III offender, and her registration period was extended from 25 years to life.

77. Upon information and belief, Ms. Doe has no other criminal convictions.

### THE DEFENDANTS

### Governor Richard Snyder

78. Defendant Richard Snyder is the Governor of Michigan.  He is sued in his official capacity.

79. Pursuant to Article 5, §1 of the Michigan Constitution, the executive power of the state is vested in the governor.  The Michigan Constitution further provides

that the governor shall take care that applicable federal and state laws are faithfully executed.  Mich. Const., Art. 5, § 8.  Defendant Snyder is ultimately responsible for the enforcement of the laws of this state, and for supervision of all state departments, including the Michigan State Police.

80. The Governor is an appropriate defendant in a case challenging the constitutionality of a state statute.

### Colonel Kriste Etue

81. Defendant Colonel Kriste Etue is the director of the Michigan State Police. She is sued in her official capacity.

82. The Michigan State Police maintains Michigan's sex offender registry. M.C.L. § 28.721 *et seq.*  The State Police's responsibilities include enforcing SORA 2011, maintaining the state's database of sex offenders, maintaining an on-line public sex offender registry, registering offenders (along with other law enforcement agencies), developing registration forms, providing statutorily-required notices to registrants, collecting registration fees, and coordinating with national law enforcement and the national sex offender registry.  *See* M.C.L. §§ 28.724, 28.724a, and 28.725 *et seq.*

83. The director of the Michigan State Police is an appropriate defendant in a case challenging the constitutionality of Michigan's Sex Offender Registration Act.

**FACTUAL ALLEGATIONS: HISTORICAL EVOLUTION OF SORA 2011**

84. Michigan passed its first sex offender registration law in 1994.  Mich. Pub. Act 295 (1994) (eff. 10/1/95).  Before that time, Michigan did not require anyone to register as a sex offender for any purpose.

85. The 1994 statute established a private database containing basic information about people convicted of sex offenses.  Registration information was available only to law enforcement, and was exempt from all public disclosure.  A person who divulged registry information to the public was guilty of a misdemeanor, and a registrant whose information was revealed had a civil cause of action for treble damages.  Mich. Pub. Act 295, Sec. 10 (1994).

86. The statute did not require regular verification or reporting.  After the initial registration was completed, the only additional obligation was to notify local law enforcement within 10 days of a change of address.  The registrant did not need to notify law enforcement in person.  Mich. Pub. Act 295, Sec. 5(1) (1994).

87. Registry information was maintained for 25 years for individuals convicted of one offense, and for life for individuals convicted of multiple offenses.  Mich. Pub. Act 295, Sec. 5(3)-(4) (1994).

88. The statute applied retroactively to individuals whose convictions occurred before October 1, 1995, but only if they were still incarcerated, on probation or parole, or under the jurisdiction of the juvenile division of the probate court or

16

department of social services on that date.  Mich. Pub. Act 295, Sec. 3(b)-(c) (1994).

89. Since that time, the legislature has repeatedly amended the statute, each time imposing a stricter regime with new burdens on registrants, and covering more people and conduct.

90. Effective April 1, 1997, the statute's confidentiality protections were relaxed.  Law enforcement agencies were required to make registry information available to the public (for zip codes within the agency's jurisdiction) during regular business hours.  Mich. Pub. Act 494, Sec. 10(2) (1996).  The public could view a paper copy of the registry by visiting their local law enforcement agency.

91. In 1999, registry information became available to the public on the Internet through the public sex offender registry.  Mich. Pub. Act 85, Sec. 8(2), 10(2)(3) (1999).

92.  New in-person reporting requirements were imposed, with registrants being required to report quarterly or yearly, depending on their offense.  Mich. Pub. Act 85, Sec. 5a(4) (1999).

93.  In addition, the 1999 amendments: expanded the list of offenses for which registration was required and the categories of individuals required to register for life; lengthened the penalties for registration-related offenses; required registrants to maintain a driver's license or personal identification card; made registry

17

information on certain juveniles public; required fingerprinting and digitized

photographs for registrants; and mandated registration for out-of-state students,

people working in the state, and anyone convicted of a listed offense or required to

register in another state or country.  Mich. Pub. Act 85 (1999).

94.  In 2002, additional requirements were imposed on both resident and non-

resident registrants to report (in person) when they enrolled, disenrolled, worked,

or volunteered at institutions of higher learning.  Mich. Pub. Act 542, Sec. 4a

(2002).

95.  Amendments in 2004 required the Internet-based public sex offender

registry to include photographs.  Mich. Pub. Act 238 (2004).  In addition, a fee was

imposed on registrants.  Failure to pay the fee was made a crime.  Mich. Pub. Act

237 (2004).

96.  The 2004 amendments also removed the registration requirement for

offenders adjudicated under the Holmes Youthful Trainee Act (HYTA) after

October 1, 2004, unless they lost their HYTA status.  Youth assigned to HYTA

before that date, however, were still required to register, though they could petition

the court for reduced registration after 10 years.  Mich. Pub. Acts 239, 240 (2004).

97.  Further amendments, effective January 1, 2006, barred registrants (with

limited exceptions) from working, residing, or loitering within 1000 feet of school

property, and imposed criminal penalties for noncompliance.  Mich. Pub. Acts 121,

127 (2005).

98.   In addition, the penalties for registration-related offenses were increased. Mich. Pub. Act 132 (2005).

99.   In 2006, the statute was amended to allow subscribing members of the public to be notified electronically when a person registers or moves into a particular zip code.  Mich. Pub. Act. 46 (2006).

100.  Effective July 1, 2011, Michigan's Sex Offender Registration Act was extensively amended to comply with the federal Sex Offender Registration and Notification Act (SORNA), 42 U.S.C. § 16901 *et seq.,* which is Title I of the Adam Walsh Child Protection and Safety Act of 2006 (Public Law 109-248).

101.  Although states were required to comply with SORNA by July 27, 2011, or lose federal law enforcement funds, to date only 15 states have substantially complied.  The vast majority of states have elected not to comply because they are concerned about the costs and effectiveness of the federal SORNA requirements.

102.  As outlined in more detail below, SORA 2011 fundamentally changed Michigan's sex offender registry by categorizing registrants into tiers; requiring in-person reporting of vast amounts of personal information; and retroactively lengthening the registration period for most registrants.  In addition, SORA 2011 imposed new duties on local law enforcement agencies.

103.  In sum, Michigan's sex offender registry, which began as a private law

enforcement database in 1995, has changed radically in the last 17 years.  SORA

2011 subjects registrants to obligations, restraints, disabilities, and punishment of a

different character and different order of magnitude than the original sex offender

statutes.

## FACTUAL ALLEGATIONS:
## TIER CLASSIFICATION AND RETROACTIVE APPLICATION OF SORA 2011

104.  SORA 2011 classifies registrants into tiers.  A registrant's tier-

classification determines the length of time that a person must register and the

frequency of reporting.

105.  Tier I registrants must register and comply with all obligations imposed by

SORA 2011 for 15 years; Tier II registrants must register and comply for 25 years;

and Tier III registrants must register and comply for life.  M.C.L. §§ 28.722(r)-(w);

28.725(10)-(13).

106.  Tier classifications are based solely on the offense of conviction.

107.  Tier classifications are not based on, and do not correspond to, a

registrant's actual risk of re-offending or the danger any registrant poses to the

public.

108.  Prior to SORA 2011, most Michigan registrants were required to register

for 25 years.

109.  SORA 2011 was applied retroactively.  Registrants were assigned to a tier

based solely on their offense of conviction.

110.  People who previously had been required to register for 25 years, and who were retroactively assigned to Tier III, had their registration periods extended to life.  There was no individualized determination about their risk or whether lifetime registration was warranted.

111.  Although the plaintiffs have clinically been determined to be low risk (see below), under SORA 2011 they were retroactively classified as Tier III offenders and must register and comply with SORA 2011 until they die.

112.  Even upon the clearest proof that the plaintiffs are not dangerous, there is no mechanism in the statute that would allow the plaintiffs to have their registration obligations eliminated or reduced.

113.  SORA 2011 is not limited to individuals who committed sex offenses, but requires registration and reporting by individuals, such as John Doe #1, who were convicted of other offenses that do not have a sexual component.

114.  SORA 2011 is not limited to convicted individuals, but requires registration and reporting by individuals, such as John Doe #2, who were never convicted of a crime.  SORA 2011 also requires registration and reporting by youths aged 14 or older who were adjudicated as juveniles.

## FACTUAL ALLEGATIONS:
## IMPACT OF SORA 2011 ON THE PLAINTIFFS

115.  SORA 2011 imposes obligations, disabilities, and restraints that are so extensive that they cannot be set out in full here, but are instead listed in Exhibit 1, which is incorporated by reference.

116.  By way of summary, SORA 2011 subjects the plaintiffs to continuous reporting, surveillance, and supervision.  In addition, SORA 2011 severely limits their ability to direct the upbringing of their children; find housing and employment; get an education; travel; engage in free speech activities (including use of the Internet); be free from harassment and stigma; and  understand what is required of them under the statute.

117.  Finally, registration under SORA 2011 triggers a vast array of additional obligations, disabilities, and restraints under other federal, state, and local laws, as well as private policies barring or limiting registrants from access to goods or services available to the public.

### A.  Reporting, Surveillance, and Supervision

118.  As Tier III registrants, the plaintiffs must report in person every three months within a specified 15-day period, M.C.L. 28.725a(3)(c), and must provide:

- all names and nicknames, Social Security number, and date of birth;
- residential address, including any address where the individual expects to spend more than seven days, as well as the dates of any such temporary stays;

22

- employer names and addresses, including information on any person who agrees to hire a registrant for a temporary job, as well as the routes of travel for non-stationary employment;
- schools attending or schools to which accepted;
- telephone numbers registered to the individual or routinely used;
- e-mail and instant message addresses, log-in names or other identifiers assigned to the individual or routinely used;
- all other designations used in Internet communications or postings;
- license plate and registration information for any vehicle owned or regularly operated by the individual, and the location where that vehicle is kept;
- driver's license or personal ID card;
- passport and immigration documents;
- occupational license information; and
- a complete physical description.

M.C.L. § 28.727(1).

119.  SORA 2011 also requires the plaintiffs to provide a photograph, fingerprints, and palm prints.  If a plaintiff's appearance changes, he or she must update the photograph.  M.C.L. §§ 28.725a(5); 28.727(1)(q).

120.  In addition to reporting in person at regular intervals, the plaintiffs must report in person within three business days whenever certain information changes. M.C.L. § 28.722(g).  The immediate, in-person reporting requirement is triggered whenever the plaintiffs:

- change their residence;
- begin, change, or discontinue employment;
- enroll or dis-enroll as a student;
- change their name;
- intend to travel for more than seven days;
- establish an e-mail address, instant message address, or other Internet designation; and

- buy or begin using a vehicle, or cease owning or using a vehicle.

M.C.L. § 28.725(1).

121.  There are no good-cause exceptions to the reporting requirements or to the "immediate" notification requirements.  Regardless of illness, injury, transportation problems, or other emergencies, the plaintiffs must report in person within three days or face criminal charges.

122.  SORA 2011's reporting, surveillance, and supervision requirements are similar to, but more restrictive and onerous than, the reporting, surveillance, and supervision that the plaintiffs experienced while serving their sentences on probation or parole.

123.  Under SORA 2011, the plaintiffs must report significantly more information than what they were required to report while they were serving their sentences on probation or parole.

124.  SORA 2011's requirement that minor changes be reported in person within three business days is a level of reporting that far exceeds what the plaintiffs experienced while they were serving their sentences on probation or parole.

125.  As a result of SORA 2011's immediate reporting requirements, coupled with the quarterly reporting requirements, the plaintiffs must – for the rest of their lives – report in person to law enforcement with a frequency that is similar to, and often greater than, their reporting obligations when they were on probation or

parole.

126.  For the plaintiffs, the lifetime surveillance imposed by these reporting requirements is not only intrusive, but burdensome.  The time required to register or update information varies depending on where and when the plaintiffs report.  Each registration can take up to an hour-and-a-half, not including travel time.

## B.  Family and Parenting

127.  SORA 2011 has severely impaired the plaintiffs' family relationships and parenting, in large part because the statute bars the plaintiffs from "loitering" within 1000 feet of school property.  M.C.L. § 28.734.  "To loiter" means "to remain for a period of time and under circumstances that a reasonable person would determine is for the primary purpose of observing or contacting minors."  M.C.L. § 28.733(b).  This provision contains no exception for the plaintiff-parents, who are observing or contacting their own children.

128.  For example, Mr. Doe #1's fiancé has a 14-year-old daughter.  Mr. Doe #1 cannot attend his future step-daughter's school and extra-curricular events.

129.  The same is true for Mr. Doe #2.  His ability to participate in the upbringing of his daughter is limited because, as a registered sex offender, he cannot participate in her school and extra-curricular events.

130.  Mr. Doe #2's status as a registered sex offender was cited by a judge in support of an order awarding primary custody of his daughter to her mother.

131.  Mr. Doe #3's status as a registered sex offender, too, has interfered with his family relationships.

132.  Mr. Doe #3 is married and has two boys, ages 4 and 8.  He and his wife, who is a schoolteacher, are expecting their third child in the fall of 2012.

133.  Due to his status as a registered sex offender, Mr. Doe #3 has been barred from attending parent-teacher conferences.  His older son plays basketball and football, while his younger son plays soccer.  Because of the vagueness of the statute, Mr. Doe #3 does not know if or how SORA 2011 applies to his parenting activities.  He is uncertain about where he can and cannot take his sons.  He does not know which of their events he can or cannot attend, and he fears prosecution if he goes to their games.

134.  Mr. Doe #4's status as a registrant has similarly strained his family relationships.

135.  Mr. Doe #4 is married and has two children, ages 10 and 4, with his wife.

136.  Other parents do not want their children to be friends with Mr. Doe #4's children because Mr. Doe #4 is on the registry.

137.  Mr. Doe #4's wife left him in part because his status as a registered sex offender harmed the family.  She has told him that if he is able to get off the registry, she will return.

138.  Due to his status as a registered sex offender, Mr. Doe #4 is unable to

participate in many parenting activities.  He cannot attend his 10-year-old daughter's volleyball games, basketball games, and other school or extra-curricular functions.  Mr. Doe #4's daughter asks him why he never comes to her events.  Mr. Doe #4 also cannot pick up or drop off his daughter at school.  Mr. Doe #4 is concerned that he will be similarly unable to participate in his son's education and activities when the boy starts school.

139.  Mr. Doe #4 also has a five-year-old daughter with the victim in his case.  The victim/ mother very much wants Mr. Doe #4 and their child to have a normal father/daughter relationship, but SORA 2011 has severely limited his ability to do so.  *See* I.G. Decl. (Exh. 7).

140.  Ms. Doe's status as a registered sex offender has likewise impaired her ability to raise her daughter.  When her daughter was attending school in Ohio, Ms. Doe was able to attend parent-teacher conferences, school events, and extra-curricular programs, and otherwise to participate in her daughter's education.

141.  Now that Ms. Doe's daughter attends school in Michigan, Ms. Doe is barred from parent-teacher conferences, the school building, and extra-curricular events.  She has been unable to attend her daughter's school plays and will be unable to attend her daughter's eighth grade graduation.

### C.  Housing

142.  SORA 2011 also severely limits the plaintiffs' access to housing.

27

143.  SORA 2011 bars the plaintiffs from "residing" within 1000 feet of school property, making a substantial amount of housing unavailable as a matter of law. M.C.L. § 28.735.  The plaintiffs are also prohibited from living with family members if those family members live within 1000 feet of school property.

144.  Because sex offender registry address information is public, many landlords outside geographic exclusion zones refuse to rent to registrants, since their properties can then be easily identified on the registry.

145.  When Mr. Doe #1 was first released from prison, he hoped to live with his family until he could get back on his feet.  He could not live with either his mother or his sister, however, because they both lived within 1000 feet of a school.  He also could not live with another sister or his aunt because the Department of Corrections does not allow registered sex offenders to live in homes with children (even though Mr. Doe #1's crime was a non-sex offense robbery that had occurred two decades earlier).  He therefore was released to a half-way house.

146.  Mr. Doe #1 was rejected by landlords because of his status as a registered sex offender.  He was finally able to get an apartment when he had a friend lease a unit for him.  He now lives in a flat owned by his aunt.

147.  Mr. Doe #2's status as a registrant has likewise prevented him from finding housing.  When looking for apartments, Mr. Doe #2 was rejected because he is a registrant.

148.  Mr. Doe #2 has been unable to secure his own housing, and stays with friends or family if they will let him and if their homes are not within a geographic exclusion zone.

149.  At one point Mr. Doe #2 asked his cousin for a place to stay.  His cousin refused, explaining that the neighbors would find Mr. Doe #2 on the registry, and would then seek to have both of them (Mr. Doe #2 and his cousin) evicted.

150.  As a disabled military veteran, Mr. Doe #2 could qualify for subsidized housing.  He identified a program that would have provided him with a Section 8 voucher for his own apartment.  But under federal law, individuals subject to lifetime sex offender registration are barred from subsidized housing.  Therefore Mr. Doe #2 was ineligible.  24 C.F.R. § 5.856.

151.  Mr. Doe #3 and his wife would like to move their growing family to a larger home, but   they are restricted in their search for a new house, as they cannot move to a home that is within 1000 feet of a school.

152.  Likewise, because Mr. Doe #4 is on the registry, he has had severe housing problems in addition to the loss of his home to foreclosure when the registry cost him his job (*see* below).

153.  When Mr. Doe #4 has tried to rent an apartment, landlords have told him that they will not rent to anyone who is on the sex offender registry.

154.  For a time Mr. Doe #4 was registered at his mother's address.  But

neighbors in her apartment complex complained, and his mother was threatened with eviction, so he left.

155.  Mr. Doe #4 then lived with his sister.  But in February 2012, the sister's landlord threatened her with eviction if Mr. Doe #4 continued to live with her.

156.  Mr. Doe #4 is now homeless.

157.  Although Mr. Doe #4's family members would be happy to have him stay if he were not on the registry, they fear that they will lose their housing if they allow him to reside with them.

158.  The geographic restrictions also affect Ms. Doe's ability to secure stable housing.  Several years ago, she and her husband were able to rent a home from one of her distant cousins.  When the cousin lost the home to foreclosure, Ms. Doe and her husband were notified by the bank that they might be forced to vacate the home on short notice.

159.  Despite an exhaustive search, Ms. Doe and her husband were unable to find alternate affordable housing that was not within a restricted zone.  Although at present the bank has allowed Ms. Doe and her family to remain in the home, she is afraid that if she is required to vacate the home on short notice in the future, she and her husband will be unable to find housing.

### D.  Employment

160.  SORA 2011 bars the plaintiffs from working within 1000 feet of school property, making a substantial number of jobs unavailable to the plaintiffs as a matter of law.  M.C.L. § 28.735.

161.  Moreover, under SORA 2011, information about employers who hire the plaintiffs is posted on the public sex offender registry.  M.C.L. § 28.728(2)(d). The public posting of employer information creates a significant disincentive for employers to hire the plaintiffs.

162.  Mr. Doe #1 has repeatedly lost employment opportunities because of his status as a registered sex offender.  When he was first released from prison, he participated in a reentry program designed to help him find employment.

163.  Mr. Doe #1 actively sought work and flagged potential jobs off employment lists.  His case manager told him time and time again that those employers would not hire registered sex offenders.  The occupations where he was denied employment included garbage collection and fast food restaurant work.  His job search was further restricted because he could only apply for jobs located more than 1000 feet from a school.

164.  Mr. Doe #1 tried to open his own business as a subcontractor on a home preservation project to restore foreclosed homes.  Mr. Doe #1's parole agent required him to close the business because many contracting jobs are within

geographic exclusion zones where registered sex offenders are prohibited from working.

165.  Mr. Doe #1 finally convinced the organization that ran his reentry program to hire him for its programs for special needs adults, and he has been successfully employed there since.

166.  Mr. Doe #2 has also been harmed in his search for work.  Although he need not list his sealed HYTA case on job applications asking whether he has a criminal record, employers learn of his sealed case and refuse to hire him because he is on the registry.

167.  Mr. Doe #2 also hoped to start a program mentoring at-risk youth by engaging them in construction projects.  He was unable to do so because his status as a registered sex offender would have made it impossible for him to work with youth.

168.  Mr. Doe #3 is a co-owner of a family business, and has worked there for many years.  Although he is employed now, he is concerned that if he were unable to continue working in the family business, his status as a registrant would prevent him from finding another job.

169.  As to Mr. Doe #4, his status as a registered sex offender has prevented him from finding or holding a job.

170.  At the time of his offense and for much of the time he was on probation,

Mr. Doe #4 worked at an auto parts factory.  He did well, repeatedly earning raises over a three-year period.

171.  In 2008, however, an anonymous caller informed the factory's management that Mr. Doe #4 was listed on the sex offender registry.  Mr. Doe #4 was fired, and escorted off the premises by security.

172.  The fact that Mr. Doe #4 was listed on the public sex offender registry made information about his offense readily available to the anonymous caller and directly contributed to Mr. Doe #4's firing.

173.  Mr. Doe #4 could not pay his bills after he was fired.  As a result, he lost his home to foreclosure, and his car was repossessed.

174.  Mr. Doe #4 has had great difficulty finding work since then because so few employers will hire registrants.

175.  Mr. Doe #4 found a job with a finishing company and worked there for approximately six months.  Then the newspaper *Busted*, which republishes photos and information from the sex offender registry in a newsprint format, published the registry listing for Mr. Doe #4.  The newspaper appeared in the break room at his work.  Mr. Doe #4 lost his job the next day.

176.  The geographic restrictions on where registrants can work have further harmed Mr. Doe #4's job search.  For example, Mr. Doe #4 was offered a factory job by American Staffing, but the factory was within 1000 feet of a school.

Therefore Mr. Doe #4 could not accept the offer.

177.  Mr. Doe #4 is presently unemployed, and has no source of income other than odd jobs.

178.  Ms. Doe's status as a registrant has also impaired her ability to find work. Ms. Doe recently earned a degree in medical billing.  Through her career services office she was placed in an externship.  Although the host organization has been pleased with her work, the employer is concerned about hiring her because the employer's information would then be posted on the sex offender registry.

179.  Ms. Doe has submitted over 100 resumes for other jobs, but has been unable to find employment.

### E.  Education

180.  SORA 2011 has also made it more difficult for the plaintiffs to get an education.

181.  For example, Mr. Doe #2 wanted to pursue a degree as a medical assistant.  When he applied to one such program through the Everest Institute, he was denied because he was on the sex offender registry.  Because Mr. Doe #2's HYTA case is sealed, the Everest Institute would not have known of his history but for the fact that Mr. Doe #2 is listed on the registry.

182.  Mr. Doe #2 was eventually able to earn a degree as a medical assistant through another institution.  He then wanted to become a cardio-vascular

stenographer.  That degree requires clinical courses.  Because of Mr. Doe #2's status as a registered sex offender, he is not allowed to take clinical courses in a hospital, and therefore cannot pursue his chosen degree.

183.  Mr. Doe #3's status as a registered sex offender has limited his ability to get an education.  Mr. Doe #3 enrolled in college in 2005.  When he learned that he had to report that he was attending college, he was concerned that his college classmates would find out that he was a registered sex offender.  Mr. Doe #3 dropped out of school rather than risk facing their hostility.

184.  Because of the registry, Mr. Doe #4 has likewise had difficulty getting an education.  He was rejected by several GED programs because he is a registered sex offender.

185.  With the assistance of his probation officer, Mr. Doe #4 was eventually able to identify a GED program that accepts registrants, and is currently pursuing his GED.

## F.  Travel

186.  The plaintiffs' status as registrants has severely restricted their ability to travel.

187.  The plaintiffs must provide advance notice when they intend to travel anywhere for more than seven days.  They must tell the police where they are going, where they will stay, how long they will be there, and when they will return.

M.C.L. § 28.725(1).

188.  The plaintiffs must provide 21 days advance notice if they travel outside the U.S. for more than seven days.  M.C.L. § 28.725(7).

189.  In addition, the plaintiffs must plan their travel so that they are able to register in person during the first 15 days of January, April, July and October, as required by the statute.

190.  If the plaintiffs travel, they must comply with any applicable sex offender registration laws in other jurisdictions.  Because sex offender laws are exceedingly complex and vary from state to state, it is extremely difficult to obtain accurate information about either affirmative reporting obligations (such as registering one's presence in a state) or prohibitions on ordinary behavior (such as visiting a library or park) in other jurisdictions.  *See* Consequences Triggered by Sex Offender Registration:  A National Sample, Attachment A to Declaration of James J. Prescott (Exh. 8).

191.  Mr. Doe #1 visits friends and family for no more than six days at a time because otherwise he would be required to notify law enforcement in person about his travel plans.

192.  Mr. Doe #2 is a military veteran, with friends all over the country and all over the world.  He enjoys travel.  He frequently drives to see his parents in Florida and his friends in Georgia, Maryland, Tennessee, and other places.

193.  Although Mr. Doe #2 would like to take extended trips to visit his friends and family, he does not do so, but rather limits his trips to seven days or less, including driving time.

194.  Mr. Doe #2 would like to travel internationally to see friends from the military who are stationed overseas.  One of his friends, a paraplegic military veteran, has invited Mr. Doe #2 to accompany him on a trip to Panama.

195.  Mr. Doe #2 has been unable to take these trips because SORA 2011 requires extensive advance notice for international travel.  Mr. Doe #2 is concerned that he cannot comply with the restrictions on international travel relating to where he will be staying at each stage of his trip – information that he cannot know in advance given the nature of his travel.

196.  Mr. Doe #3's status as a registrant has also impaired his ability to travel. In April 2011, Mr. Doe #3 took his wife on a four-day getaway to a resort in Mexico to celebrate her graduation from a program at the University of Michigan. On their return, border agents separated him from his wife and interrogated him for hours.  He was asked questions about his sex offender status.  Because of that experience, Mr. Doe #3 is reluctant to travel outside the United States again.

197.  Mr. Doe #4's status has limited his travel as well.  In 2007, Mr. Doe #4 wanted to travel to Puerto Rico to visit a sick relative, but was unable to do so because his registration obligations made the trip too complicated, and put him at

risk of felonious noncompliance.

198.  Ms. Doe and her husband would like to take extended trips to visit friends and family.  However, they only take trips that last seven days or less, including driving time, due to the requirement that Ms. Doe report in person if she goes anywhere for more than seven days.

199.  On one occasion, Ms. Doe took a wrong turn while driving in Detroit, and accidentally got into a traffic lane leading to the tunnel to Canada.  Although Ms. Doe did not cross into Canada, when she turned around, she had to go back through the United States border checkpoint.

200.  Because of Ms. Doe's status as a registrant, border agents demanded that Ms. Doe and her family get out of the vehicle.  The agents searched the car, interrogated Ms. Doe, her husband, and her daughter separately, and suggested that Ms. Doe was abducting her daughter.  The family was eventually released.

201.  Because of the requirements of SORA 2011, Ms. Doe has decided not to travel outside the United States, although she would like to do so.

### G.  Speech & Internet

202.  SORA 2011 severely restricts the plaintiffs' ability to speak freely on the Internet.  The plaintiffs not only must provide law enforcement with all electronic mail addresses, instant message addresses, log-in names, or other identifiers that are assigned to or routinely used by them, M.C.L. § 28.727(1)(i), but must also

report in person within three days whenever they establish any electronic mail address, instant message address, or other designation used in Internet communications or postings.  M.C.L. § 28.725(1)(f).

203.  The plaintiffs are concerned about using the Internet because SORA 2011 is unclear about whether, for example, they must report immediately and in person if they set up an on-line account to pay their taxes, register with Netflix, purchase or review products on Amazon, or use a college on-line bulletin board.

204.  Mr. Doe #4 does not use the Internet because he would be required under SORA 2011 to register all email and Internet identifiers, and would need to report constantly in order to use different websites with different user-names.

205.  Mr. Doe #4 would like to communicate with his family on Facebook, but does not do so because he would have to register information about his account.

206.  Ms. Doe's status as a registrant similarly restricts her freedom to use the Internet.  Ms. Doe has twice established a Facebook account, only to have it deleted without notice.  Although Facebook gave her no reason for shutting down her account, Facebook prohibits registrants from using its site.  Ms. Doe had been using her Facebook account both to communicate with friends and family and to organize a high school reunion.  She is now unable to do so.

207.  In addition, Ms. Doe is afraid that because she must provide all email and Internet identifiers pursuant to SORA 2011, her Internet use will be monitored.

## H.  False Information and Public Stigmatization

208.  The sex offender registry publicly and falsely labels Mr. Doe #1 as a "convicted sex offender," which he is not, as he was never convicted of a sex offense.

209.  The sex offender registry publicly and falsely labels Mr. Doe #2 as a "convicted sex offender," which he is not, as his case was dismissed and he was never convicted of a crime.

210.  The public registry website labels registrants by tier.  M.C.L. § 28.728(2)(l).  All of the plaintiffs are labeled as Tier III, which stigmatizes them, and publicly and falsely identifies them as among the most dangerous sex offenders on the registry.

211.  The public registry website posts extensive personal information about each registrant, including residential address, employer address, date of birth, school information, vehicle information, physical description (weight, height, etc.), and a photograph.  M.C.L. § 28.728(2).

212.  Because they are stigmatized as sex offenders on the public registry website, the plaintiffs and their families are subjected to harassment, social ostracism, and even threats of violence.

213.  For example, in the fall of 2010, Mr. Doe #4 received an anonymous death threat by mail.  Inside an envelope was a print-out of his page from the sex

offender registry with his photo.  His eyes were blacked out on the photo, and on the paper were the words "You will die."   Mr. Doe #4 has also been called a child molester on the street, and his wife is regularly asked why she is married to a sex offender.

### I.  Vagueness, Strict Liability, and Impossibility of Compliance

214.  The plaintiffs have been further harmed because the restrictions and obligations of SORA 2011 are so vague that the plaintiffs are unable to know whether or not they are in violation of the law, or are so extensive and pervasive that the plaintiffs are literally unable to comply with the law.  Moreover, different law enforcement agencies in different places apply the requirements of SORA 2011 differently.

215.  SORA 2011's requirements for reporting personal information are so vague that the plaintiffs do not understand what information must be reported, or what changes in information subject them to the in-person immediate reporting requirement.

216.  For example, Mr. Doe #1's vehicle breaks down frequently.  He does not know whether he must report each such period of non-use under M.C.L. § 28.725(1)(g), which requires him to report in person within three days if "operation of [his] vehicle is discontinued."

217.  SORA 2011 also requires Mr. Doe #1 to report the location where he

stores his vehicle.  M.C.L. § 28.727(1)(j).  He does not know if he must re-register each time he takes his car to the garage for repairs.

218.  Similarly, Mr. Doe #4 is confused about the vehicle reporting requirements.  He does not have a vehicle of his own, but has been told by the police that if he borrows a car more than three times, he must immediately report in person to provide the vehicle information.  M.C.L. § 28.727(1)(j) ("regular operation" of a vehicle).

219.  Mr. Doe #4 does not have a phone of his own.  He is unclear about whether M.C.L. § 28.727(1)(h) requires him to register his mother's telephone number if he uses her phone on occasion, including to get messages from counsel.

220.  Ms. Doe has registered a vehicle that she owns, but when it breaks down, she sometimes borrows her parents' cars.  Neither she (nor counsel) could determine whether her use of her parents' cars qualifies as "regularly operat[ing]" a vehicle.  M.C.L. § 28.725(1)(g).

221.  The plaintiffs who use the Internet are also unable to determine what information they must report under M.C.L. § 28.725(1)(f).

222.  The plaintiffs often cannot know if they are working, residing, or "loitering" within 1000 feet of school property because the property boundaries are unknown and the distances are impossible to measure without sophisticated equipment.

223. For example, Mr. Doe #1, when looking for an apartment, could not determine whether or not residences were within a geographic exclusion zone. He did not know whether the 1000 feet was measured building to building or property-line to property-line. He also had no easy way to gauge where school property lines were located.

224. Similarly, Mr. Doe #4 does not know whether he can take his own children to a playground on school property, or to a park, if other children are present. He does not know whether he can attend a minor cousin's birthday party in a public park, or whether he can go to a mall, where children may be present. The risk of a wrong decision is a criminal charge.

225. In discussing this case with counsel, the plaintiffs learned of many obligations and restrictions of which they were previously unaware. All the plaintiffs are concerned that they will inadvertently violate SORA 2011's requirements because they do not understand what they are.

226. Finally, SORA 2011 imposes criminal liability despite the impossibility of compliance. SORA 2011 imposes liability regardless of whether illness, injury, or practical difficulties make compliance impossible.

227. For example, since becoming homeless Mr. Doe #4 has been unable to comply with M.C.L. § 28.725a(7), which requires him to maintain a driver's license or personal identification card "with the individual's current address." The

Secretary of State will not issue identification without an address, and therefore Mr. Doe #4, who is registered as homeless, cannot comply with the requirement that his license match his registration information.

228.  Mr. Doe #4 also has difficulty complying with the reporting requirements because he does not have a vehicle and cannot arrange for transportation to update his information within three days.

229.  The plaintiffs fear that despite their best efforts to understand and comply with the law, and despite the absence of any intention to violate the law, they will be held strictly liable for any failure to comply.

230.  SORA 2011 imposes penalties of up to 10 years imprisonment for violations of the Act.  M.C.L. §§ 28.729(1); 28.734(2); 28.735(2).

## J.  Consequences Beyond SORA 2011

231.  Because the plaintiffs are required to register as sex offenders under SORA 2011, they are also subject to a vast and labyrinthine array of laws and ordinances imposed on registered sex offenders by the federal government, other state or tribal governments, and local municipalities.  *See* Prescott Decl., at 11-12 (Exh. 8); and Attachment A to Decl. (Consequences Triggered by Sex Offender Registration:  A National Sample).

232.  A compendium of the most significant state laws (which does not include federal, tribal, or local laws, and which disregards many of the more minor

requirements) contains over 1000 pages of obligations and restraints.  *Id.* at 9.

233.  Because registration in one state generally triggers registration in another state, the fact that the plaintiffs are subject to SORA 2011 means they are also subject to the sex offender laws of other jurisdictions if they travel or move.

234.  In addition, because the plaintiffs are required to register as sex offenders under SORA 2011, they are subject to policies by private entities that refuse to provide goods or services to registered sex offenders.  But for the fact that the plaintiffs are labeled by the state as registered sex offenders, the goods and services provided by those private entities would generally be available to them.

**FACTUAL ALLEGATIONS:**
**SORA 2011 IS NOT RATIONALLY RELATED TO THE GOAL OF**
**PUBLIC SAFETY**

235.  The plaintiffs incorporate by reference the declarations of Dr. J.J. Prescott (Exh. 8); Dr. Jill Levenson (Exh. 9); Dr. Janet Fay-Dumaine (Exh. 10); Peter Wagner, Esq. (Exh. 11); and Anne Yantus, Esq. (Exh. 12), all of which are attached.

236.  The avowed purpose of Michigan's sex offender registry is to "prevent[] and protect[] against the commission of future criminal sexual acts by convicted sex offenders."  M.C.L. § 28.721a.

237.  The idea that SORA 2011 will promote public safety is based on the assumption that sex offender registration will reduce recidivism by convicted

45

offenders and thereby reduce the risk to the public.

238.  That assumption is false.

239.  In fact, the research shows that public registries are likely to *increase, rather than decrease, recidivism*, and are therefore counterproductive to their avowed purpose of public protection.

240.  As outlined in more detail in the declaration of James J. Prescott (Exh. 8), large-scale empirical research on the impact of sex offender registries has found that *public* sex offender registries have likely increased, and almost certainly not reduced, the frequency of sex offenses.  (By contrast, the research has also found that *private law enforcement* registries have reduced recidivism against family members, neighbors, *etc.*, though not against strangers.)

241.  Specifically, this research shows that the more people a state subjects to public sex offender registration, the higher the relative frequency of sex offenses in that state.  Public registries (based on the offense of conviction) correlate with an *increase* in frequency of sex offenses against all types of victims (family members, neighbors, acquaintances, and strangers).  Prescott Decl., at 3-4 (Exh. 8).

242.  Applied to Michigan, this research suggests that SORA 2011 contributes to sex offense rates in Michigan that are 10% higher than they would be without SORA 2011.  Prescott Decl., at 3 (Exh. 8).

243.  Although it may seem counter-intuitive that public registration increases

rather than decreases recidivism, these results reflect the fact that sex offender registration and the attendant consequences exacerbate risk factors for recidivism, such as lack of employment and housing, and prevent healthy reintegration into the community.  Prescott Decl., at 7-8 (Exh. 8).

244.  These results are mirrored by other evidence-based research on the impact of sex offender registration.  Most studies reveal no significant reduction in sex crime rates that can be attributed to sex offender laws and policies.  Rather, there is a significant body of empirical work that overwhelmingly shows that, at best, public registration makes no difference to recidivism rates, and that it may well be counter-productive.  *See* Levenson Decl., at 3 (Exh. 9); Prescott Decl., at 12 (Exh. 8).

245.  The two studies that detected reductions in sex crime recidivism after the passage of registration laws were both in states that have risk-based, rather than offense-based, classification, and that limit public notification to those offenders who have been individually determined to pose the greatest threat to community safety.  *See* Levenson Decl., at 3 (Exh. 9).

246.  Moreover, there is no research to support the hypothesis that registrants who live closer to child-oriented settings are more likely to reoffend.  Rather, the research shows that where registrants live is not a significant contributing factor to recidivism.  *See* Levenson Decl., at 4 (Exh. 9).

247.  Residency restrictions reduce housing options for registrants, leading to housing instability.  Housing instability is consistently correlated with higher criminal recidivism, and may help account for the increases in recidivism triggered by registration.  *See* Prescott Decl., at 7-8 (Exh. 8); Levenson Decl., at 5-6 (Exh. 9).  Thus, residency restrictions are likely to increase rather than decrease sexual offending.

248.  Similarly, requirements that interfere with employment, social support, and engagement in pro-social activities undermine the avowed public safety goals of sex offender registration laws.  Social policies that ostracize and disrupt the stability of sex offenders are counterproductive to increasing public safety.  *See* Levenson Decl., at 7, 10 (Exh. 9).

249.  Failure to comply with registration requirements does not predict sexual recidivism.  Levenson Decl., at 11-12 (Exh. 9).

250.  There is no empirical evidence to support the notion that more frequent registration check-ins lower recidivism, nor is there evidence that reporting additional information (*e.g.*, email addresses, employment information) reduces recidivism.  Levenson Decl., at 10 (Exh. 9).

251.  In sum, SORA 2011 is not rationally related to the public safety goal it purports to serve.

**FACTUAL ALLEGATIONS: THE REQUIREMENTS OF SORA 2011
BEAR NO REASONABLE RELATIONSHIP TO THE RISK THAT
INDIVIDUAL REGISTRANTS POSE TO THE COMMUNITY**

252.  SORA 2011 is also premised on the assumption that all individuals

convicted of sex offenses pose a great risk to public safety, which justifies

continuous and lengthy supervision and restrictions.

253.  In fact, while some individuals convicted of sex offenses will reoffend, the

vast majority of new sex offenses are committed not by registered offenders, but

by individuals without prior sex offenses.  For example, a study in New York

found that 95% of all arrests for sexual offenses were for individuals who did not

have a prior sexual offense conviction and who were not on a sex offender registry.

*See* Levenson Decl., at 8 (Exh. 9).

254.  Among those with prior sex offenses, recidivism rates vary with the

presence of certain risk factors.  *See* Levenson Decl., at 8 (Exh. 9).  While some

individuals convicted of sex offenses pose a significant risk to public safety, most

do not.

255.  Most sex offenders do not re-offend sexually.  First-time sexual offenders

are significantly less likely to re-offend than those with multiple sexual

convictions, and offenders over the age of 50 are less likely to re-offend than

younger offenders.  Moreover, recidivism rates differ significantly depending on

the nature of the offense (*e.g.*, rape, incest, child victim, *etc.*).

49

256.  Research indicates that the risk for sexual re-offending is reduced by half when a person has spent 5-10 years offense-free in the community.  The risk continues to decline the more time the person spends offense-free in the community.  Risk for sexual recidivism also declines with age.  *See* Levenson Decl., at 10 (Exh. 9).

257.  SORA 2011 is not based on risk.  The tier to which an individual is assigned, whether an individual is listed on the public registry, and how long an individual must register, are all based solely on the offense of conviction, not on the individual's level of risk.

258.  Individuals classified as Tier III under SORA 2011 are often at lower risk to reoffend than individuals classified as Tier I or Tier II.  The result of this offense-based registration system is that the public's and law enforcement's ability to identify sexually dangerous persons is significantly reduced.  *See* Levenson Decl., at 2 (Exh. 9).

259.  Because recidivism risk declines significantly with advancing age and with time spent offense-free in the community, requiring registration for 25 years to life is both inefficient and unnecessary.  *See* Levenson Decl. (Exh. 9) at 10.

260.  In addition, SORA 2011, by focusing on the danger posed by strangers (who can be identified through the registry), misidentifies the source of risk.  In 93% of cases of child sexual abuse, the offender was a family member or

acquaintance, not a stranger listed on the registry.

261. Public sex offender registration and residency restrictions, which focus on "stranger danger," give parents a false sense of security by implying that knowing where sex offenders live or banishing them from the community in fact reduces the risk of sex offenses being committed, when such measures do not have this effect. *See* Levenson Decl., at 9 (Exh. 9).

262. In sum, the requirements of SORA 2011 bear no rational relationship to the risks that individual registrants pose to the community.

## FACTUAL ALLEGATIONS: THE PLAINTIFFS' RISK LEVELS

263. Actuarial risk assessment instruments – which are used to determine the statistical likelihood that an individual will reoffend based on known diagnostic indicators – are far better at predicting recidivism risk than the fact of a conviction. *See* Levenson Decl., at 8 (Exh. 9).

264. The most commonly used and well-researched risk instrument is the Static-99. The Static-99 is designed to assist in the prediction of sexual recidivism for male sexual offenders. The Static-99 has demonstrated good predictive accuracy in multiple validation studies and offers a firm scientific basis for assessing the likelihood that an individual convicted of a sex offense will re-offend. *Id*.

265. The Static-99 is easily scored by anyone trained to do so. *Id*.

266.  Janet Fay-Dumaine, Psy. D., a licensed psychologist, conducted actuarial risk assessments of plaintiffs John Does #2-4 using the Static-99R (the most recent version of the Static-99).

267.  John Doe #1 could not be scored as he did not commit a sex offense.  The Static-99 also could not be used for Mary Doe, as it has not been validated for female offenders.  Fay-Dumaine Decl., at 1, 4 (Exh. 10).

268.  John Does #2-4 all received a Static-99R score of "2".  Offenders from routine correctional samples with a score of "2" have been found to sexually reoffend at a rate of only five percent (or one in 20) over five years.  *See* Fay-Dumaine Decl., at 1 (Exh. 10).

269.  Because sexual offending decreases steadily with age, the Static-99R incorporates age as a risk factor.  John Does #2-4 are all currently under age 35.  At the age of 35, their Static-99R scores will drop to a "1", and their recidivism risk will drop to 3.8%.  As they grow even older, their recidivism risk will continue to decrease.  *See* Fay-Dumaine Decl., at 1, 3 (Exh. 10).

270.  Although the Static-99R could not be scored for Mary Doe, research on female sexual offenders has found that they have "an 'extremely low' rate of sexual recidivism" (between 1-3%).  Fay-Dumaine Decl., at 4 (Exh. 10).

271.  Although the plaintiffs are classified as Tier III offenders and required to register for life, actuarial risk assessment indicates that they are in fact extremely

low risk. Moreover, the nature of their offenses and the length of time that they have successfully lived offense-free in the community also indicate that they are very unlikely to reoffend.

### FACTUAL ALLEGATIONS: GEOGRAPHIC EXCLUSION ZONES

272. Under SORA 2011, the plaintiffs are barred from residing, working, or "loitering" within a "student safety zone," defined as 1000 feet from school property. M.C.L. §§ 28.733-735.

273. The State of Michigan does not make maps available to the public showing where the exclusion zones are located or what their boundaries are.

274. It is impossible for ordinary people to identify the areas that are inside and outside the exclusion zones. The task is difficult even for experts with sophisticated mapping technology. Distances are difficult to estimate or measure and property boundaries are difficult to locate. Moreover, exclusion zones often have irregular shapes, because they are measured from property boundaries and because the zones overlap. Exclusion zones are not shaped like simple circles around a fixed point. Wagner Decl., at 4 (Exh. 11).

275. It is impossible for the plaintiffs to comply with the prohibition on "loitering," which requires moment-to-moment knowledge of whether or not they are in an exclusion zone. Wagner Decl., at 6 (Exh. 11).

276. The exclusion zones cover vast areas, especially in urban and suburban

regions.  Because exclusion zones are measured as the crow flies, rather than as people actual travel between two points, some exclusion zones cover areas that are much further than 1000 feet from a school, in terms of the travel distance.  Wagner Decl., at 6-10 (Exh. 11).

277.  Exclusion zones put a significant percentage of cities and towns off-limits. As a result, exclusion zones severely restrict access to employment and housing, and limit registrants' ability to engage in normal human activity.  Wagner Decl., at 10 (Exh. 11).

## FACTUAL ALLEGATIONS:
## CENTRALITY OF REGISTRATION TO PLEA NEGOTIATIONS

278.  Because of the severe burdens associated with sex offender registration, the issue of whether a conviction will result in registration is critical for criminal defendants.  Yantus Decl., at ¶¶ 5-7 (Exh. 12).

279.  The choice whether or not to plead guilty often turns on whether a defendant must register, for how long a defendant must register, and whether registration is public or private.  Yantus Decl., at ¶¶ 5-7 (Exh. 12).

280.  The plaintiffs elected to waive their constitutional right to trial and pled guilty based on their understanding of the consequences of their pleas.

281.  SORA 2011 has fundamentally, and retroactively, altered the consequences of their pleas.

## FACTUAL ALLEGATIONS:
## UNFUNDED COSTS TO LOCAL LAW ENFORCEMENT

282.  SORA 2011 imposes new unfunded obligations on local law enforcement agencies.

283.  As set forth above, SORA 2011 mandates that local law enforcement agencies collect, maintain, and report far more, and far more detailed, information about registrants than was true in the past.  *See* Exh. 1.

284.  The new requirement for in person reporting of a much broader range of information increases the number of interactions that local law enforcement must have with registrants and the amount of time that local law enforcement must devote to registration and monitoring.  *Id.*

285.  SORA 2011 mandates that local law enforcement agencies register and monitor registrants for much longer periods of time.  Upon information and belief, under SORA 2011, about 80% of registrants are now classified as Tier III, which means that they must report quarterly for life.

286.  SORA 2011 also imposes new obligations with respect to enforcement.  If a registrant fails to register or update registration information as required, local law enforcement must within three days: determine if the individual has absconded or is locatable; notify the State Police; revise the information in the registry to reflect that the person has absconded or cannot be found; seek a warrant for the individual's arrest; and enter information into the national crime information center

wanted-person file.  M.C.L. § 28.728a.

287.  Upon information and belief, SORA 2011 increases the costs borne by local law enforcement agencies in registering and monitoring sex offenders, and in enforcing the act.

288.  While to date no published information spells out the increased costs of SORA 2011 to local Michigan law enforcement, a study of Texas municipalities facing similar changes found that registering offenders under the Adam Walsh Act would cost an additional $14 million per year for cities and counties statewide.  *See* Tim Brown, Texas Association of Counties, *Costs to Local Governments from Implementing the Adam Walsh Act* (Oct. 19, 2010) (Exh. 13).

289.  SORA 2011 increases the one-time registration fee paid by each new registrant by $15 (from $35 to $50).  M.C.L. § 28.725b(1).

290.  SORA 2011 increases the portion of the fee allotted to local courts and local law enforcement by $10 (from $10 to $20).  M.C.L. § 28.725b.

291.  This increase of $10 per new registrant is the sole source of funding for all of the increased local government activity required by SORA 2011 for the registration and monitoring of both current and future registrants.

292.  The Senate Fiscal Impact Statement estimated that, for the entire state, the fee increase would result in an increase of only $20,000 annually, to be divided by local agencies state-wide.

293.  Upon information and belief, the minimal additional revenue provided to local law enforcement under SORA 2011 is far below the actual necessary costs to local law enforcement of implementing SORA 2011.

## CLAIMS FOR RELIEF

## COUNT I: VIOLATION OF THE EX POST FACTO CLAUSE

294.  The retroactive application of SORA 2011 violates the Ex Post Facto Clause of the U.S. Constitution, Art. I, § 10, cl. 1, because it makes more burdensome the punishment imposed for offenses committed prior to enactment of SORA 2011, and it applies SORA 2011 retroactively.

## COUNT II: VIOLATION OF THE DUE PROCESS CLAUSE (Travel)

295.  The right to travel is a fundamental right that is protected under the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

296.  SORA 2011 substantially interferes with the plaintiffs' ability to travel.

297.  SORA 2011 does not provide for any individualized consideration before restricting the plaintiffs' right to travel.

298.  SORA 2011 violates the plaintiffs' fundamental right to travel because it is not narrowly tailored to serve a compelling state interest.

## COUNT III: VIOLATION OF THE DUE PROCESS CLAUSE (Work)

299.  The right to engage in the common occupations of life is a fundamental right that is protected under the Due Process Clause of the Fourteenth Amendment.

300.  SORA 2011 substantially interferes with the plaintiffs' ability to engage in the common occupations of life.

301.  SORA 2011 creates a wholesale barrier to employment.  That barrier is not based on the plaintiffs' fitness or capacity to work in the jobs from which they have been excluded.

302.  SORA 2011 does not provide for any individualized consideration before restricting the plaintiffs' ability to engage in the common occupations of life.

303.  SORA 2011 violates the plaintiffs' fundamental right to engage in the common occupations of life because it is not narrowly tailored to serve a compelling state interest.

**COUNT IV: VIOLATION OF THE DUE PROCESS CLAUSE (Children)**

304.  The right to direct the education and upbringing of children is a fundamental right that is protected by the Due Process Clause of the Fourteenth Amendment.

305.  SORA 2011 substantially interferes with the plaintiffs' ability to direct the education and upbringing of their children.

306.  SORA 2011 does not provide for any individualized consideration before restricting the plaintiffs' right to direct the education and upbringing of children.

307.  SORA 2011 violates the plaintiffs' fundamental right to direct the education and upbringing of children because it is not narrowly tailored to serve a

compelling state interest.

## COUNT V: VIOLATION OF THE FIRST AMENDMENT

308.  The First Amendment prohibits abridgement of the freedom of speech.
The Fourteenth Amendment incorporates the First Amendment against the states.

309.  SORA 2011 requires the plaintiffs to report information about their on-line accounts and activity to law enforcement, which substantially interferes with access to the Internet as a forum for speech and eliminates the plaintiffs' opportunities for anonymous on-line speech.

310.  SORA 2011's requirements to report information about on-line accounts and activity is invalid under the First Amendment both on its face and as applied because it is not narrowly tailored to serve a compelling state interest and because it prohibits a substantial amount of protected speech.

## COUNT VI: VIOLATION OF THE DUE PROCESS CLAUSE
### (Retroactivity)

311.  The Due Process Clause of the Fourteenth Amendment imposes limits on retroactive legislation that is harsh or oppressive or that violates principles of fundamental fairness.

### Claim of John Doe #1

312.  John Doe #1 pled guilty to the offense of kidnapping in 1990.  There was no sexual element to his crime, and at the time he pled guilty, Michigan had no sex offender registration.  Mr. Doe #1 is now subject to lifetime sex offender

registration.

313.  Retroactively imposing SORA 2011 on Mr. Doe #1 violates the Due

Process Clause of the Fourteenth Amendment to the United States Constitution.

### Claim of John Doe #2

314.  John Doe #2 pled guilty in 1997 under the Holmes Youthful Trainee Act

based on a promise that, upon completion of probation, his case would be

dismissed and his records would be sealed.  He successfully completed probation

and his case was dismissed.  Nevertheless, Mr. Doe #2 is subject to lifetime

registration under SORA 2011.

315.  Retroactively imposing SORA 2011 on Mr. Doe #2 violates the Due

Process Clause of the Fourteenth Amendment to the United States Constitution.

### Claims of John Does #3 and #4 and Mary Doe

316.  Prior to the enactment of SORA 2011, the plaintiffs were required to

register for 25 years if living in Michigan.

317.  SORA 2011 has been applied retroactively to extend the plaintiffs'

registration periods from 25 years to life without any individualized showing that

such an extension is warranted.

318.  Retroactively extending the plaintiffs' registration periods violates the

Due Process Clause of the Fourteenth Amendment to the United States

Constitution.

## COUNT VII: VIOLATION THE DUE PROCESS CLAUSE
### (Vagueness, Impossibility and Strict Liability)

319.  The Due Process Clause of the Fourteenth Amendment prohibits states from enforcing laws that are unconstitutionally vague.  As a matter of due process, statutory requirements must be written with sufficient specificity that persons of ordinary intelligence need not guess at their meaning and will not differ as to their application.

320.  SORA 2011 contains provisions that are invalid under the vagueness doctrine because those provisions fail to provide a person of ordinary intelligence fair notice of what is required and what is prohibited under the statute, making it impossible for the plaintiffs to conform their conduct to the statutory requirements, and making it likely that the statute will be enforced in different ways in different places or against different people.

321.  The Due Process Clause of the Fourteenth Amendment prohibits states from enforcing laws with which it is impossible to comply.  SORA 2011 contains provisions with which compliance is impossible.

322.  The Due Process Clause also limits the use of strict liability in the criminal law.  SORA 2011 contains provisions that impose strict liability in violation of due process.

323.  The parts of SORA 2011 that are void for vagueness, or are impossible to comply with, or wrongly impose strict liability include but are not limited to:

a. the prohibition on working within a student safety zone, M.C.L. § 28.733-734;

b. the prohibition on loitering within a student safety zone, M.C.L. § 28.733-734;

c. the prohibition on residing within a student safety zone, M.C.L. § 28.733 & 735;

d. the requirement to immediately report changes in personal data, M.C.L. § 28.725;

e. the requirement to report educational information, M.C.L. § 28.724a; and

f. the requirement to maintain a driver's license or state personal identification card with a current address.  M.C.L. § 28.725a(7).

## COUNT VIII: VIOLATION OF THE HEADLEE AMENDMENT

324.  The Headlee Amendment to the Michigan Constitution prohibits the state legislature from requiring local governments to increase their level of participation in a state program unless the state fully funds any necessary increased costs.  Mich. Const. Art. 9, § 29.

325.  The State Disbursements to Local Units of Government Act, M.C.L. § 21.231 *et seq.*, which implements the Headlee Amendment, requires that the state legislature "appropriate an amount sufficient to make disbursements to each local unit of government for the necessary cost of each state requirement."  M.C.L. § 21. 235(1).

326.  As Michigan taxpayers, the plaintiffs have standing to bring a Headlee claim.  Mich. Const. Art. 9, § 32.

327.  SORA 2011 imposes increased requirements on local law enforcement agencies for the collection, maintenance, and reporting of data that the State of

Michigan uses for its sex offender registry.

328.  SORA 2011 also imposes increased requirements on local law enforcement agencies for the enforcement of SORA 2011.

329.  Upon information and belief, the increased and unreimbursed costs borne by local law enforcement agencies under SORA 2011 substantially exceed $300 per local government.  *See* M.C.L. § 21.232(4) (costs below $300 are considered *de minimus*).

330.  These increased requirements are a "new activity or service or an increase in the level of any activity or service beyond that required by existing law," within the meaning of the Headlee Amendment.

331.  The State of Michigan has failed to make or disburse a state appropriation to local governments that is sufficient to cover the necessary increased costs imposed on local governments under SORA 2011.

332.  SORA 2011 violates the Michigan Constitution, Art. 9, § 29 and the State Disbursements to Local Units of Government Act because SORA 2011 requires new activities or services, as well as an increase in the level of existing activities or services beyond that required by existing law, without sufficiently funding the necessary increased costs imposed on local governments.

**Lack of Legal Remedy**

333.  The plaintiffs' harm is ongoing, and cannot be alleviated except by

injunctive relief.

334.  No other remedy is available at law.

### **Request For Relief**

Wherefore, the plaintiffs request that this Court:

a.  Issue a judgment, pursuant to 28 U.S.C. §§ 2201-2202, declaring that retroactive application of SORA 2011 violates the prohibition in the United States Constitution against ex post facto laws, and issue a preliminary and permanent injunction restraining the defendants from retroactively enforcing SORA 2011 against the plaintiffs without an individualized determination of dangerousness;

b.  Issue a judgment, pursuant to 28 U.S.C. §§ 2201-2202, declaring that SORA 2011 unconstitutionally interferes with the plaintiffs' fundamental rights to travel, to engage in the common occupations of life, to direct the education and upbringing of their children, and to engage in free speech, and issue a preliminary and permanent injunction restraining the defendants from enforcing against the plaintiffs those provisions of SORA 2011 that interfere with these rights;

c.  Issue a judgment, pursuant to 28 U.S.C. §§ 2201-2202, declaring that applying SORA 2011 to John Does #1 and #2 violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution, and issue a preliminary and permanent injunction restraining the defendants from enforcing SORA 2011 against them;

d.  Issue a judgment, pursuant to 28 U.S.C. §§ 2201-2202, declaring that retroactively extending the registration periods of John Does #3 – 4 and Mary Doe violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution; and issue a preliminary and permanent injunction restraining the defendants from retroactively extending their registration periods;

e.  Issue a judgment, pursuant to 28 U.S.C. §§ 2201-2202, declaring that SORA 2011 is void under the Due Process Clause of the Fourteenth Amendment due to vagueness, impossibility, and wrongful imposition of

strict liability, and issue a preliminary and permanent injunction restraining the defendants from enforcing against the plaintiffs those provisions of SORA 2011 that are unconstitutional;

f. Issue a judgment, pursuant to 28 U.S.C. § 2201-2202, declaring that SORA 2011 violates Michigan's Headlee Amendment, Mich. Const. art. 9, § 29; and issue a preliminary and permanent injunction restraining the defendants from enforcing SORA 2011 until such time as the legislature appropriates funds sufficient to cover the necessary increased costs to local governments;

g. Award the plaintiffs their costs and attorneys' fees pursuant to 42 U.S.C. § 1988 and Mich. Const. Art. 9, § 32; and

h. Grant such other relief as the Court finds just and proper.

## COMPLAINT OF INTERVENOR JOHN DOE #5

Intervening plaintiff John Doe #5, for his complaint, states as follows[2]:

335. I am a resident of Detroit, Wayne County, MI. The parties have stipulated that I can be added as a named plaintiff in this action.

336. In 1979, when I was 21 years old, I ran in to my sister and a girl from the neighborhood where I grew up, at a local store.

337. The girl and I had known each other for a long time.  At that time she was 17 years old.

338. We all went back to my place.  At some point the girl and I went to my bedroom and we had sex.

---

[2] A declaration of John Doe #5 attesting to the facts of the intervenor's complaint is attached as Exhibit 14.

339. I believe that when she got home her mother asked where she had been, and she said she had been over at my place.  I believe her brother called the police.

340. The police came and talked to me.  At first they told me that they were not going to prosecute me, but then the girl's father got involved.

341. The girl's father did not live with her, but he was a minister or something, and he pushed the case with the police.  I was then charged with CSC III.

342. I was offered a plea down to CSC IV with six months in the Wayne County House of Corrections.

343. I rejected the plea because the sex was consensual; I believed that I had not committed any crime.

344. The case went to trial.  My sister backed up my account of what happened, but the prosecutor argued, "She's his sister."

345. The girl said she had not consented; I think she had to say that to stay in the good graces of her mother, her father, and her brother.

346. I made the mistake of testifying, and no doubt I came across to the jury as arrogant and self-centered and cocky, which is exactly how I was at 21.

347. I was convicted of CSC III; the court sentenced me to 2-15 years in prison, I believe in March of 1980.  This was my first conviction of any kind.  No one said anything about my having to register under a sex offender law.

348. I served about 21 months and got out 90 days early, I believe in December 1981.

349. During the 1990s, I committed some property crimes and went to prison twice (I believe for 20 months and 34 months) for those crimes.  I also got probation for some property crimes during the 2000s; I believe that in one of those cases I served around 8 months in the Wayne County Jail.

350. To the best of my knowledge, in none of those cases did anyone ever tell me that I would have to register under a sex offender law.

351. In November 2011 I was arrested for collecting scrap.  I pled guilty to larceny of more than $1,000 but less than $20,000 (MCL 750.3563A).

352. I believe the sentence was 18 months, with the first nine months to be served in the county jail.

353. At my sentencing, I believe the circuit court judge told me that I would not have to register under SORA.  (I am trying to get a transcript of that hearing.)

354. I only served five months and then got out on probation.

355. Part of the probation included a residential alcohol program.  Because I was in the residential program I could not report in person to my parole agent, who wrote me up for failing to report.  I had to go back to court in the summer of 2012.

356. By then the probation department was saying that I was required to register under SORA.  The judge agreed and gave me until November 2012 to register.

357. I had an MDOC policy directive that made it sound like certain procedures should have been followed, which never occurred.

358. When I failed to register by November 2012, I got charged with what I believe was a probation violation.  In January 2013 a visiting judge sentenced me to 90 days in jail.

359. I decided it wasn't worth the fight, so as soon as I got out I registered, and I have tried to keep my registration up to date, and to comply with the registration law, ever since.

360. Once I had to register, I was told that I couldn't stay at the place where I was living because it was across the street from a school.

361. I don't understand why I can't live near a school or park when I have never had any sexual interest in children and my 33-year-old CSC III conviction had nothing to do with children.

362. My sole source of income is disability.  I get a 30% Veterans Administration disability benefit, and I get SSI, for a total of about $710 a month, plus Medicaid.

363. Moving is always a burden for me because I almost never have savings to pay a deposit in addition to the rent, which limits the options of where I can live.

364. I was told that I had to register for life because of the "severity of the offense" that I was convicted of 33 years ago.

365. I have a stable life, with a girlfriend, family, friends, and help from Veterans' Services, Jewish Vocational Services, *etc.*  I am currently 56 years old.

366. I don't understand how I can be required to register as a sex offender for life for something that I did 33 years ago.  There was no registration law then, and when I was sentenced in 2011 for larceny, I believe I was told by the court that I would *not* have to register.

367. I believe that but for the 2011 crime – which had nothing to do with sex – I would not have to register at all.

368. I don't understand how I became sexually dangerous after 30+ years of clear conduct (I mean no sex offenses) just because I took some scrap metal that I should not have taken.

369. I wish to be added to the current lawsuit, which the lawyers tell me challenges the Sex Offender Registration Act.

370. Because of the registration law, there are places that I cannot live or work, and places that I cannot go.

371. I have never read the law and don't really know what I can do and what I can't do, or when or what I'm supposed to report.

372. I feel like at any time I can be arrested for a violation, because I am pretty sure there is always something I did or didn't do (that I don't know about) that would be a violation.

373. I have no idea what the boundaries are of schools or parks where there are kids, or how close I can get to them without violating the law, and I don't know how I am supposed to find out.

374. Over the years I have occasionally run in to the neighbor girl I had sex with that one time back in 1979.

375. She always apologizes for the trouble she caused me then, and tells me she wishes she had stood up to her family and taken responsibility for what she did.

376. I tell her not to worry; it wasn't her fault, and it was my attitude that got me convicted by the jury.

(Claim and Relief for Intervening Plaintiff)

377. Intervening plaintiff John Doe #5 adopts the claims raised by the plaintiffs in their earlier complaint, subject to the Court's order regarding all of those claims, and also adopts the requests for relief.

## SUPPLEMENTAL COMPLAINT BASED ON AMENDMENTS TO MICHIGAN'S SEX OFFENDER REGISTRATION ACT

378. On November 5, 2013, Michigan enacted Public Act 149 of 2013, (Exh. 15), which amended M.C.L. § 28.725a, effective April 1, 2014.[3]

---

[3] Public Act 149 of 2013 also altered registrants' reporting requirements, discussed in ¶¶ 118, 189, *supra*. Tier III registrants continue to report quarterly, but must do so according to a schedule set by their birth month. M.C.L. § 28.725a(3), *as amended*. Plaintiffs do not challenge the change in the timing for reporting.

379. M.C.L. § 28.725a(6) previously provided that registrants pay a one-time $50 registration fee.  M.C.L. § 28.725a(6), *as amended*, provides that registrants must pay both a $50 registration fee upon initial registration, and a $50 annual fee following the year of initial registration. The total fees cannot exceed $550.

380. An indigent registrant may seek a temporary waiver of the fee by proving his/her indigency to the satisfaction of the local law enforcement agency, sheriff's department, or MSP post where the individual reports. A registrant who is unable to pay must seek a new waiver every 90 days. M.C.L. § 28.725b(3).

381. Willful refusal or failure to pay the fees is a misdemeanor, punishable by imprisonment for not more than 90 days. M.C.L. § 28.729(4).

### COUNT IX: VIOLATION OF THE EX POST FACTO CLAUSE: SORA 2013 AND PUBLIC ACT 149 OF 2013

382. SORA 2011, in combination with Public Act 149 of 2013 – collectively "SORA 2013" – imposes such extensive and punitive restrictions on the plaintiffs that it violates the Ex Post Facto Clause of the U.S. Constitution, Art. I, § 10, cl. 1, because it makes more burdensome the punishment imposed for offenses committed prior to enactment of these laws, and applies retroactively.

383. The retroactive application of the fee requirements of Public Act 149 of 2013 violates the Ex Post Facto Clause of the U.S. Constitution, Art. I, § 10, cl. 1, because it makes more burdensome the punishment imposed for offenses

committed prior to enactment of Public Act 149 of 2013, and it applies Public Act

149 of 2013 retroactively.

## **Request For Relief**

Wherefore, the plaintiffs request that this Court:

i.  Issue a judgment, pursuant to 28 U.S.C. §§ 2201-2202, declaring that
    retroactive application of SORA 2013 violates the prohibition in the
    United States Constitution against ex post facto laws, and issue a
    preliminary and permanent injunction restraining the defendants from
    retroactively enforcing SORA 2013 against the plaintiffs without an
    individualized determination of dangerousness;

j.  Issue a judgment, pursuant to 28 U.S.C. §§ 2201-2202, declaring that
    retroactive application of the fee provisions Public Act 149 of 2013
    violates the prohibition in the United States Constitution against ex post
    facto laws, and issue a preliminary and permanent injunction restraining
    the defendants from retroactively enforcing the fee provisions against the
    plaintiffs.

Respectfully submitted,

s/ Miriam Aukerman
American Civil Liberties Union
   Fund of Michigan
Attorney for Plaintiffs
1514 Wealthy SE
Grand Rapids, MI 49506
(616) 301-0930
maukerman@aclumich.org  (P63165)

s/ Michael Steinberg
s/ Kary Moss
American Civil Liberties Union
   Fund of Michigan
Attorneys for Plaintiffs
2966 Woodward Avenue
Detroit, MI  48201
(313) 578-6814
msteinberg@aclumich.org  (P43085)
kmoss@aclumich.org  (P49759)

s/ Paul D. Reingold
Michigan Clinical Law Program
Attorneys for Plaintiffs
363 Legal Research Building
801 Monroe Street
Ann Arbor, MI  48109
(734) 763-4319
pdr@umich.edu  (P27594)

s/ William Swor
Attorney for Plaintiffs
645 Griswold Street, Ste. 3060
Detroit, MI  48226
(313) 967-0200
wwswor@wwnet.net  (P21215)

Dated:  December 2, 2013

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

### <u>INDEX OF EXHIBITS</u>

<u>Exhibit</u>       <u>Description</u>

1             Obligations, Disabilities, and Restraints Imposed by SORA 2011

2             Declaration of John Doe #1

3             Declaration of John Doe #2

4             Declaration of John Doe #3

5             Amended Declaration of John Doe #4

6             Declaration of Mary Doe

7             Amended Declaration of I.G.

8             Declaration of Dr. James J. Prescott, J.D., Ph.D., on SORA Effects

9             Declaration of Dr. Jill Levenson, Ph.D., on SORA Studies and Effects

10            Declaration of Dr. Janet Fay-Dumaine, Psy. D., on the Plaintiffs' Risk
              Level

11            Declaration of Peter Wagner, J.D., on the Impact of Exclusion Zones

12            Declaration of Anne Yantus, J.D., on the Impact of Registration on
              Plea Bargaining

13            Texas Association of Counties Report on Costs to Local Governments
              of Implementing the Adam Walsh Act

14            John Doe #5 Verification of Intervenor's Complaint

15            Michigan Public Act 149 of 2013