UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

JOHN DOES #1-5 and MARY DOE,

                        Plaintiffs,

v.

RICHARD SNYDER, Governor of the
State of Michigan, and COL. KRISTE
ETUE, Director of the Michigan State
Police, in their official capacities,

                        Defendants.

File No. 2:12-cv-11194

Hon. ROBERT H. CLELAND

Mag. Judge DAVID R. GRAND

_____

**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
AFTER DISCOVERY**

Pursuant to Fed. R. Civ. P. 56, plaintiffs move for summary judgment on the grounds that there are no genuine issues of material facts and that they are entitled to judgment as a matter of law.

Specifically, plaintiffs ask that this Court grant summary judgment in their favor on Counts IV, V, VI, VII, and IX of their First Amended Complaint (Dkt 46). Further, plaintiffs ask this Court to:

    a.  Issue a judgment, pursuant to 28 U.S.C. §§ 2201-2202, declaring that
        SORA 2013 is void under the Due Process Clause of the Fourteenth

Amendment due to vagueness, impossibility, and wrongful imposition of strict liability, and issue a preliminary and permanent injunction restraining the defendants from enforcing against the plaintiffs those provisions of SORA 2013 that are unconstitutional for these reasons;

b. Issue a judgment, pursuant to 28 U.S.C. §§ 2201-2202, declaring that SORA 2013 unconstitutionally interferes with the plaintiffs' fundamental right to direct the education and upbringing of their children, and issue a preliminary and permanent injunction restraining the defendants from enforcing against the plaintiffs those provisions of SORA 2013 that interfere with these rights;

c. Issue a judgment, pursuant to 28 U.S.C. §§ 2201-2202, declaring that SORA 2013 unconstitutionally interferes with the plaintiffs' fundamental rights to engage in free speech, and issue a preliminary and permanent injunction restraining the defendants from enforcing against the plaintiffs those provisions of SORA 2013 that interfere with these rights;

d. Issue a judgment, pursuant to 28 U.S.C. §§ 2201-2202, declaring that requiring the plaintiffs to register for life violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution; and issue a preliminary and permanent injunction restraining the defendants from requiring plaintiffs to register for life;

e. Issue a judgment, pursuant to 28 U.S.C. §§ 2201-2202, declaring that retroactive application of the fee provisions Public Act 149 of 2013 violates the prohibition in the United States Constitution against ex post facto laws, and issue a preliminary and permanent injunction restraining the defendants from retroactively enforcing the fee provisions against the plaintiffs;

f. Issue a judgment, pursuant to 28 U.S.C. §§ 2201-2202, declaring that the retroactive application of the fee provisions Public Act 149 of 2013, in combination with the other provisions of SORA 2013, violates the prohibition in the United States Constitution against ex post facto laws, and issue a preliminary and permanent injunction restraining the defendants from retroactively enforcing SORA 2013 against the plaintiffs without an individualized determination of dangerousness.

On February 17, 2014, plaintiffs' counsel contacted defendants' counsel to seek concurrence for this motion. Concurrence was not granted.

Respectfully submitted,

s/ Miriam Aukerman
American Civil Liberties Union
 Fund of Michigan
Attorney for Plaintiffs
1514 Wealthy SE
Grand Rapids, MI 49506
(616) 301-0930
maukerman@aclumich.org (P63165)

s/ Paul D. Reingold
Michigan Clinical Law Program
Attorneys for Plaintiffs
363 Legal Research Building
801 Monroe Street
Ann Arbor, MI 48109
(734) 763-4319
pdr@umich.edu (P27594)

s/ Sofia Nelson
s/ Michael Steinberg
s/ Kary Moss
American Civil Liberties Union
 Fund of Michigan
Attorneys for Plaintiffs
2966 Woodward Avenue
Detroit, MI 48201
(313) 578-6814
snelson@aclumich.org (P77960)
msteinberg@aclumich.org (P43085)
kmoss@aclumich.org (P49759)

s/ William Swor
Attorney for Plaintiffs
645 Griswold Street, Ste. 3060
Detroit, MI 48226
(313) 967-0200
wwswor@wwnet.net (P21215)

Dated: February 20, 2014

# PLAINTIFFS' BRIEF IN SUPPORT OF
# MOTION FOR SUMMARY JUDGMENT
# AFTER DISCOVERY

## TABLE OF CONTENTS

Index of Authorities ................................................................................. iii

Statement Of Material Facts ....................................................................... 1

I.  SORA 2013 IS UNCONSTITUTIONALLY VAGUE ...................................... 1

  A.  SORA 2013 Provides Neither Clear Notice of What Conduct Is
      Forbidden Nor Adequate Guidance to Law Enforcement ......................... 1

  B.  SORA 2013 Is Unconstitutional Unless It Meets a High Standard for
      Clarity. .......................................................................................... 3

  C.  The Geographic Exclusion Zones Are Void for Vagueness. .................... 4

  D.  SORA 2013's Reporting Requirements Are Void for Vagueness. ............ 8

  E.  The "Loitering" Provision Is Void for Vagueness. ............................... 10

II.  SORA 2013 IMPOSES STRICT LIABILITY FOR DUTIES THAT ARE
     UNKNOWABLE OR IMPOSSIBLE TO PERFORM. .................................... 11

III. SORA 2013 VIOLATES PLAINTIFFS' FUNDAMENTAL RIGHT TO
     PARENT. ........................................................................................... 14

  A.  Parents Have a Fundamental Right to Participate in Their Children's
      Upbringing. ..................................................................................... 14

  B.  SORA 2013's Exclusion Zones Prevent Parents from Participating in
      Their Children's Upbringing. ............................................................. 16

  C.  SORA 2013's Exclusion Zone Provisions Are Not Narrowly Tailored. . . 18

IV.  SORA 2013 RESTRICTS PLAINTIFFS' FUNDAMENTAL RIGHT TO
     FREE SPEECH. ................................................................................... 19

  A.  SORA 2013's Internet Restrictions Infringe More Speech than Is
      Necessary. ....................................................................................... 20

  B.  SORA 2013 Violates Plaintiffs' Right to Anonymous Speech ............... 21

V.   SORA 2013'S LIFETIME REGISTRATION REQUIREMENT VIOLATES
     DUE PROCESS. ...........................................................................22

     A.   Retroactive Laws Are Disfavored. ...........................................22

     B.   Because Lifetime Registration Burdens Fundamental Rights and Is
          Retroactive, the Court Should Apply Strict Scrutiny..............................23

     C.   Lifetime Registration Is Not Narrowly Tailored.....................................28

     D.   Requiring Public Registration for Life Is Not Rationally Related to
          Any Legitimate Government Purpose.......................................31

VI.  SORA 2013'S RETROACTIVE ANNUAL FEE VIOLATES THE EX POST
     FACTO CLAUSE. ...........................................................................33

     A.   The $50 Annual Charge Violates the Ex Post Facto Clause....................34

     B.   SORA 2013's Cumulative Burdens, Including the Annual Fee, Violate
          the Ex Post Facto Clause. ...........................................................35

Conclusion ...........................................................................36

INDEX OF AUTHORITIES

## Cases

*Belle Maer Harbor v. Charter Twp of Harrison*, 170 F3d. 553
   (6th Cir. 1999) ............................................................................................ 4, 6, 10

*Bowen v. Georgetown Univ. Hospital*, 488 U.S. 204 (1988) ................................. 22

*Broadrick v. Oklahoma* 413, U.S. 601 (1973) ........................................................ 19

*Citizens United v. Federal Election Com'n*, 558 U.S. 310 (2010) ......................... 23

*City of Cleburne v. Cleburne Living Center,* 473 U.S. 432 (1985) ........................ 31

*Colautti v. Franklin*, 439 U.S. 379 (1979) .......................................................... 3, 12

*Columbia Natural Resources, Inc. v. Tatum*, 58 F.3d 1101 (6th Cir. 1995) ............. 1

*Connally v. General Construction Co.*, 269 U.S. 385 (1926) ................................... 2

*Connecticut Dep't of Pub. Safety v. Doe*, 538 U.S. 1 (2003) ................................. 30

*Cramp v. Bd. of Pub. Instruction*, 368 U.S. 278 (1961) ........................................... 2

*Cunney v. Bd. of Trustees of Village of Grand View, N.Y.*, 660 F.3d 612
   (2d Cir. 2011) ......................................................................................................... 7

*Doe v 2TheMartcom Inc*, 140 F Supp 2d 1088 (WD Wash 2001) ......................... 21

*Doe v. Cahill,* 884 A.2d 451 (Del.2005) ............................................................... 21

*Doe v. City of Albuquerque*, 667 F.3d 1111 (10th Cir. 2012) ................................ 23

*Doe v. Jindal,* 853 F. Supp. 2d 596 (M.D. La. 2012) ............................................ 20

*Doe v. Nebraska,* 898 F.Supp.2d 1086 (2012) ...................................................... 21

*Doe v. Prosecutor,* 705 F.3d 694 (7th Cir. 2013) ............................................ 20, 22

*Doe v. Thompson*, Case No. 12-C-168 (Kan. Division 6, July 2013) .................... 29

*Does v. Snyder*, 932 F. Supp. 2d 803 (E.D. Mich. 2013) ............................ 9, 25, 32

*Eastern Enterprises v. Apfel*, 524 U.S. 498 (1998) ................................................ 24

*Elwell v. Twp. of Lower*, 2006 WL 3797974 (N.J. Super. Ct.. 2006) ..................... 16

*General Motors Corp v. Romein*, 503 U.S. 181 (1992) .......................................... 23

*Ghanam v. Does*, 2014 WL 26075 (Mich. App. Jan 2, 2014) ................................ 21

*Grayned v. City of Rockford*, 408 U.S. 104 (1972) ...................................................3

*I.N.S. v. St. Cyr*, 533 U.S. 289 (2001)................................................................ 26, 27

*Johnson v. Cincinnati*, 310 F.3d 484 (6th Cir. 2002) ...............................................15

*Kaiser Aluminum & Chemical Corp. v. Bonjorno*, 494 U.S. 827 (1990)................22

*Kennedy v. Mendoza-Martinez*, 372 U.S. 144 (1963) ..............................................35

*Kolender v. Lawson*, 461 U.S. 352, (1983)...................................................... 1, 2, 9

*Lambert v. California*, 355 U.S. 225 (1957)............................................................12

*Landgraf v. USI Film Products*, 511 U.S. 244 (1994)............................................22

*Lanzetta v. New Jersey*, 306 U.S. 451 (1939).........................................................2

*Lynch v. United States*, 292 U.S. 571 (1934).........................................................24

*M.L.B. v. S.L.J.*, 519 U.S. 102 (1996) ....................................................................15

*McIntyre v. Ohio Elections Commission,* 514 U.S. 334 (1995) .............................21

*Morissette v. U.S.*, 342 U.S. 246 (1952) .................................................................11

*Mueller v. Raemisch*, __ F.3d __, 2014 WL 265758 (Jan. 24, 2014, 7th Cir.) .......34

*Padilla v. Kentucky*, 559 U.S. 356 (2010) ..............................................................26

Pension Benefit Guar. Corp. v. R.A. Gray & Co., 467 U.S. 717 (1984)................33

*People v. Cole*, 817 N.W.2d 497 (Mich. 2012) ......................................................27

*Reno v. ACLU,* 521 U.S. 844 (1997) ......................................................................19

*Rinaldi v. Yeager*, 384 U.S. 305 (1966)..................................................................33

*Romer v. Evans*, 517 U.S. 620 (1996) ....................................................................31

*Seal v. Morgan*, 229 F.3d 567 (6th Cir. 2000).......................................................23

*Smith v. Doe*, 538 U.S. 84 (2003) ..........................................................................35

*State v Packingham*, 748 SE 2d 146 (NC Ct App 2013).........................................20

*Troxel v. Granville*, 530 U.S. 57 (2000) ......................................................... 14, 15

*U.S. Trust Co. of New York v. New Jersey*, 431 U.S. 1 (1977)...............................24

*U.S. v. Apollo Energies, Inc.,* 611 F.3d 679 (10th Cir. 2010)..................................12

*U.S. v. Barton*, 455 F.3d 649 (6th Cir. 2006)..........................................................25

*United States v. Caseer*, 399 F.3d 830 (6th Cir. 2005)..............................................7

*United States v. Jones*, 489 F.3d 243 (6th Cir. 2007)...............................................34

*United States v. Prather*, 205 F.3d 1265 (11th Cir. 2000).......................................34

*United States v. Ragen*, 314 U.S. 513 (1942) ..........................................................12

*Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1 (1976) .........................................33

*Vill. of Hoffman Estates*, 455 U.S. 489 (1982) ..........................................................3

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989)................................................19

*Washington v. Glucksberg*, 521 U.S. 702 (1997) ............................................. 18, 24

*Welch v. Henry*, 305 U.S. 134 (1938)......................................................................24

*Wisconsin v. Yoder*, 406 U.S. 205 (1972) ................................................................14

## Statutes

M.C.L. § 28.722 ............................................................................................................8

M.C.L. § 28.723(1) .......................................................................................................9

M.C.L. § 28.724a ..........................................................................................................9

M.C.L. § 28.725(1) .....................................................................................................8, 9

M.C.L. § 28.725(1)(f) .................................................................................................19

M.C.L. § 28.725a .........................................................................................................4

M.C.L. § 28.725a(3)....................................................................................................13

M.C.L. § 28.725a(6)(b) ......................................................................................... 33, 35

M.C.L. § 28.725a(7).....................................................................................................14

M.C.L. § 28.725b(3) .....................................................................................................34

M.C.L. § 28.727(1) .......................................................................................................8

M.C.L. § 28.727(1)(i)...................................................................................................19

M.C.L. § 28.729(2) ......................................................................................... 11, 12, 13, 14

M.C.L. § 28.729(4) .......................................................................................................33

M.C.L. § 28.733 ............................................................................................................5

M.C.L. § 28.733(b) ...............................................................................10

M.C.L. § 28.734 ...................................................................................11

M.C.L. § 28.734(5) ...............................................................................18

M.C.L. § 750.145(d) ..............................................................................20

**Other Authorities**

2 J. Story, Commentaries on the Constitution § 1398 (5th ed. 1891) ....................22

Holmes, *The Common Law* ......................................................................12

**Treatises**

Rotunda & Nowak, 2 Treatise on Const. L. § 15.9(a)(vi) .......................................24

## STATEMENT OF MATERIAL FACTS

Because the case involves a voluminous record, the Statement of Material

Facts is attached as a separate document.

### ARGUMENT

## I.   SORA 2013 IS UNCONSTITUTIONALLY VAGUE.

### A.   SORA 2013 Provides Neither Clear Notice of What Conduct Is Forbidden Nor Adequate Guidance to Law Enforcement.

A statute is unconstitutionally vague if it does not (1) provide a person of or-

dinary intelligence notice of what conduct is prohibited, and (2) provide clear guid-

ance for those who enforce its prohibitions. *Kolender v. Lawson*, 461 U.S. 352, 357

(1983). These requirements reflect the two primary goals of the void for vagueness

doctrine: first, "to ensure fair notice to the citizenry," and second, "to provide

standards of enforcement by the police, judges, and juries." *Columbia Natural*

*Resources, Inc. v. Tatum*, 58 F.3d 1101, 1104 (6th Cir. 1995).

SORA 2013 fails both prongs of this test. With respect to the notice prong,

SORA 2013 is filled with vague and overbroad language, leaving plaintiffs un-

certain about their obligations under the law. Mat. Facts §§ IV-VII; Plaintiffs'

Response to Interrogatory 11, Exh 35. "[A] statute which either forbids or requires

the doing of an act in terms so vague that [people] of common intelligence must

necessarily guess at its meaning and differ as to its application violates the first

essential of due process of law." *Connally v. General Construction Co.*, 269 U.S.

1

385, 391 (1926). Among the most fundamental protections of due process is that

"'[n]o one may be required at peril of life, liberty or property to speculate as to the

meaning of penal statutes. All are entitled to be informed as to what the State com-

mands or forbids.' " *Cramp v. Bd. of Pub. Instruction*, 368 U.S. 278, 287 (1961)

(quoting *Lanzetta v. New Jersey*, 306 U.S. 451, 453 (1939)).

If plaintiffs' depositions proved anything, it is that they live in constant fear

of being found in violation of the statute because they do not understand what it

requires. To a person they limit their own behavior even beyond what a legalistic

reading of the statute demands because the consequences of being wrong are so

dire. For example, John Doe #3 did not attend his own child's birthday party be-

cause he was not sure if it was permitted, and he did not want to do anything that

would put him at risk of being incarcerated and separated from his family. Mat.

Facts §§ IV-VII; Doe #3 Dep 118-119, Exh 3.

SORA 2013 also fails the second prong of the *Kolender* test because it does

not provide adequate enforcement standards. "[T]he more important aspect of the

vagueness doctrine is … the requirement that a legislature establish minimal guide-

lines to govern law enforcement." *Kolender*, 461 U.S. at 358 (quotation omitted).

Without such minimal guidelines, a criminal statute may permit "a standardless

sweep [that] allows policemen, prosecutors, and juries to pursue their personal

predilections." *Id*. In the absence of "explicit standards," those who enforce the law

are vested with the power to decide basic policy matters on an *ad hoc* and subjective basis "with the attendant dangers of arbitrary and discriminatory application." *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972).

## B. SORA 2013 Is Unconstitutional Unless It Meets a High Standard for Clarity.

The Supreme Court has explained that "[t]he degree of vagueness that the Constitution tolerates, as well as the relative importance of fair notice and fair enforcement," depend on several factors. *Vill. of Hoffman Estates*, 455 U.S. 489, 498 (1982). First, "because the consequences of imprecision are qualitatively less severe" for civil statutes than for criminal statutes, laws that impose criminal liability are subject to heightened review. *Id.* at 499. Second, "[t]he constitutionality of a vague statutory standard is closely related to whether the standard incorporates a requirement of *mens rea*." *Colautti v. Franklin*, 439 U.S. 379, 395 (1979). In the absence of a scienter requirement which "may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed," laws are subject to more exacting constitutional scrutiny. *Hoffman Estates*, 455 U.S. at 499. "Finally, perhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights." *Id.* In sum, "[a]n enactment imposing criminal sanctions or reaching a substantial amount of constitutionally protected conduct may withstand facial constitutional scrutiny only if it incorporates a high

level of definiteness." *Belle Maer Harbor v. Charter Twp of Harrison*, 170 F3d.
553, 557 (6th Cir. 1999).

All three factors apply here. SORA 2013 imposes criminal sanctions (of up
to ten years of imprisonment) for non-compliance. M.C.L. §§ 28.729, 28.734(2),
28.735(2). Plaintiffs are strictly liable for violating the reporting requirements or
the student safety zone laws. M.C.L. §§ 28.725a, 28.729(2), 28.734-735; Mat.
Facts § VIII. And SORA 2013 affects plaintiffs' constitutional rights, most notably
with respect to parenting and Internet use. Mat. Facts §§ IX, X. Therefore, to
survive a constitutional challenge, SORA 2013 must include a "high level of
definiteness." *Belle Maer Harbor*, 170 F.3d at 557.

There are at least three areas where SORA 2013 fails that standard, resulting
in both inadequate notice to registrants and inconsistent implementation by law en-
forcement: (1) the inchoate geographic exclusion zones, (2) the lack of clarity for
affirmative reporting requirements, and (3) the confusion regarding "loitering."

**C. The Geographic Exclusion Zones Are Void for Vagueness.**

SORA 2013 defines a "student safety zone" as the area within 1,000 feet of a
"building, facility, structure, or real property owned, leased, or otherwise con-
trolled" by a "public, private, denominational, or parochial school" offering any
grade from developmental kindergarten to 12th grade, for which the property is
used for educational instruction or for "use by students not more than 19 years of

age for sports or other recreational activities." M.C.L. §§ 28.733(d), (e), (f).

These definitions may have made sense in a legislative committee room, but they are unworkable on the ground, for registrants and police alike. Geographic exclusion zones are not marked in the physical environment, and neither registrants nor police can know as they move about where those boundaries are. Moreover, the state provides no guidance on whether the 1,000-foot distance should be measured point to point or property-line to property-line, or on whether the distance should be measured as the crow flies or as people actually travel. Yet the size and shape of the exclusion depends entirely on how the measurement is done. Mat. Facts § V; Wagner 1st and 2nd Expert Reports, Exhs 25-26.

Even if one assumes that the statute should be interpreted to require property-line to property-line measurement, the exclusion zones are still unknowable because the state does not provide maps of those zones. Nor does the state make parcel data or lists of schools available, and without such information mapping exclusion zones is impossible. Furthermore, ordinary registrants and even police are unable to measure the 1,000-foot distance even if they had the necessary data. In sum, a registrant has no way of determining beforehand whether she has impermissibly entered an exclusion zone, and law enforcement has no way of knowing either. Wagner 1st and 2nd Expert Reports, Exhs 25-26; Mat. Facts § V (neither police nor registrants can determine boundaries of exclusion zones).

5

The problems with lack of notice and inconsistent enforcement are exacerbated by the Michigan State Police's policy of requiring each local law enforcement agency to determine for itself how to measure the boundaries of the prohibited area. Yet those agencies in turn routinely refer questions about exclusion zones back to the MSP. Violation of the statute depends entirely on the discretion of individual law enforcement agencies or local prosecutors in how they measure the 1,000-foot distance. Moreover, no law enforcement agency exercises supervisory authority to ensure consistent application of the law from one jurisdiction to another. Mat. Facts §§ IV-V.

Laws providing inadequate guidance on distance are unconstitutionally vague. In *Belle Maer*, 170 F.3d 553, the Sixth Circuit struck down an ordinance that imposed a "reasonable radius" requirement for certain marine apparatus. The court rejected the township's argument that the language was adequate and held that "due process requires at least sufficient exactness to prevent arbitrary enforcement and give notice of what an individual must do to comply with the enactment." *Id.* at 559. Because "neither the enforcement officer nor the [marine] operator can ascertain by examining the language of the Ordinance alone whether criminal sanctions will result from [different distances] around a protected object," the ordinance was void for vagueness. *Id.*

The Second Circuit likewise addressed vagueness in measurement in *Cunney*

6

*v. Bd. of Trustees of Village of Grand View, N.Y.*, 660 F.3d 612, 620-21 (2d Cir. 2011), where it overturned a zoning ordinance that prohibited structures rising more than 4.5 feet above a specific road. Although 4.5 feet itself is a measurable distance, the court found that it was "remarkably unclear" from what elevation the building height was to be measured. *Id.* The ordinance therefore failed to give specific notice of how to design a compliant building, and also failed to provide an objective standard the village could apply for enforcement. *Id*. The village's many interpretations as to how to measure the height reinforced the finding that the ordinance's vagueness would result in arbitrary enforcement. *Id*. at 622. SORA 2013's 1,000-foot distance, like the 4.5 feet at issue in *Cunney*, is a specific distance that seems precise, but is in fact unconstitutionally vague because it is unclear to both registrants and police how that distance should be measured.

Finally, the Sixth Circuit has warned that a statute can be vague even when precisely drafted if it is "written in a language foreign to persons of ordinary intelligence" and is so "technical or obscure that that it threatens to ensnare individuals engaged in apparently innocent conduct." *United States v. Caseer*, 399 F.3d 830, 836-37 (6th Cir. 2005). Here, the complicated language of geographic mapping is a language which few registrants can understand. Without specialized software and access to parcel data (which even the MSP cannot obtain), registrants cannot accurately map the areas that are off-limits. Mat. Facts § V.

### D. SORA 2013's Reporting Requirements Are Void for Vagueness.

Plaintiffs are subject to both quarterly and "immediate" (three-day) reporting requirements. M.C.L. §§ 28.725(1), 28.727(1). But the statute is unclear what information must be reported, and what events trigger "immediate" reporting.

First, many reporting requirements turn on how often a registrant takes some specified action. For example, registrants must report telephone numbers or email addresses "routinely used," vehicles "regularly operated", and the locations where vehicles are "habitually stored or kept." M.C.L. §§ 28.725(1)(g), 28.727(1)(h)-(j). The length of time or number of uses that qualify as "routinely," "regularly" or "habitually" is undefined. It is not clear how many uses of a car constitute "regularly," or how long a car must remain in a place to be considered "habitually" kept there. Registrants cannot know at what point they cross the line from a permitted act to a criminal violation of the law, nor can a court determine what the legislature meant. A person of common intelligence must guess how often is "regularly," and whether that differs from "habitually" or "routinely." Discovery showed that even the police cannot parse those terms. Mat. Facts, §§ IV, VI.

Second, many terms used in the statute – like "employee," "employer," "temporarily reside," "discontinue" one's studies/vehicle use, and "designation used in Internet communications" – are undefined or ill-defined, leaving registrants unsure about what changes must be immediately reported. M.C.L. §§ 28.722(e),

(p), (q); 28.723(1); 28.724(6); 28.724a; 28.725(1). Nor does law enforcement understand these terms: for example, neither MSP SOR Unit staff nor local police knew whether odd jobs are reportable or which Internet uses must be registered. Mat. Facts §§ VI, X.

The state provides no further guidance either to registrants or local law enforcement on what is reportable. As this Court previously noted, "If the individual police officers arrive[] at [a] conclusion on their own, the reporting provision certainly raises red flags." *Does v. Snyder*, 932 F. Supp. 2d 803, 822 (E.D. Mich. 2013). Discovery proved that to be the case: in response to deposition questions and surveys, MSP SOR Unit staff and local law enforcement agencies either could not answer questions about what information is reportable, provided inconsistent answers, or gave demonstrably wrong answers. Mat. Facts §§ IV, VI.

The Supreme Court and Sixth Circuit have repeatedly held that terms similar to those at issue here are void for vagueness. For example, in *Kolender*, 461 U.S. 352 (1983), the Court considered a facial challenge to a loitering statute that required people to provide "credible and reliable" identification and to account for their presence upon request. *Id.* at 353. The Court criticized the statute as vesting "complete discretion in the hands of the police" to determine whether a suspect had provided "credible and reliable" information, so that a person could walk innocuously on public streets "only at the whim of any police officer who happens to stop

that individual." *Id.* at 358. Discovery has shown that exactly the same thing is occurring under SORA. The Michigan State Police, local law enforcement, and county prosecutors' offices interpret SORA as they see fit, resulting in "complete discretion" at the local level, and vast disparities and inconsistencies in (1) what registrants are required to do from place to place, and (2) how SORA is enforced. Mat. Facts §§ IV-VII.

Similarly, in *Belle Maer*, 170 F.3d at 558, the Sixth Circuit found the term "reasonable" to be unconstitutionally vague. Not only did "reasonable" lack a statutory definition, but the common dictionary meaning of the word failed to provide adequate notice of the conduct prohibited and the standards for enforcement. The court noted that defendant's position was "substantially undercut" by deposition testimony of the officer charged with enforcing the ordinance, who conceded that "'[o]ne person's idea of a reasonable radius would vary from another's.'" *Id.* at 558. Here, too, the record is peppered with deposition testimony from Michigan State Police SOR Unit staff that different agencies will enforce SORA 2013 differently. Mat. Facts §§ IV-VII.

### E. The "Loitering" Provision Is Void for Vagueness.

SORA 2013 defines "to loiter" as meaning "to remain for a period of time and under circumstances that a reasonable person would determine is for the primary purpose of observing or contacting minors." M.C.L. § 28.733(b). Plaintiffs

10

may not "loiter" within 1,000 feet of school property. M.C.L. § 28.734.

The meaning of this term is totally unclear. For example, even in discovery defendants were unable to say whether the loitering ban would prohibit registrant-parents from observing or contacting their *own* children within an exclusion zone, *i.e.*, walking past a school with one's child in tow. Defendants' Answers to First Requests for Admission, No. 93, Exh 44. Plaintiffs do not know whether they are permitted to attend parent-teacher conferences, go to a school movie night, visit a nephew who lives in an exclusion zone, or take their children to a playground on the weekend. The police do not know either. Mat. Facts §§ VII, IX.

## II.   SORA 2013 IMPOSES STRICT LIABILITY FOR DUTIES THAT ARE UNKNOWABLE OR IMPOSSIBLE TO PERFORM.

SORA 2013 applies strict liability to many violations, making the problem of vagueness more acute. M.C.L. §§ 28.729(2); 28.734(2); 28.735(2). The law imposes complex, ambiguous requirements, yet punishes even inadvertent noncompliance. Strict liability is strongly disfavored in criminal law because "[i]t is … the general rule of law and the dictate of natural justice, that to constitute guilt there must be not only a wrongful act, but a criminal intention." *Morissette v. U.S.*, 342 U.S. 246, 274 (1952). In the absence of a scienter requirement, laws – particularly vague laws – may be "little more than 'a trap for those who act in good faith.' " *Colautti*, 439 U.S. at 395 (citing *United States v. Ragen*, 314 U.S. 513, 524 (1942)).

11

In *Lambert v. California*, 355 U.S. 225 (1957), the Court decided this precise issue, holding that a law requiring felons to register violated due process. The law "'punished conduct which would not be blameworthy in the average member of the community,'" and therefore the defendant could not be held strictly liable. *Id*. at 229 (*quoting* Holmes, *The Common Law*, at 50). Strict liability is "constitutionally suspect" when conduct that is "commonly and ordinarily not criminal" results in a criminal violation. *U.S. v. Apollo Energies, Inc.,* 611 F.3d 679, 687 (10th Cir. 2010). While strict liability is allowable in regulating activities that people would ordinarily expect to be regulated (such as handling explosives), it is not constitutionally permissible to impose strict liability for engaging in activities that are not commonly criminalized (such as taking one's children to school or failing to report one's new email address). Yet under SORA 2013 ordinary activities are strict-liability crimes.

Moreover, the penalties under SORA 2013's strict liability provisions are severe. Violators can be sentenced to as much as two years of imprisonment, $2,000 in fines, or both. M.C.L. §§ 28.729(2); 28.734(2); 28.735(2). Since 2000, over 8,000 people have been convicted of violating M.C.L. § 28.729(2) (strict liability for reporting violations) and over 450 have been convicted of violating M.C.L. §§ 28.734(2); 28.735(2) (strict liability for safety zones). MSP SORA Conviction Data, Exh 46. It is clear that SORA's strict liability violations are and

will be prosecuted, even if some of these convictions were pled down from wilful violations.

Plaintiffs are also strictly liable even if they do not know, for example, what constitutes "regular use" of a vehicle, or whether attending a child's graduation is "loitering," or where the boundaries are for an exclusion zone. Indeed, even reliance on the advice of police or correctional officials cannot insulate them from liability if they misread the statute. Poxson Dep 66-68, Exh 14 (prosecuted for non-reporting even though he was "doing exactly what [he] had been told to do by local law enforcement"); Stapleton Expert Report 9, Exh 28 (MDOC agents permit conduct only to find that prosecutors or other law enforcement agencies disagree).

Most troubling of all is that SORA 2013 combines strict liability with impossibility. Plaintiffs must report in person regardless of whether illness, injury, or emergency makes compliance impossible. They will have to do so for the rest of their lives no matter how old or infirm they get, even if they are in nursing homes or suffer from dementia. M.C.L. §§ 28.725a(3); 28.729(2). Plaintiffs are strictly liable for non-reporting even where, as in the case of Doe #3, they cannot report because the registering agency is closed. Doe #3 Dep 56-60, Exh 3.

Mr. Doe #4's case presents a different example of impossibility. He is strictly liable for failing to maintain a driver's license with a current address, but he is unable to comply with the provision because SORA 2013 rendered him homeless.

13

Without an address, he cannot update his driver's license to match his registration address (which is "homeless"), and so is automatically in violation. M.C.L. §§ 28.725a(7); 28.729(2); Mat. Facts § VIII.

## III.   SORA 2013 VIOLATES PLAINTIFFS' FUNDAMENTAL RIGHT TO PARENT.

SORA 2013 infringes on plaintiffs' fundamental right to raise and care for their children, a right guaranteed to them through the due process clause of the Fourteenth Amendment. SORA 2013 creates geographic exclusion zones which ban registrants from engaging in core parenting activities and prevent them from participating in their children's upbringing and education.

### A.   Parents Have a Fundamental Right to Participate in Their Children's Upbringing.

The Supreme Court has called a parent's right to make decisions about the care, custody, and control of his or her children "perhaps the oldest of the fundamental liberty interests recognized by this Court." *Troxel v. Granville*, 530 U.S. 57, 65 (2000). *See also Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972) ("The history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children. This primary role of parents in the upbringing of their children is now established beyond debate as an enduring American tradition."). The education and upbringing of children are "among the associational rights this Court has ranked as of basic importance in our society, rights

14

sheltered by the Fourteenth Amendment against the State's unwarranted usurpation, disregard, or disrespect." *M.L.B. v. S.L.J.*, 519 U.S. 102, 116 (1996). Parents have a right not just to be involved in their children's lives, but to "to make decisions concerning the care, custody, and control of their children." *Troxel*, 530 U.S. at 66.

The Sixth Circuit has reaffirmed this principal in the context of geographic exclusion zones. In *Johnson v. Cincinnati*, 310 F.3d 484 (6th Cir. 2002), the court considered whether a geographic ban which prevented a grandmother from participating in her grandchildren's upbringing violated substantive due process. The plaintiff in *Johnson* was charged with a drug crime. The charge triggered an automatic ban from certain drug exclusion zones, which prevented the plaintiff from visiting her grandchildren and walking them to and from school. The court found that a drug exclusion zone "plainly infringed on [the plaintiff's] right to participate in the rearing of her grandchildren." *Id*. at 505. The geographic exclusion zone at issue in *Johnson* created an encumbrance, rather than an absolute barrier to being a part of the grandchildren's lives, yet the court still found that it violated the plaintiff's fundamental rights.

Similarly, a New Jersey court has said that geographical exclusion zones implicate fundamental parenting rights:

> The geographical restrictions on where the plaintiff … [may] 'loiter,' substantially intrude[s] upon significant family matters involving pri-

15

> vate and personal choices about how to raise and care for children,
> and decision-making about where to reside [by restricting] … a low-
> risk offender, from accompanying his children to the school bus stop,
> going into a school or to a public park with his children, for fear of
> being charged with 'loitering.'

*Elwell v. Twp. of Lower*, 2006 WL 3797974 at 15 (N.J. Super. Ct.. 2006). These

cases make clear that exclusion zones violate fundamental parenting rights where

they limit registrants' ability to raise and care for their children.

### B. SORA 2013's Exclusion Zones Prevent Parents from Participating in Their Children's Upbringing.

SORA 2013's curtailment of parental rights arises principally from the stat-

ute's prohibition on "loitering" within 1,000 feet of a school. M.C.L. § 28.734(1)

(b). The plain language of the statute contains no exemption that would allow

registrant-parents *ever* to contact or observe their own children within geographic

exclusion zones – zones that in places like Grand Rapids can comprise almost half

the city. Wagner 2nd Expert Report, Figure 10, Exh 26. It is hard to imagine how a

person can parent if she cannot observe or contact her children in half the city,

especially if she does not know which half is off-limits.

Even if one could read into the statute the idea that parents can observe and

contact their own children (but not their children's friends or classmates), parent-

ing is severely restricted. Parents can take their children to parks, playgrounds, or

other child-centered locations only if they first ascertain that those locations are

either outside exclusion zones (*i.e.*, not in the undefined half of the city that is pro-

16

hibited) or that no other children are present. A parent planning her child's birth-day party must find a location outside an exclusion zone, or not attend.

Furthermore, plaintiffs are unsure what sorts of activities constitute loitering. Because of uncertainty about the law, and an inability to get clear answers, plaintiffs have concluded that the safest course of action is to never put themselves in a situation where they could be arrested, particularly in front of their children. Accordingly, they avoid important events like parent-teacher conferences, which take place on school grounds, often with students in the building, and sometimes during the school day. Mat. Facts § IX.

Finally, the state itself has made clear that registrant-parents are barred from participating in the very activities that are most central to their children's lives. Attorney General Letter (7/14/06), Exh 94. Registrant-parents may not attend their children's sporting events, graduation ceremonies, school plays, recitals, concerts, debates, science fairs, dances, pep rallies, art shows, or any other school activity that might involve observing children. For example, Mary Doe attended her daughter's 5th grade graduation in Ohio, but could not attend her daughter's 8th grade graduation in Michigan. These sorts of events can be milestones in a child's development. The record is replete with examples of the severe emotional consequences that this prohibition on parental involvement has not just for the plaintiff- parents, but also for their children. Moreover, those children may miss out on educational

17

opportunities because their parents cannot attend. Mat. Facts § IX. Depriving parents of the right to participate in these central events is a greater restriction on familial rights than the ability to walk a grandchild to school, which the Sixth Circuit identified as an unconstitutional infringement in *Johnson*.

### C. SORA 2013's Exclusion Zone Provisions Are Not Narrowly Tailored.

A law that infringes on a fundamental right must be narrowly tailored. *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997). Yet SORA 2013's exclusion zones apply to all plaintiffs registrants regardless of (1) their status as parents, (2) whether or not their conviction involved children, (3) their likelihood of reoffending, or (4) the availability of more narrowly tailored alternatives.

Although the state has the capacity to track whether registrants are parents, it does not do so. Nor are police trained to treat parents any differently than other registrants. Mat. Facts § IX. The statute includes carve-outs for some fundamental rights (*e.g.,* voting in a school building, M.C.L. § 28.734(5)), but it does not contain similar exceptions for parents with children in school.

In sum, because SORA 2013 contains no exemptions for parent/child relationships, it impermissibly burdens core parental activities and violates plaintiffs' fundamental right to participate in their children's upbringing.

**IV.   SORA 2013 RESTRICTS PLAINTIFFS' FUNDAMENTAL RIGHT TO FREE SPEECH.**

The First Amendment's free speech protections extend to the Internet. The Supreme Court has held that there is "no basis for qualifying the level of First Amendment scrutiny that should be applied to" the Internet. *Reno v. ACLU,* 521 U.S. 844, 870 (1997). Laws burdening speech must be narrowly tailored. *See Broadrick v. Oklahoma* 413, U.S. 601, 613 (1973). Time, place, and manner restrictions on speech must also be narrowly tailored, and must serve a "significant government interest" and "leave open ample alternative channels for communication." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).

SORA 2013 requires plaintiffs to disclose any Internet identifiers they regularly use and report any new email addresses or instant messaging accounts. M.C.L. § 28.727(1)(i). Registrants must also report in person within three days whenever they establish "any electronic mail or instant message address, or any other designations used in Internet communications or postings." M.C.L. § 28.725 (1)(f). These requirements are unconstitutional because they burden more speech than necessary, chill protected speech, and violate plaintiffs' right to anonymous speech.

19

### A. SORA 2013's Internet Restrictions Infringe More Speech than Is Necessary.

A number of courts have struck down online speech restrictions imposed on registrants as overly broad. In *Doe v. Prosecutor,* 705 F.3d 694 (7th Cir. 2013), the Seventh Circuit held that a law prohibiting sex offenders from using certain websites was not narrowly tailored because it broadly prohibited a wide range of protected speech. *Id.* at 695. As the court pointed out, Indiana already had laws prohibiting soliciting minors online, and these existing laws did a much better job at narrowly targeting the behavior the state wanted to curtail. *Id.* at 699. *See also Doe v. Jindal,* 853 F. Supp. 2d 596 (M.D. La. 2012) (finding a statute that restricted Internet use overly broad and vague); *State v Packingham*, 748 SE 2d 146, 152 (NC Ct App 2013) (finding a statute restricting Internet use for registrants overly broad because it "appli[ed] equally to every registered sex offender in the state, regardless of whether the offender committed a sexual offense involving a minor.").

SORA 2013's Internet provisions restrict speech, but do nothing beyond what is accomplished by existing laws to protect minors from sexual crime. Michigan, like Indiana, has separate laws to address soliciting minors online. *See, e.g.,* M.C.L. § 750.145(d). And SORA 2013's reporting burdens apply to all registrants, regardless of whether their crime involved minors or the Internet. These restrictions are overbroad, and therefore are not narrowly tailored.

20

### B.  SORA 2013 Violates Plaintiffs' Right to Anonymous Speech

The U.S. Supreme Court has stated that "an author's decision to remain anonymous ... is an aspect of the freedom of speech protected by the First Amendment." *McIntyre v. Ohio Elections Commission,* 514 U.S. 334, 342 (1995). Anonymous Internet speech is also protected. *See Doe v 2TheMartcom Inc*, 140 F Supp 2d 1088, 1092 (WD Wash 2001) ("The right to speak anonymously extends to speech via the Internet."); *Ghanam v. Does*, 2014 WL 26075 (Mich. App. Jan 2, 2014) ("This right to speak anonymously applies to those expressing views on the Internet."); *Doe v. Cahill,* 884 A.2d 451, 456 (Del.2005) ("It is clear that speech over the Internet is entitled to First Amendment protection. This protection extends to anonymous Internet speech.").

SORA 2013 limits legitimate and protected speech. Mat. Facts § X. Registrants have to identify themselves even if their online conversations and postings are critical of state government, or law enforcement, or local elected officials. Requiring registrants to identify themselves in every online interaction has an unconstitutional chilling effect on speech. *See Doe v. Nebraska,* 898 F.Supp.2d 1086, 1120 (2012) (finding a law requiring registrants to provide the state with Internet identifiers "clearly chills offenders from engaging in expressive activity that is otherwise perfectly proper."). It is also redundant given existing Michigan law. Online solicitation is already illegal and "the goal of deterrence does not li-

cense the state to restrict for more speech than necessary to target the prospective harm." *Doe v. Prosecutor*, 705 F3d at 701.

## V.   SORA 2013'S LIFETIME REGISTRATION REQUIREMENT VIOLATES DUE PROCESS.

### A. Retroactive Laws Are Disfavored.

Under the 2011 SORA amendments, plaintiffs were all retroactively subjected to lifetime registration. Retroactivity is generally disfavored in the law, *Bowen v. Georgetown Univ. Hospital*, 488 U.S. 204, 208 (1988), in accordance with "fundamental notions of justice" that have been recognized throughout history. *Kaiser Aluminum & Chemical Corp. v. Bonjorno*, 494 U.S. 827, 855 (1990) (Scalia, J., concurring). As Justice Story put it: "Retrospective laws are, indeed, generally unjust; and, as has been forcibly said, neither accord with sound legislation nor with the fundamental principles of the social compact." 2 J. Story, Commentaries on the Constitution § 1398 (5th ed. 1891).

The due process clause "protects the interests in fair notice and repose that may be compromised by retroactive legislation; a justification sufficient to validate a statute's prospective application under the clause may not suffice to warrant its retroactive application." *Landgraf v. USI Film Products*, 511 U.S. 244, 266 (1994) (citation omitted). Retroactive legislation "presents problems of unfairness that are more serious than those posed by prospective legislation, because it can deprive citizens of legitimate expectations and upset settled transactions." *General Motors*

22

*Corp v. Romein*, 503 U.S. 181, 191 (1992). The "Legislature's unmatched powers allow it to sweep away settled expectations suddenly and without individualized consideration. Its responsivity to political pressures poses a risk that it may be tempted to use retroactive legislation as a means of retribution against unpopular groups or individuals." *Landgraf*, 511 U.S. at 266.

### B. Because Lifetime Registration Burdens Fundamental Rights and Is Retroactive, the Court Should Apply Strict Scrutiny.

Despite the strong presumption against retroactive legislation, such laws are not *per se* unconstitutional. Rather, their constitutionality depends on the extent to which such laws undermine fundamental fairness. Courts thus consider several factors.

First, as with all laws, retroactive laws that burden fundamental rights are "subject to strict scrutiny, and will be upheld only when they are narrowly tailored to a compelling governmental interest." *Seal v. Morgan*, 229 F.3d 567, 574 (6th Cir. 2000). The state has the burden to demonstrate that a restriction that burdens a fundamental right is narrowly tailored. *Citizens United v. Federal Election Com'n*, 558 U.S. 310, 898 (2010); *Doe v. City of Albuquerque*, 667 F.3d 1111, 1132 (10th Cir. 2012) (invalidating city ordinance restricting registered sex offenders from using public libraries as insufficiently narrowly tailored).

Because SORA 2013 retroactively imposes a lifelong burden on plaintiffs' fundamental rights, most notably their First Amendment rights and their right to

parent their children, it should be subject to heightened scrutiny. *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997).

Second, the constitutionality of retroactive legislation depends on the "distance into the past that the act reaches back to impose a liability… and the magnitude of that liability." *Eastern Enterprises v. Apfel*, 524 U.S. 498, 534 (1998) (plurality opinion) (invalidating retroactive application of health benefits law). Where "the consequences are particularly harsh and oppressive," retroactive legislation is more likely to be found unconstitutional. *U.S. Trust Co. of New York v. New Jersey*, 431 U.S. 1, 45 n.13 (1977) (quotation marks omitted).

SORA 2013 has unlimited retroactive reach, covering even plaintiffs like Does #1 and #5, who were convicted decades ago, long before the creation of Michigan's sex offender registry. Moreover, the retroactive application of SORA 2013 subjects plaintiffs to severe consequences affecting every aspect of their lives, from parenting and free speech, to housing, work, travel, education, public stigmatization, and continuous lifelong reporting. Mat. Facts, §§ IX, X and XII.

Third, retroactive legislation is subject to greater scrutiny under the due process clause if it invalidates agreements made by the government. Rotunda & Nowak, 2 Treatise on Const. L. § 15.9(a)(vi) (due process requires "more than a rational relationship" for modification of governmental agreements); *Lynch v. United States*, 292 U.S. 571 (1934) (retroactive legislation repealing government

24

insurance agreements violated due process; standard of review is higher than for legislation modifying private contracts).

This Court previously decided that there are some circumstances where the state may abrogate its plea agreements (*e.g.*, SORA may abrogate records sealed under the Holmes Youthful Trainee Act). *Snyder*, 932 F. Supp.2d at 820-821. The issue here, however, is not whether the state may *ever* abrogate the terms of a plea agreement, but rather what standard of review applies to retroactive legislation that affects the terms of plea agreements – in this case the retroactive requirement of lifetime registration.

Fourth, as the Sixth Circuit explained in *U.S. v. Barton*, 455 F.3d 649, 654-655 (6th Cir. 2006), "when addressing ex post facto-type due process concerns, questions of notice, foreseeability, and fair warning are paramount." In *Barton* the court found no due process violation in the retroactive application of a detrimental change to a sentencing law because "the change in question would not have had an effect on anyone's behavior." *Id.* at 655. Here, by contrast, the undisputed record is that plaintiffs would have made different decisions – especially with respect to plea bargaining – had they known they would become subject to lifelong registration. Mat. Facts § III. Moreover, the record shows that for both prosecutors and criminal defendants, sex offender registration is central to plea negotiations. *Id.* at § XI.

The due process requirement of fair notice of the consequences of a criminal conviction is not limited to those sanctions traditionally recognized as punishment for the purposes of ex post facto analysis. For example, the U.S. Supreme Court has been particularly concerned about protecting defendants' due process rights with respect to the immigration consequences of convictions. Deportation, like sex offender registration, is a "severe penalty" that is "intimately related to the criminal process, which makes it uniquely difficult to classify as either a direct or a collateral consequence." *Padilla v. Kentucky*, 559 U.S. 356, 357 (2010); Mat. Facts § XI (sex offender registration is a key issue in plea bargaining); Mat. Facts § XV (registration is an integral part of sentencing).

But regardless of how sanctions are classified, due process is implicated when severe consequences tied to criminal convictions are retroactively applied. For example, in *I.N.S. v. St. Cyr*, 533 U.S. 289 (2001), the Supreme Court held that changes to an immigration law, which barred discretionary relief for individuals convicted of certain crimes, could not be applied retroactively. "Plea agreements involve a *quid pro quo* between a criminal defendant and the government." *Id.* at 323. Since defendants "rely[] upon settled practice, the advice of counsel, and perhaps even the assurance in open court" regarding the consequences of a plea, the "potential for unfairness in the retroactive application of [the statute] … is significant and manifest." *Id.* Once plea agreements are made, "it would surely be

26

contrary to familiar considerations of fair notice, reasonable reliance, and settled expectations" to impose more severe conviction-based consequences than those considered by the defendant at the time of the plea. *Id.* (citation omitted.) The Court's reasoning is as true for sex offender registration as it is for immigration. *See also People v. Cole*, 817 N.W.2d 497 (Mich. 2012) (lifetime electronic monitoring of a sex offender who was unaware of that sanction at the time of the plea violates due process).

The due process question before this Court is not whether the myriad amendments to SORA over the last 20 years can be applied retroactively, but rather whether one particular change – the imposition of lifetime registration – violates due process.[1] Plaintiffs do not suggest that every retroactive amendment to SORA (*e.g.*, changing the reporting month) violates due process. Rather, they challenge one particular change, namely the retroactive requirement of lifetime registration. All of the factors requiring heightened scrutiny of retroactive laws apply to retroactive lifetime registration: fundamental rights are at issue; SORA reaches far back in time and imposes consequences of enormous magnitude; the government is vitiating agreements it made; and plaintiffs lacked fair notice. In sum, retroactive lifetime registration meets heightened scrutiny.

---

[1] While plaintiffs have argued that the cumulative amendments to SORA constitute punishment in violation of the ex post facto clause, the due process question here is specifically limited to the issue of lifetime registration.

## C. Lifetime Registration Is Not Narrowly Tailored.

SORA's stated purpose is to "prevent[] and protect[] against the commission of future criminal sexual acts by convicted sex offenders." M.C.L. § 28.721a. Public safety is certainly an important government interest, but SORA 2013's lifetime registration requirement is not narrowly tailored to that purpose.

First, lifetime registration is inherently overbroad. While approximately 27% of registrants were subject to lifetime registration before the 2011 amendments, approximately 72% were subject to lifetime registration after the amendments. Under the statute, almost three-quarters of active registrants, or nearly 30,000 people, must register for life as sex offenders, regardless of the risk they pose to society and regardless of their physical capacity to commit an offense. This number will keep growing as more people are added to the registry each year than drop off due to death – the only way for lifetime registrants to come off the list. Mat. Facts § XI.

SORA 2013 requires lifetime registration for all Tier III registrants despite the fact that research shows that recidivism dramatically decreases with age. The recidivism risk of medium and high-risk offenders drops off sharply over time, so that after 17 years offense-free in the community even high-risk offenders present a statistically lower risk of committing a sex offense than the baseline comparison group of men not previously convicted of sex offenses. Mat. Facts § XIII.

Moreover, low-risk offenders – including many Tier III offenders – pose *less* statistical risk of committing a sex offense from the outset than the baseline comparison for "out of the blue" offenses. Mat. Facts § XIII.

Thus lifetime registration is not tailored at all – much less narrowly tailored – to SORA's avowed public safety goal. A Kansas court recently concluded that even a 25-year registration requirement "exceeds the amount of time necessary to protect public safety." *Doe v. Thompson*, Case No. 12-C-168 at 25 (Kan. Division 6, July 2013), Exh 71.

Second, imposition of lifetime registration is not narrowly tailored to the purported public safety goal because research shows that public registration of sex offenders is actually *counterproductive and detrimental to public safety*. In fact, SORA 2013's public disclosure component affects public safety *adversely*. Prescott Report 2-4, 8, 12, Exh 22. And no evidence supports the proposition that exclusion zones add to public safety or reduce crime in any way, despite the huge burden such zones place on registrants. Mat. Facts §§ XIII-XIV. The state has not refuted the evidence that offense-based public sex offender registration and notification actually undermines SORA 2013's stated purpose by increasing sex crime recidivism, nor has the state introduced any evidence that exclusion zones promote public safety. In Kansas, the court struck down part of that state's SORA regime because "the very notification schemes that are meant to protect the public

from possible recidivism are likely to increase recidivism." *Thompson,* Case No. 12-C-168 at 23, Exh 71.

Even if SORA 2013 were not retroactive, its lifetime registration provision burdens fundamental rights, is not narrowly tailored, and is therefore unconstitutional.[2] SORA 2013 burdens plaintiffs' fundamental rights for life: it not only affects plaintiffs' rights to parent and to use the Internet today, but the lifetime registration requirement means that those rights will be restricted forever. Yet the state has offered no rationale or evidence to support barring registrants *whose crimes did not involve children* from living, working, or loitering within 1,000 feet of a school. Likewise, SORA is not narrowly tailored to advance the goal of public safety when it requires all 40,000 registrants to immediately report in person if they create a new Internet identifier, where fewer than 2,800 registrants were convicted of Internet or computer-related offenses. Mat. Facts § XIII. Nor is SORA narrowly tailored when it requires people like Mr. Doe #1 to face restrictions for

---

[2] Some courts have found that earlier (less onerous) registration laws do not violate fundamental rights, and are therefore subject to rational basis review. The Supreme Court, however, has yet to reach the question of whether the far more comprehensive SORNA-based registration laws, or ones that include exclusion zones, burden fundamental rights. *Connecticut Dep't of Pub. Safety v. Doe*, 538 U.S. 1, 7 (2003) ("We find it unnecessary to reach this question [of whether respondent was deprived of a liberty interest as a result of registration]…."). Because the Sixth Circuit has yet to consider a registration regime as all-encompassing as SORA 2013, and because the Supreme Court has yet to reach the question of whether these new registration laws burden fundamental rights, this case presents an issue of first impression.

life even though they never committed a sex offense, and have never been found to
pose a sexual danger to anyone.

### D. Requiring Public Registration for Life Is Not Rationally Related to Any Legitimate Government Purpose.

To survive rational basis review, a statute must be rationally related to a
legitimate state interest. *City of Cleburne v. Cleburne Living Center,* 473 U.S. 432,
440 (1985). While rational basis review is a less exacting standard than strict scru-
tiny, a statue still must be "narrow enough in scope and grounded in a sufficient
factual context" for a court to understand the relationship between the burden im-
posed and the governmental purpose advanced by that burden. *Romer v. Evans*,
517 U.S. 620, 632-33 (1996); *see also Celburne*, 473 U.S. at 446.

It is irrational to require most Michigan registrants to register and report
quarterly in-person for *life* no matter how low their risk of reoffending, and no
matter how old or incapacitated they become. More importantly, SORA 2013 is
not rationally related to its stated purpose because offense-based public sex offen-
der registries undermine the avowed purpose of the law. The state has proffered no
evidence that registration reduces recidivism, and indeed the state does not even
track recidivism. Mat. Facts § XIV.

Unable to prove a public safety justification, the state alternately claims that lifetime registration is necessary to conform to federal law,[3] and therefore to create a uniform registration regime across states. In fact, although states were required to comply with SORNA by July 27, 2011, or lose federal law enforcement funds, to date only 17 states have substantially complied. The majority of states have elected not to adopt SORNA standards because they are concerned about the costs and effectiveness of those standards. Mat. Facts § XI (states have concluded that substantial compliance with SORNA is irrational and cost prohibitive). The goal of uniformity cannot be a rational basis if two-thirds of the states have declined to adopt SORNA-compliant sex offender laws. *Snyder,* 932 F. Supp.2d at 821.

To the contrary, there is "incredible variety in the procedures and substantive obligations across the states." Prescott Exp Rep § 11, Att A, Exh 22. Lifetime registration does not in any way simplify this patchwork of thousands of laws; it only forces plaintiffs to comply with them for the rest of their lives.

The 2011 legislative history suggests that another potential justification for imposing lifetime registration was to avoid losing Byrne grant funding by complying with SORNA. Mat. Facts § XI. The desire to conserve resources alone is not a sufficient rational basis to impose an otherwise unjustified burden on a particular

---

[3] Student safety zones are not required by SORNA, so the only purpose for the exclusions zones can be public safety, which is not supported by any research.

group. Moreover, the fiscal analysis of other states – concluding that the cost of implementing SORNA far exceeds the reduction in federal funding at issue – calls this justification into question as well. Mat. Facts § XV. *See Rinaldi v. Yeager*, 384 U.S. 305, 309-10 (1966).

Finally, "the retrospective aspects of legislation, as well as the prospective aspects, must meet the test of due process, and the justifications for the latter may not suffice for the former." *Usery v. Turner Elkhorn Mining Co*., 428 U.S. 1, 17 (1976). Not only must the law be justified by a rational legislative purpose, but "the retroactive application of the legislation" must itself be separately justified by a rational legislative purpose. *Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 730 (1984). There is no rational basis for applying lifetime registration to people like Mr. Doe #5, who went over thirty years without a sex offense before he was "recaptured" by SORA for stealing scrap metal, and who is now subject to lifelong registration.

## VI.   SORA 2013'S RETROACTIVE ANNUAL FEE VIOLATES THE EX POST FACTO CLAUSE.

In November 2013, Michigan passed a new law requiring registrants to pay an annual fee of $50. M.C.L. § 28.725a(6)(b) (eff. Apr. 1, 2014). The rationale behind the new fee requirement was to help offset the cost of maintaining the registry. Mat. Facts §XVI. Failure to pay the annual fee within 90 days of reporting is a crime. M.C.L. § 28.729(4). Indigent registrants who cannot pay the fee must seek a

waiver every 90 days to avoid being non-compliant and subject to prosecution.

M.C.L. § 28.725b(3).

### A. The $50 Annual Charge Violates the Ex Post Facto Clause.

In *United States v. Jones*, 489 F.3d 243, 255 n.5 (6th Cir. 2007), the Sixth

Circuit held that retroactively increasing a conviction-based fee violates the ex post

facto clause, even if the fee increase was as small as $50. Under the rationale of

*Jones,* retroactively requiring plaintiffs to pay the $50 annual fee is likewise un-

constitutional punishment here. *See also United States v. Prather*, 205 F.3d 1265,

1272 (11th Cir. 2000) (retroactive fee increase for crimes from $50 to $100 is a

violation of the ex post facto clause).

Although Sixth Circuit law is controlling here, defendants will likely rely on

the Seventh Circuit's recent decision reversing a Wisconsin District Court, which

had held that an annual sex offender registration fee constituted an ex post facto

violation. *Mueller v. Raemisch*, __ F.3d __, 2014 WL 265758 (Jan. 24, 2014, 7th

Cir.). The *Mueller* court, however, failed to apply the well-established test for

determining whether a new penalty violates the ex post facto clause.[4] Under that

---

[4] The *Mueller* court instead baldly asserted that the annual fee is compensation
registrants must pay for the state's decision to obtain and record information about
them, analogizing to the fee one might pay to obtain a passport. *Mueller*, 2014 WL
265758 at *4-5. This analogy fails. Not only does a person receive a benefit from
obtaining a passport, but there are no criminal sanctions for failing to acquire one.
By contrast, sex offender registration is mandatory and failure to comply is crim-

test, a court must first determine whether the legislature intended a criminal or civil consequence and then, if the answer is civil, look to the *Kennedy-Mendoza* factors to determine if the law is punitive in effect. *Smith v. Doe*, 538 U.S. 84, 92 (2003); *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-69 (1963). Assuming here that the legislative intent was civil, the annual fee has a punitive effect under the *Kennedy-Mendoza* factors because it imposes a financial sanction, which is a traditional form of punishment, based solely on the fact of a prior conviction. Just as the state could not retroactively impose a special fee on people with old criminal records in order to fund a new court building (on the theory that those people might reoffend and use court services), the state may not retroactively fund the sex offender registry by singling out registrants to pay.

Moreover, any claim that registrants are paying for a "service" is undercut by the fact that registrants must pay for the full year regardless of whether or not they are actually being monitored, or even whether or not they remain on the registry. M.C.L. § 28.725a(6)(b) (fee may not be prorated even if the individual is removed from the registry).

### B. SORA 2013's Cumulative Burdens, Including the Annual Fee, Violate the Ex Post Facto Clause.

This Court has rejected plaintiffs' argument that the cumulative burdens of

---

inal. Moreover, registrants are harmed, not benefited, by being on the registry, and any alleged benefits of the "service" go only to the public at large.

SORA 2011 constitute punishment. But the annual fee increases those burdens even more. SORA 2013 therefore violates the ex post facto clause.

**CONCLUSION**

For the above reasons, plaintiffs ask the Court to grant their motion for summary judgment, and to grant the declaratory and injunctive relief set forth in the motion.

Respectfully submitted,

s/ Miriam Aukerman (P63165)        s/ Paul D. Reingold (P27594)
s/ Sofia Nelson (P77960)           Michigan Clinical Law Program
s/ Michael Steinberg (P43085)
s/ Kary Moss (P49759)              s/ William Swor (P21215)
American Civil Liberties Union
 Fund of Michigan

Dated: February 20, 2014

**Certificate of Service**

This motion and brief, along with the accompanying material facts and exhibits, were filed using the Court's ECF system, which provides same-day e-mail service to all counsel of record.

<u>s/ Miriam Aukerman</u>
American Civil Liberties Union
 Fund of Michigan
Attorney for Plaintiffs
1514 Wealthy SE
Grand Rapids, MI 49506
(616) 301-0930
maukerman@aclumich.org (P63165)