UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

JOHN DOES #1-5 and MARY DOE,

                         Plaintiffs,

v.

RICHARD SNYDER, Governor of the
State of Michigan, and COL. KRISTE
ETUE, Director of the Michigan State
Police, in their official capacities,

                Defendants.

File No. 2:12-cv-11194

HON. ROBERT H. CLELAND

Mag. Judge DAVID R. GRAND

_____

**STATEMENT OF MATERIAL FACTS
IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# Contents

I.    INTRODUCTION ............................................................................................6

II.   TERMINOLOGY AND EXPERT REPORTS AS MATERIAL FACTS............................6

III.  THE PLAINTIFFS.........................................................................................7

    A.   John Doe #1 ....................................................................................7

    B.   John Doe #2 ..................................................................................10

    C.   John Doe #3 ..................................................................................15

    D.   John Doe #4 ..................................................................................18

    E.   John Doe #5 ..................................................................................20

    F.   Mary Doe ......................................................................................24

IV.   LAW ENFORCEMENT AGENCIES AND REGISTRANTS DO NOT
      UNDERSTAND THE REQUIREMENTS OF SORA 2013 BECAUSE THE
      STATUTE IS VAGUE .................................................................................27

    A.   SORA 2013 Is a Complex Statute and Even MSP SOR Unit Staff, Prosecutors,
        and Correctional Officials Make Errors When Asked What the Statute Requires .........27

    B.   Local Law Enforcement Agencies and Prosecutors Interpret SORA Differently ..........29

    C.   Local Law Enforcement Routinely Refer Registrants' Questions to the Michigan
        State Police; the Michigan State Police Routinely Refer Registrants' Questions to
        Local Law Enforcement.............................................................................31

    D.   Parole and Probation Agents Cannot Interpret and Apply the Statute............................33

    E.   The State Provides Registrants With Minimal Information About The
        Requirements Of SORA 2013 .....................................................................36

    F.   In Practice Registrants Cannot Get Clarification About What Common Day-to-
        Day Activities are Permissible.....................................................................39

    G.   The Repeated Amendments to SORA Make It Difficult for Registrants to Keep
        Track of Their Obligations and to Plan for the Future......................................45

    H.   Registrants Face Prosecution, Conviction, and Jail or Prison if They Misinterpret
        SORA's Requirements...............................................................................46

V.    GEOGRAPHIC EXCLUSION ZONES ARE VAGUE ......................................................48

    A.   SORA Geographic Exclusion Zones Are Vast, Including at Least 46% of the
        City of Grand Rapids ...............................................................................49

    B.   Different Measurement Methods Significantly Affect the Shape And Size of
        Exclusion Zones.....................................................................................54

    C.   Defendants Themselves Do Not Know How to Map or Enforce Exclusion Zones........63

    D.   Decisions About How to Measure Exclusion Zones Are Left to Local Law
        Enforcement Agencies, Resulting in Significant Variation ...............................65

    E.   Although There Is Confusion about How to Measure, From Property Line to
        Property Line Appears to Be the Most Common Method ...............................68

F.  The Michigan State Police OffenderWatch System Will Use Point-to-Point Measurement ....................................................................................69

G.  Geographic Exclusion Zones and Property Lines Are Not Visible ..............................70

H.  To Map Exclusion Zones One Needs Parcel Data, But Such Data Are Either Impossible or Practically Impossible for Registrants to Obtain ....................71

I.  Inability to Accurately Identify Geographic Exclusion Zones Puts Registrants at Risk of Non-Compliance ..................................................72

VI.   SORA'S REPORTING OBLIGATIONS ARE VAGUE ....................................78

A.  The Plaintiffs Are Subject to Extensive In-Person Reporting Requirements And Those Requirements Are Vague ......................................78

B.  Law Enforcement is Either Unsure What Registrants Must Report, or Provides Conflicting Information ............................................81

C.  The Plaintiffs Do Not Know What They Are Required to Report .................................84

VII.  THE TERM "LOITERING" IS VAGUE ....................................................85

A.  MSP Employees Do Not Know What Constitutes "Loitering" ......................................85

B.  Plaintiffs and Their Families Do Not Know What Constitutes "Loitering," and Therefore Avoid Many Common Activities ........................86

VIII. STRICT LIABILITY AND IMPOSSIBILITY: PLAINTIFFS ARE CRIMINALLY LIABLE IF THEY VIOLATE SORA 2013 EVEN WHERE COMPLIANCE WITH THE STATUTE IS IMPOSSIBLE ..................................................87

A.  Plaintiffs Are Strictly Liable for Failure to Comply With SORA 2013 ........................87

B.  Although Compliance Can be Practically or Actually Impossible, Registrants are Still Strictly Liable ..................................................89

IX.   SORA 2013 LIMITS PLAINTIFFS' ABILITY TO PARENT THEIR CHILDREN. .........92

A.  SORA 2013 Restricts Plaintiffs' Parenting and Involvement in Their Children's Education and Upbringing ................................................92

B.  Defendants Do Not Know Whether Registrant-Parents Can Observe or Contact Their Own Children While Inside Exclusion Zones ...................103

C.  Law Enforcement Agencies Do Not Know or Give Conflicting Answers About What Parenting Activities Are Permitted .....................105

D.  Children of Registrants Suffer Because Their Parents Are on the Sex Offender Registry .................................................................107

X.    SORA 2013 LIMITS PLAINTIFFS' ABILITY TO USE THE INTERNET ....................107

A.  Local Law Enforcement Agencies Do Not Know or Provide Conflicting Accounts of What Internet Information Must Be Reported..........................108

B.  SORA's Vagueness and Burdensome Reporting Requirements Inevitably Lead Registrants to Limit Their Use of the Internet..............................110

XI.   PLAINTIFFS WERE RETROACTIVELY REQUIRED TO REGISTER FOR LIFE ......116

iii

A.  SORA Started Out as a Private Law Enforcement Database.......................116

B.  After Repeated Amendments, SORA Now Subjects Plaintiffs to Geographic Exclusion Zones, Continuous Reporting of Daily Activities, Public Registration, and Annual Fees..............................................................................117

C.  As a Result of the 2011 SORA Amendments, Thousands of Registrants Were Retroactively Required to Register for Life...................................................120

D.  All Six Plaintiffs Were Retroactively Required to Register for Life...........123

E.  SORNA, Federal Funding, and Substantial Compliance..............................124

XII. PLAINTIFFS WILL SUFFER SEVERE HARM BECAUSE THEY MUST NOW REGISTER FOR LIFE ...........................................................................................126

A.  Plaintiffs' Access to Housing Will Be Severely Restricted for Life............127

B.  Plaintiffs' Ability to Find Employment Will Be Severely Restricted for Life ............133

C.  Plaintiffs Will be Subject to SORA's Reporting Requirements for Life.....137

D.  Plaintiffs Will Be Subject to Enforcement Sweeps and at Risk of Prosecution and Conviction for Registry Violations for Life..................................................138

E.  Plaintiffs Will Be Subject for Life to Supervision That Is Similar to, or More Onerous Than, Probation and Parole ...........................................................141

F.  Plaintiffs' Access to Education Will Be Limited for Life .............................143

G.  Plaintiffs' Ability to Travel Will Be Restricted for Life...............................144

H.  Plaintiffs Will, for the Rest of Their Lives, Be Publicly Stigmatized and Face Harassment or Even Vigilantism ...................................................................146

I.  For Life Plaintiffs Will Be Subject to Numerous Laws and Restrictions, beyond SORA, That Are Triggered By Plaintiffs' Status as Registrants ..................148

J.  The Harms Plaintiffs Experience Stem from the Fact They Are Subject to SORA 2013, Not From Their Convictions...............................................................149

XIII. THE REQUIREMENTS OF SORA 2013 BEAR NO REASONABLE RELATION TO PLAINTIFFS' ACTUAL RISK .......................................................................150

A.  The Stated Purpose of SORA 2013 Is to Prevent Future Sex Crimes by People who Pose a Serious Danger of Committing Such Crimes .............................150

B.  Recidivism Risk Varies Widely Among People Convicted of Sex Offenses...............151

C.  Clinical Risk Assessment Instruments Predict Risk More Accurately Than the Offense of Conviction....................................................................................154

D.  Low-Risk Offenders Are Less Likely to Commit Sex Crimes than a Baseline of Individuals Without Such Convictions, and Even High-Risk Offenders Drop Below that Baseline Over Time ....................................................................157

E.  SORA 2013's Tier Classifications Are Not Based on and Do Not Correspond to Risk ...............................................................................................................161

F.   SORA 2013, Which Does Not Account for Risk, Stands in Contrast to the
     Evidence Based Practices of the Michigan Department of Corrections ......................162

XIV. RESEARCH SHOW REGISTRIES AND STUDENT SAFETY ZONES ARE NOT
     EFFECTIVE ...........................................................................................................164

A.   Public Registries Increase Rather Than Decrease Recidivism .....................................164

B.   There is No Evidence that Geographic Exclusion Zones Reduce Recidivism .............166

C.   Failure to Comply with Reporting Requirements Does Not Predict Recidivism .........167

D.   The Michigan State Police Do Not Track Recidivism Rates........................................167

XV.  THE MECHANICS OF REGISTRATION, THE MICHIGAN STATE POLICE
     SOR UNIT, THE SOR DATABASE, AND SYSTEM COSTS ........................................168

A.   Registration Occurs Prior to or as Part of Sentencing and Involves Multiple Law
     Enforcement Agencies .............................................................................................168

B.   Sex Offender Registration Is a Central Issue in Plea Negotiations .............................170

C.   The Structure and Responsibilities of the MSP SOR Unit ..........................................171

D.   The SOR Data Management System Is Used to Record, Maintain, and Publicize
     Information on Registrants .......................................................................................173

E.   The Current SOR Data Management System is Being Replaced by a New Data
     Management System Called OffenderWatch..............................................................174

F.   The Cost of Michigan's Sex Offender Registry Is Unknown, But Is in the
     Millions of Dollars ...................................................................................................175

XVI. RETROACTIVE IMPOSITION OF ANNUAL FEES ....................................................177

## I.    INTRODUCTION

1.  Plaintiffs John Does #1-5 and Mary Doe are Michigan residents who have been retroactively required to comply with Michigan's Sex Offender Registration Act for the rest of their lives. *See* M.C.L. § 28.721 *et. seq.*, as amended July 1, 2011 (SORA 2011); Verified Complaint[1], ¶ 1.

## II.    TERMINOLOGY AND EXPERT REPORTS AS MATERIAL FACTS

2.  Michigan's Sex Offender Registration Act (SORA) has been amended repeatedly. Plaintiffs used the term "SORA 2011" in their complaint to refer to the cumulative amendments then in effect, most notably the 2006 amendments imposing geographic exclusion zones and the 2011 amendments pursuant to the federal Adam Walsh Act creating the tier structure, imposing life-time registration on Tier III registrants, and adding significant new verification and immediate reporting requirements. SORA was amended again in 2013 to impose an annual fee. Plaintiffs therefore now use the term "SORA 2013" to refer to the current iteration of the statute. Verified Compl, ¶¶ 89, 102, 105; Mich. Pub. Acts 121, 127 (2005); Mich. Pub. Act. 17-18 (2011); Mich. Pub. Act 149 (2013).

3.  Defendants did not present any expert testimony to contradict the declarations and testimony of plaintiffs' experts. In this Statement of Material Facts, plaintiffs summarize their experts' reports. Plaintiffs specifically proffer as

---

[1] All references to the Verified Complaint refer to the First Amended Complaint, Dkt 46.

undisputed material facts all of the facts and conclusions in those reports. *See*

Prescott, Levenson, Fay-Dumaine, Wagner, Yantus, and Stapleton Expert Reports,

Exhs 22-28.

## III.  THE PLAINTIFFS

### A. John Doe #1

4.   Plaintiff Mr. John Doe #1 resides in the Eastern District of Michigan. Verified Compl, ¶ 15.

5.   In 1990, when Mr. Doe #1 was 20 years old, he was fired from his job at McDonalds. He believed he was fired unjustly. Out of anger and revenge, he attempted to rob his former employer. Verified Compl, ¶ 16.

6.   As the manager of the McDonalds and her son were leaving, Mr. Doe #1 approached with the intent of robbing the restaurant. During the attempted robbery, Mr. Doe #1 threatened to lock the manager's 12-year-old son in the walk-in freezer if the manager did not open the restaurant's safe. Doe #1 Dep 11-12, Exh 1.

7.   The manager and her son escaped, and Mr. Doe #1 was apprehended by police. *Id*. at 21-23.

8.   Mr. Doe #1 pled guilty to armed robbery and weapons charges. He also pled no contest to kidnapping (for the threat to the manager's son). Verified Compl, ¶ 18; Doe #1 Dep 23, Exh 1.

9.   Mr. Doe #1 never engaged in any sexual misconduct during the attempted

robbery, nor has he ever been accused of sexual misconduct against anyone. Verified Compl, ¶ 19; Doe #1 Dep 84, Exh 1.

10. Mr. Doe #1 was sentenced to 20 to 40 years in prison. Verified Compl, ¶ 20; Doe #1 Dep 26, Exh 1.

11. After a conversation with his mother, where he realized that by being incarcerated he had hurt his family, Mr. Doe #1 decided to turn his life around. Doe #1 Dep 28-29, Exh 1.

12. Mr. Doe #1 became a leader within the inmate community and a model prisoner. He helped run Chance for Life, a program that trains prisoners how to handle conflict peacefully. He was also elected vice-president of the National Lifers Association. He was involved in the Warden's Forum, a program where older prisoners mentored younger ones. He earned the support of his warden for parole. Doe #1 Dep 28, 30-32, 87, 106, Exh 1; Verified Compl, ¶ 21.

13. Mr. Doe #1 served 20 years in prison for the crime he committed. He has taken full responsibility for his crime, including writing the victims to apologize for his actions. Doe #1 Dep 23, 35-36, Exh 1.

14. In November 2009, Mr. Doe #1 was paroled. He successfully completed his parole in November 2011. Verified Compl, ¶ 22.

15. Mr. Doe #1 first learned that he would be required to register as a sex offender when he was paroled. Doe #1 Dep 40, Exh 1. He did not understand why he

was required to register as a sex offender since his conviction was for robbing a McDonalds. He had never committed a sex crime. Doe #1 Dep 43, Exh 1.

16. Mr. Doe #1 has led a productive life since his release. He has been employed for nearly five years as a vocational services coach, where he assists adults with mental and physical disabilities in the workplace. Doe #1 Dep 10, Exh 1; Verified Compl, ¶ 23.

17. Mr. Doe #1 has two adult children, one toddler, and co-parents his fiancé's teenaged daughter. He currently lives with his fiancée and his two youngest children. Doe #1 Dep 64-65, 68, Exh 1.

18. Mr. Doe #1 has not been charged with or convicted of any crime since his convictions following the 1990 McDonalds robbery. Verified Compl, ¶ 24.

19. Under SORA 2013, people convicted of kidnapping a minor are required to register as sex offenders for life, even if the circumstances of the offense lack any sexual component. M.C.L. § 28.722(w)(ii).

20. At the time Mr. Doe #1 was convicted, Michigan did not have a sex offender registry. He therefore did not receive, and could not have received, any notice that his conviction for a non-sex offense would subject him to registration as a sex offender. Verified Compl, ¶ 26; Doe #1 Dep 84-85, Exh 1.

21. Had Mr. Doe #1 had reason to believe that a kidnapping conviction would result in him being required to register as a sex offender for life, he would have

9

gone to trial or tried to bargain for an alternate disposition that would not have resulted in registration. Verified Compl, ¶ 27; Doe #1 Dep 84-85, Exh 1.

22. When Mr. Doe #1 was released from prison in 2009 he was required to register for 10 years from the date of release. Mich. Pub. Act 132 Sec. 5(6) (2005) (requiring registration for 25 years or 10 years after release from imprisonment, whichever is longer).

23. As a result of the 2011 amendments, Doe #1 was classified as a Tier III offender. He must register and comply with all SORA 2013 requirements for life, even though he has never been accused – let alone been convicted – of any sex offense. Verified Compl, ¶ 28; Mich. Pub. Act 17, §5(12) (2011).

**B. John Doe #2**

24. Plaintiff John Doe #2 resides in the Eastern District of Michigan. Verified Compl, ¶ 29.

25. In the summer of 1996, when Mr. Doe #2 was 18 years old, he had a sexual and romantic relationship with a 14-year-old girl. Doe #2 Dep 52-53, Exh 2.

26. Eventually, the mother of Mr. Doe #2's under-age girlfriend became aware of their relationship. Doe #2 Dep 56-57, Exh 2.

27. Mr. Doe #2 was prosecuted after the girl engaged in sexual contact with several boys, including him. The girl provided an affidavit stating that she willingly engaged in that sexual contact. Aff of Victim in Case of Doe #2, Exh 66;

Doe #2 Dep 59-60, Exh 2.

28. Mr. Doe #2 pled guilty under the Holmes Youthful Trainee Act (HYTA) to criminal sexual conduct III, which prohibits sex with person under the age of 16. Verified Compl, ¶ 31; Doe #2 Dep 60, Exh 2; M.C.L. § 750.520d(1)(a).

29. HYTA is a record-sealing statute that allows young offenders to have their cases dismissed and their files sealed if they successfully complete probation. Specifically, HYTA provides that if a youth aged 17 to 21 pleads guilty, the court "*without entering a judgment of conviction*" may "assign that individual to the status of youthful trainee." M.C.L. § 762.11(1) (emphasis added). If the youth completes the trainee period – typically a period of probation – then "the court shall discharge the individual and dismiss the proceedings." M.C.L. § 762.14(1).

30. An assignment to youthful trainee status "*is not a conviction for a crime*." M.C.L. § 762.14(2) (emphasis added). Moreover, "all proceedings regarding the disposition of the criminal charge and the individual's assignment as youthful trainee shall be closed to public inspection." M.C.L. § 762.14(4). Court records in HYTA cases are sealed from the public and do not appear on the person's criminal history.

31. At the time of Mr. Doe #2's offense, Michigan had just created it's sex offender registry. Although the statutory scheme required registration of HYTA trainees, the registry was private. It was available only to law enforcement, and

registry information was exempt from Freedom of Information Act requests. Thus, there was no conflict between HYTA's promise that Mr. Doe #2's records would be sealed, and the maintenance of a non-public law enforcement database. Verified Compl, ¶ 37; Mich. Pub. Act 295 (1994) (eff. Oct. 1, 1995).

32. Mr. Doe #2's plea was based on the state's promise that his case would be dismissed under HYTA and his records sealed. At no time before his plea was Mr. Doe #2 ever told that information about his case could be posted on a public Internet-based sex offender registry (which at that time did not exist). Doe #2 Dep 60, 66, 136-138, Exh 2.

33. Pursuant to his plea, Mr. Doe #2 received no jail time, but was sentenced to two years of probation. His name was placed on the non-public law enforcement sex offender registry for 25 years, making him eligible for removal at age 44. He was discharged from probation early (after 18 months) for good behavior. He also completed sex offender therapy. His case was dismissed *without conviction* and his records sealed. Verified Compl, ¶ 35; Doe #2 Dep 61, 66, 76, Exh 2.

34. After Mr. Doe #2 initially registered and his name was placed on the non-public registry, it was his understanding that nothing further was required of him. At that time the statute did not require reporting at regular intervals. Doe #2 Dep 61-62, 67, Exh 2; Mich. Pub. Act 295, Sec. 10 (1994).

35. Had Mr. Doe #2 known that changes in Michigan law would result in him

being subjected to life-time public registration as a sex offender, he would have taken his case to trial. Doe #2 Dep 137, Exh 2.

36. After successfully completing his HYTA probation, Mr. Doe #2 went on to lead a productive life. He served in active-duty military service twice, earning an honorable discharge both times. While in the service, he was injured in an accidental grenade explosion, suffering a traumatic brain injury. He now receives disability benefits through the Veterans Administration. Verified Compl, ¶ 39; Doe #2 Dep 11-14, 63, Exh 2; Certificate of Release from Active Duty (Doe #2 DD-214), Exh 65.

37. Mr. Doe #2 has one teenage daughter who also resides in the Eastern District of Michigan, living with her mother. Doe #2 Dep 22-24, Exh 2.

38. Around 2010, after Mr. Doe #2 was discharged from the military he got a call from a Michigan law enforcement official. The officer told him that he was now subject to supervision as a sex offender. Mr. Doe #2 had not previously known that as a result of successive amendments to SORA, he had retroactively become subject to Michigan's requirements for ongoing reporting (in addition to the original one-time initial registration). Doe #2 Dep 20, 67-68, Exh 2.

39. For nearly 15 years before being notified by the Michigan State Police that he was subject to supervision and reporting as a sex offender, Mr. Doe #2 had led a normal life free from the burdens and restrictions of registration. Doe #2 Dep, 62.

13

40. In 2011 Mr. Doe #2 was retroactively re-classified as a Tier III offender, and he must now register for life. *Id.* at 68.

41. Mr. Doe #2 was four years and one month older than the girl with whom he had a sexual relationship. Had the age difference between them been less than four years, Mr. Doe #2 would not be subject to sex offender registration. M.C.L. § 28.722(w)(iv); Doe #2 Dep 82, Exh 2.

42. Mr. Doe #2 has no criminal convictions. (He does have a military disciplinary action for marijuana use). Doe #2 Dep 137-138, Exh 2.

43. The Michigan State Police criminal history print-out for Mr. Doe #2 indicates that he does not have any conviction history. However, he is listed as a convicted sex offender on Michigan's sex offender registry. *Compare* Doe #2 MSP Criminal History Print-out, Exh 63, *with* Doe #2 Michigan Sex Offender Registry Print-out, Exh 64.

44. But for the fact that Mr. Doe #2 is publicly listed on the sex offender registry, schools, employers, landlords, and the public would be unaware of his sealed HYTA case or the facts underlying it. That was precisely the deal that was offered and accepted when he agreed to the HYTA disposition of his case. Verified Compl, ¶ 44; Doe # 2 Dep 76, 138, Exh 2.

45. Despite the fact that Mr. Doe #2's plea was based on an explicit promise by the state that his records would be kept private, and despite the fact that he was

14

never convicted of a crime, he is now required to comply with SORA 2013 for the rest of his life. Verified Compl, ¶¶ 41-42; Doe #2 Dep 68-69, Exh 2.

**C. John Doe #3**

46. Plaintiff John Doe #3 resides in the Eastern District of Michigan. Verified Compl, ¶ 46.

47. In January 1998, when Mr. Doe #3 was 19 years old, he had a romantic and sexual relationship with a 14-year-old girl. Verified Compl, ¶ 47.

48. Mr. Doe #3 met the girl at a hair salon in his neighborhood, where she was working. As he was paying for his haircut she slipped him her phone number. Doe #3 Dep 24, Exh 3.

49. Mr. Doe #3 called the number she had given him, and they began dating. After a few dates they had sex. Doe # 3 Dep 25, Exh 3.

50. At the time, Mr. Doe #3 did not know how old she was. Doe #3 Dep 26, Exh 3.

51. Both Mr. Doe #3 and his girlfriend were from immigrant Muslim families. Doe #3 Dep 35-36, 40, Exh 3.

52. When the girl's father learned of their relationship he flew into a rage and threatened to kill his daughter for disgracing the family. To protect herself from her father, the girl told him she had been raped. Her father then took her to the police, where she gave a written statement. Doe #3 Dep 30-31, 43-45, Exh 3.

53. After the police were contacted, the girl's family and Mr. Doe's family met to discuss the matter. The girl's father demanded that Mr. Doe #3 marry his daughter. Doe #3 Dep 31, 37-38.

54. In order to protect himself, as well as to protect the girl from her father, Mr. Doe #3 agreed to the family's demands that he marry his girlfriend in an Islamic ceremony, though no date was set. (They could not marry in a civil ceremony because she was underage.) After this agreement, Mr. Doe #3 and his girlfriend had her father's blessing to continue seeing each other. Doe #3 Dep 37-41, Exh 3.

55. As a result of the agreement between the families, Mr. Doe #3's girlfriend and her father went back to the police and changed her statement – admitting that the sexual relationship had, in fact, been consensual. Doe #3 Dep 46-47, Exh 3.

56. About a month later, the girlfriend's father suddenly decided the marriage must happen immediately. He demanded a $50,000 dowry and $50,000 more if they ever divorced. Doe #3 Dep 41-42, 47-48, Exh 3.

57. Mr. Doe #3 and his family refused this demand. *Id.*

58. Not long afterward Mr. Doe #3 was arrested for having sex with a minor. Doe #3 Dep 50-52, Exh 3.

59. Mr. Doe #3 eventually entered into a plea agreement, pleading guilty to attempted criminal sexual conduct III, which prohibits sex with a person under the age of 16. He was sentenced under the Holmes Youthful Trainee Act to four years

16

of probation. Doe #3 Dep 56, Exh 3; M.C.L. § 750.520d(1)(a).

60. At the time of Mr. Doe #3's offense, Michigan did not yet have a public, Internet-based registry. Mr. Doe #3 was required to register for 25 years on the non-public law enforcement registry, making him eligible for removal at age 45. Mich. Pub. Act 494, Sec. 10(2) (1996).

61.The requirements for quarterly in-person reporting were introduced after Mr. Doe #2's plea was accepted, but they were nevertheless applied retroactively to him. Verified Compl, ¶ 51; Doe #3 Dep 61-62, Exh 3.

62. During his last year of HYTA probation, Mr. Doe #3 came back from a vacation near the end of the 15-day registration period. He was unable to report because the law enforcement office was closed. He wound up reporting one day late. He went directly to the probation office to tell his agent that he had missed his registration by one day. Nevertheless, based on his failure to report timely, his status under HYTA was revoked, and a conviction was entered. Doe #3 Dep 56-60, Exh 3.

63. At the age of 23 Mr. Doe #3 married his wife S.F.[2] Doe #3 Dep 17, Exh 3.

64. Mr. Doe #3 and his wife S.F. have three sons, aged nine, six, and 6 months. S.F. Dep 9, Exh 8.

65. Mr. Doe #3 works at the family business (an auto repair shop and gas sta-

---

[2] S.F.'s initials have been changed to protect the privacy of their family.

17

tion). Doe #3 Dep 11, Exh 3. His wife is a public school teacher. Doe #3 Dep 119, Exh 3; S.F. Dep 10, Exh 8.

66. In 2011, Mr. Doe #3 was retroactively re-classified as a Tier III offender. His registration period was extended from 25 years to life. Doe #3 Dep 65, Exh 3.

67. Mr. Doe #3 was four years and ten months older than the girl with whom he had sex. Had the age difference been less than four years, Mr. Doe #3 would not be subject to registration. Verified Compl, ¶ 54; M.C.L. § 28.722(w)(iv).

68. Mr. Doe #3 has no other criminal convictions. Verified Compl, ¶ 55.

**D. John Doe #4**

69. Plaintiff John Doe #4 resides in the Western District of Michigan. He is homeless. Verified Compl, ¶ 56; Doe #4 Dep 35, Exh 4.

70. In the summer of 2005, when Mr. Doe #4 was 23 years old, he had a sexual and romantic relationship with I.G., a girl he met at a nightclub. Doe #4 Dep 10, Exh 4; Decl of I.G., Exh 31.

71. The club where they met was restricted to those aged 18 and older. *Id.*; I.G. Dep 18, Exh 7.

72. Mr. Doe #4 did not know that I.G. had managed to slip into the nightclub without having her ID checked because she was with a group of older friends. He assumed she was of age because she had entered the club. At the time I.G. was actually 15. Doe #4 Dep 20, Exh 4; I.G. Dep 18, Exh 7.

18

73. I.G. became pregnant as a result of their sexual relationship. After her parents learned she was pregnant they went to the police and Mr. Doe #4 was eventually arrested. Verified Compl, ¶ 58; I.G. Dep 32-34, Exh 7; Doe #4 Dep 23, Exh 4.

74. It was only after Mr. Doe #4 was questioned by the police that he learned I.G.'s actual age. Doe #4 Dep 20-21, Exh 4.

75. In 2006, Mr. Doe #4 pled guilty to attempted criminal sexual conduct III, which prohibits sex with person under the age of sixteen. Doe #4 Dep 25, Exh 4; M.C.L. § 750.520d(1)(a).

76. Under the terms of the plea agreement, the case was to be dismissed if I.G.'s baby's DNA did not match that of Mr. Doe #4. I.G. had had other sexual partners, and it was unclear with whom she had become pregnant. It turned out that Mr. Doe #4 was the father of the child, and thus the case was not dismissed. Verified Compl, ¶ 60; I.G. Dep 32, 40-41, Exh 7.

77. Mr. Doe #4 was sentenced to five years of probation, which he served successfully. He also completed sex offender counseling. Doe #4 Dep 25, Exh 4.

78. At the time of his conviction, Mr. Doe #4 was required to register for 25 years, making him eligible for removal at age 49. Verified Compl, ¶ 62; Doe #4 Dep 48, Exh 4.

79. In 2011, Mr. Doe #4 was retroactively re-classified as a Tier III offender,

and his registration period was extended from 25 years to life. *Id.*

80. I.G. and Mr. Doe #4 are currently in a romantic relationship. They have two children together: a daughter whose conception triggered the criminal case (now 7) and a new baby. Doe #4 Dep 59-64, Exh 4; I.G. Dep 46-47, Exh 7.

81. I.G. testified that while sex offender registration laws are intended to protect victims like her, "I feel like the overall effect of it was completely opposite and I don't feel like there was an actual crime." Rather than feeling like a victim of a crime, she feels like a "victim of the criminal justice system" because the registry has severely affected her ability to have a normal family live with Mr. Doe #4 and their children. I.G. Dep 88-90, Exh 7.

82. Mr. Doe #4 also has two children with his ex-wife. Doe #4 Dep 63, Exh 4.

83. While Mr. Doe #4 has had difficulty keeping a job as a result of the registry, he currently works for a cell phone company. Doe #4 Dep 29-31, Exh 4.

84. Mr. Doe #4's only other criminal convictions are for driving on a suspended license. Verified Compl, ¶ 64.

**E. John Doe #5**

85. John Doe #5 is a resident of the Eastern District of Michigan. Verified Compl, ¶ 335.

86. In 1979, when Mr. Doe #5 was 21 years old, he ran into his sister and a young woman from the neighborhood at a local store. Doe #5 Dep 15, Exh 5.

87. Mr. Doe #5 and the young woman had known each other since they were children. At that time she was 17 years old. Doe #5 Dep 15, Exh 5.

88. The three of them decided to go back to Mr. Doe #5's apartment. At some point the girl and Mr. Doe #5 went into Mr. Doe #5's bedroom and had sex. Doe #5 Dep 16, Exh 5.

89. Mr. Doe #5's understanding is that when the young woman's family learned she had had sex, her father – who was a preacher and believed that what happened was immoral – insisted that charges be filed. Doe #5 Dep 18-19, 22, Exh 5.

90. Mr. Doe #5 was eventually charged with CSC III. Verified Compl, ¶ 341; Doe #5 Dep 19, Exh 5.

91. Mr. Doe #5 was offered a plea to CSC IV with six months jail time, but he rejected the plea because the sex was consensual. He did not want to plead guilty to a crime he felt he did not commit, so he chose to take the case to trial. Verified Compl, ¶¶ 342-43; Doe #5 Dep 30, Exh 5.

92. At the trial Mr. Doe #5's sister, who had been present in the apartment when Mr. Doe #5 and the young woman had sex, verified his account that the sex was consensual. But the girl testified that she had not consented, which Mr. Doe #5 believes she did only to stay in the good graces of her father. Doe #5 Dep 21-22, 33-34, Exh 5.

93. Mr. Doe #5 chose to testify. He believes he came across as arrogant, which in retrospect is how he would describe himself at 21 years old. Verified Compl, ¶ 346; Doe #5 Dep 30-31, Exh 5.

94. Mr. Doe #5 was convicted of CSC III. The court sentenced him to 2-15 years in prison. This was his first conviction of any kind. Verified Compl, ¶ 347; Doe #5 Dep 23, 37-38, Exh 5.

95. In 1980, at the time of Mr. Doe #5's conviction, there was no sex offender registry in Michigan, and therefore, no one mentioned the possibility of registration to Mr. Doe #5. Verified Compl, ¶ 347; Doe #5 Dep 41, 44.

96. Mr. Doe #5 served about 21 months of his sentence. Doe #5 Dep 38, Exh 5.

97. In subsequent years, Mr. Doe #5 was convicted of several property crimes. Up until 2011, however, no court ever required him to register as a sex offender. Verified Compl, ¶¶ 349-50; Doe #5 Dep 43-45, Exh 5.

98. In November 2011, Mr. Doe #5 was arrested for collecting scrap metal, and pled guilty to larceny (M.C.L. § 750.3563A). Verified Compl, ¶ 351; Doe #5 Dep 43, 45, Exh 5.

99. During the plea bargaining process Mr. Doe #5 was not informed that a felony conviction for larceny would result in lifetime sex offender registration. Doe #5 Dep 41, 45, Exh 5.

100.   Had Mr. Doe #5 known earlier in the process that his plea would lead to registration he would have attempted to negotiate a different plea. Doe #5 Dep 42-43. At sentencing Mr. Doe #5 was informed by the judge that there was a possibility he would have to register as a sex offender. He was sentenced to probation. Doe #5 Dep 45, Exh 5.

101.   While serving probation Mr. Doe #5 was informed by the probation department that he was now required to register under SORA for life. A judge agreed and gave him until November 2012 to register. Verified Compl, ¶ 356; Doe #5 Dep 46, Exh 5.

102.   Mr. Doe #5 did not register because he did not understand how he could be mandated to register for something that had happened over 30 years before. He was then charged and convicted of failure to register, and sentenced to 90 days in jail. Verified Compl, ¶ 358; Doe #5 Dep 43, 46-47, Exh 5.

103.   After being jailed for failing to register, Mr. Doe #5 decided that resisting registration was not worth the penalty. Since then he has tried to keep his registration up to date, and to comply with the registration law. Verified Compl, ¶ 359; Doe #5 Dep 52, Exh 5.

104.   Once Mr. Doe #5 became a registered sex offender, his probation officer ordered him to move because his apartment was within 1000 feet of a school. Mr. Doe #5 was forced to relocate. Verified Compl, ¶ 360; Doe #5 Dep 67, Exh 5.

105.  In 2013 Mr. Doe #5 received a notice stating that his Section 8 housing voucher was being terminated as a result of his status as a lifetime registrant. Decl of John Doe #5, Exh 29.

106.  Mr. Doe #5's sole source of income is disability benefits from the Veterans Administration and Social Security Administration, totaling about $710 a month. Verified Compl, ¶ 362; Doe #5 Dep 8, Exh 5.

107.  Prior to being ordered to register in 2012, Mr. Doe #5 had lived from 1980 to 2012 without the burdens of registration. Doe #5 Dep 77, Exh 5.

108.  During that 33-year period Mr. Doe #5 was never charged with or convicted of a new sex offense, nor has he been since 2012. Doe #5 Dep 77-78, Exh 5.

109.  Mr. Doe #5 has a girlfriend, children, and grandchildren, whom he visits regularly. He is 56 years old. Verified Compl, ¶ 365, Doe #5 Dep 78, Exh 5.

**F. Mary Doe**

110.  Plaintiff Mary Doe resides in the Eastern District of Michigan. Verified Compl, ¶ 65.

111.  In 2003, while living in Ohio, she was convicted of unlawful sexual conduct with a minor for having a sexual relationship with a 15-year-old male. Mary Doe Dep 11-12, Exh 6.

112.  This was Mary Doe's first and only arrest or conviction for sexual misconduct. She has no other criminal history. Verified Compl, ¶ 77.

24

113. She was sentenced to three years in prison. Mary Doe Dep 13, Exh 6.

114. At the time, Ohio's sex offender registration statute was risk-based rather than offense-based. A person's registration requirements, including the length and frequency of reporting obligations, were determined through an individualized adjudication of risk. Verified Compl, ¶ 68; *State v. Bodyke*, 933 N.E.2d 753 (Ohio 2010).

115. Based on a psychological evaluation, the court concluded that Ms. Doe was neither a "sexual predator" nor a "habitual offender." She was assigned to the lowest risk level of the registry, which required address verification once a year for ten years. Verified Compl, ¶ 69.

116. Although Ohio has since moved to an offense-based registration scheme similar to Michigan's SORA 2013 (in order to comply with the same federal Adam Walsh requirements that led to Michigan's SORA amendments in 2011), the Ohio Supreme Court has held that people like Ms. Doe (who received individualized risk-based hearings) cannot be retroactively reclassified under an offense-based scheme. The court held that such legislative reclassification of individuals who have been adjudicated by the judiciary violates the separation of powers. *See State v. Bodyke*, 933 N.E.2d 753 (Ohio 2010).

117. The Ohio Supreme Court also held that Ohio's new law – which requires extensive reporting and lengthens registration periods similar to SORA 2013 – can-

25

not be applied retroactively without violating the ex post facto clause. *See State v. Williams*, 952 N.E.2d 1108 (Ohio 2011).

118.  Thus, in Ohio, Ms. Doe could not be required to register for more than ten years, nor could she be subjected to restrictions beyond those imposed under the terms of her initial Ohio registration order. Verified Compl, ¶ 72.

119.  In May 2004, after serving less than eight months in prison, Ms. Doe was granted judicial release. Her sentence was modified to four years of probation and 200 hours of community service. She successfully completed probation, community service, and sex offender therapy, and was discharged from probation in April 2008. Mary Doe Dep 13, 16, Exh 6; Verified Compl, ¶ 73.

120.  Ms. Doe acknowledges that what she did was wrong, and has worked to change her life. She now does everything she can to put her family first. Mary Doe Dep 16-17, Exh 6.

121.  When Ms. Doe received judicial release in 2004, she moved to Michigan to live with her parents. Under Michigan law at the time, she was required to register quarterly for 25 years, becoming eligible for removal at age 54. Verified Compl, ¶ 74.

122.  Ms. Doe married her current husband in 2010. Mary Doe Dep 18, Exh 6.

123.  Ms. Doe has been awarded sole custody of her teenage daughter. She lives with her husband and daughter. Mary Doe Decl, Exh 30.

124.  Ms. Doe's family, including her elderly parents, her extended family and stepchildren and step-grandchildren all live in Michigan. For these reasons, Ms. Doe wishes to live in Michigan. Verified Compl, ¶ 75; Mary Doe Dep 23, Exh 6.

125.  Ms. Doe is gainfully employed. Mary Doe Dep 113, Exh 6.

126.  In 2011, Ms. Doe was retroactively re-classified as a Tier III offender, and her registration period was extended from 25 years to life. Mary Doe Dep 28-29, Exh 6.

## IV.   LAW ENFORCEMENT AGENCIES AND REGISTRANTS DO NOT UNDERSTAND THE REQUIREMENTS OF SORA 2013 BECAUSE THE STATUTE IS VAGUE

127.   SORA 2013 contains numerous terms and provisions that are unconstitutionally vague. The list of such terms is so extensive that it cannot be set out fully here. Instead, plaintiffs incorporate an interrogatory response they provided to defendants setting forth the sections of SORA that plaintiffs contend are most problematic. Pls' Resps to Defs' Interrog 11, Exh 35.

128.   As Karen Johnson, Michigan State Police (MSP) Sex Offender Registration (SOR) Unit Manager noted, it is "difficult [for registrants] to maintain compliance if they don't know what they're supposed to do." Johnson Dep 28, Exh 15.

### A. SORA 2013 Is a Complex Statute and Even MSP SOR Unit Staff, Prosecutors, and Correctional Officials Make Errors When Asked What the Statute Requires

129.   SORA 2013 imposes obligations, disabilities, and restraints that are so

27

extensive that they cannot be set out in full here, but are instead listed in Exh 34.

130.   SORA 2013 contains numerous sections and subsections, many of which involve cross-references from one section to another. M.C.L. § 28.721 *et. seq.*

131.   Sergeant Bruce Payne, the MSP's SORA Enforcement Coordinator, testified that after he took that job it took "a good six, seven months" before he felt like he really understood SORA's requirements. Payne Dep 15-16, Exh 17.

132.   Despite his postion and experience, Sgt. Payne provided legally incorrect information in response to deposition questions about SORA. For example, he testified that registrants cannot live within 1000 feet of a university, and that a homeless person could not stay at a shelter that is within 1000 feet of a school. Payne Dep 47, 64, Exh 17. *But see* M.C.L. § 28.733(d) (defining school as grades 1-12); *Poe v. Snyder*, 834 F. Supp. 2d at 733. Sgt. Payne also could not remember what education information registrants must report. Payne Dep 96, Exh 17.

133.   Former DOC Legal Affairs Administrator Stapleton testified that although he is an attorney and has been professionally responsible for providing guidance to the MDOC on the meaning of SORA, he could not remember the details without looking at the statute. In his opinion, registrants who lack legal training, professional experience, or access to legal resources would "find it quite confusing." Stapleton Dep 101-02, Exh 13.

## B. Local Law Enforcement Agencies and Prosecutors Interpret SORA Differently

134.   SORA registration and enforcement is handled by a variety of law enforcement agencies, including county sheriffs' departments, municipal police departments, probation agents and parole agents. M.C.L. §§ 28.722(n); 28.724.

135.   There are 83 county prosecutors' offices that prosecute SORA violations. Tanner Dep 31, Exh 21.

136.   There are approximately 600 law enforcement agencies that can access Michigan's SOR database. OffenderWatch Training, Disc 3, Part 1, Exh 68.

137.   There are approximately 8,000 individual users who can access Michigan's SOR database. Law enforcement employees do not need to be trained before they access the system. Johnson Dep 92-93, Exh 15.

138.  Training on SORA is not required for MSP or other law enforcement officers, with the exception of MSP post coordinators. Burchell Dep 24-25, 94, Exh 16.

139.  To determine if different law enforcement agencies apply the requirements of SORA differently, plaintiffs asked two volunteers, Timothy Poxson and Joseph Granzotto, to make calls to local law enforcement agencies and to prosecutor's offices and ask a series of questions about SORA requirements. Poxson Decl 2, 6, Exh 32; Granzotto Decl 1-2, 8, Exh 33.

140.   Mr. Poxson called 23 police departments and 19 prosecutor's offices. Mr.

Granzotto called 29 police departments and 10 prosecutor's offices. *Id*.

141.   The results of those surveys showed that different law enforcement agencies and different prosecutors interpret SORA differently. Poxson Decl, Exh 32; Granzotto Decl, Exh 33.

142.   Mr. Poxson reported that he did not receive consistent answers to any of his questions. The people he called were often unsure about their answers, or provided conflicting answers, even to basic questions like when registrants must report an address change, or whether registrants must report self-employment or on-line education. Poxson Decl 2-9, Exh 32.

143.   Similarly, respondents to Mr. Granzotto's survey were unsure about, or provided varying answers to, questions about whether registrants may pick up or drop off their children at school, or whether school sports fields are included in the exclusion zones, or under what circumstance registrants can pass through an exclusion zone. Granzotto Decl 2-3, 5-7, 9-11, Exh 33.

144.   The surveys by Mr. Granzotto and Mr. Poxson also showed that local law enforcement agencies and prosecutors have erroneous understandings of the statute. When asking about how long registrants have to report an address change, Mr. Poxson got answers ranging from three days (including weekends) to ten days. Poxson Decl 2, Exh 32. Of the two prosecutor's offices that responded to the same question, one said a week, and the other 10-15 days. Id. at 8-9, Exh 32. Under

SORA 2013 registrants must report an address change within 3 business days. M.C.L. § 28.725(1)(a); M.C.L. § 28.722(g).

145.  Similarly, when Mr. Poxson asked prosecutors' offices about the requirements to report travel, one reported that travel need not be reported, and the other did not know. Poxson Decl 8-10, Exh 32. Under SORA 2013, registrants must in fact report travel. M.C.L. §§ 28.725(1)(e), (7).

**C. Local Law Enforcement Routinely Refer Registrants' Questions to the Michigan State Police; the Michigan State Police Routinely Refer Registrants' Questions to Local Law Enforcement**

146.  When Mr. Granzotto surveyed local police departments, of the 17 police departments that provided some kind of response, nine referred him to the Michigan State Police for answers to his questions. Granzotto Decl 2, Exh 33.

147.  Of the 23 police departments surveyed by Mr. Poxson, three told him to contact the MSP. Poxson Decl 2, Exh 32.

148.  Conversely, Leslie Wagner, MSP Registry Coordinator, testified that the MSP SOR Unit refers registrants' questions on the meaning of SORA to local law enforcement, or if the registrant has already contacted local law enforcement, to the prosecutor. "[I]f the local law enforcement agency is asking that question I'm not going to refer them back to themselves, I would refer them to the county prosecutor." L. Wagner Dep 39-40, Exh 18.

149.  Sgt. Payne, Michigan SORA Enforcement Coordinator, similarly testified

31

that when the MSP is unsure about what SORA means, the MSP refers the registrant asking the question to local law enforcement. If local law enforcement does not know, then it would "be up to the local prosecutor to decide what the law means." Payne Dep 32-33, 90-91, Exh 17.

150.   For example, the MSP refers to local law enforcement any questions about whether a residence is within a geographic exclusion zone, or whether a particular educational establishment qualifies as a "school" for the purpose of creating an exclusion zone, or whether a registrant must report cross-country travel for a week, or report a vehicle that is used three times during a three month period. Payne Dep 32-33, 49, 68-69, 90, 93, 98-99, Exh 17.

151.   Sgt. Payne testified that when registrants "can't get anywhere with the local law enforcement agency we will refer them to the prosecutor's office" to seek clarity. Payne Dep 34, Exh 17.

152.   Karen Johnson, the MSP's SOR Unit Manager, testified that one reason the MSP refers questions to local prosecutors is that different prosecutors can have different answers to the same questions. Johnson Dep 315-16, Exh 15.

153.   Similarly, Trooper Timothy Burchell, SOR Unit Coordinator, testified that he refers questions about SORA from local law enforcement agencies to their local prosecutors:

Q. And why do you tell them to check with their local prosecutor?

32

A. Because every county's different.

Q. When you say 'every county's different,' what do you mean by that?

A. That the prosecutors make different decisions from county to county on what they will prosecutor [sic] and what they won't.

Q. What things do they decide differently?

A. I'm not sure, but I know that in our experience that we can't give a broad statement that covers how the law's going to be enforced.

Burchell Dep 45, Exh 16.

### D. Parole and Probation Agents Cannot Interpret and Apply the Statute

154.   Richard Stapleton, former Legal Affairs Administrator for the Michigan Department of Corrections (MDOC), explained in his expert report that parole and probation agents charged with supervising parolees and probationers who are also subject to sex offender registration have great difficulty interpreting and applying SORA. Stapleton Expert Report 1, Exh 28.

155.   At the MDOC, Stapleton was responsible for assisting department managers and field staff in answering legal questions about SORA. Stapleton Expert Report 8, Exh 28; Stapleton Dep 30-31, 83, Exh 13.

156.   Stapleton received many questions, mostly related to employment, "loitering", family reunification, and how to measure geographic exclusion zones. He found that many such questions "could not be appropriately answered because of the lack of adequate definition or guidance within SORA itself." Stapleton Expert Report 8, Exh 28; Stapleton Dep 30-31, 83, Exh 13.

157.   In trying to answer questions about SORA, Stapleton looked at the statute and tried to determine legislative intent, but his focus was not so much "legal research . . . because most of the questions arise because of the lack of an answer in the act itself." Stapleton Dep 34, Exh 13.

158.   Instead Stapleton "sounded out" the question with the attorneys in the Corrections Division of the Office of Attorney General, called the Michigan State Police, or phoned the MDOC's Field Operations Administration to "find out what we've been doing" in practice. When Stapleton found that different MDOC agents were applying SORA differently, he would draft internal memorandum in an effort to promote uniform application among MDOC employees across the state. Stapleton Dep 33-35, Exh 13.

159.   Even though the MDOC has a central legal office to address questions and promote consistent application of the law, there is "very much inconsistency" and a "great deal of disparity" in how MDOC agents apply SORA. For example, on the west side of the state parole agents were not allowing registrants to attend their children's sporting events or plays, whereas on the east side of the state they were. Stapleton Dep 86-88, Exh 13.

160.   Stapleton also explained that measuring geographic exclusion zones was complicated because "there isn't a standard process by which to measure, you know, is it as the crow flies again or do you measure from property corner to

34

property corner. You know, sometimes there's private property that you cannot cross in between but if you go down the sidewalk and over then . . . it's more than 1000 feet, but if you cut across between the houses right across it might be 800 feet." Stapleton Dep 85, Exh 13.

161.   Stapleton testified that at least within the MDOC there "was some means of trying to communicate with the field operations administration folks to get [interpretations] out to their agents, but independent police departments, sheriffs, troopers at the front desk, they don't know this stuff and there's a lot of bad information that gets put out." Stapleton Dep 87-88, Exh 13.

162.   Stapleton also reported that the MDOC has established "sex offender specific" caseloads, allowing agents to specialize in the technical requirements of SORA. "But even with intensive supervision, SORA's complexity and vagueness all but guarantee that parolees and probationers will still be unsure about what they can and cannot do." Moreover, no similar orientation is provided to registrants who are not under MDOC supervision. Stapleton Expert Report 9, Exh 28.

163.   In Stapleton's experience, the interpretation of SORA varies significantly from jurisdiction to jurisdiction, meaning that to avoid criminal prosecution for non-compliance – registrants must rely on the varying interpretations of prosecutors and courts across the state. Stapleton Expert Report 9, Exh 28.

164.   For example, law enforcement officials told Stapleton more than once

that "loitering" is something you know when you see it. Stapleton said there were

circumstances where MDOC agents approved registrants to work in particular

areas, but "[l]aw enforcement didn't want them in that area and would say they

were loitering, and they would answer, no, they have the agent's approval to work

in that area." Stapleton Expert Report 9, Exh 28; Stapleton Dep 77, Exh 13.

165.   Stapleton also explained that the disparities in SORA enforcement do not

reflect disparities in prosecutorial decisions about whether to prosecute an offense,

but rather in how different prosecutors interpret what conduct even constitutes an

offense. Stapleton Dep 109-11, Exh 13.

### E. The State Provides Registrants With Minimal Information About The Requirements Of SORA 2013

166.   The "only document provided to registrants that describes or explains

what information registrants must report" is the "Explanation of Duties" form.

Defs' Supp Resps to 1st Interrogs, RFP No 10, Exh 43; Explanation of Duties

Form, Exh 62.

167.   Registrants are required to sign the "Explanation of Duties" form at their

initial registration. Failure to sign is a crime. Johnson Dep 144, Exh 15; M.C.L. §§

28.725a(1)-(2), 28.727(3)-(4); 28.729(3).

168.   The Explanation of Duties Form is only provided to registrants at the

time of signing. "They're notified once and that satisfies what our unit asks for.

They have been notified of their duties." Burchell Dep 92, Exh 16.

169. The Explanation of Duties form was revised in 2011. Individuals on the registry at that time, who had previously signed an earlier version of the form, were required to sign the new form. Johnson Dep 141, Exh 1.

170. According to Johnson, the Explanation of Duties form is "supposed to encapsulate what registrants are supposed to do." But "[t]he statute has things in it that are not in this explanation of duties." Johnson Dep 141, 147, Exh 15; Explanation of Duties Form, Exh 62.

171. For example, the Explanation of Duties Form states that registrants are "prohibited by law from loitering within 1000 feet" of school properties. However, the form does not define what loitering is. Johnson Dep 141, 145-47, Exh 15; Explanation of Duties Form, No 13, Exh 62.

172. The Explanation of Duties Form also states that registrants must provide all telephone numbers they "routinely use" and information regarding any vehicle they "regularly operate," but does not quantify how frequently a phone number or vehicle must be used to be reported. Explanation of Duties Form, No 4, Exh 62.

173. Similarly, the Explanation of Duties Form states that registrants must report within three business days upon establishing any email address, instant messaging address or "any other designation used in Internet communications," but does not further define what Internet activity must be reported. Explanation of Duties Form, No 6, Exh 62.

37

174.   The Explanation of Duties Form is "the way in which registrants are informed about what their obligations are." However, registrants must comply with SORA regardless of whether they ever received and signed that form. L. Wagner Dep 79-80, Exh 18.

175.   The SOR unit sends mass mailing to registrants only to notify them of major amendments to SORA. Johnson testified that there had been "very, very, very few" mass mailings to registrants, and estimated that this occurred fewer than five times. One such mailing was done after the 2011 amendments, and another was done after registrants' photographs were added to the public registry. Johnson Dep 108-10, 142-44, Exh 15.

176.   The letters sent out after the 2011 statutory changes notified registrants of their tier level as well as some of the changes to the statute. For example, a form letter was sent to all newly reclassified Tier III registrants notifying them that they would have to register for life and would have to provide additional information. Johnson Dep 139-41, Exh 15; Tier III Notification Letter, Exh 48.

177.   Johnson testified that the letters "weren't intended to be comprehensive about what the requirements were." For example, the tier notification letters do not contain any information about geographic exclusion zones. Johnson Dep 139-41, Exh 15; Tier III Notification Letter, Exh 48.

178.   The SOR database does not show whether particular registrants actually

received the letter informing them of their tier status. L. Wagner Dep 56, Exh 18.

## F. In Practice Registrants Cannot Get Clarification About What Common Day-to-Day Activities are Permissible

179.  MSP officials testified that because ordinary activities like attending a child's football game, volunteering at a church picnic, or taking a job could violate SORA, and because different law enforcement agencies interpret SORA differently, registrants should contact their local law enforcement agency before engaging in such ordinary activities. Karen Johnson's deposition is illustrative:

> Q. [F]rom the perspective of the registrant, if they want to determine whether they can go to [their child's] football game, whether they can volunteer at the church fundraiser and whether they could apply for work at the 50 different places they're applying for work, you would say to them you need to contact your local law enforcement to get the answers to all those questions?
> A. Yes.
> Q. So for many common life activities a person would first have to contact their local law enforcement before doing that in order to avoid the risk of prosecution?
>   [Objections and discussion between counsel omitted.]
> A. For all the – leaving common life activities out, the answer would be yes, they need to contact their law-enforcement agencies if they want to ensure they are not working within a student safety zone or doing other activities that would violate the statute.

Johnson Dep 331-32, Exh 15.

180.  Johnson also testified that if a registrant was applying for 50 jobs and wanted to determine if those jobs were within a geographic exclusion zone, the registrant would need to contact local law enforcement about each of the 50 jobs.

Johnson Dep 323, Exh 15.

181.  Mr. Doe #3's wife explained that "anything we want to do we have to think of [the registry] first" to see what is permitted and whether the registry will interfere. S.F. Dep 34, Exh 8.

182.  Joseph Granzotto, who surveyed 29 local police departments, found that only nine departments answered his questions, with three more providing answers to some of his questions. The remaining departments did not return messages despite repeat calls, or could not connect Mr. Granzotto to anyone who could answer his questions. Of the ten prosecutor's offices he contacted, only three provided answers. The remaining prosecutor's offices either refused to answer his questions, or Mr. Granzotto was unable to reach anyone. Granzotto Decl 2, 4-5, 8-9, Exh 33.

183.  Similarly, Timothy Poxson, who surveyed 23 local police departments with questions about SORA, found that only 11 departments answered most or all of his questions. The remaining 12 either refused to answer his questions, or did not know the answer. Of the 19 prosecutors' offices he contacted, only two answered all of his questions. Five offices told him to contact a private attorney, and six told him to contact another agency for answers. Poxson Decl 2, 7, Exh 32.

184.  Mr. Poxson, who was previously a registrant but whose registration period has expired, testified that as a registrant he would call law enforcement with questions but "couldn't get direct answers." For example, he wanted to find out whether he could reside within 1000 feet of a school bus garage, but "never was

able to get an answer" about whether that location was considered to be within a geographic exclusion zone. Poxson Dep 63-64, Exh 14.

185.   Similarly, Mr. Doe #2 testified that it is difficult to ask questions about SORA when registering because the lines are so long: "I wanted to ask . . . exactly what the guidelines were with different stuff like schools and where to move, where to live, what to register, what not to register. I didn't get a chance to say much at all. They just told me to sign a paper, get in line." Doe #2 Dep 74, Exh 2.

186.   Mr. Doe #3 testified, "I was trying to ask [local law enforcement officials] these questions, and they're like, we're not the court. You've got to go and talk to other people. We can't – we need you to initial this paper, give us I think it was $35, and have a nice day." Doe #3 Dep 66, Exh 3.

187.   Mr. Doe #4 testified that when he asks questions of the police about his SORA obligations, "[s]ometimes they don't even know," and "[s]ometimes my lawyer doesn't even know." For example, when his employer was going to have him move from store to store, he sought legal advice: "I asked [my attorney], can I do that? Her answer was, I don't know." He then asked the police, who told him that if he worked anywhere for between two and five hours, he would have to register that location. Doe #4 Dep 49-50, 68-69, 89, Exh 4.

188.   Even within the same agency, different law enforcement officers can provide different answers to the same question. For example, Mr. Doe #4 was told by

one registering official that he needed to register his GED classes, and by another

registering official that he did not. Doe #4 Dep 88, Exh 4.

189.  Mr. Doe #1 stated that as a non-lawyer he does not know how to read or

understand the statute, and that "[n]o one has given me a guide to what I can and

cannot do." Doe #1 Interrog Resp No 11, Exh 36.

190.  Mr. Doe #2 stated that when he asked questions of local law enforcement

about what he "can and cannot do . . . they could not answer my questions." He

was never given any kind of rulebook:

> I am clueless about the rules… It seems like the state is more concerned with
> getting us on the list than telling us what the rules are. There is not [sic]
> manual or rulebook that we can look at to figure out what we can and cannot
> do. There aren't any public maps about where the school safety zones are
> either. It seems like if they want us to follow the rules, they should tell us
> what the rules are.

Doe #2 Interrog Resp Nos 6, 11, Exh 37.

191.  Mr. Doe #3, who works in auto repair, testified that he does not know

what work is permissible. "[F]or work . . . I do a lot of tows . . . . If I get a call,

hey, you've got a lockout, a lady locked her keys out in the parking lot of this

school, can I go do that call? I'm unclear about what I can do and what I can't do."

Doe #3 Dep 10-11, 109, Exh 3.

192.  Mr. Doe #3 has asked questions at the police department about his regis-

tration obligations, "but no one can give me clear answer about what information I

have to give them . . . . Now I don't ask questions because the police officers don't

know the answer to my questions anyway." Doe #3 Interrog Resp No 6, Exh 38.

193.   Mr. Doe # 3's wife testified that the lack of clarity affects day-to-day life:

Q. And when you don't know if he can or can't do something or if he has to do
    something or not do something, what do you guys do as a couple?
A. We don't do it, honestly, because of our past experiences.
Q. And why don't you do it? Why do you err on the side of caution?
A. I don't want him getting arrested, so, I mean, if we have to stay away from
    doing something, again not living normal, you know, we won't do it.
Q. Okay. So if there's an area, a gray area, something you don't understand,
    your response is?
A. Don't do it… It's just not worth it.

S.F. Dep 99-100, Exh 8.

194.   S.F. further testified that she had tried reading up on the SORA

requirements but they were not clear to her "[s]o we avoid anything that could

potentially get him in trouble or arrested." For example, Mr. Doe #3 does not go to

parks, even if the parks are not associated with schools, because there are minors in

parks, and the family does not "want there to be a gray area that we missed." S.F.

Dep 36-37, 78-79, Exh 8.

195.   Similarly, Mr. Doe #4 stated:

There are no maps about where I can live, work or be. … I am not [a] lawyer,
and I don't know how to read laws. But even when I ask my lawyers what
something means, they often don't know, but have to guess what it probably
means.

Doe #4 Interrog Resp No 11, Exh 39.

196.   Mr. Doe #4 does not know whether he can take his own children to a playground on school property, attend a minor cousin's birthday party in a public park, or go to a mall where children may be present. "I don't know if I go to a store where there's kids, am I allowed in that store? If I go to a park and there's kids, am I allowed to go to the park? Am I allowed to go to a gathering? The registry is confusing to me. I don't understand it, not one bit." The risk of being mistaken is a criminal charge. Verified Compl, ¶ 224; Doe #4 Dep 76, Exh 4.

197.   Because of confusion about what the law requires, Mr. Doe #4 avoids activities, some of which are in fact prohibited by the statute and others of which are actually permitted: "they tell me you cannot be within 1000 feet of schools, children, or parks." Doe #4 Dep 71-72, 76, Exh 4.

198.   As a non-lawyer, Mary Doe explained that she does not know how to "decipher" the SORA statute. She can read what it says "but I don't understand exactly what it's requiring." Mary Doe testified that "because everything in [the law] is very vague, that if you make a mistake you're always worried about, you know, did I make a mistake? … You're constantly worrying about that. It's always in the back of your mind." Mary Doe Dep 53-56; 105, Exh 6.

199.  When plaintiffs do gets answers from police, those answers may be wrong. For example, when Mr. Doe #3 told police that he was planning a four-day trip to Mexico with his wife, the registering official told him registrants cannot

leave the country. Doe #3 Dep 93, Exh 3. In fact, SORA 2013 would not bar the trip, although registrants must provide 21 days advance notice for foreign travel lasting more than seven days. M.C.L. § 28.725(7).

### G. The Repeated Amendments to SORA Make It Difficult for Registrants to Keep Track of Their Obligations and to Plan for the Future

200.  SORA has been repeatedly amended over the past 20 years, creating a host of new obligations and restrictions on registrants over the years. *See* Section XI.A-B, *infra*.

201.  Mr. Doe #1 stated that "the state keeps changing the requirements. But I don't know how I am supposed to know when the laws change." Doe #1 Interrog Resp No 11, Exh 36.

202.  Mr. Doe #2 said that because the registry requirements have changed so often in the past, and have been applied retroactively, he has no faith that SORA will not change again in the future, and be applied retroactively. He is therefore concerned about turning over personal information to the government that, though not publicly posted on the Internet now, could be publicly posted in the future. Doe #2 Dep 138-39, Exh 2.

203.  Mr. Doe #3 stated that as a non-lawyer he does not know how to under-stand the law but he does "know that the state keeps changing the requirements." Doe #3 Interrog Resp No 11, Exh 38.

204.  Mr. Doe #4 testified that because the "registry changes every day," it is difficult to understand what he can and cannot do. Doe #4 Dep 65, Exh 4.

205.  Mr. Poxson testified that when he was on the registry it was difficult to keep track of the SORA requirements, due to the repeated legislative changes. Poxson Dep 17, 80, Exh 14.

206.  Even MSP officials recognize that changes to SORA can cause confusion. For example, Johnson testified that the MSP was "assuming there are going to be sex offenders that are confused" by recent legislative changes, which set different verification periods for registrants depending on their birth month, rather than re-quiring all registrants to verify at the same time (formerly January, April, July and October for Tier III registrants). Nevertheless, individuals who verify in the wrong month could be prosecuted. Johnson Dep 272-73, Exh 15; Mich. Pub. Act 149 (2013).

207.  Moreover, to the extent that judicial decisions affect the interpretation of SORA, registrants are unlikely to know about such decisions since they do not typically have access to Westlaw/Nexis alerts to inform them of new cases. Nor are registrants provided with copies of any Attorney General opinions interpreting SORA. Stapleton Dep 102-03, Exh 13.

## H. Registrants Face Prosecution, Conviction, and Jail or Prison if They Misinterpret SORA's Requirements

208.  SORA 2013 imposes penalties of up to 10 years imprisonment for viola-

46

tions of the Act. M.C.L. §§ 28.729(1); 28.734(2); 28.735(2).

209.   A registrant who does not correctly understand the SORA requirements faces jail or prison. As Mr. Doe #4 testified, "the consequences of making a mistake" about what the registry requires are "[p]rison, and I don't want to go to prison." Doe #4 Dep 87, Exh 4.

210.   Mr. Poxson testified that when he was on the registry, he was afraid that he "might violate [the law] in some way and not even know I violated." Poxson Dep 81, Exh 14.

211.   Even where registrants are able to get information from law enforcement about their obligations, reliance on that information does not protect them from prosecution if the information is erroneous. For example, Mr. Poxson testified that the local police told him that his misdemeanor offense required only annual verification. But the MSP disagreed, and told him that unless he began registering quarterly, he would be arrested. Mr. Poxson was prosecuted for failure to report even though he was "doing exactly what [he] had been told to do by local law enforcement." The prosecutor eventually dropped the charges after seeing that Mr. Poxson had it in writing that he was only required to report once a year. Poxson Dep 66-68, Exh 14.

212.   Similarly, Richard Stapleton reported that confusion about the meaning of SORA leads to situations where MDOC agents inform parolees/probationers that

some conduct is permissible, only to find that prosecutors or law enforcement agencies disagree. Stapleton was involved in several cases as MDOC Legal Affairs Administrator where parole agents had authorized parolees to attend their children's sporting events, only to have the registrants charged by local prosecutors for violating SORA. In another case, a parolee was approved to re-shingle roofs near a school, and the local prosecutor wanted to prosecute him for loitering. Stapleton Expert Report 9, Exh 28; Stapleton Dep 83-85, 105-06, Exh 13.

213.  Stapleton testified that because SORA requires that any violation of the act results in parole rescission, the MDOC is required to return registrants to prison if they are not in compliance, even where prosecutors do not prosecute these violations. Registrants are returned to prison for SORA violations under a preponderance of the evidence standard, which is all that is required for a parole violation. Parolees have no right to appeal such a parole violation internally within the department, and judicial review of parole violation is limited. Stapleton Dep 88-89, 108-09, Exh 13; M.C.L. §§ 28.729(5), (7).

## V.   GEOGRAPHIC EXCLUSION ZONES ARE VAGUE

214.  Under SORA 2013, the plaintiffs are barred from residing, working, or "loitering" within a "student safety zone," defined as "the area that lies 1000 feet or less from school property." M.C.L. §§ 28.733(e)-(f), 28.734, 28.735.

215.  As explained in the expert report of Peter Wagner, how a "student safety

48

zone" is defined and measured determines the shape and extent of the protected zone, and therefore controls whether or not a registrant is engaging in unlawful behavior. In Michigan, the size, shape, and boundaries of "student safety zones" are effectively unknowable, even for experts with specialized software and relevant training. Accordingly, the plaintiffs often cannot know if they are working, residing, or "loitering" within 1000 feet of school property. Wagner 2nd Expert Report i, Exh 26.

### A. SORA Geographic Exclusion Zones Are Vast, Including at Least 46% of the City of Grand Rapids

216.  The exclusion zones, however measured, cover vast areas, especially in urban and suburban regions. They thereby severely restrict access to employment and housing, and limit registrants' ability to engage in normal human activity. Wagner 1st Expert Report 6-10, Exh 25.

217.  Mr. Wagner produced an under-inclusive map (erring on the conservative side) for the City of Grand Rapids, showing that at least 46% of Grand Rapids property parcels lie within exclusion zones. Wagner 2nd Report ii, 27-28, Figure 10, Exh 26.

# "School safety zones" in the city of Grand Rapids



**Legend**

**City of Grand Rapids Parcels**

☐ Parcels that may not be within 1,000 feet of a school parcel

■ Parcels within 1,000 feet of a school parcel

**Figure 10.**

218.  Many of the "permissible" areas on that map are likely not appropriate for living, working, or spending time because they are in industrial areas. *Id.*

219.  Expanding the number of "protected places" can dramatically increase the total area covered by exclusion zones. For example, during the 2011-12 legislative session, the Michigan Senate (but not the House) passed S.B.76 and 77, which would criminalize loitering within 1000 feet of daycare centers. Based on a list of the approximately 10,729 daycare providers in Michigan, Mr. Wagner created a map showing what 1,000 foot circles around just two dozen daycare providers in Lansing would look like. This map significantly understates the size of the potential exclusion zones, because it is not based on parcel data. Wagner 2nd Expert Report 28-32, Figure 11, Exh 26; S.B. 76 and 77 (2012), Exh 97.



**Figure 11.**

220.  Mr. Wagner also found that if daycares are added to the list of protected places, 75% of Grand Rapids would be off-limits. *Id.*, Figure 12.

## Most of Grand Rapids is within 1,000 feet of a school or day care property



**Legend**

**City of Grand Rapids Parcels**

- Parcels that may not be within 1,000 feet of a school or day care parcel
- Parcels within 1,000 feet of a school parcel
- Parcels within 1,000 feet of a day care parcel

**Figure 12.**

53

221.  Because it is difficult to know where exclusion zones are, not only do registrants avoid engaging in activities in areas that are close to but not actually in exclusion zones, but law enforcement may enforce prohibitions on residing, working or loitering in areas that are not actually exclusion zones. For example, Sgt. Payne testified that if he saw a registrant who was close to a school, he would tell the registrant to move along, even without measuring whether the registrant was actually within 1000 feet. Payne Dep 62, Exh 17.

**B. Different Measurement Methods Significantly Affect the Shape And Size of Exclusion Zones**

222.  There are four significant variables that affect the measurement of geographic exclusion zones.

   a.  The activity (reside, work, or loiter, as defined in M.C.L. § 28.733(b));
   b.  The measurement of the distance (as the crow flies or along the road);
   c.  What point the distance is measured from (building, property line, etc.);
   d.  What point the distance is measured to (person, building, property line).

Variations in those factors lead to dramatically different results in the size, shape, and boundaries of exclusion zones, and therefore determine whether or not a registrant is engaging in lawful behavior. Wagner 2nd Expert Report 3, Exh 26.

223.  The nature of the prohibited activity can affect how one measures distance. Loitering and working are not necessarily stationary activities, meaning that determining whether a registrant is within a protected zone can involve real-time mapping of the distance between a fixed protected area and an ambulatory

person moving about. *Id.*

224.  Johnson similarly testified that proximity mapping "doesn't work for

loitering," when a person is moving around.

> Q. So your testimony is you don't know how it's measured, loitering is
>     measured, whether it's measured from the person or from the parcel or from
>     some other thing?
> A. Correct.

Johnson Dep 228-29, Exh 15.

225.   Moreover, as the figures included in Mr. Wagner's expert report show, if

one measures in a straight line between two points, regardless of obstructions or

normal travel routes, then an exclusion zone may include areas that are not at all

close to schools in terms of actual/practical travel distance. Wagner 2nd Expert

Report 5-6, 13-14, Figures 1, 2, Exh 26.



Figure 1 (person in marked house, which is less than 1000 feet from school, would need to travel 4,200 feet to get to the closest part of school property)



Figure 2 (home within 1000 feet of school has driving distance of 4.4 miles)

226.   Third, while 1000 feet is an objective distance, the size, shape, and boundaries of an exclusion zone are affected by the two points between which one measures. Taking the example of the prohibition on residing within 1000 feet of a

56

school, exclusion zones could be measured: (a) from the school building to the home building; (b) from the school property line to the home property line; (c) from the school property line to the home building; or (d) from the school building to the home property line. Wagner 2nd Expert Report 4, 7, Exh 26.

227.   Variations in the methodology used to measure the protected distance has a tremendous impact on the size, shape, and boundaries of exclusion zones, and hence a tremendous impact on whether registrants are in fact residing, working, or visiting a place unlawfully. Wagner 2nd Expert Report 7-15, Figures 3-5, Exh 26.



Figure 3 (view of school)



Figure 4 (showing, in successively darker colors, a school symbol for the front entrance, the school's outline in orange, and the school's property line in brown)



Figure 5 (showing 1,000-foot exclusion zones drawn around each of three nested protected areas: the school's entrance, the school building and the school property)

228.   As these images demonstrate, the area covered by a 1000-foot distance around a school property perimeter is much more extensive than the area covered by a 1000-foot distance from a single point at the school. The differential was 3.5

times larger for the example used in Mr. Wagner's report. Wagner 2nd Expert

Report 9-10, Figures 4, 5, Exh 26.

229.   Mr. Wagner explained in his deposition:

A. …The general problem here … is that as the distance gets bigger the area
that's affected grows much faster, so as you double the distance, as you
double the radius, the area that's affected goes up four times. So 500 feet
sounds like it's half the size of 1,000 feet but the affected area is actually a
quarter of the size.
Q. And why is that?
A. Geometry. . . . It's because the area of a circle is pi r2, so when you double r
you're actually making the area four times larger.

P. Wagner Dep 65-66, Exh 11.

230.   Exclusion zones are not shaped like simple circles around a fixed point.

While measuring 1000 feet from a single point will produce a circle, measuring

1000 free from a parcel boundary will produce an irregular shape. Moreover, as

shown in figures 6a, 6b, and 6c, measuring to the home property line will create

bizarrely shaped exclusion zones, since the entire parcel of a home becomes off

limits if any part of the parcel is within 1000 feet of a school. The size of the

intersecting parcels significantly affects the total size of the exclusion zones.

Wagner 1st Expert Report 4, Exh 25; Wagner 2nd Expert Report 11-13, Figures 6a-

6c, Exh 26.



Figure 6a (exclusion zone measured from school entrance to home property line)



Figure 6b (exclusion zone measured from school building perimeter to home property line)



Figure 6c (exclusion zone measured from school property line to home property line)

231.    The size, shape and boundaries of exclusion zones are also affected by whether distances are measured "as the crow flies" or as a person could actually travel. Wagner 2nd Expert Report 4-5, figure 7a, 7b, Exh 26.



Figure 7a (1000 foot distance measured along streets that connect to school property)



Figure 7b (showing properties that are adjacent to the 1,000 foot distances as measured along roads)

232.   Finally, exclusion zones in densely populated areas frequently intersect and overlap, creating oddly shaped zones that blanket communities. Wagner 1st Expert Report 4-5, Exh 25; Wagner 2nd Expert Report 34, Figure 13, Exh 26.



Figure 13 (map showing how different 1000 –foot exclusion zones overlap)

233.   If parcel-to-parcel measurement is used for all prohibited conduct, registrants must be able to identify these oddly-shaped exclusion zones and structure their lives accordingly, not just when making larger decisions such as where to live, but also when engaging in everyday activities such as taking their children to the park. Wagner 2nd Expert Report 13, Exh 26.

234.    In short, whether or not a person is violating SORA by residing, working, or loitering in a particular place will depend on what measurement method is used. Wagner 2nd Expert Report 15, Exh 26.

**C. Defendants Themselves Do Not Know How to Map or Enforce Exclusion Zones**

235.   The MSP's Manual on SORA does not state whether geographic exclusion zones should be measured point to point or property-line to property-

line. MSP SOR Manual § 4.1, Exh 83.

236.    Karen Johnson, when asked about her understanding of how exclusion

zones should be measured testified: "We get the telephone calls asking us the

questions, so I know what the questions are but I don't know what the answers

are." Johnson testified that she did not know how to determine whether a residen-

tial or employment address is within a student safety zone, and that she did not

know whether the 1000-foot distance is measured property-line to property-line or

point to point. In situations where she does not know whether a particular property

counts as a "school property" as defined in SORA, Johnson refers the question to

the local prosecutor. Johnson Dep 58, 61, 225-26, 240-43, Exh 15.

237.    Similarly, Leslie Wagner, MSP Registry Coordinator, testified:

A. We don't know and I don't know if the registry is supposed to be from one
   parcel to a point or a parcel to a parcel or point to point . . .
Q. You yourself are not sure whether it should be measured parcel to parcel or
   point to point?
A. Correct.

L. Wagner Dep 27-29, Exh 18.

238.    When geographic exclusion zones were created in 2006, the MSP SOR

Unit created a cheat-sheet to help SOR Unit staff understand the changes. Johnson

Dep 314-15, Exh 15.

239.    The cheat-sheet contains answers to approximately 15 questions. One

entry is crossed out as incorrect. At least one other entry, which states that home-

less registrants cannot use shelters, is legally incorrect. *See Poe v. Snyder*, 834 F.

Supp. 2d 721, 733 (W.D. Mich. 2011) (holding SORA does not prohibit registrants

from using emergency shelters within 1000 feet of a school). Student Safety Zone

Cheat-sheet, Exh 49.

240.   The cheat-sheet does not state how the 1000 feet is measured. Student

Safety Zone Cheat-sheet, Exh 49.

241.   MSP did not share the cheat-sheet with other agencies "because other

agencies might come to different conclusions" about how to interpret the law.

Johnson Dep 315, Exh 15.

242.   MSP SOR Unit staff members were unable to answer questions at their

depositions about how the geographic exclusion zones work. For example, Trooper

Burchell, SOR Unit State Coordinator, was asked whether a farmer is in violation

if he drives his tractor across two fields, each of which is a separate parcel but only

one parcel of which is within an exclusion zone. Trooper Burchell did not know.

He also did not know whether a particular Grand Rapids area school, which is

located within a zoo, would qualify as a school, and further did not know "how a

registrant could figure out if it's a school." Burchell Dep 56, 58-60, Exh 16.

**D. Decisions About How to Measure Exclusion Zones Are Left to Local
Law Enforcement Agencies, Resulting in Significant Variation**

243.   Karen Johnson, the MSP SOR Unit Manager, testified that "each [law

enforcement] agency may have their own policies and procedure on how they

determine whether or not a sex offender can live at a residence or not. I don't know

what those are and we don't provide any guidance how they should do that."

Johnson Dep 56-60, Exh 15.

244. Karen Johnson testified that, to her knowledge, the prosecuting attorneys

association had not trained prosecutors on how to handle student safety zone

issues. Johnson Dep 59-60, Exh 15.

245. If registrants call with questions about exclusion zones the MSP refers

them to local law enforcement. If local law enforcement calls the MSP, they are

referred to the local prosecutor. Johnson further testified that it is possible that one

prosecutor could measure 1000 feet from the door of a school while another

prosecutor could measure 1000 feet from the edge of the school's football field.

She did not know how prosecutors advise local law police to measure, saying that

"[w]e really don't deal with student safety zones." Johnson Dep 56-60, Exh 15.

246. Johnson testified that the plaintiffs, who are from different parts of the

state, would need to contact their respective local police departments, local prose-

cutors and local sheriffs to determine how measurement is handled in their juris-

diction. Johnson Dep 100-01, Exh 15.

247. SOR Unit Enforcement Coordinator Bruce Payne testified that the MSP

does not provide any guidance to local law enforcement agencies on how to meas-

ure geographic exclusion zones. The local law enforcement agency itself decides

whether to measure 1000 feet from property line to property line or from building to building, as well as whether to measure as the crow flies or as a person would actually travel. Payne Dep 31-35, 42-43, Exh 17.

> Q: But it would be the local law enforcement decision whether to measure from the building to the property line or whether to measure from the property line to property line?
> A. Absolutely, yes.

Payne Dep 35, Exh 17.

248.   Sergeant Payne testified that he did not know what measurement techniques local agencies use, and that "there's so many law enforcement agencies in the state of Michigan you would have to individually contact everyone to see what they are specifically doing." Payne Dep 36, Exh 17.

249.   SOR Unit Coordinator Burchell similarly testified that he did not know whether to measure property line to property line or point to point, and that such decisions would be up to the local prosecutor:

> Q: So you get a question regarding how to measure loitering, and the person says the registrant is standing 2,000 feet away from the school, but the parcel, the property on which the registrant is standing, is 900 feet away from the school. Is that a violation?
> A. I would ask them to check with their local prosecutor whether or not it's a violation.

Burchell Dep 45-47, 54, Exh 16.

250.   Mr. Granzotto's survey showed that local law enforcement agencies use a wide variety of techniques to measure the 1000 feet, from laser measure, walking

tape measures, wheel markers, to Google maps. Granzotto Decl 5, Exh 33.

251.   Because local law enforcement in one place may use point to point measurement and local law enforcement in another place may use property line to property line measurement,

> there's no uniformity state-wide . . . [P]eople can't know without knowing how law enforcement at that moment is enforcing the law where they can live or work. And then once they know how law enforcement is currently enforcing the law there's no guarantee if there's no uniformity that the law will continue to be enforced in that area, so before I buy a home or get a job there's no notice that the next police officer in the same town will agree with that interpretation . . . . [T]here's this massive discrepancy on how the law is enforced and understood which greatly affects what areas are subject to special treatment, so the amount of uncertainty that it gives to people on the registry is quite large.

P. Wagner Dep 123-125, Exh 11.

### E. Although There Is Confusion about How to Measure, From Property Line to Property Line Appears to Be the Most Common Method

252.   Mr. Granzotto's survey found that 11 of 12 responding police departments measured property line to property line. Of three responding prosecutor's offices, one measured from the centers of the properties, one from the property line, and one said the measurement issue would be decided by the judge. Granzotto Decl 2-3, 10, Exh 33.

253.   Herb Tanner, of the Prosecuting Attorneys' Association of Michigan, testified that among prosecutors there is "a pretty strong consensus that it is measured property line to property line." Tanner Dep 17, 79, Exh 21.

## F. The Michigan State Police OffenderWatch System Will Use Point-to-Point Measurement

254.   The MSP is moving to a new data management system called

OffenderWatch (*see* Section XV. D., *infra*). Unlike the prior SOR data

management system, OffenderWatch has tools allowing law enforcement to

determine whether a residence, work, or volunteer address is within 1000 feet of a

school. If the registrant reports an address within an exclusion zone, a pop-up

screen appears. Johnson Dep 222-23, Exh 15; Offender Watch Manual 28-29, 44,

138, Exh 50; OffenderWatch Contract 26, Exh 52.

255.   Ms. Wagner testified that whether mapping will be done point to point or

parcel to parcel depends on whether the SOR unit can obtain parcel data. L. Wag-

ner Dep 27-29, Exh 18.

256.   Although uncertainties remain because OffenderWatch is still being

developed, Ms. Johnson believed OffenderWatch will be programed to measure

proximity violations from point to point. Ms. Johnson was uncertain, but thought

that the point will be the center of the parcel, rather than the center of any building

located on that parcel. Johnson Dep 226-28, Exh 15.

257.   OffenderWatch will input a list of schools that the MSP obtained from

the Michigan Department of Education. That list does not include all school

properties as defined in SORA. Johnson Dep 233-36, Exh 15.

258.   The proximity measurements in OffenderWatch are "not a definitive

interpretation of where schools are or how to measure or what's within 1000 feet of a school." Johnson Dep 354, Exh 15. Although the new mapping feature is a "tool," it is "not going to tell [law enforcement] exactly if [a specific location] [i]s within a school safety zone." L. Wagner Dep 27-29, Exh 18. It will still be "up to each agency" to determine how to measure. Id.

259.   A prosecutor could prosecute for an exclusion zone violation even if no violation shows in OffenderWatch. Johnson Dep 354, Exh 15.

**G. Geographic Exclusion Zones and Property Lines Are Not Visible**

260.   The boundaries of SORA's geographic exclusion zones are unmarked in the physical environment. Wagner 1st Expert Report 4, Exh 25.

261.   Similarly, the property lines of schools or other property parcels are un-marked in the physical environment. Sgt. Payne noted:

Q. So how would a registrant know where the property line is?
A. I don't know. I don't have that answer.
Q. But it's not like – I mean, you can see a corner of a building, right? You can see where that is, right?
A. Right.
Q. But you can't necessarily see where a property line is; is that accurate?
A. That could be accurate, yes.
Q. Do you know if there's any publicly available maps showing parcel data that are available to registrants?
A. Personally I do not, no.

Payne Dep 57, Exh 17.

262.   Similarly, Trooper Burchell testified:

Q. Assuming that student safety zones are measured from the parcel boundaries

70

rather than the building, how would a registrant know what parcel a school's
located on?

A. I don't know …. I don't know how they'd know.

Burchell Dep 60, Exh 16.

## H. To Map Exclusion Zones One Needs Parcel Data, But Such Data Are Either Impossible or Practically Impossible for Registrants to Obtain

263.   In jurisdictions where geographic exclusion zones are measured property
line to property line, it is necessary to obtain parcel data in order to accurately map
exclusion zones. Plaintiffs' mapping expert Peter Wagner explained that obtaining
parcel data is the first step for determining the boundaries of the exclusion zone:

> Because assuming, and in Michigan this is a big assumption, assuming that …
> the statute is to be measured on a property line to property line basis, you have
> to know where the property lines actually are.

P. Wagner Dep 48, Exh 11; Wagner 2nd Expert Report, 15, 19, 21-22, Exh 26.

264.   The MSP SOR Unit has tried to obtain parcel data but has been unable to
get it, despite working with the state's Geographic Information Systems Office.
Wagner 2nd Expert Report 23, Exh. 26; L. Wagner Dep 59, Exh 18.

265.   Both plaintiffs' counsel and their expert Peter Wagner engaged in an
extensive effort to obtain parcel data. Some jurisdictions indicated that they did not
have such data. Others indicated they did have the data, but the cost of acquiring it
ran as high as six figures for just one county. After "several years and many pages
[of correspondence]" Mr. Wagner was "eventually able to find parcel data for parts
of just one county in Michigan," which he used to make some of the maps included

71

in his second expert report. Wagner 1st Expert Report, 11, Exh 25; Wagner 2nd Expert Report, 23, Exh 26; P. Wagner Dep 48, Exh 11.

266.    Given that plaintiffs' expert was unable to identify a source for statewide parcel data, and given that the Michigan SOR Unit was unable to provide information on where such data might be obtained, it is highly unlikely that ordinary registrants would be able to obtain the parcel data needed to accurately map exclusion zones. Wagner 2nd Expert Report 22, Exh 26; Johnson Dep 61, Exh 15; L. Wagner Dep 27-28, Exh 18.

## I.  Inability to Accurately Identify Geographic Exclusion Zones Puts Registrants at Risk of Non-Compliance

267.    SORA creates exclusion zones around "school property," defined as "a building, facility, structure, or real property owned, leased, or otherwise controlled by a school, other than a building, facility, structure, or real property that is no longer in use on a permanent or continuous basis, to which either of the following applies:

> (i)  It is used to impart educational instruction.
> (ii) It is for use by students not more than 19 years of age for sports or other recreational activities."

M.C.L. § 28.733(e).

268.    As Peter Wagner notes in his expert report, it is not always obvious whether a particular property qualifies as school property, triggering creation of an exclusion zone. Wagner 2nd Expert Report, 19, Exh 26.

72

269.   MSP SOR Unit staff were unable to answer questions during their depositions about whether certain types of properties or educational activities would trigger an exclusion zone. Payne Dep 46-55, Exh 17; Johnson Dep 241-42, Exh 15.

270.   Plaintiffs' expert Peter Wagner was unable to identify, and defendants were unable to produce, a comprehensive list of "school properties." After discovery negotiations, defendants did produce a list of 4,253 schools, but explained that this list was not comprehensive, as it only included school buildings, not other school properties. Wagner 2nd Expert Report 20, 29, Exh 26; Defs' Resp to Pls' First Interrog, No. 6, Exh 42.

271.   SOR Unit staff have "tried but [] could not find" a list of properties that qualified as "school properties" as defined by SORA. L. Wagner Dep 36, Exh 18.

272.   Ms. Johnson testified that she relies on the Michigan Department of Education to determine whether a particular property qualifies as a "school property" within the meaning of SORA. Johnson Dep 244, Exh 15.

273.   The State of Michigan does not make maps available to the public showing where the exclusion zones are located or what their boundaries are. "No information is created, maintained, updated, and/or publicized [by the defendants] regarding which geographic areas are located within student safety zones." Defs' Resp to First Interrog, No. 4, Exh 42.

274.   The Explanation of Duties Form provided to registrants does not identify

73

the geographic exclusion zones, explain how to determine the boundaries of such

zones, or explain how the 1000 feet are measured. Explanation of Duties Form,

Exh 62.

    275.   Leslie Wagner testified:

Q. So looking at [the Explanation of Duties Form] the registrant wouldn't know
    whether it's measured parcel to parcel or point to point?
  [Objection omitted.]
A. I would assume they would not know.
Q. Is there anywhere else – any other written material that's provided to
    registrants to tell them where the student safety zones are or how they are
    measured?
A. I don't know, nothing has been produced since I've been there.
Q. Do you – you don't provide any maps to registrants?
A. No.
Q. Do you know if local law enforcement provides maps?
A. I don't know.
Q. But you don't instruct local law enforcement to develop maps for their
    jurisdiction?
A. No.

L. Wagner Dep 80-81, Exh 18; Explanation of Duties Form, Exh 62.

    276.   The new OffenderWatch proximity violation measurement tool will not

be made available to registrants. Johnson Dep 230-31, Exh 15.

    277.   Ms. Johnson testified that "I try to encourage my staff not to answer

questions about student safety zones." Johnson Dep 315, Exh 15.

    278.   Of the police departments contacted by Mr. Granzotto, none provided

maps to registrants outlining what areas were covered by exclusion zones. Plain-

tiffs' counsel also sent Freedom of Information Act requests to police departments

seeking such maps. Of the eight departments that responded, only one provided a

map. Granzotto Decl 6-7, 12, Exh 33.

279.   Mr. Wagner and his staff, who have specialized software and experience

making maps, spent 16 hours creating an exclusion zone map for just one city,

after finally obtaining the relevant parcel data. Wagner 2nd Expert Report 24-26,

Exh 26.

280.   Mr. Wagner explained that "[i]t is reasonable to assume that generating a

map such as this one … would be impossible for a lay person on the registry who

has no mapmaking experience or tools whatsoever." Wagner 2nd Expert Report 26,

Exh 26.

281.   Mr. Wagner also explained that it is impossible to measure 1000 feet

with ordinary consumer tools, such as a tape measure. Using a car odometer results

in "a lot of error" since one must follow the road to measure "because you really

can't drive through people's houses or across rivers with your car." P. Wagner Dep

101, Exh 11; Wagner 2nd Expert Report 15-16, Exh 26.

282.   Mr. Wagner testified that programs like Google Maps can provide a

"rough estimate" but "[w]hat that rough estimate does is gives you a huge list – a

very small list of yeses, a very small list of noes, and a huge list of maybes, I don't

knows, and I'm not sure what you're supposed to do with that list." P. Wagner Dep

101, Exh 11.

283.   Specialized mapping software is expensive and requires considerable

training. Wagner 2nd Expert Report 15-16, Exh 26.

284.   In any event, accurate measurement and mapping requires parcel data.

Such data is not readily available, and is not available for Michigan in Google

Earth. Wagner 2nd Expert Report 15-16, 23, Exh 26.

285.   Mr. Wagner concluded:

Exclusion zones in Michigan are not only unknowable for the average person
on the street. They are also unknowable to trained geographers with special
software, access to specialized data and expertise in criminal justice
mapping…. In sum, there is simply no good way in Michigan for experts, much
less registrants, to determine exactly what areas are subject to SORA's "student
safety zone" provisions.

Wagner 2nd Expert Report 34, Exh 26.

286.   Plaintiffs must comply with the geographic restrictions 24 hours a day for

the rest of their lives. M.C.L. §§ 28.733-735. The experience of registrants, who

must conform their activities to the zones, is quite different from that of law en-

forcement officials, who need only prove a violation at one moment in time. As

Peter Wagner explained:

[L]aw enforcement can just work backwards from a given address to determine
if it's in compliance. It's a very different process that someone has to go
through in order to determine where they can reside, work, or loiter.

P. Wagner Dep 95, Exh 11.

287.   Moreover, methods a registrant might use to determine whether a fixed

location is within 1000 feet of a school are not available to them as they move

about during the course of their daily lives, which can include working in multiple

locations or traveling across town with their children in tow:

> Realistically the only way to do that [move about town without violating an
> exclusion zone] would be to map the entire city or county before you left the
> house and consult it constantly, or make your own smart phone app, but you
> really have to map everything in advance. This is not something you can do one
> at a time. For enforcement purposes the police can measure back from that one
> point and it's very easy for them. For a person who's going about their daily life
> without having a map in advance it's impossible.

P. Wagner Dep 130, Exh 11.

288.   When Mr. Doe #1 was looking for an apartment, he could not determine

whether or not residences were within a geographic exclusion zone. He did not

know from where the 1000 feet was measured or where school property lines were

located. Verified Compl, ¶ 223.

289.   When Mr. Doe #3 and his wife were searching for a new home, they saw

homes they wanted to buy that were clearly too close to a school, but also homes

where they did not know if the house was too close to a school. Mr. Doe #3 used

his odometer to estimate distances based on the driving distance:

> Honestly, I drove my car and I reset my tach [*sic*] and I drove the neighborhood
> to see how far it was. You know, I figured, you know, a quarter mile was more
> than a thousand feet, so if I was anything over a quarter mile I was pretty much
> safe.

Doe #3 Dep 125, 130-31, Exh 3.

290.   Mr. Doe #4 does not know how to find out if a place is 1000 feet from a school. The police do not provide maps of exclusion zones. Doe #4 Dep 95, Exh 4.

291.    When Mary Doe and her husband got married and were looking for a home, the police did not give her a map or tell her how to figure out what housing was permissible. She tried to measure distances on Google: "[T]hen it gives you point two miles, point one miles, and then you've got to figure out how many feet are in point one of a mile and then figure out from there if you're in violation or not." Because she was unsure, she looked at properties that were further from the 1000 foot mark "so that I know that I'm okay." Mary Doe Dep 109-110, Exh 6.

292.   The difficulty of determining where exclusion zones are also affects the plaintiffs' ability to obtain employment because, as Mary Doe explained, "If you're out of work and you're just applying wherever and you get that job and then you have to say, oh, I can't take it, you know, because you didn't know at the time it was within a thousand feet." Mary Doe Dep 77, Exh 6.

## VI.  SORA'S REPORTING OBLIGATIONS ARE VAGUE

### A. The Plaintiffs Are Subject to Extensive In-Person Reporting Requirements And Those Requirements Are Vague

293.   As Tier III registrants, the plaintiffs must report in person every three months within a specified 15-day period[3], M.C.L. 28.725a(3)(c), and must provide:

---

[3] Registrants previously had to report during the first 15 days of January, April, July and October. After passage of Public Act 149 of 2013, Tier III registrants

78

- all names and nicknames, Social Security number, and date of birth;
- residential address, including any address where the individual expects to spend more than seven days, as well as the dates of any such temporary stays;
- employer names and addresses, including information on any person who agrees to hire a registrant for a temporary job, as well as the routes of travel for non-stationary employment;
- schools attending or schools to which accepted;
- telephone numbers registered to the individual or routinely used;
- e-mail and instant message addresses, log-in names or other identifiers assigned to the individual or routinely used;
- all other designations used in Internet communications or postings;
- license plate and registration information for any vehicle owned or regularly operated by the individual, and the location where that vehicle is kept;
- driver's license or personal ID card;
- passport and immigration documents;
- occupational license information; and
- a complete physical description.

M.C.L. § 28.727(1).

294.  Plaintiffs must provide a photograph, fingerprints, and palm prints. If a plaintiff's appearance changes, he or she must update the photograph. M.C.L. §§ 28.725a(5), 28.727(1)(q).

295.   In addition to reporting in person at regular intervals, the plaintiffs must report "immediately" whenever certain information changes. The immediate, in-person reporting requirement is triggered whenever the plaintiffs:

- change their residence;
- begin, change, or discontinue employment;

---

continue to report quarterly, but must do so according to a schedule set by their birth month. M.C.L. § 28.725a(3), *as amended*.

- enroll or dis-enroll as a student;
- change their name;
- intend to travel for more than seven days;
- establish an e-mail address, instant message address, or other Internet designation; and
- buy or begin using a vehicle, or cease owning or using a vehicle.

M.C.L. § 28.725(1).

296.   SORA 2013's requirements for reporting personal information are so vague that the plaintiffs do not understand what information must be reported, or what changes in information subject them to the in-person immediate reporting requirement. Verified Compl, ¶ 214; Pls' Resp to Interrog No. 11, Exh 35.

297.   First, many of the reporting requirements turn on the frequency with which a registrant is engaging in the activity. For example, registrants must report telephone numbers "routinely used," email addresses "routinely used," vehicles "regularly operated," and the locations where vehicles are "habitually stored or kept." The length of time or number of uses that qualify as "routinely," "regularly" or "habitually" is undefined. M.C.L. §§ 28.725(1)(g), 28.727(1)(h)-(j).

298.   Second, many of the terms used in the statute – like "employee," "employer," "residence," "student," "domicile," "temporarily reside," "discontinue" one's studies/vehicle use, "designation used in internet communications" – are undefined or poorly defined, leaving registrants guessing whether they have engaged in an activity that must be reported. M.C.L. §§

28.722(e), (p), (q); 28.723(1), 28.724(6), 28.724a, 28.725(1).

299.   Finally, M.C.L. § 28.725(1) requires "immediate" reporting of certain

information changes. While "immediate" is defined to mean three business days,

M.C.L. § 28.722(g), it is unclear what "business days" means in the context of

reporting to law enforcement authorities, where some agencies provide service

seven days a week and others are open less frequently. This is particularly true in

jurisdictions where registrants could potentially report at several different law

enforcement agencies (*e.g.*, either city or county police), and those agencies have

different days of operation. M.C.L. § 28.722(n).

### B. Law Enforcement is Either Unsure What Registrants Must Report, or Provides Conflicting Information

300.   The surveys conducted by Mr. Poxson showed that local law

enforcement agencies either could not answer or provided conflicting answers to

questions regarding registrants' reporting requirements. Poxson Decl, Exh 32.

301.   For example, when Mr. Poxson asked local law enforcement agencies

about the employment reporting requirements, some said that shoveling snow (or

ceasing to shovel snow) must be reported, others said it need not be, and others did

not know. Of the two responding prosecutor's offices, one said they did not know,

and the other said snow shoveling is not reportable. Poxson Decl 5, 8-9, Exh 32.

302.   When Mr. Poxson surveyed local law enforcement agencies about how

often a registrant could use a vehicle before having to report it, some departments

did not know the answer, and others provided answers ranging from once or twice, to six or seven times, to "whatever is reasonable." The responding prosecutor's offices stated that they either did not know the answer to the question, or that there was no requirement to report borrowed vehicles. Poxson Decl 3, 8-9, Exh 32.

303.   MSP's SOR Unit staff were similarly unclear at their depositions about SORA 2013's reporting requirements. *See* IV., *infra*.

304.   Neither Enforcement Coordinator Payne nor Trooper Burchell could answer questions like whether snow-shoveling is reportable employment, whether a registrant whose manager sent him to work at a different job site for a week would need to report that change, or whether volunteering at a church fundraiser needs to be reported. Payne Dep 85-89, Exh 17; Burchell Dep 67-68, Exh 16.

305.   During his deposition Trooper Burchell reviewed both the Explanation of Duties Form and the SORA statute, but was still unable to answer those questions:

> Q: So I guess my question is, if you don't know the answer to those questions, is there any information that is given to registrants that would allow them to know the answer to those questions?
> A. Not that I know of.

Burchell Dep 70-71, Exh 16.

306.   Leslie Wagner did not know whether a registrant would need to report a temporary assignment to a different job site or volunteering at a church picnic. She did not know how a registrant who is traveling but does not have a specified ad-

dress destination could report. L. Wagner Dep 37, 60-63, Exh 18.

307.    Ms. Johnson responded to similar questions by saying that she "would give them a definition [of employment in the statute] and rely on them to get with their prosecutor and make that determination." Johnson Dep 327, Exh 15.

308.    With respect to SORA 2013's requirements for reporting certain property items that are "regularly used" or "routinely operated," SOR Unit staff was similarly unsure. Neither Sgt. Payne nor Trooper Burchell knew how often a registrant could borrow a car before needing to report it. Trooper Burchell testified that this is "up to interpretation by the prosecutor." Sgt. Payne testified, "Some may say, yes, it's regular use, some may say no. That would be probably a judgment call by the prosecutor or the law enforcement agency." Payne further agreed that "each law enforcement agency might come to a different conclusion about what regular use means." Payne Dep 93, Exh 17; Burchell Dep 73-74, Exh 16.

309.    Leslie Wagner did not know what constituted regularly operating a vehicle. L. Wagner Dep 38, Exh 18.

310.    The MSP SOR Unit's Manual does not provide any further clarification on registrants' reporting requirements. For example, the Manual does not explain what qualifies as reportable "employment," what "designations used in internet communications" are reportable, or how often a vehicle can be used before it must be reported. MSP SOR Manual § 2.5, Exh 83.

## C. The Plaintiffs Do Not Know What They Are Required to Report

311.   Like law enforcement officials, plaintiffs are unsure what information must be reported. But unlike the police, plaintiffs face criminal sanctions, which could be as high as ten years imprisonment, if they fail to report information that a prosecutor later determines was required. M.C.L. § 28.729.

312.   For example, Mr. Doe #1's employer has a fleet of vehicles. Mr. Doe #1 does not know which vehicles he must report: "I don't know whether or not I have to go tell them I got to register 36 vehicles that they have because there may come a time I may get van 27." Doe #1 Dep 89, 94-95, Exh 1.

313.  SORA 2013 also requires Mr. Doe #1 to report the location where he stores his vehicle. M.C.L. § 28.727(1)(j). He does not know if he must re-register each time he takes his car to the garage for repairs. Verified Compl, ¶ 217.

314.   Mr. Doe #2 does now know if he must register his girlfriend's car, which he occasionally uses to run errands or go register. Doe #2 Interrog Resp No. 15, Exh 37.

315.   Mr. Doe #3 is unsure whether the term "routinely use" means daily use, weekly use, or monthly use. Doe #3 Dep 121-22, Exh 3.

316.   Mr. Doe #4 does not have a vehicle of his own, but has been told by the police that if he borrows a car more than three times he must immediately report in person. This conflicts with Mr. Doe #4's colloquial understanding that the term

"regular use" of a vehicle should mean a vehicle he drives every day. Verified Compl, ¶ 218; Doe #4 Dep 84, Exh 4; M.C.L. § 28.727(1)(j).

317.   Mr. Doe #4, who does not have a phone of his own, is unsure whether he must register his mother's telephone number if he uses her phone on occasion, such as to get messages from counsel. Verified Compl, ¶ 219.

318.   Ms. Doe was uncertain whether she needed to register a vehicle she drives that belongs to her parents. When she asked her local police department, she was told she had to register a vehicle if she was driving it or if it was parked in her driveway. Mary Doe Dep 42, Exh 6.

## VII.   THE TERM "LOITERING" IS VAGUE

319.   SORA 2013 prohibits registrants, with some exceptions not applicable here, from "loitering" within 1000 feet of school property. M.C.L. § 28.734.

320.   The statute defines "to loiter" as meaning "to remain for a period of time and under circumstances that a reasonable person would determine is for the primary purpose of observing or contacting minors." M.C.L. § 28.733(b).

### A.  MSP Employees Do Not Know What Constitutes "Loitering"

321.   MSP SOR Unit staff were unable to answer deposition questions about whether certain types of activities were prohibited as "loitering." *See, e.g.* Johnson Dep 326, Exh 15 (unsure whether going to school playground on weekend is prohibited).

322.    Enforcement Coordinator Payne said "loitering" meant a registrant "can't hang around a school or a student safety zone." According to Sgt. Payne, the loitering provision would (a) prohibit a registrant from being present on school property even when there are no children there; (b) prohibit a registrant from taking her/his own children to a school playground, even if there are no other children present; and (c) prohibit a registrant from taking his/her child to a park within 1000 feet of a school because they are "hanging around" a place that is too close to a school. Payne Dep 26, 60-61, 81-82, Exh 17.

323.    The MSP SOR Unit's internal cheatsheet regarding the student safety zones does not define loitering other than to cite the statutory definition. SOR Unit Student Safety Zone Cheatsheet, Exh 49.

## B. Plaintiffs and Their Families Do Not Know What Constitutes "Loitering," and Therefore Avoid Many Common Activities

324.    Plaintiffs testified that they do not know what "loitering" means. Doe #1 Dep 88, Exh 1; Doe #3 Dep 100-01, 123-24, Exh 3.

325.    Mr. Doe #3's wife explained that if "loitering" means "he can't hang around the school for purposes of observing minors" then "that would mean my own children I guess also." Due to the "loitering" prohibition, her husband does not attend parent-teacher conferences, where children may be present. S.F. Dep 844, 1-83, Exh 8.

326.    S.F. further explained that their family cannot take a chance on

misinterpreting the statute:

> Q: What is your understanding of what [that term "loitering"] means?
> A. For a period of time…. But how long would a period of time be? ... There's a gray area….
> …
> Q. For a period of time that a reasonable person would determine is for the primary purpose of observing minors.
> A. Observing minors but to what extent? Like, I have cousins that go to that school and my husband has nieces and nephews that attend that school and my children attend that school, he can't be standing there waiting for my children? I mean, I don't know what a period of time is. I don't know. Like, I don't know what that means. Can he be standing there waiting for my children to come out of school and talk to his niece or nephew or observe his own children walking down from school? I don't know what that means. I don't know what he could get into trouble for…. So do we avoid things? Yes, just so he doesn't get in trouble.

S.F. Dep 87-88, Exh 8.

327.   Similarly, I.G. testified that at a family movie night at school, some families might be there for the purpose of observing the movie, while others would be there for the purpose of seeing other families and children, and so she does not know whether Mr. Doe # 4 would be "loitering" if he went to such an event. I.G. Dep 72, Exh 7.

## VIII.   STRICT LIABILITY AND IMPOSSIBILITY: PLAINTIFFS ARE CRIMINALLY LIABLE IF THEY VIOLATE SORA 2013 EVEN WHERE COMPLIANCE WITH THE STATUTE IS IMPOSSIBLE

### A. Plaintiffs Are Strictly Liable for Failure to Comply With SORA 2013

328.  As defendants admit, SORA 2013 makes plaintiffs strictly liable for

failure to comply with its requirements and prohibitions.[4] Defs' Answers to First Req for Admis, No. 142-45, Exh 44.

329. Specifically, under M.C.L. § 28.729(2), plaintiffs are strictly liable for violating the requirements of M.C.L. § 28.725a, which includes not only the requirement that plaintiffs report in person every three months, but also such provisions as getting a new photograph taken within three days if a registrant's appearance does not adequately match that on his/her identification card. M.C.L. § 28.725a(5); Defs' Answers to First Req for Admis, No. 142, Exh 44.

330. M.C.L. §§ 28.734-28.735 makes registrants strictly liable for working, residing, or loitering in a student safety zone. Defs' Answers to First Req for Admis, No. 143-45, Exh 44.

331. Plaintiffs fear that despite their best efforts to understand and comply with the law, and despite the absence of any intention to violate the law, they will be held strictly liable for any failure to comply, even when their violation is inadvertent or is based on a failure to understand the law. Verified Compl, ¶¶ 225 229.

332. Michigan does not provide the information registrants need to comply with SORA 2013, like maps of exclusion zones or clarity on what activities must be reported. Nevertheless, plaintiffs are strictly liable for complying with SORA

_____

[4] SORA 2013's penalty provisions include both strict liability provisions and "willful" violation provisions. M.C.L. §§ 28.729; 28.734, 28.735.

2013. M.C.L. §§ 28.729, 28.734, 28.735.

333.   As Enforcement Coordinator Payne put it:  it is "really on the offender to make sure that he or she complies with the requirements." Payne Dep 14, Exh 17.

## B. Although Compliance Can be Practically or Actually Impossible, Registrants are Still Strictly Liable

334.  Even where the requirements of SORA 2013 are knowable and under-standable, it may be practically or actually impossible for registrants to comply. Yet they are criminally liable regardless of whether illness, injury, or practical difficulties make compliance impossible. M.C.L. §§ 28.729, 28.734, 28.735.

335.  SORA mandates that law enforcement "[s]eek a warrant for the individ-ual's arrest if the legal requirements for obtaining a warrant are satisfied." M.C.L. §28.728a(1)(d).

336.  The MSP trains local law enforcement that "[e]very non-compliant offen-der should have a warrant." MSP SOR Manual §6.2, Exh 83; MSP Sex Offender Registry and Enforcement Training Powerpoint 2011, 82, Exh 58.

337.  In response to letters from registrants regarding the difficulties of registra-tion, the MSP SOR Unit explains that MSP is "obligated to obey and enforce the Michigan Sex Offenders Registration Act. The Department does not have the legal authority to deviate from the requirements under the Act." Sample SOR Letter to Registrant, Exh 57.

338.  For example, failure to register is a strict liability crime regardless of the reasons why a person might be unable to register within the 15-day registration window. M.C.L. § 28.729(2).

339.  By law, all registrants must report in person. M.C.L. § 28.725a(3). Sgt. Payne testified that if a registrant were run over by a bus and hospitalized, the registrant would still be a violation of SORA for failing to register in person during the 15-day verification window. Payne Dep 105-06, Exh 17.

340.  MSP does not provide guidance to local law enforcement on how to handle situations where registrants cannot verify in person due to age, disability, or similar factors. Rather, training materials state: "It is up to your agency to determine verification procedures when an offender is physically unable to verify his/her address. Hospital. Nursing Home. Mental Health Facility." MSP Sex Offender Registry Training Powerpoint 2011, 50, Exh 58; L. Wagner Dep 76-77, Exh 18; Payne Dep 104-06, Exh 17; Johnson Dep 337-38, Exh 15.

341.   In Mr. Doe #3's case, his inability to comply with the 15-day reporting requirement cost him his participation in the HYTA program that would have sealed his record. Doe #3 Dep 57, Exh 3; M.C.L. § 28.729(6) (requiring revocation of HYTA for violations of SORA).

342.  As defendants admit, registrants are strictly liable if they do not have a driver's license or personal identification card that matches their registry address,

90

regardless of whether they can meet the Secretary of State's criteria for issuance of such identification. M.C.L. § 28.725a(7); Payne Dep 107, Exh 17; MSP Official Order No. 79, 4, Exh 47; Defs' Answers to First Req for Admis, No. 141, Exh 44.

343.  Since becoming homeless Mr. Doe #4 has been unable to comply with the requirement that he maintain a driver's license or personal identification card "with the individual's current address." M.C.L. § 28.725a(7). The Secretary of State will not issue identification with "homeless" as an address. Therefore Mr. Doe #4, who is registered as homeless, cannot get a driver's license that matches his registration information. Doe #4 Dep 90-91, Exh 4; Verified Compl, ¶ 227.

344.  It is impossible for plaintiffs to comply with the ban on "loitering", which requires moment-to-moment knowledge of whether they are in an exclusion zone.

345.  SORA 2013 also does not contain any exemptions for situations where compliance is practically very difficult, although perhaps not physically impossible. M.C.L. §§ 28.729, 28.734, 28.735.

346.  For example, Mr. Doe #4 has difficulty complying with the reporting requirements because he does not have a vehicle and cannot always arrange for transportation to update information within three days. Doe #4 Dep 99-100, Exh 4.

347.  Similarly, it may be actually or practically impossible for registrants to comply with M.C.L. § 28.725(1)(e), which requires a registrant to report in person at their home registering jurisdiction whenever they "intend[] to temporarily reside

at any place other than his or her residence for more than 7 days." A person's

travel plans can be changed while the person is away from their home jurisdiction,

but it can be difficult or impossible for them to return home to report this change.

348.  The law enforcement respondents to Mr. Poxson's survey on this question

stated that registrants who travel must have a destination address, must have an

itinerary, and must report to local law enforcement each time they change

locations. Poxson Decl. 6, Exh 32.

349.  Sgt. Payne testified that a registrant traveling across the country should

stop in every state to check with local law enforcement to see what the require-

ments are, since they differ from state to state. A homeless registrant who was

moving from place to place might need to register in person as often as every eight

days. Payne Dep 90-92, Exh 17.

350.  A homeless registrant who is staying with different friends for short

periods could have to report every eight days. L. Wagner Dep 62, Exh 18.

## IX.    SORA 2013 LIMITS PLAINTIFFS' ABILITY TO PARENT THEIR CHILDREN.

### A. SORA 2013 Restricts Plaintiffs' Parenting and Involvement in Their Children's Education and Upbringing

351.  Mr. Doe #1 would like to take his two-year old son to parks or play-

grounds, but he does not because he fears it would make him non-compliant with

SORA: "I don't understand my responsibility, and more importantly I'm just in

fear of the consequences of … not doing what's right… so I just don't." Doe #1
Dep 65-67, Exh 1.

352.  Although Mr. Doe #1 hopes to go to his son's sporting events and parent
teacher conferences as the child grows up, Mr. Doe #1 must weigh this desire to be
an involved parent against the risk of being a totally absent parent if he violates
SORA: "[B]ut that fear of going back to prison, which one weighs more heavy, me
not being involved in their life while I'm out here or me going back to prison."
Doe #1 Dep 104-05, Exh 1.

353.  Mr. Doe #1 cannot attend his future step-daughter's school and extra-
curricular events. He does not contact her teachers due to fear of violating his
registry requirements and thereby "subjecting my family [to] losing me again."
Doe #1 Dep 91, 105-06, Exh 1; Verified Compl, ¶ 128.

354.  The same is true for Mr. Doe #2. His ability to participate in the upbring-
ing of his daughter is limited because he cannot participate in her school and extra-
curricular events. Verified Compl, ¶ 129.

355.  Mr. Doe #2's daughter wants him to go to her basketball games and field
trips, but he cannot. Doe #2 Dep 41, 131, Exh 2.

356.  Mr. Doe #2 has limited his involvement in his daughter's education:

After I found out that schools were – I mean, it's so cloudy to what I can and
can't do that once I read schools were off limits in some sort of way or another I
left it alone altogether because I did not want to risk my freedom…

93

Doe #2 Dep 50, Exh 2.

357.   Mr. Doe #3's testified that it was important for him to get off the registry so he could give his children (a fourth grader, a first grader, and an infant) a normal life: "Most important thing is my children. I feel like my children are getting tried with me. I feel like they're the victims." Doe #3 Dep 128, Exh 3; S.F. Dep 9, Exh 8; Doe #3 Interrog No. 8, Exh 38.

358.   Mr. Doe #3's wife testified:

> We have a lot of family oriented nights [at her school] and I have to volunteer because obviously I'm a schoolteacher and … and I'd love for my children to be there with my husband while I'm volunteering, while I have one of the centers or the activities or if I'm doing something, I'd love for my husband and children to come, but he can't…. If my son forgets his backpack at home he can't take it to him. He can't drop off my children nor pick them up, and I have to be at work 15 minutes before and stay 15 minutes after. I can never drop off my kids nor be there for their first day of kindergarten. Neither can my husband…. I can't attend parent-teacher conferences because my parent-teacher conferences for my students are the same days as my children.… And neither can he…. [H]e can never attend functions at my kids' schools, and especially when they're during the day I can't either, first days, last days of school, school parties, classroom parties. I'd love to be a homeroom mom but I'd love even more for my husband to be there with his children.… I feel like this is depriving him of his right of being a father because my childhood memories consist of my dad coming with me on field trips…. I wish my husband could be there and I know they wish their dad can be there, but we make excuses to why their dad can't be there. They're too young to understand this.

S.F. Dep 20-21, Exh 8.

359.   Mr. Doe #3's wife, as a schoolteacher herself, explained that teachers do not necessarily have time to talk with parents over the phone given the teachers'

work load. "[I]f I actually would sit there and talk to [the parents] on the phone I

couldn't eat my lunch. There's no time. We really don't have any time." Moreover,

it is "very hard" to do parent teacher conferences over the phone:

> [D]uring the conference we're usually handing out report cards, and parents
> want to know why their child received this grade. And that's where I pull out
> my grade book and I pull out all my assessments and I say, okay, this is where it
> happened here and this is what they need to work on and this is why they
> received this grade, and it has to be like – honestly it has to be in person.

S.F. Dep 61-64, Exh 8.

360.  At S.F.'s deposition, defendants' counsel suggested that Mr. Doe #3

could attend parent-teacher conferences because he would not be there for the

purpose of observing minors, provided he did not take his own children along. S.F.

explained that the family cannot take that risk:

> A. But can he be arrested for that? I don't know. Can I tell an officer, hey,
> officer he was there to speak to the teacher solely, only to speak to the
> teacher for my kid's education, I don't know what he can and can't be
> arrested for.… I don't, but can you promise me that he won't be arrested if
> he goes to parent-teacher conferences?
> Q. I can't answer questions for you.
> …
> A. Can anyone answer that question for me? Is it part of the law that states if
> you're going for your own child's educational purpose it's okay to go? No,
> there's the gray area that I'm talking about… so, yeah, do we avoid?
> Absolutely. If it's not stated specifically that he can go he can't go.

S.F. Dep 104-05, Exh 8.

361.  Mr. Doe #3 also cannot pick up his children at school. Doe # 3 Dep 119-

20, Exh 3; S.F. Dep 26, Exh 8.

362.  Mr. Doe #3 fears prosecution if he attends his sons' events, and is

uncertain "as a parent what can I do with my kids, where can I go with my kids? …

My kids' sporting event, can I be there, can I not be there? Where am I – where am

I prohibited? You know, as a parent why do I have to have limits with my kids?

My kids didn't commit this crime." Doe #3 Dep 107, Exh 3; Verified Compl, ¶ 133

363.  Mr. Doe #3's wife testified:

> If the games are held at school he can't come. I mean, part of fatherhood is
> wanting to watch your children play their sports. He can't attend and I do it all.
> I mean, sometimes I'm exhausted. I have a newborn baby, you know, it's hard,
> but I mean, we manage to do it because I'm not going to deprive my kids of
> joining sports because their dad can't be at the games that are held at schools…
> But he can't be there for his children's sports and I have to do it all, so at times
> I feel like I'm a single parent because he can't help me even if he wanted to,
> which he does. He'd love more than anything to coach his son's team. Can't.
>          *      *      *      *      *      *      *
> Like you can't go back in time and make up this time because he's missed my
> first son in all of his soccer games, and now he's in football and I know how
> much my husband loves football. And my son, he sees like, you know, the glow
> in his dad's eyes when he wears his uniform or whatever, and he can't go so,
> you know. And my second child plays soccer and he's really good at it, and my
> oldest son that plays football, he starts in all the games, and he sees dads there
> and he always asks me, and he gets emotional and he cries and he thinks his dad
> doesn't care. Then I have to see my husband crying. I do. This is what I have to
> do. I have to see them cry and I have to see them go through this and it hurts
> me, so that's what I mean by normal… And I have three boys. They're all boys.
> I know nothing about football, but I'm learning because I have to live with this
> for the rest of my life…

S.F. Dep 24-25, 76-77, Exh 8. *See* Doe # 3 Dep 112-14, 120, Exh 3.

364.  Because Mr. Doe #3 cannot attend his sons' games, he buys DVDs of the

games from another parent who tapes them. S.F. Dep 80-81, Exh 8.

365.  Because he does not know exactly what is and is not permitted, Mr. Doe #3 misses out on activities with his children such as field trips. When they ask why he cannot go he tells them he has to work and "[i]t's always a lie." He cannot attend school activities like movie nights, math nights, bingo nights, open house/meet the teacher, talent shows, musicals, concerts or plays. Doe #3 Dep 118-19, Exh 3; S.F. Dep 85-86, Exh 8.

366.  Mr. Doe #3 also misses his sons' birthdays if they celebrate with parties at child-centered locations:

> Q. Have you ever missed a birthday?
> A. Yes.
> Q. What happened?
> A. That was one of the things that we talked about, Jungle Java [an indoor playground]… I had to tell them I had to work, and it was a Sunday and I don't work on Sundays.
> Q. How did your son react?
> A. He knew I was lying, but I left the house the whole day in my work clothes. He was upset.

Doe #3 Dep 118-19, Exh 3.

367.  Mr. Doe #3 and his wife are concerned about what will happen when their son goes to middle school, where the sex ed curriculum includes teaching about the sex offender registry:

> I mean, my husband's nephew came home one day because they allowed them to [search the registry in sex ed class] and told his parents, you know, my uncle's on the registry and my friends were asking isn't that your uncle? And he said no because he was embarrassed…[I]f I don't want my son in this class – I mean, in this sex ed and I can sign him out of it it doesn't stop his friends from

97

being in that class and learning about it, getting on there and telling him, hey, isn't that your dad.

S.F. Dep 28-30, Exh 8.

368.   Mr. Doe #4, his girlfriend I.G., and their two children have been unable to live together because he is on the registry. Although I.G. has worked as a leasing agent for four years and manages approximate 1800 apartments, although she has looked into dozens of properties in different neighborhoods, and although she has access to leasing-agent property lists, the only places she can find where the family could live together are in dangerous neighborhoods or high-rent areas. Quite a few properties are in exclusion zones, while others will not accept registrants. I.G. could get a 15% rent discount at her employer's complex, but as a registrant Mr. Doe #4 is unable to live there. I.G. Dep 8-13, 77-84, Exh 7; Doe #4 Dep 96, Exh 4.

369.  I.G. and the couple's children are currently living with her parents in order to save money so the family can buy a home together. Because the family has been unable to determine how far I.G.'s parents' house is from a school, Mr. Doe #4 cannot live there:

Q. Is [Mr. Doe #4] able to live with you at your parents' home?
A: I don't think he would be able to. I mean I don't know the exact distance. The school is right down the street so I'm not sure if it's like 1,001, I don't know. It's like really close when I try to look it up but…
Q. So you're not able to figure out whether it's within 1000 feet?
A. Right.
Q. Would your parents let [Mr. Doe #4] live there if it were not within 1000 feet?

98

A. Until we found a place, yes.

Q. But because you're not sure whether it's within 1000 feet he's not living there now?

A. Yes.

…

Q. Is it fair to say that he could be living with you today if he were not on the registry?

A. Yup.

I.G. Dep 86-87, Exh 7.

370.  I.G. testified that "[w]e can't really be a family," "we cannot live together," and "I still feel like a single parent." The fact that Mr. Doe #4 is on the registry affects "everyday activities," and the family lives with "constant uncertainty about how his registry status can affect [them]." Because the family cannot live together, means "we're not together in the sense where we can, you know, always have dinner together or help with my daughter's homework, things like that." I.G. Dep 55-60, 75-76, Exh 7.

371.  Mr. Doe #4's status as a registrant severely constrains his ability to parent: "I want to be involved in my kids' stuff but it's impossible." "I don't even know what to do, where to go, what can I do, what can I not do." Doe # 4 Dep 59-60. Mr. Doe #4 does not take his daughter to the park or other places where lots of children might be, because he is not sure whether this is allowed. I.G. Dep 58-59, Exh 7.

372.  Mr. Doe #4 "cannot participate in everyday activities as far as school goes," such as parent-teacher conferences, evening programs, and holiday parties.

He cannot help drop off or pick up their daughter at school, which is a burden on I.G. who is at work when school lets out. Moreover, because I.G.'s work schedule can prevent her from taking their daughter to school activities, the fact that Mr. Doe #4 cannot attend means that their daughter is missing out on educational opportunities. Their daughter does not understand his absence from her activities: "she's just always asking why, why, why, why." I.G. Dep 55-68, 74, Exh 7; Doe #4 Dep 63-65, Exh 4.

373.  Because the family is unsure what parenting activities are allowed, they are afraid for Mr. Doe #4 to step foot on school property. Once when I.G. went to get her daughter at school, the police were there checking everyone's identification due to an incident at the school. Thereafter the family became even more concerned about Mr. Doe #4 ever going to the school; if he had been there that day, his ID would have been checked and he could have been arrested for being a sex offender on school property. The "safest course of action" for Mr. Doe #4 is not to go near the school, particularly since the family does not want their daughter to witness him getting arrested. I.G. Dep 69-72, Exh 7; Doe #4 Dep 63-65, Exh 4.

374.  Mr. Doe #4 does not contact his children's teachers because he does not understand if that is allowed. The school does not provide phone numbers or email addresses for teachers, and parent/teacher communication occurs at conferences or at pick-up/drop-off. Doe #4 Dep 63-65, Exh 4; I.G. Dep 73-74, Exh 7.

375.  Mr. Doe #4's registry status has also affected the family with respect to the birth of their second child. I.G. testified: "Now with the baby…I have to do it all on my own, whether – well, when he could be there but he can't at the moment." She testified that a newborn takes a lot of care, and that because the family cannot live together, Mr. Doe #4 would be unable to help with nighttime feedings, diaper changing, and other day-to-day baby care. I.G. Dep 75-76, Exh 7.

376.  The registry has also affected Mr. Doe #4's ability to be involved in the upbringing of his two children with his ex-wife. Prior to being placed on the sex offender registry, Mr. Doe #4 was an involved parent. "Anything – any activities she had in school I went. Any activities in general I was there." Verified Compl, ¶ 135; Doe #4 Dep 59-64, Exh 4.

377.  Due to his status as a registered sex offender, Mr. Doe #4 is now unable to participate in many parenting activities with those children. For example, he cannot attend his 11-year-old daughter's volleyball games, basketball games, and other school or extra-curricular functions, and cannot pick up or drop off his daughter at school. Mr. Doe #4's daughter asks him why he never comes to her events. Other parents do not want their children to be friends with Mr. Doe #4's children because Mr. Doe #4 is on the registry. Verified Compl, ¶ 138.

378.  Mr. Doe #4's ex-wife left him in part because his status as a registered sex offender harmed the family. Verified Compl, ¶ 137.

379.  Mr. Doe #5, whose children are adults, wants to be able to participate in the lives of his grandchildren, who are currently toddlers. He would like to be able to attend their sporting events, school plays, and similar events as they grow up, but he cannot do so because he is on the registry. Doe #5 Dep 78-79, Exh 5.

380.  Ms. Doe's status as a registrant has likewise impaired her ability to raise her daughter. When her daughter was attending school in Ohio, Ms. Doe

> went to every parent-teacher conference. I went to every school program, everything, and it was all on campus because Ohio laws I want to say weren't the same as Michigan that I was able to do it all. Her teachers all knew me. I was in constant communication with them at all times. I was even at her fifth grade graduation.

Mary Doe Dep 107-08, Exh 6; Verified Compl, ¶ 140-41.

381.  Now that Ms. Doe's daughter attends school in Michigan, Ms. Doe is barred from parent-teacher conferences, the school building, and extra-curricular events. She missed her daughter's eighth grade graduation because it was on school grounds, and cannot attend her daughter's school plays. Although she tries to communicate with her daughter's teachers by phone or meet with them off school grounds, the teachers either do not return her calls or take days to do so. Not one has met with her off school grounds. Mary Doe Dep 66-70, 108, Exh 6.

382.  Ms. Doe had difficulty getting clear answers about SORA restrictions on parenting. She tried to find out from the police if she could attend a school play being performed off school grounds, and was told by the sergeant that he wanted to

say she could, but he had to get back to her. Mary Doe Dep 31-32, Exh 6.

383.   On the question of whether Ms. Doe can drop off and pick up her child at school, there "has never been a clear answer." Ms. Doe contacted multiple police and government agencies. One told her she could do so if she stayed in the car pool lane. Another agency sent a letter with legal information to her ex-husband, but not to her. When Ms. Doe contacted her Ohio attorney for an explanation "because the letter made no sense," the attorney said he did not know Michigan law. Finally, about six months after her daughter started school, she asked a different police agency, and was told she was not in violation. Mary Doe Dep 32, 36-42, Exh 6.

## B. Defendants Do Not Know Whether Registrant-Parents Can Observe or Contact Their Own Children While Inside Exclusion Zones

384.   SORA 2013's prohibition on loitering contains no exception for registrant-parents who are observing or contacting their own children. M.C.L. § 28.733(b).

385.   The plain language of the statute appears categorically to prohibit registrant-parents from observing or contacting their own children anywhere within an exclusion zone. M.C.L. §§ 28.733(b), 28.734(1)(b).

386.   When asked to admit that the statutory ban on loitering contains no exception for registrant-parents who are observing or contacting their *own* children, defendants stated:

Admit that SORA does not contain express language described in the request.

103

Denied in part because *Defendants neither admit nor deny that plaintiffs' contacting or observing their own children constitutes "loitering" within the meaning of the statute.*

Defs' Answers to First Req for Admis, No. 93, Exh 44 (emphasis added).

387.  Defendants do admit that SORA is interpreted in the same manner regardless of whether a registrant does or does not have children. A person's status as a parent does not change the way the statute is enforced. Defs' Answers to First Req for Admis, No. 136, Exh 44; Payne Dep 80, Exh 17; Burchell Dep 65, Exh 16.

388.  The MSP does not keep track of whether a registrant is a parent. Payne Dep 80, Exh 17; Burchell Dep 65, Exh 16.

389.  Under the new OffenderWatch data management system, it would be possible to track whether or not a particular registrant has children. Johnson Dep 251-53, 256-57, Exh 15; OffenderWatch User Manual 45, 73, 79-80, Exh 50.

390.  Several MSP SOR Unit staff, including manager Karen Johnson, Trooper Burchell and Leslie Wagner, all testified that they did not know whether observing one's own child in a school zone – for example, taking a walk with one's child that crosses a school zone, or taking one's child to a playground on the weekend or when no other children are present – would be loitering. Burchell Dep 54, 64-66, Exh 16; L. Wagner Dep 39, Exh 18; Johnson Dep 326, Exh 15.

391.  By contrast, Sgt. Payne testified that the definition of loitering does apply to observing one's own children. Thus, local law enforcement would need to de-

cide the question of whether, for example, a grandparent/registrant could attend Thanksgiving dinner at a home within 1000 feet of a school for the purpose of observing his grandchildren. If a parent wants to take his or her child to a park located within 1000 feet of a school, the parent should first confirm with local law enforcement whether this is permitted. Payne Dep 20, 94-96, Exh 17.

### C. Law Enforcement Agencies Do Not Know or Give Conflicting Answers About What Parenting Activities Are Permitted

392.  In his survey of law enforcement agencies, Mr. Granzotto asked whether registrants may pick up or drop off their children at school. Four police department respondents said it would not violate SORA, two were unsure, and two said it was a violation. Of the three responding prosecutors, two said it was not a violation, and one said it was technically a violation. Granzotto Decl 5-6, 10, Exh 33.

393.  With respect to parent-teacher conferences, three departments indicated that whether a registrant would be allowed to attend would vary from school to school, which did not address whether such attendance is a violation. One department said registrants cannot attend; two were unsure. Granzotto Decl 2, 6, Exh 33.

394.  With respect to parents attending their children's sports events, school plays, or similar events, most law enforcement agencies responding to Mr. Granzotto's survey stated that this was not permitted, although several were unsure, and one said that the local prosecutor allowed this while the state did not. For prosecutor's offices, one respondent said this was a violation, and their office has success-

fully prosecuted registrant parents for attending their children's sports events. However, another prosecutor's office stated that there was no comprehensive law on the issue. Granzotto Decl 8, 11, Exh 33.

395.  With respect to whether parent-registrants can take their own children to a school playground on the weekend, five police departments responding to Mr. Granzotto's survey said this would not be allowed, one said it would be allowed, and two were unsure. Among prosecutor's offices, one said it would be allowed, one said it would not, and one said it would be close to a violation. Granzotto Decl 8, 11-12, Exh 33.

396.  MSP SOR Unit staff provided similarly inconsistent answers to such questions. For example, Sgt. Payne testified that a parent could not attend his/her child's football game at a school. Payne Dep 80, Exh 17. Leslie Wagner, who had received that very question from a caller on the day of her deposition, said she told the caller this would be loitering, but that the caller should follow up with local law enforcement or the local prosecutor to see how it would be handled in his jurisdiction. L. Wagner Dep 40-41, Exh 18. Trooper Burchell testified that he did not know whether a registrant could attend his/her child's football game, that he would need to check with the local prosecutor, and that "some prosecutors might say that's fine and others might say it's a violation." Burchell Dep 65-66, Exh 16.

### D. Children of Registrants Suffer Because Their Parents Are on the Sex Offender Registry

397.  Children of registrants are affected by the housing and employment consequences that stem from registration and geographic exclusion zones. For example, one study found that 74% of registrants could not attend school events, sports events, or children's birthday parties. Collateral Damage: Family Members of Registered Sex Offenders 11, Exh 81; Levenson Expert Report 7, Exh 23.

398.  Research on children of registrants has demonstrated that they are treated differently by other children at school, that their friendships are affected by public notification, and that they experience ridicule, teasing, and depression. Collateral Damage: Family Members of Registered Sex Offenders 11, Exh 81; Levenson Expert Report 7, Exh 23.

### X.   SORA 2013 LIMITS PLAINTIFFS' ABILITY TO USE THE INTERNET

399.  SORA 2013 requires registrants to report "all electronic mail addresses and instant message addresses assigned to the individual or routinely used by the individual and all log-in names or other identifiers used by the individual when using any electronic mail address or instant messaging system." M.C.L. § 28.727(1)(i).

400.  SORA 2013 further requires that registrants report in person within three days whenever they establish "any electronic mail or instant message address, or

any other designations used in internet communications or postings." M.C.L. § 28.725(1)(f).

### A. Local Law Enforcement Agencies Do Not Know or Provide Conflicting Accounts of What Internet Information Must Be Reported

401.  Defendants admit that they do "not provide training specific to determining what information is specifically reportable under 'other identifier' or other designations used in internet communications and posting, nor as to how it is specifically determined whether an address/name/identifier is reportable as 'established,' 'used,' or 'routinely used' by the registrant. [The MSP SOR unit] would refer the [inquiring] law enforcement agency to their local prosecuting attorney's office for guidance." Defs' Resp to Pls' First Interrog, No. 11, Exh 42.

402.  Sgt. Payne testified that he did not know what "other designations used in Internet communications or postings means." He did not know whether a registrant would need to report creation of an account in order to comment on a news website or use a gaming website. Payne Dep 100-01, Exh 17.

403.  Ms. Johnson, by contrast, testified that the MSP's position is that the electronic reporting requirement applies only to e-mail addresses and screen names "in which social communication exists." In her opinion, although an Internet bank account involves communicating with the bank, it would nevertheless not need to be registered. Whether or not a gaming account would need to be registered would depend on whether there are other players. Johnson Dep 332-35, Exh 15.

404.  Trooper Burchell, however, testified that identifiers used to play at gaming sites or comment on news articles would need to be reported. His belief was that all identifiers used to communicate with others are reportable. While he conceded that an on-line bank account identifier is used to communicate with a bank, he believed such identifiers need not be reported because "you can't stalk your bank." He was uncertain whether accounts for on-line purchases, such as Amazon, are reportable. Burchell Dep 75-79, Exh 16.

405.  Ms. Wagner testified that she has difficulty understanding what is meant by a "designation used in Internet communications or postings." She did not know whether registrants must report email addresses used at work or accounts created to comment on news articles. She first thought online banking would not be report-able because "it's not communicating with others." But when asked whether regis-trants are communicating with their bank, she was unsure and said that "it would be up to the prosecutor to decide what that means." L. Wagner Dep 63-66, Exh 18.

406.  The Explanation of Duties form provided to registrants does not specify what kinds of accounts must be reported, nor does it suggest that the reporting requirement is limited to identifiers involving "social communication." Johnson Dep 336, Exh 15; Explanation of Duties Form, Exh 62.

407.  When Mr. Poxson surveyed local law enforcement agencies regarding whether an on-line bank account, newspaper account, Amazon account, or X-Box

account needs to be reported, he received varying responses. Different departments

stated that all accounts, or all accounts with usernames, or all accounts with email

addresses would need to be reported. One department said only email addresses

need to be registered, while another department stated that Internet bank account

information would not need to be registered, but newspaper, Amazon, or X-box

accounts would. The prosecutor's offices responded either that they did not know

the answer, or that none of these types of accounts were reportable. Poxson Decl 3-

4, 8-9, Exh 32.

408.  Prosecutor Herb Tanner testified that on-line bank identifiers would not

need to be registered because the law is directed at social media:

Q. Can you show me where in the law it says it's directed at social media?
A. It's not in the law.

Tanner Dep 81, Exh 21.

### B. SORA's Vagueness and Burdensome Reporting Requirements Inevitably Lead Registrants to Limit Their Use of the Internet

409.  National research shows that 92% of adult Americans use email. Pew

Research Center, *Search and email still top the list of most popular on-line*

*activities* (May 2011), Exh 77.

410.  By contrast, MSP data show that less than half of all non-incarcerated

Michigan registrants report having an email address or other Internet identifier.

Defs' 2nd Supp. Resp to First Interrog, No. 15c, Exh 98; Johnson Dep 298-300,

Exh 15.

411.  Plaintiffs are concerned about using the Internet because SORA 2013 is
unclear about whether they must report immediately and in person if they set up an
on-line account to pay their taxes, register with Netflix, purchase or review prod-
ucts on Amazon, or comment on on-line bulletin board. Verified Compl, ¶ 203.

412.  Mr. Doe #1 limits his Internet use both because he has "a hard time
knowing what exactly I have to report" and because if he creates a new account, he
has to go report it in person, which is time-consuming. Doe #1 Dep 52-59, Exh 1;
Doe # 1 Interrog Resp No. 2, 5, Exh 36.

413.  Mr. Doe #1 would like to establish a business and has tried to do so. How-
ever, he gave up because the SORA restrictions made it difficult to market his bus-
iness on the Internet (*e.g.,* advertise on Craig's List or Angie's List, or do other
sorts of on-line marketing). He specifically did not create a Facebook or Kick-
starter account for his business because he feared becoming non-compliant. Even
something as simple as ordering business cards or registering his business on-line
would likely involve creating new electronic accounts, and he is unsure what he
then needs to do to be in compliance with his registration requirements. Doe #1
Dep 52-59, 85, Exh 1; Doe #1 Interrog Resp No. 4, Exh 36.

414.  Doe #2 stated:

Before I had to register I used the Internet a lot. Once I was told I had to regis-

ter, I closed down a quite a number of accounts because I did not want to have to report them. I try not to do anything that would cause me to create a new account on the Internet, since I would then have to register that account. I am also very confused about what I have to report, such as whether I have to report accounts that are not social media accounts.

       *      *         *         *         *

I used to have accounts with MySpace and other social sites. When I was told I had to report those, I closed my accounts.

I would like to have a Facebook account, Twitter account, or other accounts that people with free lives can open up. I can't even open an account on a recipe site without having to register that. I would like to do on-line shopping at sites like East-Bay [*sic*] where you can save money, but I don't open accounts because of the registration requirements.

Doe #2 Interrog Resp No. 2, 4, Exh 37.

415.  Mr. Doe #2 further testified:

E-mail, just the phrase e-mail is – makes it so cloudy because you can have an e-mail account on Amazon, you can have an e-mail account on Craig's List, you can have an e-mail account on things that aren't necessarily social media, and you wonder why would I have to register any of that. I mean, it's vague. It's very vague.

Doe #2 Dep 88, Exh 2.

416.  Mr. Doe #2 also explained that he uses the Internet to look at news sites,

but he does not comment on such sites because he would have to report doing so.

Doe #2 Dep 94, Exh 2.

417.  Mr. Doe #2's confusion about what is reportable causes him to restrict his

Internet use: "I don't know what brings me into conflict with the registration re-

quirements, so to feel safe I cut out as much Internet activity as I can." Doe #2

Interrog Resp No. 5, Exh 37; Doe #2 Dep 97-98, Exh 2.

418.  Mr. Doe #3 testified that he was unsure what Internet activity he has to report, such as a fantasy football league where he has a unique user name. More-over, "there's things I want to do with my son, like Study Island, but I have to – he's nine and my other son is six, so if I want to put in my name and my e-mail am I allowed to do that? I don't know." Doe #3 Dep 71-72, Exh 3.

419.  Mr. Doe #3 testified:

> I understand that I can have accounts, but what I don't understand is what ac-counts need to be registered. What do I need to tell them and what don't I tell them…. Where am I safe and where I'm not safe…. Say I've got 16 different accounts to where – like I listed here in my answer, as far as like [My City] Soccer, Facebook, Twitter, other social networks, Study Island, math websites, ESPN fantasy football, these are the things that I don't – I'm not on because I'm unclear if I can have them…. Especially the ones with Study Island, math websites, those two are crucial in my life because I want to be a father and I want to teach my kids, you know, this is education.

Doe #3 Dep 80-81, Exh 3.

420.  Mr. Doe #3 then explained how Study Island would allow him to get his son's scores if Mr. Doe #3 could sign up for the website, and how the [My City] Soccer site would allow him to keep track of his children's games, cancelled practices, and who is supposed to bring a snack for the team. But he does not participate "because I don't know if I can be involved … because it's a children thing." "If I'm not allowed near schools how am I allowed to do anything online with kids' websites?" Doe #3 Dep 80-84, 99-102, Exh 3; Doe #3 Interrog Resp No.

4, 5, Exh 38.

421.   When asked whether he'd inquired of law enforcement about his Internet

reporting obligations Mr. Doe #3 testified:

A. With all due respect, nobody inside the [city] police station has a clue about
   the law or the statute of a sex offender.
Q. And why do you say that?
A. Because I've asked questions before and they can never answer them.
Q. Do they refer you to anyone?
A. No… Actually one guy told me to go look it up on the Internet.

Doe # 3 Dep 87-88, Exh 3.

422.   Mr. Doe #3 also avoids doing anything on the Internet that would require

him to open additional accounts, because he would then have to go and report in

person. Doe #3 Interrog Resp No. 2, Exh 38.

423.   Mr. Doe #4 would like to use the Internet, email friends or family, use

Facebook, comment on websites, and purchase items on-line. He does not,

however, because he does not understand his Internet obligations. "[I]t is just

easier and safer not to use the Internet at all. I do know that I have to report in

person when I get a new account…. it is too complicated to report in person." Doe

#4 Dep 53-58, 93, Exh 4; Doe #4 Interrog Resp No. 2, 4, Exh 39.

424.   Mr. Doe #5 is similarly unclear about what his responsibilities are. Doe #5

Interrog Resp No. 2, Exh 40.

425.   Ms. Doe limits her Internet use because she is "very confused about what

I do and do not need to report," and because she has to report new accounts in person. Ms. Doe asked the police what identifiers she must register, and was told she did not have to register identifiers associated with bank accounts or electric bills. Mary Doe Interrog Resp No. 2, 4, 5, Exh 41; Mary Doe Dep 31, Exh 6.

426.  Ms. Doe would like to respond to on-line news articles (on websites like the Detroit News, Click on Detroit, or Fox) and use Facebook, Instagram and Twitter to communicate with family and friends. She does not, because then she would then have to go register. Mary Doe Dep 47-48, Exh 6; Mary Doe Interrog Resp No. 4, Exh 41.

427.  The registry also affects Ms. Doe's ability to shop on-line: "[I]f I were to create … an account one day for one store and then I saw something on sale a couple days later and something on sale a couple days more later, it's very confusing that if I don't report it if I'm going to be charged with a felony, a misdemeanor, and just be sent right back to prison or be on probation again." Mary Doe Dep 104-05, Exh 6; Mary Doe Interrog Resp No. 4, Exh 41.

428.  Ms. Doe has sought legal advice on what Internet information she must register "but because the laws are so confusing even they [the attorneys] don't know the answer." Mary Doe Dep 50-51, Exh 6.

429.  In addition, Ms. Doe is afraid that because she must provide all email and Internet identifiers pursuant to SORA 2013, her Internet use will be monitored.

Verified Compl, ¶ 207.

430.  A registrant who wants to post comments anonymously on the Internet cannot do so because anyone with access to the SOR system can determine that the registrant made the posting. L. Wagner Dep 71-72, Exh 18.

## XI.   PLAINTIFFS WERE RETROACTIVELY REQUIRED TO REGISTER FOR LIFE

### A. SORA Started Out as a Private Law Enforcement Database

431.  Michigan passed its first sex offender registration law in 1994. Before that time, Michigan did not require anyone to register as a sex offender for any purpose. Mich. Pub. Act 295 (1994).

432.  The 1994 statute established a private database containing basic information about people convicted of sex offenses. Registration information was available only to law enforcement, and was exempt from all public disclosure. A person who divulged registry information to the public was guilty of a misdemeanor, and a registrant whose information was revealed had a civil cause of action for treble damages. Mich. Pub. Act 295, Sec. 10 (1994).

433.  The statute did not require regular verification or reporting. After the initial registration was completed, the only additional obligation was to notify local law enforcement within 10 days of a change of address. The registrant did not need to notify law enforcement in person. Mich. Pub. Act 295, Sec. 5(1) (1994).

434.  The private registry information was maintained for 25 years for people

116

convicted of one offense, and for life for people convicted of multiple offenses. Mich. Pub. Act 295, Sec. 5(3)-(4) (1994).

435.  The statute applied retroactively to people whose convictions occurred before October 1, 1995, but only if they were still incarcerated, on probation or parole, or under the jurisdiction of the juvenile division of the probate court or Department of Social Services on that date. Mich. Pub. Act 295, Sec. 3(b)-(c) (1994).

**B. After Repeated Amendments, SORA Now Subjects Plaintiffs to Geographic Exclusion Zones, Continuous Reporting of Daily Activities, Public Registration, and Annual Fees**

436.  The legislature has repeatedly amended SORA over the last two decades, each time imposing a stricter regime with new burdens on registrants, and covering more people and conduct. Mich. Pub. Act 494 (1996); Mich. Pub. Act 85 (1999); Mich. Pub. Act 542 (2002); Mich. Pub. Acts 238, 239, 240 (2004); Mich. Pub. Acts 121, 127, 132 (2005); Mich. Pub. Act 46 (2006); Mich. Pub. Acts 17, 18 (2011); Mich. Pub. Act 149 (2013).

437. Effective April 1, 1997, the statute's confidentiality protections were relaxed. Law enforcement agencies were required to make registry information available to the public (for zip codes within the agency's jurisdiction) during business hours. The public could view a paper copy of the registry by visiting their local law enforcement agency. Mich. Pub. Act 494, Sec. 10(2) (1996).

438.  In 1999, registry information became available to the public on the

Internet. Mich. Pub. Act 85, Sec. 8(2), 10(2)(3) (1999).

439.  New in-person reporting requirements were imposed, with registrants

being required to report quarterly or yearly, depending on their offense. Mich. Pub.

Act 85, Sec. 5a(4) (1999).

440.  In addition, the 1999 amendments: expanded the list of offenses for which

registration was required and the categories of individuals required to register for

life; lengthened the penalties for registration-related offenses; required registrants

to maintain a driver's license or personal identification card; made registry infor-

mation on certain juveniles public; required fingerprinting and digitized photo-

graphs for registrants; and mandated registration for out-of-state students, people

working in the state, and anyone convicted of a listed offense or required to regis-

ter in another state or country. Mich. Pub. Act 85 (1999).

441.  In 2002, additional requirements were imposed on both resident and non-

resident registrants to report (in person) when they enrolled, dis-enrolled, worked,

or volunteered at institutions of higher learning. Mich. Pub. Act 542, Sec. 4a

(2002).

442.  Amendments in 2004 required registrants' photographs to be posted on the

Internet-based public registry. In addition, a fee was imposed on registrants.

Failure to pay the fee was made a crime. Mich. Pub. Acts 237, 238 (2004).

443.  The 2004 amendments removed the registration requirement for youthful

118

(HYTA) offenders after October 1, 2004, unless they had lost their HYTA status.

Youth assigned to HYTA before that date, however, were still required to register,

though they could petition the court for reduced registration after 10 years. Mich.

Pub. Acts 239, 240 (2004).

444.  Further amendments, effective January 1, 2006, barred registrants (with

limited exceptions) from working, residing, or loitering within 1000 feet of school

property, and imposed criminal penalties for noncompliance. Mich. Pub. Acts 121,

127 (2005). In addition, the penalties for registration-related offenses were in-

creased. Mich. Pub. Act 132 (2005).

445.  In 2006, SORA was amended to allow subscribing members of the public

to be notified by email when a person registers or moves into a requested zip code.

Mich. Pub. Act 46 (2006).

446.  In 2011 SORA was extensively amended to comply with the federal Sex

Offender Registration and Notification Act (SORNA), 42 U.S.C. § 16901 *et seq.,*

(Title I of the Adam Walsh Child Protection and Safety Act of 2006 (Public Law

109-248). Mich. Pub. Act. 17-18 (2011).

447.  The 2011 amendments placed registrants into three tiers based on the

offense of conviction, meaning that for many registrants, including the plaintiffs,

their registration periods were extended to life. Mich. Pub. Act 17-18 (2011).

448.  SORA 2011 also provided that persons whose offenses predated creation

of the registry would be required to register if convicted of any new felony. Mich. Pub. Act 17-18 (2011).

449. The 2011 amendments require registrants to provide additional personal information (*e.g.*, internet identifiers, telephone numbers, vehicle information, *etc*.) during verification periods, and to immediately report in person when certain information changes. Mich. Pub. Act 17-18 (2011).

450. In 2013, while this case was pending, Michigan enacted new legislation requiring registrants to pay a $50 annual fee, and changing the months in which Tier III registrants must report. Mich. Pub. Act 149 (2013).

451. With very limited exceptions not applicable here, the amendments to SORA over the last 20 years have all been applied retroactively, so that regardless of when registrants were convicted, today they are subject to all of the provisions of SORA 2013. *See generally* M.C.L. § 28.721 *et. seq.*

## C.  As a Result of the 2011 SORA Amendments, Thousands of Registrants Were Retroactively Required to Register for Life

452. Under the 2011 SORA amendments, a registrant's tier-classification determines the length of time that a person must register and the frequency of reporting. M.C.L. §§ 28.722(r)-(w); 28.725(10)-(13).

453. Tier I registrants must register and comply with all obligations imposed by SORA 2013 for 15 years; Tier II registrants must register and comply for 25 years; and Tier III registrants must register and comply for life. M.C.L. §§ 28.722 (r)-(w);

28.725(10)-(13).

454.  Before the 2011 SORA amendments, almost three-quarters of those on the registry were 25-year registrants. (Registration Length June/August 2011, Exh 61) M.C.L. § 28.725(6) (2009).

455.  Under the 2011 amendments, 25-year registrants who were retroactively assigned to Tier III had their registration periods retroactively extended to life. M.C.L. § 28.725(12).

456.  The tier classifications took effect July 1, 2011. Mich. Pub. Act 18, Enacting Sec. 2 (2011).

457.  MSP data show that on June 1, 2011, there were 11,313 registrants subject to lifetime registration. On August 1, 2011, there were 28,680 registrants – 17,367 more – subject to lifetime registration. While a few of the 17,367 may have been added through new convictions, the 2011 amendments retroactively extended the registration period to life for many thousands of registrants. Registration Length June/August 2011, Exh 61.

458.  Before the 2011 amendments, about 27 percent of active registrants were subject to lifetime registration. At that time there were 41,815 active registrants, of whom 11,313 were lifetime registrants. Registration Length June/August 2011, Exh 61.

459.  By comparison, after the 2011 amendments, about 72 percent of active

registrants were subject to lifetime registration. At that time there were 39,611 active registrants, of whom 28,680 were lifetime registrants. Registration Length June/August 2011, Exh 61.

460.  Because lifetime registrants are, by definition, required to remain on the registry for life while shorter-term registrants are removed, the percentage of life-time registrants will increase over time. In fact, by May 2013, the percentage of lifetime registrants had already increased to about 73 percent of registrants. Total Number of Offenders by Tier, Exh 54 (showing 2,362 Tier I registrants; 8,754 Tier II registrants; and Tier III 29,420 as of 5/24/13).

461.  No formal process exists for registrants to challenge their tier assignment. After the statute changed in 2011, the MSP SOR Unit received over 100 letters from individuals objecting to their tier classification. The MSP agreed that some people were incorrectly classified, and their tier levels were changed. Johnson Dep 121-24, Exh 15.

462.  SORA 2013 does not contain specific tier classifications for out-of-state offenses. Johnson testified that a student or legal intern (under the supervision of a lawyer) identified comparable Michigan offenses for out-of-state offenses, and that the tier classifications for individuals with out-of-state convictions were determined on that basis. Johnson Dep 114-17, Exh 15.

**D. All Six Plaintiffs Were Retroactively Required to Register for Life**

463.  At the time plaintiffs were convicted or adjudicated, they either did not

have to register at all or had to register for 10-25 years. Section III., *supra*.

464. Although plaintiffs have clinically been determined to be low risk (Section

XIII., *infra*), under SORA 2011 they were retroactively re-classified as Tier III of-

fenders and must register and comply with SORA until they die. Section III.,

*supra*.

465.  As John Doe #5 testified:

Q: So for approximately 33 years you did not have to report your address to the police?
A. No.
Q. You didn't have to report any employment to the police?
A. No.
Q. Your email?
A. No.
Q. For 32 to 33 years you could live wherever you wanted?
A. Yes.
Q. You could live within 1000 feet of a school?
A. Yes.
Q. You could work within 1000 feet of a school?
A. Yes.
Q. And for 32 to 33 years no one could look you up on a registry with your picture and your address?
A. Yes.
…
Q. And in that [32-33 year] period of time were you ever accused of, charged, with, or convicted of a sex offense…?
A. No.

Mr. Doe #5 is now 56 years old and will remain on the registry for the rest of his

life for a crime he committed in 1979. Doe #5 Dep 77-78, Exh 5; Verified Compl

¶¶ 336-47.

### E. SORNA, Federal Funding, and Substantial Compliance

466.  The federal Sex Offender Registration and Notification Act (SORNA 2006) creates an apparent financial incentive for states to adopt sex offender laws that substantially comply with SORNA. States lose 10 percent of their Byrne Judicial Access Grant funds – federal money that comes to states for use by prosecutors and local law enforcement – if they do not comply with SORNA. Hawkins Dep 17-18, Exh 19.

467.  Congress cannot compel states to adopt laws. *Printz v. United States*, 521 U.S. 898, 924 (1997) ("Even where Congress has the authority under the Constitution to pass laws requiring or prohibiting certain acts, it lacks the power directly to compel the states to require or prohibit those acts."). So states can choose to meet the SORNA requirements or forego the federal funds.

468.  Although states were required to comply with SORNA by July 27, 2011, to date only 17 states have done so. *SMART SORNA States Listing*, Exh 91.

469.  The majority of states have elected not to adopt SORNA-compliant laws because they are concerned about the costs and the effectiveness of such laws.  *See, e.g.,* The Nat'l Conference of State Legislatures, *Cost-Benefit Analyses of SORNA Implementation*, Exh 72; Levenson Expert Report 2, Exh 23.

470.  If Michigan had elected not to become SORNA-compliant, it would have

lost 10 percent of its Byrne funds, which were estimated to be about $10 million for 2011. Byrne Fund Reports 2011, Exh 96. So the cost of not complying would have been the loss of about $1 million a year based on the 2011 figure. Hawkins Dep 18, Exh 19.

471.  When Texas was faced with the same decision, it studied the projected cost of SORNA compliance – focusing on the cost to local law enforcement – and estimated that the costs of implementing SORNA would range from $14 million to $25.9 million a year. Texas determined that the loss of 10 percent of its Byrne funds (about $2 million in 2011 for Texas) would be far less than the cost of complying with the Adam Walsh Act. Texas Association of Counties Study 10, Exh 75; Byrne Fund Reports 2011, Exh 96.

472. Similarly, both California and Colorado concluded that the cost of implementing the Adam Walsh Act far exceeded the loss in Byrne grant funding that would result from non-compliance. California AWA Position Statement 3-4, Exh 73; Colorado AWA White Paper 4, Exh 74.

473.  Texas' Byrne funds were about double Michigan's, so applying the Texas study to Michigan means that the real costs of SORNA compliance in Michigan may be in the range of $7 million to $13 million a year. Byrne Fund Reports 2011, Exh 96; Texas Association of Counties Study 9-10, Exh 75.

474.  Although the DOJ Office of Sex Offender Sentencing, Monitoring, Appre-

125

hending, Registering, and Tracking (SMART) provided grants to help Michigan transition to a SORNA-compliant law, those grants will cease now that Michigan has attained substantial compliance. Johnson Dep 338-39, 349, Exh 15; SMART Confirmation of Michigan's Substantial Compliance, Exh 95.

475.  SORNA requires "substantial compliance," not "exact compliance," in order for states to receive Byrne grant funding. Johnson Dep 339-340, Exh 15.

476.  To attain SORNA compliance, states must meet the detailed requirements mandated by the SMART office. *See National Guidelines for SORNA Compliance* and *SORNA Substantial Implementation Checklist*, available at http://www.smart.gov/pdfs/final_sornaguidelines.pdf and http://www.smart.gov/sorna_tools.htm#checklist.

477.  Key requirements of Michigan's SORA 2013 – including the geographic exclusion zones, some immediate reporting requirements, and annual fees – are not part of the SORNA standards. 42 U.S.C. § 16901 *et seq.*; Johnson Dep 340, Exh 15; Tanner Dep 21, Exh 21; Hawkins Dep 34-35, Exh 19.

## XII.   PLAINTIFFS WILL SUFFER SEVERE HARM BECAUSE THEY MUST NOW REGISTER FOR LIFE

478.   As set forth above, the retroactive imposition of lifetime registration affects virtually every aspect of plaintiffs' day-to-day lives. Plaintiffs must comply with extensive but unknowable restrictions and obligations for as long as they live,

or face criminal sanctions. *See* Sections III-XI, *supra.*

479.   For the rest of their lives plaintiffs will also be required to report frequently in person; subjected to continuous monitoring; severely limited in their ability to find housing and employment; restricted in their ability to access education or to travel; identified publicly and falsely as dangerous; and subjected to a vast array of additional obligations and restraints under other federal, state, and local laws. *Id.*

480.   In addition, until plaintiffs die, they will be subject to whatever new burdens or obligations Congress or the Michigan legislature may create, such as new annual fee on registrants and the proposed daycare exclusion zone. Mich. Pub. Act 149 (2013); S.B. 76 and 77 (2012), Exh 97.

481.   Plaintiffs cannot know what additional requirements may be added in the future. As Mr. Doe #3 explained, when he first registered it was for 25 years on a law-enforcement-only database; now he must register for life on a public registry. He fears the law could change again in the future. Doe #3 Dep 117, 132-33, Exh 3.

**A. Plaintiffs' Access to Housing Will Be Severely Restricted for Life**

482.  SORA 2013 bars plaintiffs from "residing" within 1000 feet of school property, making a substantial amount of housing unavailable as a matter of law. Plaintiffs are also prohibited from living with family members if those family members live within 1000 feet of school property. M.C.L. § 28.735.

483.  National research shows that residential restrictions profoundly reduce housing options for registrants, increasing transience and homelessness, as well as preventing registrants from living with their families. Plaintiffs' experience confirms this research. Levenson Expert Report 4, Exh 23.

484.  When Mr. Doe #1 was first released from prison, he hoped to live with his family until he could get back on his feet. He could not live with either his mother or his sister, however, because they both lived within 1000 feet of a school. He also could not live with another sister or his aunt because the MDOC does not allow registered sex offenders to live in homes with children. He therefore was released to a half-way house. Verified Compl, ¶ 145; Doe #1 Dep 86, Exh 1.

485.  Mr. Doe #1 was rejected by landlords because of his status as a registered sex offender. He was finally able to get an apartment when he had a friend lease a unit for him. Verified Compl, ¶ 146.

486.  Mr. Doe #2's status as a registrant likewise prevented him from finding housing. When looking for apartments, Mr. Doe #2 was rejected because he is a registrant. Verified Compl, ¶ 147; Doe #2 Dep 127-28, 145-46, Exh 2.

487.  Because Mr. Doe #2 does not have a criminal record, his difficulties finding housing are solely attributable to his status as a registrant:

> Even when I tried to get into an apartment, they gave me a readout of why they wouldn't let me live there, and it said national sex offender registry and up under it said, conviction information, none.

Doe #2 Dep 76, Exh 2.

488.   At one point Mr. Doe #2 asked his cousin for a place to stay. His cousin refused, explaining that the neighbors would find Mr. Doe #2 on the registry, and would then seek to have both of them (Mr. Doe #2 and his cousin) evicted. Verified Compl, ¶ 149.

489.   As a disabled military veteran, Mr. Doe #2 could qualify for subsidized housing and has identified a program that would have provided him with a Section 8 voucher for his own apartment. But under federal law, individuals subject to life-time sex offender registration are barred from subsidized housing. Therefore Mr. Doe #2 was ineligible. 42 U.S.C.A. § 13663; Verified Compl, ¶ 150.

490.   When Mr. Doe #3 and his wife moved their growing family to a larger home, they needed to restrict their search for a new home to those that were more than 1000 feet of a school. The home they purchased cost $25,000 more than bigger homes they wanted to purchase that were in exclusion zones. Verified Compl, ¶ 159; S.F. Dep 11-14, 85, Exh 8; Doe # 3 Dep 125-31, Exh 3.

491.   Likewise, Mr. Doe #4 has had severe housing problems in addition to the loss of his home to foreclosure when the registry cost him his job. Verified Compl, ¶ 152, see Section XII. B., *infra*.

492.   When Mr. Doe #4 has tried to rent an apartment, landlords have told him

that they will not rent to anyone on the registry. He has searched "wherever I can get accepted" but has been unable to find any landlord that will rent to him. He has also tried to rent a room from friends, but they refuse because he is on the registry. Verified Compl, ¶ 153; Doe #4 Dep 33-35, 39, Exh 4.

493.  For a time after his conviction Mr. Doe #4 was registered at his mother's address. After an anonymous caller reported that he was on the registry, however, his mother was threatened with eviction unless he moved out, so he left. He was able to live in that housing despite having a felony conviction, but was forced to move once the landlord learned he was on the sex offender registry. Verified Compl, ¶ 154; Doe #4 Dep 39, 97-98, Exh 4.

494.  Mr. Doe #4 then lived with his sister. But "the marshals went over there, I guess, for a sweep and when that occurred the next day [the landlord] told my sister either he leaves or you're evicted." Again, Mr. Doe #4 was able to live in his sister's home despite having a felony conviction, but was forced to leave immediately after the landlord learned he was a registrant. Doe #4 Dep 98-99, Exh 4.

495.  Mr. Doe #4 cannot live with his partner I.G. and their children because they have been unable to find an apartment where he could live, and because uncertainty about the geographic exclusion zones means he cannot live with her in her current residence. Section IX. A, *supra.*

496.  I.G. testified that apartment complexes (including those outside exclusion

130

zones) are unwilling to rent to people on the registry. As a leasing agent, she not only screens potential tenants on the sex offender registry, but also gets automated updates if someone registers using an address at their complex. In addition, other residents sometimes inform her that they have found out through registry phone or email alerts that another tenant is on the registry. She then starts the eviction process. Her complex rejects all applicants who are on the sex offender registry, even if they only have misdemeanors. I.G. Dep 77-81, Exh 7.

497.   Although Mr. Doe #4's other family members would be happy to let him reside with them, they fear that they will lose their housing if they do. Mr. Doe #4 does not stay with his mother or sister for more than several days at a time because then he would have to register their addresses, and his family members could get evicted. Verified Compl, ¶ 157; Doe #4 Dep 39, Exh 4.

498.   Mr. Doe #4 was homeless when the complaint was filed, and remains homeless. Verified Compl, ¶ 156; Doe # 4 Dep 35, Exh 4.

499.   Mr. Doe #5 was able to live wherever he wanted for 33 years after he was convicted. When he was retroactively added to the registry, he became subject to the geographic exclusion zones. Doe #5 Dep 77, Exh 5.

500.   Mr. Doe #5 was forced to move once he was placed on the registry because his apartment was too close to a school. Mr. Doe #5 explained that he does not understand why he could suddenly no longer live within 1000 feet of a school

because "[m]y case was dealing with an adult or someone of age." Doe # 5 Dep 67, Exh 5; Verified Compl, ¶ 360.

501.   Because Mr. Doe #5 survives on Veterans Administration and other disability benefits, the cost of moving – especially finding the money for a security deposit – is difficult. Verified Compl, ¶ 360; Doe #5 Interrog Resp 6, Exh 40.

502.   In 2010, before Mr. Doe #5 was on the registry, he began receiving Section 8 federal housing assistance. The fact that he had a 1980 conviction for a sex offense did not make him ineligible for such assistance. Doe #5 2nd Decl, Exh 29.

503.   In November 2013, Mr. Doe #5 received a notice that his Section 8 federal housing assistance was being terminated because he is now subject to lifetime sex offender registration. Doe #5 2nd Decl, Exh 29.

504.   Federal law prohibits individuals who are subject to lifetime sex offender registration from admission into the Section 8 housing assistance program. 42 U.S.C.A. § 13663. But for the fact that SORA 2013 requires Mr. Doe #5 to register as a sex offender for life, he would not have received the termination notice.

505.   The MSP SOR Unit provides a data file annually to the Department of Housing and Urban Development to "assist them in ensuring that they don't have those offenders in public housing." Johnson Dep 88-89, Exh 15.

506.   Mr. Doe #5 believes that without voucher assistance he will not be able to afford to rent an apartment and will become homeless. Doe #5 2nd Decl, Exh 29.

507.   SORA also affects Ms. Doe's ability to secure stable housing. She and her husband rented a home from a distant cousin, but when the cousin lost the home to foreclosure, Ms. Doe and her husband were notified by the bank that they might be forced to vacate the home on short notice. Despite an exhaustive search, Ms. Doe and her husband were unable to find alternate affordable housing that was not within a restricted zone. Eventually, Ms. Doe and her husband were able to negotiate with the bank to let them remain in the home. Verified Compl, ¶¶ 158-59.

## B. Plaintiffs' Ability to Find Employment Will Be Severely Restricted for Life

508.   SORA 2013 bars the plaintiffs from working within 1000 feet of school property, making a substantial number of jobs unavailable to the plaintiffs as a matter of law. M.C.L. § 28.735.

509.   Moreover, under SORA 2013 information about employers who hire the plaintiffs is posted on the public sex offender registry, which creates a disincentive for employers to hire registrants. M.C.L. § 28.728(2)(d); Verified Compl, ¶ 178.

510.   As of October 30, 2013, MSP data showed that 13,494 registrants – or less than half of non-incarcerated registrants living in Michigan – reported having any employment. Johnson Dep 298-300, Exh 15. Defs' 2nd Supp. Resp to Pls' First Interrog, No. 15b, Exh 98.

511.   Mr. Doe #1 has repeatedly lost employment opportunities because he is a registered sex offender. When he was first released from prison, he participated in

a reentry program designed to help him find employment. Verified Compl, ¶ 162;

Doe #1 Dep 86-87, Exh 1.

512. Mr. Doe #1 actively sought work and flagged potential jobs off employment lists. His case manager told him time and time again that those employers would not hire registered sex offenders. The occupations where he was denied employment included garbage collection and fast food restaurant work. His job search was further restricted because he could only apply for jobs located more than 1000 feet from a school. Verified Compl, ¶ 163.

513. Mr. Doe #1 tried to open his own business as a subcontractor on a home preservation project to restore foreclosed homes. Mr. Doe #1's parole agent required him to close the business because many contracting jobs are within geographic exclusion zones where registered sex offenders are prohibited from working. Verified Compl, ¶ 164.

514. Mr. Doe #1 finally convinced the organization that ran his reentry program to hire him for its programs for special needs adults, and he has been employed there since. Verified Compl, ¶ 165.

515. Mr. Doe #2 need not list his sealed HYTA case on job applications asking whether he has a criminal record. However, employers refuse to hire him because he is on the registry. Due to his registry status he was unable to work as a firefighter, at Home Depot, and in various Department of Defense positions. Verified

Compl, ¶ 166; Doe #2 Dep 139, Exh 2.

516.  Mr. Doe #2 also hoped to start a program mentoring at-risk youth by engaging them in construction projects. He was unable to do so because his status as a registered sex offender would have made it impossible for him to work with youth. Verified Compl, ¶ 167.

517.  Mr. Doe #3 is a co-owner of a family business, and has worked there for many years. Although he is employed now, he is concerned that if he were unable to continue working in the family business, his status as a registrant would prevent him from finding another job. Verified Compl, ¶ 168.

518.  As to Mr. Doe #4, at the time of his offense and for much of the time he was on probation, Mr. Doe #4 worked at an auto parts factory. He did well, repeatedly earning raises over a three-year period. Verified Compl, ¶ 170.

519.  In 2008, however, an anonymous caller informed the factory's management that Mr. Doe #4 was listed on the sex offender registry. Mr. Doe #4's boss showed him a print-out from the registry and fired him. He was escorted off the premises by security. Verified Compl, ¶ 171; Doe #4 Dep 27-29, Exh 4.

520.  The fact that Mr. Doe #4 was listed on the public sex offender registry made information about his offense readily available to the anonymous caller and directly contributed to Mr. Doe #4's firing. Verified Compl, ¶ 172.

521.  Mr. Doe #4 could not pay his bills after he was fired. As a result, he lost

his home to foreclosure, and his car was repossessed. Verified Compl, ¶ 173.

522.  Mr. Doe #4 had great difficulty finding work thereafter because so few employers are willing to hire registrants. Verified Compl, ¶ 174.

523.  Mr. Doe #4 found a job with a finishing company and worked there for about six months. Then the newspaper *Busted*, which republishes photos and information from the sex offender registry in a newsprint format, published the registry listing for Mr. Doe #4. He lost his job the day after *Busted* appeared in the break room at work. He tried to explain the circumstances of his offense, but "they didn't want to listen. They just said, no, you can't work here anymore." Doe #4 Dep 30-31, Exh 4; Verified Compl, ¶ 175; Doe #4 *Busted* Newspaper, Exh 69.

524.  Mr. Doe #4 was later offered a factory job by American Staffing. However, the factory was within 1000 feet of a school, so he could not accept. Verified Compl, ¶ 176.

525.  Ms. Doe's status as a registrant has also impaired her ability to find work. Ms. Doe earned a degree in medical billing and was placed in an externship through her career services office. Although the host organization was pleased with her work, the employer was concerned about hiring her because the employer's information would then be posted on the registry. Verified Compl, ¶ 178.

526.  When Ms. Doe worked in a previous medical billing job, someone told her employer she was on the registry, and she was terminated the next day. Ms.

136

Doe's current employer does not know she is on the registry, and Ms. Doe believes she would be fired if the employer found out. Mary Doe Dep 114, Exh 6.

### C. Plaintiffs Will be Subject to SORA's Reporting Requirements for Life

527.  Not every law enforcement agency in Michigan handles sex offender registration, and some registrants must travel to report. Lines to register can be "upwards of a 100 people." Johnson Dep 101-02, 212, Exh 15.

528. Mr. Doe #2 testified that at times it can take "about an hour and a half … to get to the desk in the first place." Doe #2 Dep 75, Exh 2.

529.  Ms. Doe, who has completed 40 quarterly registrations, used to report at a police station that was open on the weekends. After moving, she now reports to a station that is only open during the week, and must take off work to register: "I might be gone two hours, it's not an easy thing to do every three months with an employer." The actual registration process, not counting travel time, can take 45 minutes, and is embarrassing because she must speak loudly through bulletproof glass or through a speaker, allowing other people in the police department to hear that she is a registered sex offender. Mary Doe Dep 51, 106-07, Exh 6.

530.  Reporting requirements are not limited to quarterly verification. Mr. Doe #3 has had to report several vehicle purchases in-person within three days. He must take off work and the registration process at the police station can take an hour: "It's a long process just for something so simple." Because his police station is

only open three to four hours a day, with a different schedule depending on the day of the week, Mr. Doe #3 sometimes goes to register only to find that the office is closed and he will have to come back. Doe #3 Dep 77-79, 120-21, Exh 3.

531.   Michigan has purchased OffenderWatch Express, an additional OffenderWatch product that allows registrants who have computer access to log into a computer and enter certain changes, which "save[s] time on data entry of the actual law-enforcement agency." Ms. Johnson testified that with the exception of residence information, where the police may, at their discretion, require docu-mentary proof, law enforcement "simply take[s] the registrant's word for it" when they report registration information. The only reason that registrants must appear quarterly in person to update information that they could provide on-line is because the law requires it. Johnson Dep 204-10, Exh 15; OffenderWatch Express Description, Exh 51; OffenderWatch Contract 17, Exh 52.

## D. Plaintiffs Will Be Subject to Enforcement Sweeps and at Risk of Prosecution and Conviction for Registry Violations for Life

532.  MSP data shows that over 10,000 felony-level charges have been brought against registrants for various registration violations, along with almost 7,000 mis-demeanor charges. There have been over 6,000 felony convictions and over 9,000 misdemeanor convictions. The most common convictions are for reporting viola-tions or non-compliance with the terms of SORA. Hundreds of people have also been convicted of student safety zone violations. MSP SORA Charging Data, Exh

45; MSP SORA Conviction Data, Exh 46.

533.  The Michigan State Police, county sheriff's offices, the U.S. Marshalls, and local law enforcement agencies regularly engage in a variety of sweeps to determine whether registrants are in compliance with SORA. These operations include: (a) random residence checks to "just randomly knock on the door of offenders to make sure they are in fact staying where they are reporting they are staying"; Payne Dep 71-78, Exh 17; (b) operations targeted at registrants who are "noncompliant;" Burchell Dep 36-42, Exh 16; (c) "absconder sweeps;" Johnson Dep 155-57, Exh 15; and (d) other types of sweeps. For at least ten years, the MSP has annually run "Operation Verify" to locate registrants deemed noncompliant. MSP SOR Manual §3.3.12, Exh 83; MSP Memo re Operation Verify, Exh 87.

534.  Registrants can be non-compliant for various reasons, including missing a verification period or failing to pay a fee or turn in a form. Sweeps are not limited to individuals who fail to verify. Payne Dep 76, Exh 17; Burchell Dep 39, Exh 16.

535.  The Public Sex Offender Registry (PSOR) includes a "submit a tip" button on each registrant's page. Information provided by the public through that system is sent to the registrant's local law enforcement agency for follow-up. Johnson Dep 131-33, Exh 15; Doe #2 PSOR Print-Out, Exh 64.

536.  Both the former SOR database and the new OffenderWatch database include investigative screens for each registrant, which are used to document

citizen tips, track follow-up law enforcement actions, and track the progress of investigation into registrants. SOR Unit Manual Section 3.3.13, Exh 83; OffenderWatch User Manual 44, Exh 50; Johnson Dep 255, Exh 15.

537.  Mr. Doe #1 reported that when officers come to his home to do random residence checks, they sometimes talk to his neighbors. Doe #1 Dep 85-86, Exh 1.

538.  Similarly, when the police come to Mr. Doe #3's home for residence checks, he and his wife have to try to explain to his children, as well as the neighbors, why the police are there asking for him.

> Mom, there's a police officer at the door. So unprofessional[]. Knocking – banging on the door… and he'll come to the door, and them driving by down the street and saying, just making sure. Really? My neighbors questioning, why was there an officer at your door? Scaring my children. I mean, there are other ways of handling this.

The officers do these sweeps multiple times a year, and have come in the early morning when the family is sleeping, and shouted out Mr. Doe #3's name, being "very aggressive." S.F. Dep 23-24, 45-51, Exh 8; Doe # 3 Dep 126-27, Exh 3.

539.  Mr. Poxson reported that when he was on the registry, the police would come to his home to verify that he lived there, sometimes showing up as late at 11:30 p.m. They would ask to come in and look around, and required him to provide two forms of identification. Poxson Dep 68-69, Exh 14.

540.  Plaintiffs are also at risk if, due to computer errors, the SOR system shows them as non-compliant when they are in fact compliant. Mr. Doe #3 and his

children were pulled over by a police officer who claimed that he was noncompliant. Mr. Doe #3 was "begging this [officer] in front of my children," explaining that he had in fact registered and compliant. Doe #3 Dep 110-12, Exh 3.

541.   S.F. testified: "I never want my husband being arrested in front of his children for something that had happened when he was a teenager." Eventually the officer determined that while the state police records indicated Mr. Doe #3 had failed to register, a local police verification receipt, that Mr. Doe #3 fortunately had with him in the car, showed he was in fact compliant. S.F. Dep 23, Exh 8.

542.   The fact that plaintiffs are now required to register for life increases the likelihood that they will be arrested for, prosecuted, or convicted of a SORA-related offense. As an MSP trainer said at an OffenderWatch training for law enforcement agencies: "Maybe we don't get them for the violation that day, but [we] got the rest of their lives to, you know, basically finally get them." Offender Watch Training Video, Disk 4, Part 1, Minute 20:25, Exh 68.

### E. Plaintiffs Will Be Subject for Life to Supervision That Is Similar to, or More Onerous Than, Probation and Parole

543.   Parolees do not have to report some of the information required of registrants, such as telephone number or vehicles they regularly use. SORA also automatically imposes restrictions on employment and residency within geographic exclusion zones; by contrast, MDOC conditions restricting residency or employment are generally tailored to the circumstances of the individual. SORA require-

ments apply for 15 years to life, while parole restrictions typically last two years. Finally, SORA requirements do not decrease over time and cannot be contested, whereas probation/parole conditions are frequently relaxed during the course of supervision and can be challenged through the MDOC grievance procedures. Stapleton Expert Report, 1, 7-8, Exh 28; Stapleton Dep 73-75, 104-05, Exh 13.

544.   Plaintiffs experience SORA 2013's reporting and supervision requirements as more restrictive and more onerous than what they experienced while serving their sentences on probation or parole. Plaintiffs must report significantly more information than what they were required to report while on probation or parole. In addition, SORA 2013's requirement that minor changes be reported in person within three business days is a level of reporting that far exceeds what plaintiffs experienced on probation or parole. Verified Compl, ¶¶ 122-125.

545.   Mr. Doe #1 testified: "I feel like I'm still on parole… each day it's like I'm still on parole… So I still feel as though I'm not free..." Doe #1 Dep 87, Exh 1.

546.   Mr. Poxson testified that "when you had police showing up at your house and you had to go in and report to the police, to me it was just another form of probation," except that it was "worse than probation." Having experienced both probation and sex offender registration, Mr. Poxson testified that "without question" registration was more punitive. Moreover, after he proved himself on probation his reporting requirements decreased very substantially to almost

nothing. By contrast, his reporting requirements on the registry increased over time. Poxson Dep 65-72, Exh 14.

547.   Furthermore, as a former police officer, Mr. Poxson testified that law enforcement officers view sex offender registration as a form of probation. When he made a complaint to the Ingham County Sheriff regarding residence checks, he was told by the sheriff that "we check on probation and parole people all the time and you're just the same, a registrant is just the same." Poxson Dep 69-72, Exh 14.

**F. Plaintiffs' Access to Education Will Be Limited for Life**

548.  SORA has also made it more difficult for the plaintiffs to get an education. For example, Mr. Doe #2 wanted to pursue a degree as a medical assistant. When he applied to such a program at the Everest Institute, he was denied because he was on the registry. Because Mr. Doe #2's HYTA case is sealed, the Everest Institute would not have known of his history but for the fact that Mr. Doe #2 is on the registry. Verified Compl, ¶ 181; Doe #2 Dep 139-40, 142-45, Exh 2.

549.  Mr. Doe #2 was eventually able to earn a degree as a medical assistant through another institution. He then wanted to become a cardio-vascular steno-grapher. That degree requires clinical courses. Because of Mr. Doe #2's status as a registered sex offender, he is not allowed to take clinical courses in a hospital, and therefore could not pursue his chosen degree. Verified Compl, ¶ 182; Doe #2 Dep, 15-17, Exh 2.

550.   Mr. Doe #3's status as a registrant likewise limited his ability to get an education. Mr. Doe #3 enrolled in college in 2005. When he learned that he had to report that his college attendance, he was concerned that his college classmates would find out that he was a registered sex offender. Mr. Doe #3 dropped out of school rather than risk facing hostility. Verified Compl, ¶ 183.

551.  Mr. Doe #4 was rejected by several GED programs because he is a registered sex offender. With the assistance of his probation officer, Mr. Doe #4 was eventually able to identify a GED program that accepts registrants, and completed his GED. Verified Compl, ¶¶ 184 185; Doe #4 Dep 5, Exh 4.

**G.  Plaintiffs' Ability to Travel Will Be Restricted for Life**

552.   Plaintiffs must provide advance notice when they intend to travel anywhere for seven days or more, and must inform the police where they are going, where they will stay, how long they will be there, and when they will return. M.C.L. § 28.725(1).

553.  The plaintiffs must provide 21 days advance notice if they travel outside the U.S. for more than seven days. M.C.L. § 28.725(7).

554.  In addition, the plaintiffs must plan their travel around their specified quarterly registration periods—ensuring they are home to register in-person. M.C.L. §28.725a(3).

555.  If the plaintiffs travel, they must comply with any applicable sex offender

registration laws in other jurisdictions. Because sex offender laws are exceedingly complex and vary from state to state, it is extremely difficult to obtain accurate information about either affirmative reporting obligations (such as registering one's presence in a state) or prohibitions on ordinary behavior (such as visiting a library or park) in other jurisdictions. *See* Expert Report of Dr. James J. Prescott Decl, Attach A, Exh 22.

556.  Mr. Doe #1 visits friends and family for no more than six days at a time because otherwise he would be required to notify law enforcement in person about his travel plans. Verified Compl, ¶ 191.

557.  Mr. Doe #2, a military veteran, has friends all over the country and world, and enjoys travel. He frequently drives to see his parents in Florida and friends in other states. Although he would like to take extended trips, Mr. Doe #2 limits his trips to seven days or less, including driving time. Verified Compl, ¶¶ 192-193.

558.  Mr. Doe #2 would like to travel internationally to visit military friends who are stationed overseas, but has been unable to do so because SORA requires extensive advance notice for international travel. Verified Compl, ¶¶ 194-95.

559.  Mr. Doe #3 took his wife on a four-day getaway to a resort in Mexico in 2011 to celebrate her graduation from a university program. On their return, border agents separated him from his wife, interrogated him for hours, and asked questions about his sex offender status. Because of that experience, Mr. Doe #3 is

145

reluctant to travel outside the United States again. Verified Compl, ¶ 196; Doe #3

Dep 94-97, Exh 3; S.F. Dep 33-34, Exh 8.

560.  Ms. Doe and her husband would like to take extended trips to visit friends

and family. However, due to SORA they only take trips that last seven days or less,

including driving time. Verified Compl, ¶ 198.

561.  Ms. Doe once took a wrong turn while driving in Detroit, and

accidentally got into a traffic lane leading to the tunnel to Canada. Although Ms.

Doe did not cross into Canada, when she turned around, she had to go back

through the United States border checkpoint. Because of Ms. Doe's status as a

registrant, border agents demanded that Ms. Doe and her family get out of the

vehicle. The agents searched the car, interrogated Ms. Doe, her husband, and her

daughter separately, and suggested that Ms. Doe was abducting her daughter. The

family was eventually released. Verified Compl, ¶¶199-200.

## H. Plaintiffs Will, for the Rest of Their Lives, Be Publicly Stigmatized and Face Harassment or Even Vigilantism

562.  As of May 22, 2013, there had been over 12,568,000 visitors to Michi-

gan's Michigan Public Sex Offender Registry (PSOR) website. Defs' Responses to

Pls' 1st Interrog, No. 10, Exh 42.

563.  The current number of visitors can be obtained by logging unto the

Michigan Public Sex Offender Registry website. (http://www.mipsor.state.mi.us,

last visited 12/19/2014, at which time the counter showed 14,373,268 visitors.)

564.  The sex offender registry website posts extensive personal information about each plaintiff, including residential address, employer address, date of birth, school information, vehicle information, physical description (weight, height, etc.), and a photograph. M.C.L. § 28.728(2); Doe #2 PSOR Print-out, Exh 64.

565.  The public can search the registry by name, age, city, county, search for all registrants within a one mile radius of a specified address, or sign up for an automated email notification system alerting them to registrants in particular zipcodes. SOR Unit Manual §§ 5.3-5.4, Exh 83; Michigan Public Sex Offender Registry (http://www.mipsor.state.mi.us).

566.  The public registry website labels registrants by tier. M.C.L. § 28.728(2)(l). All of the plaintiffs are labeled as Tier III, which suggest they are among the most dangerous sex offenders on the registry.

567.  The public sex offender registry also falsely labels Mr. Doe #1 as a "convicted sex offender," which he is not, as he was never convicted of a sex offense. Verified Compl, ¶ 208.

568.  The public sex offender registry also falsely labels Mr. Doe #2 as a "convicted sex offender," which he is not, as his case was dismissed and he was never convicted of a crime. Verified Compl, ¶ 209, Doe #2 Dep 138, Exh 2; Doe #2 MSP Criminal History Print-Out, Exh 63; Doe #2 PSOR Print-Out, Exh 64.

569.  Because they are publicly stigmatized as sex offenders on the website, the

plaintiffs and their families are subjected to harassment, social ostracism, and even threats of violence. For example, in 2010, Mr. Doe #4 received an anonymous death threat by mail. He received an envelope containing a print-out of his sex offender registry page. His eyes were blacked out on the photo. Handwritten on the paper were the words "You will die." Mr. Doe #4 has also been called a child molester on the street. Verified Compl, ¶ 213; Doe #4 Death Threat, Exh 70.

570.  Similarly, a vigilante came to Mary Doe's house when she was not home, saying that he represented a group of people that knew she was on the registry, and that he would return when she was home. Ms. Doe's husband told him that he would call the police if the man returned. Ms. Doe, who believed the man was "threatening my family," reported the incident to the police to "find out what rights I had, and I found out I had none" and that the police "couldn't do anything about it." Mary Doe Dep 97-98, Exh 6.

## I.  For Life Plaintiffs Will Be Subject to Numerous Laws and Restrictions, beyond SORA, That Are Triggered By Plaintiffs' Status as Registrants

571.  Because the plaintiffs are required to register as sex offenders under SORA 2013, they will be subject for life to a vast and ever-changing array of laws and ordinances imposed on registered sex offenders by the federal government, other state or tribal governments, and local municipalities. *See* Expert Report of Dr. James J. Prescott, 11-12, Attach A, Exh 22.

572.  A compendium of the most significant state laws (which does not include

federal, tribal, or local laws, and which disregards many of the more minor require-ments) contains over 1000 pages of obligations and restraints. *Id.* at Attach A, 9.

573. Because registration in one state generally triggers registration in another state, the fact that the plaintiffs are subject to SORA 2013 means they are also sub-ject to the sex offender laws of other jurisdictions if they travel or move. *Id.* At Attach A, 1.

## J. The Harms Plaintiffs Experience Stem from the Fact They Are Subject to SORA 2013, Not From Their Convictions

574. In the case of Mr. Doe #2, who was never convicted and does not have a criminal record that would appear on a background check, it is clear that all of the consequences he has suffered stem from the fact that the state publicly labels him as a registered sex offender. Verified Compl, ¶ 35; Doe #2 Dep 61, 66, 76, 127-28, 137-39, 145-46, Exh 2; Doe #2 MSP Criminal History Print-out, Exh 63; Doe #2 Public Sex Offender Registry Print-out, Exh 64.

575. Mr. Doe #1 was not convicted of a sex offense but is labeled as a sex offender. Doe #1 Dep 43, 84, Exh 1; M.C.L. § 28.722(w)(ii).

576. But for SORA 2013 plaintiffs would not be banned from living, working, or loitering within the geographic exclusion zones. M.C.L. §§ 28.734, 28. 735.

577. But for SORA 2013 plaintiffs would not be subject to criminal liability if they fail to report a broad array of information quarterly, and changes to specified information within three business days. M.C.L. §§ 28.725a(5), 28.727(1).

578.  But for SORA 2013 plaintiffs would not have their pictures and personal information displayed on a state-created website which labels them as Tier III sex offenders. M.C.L. § 28.728(2).

579.  Plaintiffs testified to numerous situations where they were able to access housing or employment despite having criminal records, but then lost that housing or employment when the landlord/employer learned they were on the sex offender registry. *See, e.g.*, Doe #4 Dep 27-29, 30-31, 39, 97-98, Exh 4; Doe #5 Dep 77, Exh 5; Doe #5 2nd Decl, Exh 29; Mary Doe Dep 114, Exh 6.

580.  As Mr. Poxson testified, his life changed significantly after he came off the sex offender registry, even though he continues to have criminal record. Mr. Poxson explained that much more information is available on the registry, and that, unlike with the sex offender registry, criminal history information is available only if one knows a person's name and date of birth. For him, being a registered sex offender was the worst experience of his life, other than the death of his ten-year-old daughter. Poxson Dep 18, 70-74, Exh 14.

## XIII.  THE REQUIREMENTS OF SORA 2013 BEAR NO REASONABLE RELATION TO PLAINTIFFS' ACTUAL RISK

### A. The Stated Purpose of SORA 2013 Is to Prevent Future Sex Crimes by People who Pose a Serious Danger of Committing Such Crimes

581.  SORA 2013 presumes that all people convicted of sex offenses pose such a high risk to public safety that monitoring, reporting, supervision, geographic ex-

clusion zones and other restrictions must be imposed for a very long time. For Tier

III offenders, that risk is presumed to be so great that these restrictions are imposed

for life. M.C.L. §§ 28.721a; 28.725(12).

582.  Specifically, the statute's statement of intent is:

> The legislature declares that the sex offenders registration act was enacted
> pursuant to the legislature's exercise of the police power of the state with the
> intent to better assist law enforcement officers and the people of this state in
> preventing and protecting against the commission of future criminal sexual acts
> by convicted sex offenders. The legislature has determined that a person who
> has been convicted of committing an offense covered by this act poses a poten-
> tial serious menace and danger to the health, safety, morals, and welfare of the
> people, and particularly the children, of this state. The registration requirements
> of this act are intended to provide law enforcement and the people of this state
> with an appropriate, comprehensive, and effective means to monitor those per-
> sons who pose such a potential danger.

M.C.L. § 28.721a.

583.  This statement of intent was added to the statute in 2002. Mich. Pub. Act

542 (2002).

584.  There is nothing in the legislative history to suggest that the legislature

held hearings or otherwise engaged in any fact-finding regarding the recidivism

rates of people convicted of sex offenses. Rather, the legislative history states that

a federal district court had ruled SORA unconstitutional in June 2002, and that the

case was then on appeal. Legislative Analysis of Public Act 542 (2002), Exh 88.

## B. Recidivism Risk Varies Widely Among People Convicted of Sex Offenses

585.  Among people with prior sex offenses, recidivism rates vary based on cer-

tain actuarial risk factors. Levenson Report 8, Exh 23. While some individuals con-

victed of sex offenses pose a significant risk to public safety, most do not. Fay-

Dumaine Dep 82, 129-130, Exh 12.

586.   Most sex offenders do not re-offend sexually. First-time sex offenders are

significantly less likely to re-offend than those with multiple sexual convictions,

and older offenders are much less likely to re-offend than younger offenders.

Moreover, recidivism rates differ significantly depending on the nature of the

offense (*e.g.*, rape, incest, child victim, *etc*.). Levenson Expert Rep 7-10, Exh 23;

Fay-Dumaine Dep 82, 114, Exh 12.

587.  Plaintiffs' expert Janet Fay-Dumaine, Psy.D., a licensed psychologist, has

worked for the Nebraska Department of Corrections as well as with victims of sex

offenses and with sex offenders themselves. As to recidivism, she testified: "It's

extremely contrary to our cultural assumptions about sex offenders. It's hard for

people to get their head around. Yes, there is a group of sex offenders that are at

high risk of recidivating, but that's a very small number of sex offenders. Most sex

offenders do not recidivate. And this is a pretty robust finding in the literature."

Fay-Dumaine Dep 129-130, Exh 12.

588.  "Most sex offending happens within the family. Most sex offending hap-

pens in stressful difficult situations, or it's young adult males not making a good

judgment about having sex with somebody who's a few years younger than they

are. But that's the lump sum of most sex offenses. The number of pedophiles in the world is extremely small, but the perception in the public is … everybody is going to re-offend, but there's no data to support that." Fay-Dumaine Dep 83, Exh 12. "[As to] serial rapists, I can tell you in my [20-year] career how many I have seen on one hand." Fay-Dumaine Dep 130, Exh 12.

589. Despite these significant variations in risk, registration requirements under SORA 2013 are not based on risk assessments. It is the fact of conviction (and in some cases the age of the victim and/or the age difference between the defendant and the victim) that determines whether individuals are subject to SORA 2013 and for how long. M.C.L. §§ 28.722-28.723.

590. Plaintiffs' expert Jill Levenson, who has worked both with child sexual abuse survivors and people convicted of sex offenses, explains that the result of this offense-based registration system is that the public's ability to identify sexually dangerous persons is significantly reduced. Levenson Expert Report 2, Exh 23; Levenson Dep 11-15, Exh 9. "When registries have so many people on them and there's such a wide range of risk, it becomes hard for the public to know who's most likely to pose a threat to them or their children, who's most likely to commit a new sex crime in the future." Levenson Dep 11-15, 68, Exh 9.

591. Law enforcement, too, cannot focus its resources on those who pose the greatest risk. "[T]he more work involved for law enforcement to track them and

monitor [all registrants]….they have less resources to really devote to those people who are higher risk … or severely high risk." Levenson Dep 70, Exh 9.

592. Dr. Levenson's pilot study for the National Institute of Justice confirmed what other research had found: that law enforcement "feels…unable to really target high-risk individuals because they have so many [other registrants] to track and monitor." Levenson Dep 71, Exh 9.

593. In addition, SORA 2013, by focusing on the danger posed by strangers, misidentifies the source of risk. For example, in 93% of cases of child sexual abuse, the offender was a family member or acquaintance. Levenson Expert Report 9, Exh 23.

594. Public sex offender registration and residency restrictions, which focus on "stranger danger," give parents a false sense of security by implying that knowing where sex offenders live or banishing them from the community in fact reduces the risk of sex offenses being committed, when such measures do not have this effect. *Id.*

## C. Clinical Risk Assessment Instruments Predict Risk More Accurately Than the Offense of Conviction

595. Actuarial risk assessment instruments – which are used to determine the statistical likelihood that offenders will re-offend based on known indicators – are far better at predicting recidivism risk than the offense of conviction. Levenson Expert Report 8, Exh 23; Levenson Dep 41-44, Exh 9; Fay-Dumaine Dep 112-113,

Exh 12.

596.  The most commonly used and best-researched risk instrument is called the Static-99. The Static-99 is an actuarial-based tool designed to assist in the prediction of sexual recidivism for male sex offenders. The Static-99 has demonstrated good predictive accuracy in multiple validation studies and offers a firm scientific basis for assessing the likelihood that offenders convicted of a sex offense will re-offend. Levenson Expert Report 8, Exh 23; Fay-Dumaine Dep 44-46, Exh 12.

597.  The Static-99 is easily scored by anyone trained to do so. Levenson Expert Report 8, Exh 23; Fay-Dumaine Dep 68-69, Exh 12.

598.  Ms. Fay-Dumaine conducted actuarial risk assessments of plaintiffs John Does #2-4 using the most recent version of the Static-99. (The test was re-normed by its authors to give the factor of age more weight in scoring, in light of updated actuarial research showing that age was a more significant variable in reducing risk than was first thought). Fay-Dumaine Expert Reporty 1, Exh 24; Fay-Dumaine Dep 44, Exh 12.

599.  Ms. Fay-Dumaine could not score John Doe #1 because he did not commit a sex offense and the Static-99 is specific to sex offenses. She also could not score Mary Doe because the Static-99 has not been validated for female offenders. (John Doe #5 was not scored because he intervened in the litigation after Ms. Fay-Dumaine's report was completed.) Fay-Dumaine Expert Report 1, 4, Exh 24.

155

600.  John Does #2-4 all received a Static-99 score of "2". Offenders from routine correctional samples with a score of "2" have been found to sexually reoffend at a rate of only five percent (or one in 20) over five years. Fay-Dumaine Expert Report 1, Exh 24.

601.  Because sexual offending decreases steadily with age, age is one of the factors that the Static-99 considers. John Does #2-4 are all currently under age 35. At the age of 35, their Static-99 scores will drop to a "1". Offenders with a score of 1 have a recidivism risk of about 3.8%. As Plaintiffs grow older, their recidivism risk will continue to decrease. Fay-Dumaine Expert Report 1, 3, Exh 24; Fay-Dumaine Dep 52, 114, Exh 12.

602.  Although the Static-99 could not be scored for Mary Doe, research on female sexual offenders has found them to have "an 'extremely low' rate of sexual recidivism" (between 1-3%). Fay-Dumaine Expert Report 4, Exh 24; Fay-Dumaine Dep 89-90, Exh 12; Levenson Dep 65, Exh 9.

603.  Although the plaintiffs are classified as Tier III offenders and are required to register for life, actuarial risk assessments indicate that they score in the range that is extremely low risk. Moreover, the nature of their offenses and the length of time that they have lived offense-free in the community also indicate that they are extremely unlikely to re-offend. Fay-Dumaine Expert Report 1, 4, Exh 24; Fay-Dumaine Dep 96-97, 82, 104, 110-114, Exh 12.

### D. Low-Risk Offenders Are Less Likely to Commit Sex Crimes than a Baseline of Individuals Without Such Convictions, and Even High-Risk Offenders Drop Below that Baseline Over Time

604.   Requiring registration for 25 years to life is both inefficient and unnecessary because after the passage of time reoffending is "very unlikely to occur." Fay-Dumaine Dep 92-94, 115-116, Exh 12; Levenson Expert Report 10, Exh 23.

605. Risk for sexual recidivism declines with age. Levenson Expert Report 10, Exh 23.

606. Recidivism risk also declines the more time a person spends offense-free in the community. Levenson Expert Report 10, Exh 23; Fay-Dumaine Dep 104, Exh 12; Levenson Dep 129-138, Exh 9.

607. Karl Hanson, one of the creators of the Static99, has reported: "Contrary to the popular notion that sexual offenders remain at risk of re-offending through their lifespan, the longer offenders remain offence-free in the community, the less likely they are to re-offend sexually. Eventually they are less likely to re-offend than a non-sexual offender is to commit an 'out of the blue' offense." Hanson Decl 1, Exh 79.

608. Dr. Fay-Dumaine explained that most sex offenders, including high risk offenders, do not reoffend after their first conviction. Fay-Dumaine Dep 82, Exh 12.

609.  Sex offenders who do reoffend usually do so within three to five years. For individuals who do not reoffend during that period "there's a precipitous drop" in recidivism risk. Fay-Dumaine Dep 82, Exh 12.

610. When individuals remain offense free in the community, their risk drops 50% after five years, and another 50% for every five-year interval after that. This is true even for high-risk offenders. Fay-Dumaine Dep 82, 104, Exh 12; Hanson Study 9, Exh 78.

611. Persons who have never been convicted of a sex offense also present a risk of committing sex offenses. In fact, while some individuals convicted of sex offenses will re-offend, the vast majority of new sex offenses are committed not by registered offenders, but by individuals without prior sex offenses. For example, a study in New York found that 95% of all arrests for sexual offenses were for individuals who did not have a prior sexual offense conviction and who were not on a sex offender registry. Levenson Expert Report 8, Exh 23.

612. The risk of sexual offending is about 3 % in the general male population. Fay-Dumaine Dep 93, Exh 12.

613. As explained by Drs. Levenson and Fay-Dumaine, recent research that distinguishes between low, medium, and high-risk offenders shows that low-risk offenders actually have a *lower* risk for sexual offending than the general male population by about one percentage point. Fay-Dumaine Dep 82, 93, Exh 12;

Levenson Dep 130-137, Exh 9.

614. Specifically, research shows that the baseline population of individuals who have never been arrested for a sex-related offense, but have been arrested for some other crime, had a 3% chance of committing an "out-of-the blue" sex offense. *From the outset low-risk sex offenders have a lower risk* of committing a sex offense (2.2%) than that baseline. Levenson Dep 130-137, Exh 9; Fay-Dumaine Dep 93, Exh 12; Hanson Study 9-11, Exh 78; Hanson Decl 1, 9, Exh 79.

615. For medium-risk sex offenders, the risk of committing a sex offense drops off over time so that after 10-14 years offense-free in the community, it is below the baseline for non-sex offenders. Even high-risk sex offenders pose no more risk than the base-line group after 17 years offense-free in the community. Fay-Dumaine Dep 93, Exh 12; Levenson Dep 130-137, Exh 9; Hanson Study 11, Exh 78; Hanson Decl 2, Exh 79.

616. The graph below, which was explained by Dr. Levenson at her deposition and which reflects the research of Karl Hanson, shows how the recidivism rates of different risk categories drop off over time, and how they compare to the baseline population. Levenson Dep 130-137, Exh 9.



Sex Offender Sexual Recidivism Risk Levels Over Time Graph, Exh 80.

617.  To be clear, the most up-to-date and comprehensive research in the field

shows that low-risk offenders pose *less* risk of committing a sex offense than the

baseline for "out of the blue" offenses, and that the recidivism risk of medium and

high-risk offenders drops off dramatically over time, so that after 17 years even

high-risk offenders present a statistical risk equivalent to the baseline. Hanson Decl

1, Exh 79; Hanson Study 9-11, Exh 78; Fay-Dumaine Dep 92-93, 111-112, Exh

12; Levenson Dep 130-138, Exh 9.

618.  Low and medium-risk sex offenders comprise upwards of 90 percent of all sex offenders. Fay-Dumaine Dep 113, Exh 12.

619.  Dr. Levenson testified that because even high risk sex offenders are "no more likely" than the baseline population to commit a sex offense after 17 years offense-free in the community:

> from a… cost-effectiveness point of view any benefit that a registry might serve, and, again, there's really no consensus in the research to support benefits of the registry in terms of recidivism, but any benefits that might exist after 17 years are sort of washed out by the – you know, the low likelihood of committing a new sex crime.

Levenson Dep 137-138, Exh 9.

### E. SORA 2013's Tier Classifications Are Not Based on and Do Not Correspond to Risk

618.  Under SORA 2013, the tier level to which an individual is assigned, the decision to place the individual on the private or public registry, and the length of time an individual must register are all based on the offense of conviction (and in some cases on the age of the victim and/or the age difference between the defendant and the victim). There is no individualized risk assessment or any individualized determination whether the person's risk level warrants lifetime registration. M.C.L. §§ 28.722(r)-(w); Levenson Dep 38-40, Exh 9.

619.  Many individuals classified as Tier III under SORA 2011 have a lower risk of re-offending than individuals classified as Tier I or Tier II. Research further shows that the tier structure "fail[s] to distinguish between registered offenders

who present significant threat to public safety and those who present lower risk."
Levenson Rep 2, Exh 23; Levenson Dep 127, 140-41, Exh 9. "The offense alone
doesn't really denote any particular risk." Fay-Dumaine Dep 112, Exh 12; Staple-
ton Dep 46, Exh 13.

620.   Even upon the clearest proof that plaintiffs are not dangerous, there is no
mechanism that would allow the plaintiffs to have their registration obligations
eliminated or reduced or their tier level changed. M.C.L. § 28.721 *et seq.*

### F. SORA 2013, Which Does Not Account for Risk, Stands in Contrast to the Evidence Based Practices of the Michigan Department of Corrections

621.   In his expert report, former MDOC chief legal counsel Stapleton said that
because evidence-based correctional research has shown that supervision strategies
must be tailored to an individual's risk level, and because individuals with serious
offenses may have lower risk levels than individuals with lesser offenses especially
over time, the MDOC uses empirically-based risk assessment instruments to deter-
mine each offender's actuarial risk. Supervision for parolees and probationers can
then be tailored to each offender's actual risks and needs. Stapleton Expert Report
3-4, Exh 28; Stapleton Dep 36-37, Exh 13.

622.   The Michigan Parole Board and MDOC probation agents strive to narrow-
ly tailor conditions of supervision to the individual circumstances of each
individual. The Parole Board uses risk assessment tools to tailor conditions, and

"the more accurate the risk assessment is the more narrowly tailored the conditions can be." Stapleton Expert Report 1, 5, Exh 28; Stapleton Dep 92, Exh 13.

623.  Current MDOC case management standards no longer require in-person monthly reports for all offenders, regardless of risk. Rather, the frequency and nature of reporting (*e.g.*, in person, by phone, by mail) are determined by the offender's assigned level of supervision. Depending on the level of supervision, some parolees and probationers can use the phone, mail, or email to contact their agents or report changes. Stapleton Rep 4, Exh 28; Stapleton Dep 73-75, Exh 13.

624.  By contrast, SORA 2013 requires in-person reporting no matter how low the risk or how long the offender has served offense-free in the community. M.C.L. §§ M.C.L. §§ 28.725(1); 28.727(1).

625.  The MDOC not only targets interventions to high-risk offenders, but also minimizes interventions with low-risk offenders, because evidence-based research shows that intensive supervision of low-risk offenders is counter-productive. Targeting MDOC resources to high-risk offenders is the best way to protect the public. Stapleton Expert Report 1, 3-4, 5-7, Exh 28.

626.  By contrast, the requirements of SORA 2013 are applied indiscriminately to all registrants, regardless of risk level or individual circumstances. Stapleton Expert Report 1, Exh 28.

627.  For example, although there are over 40,000 registrants, only about 2,770

were convicted of Internet or computer-related offenses. But all registrants must

report their Internet identifiers. Johnson Dep 296-298, Exh 15; Total Number on

SOR by Year, Exh 53; Defs' 2nd Supp Resp to First Interrog, No. 14, Exh 98.

628.  Similarly, SORA 2013's geographic exclusion zones apply to virtually all

registrants, not just those convicted of offenses against children. M.C.L. §28.733-

736; Johnson Dep 303, Exh 15.

629.  According to Stapleton, the fact that parolees and probationers with sex

offenses are subject to SORA undermines the MDOC's use of evidence-based

correctional practices because the statute imposes virtually identical requirements

on all registrants regardless of risk level. Stapleton Rep 1, 5-7, Exh 28.

## XIV.   RESEARCH SHOW REGISTRIES AND STUDENT SAFETY ZONES ARE NOT EFFECTIVE

### A. Public Registries Increase Rather Than Decrease Recidivism

630.  Research shows that public registries are likely to *increase, rather than*

*decrease, recidivism*, and are therefore are counterproductive to their avowed

public safety goal. Specifically, research shows that the more people a state

subjects to public sex offender registration, the higher the relative frequency of sex

offenses in that state. Public registries (based on the offense of conviction)

correlate with an *increase* in frequency of sex offenses against all types of victims

(family members, neighbors, acquaintances, and strangers). Prescott Expert Report

164

3-4, Exh 22.

631.  Applied to Michigan, this research suggests that SORA contributes to sex offense rates in Michigan that are 10% higher than they would be without SORA. Prescott Expert Report 3, Exh 22.

632.  Although it may seem counter-intuitive that public registration increases rather than decreases recidivism, these results reflect the fact that sex offender registration and the attendant consequences exacerbate risk factors for recidivism, such as lack of employment and housing, and prevent healthy reintegration into the community. Prescott Expert Report 7-8, Exh 22; Levenson Dep 77-78, Exh 9.

633.  These results are mirrored by other evidence-based research on the impact of sex offender registration. Most studies reveal no significant reduction in sex crime rates that can be attributed to sex offender laws and policies. Rather, there is a significant body of empirical work that overwhelmingly shows that, at best, public registration makes no difference to recidivism rates, and at worst is counter-productive. Levenson Expert Report 3, Exh 23; Prescott Expert Report 12, Exh 22; Levenson Dep 75, 88, 123-24, 168-69, Exh 9.

634.  The two studies that detected reductions in sex crime recidivism after the passage of registration laws were both in states that have risk-based, rather than offense-based, classification, and that limit public notification to those offenders who have been individually determined to pose the greatest threat to community

165

safety. Levenson Expert Report 3, Exh 23; Levenson Dep 42, Exh 9.

### B.  There is No Evidence that Geographic Exclusion Zones Reduce Recidivism

635.  Moreover, there is no research to support the premise that registrants who live closer to child-oriented settings are more likely to reoffend. Rather, the research shows that where registrants live is not a significant contributing factor to recidivism. Levenson Expert Report 4, Exh 9; Levenson Dep 81-83, Exh 23.

636.  A 2013 Department of Justice study evaluating sex offender residency restrictions in Michigan and Missouri found that these restrictions did not decrease recidivism. In fact in Michigan the geographic restrictions may have slightly increased recidivism. The study further found that many registrants had to relocate or could not live with family due to the restrictions, and that these laws also made it more difficult for registrants to find employment. DOJ Evaluation of Sex Offender Residency Restrictions 9-10, Exh 82; Levenson Dep 154-157, Exh 23.

637.  Similarly, a Florida study showed that proximity measures were not significant predictors of recidivism. An Iowa study reported that residency restrictions did "not seem to have led to fewer charges or convictions" for sex offenses. And a Minnesota study concluded that residency restrictions would not have prevented even one re-offense. Research shows that sex offenders do not appear to abuse children because these offenders live near schools. Levenson Expert Report 4-5, Exh 23.

638.  Residency restrictions reduce housing options for registrants, leading to housing instability. Housing instability is consistently correlated with higher criminal recidivism, and may help account for the increases in recidivism triggered by public notification. Thus, residency restrictions are likely to increase rather than decrease sexual offending. Prescott Expert Report 7-8, Exh 22; Levenson Expert Report 5-6, Exh 23; Levenson Dep 95-100, Exh 9.

639.  Similarly, SORA requirements that interfere with employment, social support, and engagement in pro-social activities undermine the avowed public safety goals of sex offender registration laws. Social policies that ostracize and disrupt the stability of sex offenders are counterproductive to increasing public safety. Levenson Expert Report 7, 10, Exh 23; Levenson Dep 97-99, Exh 9.

## C. Failure to Comply with Reporting Requirements Does Not Predict Recidivism

640.  Failure to comply with registration requirements does not predict sexual recidivism. Levenson Expert Report 11-12, Exh 23.

641.  There is no empirical evidence to support the notion that more frequent registration check-ins lower recidivism, nor is there evidence that reporting additional information (*e.g.*, email addresses, employment information) reduces recidivism. Levenson Expert Report 10, Exh 9.

## D. The Michigan State Police Do Not Track Recidivism Rates

642.  Although the purported goal of SORA is to reduce recidivism, the MSP

does not track the recidivism rate of registrants, the impact of registration on

recidivism, nor data on the effectiveness of the registry. Payne Dep 68, 110, Exh

17; L. Wagner Dep 41, Exh 18; Defs' Resp to First Interrog, No. 10, Exh 42.

643.  The technical capacity exists to run reports showing recidivism rates, but

the state has never run a report to determine whether or not individuals on the

registry are committing additional sex crimes because "it's not our purpose."

Rather, the purpose is "registering sex offenders." L. Wagner Dep 46, Exh 18.

644.  Ms. Johnson testified:

Q. If you don't track recidivism rates how do you know whether you're
   impacting recidivism?
A. We don't.
Q. You don't know if you're impacting recidivism?
A. No.

Johnson Dep 257, Exh 15.

## XV.   THE MECHANICS OF REGISTRATION, THE MICHIGAN STATE
## POLICE SOR UNIT, THE SOR DATABASE, AND SYSTEM COSTS

### A. Registration Occurs Prior to or as Part of Sentencing and Involves
### Multiple Law Enforcement Agencies

645.  Sex offender registration is supposed to occur prior to sentencing. A judge

cannot sentence unless the defendant has been registered. M.C.L. § 28.724 (5);

Yantus Dep 58-59, Exh 20.

646.  The current Judgment of Sentence form approved by the Michigan State

Court Administrative Office contains a checkbox to show sex offender registration

168

has been completed. Judgment of Sentence Form CC219b, box 3, Exh 84.

647.  Depending on when a defendant was sentenced, the requirement for sex offender registration may have been written on an earlier version of the Judgment of Sentence form or on a probation order. *See, e.g.*, Doe #2 Order Amending Probation, Exh 85; Doe #3 Order of Probation, Exh 86.

648.  For offenses that are not specifically listed in SORA 2013 as registrable offenses, the judge must determine whether the offense is by its nature a sexual offense against a person under the age of 18 and then include a finding that registration is required on the judgment of sentence. M.C.L. § 769.1(13); Yantus Dep 58-59, Exh 20.

649.  Depending on the defendant's sentence, responsibility for initial registration can lie with a probation agent, parole agent, the MDOC, the sheriffs' department, the probate court, or other entities. Typically the responsible entity will obtain the initial registration information, as well as have the registrant sign the Explanation of Duties Form. M.C.L. § 28.724; Johnson Dep 26-27, Exh 15.

650.  To meet their ongoing verification and immediate reporting requirements, registrants must report to their "registering authority," which is the "local law enforcement agency or sheriff's office having jurisdiction over the individual's residence, place of employment, or institution of higher learning, or the nearest [MSP] post designated to receive and enter sex offender registration information." M.C.L.

§ 28.722(n).

651.  The SOR database includes registrants who are incarcerated, although those registrants do not need to report until released. Johnson Dep 298, Exh 15.

**B. Sex Offender Registration Is a Central Issue in Plea Negotiations**

652.   Prosecutors are trained to leverage sex offender registration as part of plea negotiations, to use charging decisions to ensure a defendant is required to register or is subject to public registration, and to avoid registration in circumstances where the prosecutor thinks the defendant is "a good kid from a good family and [the prosecutor doesn't] want to ruin his life." Tanner Dep 66, Exh 21; Tanner Training 2013 for Prosecutors, 11, Exh 59; Tanner Training 2011 for Prosecutors, 4-7, Exh 60.

653.   Conversely, defense attorneys will try to negotiate for a conviction that does not entail registration, or for non-public registration, if possible. Because of the burdens associated with sex offender registration, the issue of whether a conviction will result in registration is critical for criminal defendants. The choice whether or not to plead guilty often turns on whether a defendant must register, for how long a defendant must register, and whether registration is public or private *Id.* Yantus Expert Report ¶¶ 5-7, Exh 27.

654.  Defense attorneys are unable to give accurate advice to defendants about any registration-related consequences of their convictions because SORA has been

repeatedly amended. The possibility of future amendments means that legal advice given today about whether registration will be public, the length of registration, or even whether a conviction will result in registration, may not be accurate in the future. Yantus Dep 80-81, Exh 20.

### C. The Structure and Responsibilities of the MSP SOR Unit

655.  The Michigan State Police maintains Michigan's sex offender registry. The MSP's responsibilities include enforcing SORA 2013, maintaining the state's database of sex offenders, maintaining an online public sex offender registry, registering offenders (along with other law enforcement agencies), developing registration forms, providing statutorily-required notices to registrants, collecting registration fees, and coordinating with national law enforcement and the national sex offender registry. M.C.L. §§ 28.724, 28.724a, 28.725 *et seq.*

656.  The MSP/SOR unit currently has a staff of about 14 people. Slightly more than half of the staff are civilian registry staff who maintain and monitor the SOR database. Roster of MSP/SOR Unit Staff, Exh 55.

657.  In addition, a sworn police SOR Enforcement Coordinator supervises a SORA Enforcement Unit comprising four regional coordinators, who are responsible for coordinating SORA enforcement in different districts around the state. Those coordinators, in turn, work with designated police officers at each post responsible for coordinating SORA enforcement. Roster of MSP/SOR Unit Staff,

Exh 55; MSP Sex Offender Registry and Enforcement Coordinators, Exh 56; MSP

SOR Manual §6.1, Exh 83; Payne Dep 70, Exh 17; Johnson Dep 148-50, Exh 15.

658.  The SOR Unit is also responsible for training MSP officers and local

police, and has developed a detailed manual keyed to its current computer system.

The SOR unit also conducts trainings, but has just four troopers to do state-wide

training for a minimum of 3,000 trainees a year. The SOR Unit's trainings focus on

how to use the data management system and follow the SOR unit protocols – that

is, how to register and update information as opposed to how to interpret the law.

Major trainings occur only when the law, or the SOR unit software, changes in

significant ways. Johnson Dep 95-98, 110, Exh 15; MSP Sex Offender Registry

and Enforcement Training Powerpoint 2011, Exh 58; SOR Unit Manual, Exh 83.

659.  In addition, the SOR unit helps coordinate enforcement of SORA 2013.

For example, the unit works with local law enforcement agencies to do "sweeps"

in order to investigate registrants whose status the computer shows as non-

compliant in some way. The MSP also does an annual sweep in conjunction with

local law enforcement called Operation Verify. Data from the sweeps are compiled

and published, along with press releases. Johnson Dep155-58, Exh 15; Sample

MSP Sweep Press Release, Exh 93; MSP Memo re Operation Verify, Exh 87.

## D. The SOR Data Management System Is Used to Record, Maintain, and Publicize Information on Registrants

660.  Michigan's registry has over 40,000 registrants and is the fourth largest state registry in the United States. Total Number on SOR By Year, Exh 53; Levenson Expert Report, 1, Exh 23.

661.  Over the years the SOR unit has developed and maintained a computer system (in conjunction with other state agencies) to record, maintain, and publicize information on registrants. The data management system can be accessed by MSP staff, local law enforcement, and correctional staff. Johnson Dep 92-93, Exh 15.

662.  The SOR software can issue alerts if registrants fail to meet SORA's reporting requirements. The database has an interface to share information with the Law Enforcement Information Network (LEIN), the National Criminal Information Center (NCIC), the National Public Sex Offender Registry, and the Michigan Secretary of State. Johnson Dep 31-34, 82-88, Exh 15.

663.  A subset of the information maintained on registrants is made available to the public via the Michigan Public Sex Offender Registry (PSOR). M.C.L. § 28.728(2). The SOR database creates the PSOR by coding some information as for law enforcement purposes only. Queries to the PSOR will produce results showing any information that is not restricted. Johnson Dep 82-88, Exh 15.

664. The MSP/SOR unit has established procedures for initial registration, periodic verification, and updating of registration information. A new registrant must

(a) fill out a registration form, and (b) sign and initial the Explanation of Duties form. Johnson Dep 22-24, 53, Exh 15.

665.  Information about a registrant's convictions is obtained from Michigan's state criminal history database, which reflects court records. Registrant photographs are generally obtained from the Secretary of State's database of drivers' license photographs. Johnson Dep 87-88, 170, Exh 15.

666.  Information that changes as result of registrants' ongoing verification and report requirements (*e.g.*, updating address, employment, phone number, email address, etc.) is generally entered directly by local law enforcement via their own office computers. A local law enforcement agency can also mail or fax updated information to the SOR unit in Lansing. Johnson Dep 19, 24-27, 72-73, Exh 15; SOR Manual § 8.3, Exh 83.

667.  Hard copies of registration receipts are supposed to be provided to registrants, so that if a question arises or a computer error occurs, the registrant can prove that he or she reported. Johnson Dep 19, 75, Exh 15.

### E. The Current SOR Data Management System is Being Replaced by a New Data Management System Called OffenderWatch

668.  SORA 2011 required a great deal more registrant information to be maintained in the SOR data management system. The first day the new law took effect the servers crashed, and they continued to crash periodically for months. Due in part to these technological issues the MSP/SOR unit determined that its

current database had limitations that could not be easily overcome with the computer resources available to the state. After visiting other states and researching the matter, the SOR unit decided to lease a dedicated software program called OffenderWatch, which is scheduled to be rolled out in February 2014. Johnson Dep 197-98, 200-03, Exh 15.

669.  OffenderWatch will allow the SOR unit to do everything it does now, but with a more user-friendly interface and with a private vendor providing technical assistance. The cost of implementing OffenderWatch is $2 million, payable over the 5-year life of the initial contract. The annual maintenance and support costs are $360,000 (which are included for the first five years in the initial $2 million). Johnson Dep 202-03, Exh 15; OffenderWatch Contract 34-35, Exh 52.

670. The OffenderWatch system has the capability to track even more information about registrants than is currently collected, including sexual orientation, religion, nationality, marital status, and medical history. Johnson Dep 248-50, Exh 15; OffenderWatch Manual 67-68, 98-99, Exh 50.

### F.  The Cost of Michigan's Sex Offender Registry Is Unknown, But Is in the Millions of Dollars

671.  The cost of operating Michigan's sex offender registry is unknown. Neither the legislature nor the State Police have conducted any study of the cost of setting up and operating the registry. Hawkins Dep 18-19, Exh 19.

672.  Defendants provided varying figures for the budget of the SOR unit. John-

son testified that the SOR unit's annual budget is about $1.2 million, of which $600,000 is for database support and $600,000 is for staff, supplies, and training. However, the SOR unit's fiscal year 2014 budget is almost $1.5 million. Johnson Dep, 283-84, Exh 15; Fiscal Year 2014 SOR Unit Budget, Exh 67.

673.  Since 1997, approximately 2,000 new registrants have been added to Michigan's registry each year, with the exception of 2011-12, when some registrants (such as youth under age 14) were removed due to legislative changes. There were approximately 17,000 registrants in March 1997, and approximately 40,000 registrants in January 2013. Legislative Services Bureau Report on SORA, Exh 92; Total Number On SOR By Year, Exh 53; Mich. Pub. Act. 17-18 (2011).

674.  Because almost three -quarters of all registrants are required to register for life, the registry's cost will likely increase over time as registrants age but remain on the registry. Total Number of Offenders By Tier, Exh 54

675. The SOR Unit budget does not include any of the costs imposed on local law enforcement, the court system, or the Michigan Department of Corrections (for initial registrations). Johnson Dep 284, Exh 15; Fiscal Year 2014 SOR Unit Budget, Exh 67.

676. The SOR Unit budget also does not include the cost of incarcerating registrants who are convicted for failure to comply with SORA 2013's extensive requirements. The estimated daily cost for a prisoner in the Michigan Department

of Corrections is approximately $94 per day. State of Michigan Prison Costs, Exh 90. The average cost of housing an inmate in a Michigan county jail varies from county to county, but is approximately $70 per day. *Regional Jail Feasibility Study* 223, Exh 89.

## XVI.   RETROACTIVE IMPOSITION OF ANNUAL FEES

677.  SORA 2011 increased the one-time registration fee paid by each new registrant by $15 (from $35 to $50). SORA 2013 added a $50 annual fee (capped at $550). Mich. Pub. Act 17, § 5a(6) (2011); M.C.L. § 28.725a (eff. 4/1/14).

678.  An indigent registrant may seek a temporary waiver of the fee by proving his/her indigency to the satisfaction of the local law enforcement agency, sheriff's department, or MSP post. A registrant who is unable to pay must prove indigency to the satisfaction of the law enforcement agency every 90 days. M.C.L. § 28.725b(3); Johnson Dep 276-77, Exh 15.

679.  Because the MSP trains law enforcement agencies that they "may charge an offender with a 90-day misdemeanor for refusing to pay the registration fee … after claiming one instance of indigence," it not clear whether a person can claim indigence for more than 90 days. MSP Official Order 79, 6, Exh 47.

680.  Willful refusal or failure to pay the fees is a misdemeanor, punishable by imprisonment for not more than 90 days. M.C.L. § 28.729(4).

681.  The MSP SOR Unit sought the annual fee provision to help cover budget shortfalls resulting both from the decision to purchase the $2-millon-dollar OffenderWatch system and from declining federal funding. Johnson Dep 201-02, 214-19, Exh 15.

682.  Ms. Johnson estimated that 50-60% of registrants would pay the fee, increasing annual registration fee revenue from $150,000 to $700,000. Johnson Dep 280-83, Exh 15; Senate Fiscal Agency Analysis for Senate Bill 221, Exh 76.

683.  Ms. Johnson was uncertain whether non-payment of the annual fee would trigger M.C.L. §28.729(5), (7), which requires the automatic revocation of parole or probation for any willful violation of SORA. Johnson Dep 279, Exh 15.

Respectfully submitted,

s/ Miriam Aukerman
American Civil Liberties Union
  Fund of Michigan
Attorney for Plaintiffs
1514 Wealthy SE
Grand Rapids, MI 49506
(616) 301-0930
maukerman@aclumich.org (P63165)


s/ Sofia Nelson
s/ Michael Steinberg
s/ Kary Moss
American Civil Liberties Union
  Fund of Michigan
Attorneys for Plaintiffs
2966 Woodward Avenue
Detroit, MI 48201
(313) 578-6814
snelson@aclumich.org (P77960)
msteinberg@aclumich.org (P43085)
kmoss@aclumich.org (P49759)

s/ Paul D. Reingold
Michigan Clinical Law Program
Attorneys for Plaintiffs
363 Legal Research Building
801 Monroe Street
Ann Arbor, MI 48109
(734) 763-4319
pdr@umich.edu (P27594)


s/ William Swor
Attorney for Plaintiffs
645 Griswold Street, Ste. 3060
Detroit, MI 48226
(313) 967-0200
wwswor@wwnet.net (P21215)


Dated: February 20, 2011