# EXHIBIT 1

DEPOSITION TRANSCRIPT OF JOHN DOE #1

## Page 1

```
1              UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF MICHIGAN
2                  SOUTHERN DIVISION
3     - - - - - - - - - - - - - - - -
                                      )
4     JOHN DOES #1-4 and MARY DOE, )
                                      )
5              Plaintiff,  )
                                      )
6       -vs-            )File No.
                        )2:12-cv-11194
7     RICK SNYDER, Governor of the  )JUDGE CLELAND
      State of Michigan, and COL.   )
8     KRISTE ETUE, Director of the )
      Michigan State Police, in    )
9     their official capacities,   )
                                      )
10             Defendants. )
      - - - - - - - - - - - - - - - -
11
12        D E P O S I T I O N
13    of JOHN DOE #1, a Plaintiff called by Defendants, taken
14    before Melinda S. Nardone, Certified Shorthand Reporter
15    and Notary Public, at 2966 Woodward Avenue, Detroit,
16    Michigan, on Friday, November 1, 2013, noticed for the
17    hour of 1:00 p.m.
18
19         HECKAMAN & NARDONE, INC.
             Certified Shorthand Reporters
20             P.O. Box 27603
               Lansing, Michigan  48909
21              (517) 349-0847
               Fax: (517) 244-0805
22            msnardone5@gmail.com
23
24
25
```

## Page 2

```
1     APPEARANCES:
2     AMERICAN CIVIL LIBERTIES UNION OF MICHIGAN
      1514 Wealthy Street, SE, Suite 242
3     Grand Rapids, Michigan  49506
      By
4     MIRIAM AUKERMAN, J.D.
           and
5     AMERICAN CIVIL LIBERTIES UNION OF MICHIGAN
      2966 WOODWARD AVENUE
6     Detroit, Michigan  48201
      By
7     SOFIA NELSON, J.D.
           and
8     MICHIGAN CLINICAL LAW PROGRAM
      363 Legal Building
9     801 Monroe Street
      Ann Arbor, Michigan  48109
10    By
      PAUL D. REINGOLD, J.D.
11
           On behalf of Plaintiffs.
12
      MICHIGAN DEPARTMENT OF ATTORNEY GENERAL
13    Public Employment, Elections & Tort
      P.O. Box 30736
14    Lansing, Michigan  48909
      By
15    ERIK A. GRILL, J.D.
           On behalf of Defendants.
16
17    Also present:  Maria Martinez
                      Julia Henshaw
18
19
20
21
22
23
24
25
```

## Page 3

```
1              EXAMINATION INDEX
2     ATTORNEY'S NAME  EXAMINATION  RE-EXAMINATION
3     BY MR. GRILL:        4          93, 114
4     BY MS. MARTINEZ:    84          104
5     BY MS. AUKERMAN:    108
6
7              *        *        *
8
9              INDEX OF EXHIBITS
10    EXHIBIT                      MARKED
11    Ex #1  Response to first set of interrogatories  47
12
13             *        *        *
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
1              Detroit, Michigan
2              Friday, November 1, 2013
3              1:10 p.m.
4          R E C O R D
5          JOHN DOE #1,
6     having been first duly sworn, testified as follows:
7          EXAMINATION
8     BY MR. GRILL:
9       Q.  Good morning, please state your name for the
10    record?
11      A.  ▮▮▮▮▮▮▮▮▮▮▮▮
12      Q.  My name is Erik Grill, I'm with the Michigan
13    Attorney General's office, I represent the Defendants in
14    this case, which in this case is the State of Michigan.
15      A.  Okay.
16      Q.  I'm going to ask you some questions this
17    afternoon and if you don't understand any of the
18    questions that I'm asking I would just ask that you let
19    me know and I will do my best to rephrase the question
20    or maybe ask it a different way.  If you answer the
21    question I'm going to assume that you heard my question
22    and that you're answering the question that I asked; is
23    that fair?
24      A.  Yes.
25      Q.  If you need a break at any point let me know,
```

Page 5

1  I'll be happy to give you one, but I would ask that if
2  I've asked a question that you answer the question
3  before we take a break.
4  **A. Okay.**
5  Q. Is there any reason at all that your testimony
6  this morning will be anything less than honest and
7  accurate?
8  **A. No.**
9  Q. Are you currently taking any prescription
10 medication or over-the-counter medication that might
11 affect your memory or your state of mind?
12 **A. No.**
13 Q. Are you currently under the influence of any
14 drugs or alcohol?
15 **A. No.**
16 Q. I think probably the best way to start is just
17 going to go through your background a little bit and
18 then we'll narrow in on some of the issues that relate
19 to this case.
20 **A. Yes, sir.**
21 Q. So what's the highest level of education that
22 you've completed?
23 **A. 12th grade.**
24 Q. So high school?
25 **A. High school.**

Page 6

1  Q. Where did you go to high school?
2  **A.** ▮▮▮▮▮▮▮
3  Q. And what year did you graduate?
4  **A. '88, 1988.**
5  Q. What did you do after you graduated from high
6  school?
7  **A. I pursued a job with -- in electronics. I went**
8  **to school for electronics briefly and then I got a job**
9  **with McDonald's.**
10 Q. Where did you go to school for electronics?
11 **A.** ▮▮▮▮▮▮▮
12 Q. What type of electronics work were you pursuing?
13 **A. Small electronics and graphs, drawing of graphs,**
14 **mechanical designs and drawings.**
15 Q. So was it trade education or was it engineering?
16 **A. Trade education.**
17 Q. And you were also working at McDonald's at the
18 same time --
19 **A. Yes.**
20 Q. -- or afterwards?
21 **A. Afterwards.**
22 Q. How far did you get with the education
23 training -- or the electronics training?
24 **A. I'd say about a year.**
25 Q. Why did you stop?

Page 7

1  **A. Living the life of crime.**
2  Q. Well, let's pursue that for a moment. When you
3  say you stopped because you were pursuing a life of
4  crime, what do you mean by that?
5  **A. Well, I felt as though schooling wasn't for me so**
6  **I decided to try to go and sell drugs.**
7  Q. When did you start doing that?
8  **A. '89, '90.**
9  Q. How long did you sell drugs?
10 **A. Six months to about a year.**
11 Q. And why did you stop?
12 **A. I became incarcerated.**
13 Q. And then what year were you in- -- what year did
14 you begin your sentence?
15 **A. I was sentenced in August of '91.**
16 Q. And how long was your sentence?
17 **A. 22 to 40 years.**
18 Q. And I'm gathering at some point after that you
19 were released?
20 **A. Yes, 2009.**
21 Q. 2009.
22 **A. November** ▮▮▮▮▮
23 Q. Parole?
24 **A. Yes, sir.**
25 Q. Were there any other convictions besides that

Page 8

1  one?
2  **A. Well, let's back up to bring clarity to it.**
3  Q. Okay.
4  **A. I sold drugs and then I caught the initial case,**
5  **I committed a crime, armed robbery, which got me to 22**
6  **to 40 years. That's what stopped me from selling drugs.**
7  **When you talk about me and selling drugs, I was selling**
8  **drugs until I caught this case here, the armed robbery**
9  **case.**
10 Q. So your armed robbery case was the one that led
11 to the prison sentence?
12 **A. Yes, sir.**
13 Q. Prior to that there was a six month to a year
14 period of time that you were selling drugs and you were
15 arrested more than once?
16 **A. Yes.**
17 Q. What types of things were you arrested for in
18 that period of time?
19 **A. For the drugs, I got caught selling drugs, I**
20 **received probation and I absconded, went back to selling**
21 **drugs, went to working for McDonald's, and then that's**
22 **when I caught the case, I attempted to rob them.**
23 Q. Just to get the time line in my mind correct.
24 **A. Okay.**
25 Q. You were arrested for selling drugs, you --



Page 9

1    A. In '89.
2    Q. In '89, you absconded from that, went back to
3    selling drugs?
4    A. Uh-huh.
5    Q. And you went back to working at McDonald's?
6    A. Uh-huh.
7    Q. And then while working at McDonald's or after
8    working at McDonald's you committed the armed robbery?
9    A. Right, because the McDonald's was the place of
10   employment and that was also the place of the crime.
11   Q. We'll come back to that in a moment, you know,
12   that's the time line.
13   A. Okay.
14   Q. After your release what have you been doing?
15   A. Working for ███ -- no, I started working for
16   sanitation, ████████. I worked for
17   ████████ for about a year. Six months after I had got
18   paroled I also got a job with ███
19   Q. What type of work were you doing with sanitation?
20   A. Public sanitation, garbage truck is what you
21   call --
22   Q. Garbage collection?
23   A. Yes, garbage collection.
24   Q. How long did you do that before starting with
25   ███

Page 10

1    A. I did that first for six months. Then I got the
2    job with ███ and I was working two jobs, and then
3    eventually I stopped the sanitation.
4    Q. What type of work do you do for ███
5    A. Vocational services.
6    Q. What does ███ stand for?
7    A. ███
8    Q. And what is incorporated within ████████
9    ███
10   A. Well, the department that I work in deals with
11   those who have -- it's called the supportive employment
12   program and deals with those who have mental and
13   physical disabilities. We take them out on the job site
14   to help them to conduct a job or do a job like a normal
15   person would.
16   Q. And you've been doing that now for how many
17   years?
18   A. Four, four or five.
19   Q. All right. Well, how many places have you lived
20   since you were released from prison?
21   A. Two.
22   Q. And where were those?
23   A. ████████ and in ███
24   Q. How long did you live in ███
25   A. Two years.

Page 11

1    Q. And the remainder of the time you've been living
2    in ███
3    A. Yes.
4    Q. Before we move off of your education, you
5    graduated high school, can I safely assume that you read
6    and understand English?
7    A. That I do what now?
8    Q. Read and understand English?
9    A. Yes.
10   Q. You're literate; you read, you can write?
11   A. Yes.
12   Q. Do you have any learning disabilities that
13   interfere with your ability -- your cognitive function
14   or anything like that?
15   A. No.
16   Q. Why don't we talk now a little bit about the
17   details of the offense that led to your incarceration
18   and your subsequent registration. Probably the easiest
19   way to do that would be could you please describe for me
20   in your own words the crime?
21   A. Well, December 22nd me and three friends, one
22   cousin of mine, two of us was ex-employees of
23   McDonald's, we decided to go and rob them. Upon getting
24   there we seen the manager and her son leaving. I
25   approached them, ordered them back into the store, open

Page 12

1    up the safe. They were not compliant. I struck one of
2    them and I threatened the other one that I would lock
3    him in a cooler if he didn't open the safe. They ran up
4    out of there and I was arrested.
5    Q. How did you order them back into the McDonald's?
6    A. I had a gun and I grabbed the manager and I told
7    her make it a robbery and not a murder. And we went
8    back into the store, I directed them to the safe, told
9    them to open the safe. And she was, you know, not
10   compliant and that's when I struck her and then I kicked
11   ███ I think his name -- and I told him to open
12   up the safe and if he didn't open up the safe that I was
13   going to lock him in the cooler. And while I was
14   proceeding to go into the safe they ran out of the
15   building.
16   Q. The manager, was that a male or a female?
17   A. She was a female.
18   Q. And she had with her son?
19   A. Yes.
20   Q. How old was her son at the time?
21   A. 14.
22   Q. Was he an employee there or did he just happen to
23   be there with her?
24   A. I don't know -- he used to just come there and
25   work as a young person, you know, with his mom, but he

Page 13

1 **wasn't per se an employee, I don't believe.  I don't**
2 **know.**
3    Q.  And so you approached them as they were leaving
4 the McDonald's?
5    **A.  Uh-huh.**
6    Q.  You had a gun?
7    **A.  Uh-huh.**
8    Q.  And what specifically did you say, the first
9 thing you said to her to get them to go back into the
10 McDonald's?
11    **A.  Make it a robbery, not a murder.**
12    Q.  That was the first thing, that wasn't in response
13 to some resistance or an effort to run or anything like
14 that?
15    **A.  Exactly.**
16    Q.  Then they went back into the McDonald's with you?
17    **A.  Yes.**
18    Q.  And you said this was with you and other
19 individuals; were they with you at the time?
20    **A.  No, they remained in the car.**
21    Q.  And so you went into the McDonald's?
22    **A.  Uh-huh.  Yes.**
23    Q.  Once you're in the McDonald's you told her to
24 open up the safe?
25    **A.  Yes.**

Page 14

1    Q.  What did she do then specifically?
2    **A.  I don't know the combination.**
3    Q.  She said she didn't know the combination?
4    **A.  Right.**
5    Q.  And how did you respond to that?
6    **A.  You're lying, you know the combination, open the**
7 **combination -- open up the safe.**
8    Q.  And what did she do then?
9    **A.  She kept saying she didn't and then I struck her.**
10    Q.  You struck her with the gun?
11    **A.  No, with my hand.**
12    Q.  Where did you strike her?
13    **A.  On the side of her head.**
14    Q.  Did she fall?
15    **A.  No.**
16    Q.  What did she do then?
17    **A.  Opened up the safe.**
18    Q.  So she did know the combination?
19    **A.  Yes.**
20    Q.  Once she opened the safe what happened next?
21    **A.  I told her to open up another one.  There was**
22 **two.**
23    Q.  There were two safes?
24    **A.  Yes.**
25    Q.  And what did she say then?

Page 15

1    **A.  She did not know the combination -- no, and then**
2 **she proceeded to open that one and that's when I had**
3 **told ███ to open it up, help her open it up.**
4    Q.  I'm not sure I understand that part of it.
5    **A.  Okay.**
6    Q.  So they open up the first safe.
7    **A.  Uh-huh, one at the top, one at the bottom.**
8    Q.  There's two safes, one in -- stacked on top of
9 each other?
10    **A.  Right.**
11    Q.  So they open the top one?
12    **A.  Uh-huh.**
13    Q.  Was there money inside?
14    **A.  Yes.**
15    Q.  And then there's a safe right below it?
16    **A.  Yes.**
17    Q.  And in both circumstances for both safes you had
18 asked her to open them up?
19    **A.  Uh-huh.**
20    Q.  And she said she didn't know the combination?
21    **A.  Right.**
22    Q.  So I don't know the combination for the top safe,
23 and then open up the bottom safe, I don't know the
24 combination for that one either?
25    **A.  Right.**

Page 16

1    Q.  When she said that she doesn't know the
2 combination for the bottom safe, what happens then?
3    **A.  That's when I threaten her again.**
4    Q.  How did you threaten her?
5    **A.  I told her I'm going to strike you again, open**
6 **the damn safe, and she opened the safe.**
7    Q.  And so she opens up the bottom safe?
8    **A.  Uh-huh.**
9    Q.  Takes the money out?
10    **A.  She just breaks the combination.  She didn't open**
11 **it all the way, and then that's when I instructed her**
12 **son to do so and he didn't want to and then that's when**
13 **I threatened to lock him in the cooler.**
14    Q.  So she entered the combination of the bottom safe
15 but didn't open the door?
16    **A.  Exactly.**
17    Q.  And then you ordered the son to open the door?
18    **A.  Yes.**
19    Q.  But he didn't want to?
20    **A.  Right.**
21    Q.  What specifically did you say to him to make him
22 open up the safe door?
23    **A.  You'd better open that up or I'm going to put you**
24 **in the cooler.**
25    Q.  The cooler where they keep the food?

Page 17

1    **A. Yeah.**
2    Q. And then what did he do then?
3    **A. He opened up -- he attempted to open up the safe**
4  **and I turned to grab a bag and they ran out.**
5    Q. Did you point the gun at -- ▮ was his name?
6    **A. Yes. No.**
7    Q. Why don't we clean that up for the record because
8  I think there were two questions there.
9    **A. Okay.**
10   Q. His name was ▮
11   **A. Her name was ▮ his name was ▮ if I can**
12  **recall.**
13   Q. That's fine. And this is not going to be the
14  part that I'm going to later on say you said his name
15  was ▮ and it turned out his name was ▮
16   **A. Okay.**
17   Q. That's not the point here, I just want to make
18  sure I've got the players right in my mind. Did you at
19  any point the gun at ▮
20   **A. I can't recall. I think I did initially and then**
21  **upon the threat I may have, but....**
22   Q. The threat to say I'm going to put you in the
23  cooler?
24   **A. Yeah.**
25   Q. At any point did you strike ▮

Page 18

1    **A. Yes, I kicked him.**
2    Q. Where did that part come in?
3    **A. Before he started to help bring the money out.**
4    Q. Of the bottom safe?
5    **A. Of the bottom safe.**
6    Q. At what part in the process did you kick him and
7  why?
8    **A. Because he wasn't compliant when I had told him**
9  **to open the safe and get the stuff out, if not I was**
10  **going to lock him in the cooler.**
11   Q. And so at some point while you're saying that and
12  telling that to him you kick him?
13   **A. Yes.**
14   Q. What kind of kick was it?
15   **A. Just a kick on like on his leg.**
16   Q. That was the next question, what part of the body
17  did you kick him on?
18   **A. On his leg.**
19   Q. Like the thigh area, the shin?
20   **A. Hamstring.**
21   Q. Kind of like the back part or the bottom part of
22  the leg?
23   **A. Yeah.**
24   Q. And so after you kick him he opens up the bottom
25  safe?

Page 19

1    **A. (Nodding head up and down.)**
2    Q. Takes the money out, you turn to grab a bag, and
3  while you're grabbing the bag the two of them ran?
4    **A. No, the bag burst actually.**
5    Q. Okay, tell me about that.
6    **A. And that's what made me grab the bag.**
7    Q. Okay.
8    **A. So while he was taking the stuff out of there the**
9  **bag burst.**
10   Q. Was it a plastic bag, canvas bag?
11   **A. It was a plastic, like a garbage bag.**
12   Q. So --
13   **A. And I proceeded to grab another bag and when I**
14  **did that they ran out of the building.**
15   Q. Was this a bag you'd brought with you or after
16  they --
17   **A. No, it was there.**
18   Q. It was there?
19   **A. Yeah.**
20   Q. So you -- at what point between the time that you
21  brought them into the McDonald's and the safe door
22  opened up did you grab the bag?
23   **A. After she opened the first safe.**
24   Q. After she opened the first safe, so then -- okay,
25  grabbed the Glad bag, the garbage bag, filled with

Page 20

1  money from the first part of the safe, and then as
2  they're filling it with the money from the bottom safe,
3  that's when the bag burst?
4    **A. Uh-huh.**
5    Q. I gather from the weight or the bulkiness of it
6  or whatever?
7    **A. Uh-huh.**
8    Q. Where were the bags in relation to the safe?
9    **A. I can't recall specifically but it was right**
10  **there in the kitchen area.**
11   Q. So that you had turned your back on the two of
12  them --
13   **A. Uh-huh.**
14   Q. -- to get a bag?
15   **A. (Nodding head up and down.)**
16   Q. Approximately how far away were the bags from the
17  safe area?
18   **A. From me to her.**
19   Q. Let the record reflect that looks to be about
20  five feet?
21   **A. (Nodding head up and down.)**
22   Q. So you turn and grab the bag. They leave through
23  the front door, the side door?
24   **A. The door we came in, the side door.**
25   Q. The side door. Did you pursue them?

Page 21

1    A. Yes.
2    Q. How far did you pursue them?
3    A. I just looked out the door over the counter and
4    noticed that officers was out there.
5    Q. The police had already arrived?
6    A. Yes.
7    Q. So in the sequence of events they open up the
8    bottom safe, they are filling it with the money, the bag
9    breaks, you turn to get another bag, they leave out the
10   door, you turn to follow them, and as you're following
11   them through -- you know, toward the door, is that the
12   side door, that's when you notice the police?
13   A. Yes.
14   Q. What happens next?
15   A. They send in the K-9 dog to retrieve me.
16   Q. After you first see the police -- did you get all
17   the way out of the McDonald's?
18   A. No, sir.
19   Q. So while you're getting out the door you look
20   through the window and you see the police are there?
21   A. Uh-huh.
22   Q. What do you do in response to that?
23   A. I went and opened the back door.
24   Q. The back part of the store?
25   A. Yeah.

Page 22

1    Q. What did you see there?
2    A. Officers.
3    Q. So there were officers at the side and then there
4    were officers in the back?
5    A. (Nodding head up and down.)
6    Q. What did you do then?
7    A. Closed the door.
8    Q. Then what happened?
9    A. I went into the cellar.
10   Q. There was actually a basement area?
11   A. Yes.
12   Q. And what did you do in the cellar?
13   A. I called myself hiding.
14   Q. You tried to hide, right?
15   A. I tried to hide.  You can't run so you have to
16   hide.
17   Q. How long were you in the cellar, do you think?
18   A. About an hour.
19   Q. And at some point while you were hiding the
20   police sent a K-9 unit in?
21   A. (Nodding head up and down.)
22   Q. The dog, I guess, tracked you?
23   A. Ruff pulled me out.
24   Q. The dog found you?
25   A. The dog found me, yes.

Page 23

1    Q. The dog comes in.  Did the dog bite you at all or
2    did he bark at you?
3    A. Yes.  Would you like for me to put it on the
4    record, I'll show you what he did.  No, he grabbed my
5    leg, he grabbed my leg and pulled me from up under a
6    shelf area that I was hiding under.  And at that time
7    the officers were right there.
8    Q. And then they arrested you?
9    A. Yes.
10   Q. Put you in the car and took you to jail?
11   A. The last time I saw the streets for 20 years.
12   Q. So as a consequence of that day what crimes were
13   you charged with, if you recall?
14   A. I was charged with 11 felony counts.  Armed
15   robbery, felonious assault, felony firearm, and
16   kidnapping.
17   Q. Okay.  And did you plead guilty or did you go to
18   trial?
19   A. I pled guilty.  No contest to one and pled guilty
20   to the others.
21   Q. All of the charges in exchange for what, what
22   were the --
23   A. Nothing.
24   Q. There was no consideration for sentencing or
25   anything like that?

Page 24

1    A. Nothing.
2    Q. If you don't mind my asking why did you take that
3    particular agreement?
4    A. I didn't know any better.  I had confidence in my
5    attorney at the time.  And also, in addition, I was
6    threatened with life sentences.
7    Q. Okay.  So the original charge had a potential for
8    a life sentence?
9    A. Yes.
10   Q. The actual sentence you received was 22 to 40
11   years?
12   A. A life sen- -- yes.
13   Q. Would it comport with your memory if the charge
14   that you pled no contest to was the kidnapping?
15   A. Yes.
16   Q. Other than the kick to the back of the leg, did
17   you have any physical contact with the 14 year old son
18   of the manager?
19   A. Just push.
20   Q. What part of his body did you push?
21   A. His shoulder.
22   Q. What correctional facility did you serve your
23   time in?
24   A. 18 to be exact, do you want the name of all of
25   them?  Not being sarcastic, not being smart, but 18 of

Page 25

1   them.

2   Q.  No, no, that's fine.  18 different ones?

3   A.  Yes.

4   Q.  It's a pretty good sampling of the Michigan

5   Department of Corrections' system.

6   A.  As I say, I traveled the State of Michigan at the

7   expense of the MDOC.

8   Q.  Some of the more scenic parts of the state, I'm

9   sure.

10   A.  Very beautiful up north, under the circumstances.

11   Q.  Under the circumstances, right.  Were

12   there -- while incarcerated did you have any tickets or

13   violations?

14   A.  Yes, one.

15   Q.  One of them.  What was it for?

16   A.  Out of place.

17   Q.  What were the circumstances for that ticket?

18   A.  You're required to have your ID on you at all

19   times, and being that I was in level four, wherever

20   you go you had to present ID.  And this one occasion I

21   did not have my ID so the officer wrote what is known as

22   a ticket.

23   Q.  Right.  So out of place, it wasn't that you were

24   someplace you weren't supposed to be, it was that you

25   were someplace without your ID?

Page 26

1   A.  Yes, sir.

2   Q.  What penalty was associated with that ticket, if

3   you remember?

4   A.  LOP, I think it was loss of privileges.  Loss of

5   privileges.

6   Q.  No time added to your sentence or anything like

7   that?

8   A.  No, because I was also charged as a second degree

9   habitual because of the drug case that I absconded from,

10   so I was on the run when I committed the crime so he

11   supplemented it with the second degree habitual, which

12   does not allow me any good time.  So the prison term I

13   had to do calendar for calendar, day for day.

14   Q.  Okay, that makes sense.  So your sentence was 22

15   to 40 years?

16   A.  20 to 40 years, plus two for the gun.

17   Q.  And how much time did you actually serve?

18   A.  19 years, ten months, and I think 11 days,

19   something around that area.

20   Q.  While you were in prison did you undergo any

21   treatment programs of any kind?

22   A.  Treatment for?

23   Q.  Psychological, emotional.

24   A.  No.  Upon my release I had to take the assaultive

25   offenders class.

Page 27

1   Q.  Tell me about that, what's involved in that

2   class?

3   A.  The greatest thing they could have ever offered

4   me or anyone in MDOC.

5   Q.  Okay, why is that?

6   A.  Because it allowed like a forum like this here

7   with a psychologist, if you would, and he was able to

8   get us to see how our thinking caused us to do certain

9   things and how environment, how our upbringing, and how

10   other elements helped to shape our thinking and us doing

11   what we did and understanding why we did what we did.

12   Bottom line, as I always say, it gave me a greater sense

13   of empathy.  I was able to go to the other side, you

14   know, and that was real moving for me, it actually

15   changed my life.  One of the things that changed my

16   life.

17   Q.  It was a significant moment in your life?

18   A.  Very significant.

19   Q.  And that was a class that was part of the terms

20   of your release at the end of your sentence?

21   A.  Yes.

22   Q.  During the prior 19 years what -- I guess was

23   there any type of similar evolution or thinking while

24   you were in prison or how did you think about your crime

25   while you were serving the majority of your time?

Page 28

1   A.  Well, as far as treatment there was none that I

2   involved myself in.  I involved myself in volunteer

3   programs.  Being that I knew how to read and write I

4   assisted in a tutoring program to help other guys read

5   and write.  I stayed in the law library a great deal.  I

6   became involved with an organization known as the

7   National Lifers, I became the vice-president there.  I

8   joined an organization called the Chance for Life.  I

9   frequented all the religious organizations, and I just

10   remained active physically.  Oh, and I worked in the

11   kitchen for the majority of my incarceration.  As far as

12   significant things happening that was moving to me --

13   can I share?  It's personal about me and my mom.

14   MS. AUKERMAN:  Yes.

15   THE WITNESS:  I first went to ▇▇▇▇ for

16   quarantine, then they sent me to what was known as MR,

17   the Michigan Reformatory.  They was opening up a new

18   facility known as ▇▇▇ in ▇▇▇▇ so they had to

19   review everybody's file.  And they selected me and about

20   100 other guys to go to ▇▇▇.  And while in

21   being I'm in ▇▇▇ I asked my family to come see me.

22   My family, of course, poor, didn't have transportation

23   and there was a conversation me and my mom had and she

24   says you always calling needing something like money,

25   she says, you know, you realize you have -- I had a

Page 29

1   daughter that my mom raised, and I had two other
2   siblings.
3        And she told me that I need to realize what
4   I was doing by asking her to come 300 miles to see her.
5   At that time I realized that I hurt my family because
6   I'm her only boy and her oldest and she looked at me for
7   a great deal of things.  And at that time that's when I
8   decided this isn't -- I want to make her genuinely proud
9   of me so I started changing my life at that point.
10  BY MR. GRILL:
11  Q.  Approximately what year would that have been?
12  A.  '92.
13  Q.  So about -- if I've got the math right about five
14  years in?
15  A.  No, sir, about two.
16  Q.  About two years in, okay.  Right, I'm sorry.
17  Tell me, before -- while I'm thinking about it let me
18  ask you this, during the time that you were selling
19  drugs were you also using drugs at that time?
20  A.  No.
21  Q.  At any point in your life did you ever use drugs?
22  A.  I smoked marijuana.
23  Q.  What kind of drugs were you selling?
24  A.  Cocaine.
25  Q.  Any other?

Page 30

1   A.  No.
2   Q.  Tell me, what is -- you mentioned two
3   organizations that you joined while you were in prison,
4   one was the National Lifers?
5   A.  Uh-huh.
6   Q.  What is that organization about?
7   A.  It's a nonprofit organization that helped guys to
8   litigate their cases pro per.  And we also involve
9   ourself with volunteer work to help other individuals
10  understand the law.  And we was doing some outreach, you
11  know, selecting like a church and homeless shelter,
12  which was very -- a big thing for us.  And we gathered
13  the prisoners in the membership and we gathered funds to
14  send to them and throughout the year we host a
15  particular shelter or group, I don't know what would be
16  a name for it, but basically that was it, it was an
17  advocacy group to help prisoners to understand the law
18  and at the same time to contribute back to the
19  community.
20  Q.  What types of legal issues would you help
21  prisoners confront?
22  A.  Being that we're not lawyers we would help
23  maneuver them through understanding like the law
24  library, for instance.  You know, a guy may not know how
25  to shepardize a case, so we would lead them that way

Page 31

1   being that there was a change of law and many guys were
2   studying the law, they were familiar with how to file
3   motions and things of that nature.
4   Q.  Would this be in relation to like criminal
5   appeals or civil law?
6   A.  Both, but mostly criminal because being in prison
7   they are mostly guys that was -- you know.
8   Q.  Wanted to get out?
9   A.  Including myself.
10  Q.  Yeah, it makes sense.  And then there was another
11  organization mentioned called the Chance for Life; what
12  was that organization about?
13  A.  Chance for Life is an organization that their
14  motto is be transformed by the renewal of your mind.  We
15  had an objective to change the attitude and behavior and
16  activity of the prisoner.  So we committed ourselves to
17  selecting a number of guys who were determined to change
18  the prison environment, such as stop catching tickets,
19  the stabbings and the fightings and things of that
20  nature.  So we would allow them to come in and be a part
21  of the organization, of the group, and in turn our
22  outside representative, he would come in and we would
23  have transformation ceremonies in which you would
24  receive a certificate and things of that nature.  So we
25  were just really geared with changing the environment of

Page 32

1   the prison.
2   Q.  What kind of changes in the environment were you
3   looking for?  I mean, aside from reducing the amount of
4   violence, was there any specific environmental change
5   that you were looking for?
6   A.  Yes, the mind set.  We knew that the majority of
7   guys would eventually go home and they would go back
8   into a community.  We wanted to try to teach them and
9   share with them the importance of responsibility, you
10  know, being responsible.  Once you grow old, like many
11  of us did in prison, you know, I had a young -- my
12  daughters, they grew up while I was in prison and to see
13  them grow up from behind bars, that changes you, you
14  know, you have to look at things totally different.  And
15  we were, you know, determined to do that.  And it wasn't
16  just for the sake of getting out of prison because most
17  of us either had a life and some of us were going home
18  one day, you know, so we just decided that this is what
19  we want to do in accordance to the introduction because
20  it was something that was introduced to us by an outside
21  representative.
22  Q.  What type of outside representative are you
23  talking about?
24  A.  A business owner.  I don't know whether or not I
25  should put this on the record, he's quite involved with

Page 33

1    the MDOC, he runs a company downtown, a for profit, but
2    his non-profit sector deals with prisoner re-entry,
3    helping guys inside.
4        Q.  I don't necessarily think it's particularly
5    relevant to this case so I'm not going to dwell on that.
6        A.  Okay.
7        Q.  But I just wanted to know -- it was a vague term,
8    I just wanted to have a little better idea of who you
9    were talking about.
10       A.  Okay, that's no problem.
11       Q.  So about two years into your sentence you had a
12   conversation with your mom that -- or your mother that
13   led you to have certain realizations, and then as a
14   consequence of that you then began pursuing ways to make
15   changes, and that would include your Chance for Life and
16   the National Lifers; is that --
17       A.  That led me to that, yes.
18       Q.  And so when you -- when the time came that you
19   were actually released and you had the treatment
20   program, which I forget, what was the thing that you
21   called it?
22       A.  The assaultive offender.
23       Q.  The assaultive offender program.  How did that
24   fit in with the work you had already been doing while
25   you were incarcerated?

Page 34

1        A.  I would say it was more, what's the word, it went
2    more inside, it was more eso- -- it allowed me to
3    actually be able to understand.  I was able to have an
4    understanding, you know, just being involved in
5    something and to get to that point knowing that you're
6    about to go into a whole new world, a whole new sphere
7    of activities, you know, that somewhat culminated
8    everything, that somewhat gave me an understanding as to
9    what it was I was going to do coming home and a better
10   perspective on violent crimes.
11       Q.  Would it be fair for me to say that you, by that
12   point, already decided that you weren't going to do any
13   more violent crimes?
14       A.  Oh, yes.
15       Q.  What type of -- more specifically, what type of
16   understanding did you arrive at, what decisions did
17   you -- are you describing about the direction you were
18   going to go in?
19       A.  To challenge the criminal mind.
20       Q.  What do you mean by that?
21       A.  Meaning, as I shared with the attorneys the other
22   day, I'm the type of person that -- I like to challenge
23   stigmas, so to say.  And we know that in coming from
24   where I grew up in a black community, you know, you
25   don't have too many responsible people.  So I wanted to

Page 35

1    change this picture of black men, young and old, that
2    like to females I'm not a dog, you know, some people say
3    all men are dogs.  How do you know that, you never met
4    all men?  I'm not one, you know.  And there was a
5    challenge amongst us inside about getting a job.
6        I was of the belief it's not hard to get a
7    job, and that's a challenge, and I think that helped
8    tear down, you know, the thought of criminal -- a
9    criminal mind, recidivism and all of those things,
10   coming home, being with family, you know, just the
11   overall umbrella of being responsible.  To me I think
12   that's -- that's a worthy challenge of any man, you
13   know, growing up where you're looked at as though you're
14   not responsible.
15       Q.  You spoke a moment ago about learning empathy or
16   developing a sense of empathy.
17       A.  Uh-huh.
18       Q.  What specifically -- as you look back on your own
19   crime how does that relate to it?
20       A.  Well, I wrote a letter to the prosecuting
21   attorney and asked her to -- or him to give it to the
22   victims, █████ and █████ because being empathetic, that
23   could have been my mom, that could have been my little
24   boy, that could have been me.  And you have a fool like
25   me doing something like that.  So I understood so I put

Page 36

1    myself there and I was seeking forgiveness from that
2    perspective, you know, so I understood.  Like I said, it
3    could have been one of my family members.
4        Q.  Did you keep a copy of the letter that you sent?
5        A.  No.  I probably did but it's probably stored in
6    my foot locker.
7        Q.  Approximately when would you have sent that
8    letter?
9        A.  Ms. Granholm was the governor.
10       Q.  Okay.  So some time between -- some time after
11   2002?
12       A.  Yes, I was in █████ I was up north, a stone's
13   throw away from Wisconsin.
14       Q.  So you were still incarcerated at the time you
15   sent the letter?
16       A.  Yes, yes, between '95 and 2,000, it was in that
17   time period.
18       Q.  Just so that I understand, the assaultive
19   offender program, were you still incarcerated at the
20   time or was that already after you were released?
21       A.  No, that was a prerequisite to release.
22       Q.  So something they make you do before they let you
23   out?
24       A.  Yes, sir.
25       Q.  Okay.  So that's while you were in █████ at the

Page 37

1  time?
2  **A. No, I was in** ████████ **when I sent the letter.**
3  Q. Where was the assaultive offender program?
4  **A. In** ████████ **in** ████████
5  Q. And did you go to ████████ after ████████
6  **A. No, before.**
7  Q. So the letter wasn't in response to the
8  assaultive offender program?
9  **A. No, that's something I did way before the**
10 **assaultive offender's program.**
11 Q. So the letter would have been written some point
12 after 2002 but before you started the assaultive
13 offender program?
14 **A. Yes.**
15 Q. Which would have been some months before your
16 release?
17 **A. No, some years before I was released.**
18 Q. The assaultive offender --
19 **A. The letter was written some years before I was**
20 **released.**
21 Q. The letter was. How long prior to your release
22 did you take part in the assaultive offender program?
23 **A. Repeat the question.**
24 Q. How soon -- in what -- how much time elapsed
25 between the assaultive offender program and your

Page 38

1  release?
2  **A. I'd say a year. Nine months I believe, roughly.**
3  Q. Roughly less than a year prior to your release?
4  **A. Right.**
5  Q. And then the letter was some years before that?
6  **A. Yes.**
7  Q. What made you write the letter?
8  **A. Again, being so far away I -- you know, I had**
9  **come to realize that how can I consciously come home?**
10 **That was a form of closure to me, to apologize. So I**
11 **just felt the need to apologize and that's the way I**
12 **chose to do it. I know I couldn't contact them direct,**
13 **so that's how I chose to do it.**
14 Q. Do you have any knowledge of whether or not the
15 prosecutor forwarded the letter on to the victims or --
16 **A. I believe, I believe they did get it.**
17 Q. Okay. What makes you -- what leads you to
18 believe that?
19 **A. Well, I know of them because I worked at the**
20 **place, and they knew of someone who probably knew of**
21 **someone, but I just got a feeling that they did get it.**
22 **I don't know -- I don't have no actual fact that they**
23 **received it.**
24 Q. You've never had any further contact with them
25 after your release or anything like that?

Page 39

1  **A. No, no.**
2  Q. Just to go back to it, the Mc- -- you robbed the
3  McDonald's that you worked at. Was this the manager
4  that you had worked with?
5  **A. Yes, I had worked with her before but not**
6  **directly.**
7  Q. How long did you work with her?
8  **A. What do you mean worked -- she was an employee**
9  **there on a particular shift that I wasn't, so probably**
10 **in passing or something like that. But working directly**
11 **with her, I never worked directly with her.**
12 Q. You worked at the McDonald's at the same time but
13 not directly under her as a supervisor?
14 **A. Exactly.**
15 Q. How long did you work at the same McDonald's
16 together?
17 **A. I would say about six months.**
18 Q. And did you know her prior to that or outside of
19 the McDonald's?
20 **A. No.**
21 Q. And had you met her son prior to the robbery?
22 **A. Just in passing, him being there like coming and**
23 **going.**
24 Q. How many times do you think you've met him or
25 seen him?

Page 40

1  **A. Twice.**
2  Q. In that same six month period of time?
3  **A. Uh-huh.**
4  Q. Had you had any conversations or -- with ████
5  other than -- or is it just maybe hi, you know, passing
6  hello?
7  **A. Yeah, never no conversation.**
8  Q. Let me ask you some questions about your
9  registration.
10 **A. Okay.**
11 Q. When did you first register as a sex offender?
12 **A. About a month -- about a week or so after I had**
13 **been released I was told to report to the** ████ **County**
14 **Sheriff.**
15 Q. And why ████ County?
16 **A. Because that's where my case originates out of**
17 ████ **County and that's where they was going to be**
18 **paroling me to a halfway house, so to say.**
19 Q. And when did you learn that you would have to
20 register?
21 **A. When I was incarcerated, upon release.**
22 Q. So they told you at sentencing?
23 **A. No.**
24 Q. Okay. At the time you were released?
25 **A. At the time I was released.**

Page 41

1    Q.  And just so that we're clear on the record, what
2    year would that have been?
3    **A.  2009.**
4    Q.  2009, okay.  At the time that you
5    registered -- at the time you were told you would have
6    to register were you told why?
7    **A.  Yes.**
8    Q.  What were you told?
9    **A.  Because of me pleading no contest to kidnapping.**
10   Q.  Was it -- were your registration requirements
11   ever explained to you by anyone?
12   **A.  Yes.**
13   Q.  Who would that have been?
14   **A.  Parole agents.**
15   Q.  And what did the parole agents tell you about
16   your registration requirement?
17   **A.  Oh, wow.  We went through it line by line and**
18   **they explained me when to go register, what I was**
19   **allowed to do and not to do, where I was allowed to go**
20   **and not to go, what I had to register, and basically**
21   **that's it.**
22   Q.  I have here in my hand a copy of the responses to
23   the first set of interrogatories, requests for
24   production of documents, and requests to admit.  I'm
25   going to hand you the packet here and direct your

Page 42

1    attention to the page which has a Bates stamp of 20.  I
2    would like you to take a look at page 20 and tell me if
3    this is the sheet that you recall filling out or seeing
4    in 2009 when you were released?
5    **A.  Yes.**
6    Q.  So this is a document entitled the explanation of
7    duties to register as a sex offender?
8    **A.  Okay.**
9    Q.  And are those your initials on each line?
10   **A.  Yes.**
11   Q.  And is that your signature at the bottom of the
12   page?
13   **A.  Yes.**
14   Q.  And so this would have been the sheet that you
15   went line by line through and the parole agents would
16   have told you about the duties and what you had to
17   register?
18   **A.  Yes.**
19   Q.  And then while we're at it on the pages with the
20   stamp of 16 through 19 is another explanation of duties
21   to register as a sex offender, which is dated July 6th
22   of 2011.  Are these also your initials and signature on
23   those pages?
24   **A.  Yes.**
25   Q.  And at the time that you filled out this document

Page 43

1    did the officer go through the sheet with you again?
2    **A.  Yes.**
3    Q.  Did you have any questions in 2009 for the parole
4    agents about any of the paragraphs here on the page
5    marked 20?
6    **A.  Yes.**
7    Q.  What questions did you have?
8    **A.  My initial question was I robbed a McDonald's,**
9    **why do I got to sign up on the register for sexual**
10   **offender?  I was just trying to get an understanding of**
11   **this because it was all new.  However, I just wanted**
12   **some clarity in regards to his time line upon which I**
13   **had to go and register.**
14   Q.  Okay.  And what did they tell you?
15   **A.  He wanted me to register the week of coming in to**
16   **see him.  Although I had 15 days to go and register, he**
17   **wanted me to register prior to coming to see him.  So**
18   **every time I came to see him he wanted me to register,**
19   **so I just had to -- I just wanted some clarity on that**
20   **and my family wanted clarity on that.**
21   Q.  Did you have any other questions?
22   **A.  No.**
23   Q.  And following that initial registration in 2009
24   did you continue to register?
25   **A.  Yes.**

Page 44

1    Q.  And then in 2011 you were given this newer
2    explanation of duties; is that fair?
3    **A.  Yes.**
4    Q.  At the time that you were given the new
5    explanation of duties did you have any questions for the
6    officer?
7    **A.  No.**
8    Q.  Subsequent to that initial occasion in 2011 when
9    you were given this new explanation of duties have you
10   had any questions about the terms of your registration
11   requirements?
12   **A.  Yes.**
13   Q.  Have you sought answers to those questions from
14   any law enforcement officers?
15   **A.  From my parole agent.**
16   Q.  What has your parole agent told you -- let me ask
17   you this, what questions did you have for your parole
18   agent?
19   **A.  It was said that they had a team of officers who**
20   **come, you know, to check and see whether or not you're**
21   **there and the manner upon which they were doing it, you**
22   **know, I had a question about.**
23   Q.  What was your specific question?
24   **A.  Them going to everybody's door pointing me out,**
25   **you know, saying that do you know that this guy is a sex**

Page 45

1  **offender.**
2  Q. When you say going to everyone's door, it would
3  be your specific residence, correct?
4  **A. Yes. I was staying in an apartment complex.**
5  Q. Right. Was it your understanding that they would
6  contact your landlord or what was the source of your
7  concern?
8  **A. Yes, I under- -- well, the source of my concern**
9  **was inciting fear, you know, the way in which they were**
10 **doing it. Mind you, I never have a problem with no one**
11 **doing their job. However, it seemed as though those**
12 **group of officers, whether they was parole agents or**
13 **state police, made it a point, in my opinion, to instill**
14 **fear into the residents.**
15         **And how I know is I was washing my clothes**
16 **in the laundry room and there was one of the tenants who**
17 **was quite liberal and who understood and was sharing**
18 **with me. So I, in turn, asked my parole agent, you**
19 **know, what are the procedures, you know, and if I may,**
20 **you know, why? I'm not presenting no trouble.**
21         **And they said that that group of guys**
22 **usually come out for the trouble making type of**
23 **parolees. And I just had a question along those lines,**
24 **but other than that I didn't have no questions.**
25 Q. And that's been since the 2011 form?

Page 46

1  **A. Yes.**
2  Q. Have you ever asked your parole agent about any
3  of the terms concerning your vehicle usage?
4  **A. No.**
5  Q. Have you ever asked your parole agent any
6  questions about your internet usage?
7  **A. No.**
8  Q. Have you ever asked your parole agent any
9  questions about where you can be in relation to a school
10 building?
11 **A. No. All these things were explained to me so I**
12 **didn't have no further questions.**
13 Q. That's fine. Sometimes I just -- I have to ask
14 questions for --
15 **A. I understand, I understand. And I'm not being**
16 **facetious or sarcastic, I'm just saying I understood**
17 **when they told me, ████████ don't go here; ██████**
18 **don't go there.**
19 Q. And I didn't think you were. You've got the
20 packet there still in front of you.
21 **A. Uh-huh.**
22        MR. GRILL: Why don't we go ahead and mark
23 the whole packet as Exhibit 1. And then that way --
24 there's only going to be the one exhibit. I think I'm
25 going to do it that way rather than several individual

Page 47

1  exhibits since they are all Bates stamped or page
2  numbered.
3         (Whereupon Deposition Exhibit No. 1
4         marked for identification.)
5  BY MR. GRILL:
6  Q. I'd like to direct your attention to page
7  number -- what is page number 11 -- Bates stamped number
8  11 in the packet there in front of you.
9  **A. You say bakes stamp?**
10 Q. Bates, at the bottom of the sheet there's going
11 to be Doe v Snyder and then 0001.
12        MS. NELSON: It's just the numbers. It's
13 the number that comes after the Bates stamp. I don't
14 know why we call it Bates stamping.
15 BY MR. GRILL:
16 Q. So on that page there, this is a printout of your
17 public sex offender registry detail. I would like you
18 to take a minute to read the sheet here and let me know
19 when you're done.
20 **A. Okay.**
21 Q. Is there any information on this sheet here, the
22 printout of your registry entry, that you believe is
23 inaccurate or untruthful?
24 **A. Yes.**
25 Q. What is that, please?

Page 48

1  **A. Address.**
2  Q. The address?
3  **A. Uh-huh.**
4  Q. Which is the street address?
5  **A. Yes. I'm assuming because this is the old one, I**
6  **just most recently had my address updated the last**
7  **registry date.**
8  Q. I think there's actually a sheet for that.
9  **A. Right.**
10 Q. Okay. So the address there, and then on what is
11 page number -- or Bates stamped number 15 there is an
12 address verification receipt, and do you see that?
13 **A. No, that's been changed.**
14 Q. When did you move?
15 **A. October.**
16 Q. Oh, last month?
17 **A. Yes.**
18 Q. That would probably be why this information is
19 not updated.
20 **A. That's why I said it was just recent.**
21 Q. Just recently, okay.
22 **A. Yes.**
23 Q. Is the address shown here on the sheet the
24 accurate address for where you were prior to your move?
25 **A. Yes.**

Page 49

1    Q. Any other information here on the printout of the
2    website that is inaccurate or untrue?
3    A. No.
4    Q. Okay. I'm going to ask you some questions now
5    related to the answers to your interrogatories, all
6    right?
7    A. Okay.
8    Q. In interrogatory number two I asked to explain
9    any reasons for claiming that the registration
10   requirements interfere with your ability to use the
11   internet. Your response to this was that you are afraid
12   to use the internet because you are registered and you
13   don't want to have to go report it in person. Why are
14   you afraid to use the internet?
15   MS. AUKERMAN: Let's give him a minute to
16   read the response.
17   BY MR. GRILL:
18   Q. Okay.
19   A. As stated during the course of this
20   interrogatory -- what do we call this?
21   Q. This is a deposition.
22   A. Deposition.
23   MS. AUKERMAN: But the paperwork, you mean,
24   the interrogatory?
25   THE WITNESS: Interrogatory, yes.

Page 50

1    MS. AUKERMAN: As stated on the
2    interrogatory?
3    THE WITNESS: But this deposition today, I
4    try my best to work hard and accomplish my goal and in
5    so doing I know that there are things I can do and I
6    can't do. I'm not going to involve myself in anything
7    that's going to take me away from that goal.
8    BY MR. GRILL:
9    Q. Okay.
10   A. Being that I've been incarcerated so long, the
11   internet and iPhones and this technology doesn't
12   interest me, it doesn't -- I don't have no desire to do
13   those things. And in so being it's time consuming for
14   me to have to say, well, I want to go and get on the
15   internet for this, however, before I do let me call you
16   or go to the police station and say, hey, you guys, I
17   need to register this information.
18   Q. Okay.
19   A. And I think that just takes out of my time, of me
20   trying to do the things I'm setting out to do, you know.
21   So with that being said I just don't see no need to just
22   be doing that.
23   Q. Now, you do have or you did list here in answer
24   to interrogatory number three two email accounts?
25   A. Uh-huh.

Page 51

1    Q. Have you identified those email accounts on your
2    quarterly registration?
3    A. Not each time, they don't require, as long as I
4    have it listed.
5    Q. But you did once?
6    A. Yes, yes.
7    Q. When you opened the email accounts you registered
8    them?
9    A. Yes.
10   Q. Have you or did you believe it was necessary to
11   register your Chase Bank account, your People's Trust
12   Credit Union account, your Huntington Bank account, or
13   your Blue Cross/Blue Shield account?
14   A. You said where is that now?
15   Q. In answer to interrogatory number three, these
16   are the internet accounts that you've opened or
17   maintained.
18   A. Okay, okay. Now what was your question again,
19   sir?
20   Q. Basically the bank and your Blue Cross account,
21   did you register those?
22   A. No, because I -- they were job related and I just
23   didn't feel the need. I thought it's information they
24   already have because I already let them know where I
25   work and what I do.

Page 52

1    Q. Has any law enforcement officer ever told you
2    that you need to register your bank or Blue Cross
3    accounts?
4    A. No.
5    Q. Similarly for your Pandora account?
6    A. No.
7    Q. Do you use Pandora to interact or communicate
8    with other people?
9    A. No.
10   Q. And similarly has any law enforcement officer
11   ever told you that you need to register your Pandora
12   account?
13   A. No. No, no.
14   Q. That was a no?
15   A. No, no.
16   Q. Are there any internet websites or services that
17   you would be interested in using that you do not
18   currently?
19   A. Yes.
20   Q. What would those be?
21   A. The Facebook. Primarily just the Facebook.
22   Q. That's the only one you can think of?
23   A. That's -- once this is resolved, that I would.
24   Q. Can you think of any others?
25   A. Kickstarter.com.

Page 53

1  Q. You would like to open a Kick Starter page?

2  **A. Yeah.**

3  Q. To start a business?

4  **A. Right.**

5  Q. What kind of business?

6  **A. In recycling and removal of plastic preferably.**

7  Q. Any others?

8  **A. No.**

9  Q. If the chief concern that you have in opening up

10  an internet account is the time, would it be possible

11  for you to open a Facebook account or Kick Starter

12  account close in time to your quarterly registration and

13  make it all part of one stop?

14  **A. One more time.**

15  Q. You register quarterly, correct?

16  **A. Uh-huh.**

17  Q. And during a quarterly registration you could

18  register any internet identifiers that you have?

19  **A. Uh-huh.**

20  Q. So wouldn't it be possible to open a Facebook

21  account or a Kick Starter page around the time that your

22  quarterly registration comes up and make it part of your

23  quarterly registration?

24  **A. Yes, but that's just -- it's too complicating.**

25  **Me, my mind set, I want to get in because I'm taking off**

Page 54

1  **from work already to go and register.  And for me to**

2  **have to sit there and submit all of these things, that**

3  **to me is not priority, it's not important to stop me**

4  **from getting back to work, you know, or spending time**

5  **with my family or subjecting me to any other unnecessary**

6  **scrutinies, I don't even give no thought to it, you**

7  **know.  Other than my vehicle, if my vehicle breaks down**

8  **and I need another vehicle, I have caught the bus**

9  **before, but that's just -- it's complicated.  I don't**

10  **feel the need to have to go there because it just**

11  **interferes with me trying to stay on a straight path,**

12  **you know.**

13  Q. Is it your understanding that you are prohibited

14  from opening a Facebook account or a Kick Starter page

15  or anything like that as a term of your sex offender

16  registration?

17  **A. Yes.**

18  Q. Is it part of the actual statute that says that a

19  sex offender can't have a Facebook page?

20  **A. No.  I don't know, you know.  I'm not aware.  And**

21  **here again, when they told me internet, you're**

22  **prohibited from dealing with that, all that is up under**

23  **the umbrella so I don't even bother any of it, because,**

24  **again, I want to be free.**

25  Q. Well, and that's kind of what I'm getting at is

Page 55

1  when the explanation of duties was -- you know, when

2  they went over it with you, was it your understanding

3  that you had to provide your identifying information,

4  your account names, or was it explained to you that you

5  just can't have one of these accounts?

6  **A. Oh, I can't recall.**

7  Q. If we were to turn back to page 16.

8  **A. Uh-huh.**

9  Q. This is the most recent explanation of duties,

10  paragraph four, and that's got your initials next to it.

11  **A. Okay.**

12  Q. And in subsection -- I always have too look for

13  it each time, subsection I, and this is the information

14  that you are required by law to provide and it states

15  all electronic mail or email addresses, instant message

16  addresses assigned to you that you routinely use and all

17  log in names or other identifiers that are used when

18  using email or instant messaging.  And that is the

19  information you're required to provide.

20  **A. Uh-huh.**

21  Q. Is there any part of that that says that you

22  can't have any of those things?

23  **A. Yes.**

24  Q. What part of it says that you can't have it?

25  **A. The log in names, don't you -- I would assume**

Page 56

1  **that you need log in names to do the Facebook.  I do not**

2  **know because I never ventured to try to find out.  So I**

3  **would assume that by being electronic, I would assume**

4  **they talking about the internet log in as well.**

5  Q. Right.  And, again, my question here is just, you

6  know, paragraph four starts out by saying, upon

7  registering as a sex offender I am required by law to

8  provide the following information, and then subsection I

9  talks about this you log in name and email

10  addresses.

11  **A. Right.**

12  Q. But subsection I here and all this, that doesn't

13  say you can't have an email address, it just says that

14  you have to register -- that it needs to be included in

15  your registration, correct?

16  **A. Okay, understood.**

17  Q. So, again, my question is basically is it your

18  under- -- do you understand that you can have an email

19  account, you just have to register it?

20  **A. Yes, sir, I understand that.  But you understand**

21  **why I don't?**

22  Q. I think you said it's the time consuming part of

23  registering.

24  **A. And then having a Facebook, that exposes me more.**

25  Q. How does it expose you more?

Page 57

1    A.  I believe that that's a worldwide web, that's a
2    part of the worldwide web, right?  So the only thing you
3    got to do, from my understanding of it, is hit my name
4    and this ugly monster pops up, this guy is a freak.  Who
5    want to deal with a guy like that?  I don't.
6         And I want to do business, I want to solicit
7    this woman to do business, this young man, this person.
8    In my mind, once I expose myself to that I have to deal
9    with that, that becomes another hurdle for me, unless
10   there's something that you know where I can push a
11   button to erase the ugly man and do business, but I'm
12   aware that I may be able to do this, but I just....
13   Q.  When you say the ugly man, what part -- you know,
14   what is it that you're concerned about there?  I want
15   to -- I think I get what you're saying, but I want to
16   make sure it's clear here.  When you say that you're
17   worried that someone would tap a button and pull it up,
18   what is the specific concern that you have?
19   A.  If I decide to go in business, which I do, I want
20   to use every marketing tool available to me.  And I
21   believe with this mass media Facebook is one of them.  I
22   would be wasting my money and my time to go in there and
23   deal with that knowing that once they discover ███████
24   ███████ is a sex offender, I lose out because I'm not
25   going to be able to become a successful businessman.

Page 58

1    This is how I see it.  So I choose not to even deal with
2    it.
3    Q.  Is what you're saying to me that you believe that
4    on your Facebook page itself it would say sex offender,
5    or is it that you're concerned -- what is the specific
6    nature of your concern there?
7    A.  I don't know.  I don't know.  However, I do know
8    that information about me, the only thing you have to do
9    is type in a name, from my understanding, and all this
10   stuff will jump up, you know.  So even if I did
11   apply for the Facebook and somebody wanted to just
12   Google who is this person, you know, Angie's List, I'm
13   going to be in a different column.  Angie going to tell
14   him don't deal with this guy.  I found him on my
15   Facebook saying I could come and cut her grass.  Angie
16   tells her don't deal with this gentleman.  This is how I
17   see it.
18   Q.  Have you looked into the terms of use for
19   Facebook or Angie's List or any of that?
20   A.  No, no, I'm surrounded -- no, no.
21   Q.  All right.  Have you tried Googling yourself
22   right now today?
23   A.  No.
24   Q.  You wouldn't know what information pops up?
25   A.  Prior to coming -- prior to being released, you

Page 59

1    know, people try to follow you, see when you're coming
2    home.  This is how I found out about all of that.  You
3    know, the internet is such a vast -- it's a worldwide
4    web, you can find out anything about people.  So prior
5    to me coming -- being released I knew that there was
6    accessible to people and I just didn't have no desire to
7    even want to deal with it.
8    Q.  Do you know whether or not sex offender registry
9    pages pop up on a Google search?
10   A.  No, I don't.
11   Q.  Have you tried contacting anyone in the
12   prosecutor's office if you had any questions about the
13   terms of use or what was restricted on the internet?
14   A.  No.  Not the prosecutor's office, no.
15   Q.  Law enforcement office?
16   A.  Only my parole agent.
17   Q.  And what did you ask your parole agent about the
18   internet?
19   A.  I didn't ask him per se specifically.  I was
20   going to learn how to use the computer down here at the
21   public library, they offer free classes, and I asked for
22   permission to go and they asked what was involved and
23   things of that nature.  And they told me what I can and
24   cannot do being that I did not have a sex crime.  At the
25   time I think the law done changed, now I'm a tier three,

Page 60

1    which I really can't do anything.
2         But at that time they said as long as I'm
3    aware of it you can.  So I told her I would like to
4    bring a laptop to her office, and she said I can so I
5    can show her what I needed to do in order for me to have
6    this job.  And she got me through it and that was it.
7    Q.  Why did you need the parole agent's permission to
8    go to the library?
9    A.  Because I didn't know whether or not I'm allowed
10   to go to any of these things and I just wanted to make
11   sure that I was doing the right thing because I did not
12   want to violate.
13   Q.  Did the parole agent indicate to you that you
14   needed to get her permission to go to the library?
15   A.  At the time I had -- it was a gentleman and he
16   said, yeah, I needed to get permission from him.
17   Q.  And was it because of the registry or was there
18   some other term about it?
19   A.  Well, he wasn't the type of parole agent I would
20   want even to go any further.  He said no, I left it at
21   that.
22   Q.  What was the name of your parole agent at the
23   time?
24   A.  I can't think of the guy, he's in ███████    It
25   will come to me during the course of here.

Page 61

1    Q. If you remember at some point as we go forward
2    just let me know.
3    A. Okay.
4    Q. For right now I'll accept to say that you can't
5    put a finger to his name or can't recall.
6    A. Okay.
7    Q. And so the parole agent at the time told you you
8    couldn't go to the library and then at some point later
9    on you wanted to take this class and so you came back to
10   the parole agent and asked?
11   A. Uh-huh.
12   Q. And they told you you could?
13   A. He told me I couldn't.
14   Q. He told you you couldn't?
15   A. He told me I couldn't.
16   Q. Did he give you a reason why? Did he give any
17   further explanation?
18   A. No, and I didn't want one from him.
19   Q. Okay. Are there any -- apart and aside from any
20   part of the sex offender registry, are there terms and
21   conditions on your parole that affect where you can and
22   can't go?
23   A. That was on my parole at the time?
24   Q. Uh-huh.
25   A. Yes.

Page 62

1    Q. Do you recall what those conditions were?
2    A. Yes, I couldn't go and visit -- my mother passed
3    prior to me being released and that's where most of my
4    siblings were and I had young sib- -- relatives. I
5    wasn't allowed to go over there.
6    Q. Why was that?
7    A. Because they was all up under the age of 18 or 14
8    something, 18 I believe it was.
9    Q. And that was --
10   A. I had nieces and nephews that was that age so I
11   wasn't allowed on parole to be with them.
12   Q. And that was a term of your parole?
13   A. (Nodding head up and down.)
14   Q. Were there other terms of your parole that you
15   can recall?
16   A. No.
17   Q. Is it that you can't recall them or that there
18   were no other terms and conditions?
19   A. I can't recall. That was the biggest one for me,
20   you know, so -- and I think all of them was somewhat
21   inter-related so if I can't be around them I just stayed
22   in my apartment for two years straight.
23   MS. NELSON: Do you want a break?
24   THE WITNESS: No, no.
25   MR. GRILL: Okay, I was about to ask.

Page 63

1    THE WITNESS: No.
2    BY MR. GRILL:
3    Q. Is it your understanding that the sex offender
4    registry or your sex offender registration requirements
5    prohibit you from accessing certain parts -- and I say
6    specifically by the language of the law or the language
7    of the requirements that were explained to you, are
8    there specific things in the internet that you are
9    barred from using as a term of the sex offender
10   registration? Do you understand my question or can I --
11   A. Yes, I do. However, as I stated, internet is the
12   internet, I don't have no desire to search it. They say
13   internet, I leave it alone. Like you said, I'm allowed
14   to have the Facebook, I just have to register it. To me
15   that's internet.
16        The reason I didn't even pursue it, because
17   it's internet, not that this person didn't explain it,
18   they explained it, I had a couple people to explain it,
19   but in ▇▇▇▇▇▇ mind I'm going to just leave it alone
20   entirely because I'm still trying to get an
21   understanding as to why I'm even dealing with it, you
22   know, having to deal with this after I robbed a
23   McDonald's. So, again, with all due respect to you I
24   just can't --
25   Q. No, that's fine, I think that's about as much of

Page 64

1    an answer to the question I can expect. Thank you very
2    much. Now, I note from the answers to interrogatories
3    it indicates that you have two children. One is
4    entering the tenth grade and one is two years old.
5    A. I have two adult children. Those were -- those
6    are children from a relationship I'm in now.
7    Q. Okay. So the EM and DH indicated here in your
8    answers to interrogatories are the children through a
9    relationship you have right now?
10   A. Yes.
11   Q. And then you have two adult children that you had
12   before being convicted?
13   A. Yes, sir.
14   Q. Is it fair for me to assume that your adult
15   children are no longer in school?
16   A. Right.
17   Q. The same answer to the interrogatory indicates
18   that EM is the daughter of your fiancee. You are
19   currently engaged to be married?
20   A. Yes.
21   Q. And then is DH also the offspring of your fiancee
22   or is he your son?
23   A. Yes.
24   Q. Or is that the answer to both?
25   A. Yes, both.

Page 65

1    Q. So he is your son through your fiancee?
2    **A. Yes.**
3    Q. Since your son is two years old, has he started
4    school yet?
5    **A. No.**
6    Q. He's got a couple years yet to go?
7    **A. Yes.**
8    Q. Does he live with you?
9    **A. Yes.**
10   Q. And similarly with EM, she shares the house with
11   you and your fiancee?
12   **A. Yes.**
13   Q. As it regards parks or playgrounds, is that the
14   type of thing that you currently do with your son?
15   **A. No.**
16   Q. Is that the type of thing that you want to do
17   with your son?
18   **A. Yes.**
19   Q. Is there a reason why you do not take your son to
20   parks or playgrounds?
21   **A. Because from my understanding it makes me**
22   **non-compliant with the registry.**
23   Q. Have you talked to your parole agent or any law
24   enforcement officer about that issue?
25   **A. No.**

Page 66

1    Q. Have you contacted -- have you asked the
2    prosecutor or contacted the prosecutor's office to
3    inquire as to what is or is not allowed as far as
4    visiting parks or playgrounds?
5    **A. No.**
6    Q. You indicated in answer to interrogatories nine
7    and ten that you do not have knowledge of the parks or
8    playgrounds in the area surrounding your residence.
9    **A. Other than visual, you know, driving past the**
10   **park or whatever.**
11   Q. Do you know, is there a park nearby to where you
12   live?
13   **A. Yes, some distance away.**
14   Q. And I'm not asking for like a specific range, but
15   is it a walkable distance?
16   **A. It can be.**
17   Q. Kind of like at the outer edge of that, it would
18   be a bit of a walk?
19   **A. It's far away, you know. Walking distance to me,**
20   **I can walk two miles, you know.**
21   Q. But it would be a long walk?
22   **A. It's a long walk.**
23       MS. NELSON: Might we take a break now?
24       MR. GRILL: Sure if we need one, why don't
25   we take about five or ten minutes.

Page 67

1    (A recess was taken.)
2    BY MR. GRILL:
3    Q. I think when we left off we were talking about
4    playgrounds and that kind of thing. Just to be clear,
5    you know, do you -- is there a reason that you don't go
6    to playgrounds or parks?
7    **A. Yes.**
8    Q. And what is that reason?
9    **A. I don't understand my responsibility, and more**
10   **importantly I'm just in fear of the consequences of not**
11   **doing the wrong -- not doing what's right and being in**
12   **the right place so I just don't.**
13   Q. Is there a particular part of the explanation of
14   duties sheet that leads to this fear that going to a
15   park may cause you some problems?
16   **A. One more time.**
17   Q. You've got the explanation of duties sheet, which
18   is I think before you, or we've looked at it already a
19   couple times. Is there a particular part of this sheet
20   or what's been explained to you as your duties as a
21   registered sex offender that causes you a concern about
22   parks specifically?
23   **A. Yes, I believe that it's just so they -- on both**
24   **ends I believe from the law enforcement part to me and**
25   **my family trying to understand it all, I just don't want**

Page 68

1    **to subject any of them let alone myself so we just play**
2    **in the driveway. I will go get him a ball, I will get**
3    **him a makeshift little hoop and we just stay in front of**
4    **the house. I'm not going to subject him to that.**
5    Q. Is it your belief or your understanding that all
6    parks and playgrounds are off limits or only those that
7    are adjacent to schools?
8    **A. All.**
9    Q. And what is that based upon, why do you think
10   that?
11   **A. Because it's just a playground. I never was**
12   **told -- or it's just all playgrounds, my belief it's**
13   **just all playgrounds.**
14   Q. Have you asked any law enforcement officer or
15   prosecutor about that?
16   **A. No, not that specific one.**
17   Q. Now, your fiancee's daughter, and I may have
18   already asked this and if I have I apologize, I'm not
19   trying to belabor the point, is she your daughter?
20   **A. No.**
21   Q. Do you plan on adopting her?
22   **A. Yes.**
23   Q. Following the marriage?
24   **A. We haven't gotten to that point yet.**
25   Q. But that's the idea long term?

Page 69

1    A.  Well, because of this, the uncertainties of all
2  of this, and as I say, my fears of subjecting anyone to
3  any of these, any of these stipulations that I clearly
4  don't have an understanding of and that I can't -- and I
5  don't believe that they have an understanding of so I
6  don't want to subject them to it, as I said in the
7  earlier part of this here.
8    Q.  What do you mean by that, what would you be
9  subject -- what would she be subjected to as far as
10  registration?
11    A.  It would be very embarrassing, and here
12  again -- to have to lie just to be in a relationship
13  because people don't understand this stuff.  I can't
14  have no healthy and wholesome relationship with no one,
15  not even family because they don't understand it, I
16  don't understand it, and I'm not going to subject myself
17  to going to prison.
18      An officer -- even if I am right just on the
19  line of an officer questioning me if he was to run my
20  plate because I'm at a stoplight next to a park and I
21  have family or friends with me, that would frighten the
22  hell out of them so I don't even want to subject them to
23  it, you know, and it's hard, very hard.  This is
24  why -- and I told -- I don't know which one I told, one
25  of the reasons why I haven't gotten married because I'm

Page 70

1  in fear of one day losing something that I've grown to
2  love as my family because of this here.  This is a
3  lifelong thing that I have to deal with.  I don't
4  subject them to it period because I don't understand it.
5      And even if I was to come to them I don't
6  think they understand it, and even if you was to give me
7  an understanding it's just still in my mind to have to
8  subject them to it.  And me being sent back to prison or
9  going to jail, that would disrupt my family.
10    Q.  So if I understand your answer correctly, it's
11  not that you think that she would have to register or
12  anything like that, it would be the connection to you?
13    A.  I don't know.
14    Q.  Do you think that she might have to register?
15    A.  I don't know.
16    Q.  Have you -- I'll ask the question, I think you
17  gave me the answer, but just to be clear, have you
18  followed up on that with your parole officer or any law
19  enforcement officer at the time of registration or any
20  prosecuting attorney about whether or not members of
21  your family would have registration requirements?
22    A.  No.
23    Q.  Let me ask the questions, your son is two years
24  old.  He doesn't go to school yet so he doesn't have any
25  teachers yet?

Page 71

1    A.  (Shaking head side to side.)
2    Q.  Would you be willing to speak to his teachers on
3  the telephone?
4    A.  No.
5    Q.  Would you be willing to exchange emails with his
6  teacher?
7    A.  While I'm on this registry?
8    Q.  Yes.
9    A.  No.
10    Q.  Would you be willing to meet with his teacher off
11  of school grounds?
12    A.  No.  For what purpose?
13    Q.  To discuss his education.
14    A.  No.
15    Q.  And that's for all three of those questions, does
16  that change any of your answers about the telephone, the
17  email, or meeting them?
18    A.  No.
19    Q.  Would you have any interest in discussing his
20  education with his teachers?
21    A.  I'd go through his mom.  No.
22    Q.  Is your fiancee's daughter, is her father in her
23  life?
24    A.  Yes.
25    Q.  Does he participate in her upbringing?

Page 72

1    A.  Yes.
2    Q.  I note from your registration sheet that you do
3  register a vehicle, it's a ███████ truck?
4    A.  Yes.
5    Q.  So you're familiar with the registration process,
6  you've done it?
7    A.  Yes.
8    Q.  Do you have any questions or uncertainty about
9  when you have to register a vehicle?
10    A.  No, I just continue to do how I do it while I was
11  on parole.  It's like being on parole and I just
12  continue doing that.
13    Q.  You mentioned to me earlier that while you were
14  in prison you worked with groups that helped prisoners
15  do pro per lawsuits and that kind of thing.  As part of
16  that did you yourself engage in any type of legal
17  research activity while you were in prison?
18    A.  Of my own?
19    Q.  Yes.  Or on behalf of other people.
20    A.  Yes.
21    Q.  So you've got some familiarity with where you can
22  find laws and look up cases and that kind of thing?
23    A.  Yes.
24    Q.  Have you done any of that yourself as it regards
25  the sex offender registry and the requirements that you

Page 73

1  have?

2      A. Yes.

3      Q. What efforts have you done in that regard?

4      A. When I first came out I researched the MCO -- but

5  prior to coming out I filed a motion to a judge because

6  I read in the statute where, from my understanding, that

7  a judge can waive the statute and I was explaining to

8  them, you know, that it should be waived. So as far as

9  the research of the stipulations or the rules in and of

10 itself, I did read them but I did not understand them.

11 I still don't understand them. But that's as far as

12 I've gone as far as researching the law because I'm not

13 a lawyer, I don't understand thoroughly.

14     Q. Just to be clear, the length of research you've

15 done on the law so far relates to --

16     A. A motion that I filed.

17     Q. A motion that you filed to have the judge waive

18 your requirements?

19     A. Right. And along those lines I also read, you

20 know, the stipulations and, you know, whatever the

21 statute.

22     Q. You read the explanation of duties and the

23 statute sections that they cite to you?

24     A. Uh-huh. And as I told them, I didn't understand

25 it. It's in the motion that I filed.

Page 74

1      Q. Now, you have not been arrested since your

2  release for non-compliance with your registration

3  requirements?

4      A. No.

5      Q. Has any officer threatened to arrest you for

6  non-compliance?

7      A. It wasn't a direct threat.

8      Q. Tell me about it.

9      A. We were traveling and we got pulled over, me and

10 my family, and the officer said over the -- her dispatch

11 that we have an SO, and I knew what she was referring

12 to. So she just made us wait and they were having

13 discussions and made us pull over and go through the car

14 and I overheard her kept saying about an SO, an SO.

15     Q. To her radio?

16     A. To her radio and to the other officer.

17     Q. Okay, there were two officers together?

18     A. Right.

19     Q. Where was the stop? Where did it occur? Was

20 it --

21     A. Here in the City of ███████ It was the border.

22 It was like federal officers I guess they were.

23     Q. Okay. And I think I read that in your

24 interrogatories that there was an occasion that you

25 crossed over into Canada.

Page 75

1      A. Right.

2      Q. Crossed the bridge and then came back and in

3  customs there was an issue?

4      A. Exactly. So I overheard them discussing it, you

5  know, and the nature -- okay, and I believe that....

6      Q. Other than her stating SO over the radio and to

7  the other officer, did they say anything to you directly

8  about your --

9      A. No, they didn't have to, it was self evident.

10     Q. Were you arrested that day?

11     A. Yes, I was.

12     Q. And why were you arrested?

13     A. I was arrested because I had an old warrant that

14 they did not clear prior to me being released from

15 prison.

16     Q. And that was from Ohio?

17     A. Right.

18     Q. A 20 year old thing, right?

19     A. Yes.

20     Q. Did that get cleared up?

21     A. Yes.

22     Q. And, of course, it's kind of obvious but just so

23 that we're clear, the warrant wasn't related to your sex

24 offender registration in any way?

25     A. No.

Page 76

1      Q. Have you ever been any place and had a police

2  officer or law enforcement officer of any kind tell you

3  that you weren't allowed to be there and, you know, you

4  have to leave?

5      A. No.

6      Q. I noticed from the documents that you produced,

7  one of the documents was a copy of your driver's

8  license, and you have an enhanced driver's license; is

9  that correct?

10     A. Yes.

11     Q. Why do you have the enhanced driver's license?

12     A. I have a motorcycle. I wanted -- I was going to

13 purchase a motorcycle.

14     Q. And I don't have a motorcycle so I honestly don't

15 know, do you need an enhanced driver's license to --

16     A. Yeah, you have to have it endorsed and all that

17 in order to drive a motorcycle.

18     Q. So it's not the kind of enhanced driver's license

19 about crossing the border that doubles as your

20 citizenship card or anything like that?

21     A. Oh, yes.

22     Q. It is that?

23     A. You have to -- the enhanced driver's license is

24 for when you want to go over there.

25     Q. And you got that only because you were thinking

Pages 73 to 76

Page 77

1   about having a motorcycle?
2   **A. No, I was thinking about traveling.**
3   Q. Okay. Where were you thinking about going?
4   **A. I wanted to go to Niagara Falls and I also wanted**
5   **to go to -- I won a trip, I was given -- offered a trip**
6   **when I first came home to go to Bahamas but I couldn't**
7   **go because of this.**
8   Q. And what about your sex offender registration
9   kept you from leaving?
10  **A. Nothing. Again, not understanding it, I didn't**
11  **want to deal with it, I didn't want my family being**
12  **subjected to it and I was afraid of going back because**
13  **of any violation, being arrested, so....**
14  Q. I note from the documents that were provided you
15  have maintained aliases in the past; are those all
16  related to the days --
17  **A. Yes.**
18  Q. -- when you were selling drugs?
19  **A. Yes.**
20  Q. Do you currently use any of those aliases?
21  **A. No, sir.**
22  Q. Are there any specific words on the explanation
23  of duties sheet, which is on page 16 on the sheet there,
24  that -- like I say, are there any specific words on this
25  explanation of duties to register as a sex offender that

Page 78

1   you are unsure of their meaning?
2   **A. I just don't understand any of it, you know,**
3   **so....**
4   Q. And, like I said, I know we've been through this
5   a lot here and I'm just trying to wrap up a few loose
6   ends.
7   **A. Okay.**
8   Q. Aside from the overall part of it, are there
9   individual words in here that you're unsure of?
10  **A. No.**
11  Q. Are you all right? Are you okay?
12  **A. Yes, yes, yes, yes, still trying to understand it**
13  **all.**
14  Q. All right, fine.
15  **A. That's all, man.**
16  Q. Is it fair to state that your main objection here
17  is that you do not believe that your offense was a
18  sexual offense?
19  **A. My main?**
20  Q. Right.
21  **A. Oh, yes.**
22  Q. How would you, if you were talking to the average
23  person on the street, how would you differentiate the
24  circumstances of your crime from someone else who
25  kidnapped a kid and ran off with them?

Page 79

1   **A. There's no evidence of me doing so. I was**
2   **railroaded, with all due respect, not being funny,**
3   **though.**
4   Q. It wasn't my prosecution, so you're not hurting
5   my feelings.
6   **A. But you understand, though, right?**
7   Q. Right. Now, you are a parent, you have children?
8   **A. (Nodding head up and down.)**
9   Q. Do you believe that there should be a sex
10  offender registry for sex offenders? Like if there --
11  **A. My children?**
12  Q. No, no, no, no, no, no, let me rephrase this
13  because I really don't want to -- no, let me try that
14  question again. If there could be a sex offender
15  registry that didn't have you on it, do you think that a
16  sex offender registry should exist?
17  **A. That didn't have me on it?**
18  Q. Right.
19  **A. I don't understand your question. I just look --**
20  **I'm not the sharpest knife in the book.**
21  Q. I will try again.
22  **A. Come on.**
23  Q. This is a hypothetical question.
24  **A. Okay.**
25  Q. All right. Let's assume for the purposes of this

Page 80

1   argument that you are no longer a sex offender, you're
2   not on the registry, you don't have to register any
3   more.
4   **A. Okay.**
5   Q. Would you still believe that there should be a
6   sex offender registry for child pornographers,
7   pedophiles, that kind of stuff?
8   **A. Yes.**
9   Q. Rapists?
10  **A. Yes, with certain stipulations, yes, I think it**
11  **should be individualized. I don't think it should be**
12  **blanket, I don't think it should be broad as it is.**
13  Q. And when you say individualized what do you mean?
14  **A. For instance, I am on it now and with the respect**
15  **that I do have for the law I believe that you guys have**
16  **enough intelligence to see that my crime or the**
17  **activities in my crime does not fit the overall intent**
18  **of this legislation, this is my belief. However, we**
19  **know that there are some heinous crimes that have been**
20  **committed and I believe that it should be tailored to**
21  **dealing with that individual. At the same time I**
22  **believe that there should be some parameter or some**
23  **process, if you will, to determine whether or not this**
24  **person is a threat or should be on there and this person**
25  **is. And then to also clip the ambiguity and the**

Page 81

1  **confusion of this law.**
2     Q.  So that I understand your answer, would it be the
3  idea that people go on the registry for what they've
4  done and then petition to be removed from it based on
5  their individual circumstances or would they only be put
6  on the registry based on their individual circumstances?
7     **A.  The former, I believe, if they --**
8     Q.  You get on the registry for the crime, but then
9  you could petition to be removed based on specific
10 circumstances?
11    **A.  Yes.  Do you have one for me?**
12    Q.  Have you contacted any of your state legislators
13 to pursue changes to the statute along the lines of what
14 you propose?
15    **A.  I decline to answer that at this moment.**
16    Q.  If you'd like to take a moment and talk to your
17 counsel I can allow it but I don't believe that you have
18 the right to refuse to answer that question.
19    **A.  Oh, don't put that on the record, I'm not**
20 **refusing.**
21    Q.  No, no.
22    **A.  It is my intent.  I have things drafted up, you**
23 **know, and it is my intent, but per se I have spoken to**
24 **two of them personally, you know, preempting them to**
25 **what's about to take place, but I just decided to wait**

Page 83

1  wanted to ask you and then I believe that's all I have,
2  in your request to admit I asked whether -- you to admit
3  that states have a compelling interest in protecting
4  children from sexual abuse and you admitted that.
5     **A.  One more time.**
6     Q.  I asked you to admit that states like Michigan
7  have a compelling interest in protecting children from
8  sexual abuse and you admitted that.
9     **A.  Okay.**
10    Q.  Let me follow up and ask you a related question,
11 do you believe that the State of Michigan has a
12 compelling interest in protecting children from
13 violence?
14    **A.  Yes.  But they shouldn't go on the registry.**
15    Q.  I think that's -- there is one last question I
16 want to ask and then it's going to be the end for me.
17 On the day you were released, you know, you had a
18 lifetime registration; is that accurate?
19    **A.  No.**
20    Q.  Was there a period of time that you did not have
21 to register for life?
22    **A.  Yeah.**
23    Q.  When was that?
24    **A.  When I got out and then it just recently changed**
25 **at some point in time.**

Page 82

1  **for a minute.**
2     Q.  Okay.  So you've personally spoken to someone,
3  like a town hall or a coffee house meeting or something
4  and --
5     **A.  I met John Conyers and we just had small talk**
6  **because he wasn't able to talk but I did inform him that**
7  **I will be contacting him.  But I didn't tell him the**
8  **nature, we didn't go off into the nature of that.**
9     Q.  And Mr. Conyers is a United States Congressman?
10    **A.  U.S., right.**
11    Q.  Have you contacted your state representatives?
12    **A.  No.**
13    Q.  Your state senator?
14    **A.  No.**
15    Q.  Governor Snyder?
16    **A.  I spoke to him but not about this.  Do you think**
17 **I should?**
18    Q.  I'm not the guy to ask.
19       MS. NELSON:  Don't you work for Snyder?
20       MR. GRILL:  I work for the people of the
21 State of Michigan.
22       THE WITNESS:  I like that answer. Do you
23 believe the people of the State of Michigan --
24 BY MR. GRILL:
25    Q.  We're still on the record.  One last thing I

Page 84

1     Q.  Before you registered for life what was your
2  registration period?
3     **A.  I believe 25 years.**
4        MR. GRILL:  Okay.  That's it, I have no
5  further questions.
6        MS. NELSON:  Can we have the room for a
7  little bit?
8        MR. GRILL:  Sure.
9        (A recess was taken.)
10                 EXAMINATION
11 BY MS. MARTINEZ:
12    Q.  Is the underlying conviction that put you on the
13 registry sexual in nature?
14       MR. GRILL:  Objection, form of the question,
15 calls for a legal conclusion.  You can answer.
16       THE WITNESS:  On the legal conclusion of
17 what I did, no.
18 BY MS. MARTINEZ:
19    Q.  At the time of your conviction did you have to
20 register?
21    **A.  No.**
22    Q.  Have you ever completed sex offender therapy?
23    **A.  No, I didn't have to because it wasn't sexual in**
24 **nature, my crime.**
25    Q.  If you'd known about the registry at the time of

Page 85

1  your conviction would you have still taken the plea?
2      MR. GRILL: Object to the form of the
3  question, calls for speculation.
4  BY MS. MARTINEZ:
5      Q. You can still answer.
6      **A. No.**
7      Q. What would you have done differently?
8      **A. I would have pursued a trial or fought harder to**
9  **bargain.**
10     Q. Why would you like to have a Facebook or Kick
11  Starter account?
12     **A. To pursue business.**
13     Q. And why haven't you created these accounts for
14  that purpose?
15     **A. In fear of being non-compliant with the registry.**
16     Q. Has anyone ever done a random residential check
17  where you lived?
18     **A. In regards to who? Officers, parole?**
19     Q. Yes, has --
20     **A. As far as coming to check to see if I'm there?**
21     Q. Uh-huh.
22     MR. GRILL: Object to form of the question,
23  lack of foundation, but you can answer.
24     THE WITNESS: Yes.
25  BY MS. MARTINEZ:

Page 86

1      Q. When they came and did that residential check did
2  they speak to your neighbors at all?
3      MR. GRILL: Object to form of the question,
4  calls for speculation, lack of foundation.
5      THE WITNESS: Yes.
6  BY MS. MARTINEZ:
7      Q. Have you ever wanted to live somewhere but you
8  couldn't because of a registry?
9      **A. Yes.**
10     Q. Where was that?
11     **A. With my mom, with my aunt, with my sisters. My**
12  **sister stayed close to a school. Upon my release it was**
13  **my intentions to go on parole with my aunt and my mom;**
14  **however, I could not because of the registry.**
15     Q. Have you ever lost a job because of a registry --
16  of the registry?
17     **A. Yes.**
18     Q. What happened?
19     **A. My parole agent -- when I was doing sanitation my**
20  **parole agent -- I had to wear the box, the tether box,**
21  **and they was questioning me about why I always had to**
22  **call in because the box kept going off. And so when I**
23  **informed them of that they asked me how long would it**
24  **be taking place and I told them that it's something that**
25  **I had to do for the rest of my life -- I mean for 25**

Page 87

1  **years at the time. And they told me it may be best for**
2  **me to get another job because it may interfere with fear**
3  **of the public finding out me running through the**
4  **neighborhood.**
5      Q. Did you have to register that employer's address?
6      **A. Yes.**
7      Q. Have you ever applied for a job and not gotten
8  hired because of the registry?
9      MR. GRILL: Object to form of the question,
10  lack of foundation.
11     THE WITNESS: Yes.
12  BY MS. MARTINEZ:
13     Q. You can still answer.
14     **A. Yes.**
15     Q. Okay. In your experience how unusual is it for
16  someone to only get one ticket in prison?
17     **A. Very unusual. You have some but I don't know of**
18  **many.**
19     Q. How does parole compare to being on the registry?
20     **A. It's the same. I feel like I'm still on parole.**
21  **And as I stated to the attorney general, to the other**
22  **side, each day it's like I'm still on parole, it feels**
23  **as though I haven't been off of parole. So I still feel**
24  **as though I'm not free, and I thought that I was,**
25  **because of the registry.**

Page 88

1      Q. Can you turn to Exhibit 1, page -- let's start on
2  page 18, question 13. Can you read that for me?
3      **A. 13, I am prohibited by law from loitering within**
4  **1,000 feet from any building, facility, structure, or**
5  **real property owned, leased, or otherwise controlled by**
6  **a public, private, denominational, or parochial school**
7  **offering developmental kindergarten, kindergarten, or**
8  **any grade from one through twelve. Loitering in a**
9  **student safety zone is a misdemeanor and may result in**
10  **criminal prosecution.**
11     Q. Does that section define loitering?
12     **A. No.**
13     Q. Do you know what loitering means?
14     **A. No.**
15     Q. Can you flip to page 16?
16     **A. Loitering in the sense of this, no, I don't. 16?**
17     Q. Yes, here you go. Can you read question 4-J?
18     **A. J, the license plate number, registration number,**
19  **and description of any motor vehicle, aircraft, or**
20  **vessel that I own or regularly operate and the location**
21  **of where they are routinely stored.**
22     Q. Do you have to report that as required by this
23  sheet?
24     **A. Yes.**
25     Q. Do you know what that section means?

Page 89

1  **A. Well, yes.**
2  Q. Do you know what --
3  **A. I register my vehicle, I take it to mean that I**
4  **got to register the vehicle that I drive.**
5  Q. Do you know what the word regularly means?
6      MR. GRILL: Object to the form of the
7  question, asked and answered.
8      THE WITNESS: Well, registration number and
9  description of any motor vehicle, aircraft, or
10 regularly -- it's just like at my job, I'm required to
11 transport -- I may be required to transport my clients.
12 I don't know whether or not I have to go and tell them I
13 got to register 36 vehicles that they have because there
14 may come a time I may get van 27, this van here, so I
15 don't know whether or not if they assign me to have to
16 transport that I would have to in turn go down to the
17 police station and register these vehicles or for them
18 to do it. And, again, I don't want to lose my job
19 because of my lack of understanding of it.
20 BY MS. MARTINEZ:
21 Q. What are the consequences of violating that?
22 **A. From my understanding I can -- I'm violating the**
23 **law. I'm not being compliant. I can go back to jail or**
24 **prison.**
25 Q. Why did you sign this sheet? What would happen

Page 90

1  if you did not sign this sheet?
2  **A. This was a prerequisite for me upon my release.**
3  Q. You've stated that you reformed your life. If a
4  person who commits a sex offense reforms their life and
5  becomes rehabilitated, should that person have a chance
6  to come off the registry?
7  **A. Yes.**
8  Q. Should only dangerous people be on the registry?
9  **A. Yes.**
10 Q. Does being on the registry -- excuse me, does the
11 fact that you're on the registry in any way protect
12 children from sex abuse or violence if --
13     MR. GRILL: Object to form -- go ahead and
14 finish
15 BY MS. MARTINEZ:
16 Q. Given that you did not commit a sex offense?
17     MR. GRILL: Object to form of the question,
18 calls for a legal conclusion, lack of foundation,
19 hypothetical, assumes facts not in evidence. Now you
20 can answer.
21     THE WITNESS: Repeat the last part?
22     MR. GRILL: Assumes facts not in evidence.
23     MS. AUKERMAN: Maybe the question could be
24 restated since the objection was so long. The objection
25 can be noted.

Page 91

1      MR. GRILL: Okay.
2      MS. AUKERMAN: Just so that he can answer
3  the question.
4      THE WITNESS: Well, according to the police
5  report and the facts and the information I was given
6  from the crime that I committed I do not believe that to
7  be so to your question.
8  BY MS. MARTINEZ:
9  Q. Do you want to be involved in your children's
10 lives?
11 **A. Very much so, yes.**
12 Q. If you weren't on the registry would you try to
13 be more involved in your children's lives?
14 **A. I would be much more involved.**
15 Q. Is the registry what prevents you from contacting
16 teachers and other people at your children's school?
17 **A. Yes, and the fear, again, of violating these here**
18 **and also subjecting my family from losing me again so,**
19 **yeah.**
20 Q. How has the registry impacted your goals in life?
21 **A. They impact them daily because I have to do this**
22 **for the rest of my life and a lot of -- a number of**
23 **ideas and goals and things I want to participate in**
24 **involves dealing with young people, especially young**
25 **people from depressed and disenfranchised neighborhoods.**

Page 92

1  **As I stated to the attorney general that it was my**
2  **desire to help curb the problems that we have with our**
3  **young people, and one of the ways of doing so is to**
4  **involve yourselves in the school environment or in their**
5  **lives as they grow up, which I'm prevented from doing.**
6  **So I just continue to live a secluded life and I tell**
7  **you guys A, B, C, one, two, three in hopes that I'm in**
8  **compliance with the registry.**
9  Q. Just to clarify an earlier question, did you
10 commit a sex offense?
11     MR. GRILL: Same objection, calls for a
12 legal conclusion.
13     THE WITNESS: How did I know he was going to
14 say that?
15     MR. GRILL: You knew it before I did, I was
16 slow.
17     THE WITNESS: No, I did not.
18 BY MS. MARTINEZ:
19 Q. Did you commit any sexual acts on a minor?
20 **A. No.**
21     MS. MARTINEZ: That's all the questions.
22     MR. GRILL: I have just a few follow ups.
23 Really not many because it's getting late.
24
25

Page 93

1  RE-EXAMINATION
2  BY MR. GRILL:
3  Q. You were asked some questions about if there were
4  places that you could live that you were barred by the
5  registry and you, I think, discussed your aunt who lived
6  near a school; is that correct?
7  **A. My sister.**
8  Q. Your sister. What about your aunt, did she live
9  near a school?
10 **A. Yes, she also lived near a school.**
11 Q. Did you find a place --
12 **A. As a matter of fact, a day care.**
13 Q. Okay. In addition to a school?
14 **A. I don't know, I didn't go any further, day care,**
15 **children, at the same time being on parole and with the**
16 **stipulations here I didn't pursue it anymore.**
17 Q. Okay.
18 **A. In my mind and understanding I was in violation.**
19 Q. But you did find a place to live and that was the
20 place in ████████ right?
21 **A. Yes.**
22 Q. You talked about a buzz box or a box that you
23 wore after you were -- while you were on parole. Was
24 that box a part of your parole or was it a requirement
25 of the sex offender registry?

Page 94

1  **A. Because I was a sex offender I was required to**
2  **wear that box.**
3  Q. As part of your parole?
4  **A. Yes.**
5  Q. There came a point where you no longer wore the
6  box, correct?
7  **A. Yes.**
8  Q. You don't have it today?
9  **A. No.**
10 Q. In talking about vehicles, you said you had some
11 uncertainty about whether or not you had to register
12 your employer's entire fleet of cars?
13 **A. Right.**
14 Q. Is there one car that you use every day at work?
15 **A. My own.**
16 Q. And as far as your employer's fleet of cars, how
17 often would you use one of those?
18 **A. I tried to avoid so being that I've been promoted**
19 **to a management, supervisor type position I would ask**
20 **someone else to do it instead of me because I'm in fear**
21 **of this here.**
22 Q. All right. Even so, if you didn't have someone
23 else do it, how often would it come up that you would
24 use one of those employer cars?
25 **A. Probably every day.**

Page 95

1  Q. Would it be the same car?
2  **A. No, it varies.**
3  Q. You talked about -- you were asked a question by
4  your counsel concerning dangerous people. Who are
5  dangerous people?
6  **A. Those who continue to perpetuate crime on not**
7  **only themselves but others.**
8  Q. And those are the people that belong on the
9  registry?
10 **A. The sex offender registry I believe is for sex**
11 **offenders. I believe that just as with parole, all the**
12 **other offenses should be given an opportunity to show**
13 **themselves worthy of being free, and upon doing so they**
14 **should be given opportunity to be productive in society.**
15 Q. And the people that would stay on the registry
16 would be the dangerous people?
17 **A. The people who would stay on the sex offender**
18 **registry are those who have committed sexual offenses,**
19 **whether it's against an adult or a child, and also be**
20 **given an opportunity to show themselves to be worthy of**
21 **gaining their civil liberties or rights.**
22 Q. Okay. Well, let me ask you this, then, if any
23 person on the registry could ultimately be removed, who
24 would be left on the registry? Who would stay on the
25 registry or would everyone come off of it at some point

Page 96

1  in time?
2  **A. I believe that who would come off the registry**
3  **are those who -- whether sexual offender or whether it's**
4  **a violent offender registry, it should be in accordance**
5  **to how they do parole. Give these individuals the**
6  **opportunity to show themselves to be worthy of**
7  **redemption, reform, and to become productive in society.**
8  Q. And the -- for lack of a better phrase because it
9  was used already in your answers, the dangerous people
10 would stay on the registry?
11 **A. According to the sex offender registry I believe**
12 **that those dangerous people who commit sexual acts**
13 **should remain on the sex offender registry until they've**
14 **proven themselves. There should be another form of**
15 **registry, if you will, for violent offenders who haven't**
16 **committed sexual acts who should also be given an**
17 **opportunity similar to the opportunities and procedures**
18 **that they have for parole.**
19 Q. And --
20 **A. I should not be on the sexual offender registry.**
21 Q. Right, and I think we already talked about that.
22 So we're talking now a little bit more about the
23 registry in large rather than specifically to you. So
24 earlier you described what were discussed as dangerous
25 people as those that commit offenses, new acts, right?

Page 97

1    **A. That could be one stipulation, that could be one.**

2    Q. Okay. So would you agree with me that before

3    someone is convicted of a sexual offense that there is a

4    period of time in which they haven't committed a sexual

5    offense?

6    **A. Before they were convicted?**

7    Q. Right.

8    **A. That they did commit one?**

9    Q. No, let me try -- ask the question this way.

10   Before someone ever commits their first crime there is a

11   period of time in which they have not yet committed a

12   crime, correct?

13   **A. Yes.**

14   Q. So there would be a point in time for any sexual

15   offender in which they had not yet committed a sexual

16   offense?

17   **A. Well, to do it again -- upon being on this list?**

18   Q. No, originally, before the very first time, any

19   sex offender, there was a period of time before they

20   committed their first sex offense?

21   MR. REINGOLD: I'm going to object to the

22   question because I don't see how you can be a sex

23   offender before you committed your first sexual offense.

24   That's what makes you a sex offender is that you

25   committed an offense.

Page 98

1    MR. GRILL: That's essentially being the

2    point I was getting at so I'll take the objection as --

3    BY MR. GRILL:

4    Q. Would you agree with your counsel's statement?

5    **A. Yes.**

6    Q. So with that understanding, would it be fair to

7    say that after someone has committed a sexual offense

8    there may be a point in time in which they can continue

9    to exist and live without committing a sexual offense?

10   **A. Yes.**

11   Q. And then ultimately at some point in the future

12   commit another sexual offense?

13   **A. That would be the same with a murderer.**

14   Q. Correct. So how would a person prove that they

15   would no longer pose the risk of committing a sexual

16   offense?

17   **A. I believe that should be determined by an**

18   **assessment of their activity, their involvement with not**

19   **only family but community. And be given a set of**

20   **standards to live by and prove themselves worthy to be**

21   **taken up off of it. If my answer is --**

22   Q. It's your answer. There was a series of

23   questions between you and your counsel and I just wanted

24   to make sure I understood your answer. There was a

25   discussion of dangerous people, as I think we just kind

Page 99

1    of exhausted that discussion.

2    **A. Okay.**

3    Q. And then there was a statement about whether or

4    not you were a dangerous offender, whether or not your

5    offense was dangerous. Do you think that your crime

6    was -- will you acknowledge that your crime was a

7    violent crime?

8    **A. Yes.**

9    Q. And then lastly, the discussion about your

10   children's teachers. I think in response to my

11   questions you stated that your son is too young -- your

12   youngest son is too young to be in school, correct?

13   **A. Uh-huh.**

14   Q. And your oldest children are out of school?

15   **A. Uh-huh.**

16   Q. So whose teachers would you be interested in

17   contacting if you were off the registry?

18   **A. Every child that I'm involved with I would want**

19   **to be in contact with anyone who plays a part in their**

20   **education and in their upbringing. When it comes to**

21   **my -- go ahead.**

22   Q. No, no, finish your answer.

23   **A. No, go ahead, I'm done.**

24   Q. Without naming specific names can you describe to

25   me are there any particular children you have in mind?

Page 100

1    **A. Well, I come from a large family so all of my**

2    **nieces and nephews.**

3    Q. Okay. Without -- if you were not on the registry

4    tomorrow, is it your understanding that you would be

5    privileged to -- or that you would have the ability to

6    discuss their education, your nieces' and nephews'

7    education, with their teachers?

8    **A. If I was not on the registry?**

9    Q. Correct.

10   **A. And you asked me would I go?**

11   Q. Right. The question specifically is is it your

12   understanding that the teachers would be authorized to

13   reveal information about your nieces' and nephews'

14   education to you?

15   **A. Upon agreement through their parents, yes.**

16   Q. Have you obtained your brothers' and sisters'

17   agreement to be involved with your nieces' and nephews'

18   education?

19   **A. Have I?**

20   Q. Yes.

21   **A. To be involved in their education?**

22   Q. Right, as you just said a minute ago.

23   **A. According to that question if I was off the**

24   **registry?**

25   Q. Right.

Page 101

1   A. Yes, I would.
2   Q. Have they given you that permission yet?
3       MR. REINGOLD: I'm going to object to the
4   question because it doesn't make sense --
5       MS. AUKERMAN: It's hypothetical.
6       MR. REINGOLD: Yes, it's totally
7   hypothetical because there's no way he can get approval
8   so why would he ask for approval?
9   BY MR. GRILL:
10  Q. Did you understand my question?
11  A. Yes, and I think it's kind of, like he said,
12  hypothetical because, again, the way I live my life
13  every day I try to make sure that I'm not crossing no
14  lines with anything. So for me to approach any of my
15  family members and ask them for permission, because I'm
16  on the registry that would create a problem.
17  Q. Let me rephrase the question a different way.
18  A. Okay.
19  Q. Have you had any discussions with your brothers
20  and sisters that would lead you to believe that but for
21  the registry they would grant you access to their
22  children's teachers?
23  A. They don't want me to be involved and they don't
24  want me to get into any trouble, they don't want to lose
25  me going back to jail so it's not an issue of giving me

Page 102

1   approval. The issue is what is it that I must do to
2   remain out here. I don't know because this is still a
3   bit confusing to me and I know it would be to them.
4   Q. But, again, I guess my question would still go
5   back to the idea of have you had any discussions with
6   them that would --
7   A. No, no. About approval?
8   Q. Any discussions that would, you know, lead you to
9   the conclusion that if the registry didn't exist
10  tomorrow that they would say, oh, well, now, let's go,
11  you can go talk to my children's teachers?
12  A. No, that's all -- that's all dependent upon her.
13  It has nothing -- because they have full confidence in
14  me and my ability to, you know, to -- they want me to be
15  involved, my family want me to be involved, but they
16  don't -- it's not the thought of my involvement
17  according to the registry, that's me, and it would be
18  difficult for --
19  Q. I think we're wandering a bit far afield and so
20  let me see if I can kind of rein this up here.
21  A. Okay.
22  Q. The specific question I had or the specific issue
23  I'm looking at here is your interaction with your
24  nieces' and nephews' teachers, okay?
25  A. Okay.

Page 103

1   Q. Now, your statement to counsel here and to me
2   would be that -- well, actually it was a question
3   broadly posed by your counsel, and in answer to my
4   specific question you said that you wanted to be in
5   contact with your nieces' and nephews' teachers; is that
6   correct? If there were no registry you would wish to
7   contact your nieces' and nephews' teachers?
8   A. Well, I guess I have the issues with the contact
9   part. Being involved, being involved in not just that
10  area but the areas that prevent me from -- that this
11  here prevents me from being involved in. I would love
12  to be involved, I want to be involved, but because of
13  this I'm prohibited to be involved so it's not a
14  discussion.
15  Q. What specific things are you prohibited from
16  doing that you would want to do?
17  A. I don't know. The only thing I know is if it has
18  to do with schools and the children (Shaking head side
19  to side.)
20      MR. GRILL: I think that is all that I have.
21  I have no further questions unless there is further
22  redirect.
23      MS. MARTINEZ: We have a couple follow up
24  questions.
25

Page 104

1           RE-EXAMINATION
2   BY MS. MARTINEZ:
3   Q. You will be on the registry for life. Your son
4   will grow up. Do you want to talk in the future to your
5   children's teachers, go to parent teacher conferences,
6   attend sporting events or plays at your son's school?
7       MR. GRILL: Objection, form of the question,
8   leading, but you may answer.
9       THE WITNESS: Any responsible parent should.
10  Yes, I do. Yes, I would.
11  BY MS. MARTINEZ:
12  Q. If you weren't on the registry would you go to
13  your nieces' and nephews' sporting events and plays or
14  other school events?
15  A. I was recently asked to come speak at the
16  University of Michigan, which my niece attends, and she
17  kept asking me why and I had to lie because I didn't
18  want to tell her the truth about this because I'm
19  uncertain, I don't understand it all, but more
20  importantly just the scrutiny of me being on the
21  registry let alone me being given permission to go or
22  being allowed to go.
23      It's the same thing with my children, with
24  my child I'm in fear that one day he's going to ask me
25  that question, just as I have had other young folk ask

Page 105

1   me.  I have an aspiring nephew who is going to play
2   sports, he would love to see his Uncle ▓ there, he
3   wants his uncle involved, but I can only be involved
4   from afar.  I can buy him a uniform and some gym shoes,
5   but there's nothing like being involved personally to be
6   there watching him.  So I have to measure 1,000 yards
7   just to see him play football and have to determine
8   whether or not I'm loitering.
9       So here again, yes, I want to, but that fear
10  of going back to prison, which one weighs more heavy, me
11  not being involved in their life while I'm out here or
12  me going back to prison.  Those are the things that go
13  through my mind and this is the reason why I don't
14  involve myself and I'm asked to but I don't because it
15  doesn't make any difference if 30 law enforcement people
16  explain this here to me, and I am an astute English
17  professor, understand every word, it's the fact that I'm
18  being prohibited from wanting to be a productive person
19  in society and being involved in my children's life, my
20  family's life, period.  Your question, Counselor.
21     Q.  I have a couple more questions.  Do you want to
22  be more involved in your stepdaughter's life?
23     A.  Yes, I do.
24     Q.  Have you been prevented from being involved in
25  her life because of the registry?  You don't have to

Page 106

1   wait for him to object.
2     A.  Yes, I have.
3     Q.  Have you ever been turned down by apartments for
4   rentals because of the registry?
5     A.  Yes.
6     Q.  Have you ever been told that certain employers
7   don't hire sex offenders?
8     A.  Yes.
9     Q.  Have you ever tried to get a temp job but were
10  turned down because of the registry?
11     A.  Yes.
12     Q.  Have you committed any crimes since your release
13  from prison?
14     A.  No.
15     Q.  Did you go through risk assessments before
16  parole?
17     A.  Yes.
18     Q.  Did the warden support your release from prison?
19     A.  Very much so.
20     MS. AUKERMAN:  Go ahead.
21  BY MS. MARTINEZ:
22     Q.  Yes, you can.
23     A.  No, as stated in my interviews with you guys
24  before I wanted to actually invite him and bring him
25  along because they are trying to get me to come back

Page 107

1   into the prisons.  However, the politics involved, but
2   anyway, Mr. ▓ Warden ▓ supported my
3   early release.  As I stated, I was a habitual offender
4   so I didn't get good time and he was able to put in
5   place the necessary procedures for me to get my early
6   release, get my good time and my disciplinary credits.
7     Q.  You stated that -- let me start over.  The parole
8   board makes decisions all the time about the likelihood
9   of prisoners to -- former prisoners to commit new
10  offenses, they consider things like therapy reports and
11  risk assessments.  Is this a model for making decisions
12  about sex offenders?
13     MR. GRILL:  Objection, form of the question,
14  leading, assumes facts not in evidence, lack of
15  foundation.  You can answer if you can.
16     THE WITNESS:  You say if I can.  Rephrase
17  it.
18  BY MS. MARTINEZ:
19     Q.  Okay.  Do you think that sex offenders should be
20  assessed individually based on their risk to recommit a
21  sex offense?
22     A.  Yes.
23     MS. AUKERMAN:  We have a student attorney in
24  the room so I'm going to take the liberty of asking --
25  just following up if that's okay.

Page 108

1       EXAMINATION
2  BY MS. AUKERMAN:
3     Q.  So in your experience in prison do you have to go
4   through various types of risk assessments prior to
5   release?
6     A.  Yes.
7     Q.  Can you tell us what kind of risk assessments are
8   done, to your knowledge?
9     A.  The parole -- your counselor do what they call a
10  PER -- hey, can I step out and go to the bathroom?
11     MR. GRILL:  Yes.
12     (A recess was taken.)
13     MS. AUKERMAN:  Can we go back on the record
14  now?
15     MR. GRILL:  Do you remember the question?
16  Can you read the question back?
17     (Reporter read back last question.)
18     THE WITNESS:  Yes.  The counselor -- the
19  prison's counselor gets with one of the parole board
20  agents and they do what is known as a PER.
21  BY MS. AUKERMAN:
22     Q.  And what is that?
23     A.  Early release pre -- a report for early release,
24  PER, prisoner early release.  It's an assessment and
25  they go through your file and they assess -- they have

Page 109

1    like a grid that they actually use to determine a number

2    or score and from there they make a record of it and

3    this is something that the parole board uses in

4    determining, you know, their decision one way or the

5    other.

6        Q. So they look at both your past conduct and the

7    statistical likelihood that you'll reoffend?

8        A. Yes.

9        MR. GRILL: Objection, form of the question,

10   foundation. You can continue.

11       THE WITNESS: Yes.

12   BY MS. AUKERMAN:

13       Q. Are you familiar with the COMPASS test?

14       A. Yes.

15       Q. Did you have to take a COMPASS test?

16       A. Yes.

17       Q. And do you know how that is used?

18       A. Similar to what I just stated, it's a line of

19   questioning and -- it's a number of parts, if I'm not

20   mistaken, if I can recall, there's a number of areas

21   with a list of questioning and then they compute it

22   according to a number and the number is determined your

23   likelihood to reoffend or your success on parole.

24       Q. So it's a statistical risk assessment instrument?

25       A. Yes.

Page 110

1        Q. And that's considered by the parole board as one

2    of the factors in whether or not the person should be

3    released?

4        A. That's a -- yes.

5        Q. Are you familiar with the Static-99; is that a

6    term that's familiar to you?

7        A. No.

8        Q. But to your knowledge are there a variety of

9    different risk assessment tools that are used by the

10   Michigan Department of Corrections? If you don't know

11   that's fine.

12       A. Yeah, only the ones I just stated that I'm

13   familiar with.

14       Q. Okay. And you mentioned earlier that the warden

15   supported your early release; is that correct?

16       A. Uh-huh.

17       Q. And that was based on the warden's knowledge of

18   your conduct in prison?

19       A. Yes, of course it has to be on hard copy as well,

20   as far as my file.

21       Q. But it's fair to say that the Department of

22   Corrections' staff had many years to become familiar

23   with your conduct and the fact that you were

24   rehabilitated?

25       A. Yes.

Page 111

1        Q. When the parole board makes decisions about

2    whether or not to release someone, are they concerned

3    about whether the individual is likely to reoffend?

4        A. Recid- -- yes.

5        Q. So one of their primary concerns is not to

6    release people who are likely to reoffend?

7        A. Yes.

8        Q. And they make decisions about likelihood of

9    reoffending?

10       A. Yes.

11       Q. And they make those decisions based on

12   institutional conduct, the underlying offense, the risk

13   assessment instruments that we talked about; is that

14   correct?

15       MR. GRILL: Objection to the form of the

16   question, foundation.

17       THE WITNESS: Yes, all that's in your PER,

18   yes.

19   BY MS. AUKERMAN:

20       Q. So they are in the business of making decisions

21   about how likely someone is to reoffend?

22       MR. GRILL: Objection to the form of the

23   question, argumentative.

24       THE WITNESS: Yes.

25   BY MS. AUKERMAN:

Page 112

1        Q. With respect to the sex offender registry, would

2    it be possible to similarly -- let me back up. When a

3    parole board makes a decision about an offense -- excuse

4    me, let me back up again. When the parole board makes a

5    decision it's individual to the specific prisoner; is

6    that right?

7        MR. GRILL: Objection to the form of the

8    question, foundation, calls for speculation.

9        THE WITNESS: They go according to your

10   file.

11   BY MS. AUKERMAN:

12       Q. So the parole board might decide that one person

13   who committed a sex offense should be released whereas

14   someone else who committed a sex offense should not be

15   released; is that correct?

16       A. I'm not aware.

17       Q. Well, let me rephrase that. So you committed an

18   armed robbery, correct?

19       A. Uh-huh.

20       Q. And the parole board decided to release you?

21       A. Uh-huh.

22       Q. Are there other people with armed robberies whom

23   the parole board did not decide to release?

24       MR. GRILL: Object to the form of the

25   question, foundation.

Page 113

BY MS. AUKERMAN:

Q. To your knowledge.

**A. I know three personally; do you want their names?**
**No.**

Q. But --

**A. Yes, yes.**

Q. So the question is that it's individual, you may
have the same offense as someone else and the parole
board might decide you're safe enough to go out into
society but this other individual is still dangerous and
they have to be kept inside?

**A. Yes.**

MR. GRILL: Objection to the form of the
question, argumentative.

BY MS. AUKERMAN:

Q. So my question is are you aware of any reason why
one could not make similar individual decisions about
whether or not a person should be on the sex offender
registry, is there any reason the same process could not
be used?

MR. GRILL: Objection, form of the question,
speculation, argumentative. You can answer if you can.

THE WITNESS: No.

MR. GRILL: Lack of foundation too.

MS. AUKERMAN: No further questions.

Page 114

MR. GRILL: I just have two.

RE-EXAMINATION

BY MR. GRILL:

Q. Are you familiar with the phrase grades one
through twelve?

**A. Yes.**

Q. Does grade one through twelve include college?

**A. No.**

Q. And then lastly --

**A. But school.**

Q. What's that?

**A. But it is a school, though, right?**

Q. Right, but it's not grades one through twelve,
right?

**A. Right.**

MS. AUKERMAN: Objection, argumentative.

BY MR. GRILL:

Q. And then lastly you were talking a series of
questions about risk assessment. In your experience are
there prisoners who are paroled who then reoffend?

**A. Yes.**

MR. GRILL: No further questions.

MR. REINGOLD: Thank you all.

MS. AUKERMAN: Thank you.

(Whereupon Deposition concluded at 4:10 p.m.)

Page 115

STATE OF MICHIGAN )
                  ) SS
COUNTY OF INGHAM  )

I, Melinda Nardone, Certified Shorthand
Reporter and Notary Public in and for the County of
Ingham, State of Michigan, do hereby certify that the
foregoing Deposition was taken before me at the time and
place hereinbefore set forth.

I further certify that said witness was
by me duly sworn in said cause; that the testimony then
given was reported by me stenographically; subsequently
with computer-aided transcription, produced under my
direction and supervision; and that the foregoing is a
full, true, and correct transcript of my original
shorthand notes.

IN WITNESS WHEREOF, I have hereunto set
my hand and seal this 14th day of November, 2013.


Melinda Sue Nardone, CSR-1311,
Certified Shorthand Reporter,
Registered Professional Reporter,
Certified Proficient,
and Notary Public,
County of Ingham, State of
Michigan.
My Commission Expires: 10-24-18