# EXHIBIT 22

EXPERT REPORT OF DR. JAMES PRESCOTT, J.D., PH.D

<u>**John Doe #1, *et al.*, v. Richard Snyder, *et al.***</u>

**EXPERT REPORT/DECLARATION OF JAMES J. PRESCOTT, J.D., PH.D.**

I, James J. Prescott, J.D., Ph.D., state under penalty of perjury as follows:

**1.  Background, Education, and Qualifications**

I am a professor of law at the University of Michigan Law School in Ann Arbor, Michigan. In 2006, I received my Ph.D. in Economics from the Massachusetts Institute of Technology. I earned my J.D. *magna cum laude* from Harvard Law School in 2002, and my B.A. in Public Policy and Economics with honors and distinction from Stanford University in 1996.

I teach and write in the areas of criminal law and criminal sentencing. Much of my recent work (which is primarily empirical) centers on the consequences of sex offender post-release laws. I focus on the effects that sex offender registration and community notification laws have on sex offense rates. The attached c.v. provides further details, including links to relevant papers and a list of institutions and conferences at which I have presented my research on measuring the effects of sex offender notification laws.

At present, I have two ongoing projects that attempt to further refine our collective understanding of the consequences of registration and community notification on the number and nature of sex offenses. (Note: I use the term "registration" to refer to laws that require the *private* registration of released sex offenders with the police or other local authorities, and the term "notification" to refer to laws that mandate that registration information be made public—i.e., *public* registries.) The first project examines whether registration and, particularly, notification laws (again, *public* registries) have any effect on the location of sex offenses (joint work with Amanda Agan, an economics graduate student at the University of Chicago). The second project studies the consequences of registration and notification laws using public health measures of sexual activity rather than reported crime levels (joint work with Jonathan Klick of the University of Pennsylvania Law School).

**2.  The Effects of Sex Offender Registration and Notification Laws**

More than three years ago, I began a series of large-scale empirical projects designed to identify and measure the consequences of sex offender post-release laws, including sex offender registration and notification laws. Last year, I published an article with Jonah Rockoff of Columbia University that offers comprehensive evidence on the relationship between sex offender notification laws (i.e., *public* registries) and the frequency and nature of sex offenses.[1]

---

[1] *See* J.J. Prescott & Jonah E. Rockoff, *Do Sex Offender Registration and Notification Laws Affect Criminal Behavior?*, 54 J.L.&Econ. 161 (2011), *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1100663.

This peer-reviewed study, which analyzed data from 15 states (including Michigan) over approximately ten years, provides compelling evidence that rather than reducing recidivism, notification laws may well have *increased* (and almost certainly have *not* reduced) the frequency of sex crimes committed by convicted sex offenders.

I describe this research in three parts. First, I report the empirical results of my research with Rockoff and explain their implications for evaluating Michigan's sex offender registration and notification laws. Second, I describe our study's data and empirical methodology. Third, I explain how and why public registries, although intended to make people safer, may actually put people at greater risk.

A.  The Recidivism Consequences of Notification (i.e., *Public* Registration)

Registration and notification laws have the potential to influence sex-offending behavior in two primary ways. First, potential first-time sex offenders (or non-registered offenders more generally) could become less likely to commit offenses because they fear having registration and notification laws applied to them in the future if they are caught and convicted. We refer to this behavioral response as "deterrence." Second, convicted sex offenders who are presently subject to registration and notification could become less likely to commit offenses because these laws make doing so more difficult—by increasing the difficulty of finding a victim or the chance of detection, or by mitigating the risk factors that cause individuals to return to crime. We term this behavioral response "recidivism reduction."

While both deterrence and recidivism reduction can influence the overall frequency of sex crimes, proponents of sex offender registration and notification laws have always (and have almost exclusively) justified them on the grounds that they can reduce recidivism. This makes sense: the goal of enabling potential victims to protect themselves by learning the identities and criminal histories of potential recidivists requires, by assumption and design, the collection and sharing of such information. By contrast, generally deterring potential offenders may be achieved in many potential ways (like increasing prison sentences).

With respect to reducing the recidivism of convicted sex offenders, the results of our empirical research do not support the use of notification (i.e., public registries). But our results do provide some support (with the caveats detailed below) for the use of private registries to help the police and other authorities monitor convicted offenders.

Private Registration: To begin with, we find no discernible deterrent effect of private registries. This is not surprising—in the 1990s, private registries allowed only the police or other state officials to learn of a conviction. As a result, there was little public shame (so long as the records remained confidential), and the burdens of complying with registry requirements were very low by comparison with today's time-consuming, difficult, and expensive obligations. We do, however, find evidence that these private registries reduced recidivism, at least with respect to sex offenses committed against family members, friends, acquaintances, and neighbors (but not

against strangers), suggesting that closer monitoring by the police provides some protection for easily identifiable targets.

Public Registration: With respect to notification, however, we observe quite the opposite pattern. The threat of becoming subjected to a notification regime—and the shame and collateral consequences that accompany being publicly identified as a sex criminal—had a measurable deterrent effect (i.e., reducing offenses by non-registrants). But, once we take into account the number of individuals subjected to public notification, we find that the more people a state subjects to notification, the higher the relative frequency of sex offenses in that state. These results are highly statistically significant: our estimates indicate that it is very unlikely that these laws are reducing recidivism by registrants, and that it is likely that these laws are actually increasing recidivism (that is, that the laws are causing positive harm).

Specifically, we find a 0.86% increase in the number of sex offenses per year for every additional registrant per 10,000 people in a notification state. Using the average registry size across our sample of states, this economically and statistically significant increase in recidivism by registrants more than offsets the estimated gains from the deterrence of crimes by potential or non-registered offenders. On balance, for states with average-sized registries, we calculate that notification laws lead to an additional 0.144 sex offenses per 10,000 people (relative to the number of offenses that would have occurred with only a private registration law in place). If Michigan were a "typical" jurisdiction in terms of the per capita number of offenders it chose to subject to notification, these findings would translate to between 100 and 200 additional sex offenses per year in the state.

Michigan, however, has one of the largest public sex offender registries in the country.[2] At registry sizes like Michigan's circa 2005 (well more than 30 registrants per 10,000 individuals in the state by any measure), notification-generated increases in recidivism dwarf deterrence gains, leading to sex offense rates that could be more than 10% higher than they would otherwise be. In fact, this estimate of the increase in the number of sex offenses resulting from notification is very conservative given the results of our study. (This is a conservative estimate because Michigan's per capita registry size is such an outlier that extrapolation is risky.) Nevertheless, our study provides evidence that can be used to show, strikingly, that Michigan's notification regime is very unlikely to be *reducing* recidivism; to the contrary, our research suggests it accounts for hundreds of additional sex offenses each year.

---

[2] Estimates of the number of publicly registered offenders can vary. Two reputable sources, Family Watchdog (http://www.familywatchdog.us/OffenderCountByState.asp, visited on March 1, 2012) and the National Center for Missing & Exploited Children (http://www.missingkids.com/en_US/documents/sex-offender-map.pdf, visited on March 1, 2012) both report that Michigan has a per-capita registration rate far above the national average, somewhere between 35 and 50 registered offenders per 10,000 individuals in the state.

We base these empirical conclusions on comparisons of sex offense frequencies over time and across states, carefully controlling for inherent geographic, economic, and social differences and trends over time. Changes in national mood would not generate these results; the study's findings also cannot be accounted for by arguing that states with large registries are just *different* from other states. For one, we control for county-level demographics and income over time and for other crime rates (e.g., the frequency of non-sex crime generally as well as the frequency of assaults). Therefore, when public registries grow, we find that even *relative to other kinds of crime*, the number of sex offenses rises under notification. For another, even within a state, if the number of publicly registered offenders grows faster than average (relative to other states), the frequency of sex offenses also grows relatively faster than average.

In the final published paper, we also address and reject a number of other explanations for our empirical findings. We consider, among others, changes in victim reporting behavior, strain on police resources, and public fatigue.

We also find evidence in our study that notification does *not*, in fact, make it much more difficult for registered offenders to commit new crimes. This result is at odds with the underlying theory that publicly identifying past offenders will alert potential victims to the presence of "nearby" offenders and allow these potential victims to protect themselves (see part C below). Specifically, we find that notification laws generate similar increases in the frequencies of sex offenses against each type of victim—i.e., against family members, neighbors, acquaintances, *and strangers*. Therefore, even in a relative sense, it does not appear that neighbors and acquaintances have benefited from the enactment of notification laws.

Finally, although our research indicates that *private* registration laws appeared to reduce recidivism in the 1990s, care is necessary in extrapolating those results to the effects of present regimes re-imagined as private registries. Leaving aside the fact that registration information is now public in Michigan (and in all states for at least high-risk offenders), the procedures and requirements of registration in the 1990s were *significantly* less burdensome in time and money, and in terms of the difficulty of compliance, than they would be if a "private version" of the average public registry were used today.

B.  Empirical Methodology for Identifying the Effects of Notification

Because the effects of these laws depend a great deal on how they are structured (see part C below), and because the states and the federal government passed these laws with no in-depth investigation of their likely consequences, my research with Rockoff on notification employed well-known federal crime data covering many states over many years to generate reliable evidence on both how these laws influence recidivism levels and, even if crime frequency remains unaffected, how these laws alter sex offender behavior more generally.

Our approach builds on the fact that notification laws are designed to reduce recidivism by making individuals who are located "near" potential recidivists (like neighbors, acquaintances,

etc.) safer by providing any potential victim with supposedly useful identifying information about released offenders who might pose a threat. Therefore, if notification works as its proponents suggest, we would expect to see relatively fewer attacks against neighbors and acquaintances under a notification regime. To test this hypothesis, Rockoff and I made use of the federal government's National Incident-Based Reporting System (NIBRS) data, the only high-quality, multi-state crime data with details about offender-victim relationships. (We discuss the NIBRS data in detail in Section 4 and the Appendix of our article, including many advantages and disadvantages of the NIBRS program and the steps we took to ensure the reliability of the data we used in our analysis.)

NIBRS is a relatively new data collection effort, with only a few states participating at the outset in the early 1990s. As registration and notification laws were enacted primarily in the 1990s, we selected the 15 states that were participating in NIBRS as of 1998: Colorado, Connecticut, Idaho, Iowa, Kentucky, Massachusetts, Michigan, Nebraska, North Dakota, Ohio, South Carolina, Texas, Utah, Vermont, and Virginia. This is a fairly representative group of states, both geographically and in terms of the evolution of their sex offender legislation. To enhance the reliability of our work, we limited our analysis to states that were part of NIBRS by 1998 to be sure that we had data for a significant period of time both before and after the states enacted their notification laws. We conducted our analysis using NIBRS data through 2005, giving us more than 10 years of data for some states and at least 7 years for all states.

Next, we characterized the content and timing of the registration and notification laws in each of these 15 states. We conducted painstaking legal analysis for more than a year to identify the precise times that statutes were enacted and when each became effective and operational. (Because NIBRS crime data is collected by month, we are able to make use of these precise legal details in our work.)

In coding these laws, we were careful to distinguish between private registries and notification (public registries) because they are meant to function in very different ways. We were also careful in how we described each notification law, as the content of these laws varies across states and over time. For example, early notification laws allowed the public merely to access paper registries; eventually, all notification laws required that sex offender data be posted to publicly accessible internet web-registries. Some states also enacted "active" notification laws in which government actors took affirmative steps to make sure individuals deemed to be at-risk by legislators (e.g., neighbors) were informed of relevant released offenders, for example, by written notice or a personal visit by a police officer.

Our research also took into account whether these laws had discretionary or mandatory features as they evolved over time. Finally, with respect to internet registries, we conducted a separate investigation to determine not only when each web registry law became effective, but when each site became operational *in fact* and largely complete in its coverage.

5

With data on individual sex offense incidents by county for 15 states over many years, we were in a position to conduct a fairly straightforward "program evaluation" had we wished to go that route. In effect, using multiple regression analysis, we could have proceeded by examining how the frequency of sex offenses (and the types of sex offenses—in particular, the frequency of sex offenses between neighbors or acquaintances) changed in response to the implementation of registration and notification laws. With 15 states and a long stretch of years, we were able to control for national trends or a trend over time in a single state (one that might affect the number of sex offenses at just around the time a state passed a sex offender law) to ensure that neither was confounding our results. Our data allow us, for example, to account for state-specific trends in the number of sex offenses as well as trends in other crime levels.

If we were interested purely in whether registration and notification laws reduced crime *on the whole*, this would have been the appropriate strategy. But these laws have been defended as attempts to reduce sex offender *recidivism*, not merely as additional deterrents to "potential" or non-registered sex offenders. As described above, public registration laws could theoretically reduce new sex offenses in one of two ways: (1) by deterring non-registered offenders (who wish to avoid, for example, the burdens and shame of public notification should they be caught and convicted); and (2) by reducing the recidivism of registered offenders by providing information to and facilitating monitoring by the public. Our research design was constructed to assess each of these possibilities separately.

Separately identifying and measuring these two hypothetical consequences of notification laws is essential, but difficult to do persuasively with comprehensive federal crime data because these data do not indicate whether a crime was committed by a registered sex offender or a new, non-registered offender.

Our research solved this problem in an intuitive way. Although we, too, were unable to observe whether a crime in our data was committed by a registered sex offender or by a non-registered or potential offender, we made use of the following simple fact: registration and notification laws cannot reduce (or increase) the frequency of sex offenses through changes in recidivism levels (by, for example, improving police and public monitoring or by informing potential victims of nearby threats) when nobody or only a few convicted sex offenders are subject to these laws—i.e., when registries are close to "empty." On the other hand, both registration and notification laws *can*, in theory, reduce the frequency of sex offenses even when registries are "empty" by deterring potential sex offenders who fear becoming subject to these laws in the future if they are convicted of committing a sex crime.

We extend this logic in our research to take advantage of the significant variation in retroactive coverage of registration and notification laws across states. This coverage variation resulted in dramatic differences in the numbers of covered individuals as these laws became effective: some states applied their laws only prospectively; others made them retroactive, applying them to individuals convicted and/or released over a range of different time frames.

Accordingly, as states began to enforce their registration and notification laws, some states had large registries while others had empty or nearly empty registries.

To operationalize this idea, we collected registry size data for each state at different points in time, and used county-level registry sizes in August 2007 to estimate the size of the registry in each county for each month. In effect, we studied how county patterns in the number and type of sex offenses vary with registry size over time. If these laws worked to reduce recidivism, we would have expected to see that counties with larger registry sizes had greater relative reductions in the number sex offenses, all else equal (i.e. after controlling statistically for other differences across counties, states, and time—crime rates and how they change, demographics and how they change, national trends and shocks, etc.). This pattern is not what we found, however.

C.  Explaining Why Notification Laws, though Intended to Keep People Safe, Actually
     Increase Recidivism

The conclusion of our research that notification appears to *increase* recidivism (see part A) may seem counterintuitive at first blush. After all, notification (i.e., the active identification of sex offenders through public registries) is designed to alert potential victims to the threat a nearby released sex offender may pose. But, for this approach to reduce the recidivism levels of released sex offenders, two separate conditions must be met.

First, for notification laws to reduce recidivism, the public identification of sex offenders must make it more difficult, on average, for an offender to commit a sex crime.

This condition, in turn, requires 1) that individuals who are likely to be victimized must be *newly* informed of an offender's status as a result of the operation of the notification law, 2) that potential victims are *newly* capable of acting in ways that reduce their exposure to victimization by registered offenders, and 3) that a released offender who becomes at risk for committing a new crime will not discover an alternative victim nearby who is either unaware of the offender's status or is unable to act on the basis of that information to reduce (or reduce by a lot) the risk of becoming a victim.

But, as ample research demonstrates, offenders are rarely strangers to their victims. Friends and family members will often already be aware of a sex offender's criminal history. When the potential victim of an offender is a stranger, it may be hard for the victim to determine the offender's status or to reduce her exposure. Even if the victim is able to reduce her exposure, a released offender who becomes at risk for reoffending may find himself surrounded by other potential victims, many or some of whom *are* unaware, in all or almost all cases. Neighbors seem most likely to benefit from notification so long as they receive the information and are able to behave in ways that reduce their risks. Neighbors, however, make up much less than 5% of all sex offense victims (Prescott & Rockoff (2011), at p.176).

7

Second, for notification to reduce recidivism, these laws must avoid aggravating the risk factors that significantly increase an offender's chance of reoffending.

Even if notification were to succeed at making it more difficult for sex offenders to reoffend, recidivism might still increase under notification regimes: after all, the difficulty of committing a crime is only one factor, among many, affecting an offender's likelihood of recidivating. Publicly identifying an individual as a sex offender (as well as imposing other significant burdens—residency restrictions, frequent reporting requirements, etc.), on the other hand, influences *many* of these factors by dramatically changing a sex offender's daily life, future prospects, and psychological and financial burdens. While a law that imposes restraints and/or burdens on a released offender does have the potential to reduce recidivism if that law makes the commission of crime more difficult or if it mitigates risk factors, such a law also has the potential to *increase* recidivism if it exacerbates risk factors (e.g., unemployment, unstable housing) that are known to contribute to reoffending.

Notification regimes, with their attendant registration burdens, appear much more likely to *increase* the likelihood that affected individuals return to crime, all else equal. These laws and their application exacerbate recidivism risk factors. Many compelling studies have established that publicly identifying sex offenders makes it more difficult for them to find employment and housing, residency restrictions make everything more expensive and life less stable, and both make it harder for registered offenders to be with family. Life as a registered sex offender, by all accounts, is simply much more difficult than it otherwise would be—in no small part because of the operation of sex offender post-release laws.

Notification schemes are intended to reproduce an upside of incarceration, essentially by "incapacitating" potential recidivists. Public registration attempts to create a barrier between released sex offenders and potential victims. Unfortunately, the analogy of post-release laws to prison is too apt: the public identification of individuals as "sex offenders" reproduces many of the deprivations and burdens of prison in addition to the incapacitation effect. Plus, by making the world outside of prison more like being in prison, the threat of sending someone to prison should he commit another sex crime is much reduced. Put another way, the more difficult, lonely, and unstable a registered sex offender's life is, the more likely he is to return to crime—and the less he has to lose by committing new crimes.

It is easy to see, therefore, that the effect on recidivism of public registration laws (and most sex offender post-release laws generally) is an empirical question: the effectiveness of these laws will depend on how they are structured and applied.

If notification and its associated burdens make it more difficult for a registered sex offender to find victims, while at the same time not aggravating the risk factors known to lead to recidivism and not reducing a registered offender's desire to avoid prison, then crime rates should drop. But if these laws impose significant burdens on a large share of former offenders, and if

only a limited number of victims benefit from knowing who and where sex offenders are, then we should not be surprised to observe more recidivism under notification, with recidivism rates rising as notification expands.

### 3. Evidence from a Compendium of Sex Offender Post-Release Laws

A. The Purposes and Process of Compilation

To carry out my empirical research into the consequences of sex offender post-release laws, and to create a resource for other researchers, I have compiled a comprehensive history (compendium) of such laws for each of the 50 states.

In order to understand the consequences of these laws on health, crime, life prospects, etc., it is necessary to carefully distill the substantive provisions of these laws into categories that can be useful for analysis. Because my work is empirical and requires comparisons across states, I designed the compendium from the outset not only to include all substantive post-release laws that are applied specifically to sex offenders, but also to ensure consistent notation and organization across states. The compendium thus records and describes the establishment and subsequent evolution of all forms of laws targeted exclusively at controlling and supervising sex offenders—including sex offender registration, community notification, residency restrictions, employment restrictions, and civil commitment, among others.

The record begins for most states in the late 1980s or 1990s—Michigan's story begins in 1994, when its legislature enacted its first registration law—but in the intervening years, dozens of laws have been passed in every state, creating a complicated, constantly changing picture for released offenders subject to registration and notification. The compendium is regularly updated, and is current through the end of 2009 (which is sufficient for its primary purpose—facilitating empirical research—as any study of a post-release law's consequences requires a significant post-period for measurement.) The compendium contains over 1000 pages of concise descriptions of every state's sex offender post-release laws.

In the 2000s, states began developing and deploying a number of new post-registration restrictions (and imposing new duties) on released sex offenders. Most of these more recent post-release restrictions have been built "on top" of the basic registration framework laid down in the early 1990s. In Michigan (as in many other states), examples include residency restrictions, employment restrictions, and loitering restrictions, first adopted in 2005 and effective on the first day of 2006.

A limitation of the compendium is that it focuses on "substantive" restrictions on behavior, not the many burdensome "procedural" requirements that must be satisfied for a released sex offender to remain free (such as registering changed residency information within a specified number of days, paying for updating registration information, etc.). Although the compendium does contain some of this information, and it is often easy to see how many new procedural

9

obligations have been added to Michigan's and other states' sex offender post-release laws, the compendium is underinclusive in that it omits many of the complicated day-to-day requirements and fees that covered offenders are under pain of penalty to satisfy.

B. Evidence from the Compendium

Analysis of the evolution of the sex offender laws of the 50 states shows that the number of post-release obligations, restrictions, constraints, and disabilities placed on sex offenders has exploded over the last twenty years and especially during the last decade.

With very few exceptions, sex offender post-release laws across the states have been caught for years in a one-way ratchet of imposing increasingly severe and burdensome restraints and disabilities on released sex offenders. In many states, these laws have become progressively more wide-reaching on an almost yearly basis, requiring more and more of an individual's time (and money) to remain in compliance. The regular changes and growing complexity of these laws make compliance more difficult and innocent errors more common. Furthermore, legislatures regularly broaden the scope of laws that had been previously on the books, adding new individuals to the class of "registered sex offenders," even though the crimes newly covered may have been committed many years in the past.

The structures undergirding the vast array of state sex offender laws are the basic sex offender registration statutes. Historically, a state identified those individuals it wished to register for the sake of monitoring (often by their crimes of conviction), and defined that category as "sex offenders" or some similar term. Registration statutes sometimes created two or more groups of offenders, differentiating one from the other and from non-sex offenders on the basis of the perceived seriousness of the crime of conviction and the perceived need, in particular, to register the groups in question.

Although these groups were demarcated for a particular purpose (i.e., for registration and police monitoring) at a particular point in time, subsequent sex offender post-release laws have in effect piggybacked on the existing structure and definitions. Yet it has never been made clear whether the individuals who the legislature originally determined ought to be publicly registered as sex offenders *also* ought to be subject to residency restrictions, employment restrictions, etc. Nor is it clear that those who are subject to residency restrictions ought to be subject also to employment restrictions, and vice versa.

In other words, the panoply of obligations and restrictions now knotted up with "sex offender" registration are premised on an individual's underlying status as a registrant regardless of whether those particular obligations and restrictions are appropriate for the wide range of individuals who are now classified as sex offenders. Consequently, registration requirements have become indistinguishable in many states from the package of myriad restrictions and obligations that legislatures have enacted in recent years.

Registration laws and the post-release laws that derive from them share, as a general matter, a number of other characteristics, as well.

First, failure to comply with the increasingly complex and confusing restraints and disabilities will not uncommonly return a registered individual to incarceration, and these failures are often considered strict liability offenses (see, e.g., MCL § 28.735, MCL § 28.734; MCL § 28.729(2)). Considerable vagueness plagues many of the definitions of these constraints and obligations. There is often little discretion on the part of judges or others to loosen these restrictions, and the penalties for violations can be severe.

Second, while the basic categories of sex offender restrictions built on top of the early registration statutes seem straightforward enough in the abstract (e.g., residency restrictions), the vast web of sex offender post-release laws across the states are numerous, unpredictable, unexpected, burdensome, complicated, and often vague. In the attached exhibit, I list and describe several examples taken from the compendium (relying on state laws through 2009) and other research conducted for this report. Note the sheer volume of constraints and obligations the laws impose, and the constant vigilance required of offenders to stay in compliance.

One serious set of difficulties for registered sex offenders arises from the fact that they face additional obligations in other states should they travel. Post-release laws allow only very small windows within which to comply, and because there is incredible variety in the procedures and substantive obligations across the states, confusion is certain, in addition to the time and effort the satisfaction of these obligations requires.

For example, consider an offender who must register in Michigan because he maintains a residency in the state (see M.C.L. 28.723, which requires offenders "who are domiciled or temporarily reside in this state or who work with or without compensation or are students in this state" to register). If this offender visits Ohio for more than three days at a time, works there, or attends school there, he must register in Ohio as well (see R.C. § 2950.04). In Indiana, an offender must register if he spends or intends to spend at least *seven* days, inclusive, in Indiana, or if he owns any real property in Indiana and returns to the state at any time (see IC 11-8-8-7). Registration laws are written such that individuals may have to be simultaneously registered in many states at a time and yet the rules and procedures for registration vary by enough to make complete compliance difficult and time-consuming. It does not help that many states require regular in-person registration.

Consider other types of post-release restraints for a Michigan registrant who travels regularly, as well: Indiana prohibits certain registrants from residing (for a period longer than 3 nights in one location in any 30-day period) within 1000 feet of a school, youth program center, or public park (see IC 35-42-4-11). Ohio prohibits offenders from residing within 1000 feet of any school or child day care center (see R.C. § 2950.034). Thus, while both states have residency restrictions, who is subject to them and what areas are off-limits varies by state. Consequently,

registered individuals travelling to other states where they also must register will be subject to a range of different regimes of post-release laws.

Finally, while post-release laws are typically defended as attempts by legislatures to reduce recidivism and improve public safety, the history of these laws across the states undermines this interpretation (and instead is suggestive of an interest in punishment):

- States enacted and implemented registration and notification laws with no sustained or rigorous study of their likely consequences, often doing so in response to a public outcry and anger following a particular crime.

- A significant body of empirical work has examined the behavior of convicted sex offenders and the likely consequences of sex offender registration and notification laws on recidivism. This evidence is consistent with my work, showing overwhelmingly that, at best, public registration does not improve recidivism rates, and it may well be counterproductive.

- Despite this research, most of these laws and their amendments remain non-evidence-based and do not reflect our current understanding of how sex offenders behave, or what research suggests works and does not work in reducing their recidivism levels.

- Research has also demonstrated that these laws are financially costly to states and local governments, create a great deal of useless fear among members of the public, and are financially, physically, and emotionally costly to covered offenders.

- Many states impose post-release laws on the basis of the crime of conviction, regardless of whether the offender presents any risk to anyone and regardless of the availability of accurate and cost-effective risk assessment protocols.

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury that the above statements are true and correct to the best of my knowledge, information, and belief.

_____
James J. Prescott, J.D., Ph.D.

Dated: March 15, 2012

ATTACHMENT A

CONSEQUENCES TRIGGERED BY MICHIGAN SEX OFFENDER
REGISTRATION, A NATIONAL SAMPLE

**<u>Consequences Triggered by Michigan Sex Offender Registration:</u>**
**<u>A National Sample</u>**

In addition to complying with their home state's registration requirements, Michigan registrants must also comply with the idiosyncratic laws of any jurisdiction in which they are "temporarily domiciled." In many states, including nearby Ohio, Illinois, and Pennsylvania, a visit lasting longer than two days triggers registration, even if the registrant's crime of conviction would not have otherwise warranted registration in those states.

Examples of such reciprocal registration laws include: Colo. Rev. Stat. § 16-22-103 ("[A]ny person convicted of an offense in any other state or jurisdiction . . . for which the person, as a result of the conviction, is, was, has been, or would be required to register if he or she resided in the state or jurisdiction of conviction . . . shall be required to register in the manner specified in section 16-22-108, so long as such person is a temporary or permanent resident of Colorado."); Mich. Comp. Laws § 28.724(6)(d); Ohio Rev. Code Ann. § 2950.04(4); 42 Pa. Cons. Stat. § 9795.2(b)(4) (all substantively similar). Every state appears to have some sort of reciprocal registration law.

Thus, registrants who travel out-of-state, even temporarily to visit family or to engage in business, may find themselves subject to unfamiliar, unpredictable, and burdensome obligations and restrictions—not to mention registration fees. As these laws reach into many areas of life, they render it very difficult to travel lawfully. This exhibit highlights some of these travel-related burdens and provides examples of some of the more unexpected and onerous sex offender laws from around the country, to which Michigan registrants are subject if they move or travel to other states.

1.  **Reporting, Surveillance, and Supervision**

- Registrants must register, in person, if they <u>visit for longer than two days</u> in Illinois, Maryland, or Ohio, and if they spend 7 days in Indiana over any six-month period. They must register <u>within 48 hours</u> of arriving in Pennsylvania and <u>by the first working day</u> of arriving in Alaska. These obligations apply even if the registrant intends to stay only temporarily. Other states mandate similar time periods for registration. Alaska Stat. § 12.63.010; 730 Ill. Comp. Stat. 150/3(a)(1); Ind. Code § 11-8-8-7(a); Md. Code Ann. Crim. Proc. § 11-705(b)(5)(3); Ohio Rev. Code Ann. § 2950.04(4) (West); 42 Pa. Cons. Stat. § 9795.2(b)(4).

- In Illinois, registrants must pay a $100 <u>initial registration fee</u> and a $100 annual renewal fee; in Iowa, registrants must pay a $200 or $250 one-time fee post-conviction, plus a $25 annual registration fee; and in Idaho, registrants must pay a $40 annual registration fee. Idaho Code Ann. § 18-8307(2); 730 Ill. Comp. Stat. 150/3(c)(6); Iowa Code § 692A.110.

1

- In Alabama, registrants must obtain <u>travel permits</u> if they intend to leave their county of residence temporarily for more than two days. Ala. Code § 15-20A-15.

- In Illinois, registrants must provide law enforcement with a <u>detailed travel itinerary</u> if they will be away, or intend to be away, from their registered residence for more than two days; in Alabama, for visits longer than two days; and in Iowa, for visits longer than five days. Ala. Code § 15-20A-15; 730 Ill. Comp. Stat. 150/3; Iowa Code § 692A.105.

## 2.   Denial of Access to Public Accommodations

- In Warren, Michigan, registrants are <u>banned from public parks</u>, playgrounds, or city recreation facilities. Warren Mun. Code 22-140 (Warren, MI). <u>See also</u> Irvine Mun. Code 4-14-803 (Irvine, CA) (similarly, for registrants convicted of crimes involving minors).

- In Huachuca City, Arizona, registrants are banned from <u>all</u> public places, including public schools, parks, pools, and libraries. Sonu Wasu, *Ordinance Bans Registrants From All Public Places*, <u>Tucson News Now</u> (Sept. 26, 2011).

- In Iowa, certain registrants are <u>barred from public libraries</u>, and in Tennessee, library directors may exclude registrants at any time. Iowa Code § 692A.113(f); Tenn. Code Ann. § 40-39-216. <u>But see</u> *Doe v. City of Albuquerque*, 667 F.3d 1111 (10th Cir. 2012) (striking down municipality's library ban on First Amendment grounds).

- In Florida, registrants may be <u>banned from public hurricane or emergency shelters</u>. *Sex Offenders Kept From Storm Shelters*, <u>Associated Press</u> (Aug. 8, 2005), http://www.nytimes.com/2005/08/08/national/08florida.html. In Collier County and Indian River County, registrants must be kept in a separate room of the shelter. In Lee County, registrants may use only "pre-designated" shelters specifically intended for registrants. Collier County, Fla. Code of Ordinances 111-33; Indian River County, Fla. Code of Ordinances 306.06; Lee County, Fla. Code of Ordinances 24½-5.

## 3.   Restrictions on Religious Participation and Social Activities

- In Georgia, registrants <u>cannot work or volunteer at a church</u>. Ga. Code. Ann. § 42-1-15(c)(1).

- In Oklahoma, registrants must <u>receive written permission</u> from the "religious leader" of a church or other institution <u>before entering to worship</u>. Okla. Stat. tit. 21, § 1125(E).

- In North Carolina, certain registrants <u>may not be present in any place where minors gather</u> for regular educational, recreational, or social programs. N.C. Gen. Stat. § 14-208.18(a)(3). That includes churches and other institutions of religious worship. <u>See</u>

Bonnie Rochman, *Should Sex Offenders Be Barred from Church?* <u>Time</u> (Oct. 14, 2009), http://www.time.com/time/nation/article/0,8599,1929736,00.html.

- In North Hudson, Wisconsin, registrants <u>cannot "participate in any holiday event</u> involving children," except if the registrant is the parent or guardian and no other children are present. North Hudson, Wis. Code of Ordinances 70-95.

- In Tennessee, certain registrants may not "[p]retend to be, dress as, impersonate or otherwise assume the identity of a real or fictional person or character or a member of a profession, vocation or occupation while in the presence of a minor." Tenn. Code Ann. § 40-39-215(a)(1).

- In Missouri; Nassau County, Florida; and Orange County, California, registrants on Halloween must post a sign stating, "<u>No candy or treats at this residence</u>," and must turn off all outside residential lighting. Missouri registrants must also stay inside their homes "unless required to be elsewhere for just cause." Mo. Rev. Stat. § 589.426; Nassau County, Fla. Code of Ordinances 19¼-44; Orange, Cal. Code of Ordinances 9.10.045. <u>See also</u> *F.R. v. St. Charles County Sheriff's Dept.*, 301 S.W.3d 56 (Mo. 2010) (finding the Missouri provision punitive and prohibiting its retroactive application).

## 4. Restrictions on Civic Engagement

- In Minnesota and Missouri, registrants <u>cannot be candidates for school board</u> positions. Minn. Stat. § 609B.123; Mo. Rev. Stat. § 162.014.

- In Illinois, registrants <u>cannot be selected as election judges</u>. 10 Ill. Comp. Stat. 5/14-1.

- In Virgo County, Indiana, registrants <u>cannot vote at schools</u>. *Officials: Sex Offenders Can't Vote at Schools*, <u>WTHI (Terre Haute, IN)</u> (May 10, 2011), http://www.wthitv.com/dpp/news/local/officials%3A-sex-offenders-can%27t-vote-at-schools.

## 5. Free Speech, Internet, and Web Site Restrictions

- In Kentucky and North Carolina, registrants are <u>barred from using social networking</u> Web sites or instant messaging and chat room programs if those Web sites or programs also permit minors to use them. Ky. Rev. Stat. Ann. § 17.546 (West); N.C. Gen. Stat. § 14-202.5. For statutes imposing this restriction only on certain registrants, see Ind. Code § 35-42-4-12; La. Rev. Stat. Ann. § 14:91.5; Neb. Rev. Stat. § 28-322.05; Tex. Gov't Code Ann. § 508.1861.

- Such Web sites are <u>defined broadly</u> to include "any Internet website through which users have the ability to communicate via text and which allows messages to be visible to all other users or to a designated segment of all other users." La. Rev. Stat. Ann. §

3

14:91.5(c)(1). <u>But see</u> *Doe v. Jindal*, No. 11-554-BAJ-SCR, 2012 WL 540100 (M.D. La. Feb. 16, 2012) (striking down statute barring certain registrants from accessing social media as substantially overbroad and therefore a violation of the First Amendment).

- In Indiana, registrants must sign a "consent form" authorizing law enforcement authorities to <u>search "at any time" their personal computers</u> or other devices with Internet capability, as well as to install hardware or software to monitor their Internet usage. This installation shall occur at the registrant's expense. Ind. Code § 11-8-8-8(b).

- In New Jersey, registrants whose crime involved a computer or any other device with Internet capability <u>must receive court approval to use any device with Internet access</u> and must submit to unannounced searches of those devices. N.J. Stat. Ann. § 2C:43-6.6.

- In Wisconsin, a registrant <u>cannot intentionally photograph</u> a minor without obtaining the written consent of the minor's parent or guardian and notifying the parent or guardian of the registrant's registration status. Wis. Stat. § 948.14. <u>See also</u> Ga. Code Ann. § 42-1-18.

## 6. Identification Cards

- In Alabama, Indiana, and Tennessee, registrants must carry identification at all times. Ala. Code § 15-20A-18(a); Ind. Code § 11-8-8-15; Tenn. Code Ann. § 40-39-213.

- In Florida, Tennessee, and Texas, registrants must carry special driver's licenses or identification cards that clearly indicate that they are sex offender registrants. Fla. Stat. § 322.141; Tenn. Code Ann. § 55-50-353; Tex. Transp. Code Ann. § 521.057.

- In Texas, registrants must renew their driver's license or personal identification cards annually. Tex. Code Crim. Proc. Ann. art. 62.060 (West).

## 7. Housing Restrictions

- Across the country, any person whose household includes a person subject to life-time registration is <u>barred from accessing federally subsidized housing</u>. 42 U.S.C. § 13663 (2006).

- In Delaware, Illinois, Indiana, Maryland, and Washington, among other states, homeless registrants must <u>report to the local sheriff, in person, once a week</u>. Del. Code Ann. tit. 11, § 4120; 730 Ill. Comp. Stat. 150/3(a); Ind. Code § 11-8-8-12(c); Md. Code Ann., Crim. Proc. § 11-705(d)(2); Wash. Rev. Code § 9A.44.130(5)(b).

- In Pennsylvania, any person, homeless or not, who "fails to establish a residence" where he or she "is domiciled or intends to be domiciled for 30 consecutive days," must report

in person once a week. Such individuals must also report "a list of places the individual eats, frequents and engages in leisure activities." 42 Pa. Cons. Stat. § 9795.2(a)(2).

- In California, a registrant on parole may not live with any other registrant in a "single family dwelling." In Oregon, registrants on probation, parole, or supervision may not "reside in any dwelling" together. In Idaho and Oklahoma, a registrant may not live with more than one other registrant. Of these states, only California and Oklahoma provide statutory exceptions to allow married or related registrants to live together. Cal. Penal Code § 3003.5(a); Idaho Code Ann. § 18-8331; Okla. Stat. tit. 57, § 590.1; Or. Rev. Stat. § 144.642.

## 8.  Employment Restrictions

- In Daytona Beach, Florida, registrants cannot work as garbage collectors for recycling or waste disposal franchisees. Daytona Beach Shores, Fla. Code of Ordinances 12-7.

- In Georgia, registrants are barred from working or volunteering at any childcare facility, school, or church – or "at any business or entity that is located within 1,000 feet of a childcare facility, a school, or a church." Ga. Code. Ann. § 42-1-15(c)(1).

- In Louisiana, registrants cannot operate any bus, taxicab, or limousine, or work in any service position that would involve entering a residence. La. Rev. Stat. Ann. § 15:553.

- In Massachusetts, New York, and Tennessee, registrants cannot operate an ice cream truck. Mass. Gen. Laws ch. 265, § 48; N.Y. Correct. Law § 168-v; Tenn. Code Ann. § 40-39-215(a)(3).

- In Illinois, certain registrants cannot work at a state or county fair, lease to a family with children, or operate vending, rescue, or emergency vehicles. 720 Ill. Comp. Stat. 5/11-9.3.

## 9.  Restrictions by Private Businesses and Universities

Many private actors also use sex offender registries to deny registered individuals goods and services. Examples include:

- Mary Helen Miller, *Lake Michigan College Bans Sex Offenders of Children from Its Campuses,* The Chronicle of Higher Education (Mar. 3, 2010), http://chronicle.com/ article/Lake-Michigan-College-Bans-Sex/64474/.

- *Muskegon YMCA Revokes Memberships of Registered Sex Offenders*, Associated Press (Nov. 29, 2007), http://blog.mlive.com/kzgazette/2007/11/muskegon_ymca_revokes_ membersh.html (crediting the Michigan online sex offender registry for "making the

policy even possible"); Emily Friedman, *YMCAs Revoke Memberships of Registered Sex Offenders*, <u>ABC News</u> (Feb. 4, 2010), http://abcnews.go.com/US/ymca-community-centers-membership-sex-offenders/story?id=9737459 (explaining how 12 Connecticut YMCAs revoked memberships after cross-referencing their membership lists against the state's sex offender registry).

- *Assoc. Asks Church with Sex-offender to Resign*, <u>Town Hall Magazine</u> (Mar. 08, 2012), http://townhall.com/news/religion/2012/03/08/assoc_asks_church_with_sexoffender_to_resign (reporting that the Jacksonville Baptist Association in Jacksonville, Florida, is seeking a member church's resignation after the church hired a registrant as a minister).

- Heather May & Julia Lyon, *Utah Children's Hospital Screens Visitors to See if They Are Sex Offenders*, <u>The Salt Lake Tribune</u> (Dec. 18, 2011), http://www.sltrib.com/sltrib/news/53116318-78/visitors-hospital-primary-sex.html.csp (reporting on computerized check-in program used to identify registered sex offenders at "more than 100 other hospitals across the country"). This Utah children's hospital reportedly allows registrants to visit their own children (while devoting "extra scrutiny") but asks other registrants to leave.

- Carol J. Williams, *Match.com Agrees to Screen for Sex Offenders to Settle Lawsuit*, <u>Los Angeles Times</u> (Aug. 24, 2011), http://articles.latimes.com/2011/aug/24/local/la-me-match-20110824 (reporting that "the company's promise to screen all members is expected to spark a new industry norm").

- Aline Reynolds, *Facebook and Myspace Kick Out Thousands of NY Sex Offenders*, <u>Discover Magazine</u> (Dec. 4, 2009), http://blogs.discovermagazine.com/80beats/2009/12/04/facebook-and-myspace-kick-out-thousands-of-ny-sex-offenders/; *MySpace Kicks Out 90,000 Sex Offenders, Connecticut AG Says*, <u>CNN Tech</u> (Feb. 3, 2009), http://articles.cnn.com/2009-02-03/tech/myspace.sex.offenders_1_hemanshu-nigam-myspace-sexual-predators.

ATTACHMENT B

CURRICULUM VITAE

# JAMES J. PRESCOTT

University of Michigan Law School
Ann Arbor, MI 48109
734-763-2326
jprescott@umich.edu

---

## EMPLOYMENT

**UNIVERSITY OF MICHIGAN LAW SCHOOL**,  Professor of Law (2011–).
Assistant Professor of Law (2006–11).

| | |
|---|---|
| Research: | Criminal Law |
| | Empirical Law and Economics |
| | Sentencing and Corrections |
| | Employment Law |
| Teaching: | Criminal Law |
| | Employment Law |
| | Law and Economics Workshop |
| | Economic Analysis of Law |
| Service: | Organizer, Law Student Research Roundtable (2007–); University of Michigan Civil Liberties Board (2010–13); Technology Committee (2010–11); Alumni Promotion Committee (2010–11); Institutional Advancement Committee (2009–11); Academic Standards and Practices Committee (2009–10); Clinical Committee (2008–09); Student Careers and Professional Affairs Committee (2007–08); Curriculum Committee (2006–07). |

## EDUCATION

**MASSACHUSETTS INSTITUTE OF TECHNOLOGY**, Ph.D., Economics, 2006

| | |
|---|---|
| Honors: | MIT Department of Economics Fellowship (1997–99) |
| | Jacob K. Javits Fellowship (1998–2002) |
| Dissertation: | *Essays in Empirical Law and Economics* |
| | (Advisers: David Autor, Michael Greenstone, Christine Jolls) |

**HARVARD LAW SCHOOL**, J.D., 2002

| | |
|---|---|
| Honors: | Graduated *magna cum laude* |
| | John M. Olin Fellowship in Law and Economics (1999–2002) |
| | Treasurer (Vol. 115) and Editor, *Harvard Law Review* |
| Clerkship: | Hon. Merrick B. Garland, U.S. Court of Appeals for the D.C. Circuit (2002–03) |

**STANFORD UNIVERSITY**, B.A., Public Policy and Economics, 1996

| | |
|---|---|
| Honors: | Graduated with Honors and Distinction; Phi Beta Kappa (elected in junior year); Ethics-in-Society Honors Program; Presidential Award for Excellence in the Freshman Year; Truman Scholar Finalist (CA) |
| Thesis: | *Why Vote? Using Principles to Solve the Paradox of the Irrational Voter* |

## PUBLICATIONS & MANUSCRIPTS

Prescott, J.J., "Child Pornography and Community Notification: How an Attempt to Reduce Crime Can Achieve the Opposite" *Federal Sentencing Reporter*, 24 (2011), 93–101.

Prescott, J.J. and Jonah E. Rockoff, "Do Sex Offender Registration and Notification Laws Affect Criminal Behavior?" *Journal of Law and Economics*, 53 (2011), 161–206.

Prescott, J.J., "The Challenges of Calculating the Benefits of Providing Access to Legal Services," *Fordham Urban Law Journal*, 37 (2010), 303–46.

Prescott, J.J., Kathryn E. Spier, and Albert H. Yoon, "Settlement and Trial? A Study of High-Low Agreements," revise and resubmit at *Journal of Law and Economics*.

Prescott, J.J., "Measuring the Consequences of Criminal Jury Trial Protections," revise and resubmit at *Journal of Legal Studies*.

Prescott, J.J, and Sonja B. Starr, "Improving Criminal Jury Decision Making After the *Blakely* Revolution," *University of Illinois Law Review*, 2006, 301–56.

Jolls, Christine M. and J.J. Prescott, "Disaggregating Employment Protection: The Case of Disability Discrimination," *NBER Working Paper 10740* (2004).

## WORKS IN PROGRESS

Prescott, J.J., "Empirical Evidence of Prosecutorial Charging Manipulation: And What It Tells Us about What Prosecutors Are Trying to Do," draft available.

Garrett, Brandon L. and J.J. Prescott, "Determinants of Success in Post-Conviction Litigation by the Innocent," draft available.

Prescott, J.J., and Sonja Starr, "Evaluating the Impact of Criminal Record Set-Aside Laws on Recidivism and Socioeconomic Outcomes," 15-page funding narrative available.

Prescott, J.J., "The Possibilities of Offender Choice in Sentencing: Eliciting Forward-Looking Information," précis and partial draft available.

Klick, Jonathan, and Prescott, J.J., "The Effect of Sex Offender Laws on the Sexual Abuse and Health of Minors," 25-page funding narrative available.

Prescott, J.J., and Eric B. Laber, "The Effects of Judge, Prosecutor, and Defendant Race and Gender Interactions on Defendant Outcomes," 15-page funding narrative available.

Bailey, Martha J., and J.J. Prescott, "The Regulation of Vice in the 1960s: The Case of Contraception as 'Obscene,'" précis available.

Prescott, J.J., "Data Set: New Orleans District Attorney's Office Data, 1988-1999," including arrest, charging, conviction, and sentencing data with judge, prosecutor, and defendant identifiers and over 30,000 defendant observations.

## OTHER WRITING & RESEARCH

Prescott, J.J., "A Fifty-State Compendium of Sex Offender Regulation," mimeo (2010).

Prescott, J.J., "Tort as a Debt Market: Agency Costs, Strategic Debt, and Borrowing against the Future, *Harvard Law Review*, 115 (2002), 2294–316 (Student Note).

Prescott, J.J., "Prevailing Party—*Buckhannon Board & Care Home, Inc. v. West Virginia Department of Health & Human Resources*, 121 S. Ct. 1835 (2001)," *Harvard Law Review*, 115 (2001), 457–67 (Student Supreme Court Case Comment).

Prescott, J.J., "Second Circuit holds that Punitive Damages are Unavailable against Municipalities—*Ciraolo v. City of New York*, 216 F.3d 236 (2d Cir. 2000)," *Harvard Law Review*, 114 (2000), 666–72 (Student Recent Case Comment).

## GRANTS AND AWARDS

University of Michigan, Office of the Vice President for Research ($15,000) (2011) ("The Role of the Prosecutor in Criminal Justice Outcome Disparities")

Population Studies Center, University of Michigan ($4,000) (2011) ("The Effects of Sex Offender Laws on Teenage Sexual Health and on the Geography of Crime Commission")

National Fellow, Hoover Institution, Stanford University, Stanford, CA (2010–11)

National Science Foundation, Law and Social Sciences Program ($145,000) (2010) ("Evaluating the Impact of Set-Aside Laws on Ex-Offender Recidivism and Socioeconomic Outcomes") (Co-PI: Sonja Starr)

University of Michigan, Office of the Vice President for Research ($15,000) (2009) ("Evaluating the Impact of Set-Aside Laws on Ex-Offender Recidivism and Socioeconomic Outcomes")

National Poverty Center, University of Michigan ($7,500) (2009) ("Evaluating the Impact of Set-Aside Laws on Ex-Offender Recidivism and Socioeconomic Outcomes")

ABA Section on Litigation, Litigation Research Fund ($12,000) (2008) (with Albert Yoon) ("Settlement and Trial? A Study of High-Low Agreements")

## PROFESSIONAL ACTIVITIES

Affiliations:          Faculty Affiliate, Population Studies Center, University of Michigan
                       Associate Editor, *International Review of Law and Economics*
                       Member, State Bar of California (admitted in 2002)
                       Member, American Bar Association
                       Member, American Economic Association
                       Member, American Law and Economics Association


Referee Service:       *Journal of Legal Studies*
                       *Journal of Law and Economics*

3

*Journal of Empirical Legal Studies*
*American Law and Economics Review*
*Review of Law and Economics*
*Quarterly Journal of Economics*
*Review of Economics and Statistics*
*Journal of Labor Economics*
*American Economic Journal: Applied Economics*
*Journal of Public Economics*
*Law and Society Review*
*Law and Social Inquiry*
*Crime and Delinquency*

## OTHER EMPLOYMENT

Research:        Visiting Lecturer, University of Tokyo Faculty of Law (Summer 2009)
                 Visiting Researcher, Georgetown University Law Center (2004–2006)
                 Special Guest, Brookings Institution, Economic Studies Program (2004–2005)
                 Fellow in Law and Economics, Univ. of Michigan Law School (Winter 2005)
                 Post-Graduate Olin Research Fellow, Harvard Law School (2003–2004)
                 Research Assistant, Brookings Institution, Economic Studies (1996–1997)


Law Practice:    Summer Associate, Gibson, Dunn & Crutcher, LLP, New York, NY (2002)
                 Summer Associate, Munger, Tolles & Olson, LLP, Los Angeles, CA (2001)
                 Summer Associate, Morrison & Foerster, LLP, San Francisco, CA (2001)
                 Summer Associate, Gibson, Dunn & Crutcher, LLP, Los Angeles, CA (2000)

## PRESENTATIONS

**2012:**   University of Toledo College of Law (Toledo, OH) (March) ("Criminal Choice in Sentencing")

**2011:**   CELS Meetings (Northwestern Law School) (Chicago, IL) (November) (Discussant on Jonah Gelbach, "The Effects of Heightened Pleading on Motion to Dismiss Adjudication")

University of Chicago Law School (Law and Economics Workshop) (Chicago, IL) (November) ("Criminal Choice in Sentencing")

Columbia Law School (Law and Economics Workshop) (New York, NY) (October) ("Settlement _and_ Trial? A Study of High-Low Agreements")

Stanford Law School (Faculty Workshop) (Palo Alto, CA) (March) ("Settlement _and_ Trial? A Study of High-Low Agreements")

Cornell Law School (Empirical Colloquium) (Ithaca, NY) (March) ("Settlement _and_ Trial? A Study of High-Low Agreements")

NBER Mid-Year Law and Economics Meetings (Cambridge, MA) (February) (Discussant on Howard Chang & Hilary Sigman, "An Empirical Analysis of Cost Recovery in Superfund Cases: Implications for Brownfields and Joint and Several Liability")

4

**2010:**   Conference on Empirical Legal Studies (Yale Law School) (New Haven, CT) (November) ("Settlement <u>and</u> Trial?  A Study of High-Low Agreements")

CELS Meetings (Yale Law School) (New Haven, CT) (November) (Discussant on Sasha Romanosky, Rahul Telang, and Alessandro Acquisti, "Do Data Breach Disclosure Laws Reduce Identity Theft?")

American Law and Economics Association Annual Meetings (Woodrow Wilson School of Public Policy) (Princeton, NJ) (May) ("Settlement <u>and</u> Trial?  A Study of High-Low Agreements")

University of Haifa Law School (Law and Economics Workshop) (Haifa, Isreal via Internet) (May) ("Settlement <u>and</u> Trial? A Study of High-Low Agreements")

University of Virginia Law and Economics of Crime Conference (Charlottesville, VA) (March) ("Determinants of Success in Post-Conviction Litigation by the Innocent")

Rice University and University of Houston (Applied Economics Workshop) (Houston, TX) (March) ("Do Sex Offender Registration and Notification Laws Affect Criminal Behavior?")

American Economic Association Annual Meetings (Atlanta, GA) (January) ("Empirical Evidence of Prosecutorial Charging Manipulation" and Discussant on Richard Boylan and Naci Mocan, "Intended and Unintended Consequences of Prison Reform")

**2009:**   Harvard Law School (Law and Economics Workshop) (Cambridge, MA) (October) ("Settlement <u>and</u> Trial? A Study of High-Low Agreements")

University of Michigan, Population Studies Center (Brown Bag) (Ann Arbor, MI) (October) ("Do Sex Offender Registration and Notification Laws Affect Criminal Behavior?")

University of Toronto, Faculty of Law (Law and Economics Workshop) (Toronto, ON) (September) ("Settlement <u>and</u> Trial?  A Study of High-Low Agreements")

NBER Law and Economics Summer Institute (Cambridge, MA) (July) ("Settlement <u>and</u> Trial?  A Study of High-Low Agreements")

Hastings Law School Faculty Workshop (San Francisco, CA) (February) ("Do Sex Offender Registration and Notification Laws Affect Criminal Behavior?")

Stanford Law School (Law and Economics Workshop) (Palo Alto, CA) (January) ("Do Sex Offender Registration and Notification Laws Affect Criminal Behavior?")

American Economic Association Annual Meetings (San Francisco, CA) (January) ("Do Sex Offender Registration and Notification Laws Affect Criminal Behavior?" and "The Effects of Judge, Prosecutor, and Defendant Race and Gender Interactions on Defendant Outcomes")

**2008:**   American Bar Association Litigation Section Access to Justice Symposium (Atlanta, GA) (December) ("The Challenges of Calculating the Benefits of Providing Access to Legal Services")

Searle Center Research Symposium on Empirical Studies of Civil Liability (Northwestern Law School) (October) ("Settlement <u>and</u> Trial?  A Study of High-Low Agreements")

Conference on Empirical Legal Studies (Cornell Law School) (October) ("Do Sex Offender Registration and Notification Laws Affect Criminal Behavior?")

CELS Meetings (October) (Cornell Law School) (Discussant on John F. Pfaff, "The Myths and Realities of Correctional Severity: Evidence from the National Corrections Reporting Program on Sentencing Practices")

Harvard Law School (Law and Economics Workshop) (Cambridge, MA) (September) ("Do Sex Offender Registration and Notification Laws Affect Criminal Behavior?")

Law and Society Annual Meetings (Montreal, Canada) (May) ("The Effects of Judge, Prosecutor, and Defendant Race and Gender Interactions on Defendant Outcomes")

American Law and Economics Association Annual Meetings (Columbia Law School) (May) ("The Effects of Judge, Prosecutor, and Defendant Race and Gender Interactions on Defendant Outcomes")

University of Chicago Law School (Criminal Law Colloquium) (Chicago, IL) (April) ("Do Sex Offender Registration and Notification Laws Affect Criminal Behavior?")

Brooklyn Law School (Faculty Workshop) (Brooklyn, NY) (April) ("Do Sex Offender Registration and Notification Laws Affect Criminal Behavior?")

University of Haifa Law School (Law and Economics Workshop) (Haifa, Isreal via Internet) (March) ("Do Sex Offender Registration and Notification Laws Affect Criminal Behavior?")

University of Virginia School of Law (Law and Economics Workshop) (Charlottesville, VA) (February) ("Do Sex Offender Registration and Notification Laws Affect Criminal Behavior?")

NBER Mid-Year Law and Economics Meetings (Cambridge, MA) (February) (Discussant on Betsey Stevenson, "Beyond the Classroom: Using Title IX to Measure the Return to High School Sports")

**2007:**  Northwestern University Law School (Law and Economics Colloquium) (December) ("Do Sex Offender Registration and Notification Laws Affect Criminal Behavior?")

CELS Meetings (November) (NYU Law School) (Discussant on Stéphane Mechoulan, "The External Effects of Black-Male Incarceration on Black Females")

NBER Working Group on Crime (Cambridge, MA) (September) ("Do Sex Offender Registration and Notification Laws Affect Criminal Behavior?")

National Federal Sentencing Guidelines Seminar (Salt Lake City, UT) (May) ("Using U.S. Sentencing Commission Data in Empirical Research")

American Law and Economics Association Annual Meetings (Harvard Law School) (May) ("The Effects of Sex Offender Notification laws")

**2006:**  Conference on Empirical Legal Studies (Univ. of Texas Law School) (October) ("Empirical Evidence of Prosecutorial Charging Manipulation")

CELS Meetings (October) (Univ. of Texas Law School) (Discussant on Brandon Garrett, "Judging Innocence")

Junior Empirical Legal Scholars Conference (Cornell Law School) (September) ("Empirical Evidence of Prosecutorial Charging Manipulation")

6

Law and Society Annual Meetings (Baltimore, MD) (July) ("Measuring the Consequences of Criminal Jury Trial Protections")

Various Job Talks (January and February) ("Measuring the Consequences of Criminal Jury Trial Protections") (Michigan; Harvard; Stanford; NYU; Columbia; Univ. of Pennsylvania; UCLA; Georgetown; USC; Washington University; Univ. of Texas)

**2005:**     Various Job Talks (September through December) ("Measuring the Consequences of Criminal Jury Trial Protections") (Yale; Univ. of Virginia; Duke; Cornell; Boston Univ.; Minnesota; Univ. of Colorado; William and Mary; Univ. of Miami)

MIT Department of Economics Labor Seminar (November) ("Measuring the Consequences of Criminal Jury Trial Protections")

Florida State College of Law (Faculty Enrichment Series) (June) ("Measuring the Consequences of Criminal Jury Trial Protections")

Brookings Institution, Economic Studies Program (Brown Bag Lunch Talk) (June) ("Measuring the Consequences of Criminal Jury Trial Protections")

American Law and Economics Association Meetings (May) (NYU) ("Measuring the Consequences of Criminal Jury Trial Protections")



**MICHIGAN LAW**
UNIVERSITY OF MICHIGAN

JAMES J. PRESCOTT
*Professor of Law*

September 29, 2013

Clerk of the Court
Eastern District of Michigan
Via e-filing by the plaintiffs' counsel

       Re: *John Does #1-5 and Mary Doe v. Rick Snyder and Col. Kriste Etue*
       E.D. Mich. No. 12-cv-11194
       Amendment to James J. Prescott's expert report,

To Whom It May Concern:

       I am writing today to ensure that my original expert report, filed with the court on March 15, 2012, on behalf of the plaintiffs, is in full compliance with Federal Rule of Civil Procedure 26(a)(2)(B).

       Rule 26(a)(2)(B)(iv) requires an expert report to contain the witness's qualifications, including a list of all publications authored in the previous 10 years. Given the time that has passed since I filed my report, I have attached my most recent CV to be included as an appendix to my original report.

       I would also note that my original report did not include a list of cases in which I have testified as an expert in the past four years or a statement of compensation for my work on this case, as required by the rule. At that time, I had not testified as an expert on any cases in the past four years and was not receiving compensation for my work on this case. Nothing has changed since then.

       Sincerely,

       James J. Prescott

encl: updated CV
cc: by e-filing notice to all counsel (w/ encl)

Room 3170 South Hall, 701 South State Street
Ann Arbor, Michigan 48109-3091  USA

T: 734.763-2326   C: 734.751-2421
Email: jprescott@umich.edu