# EXHIBIT 24

EXPERT REPORT OF DR. JANET FAY-DUMAINE, PSY.D

# Declaration and Report of Janet Fay-Dumaine, Psy. D.

TO: Miriam Aukerman and Paul Reingold
RE: Static-99R Assessment of Named Plaintiffs
DT: February 29, 2012

**Introduction**

You asked me to provide an actuarial assessment regarding the risk for recidivism in five sex offender cases that you sent to me for review. As we discussed, there are multiple methods for risk assessment, some of which include interviewing the offender and some of which do not. The actuarial risk assessment technique used for this report is the Static-99R, which is widely employed throughout the United States, including by the Michigan Department of Corrections. It is described in more detail below. It is described in more detail below.

I scored three male offenders (John Doe #2, John Doe #3, and John Doe #4) using the Static-99R. One other offender (John Doe #1) could not be scored because his conviction was for armed robbery and kidnapping; there was nothing in the record to indicate that he has ever been convicted of a sexual offense or that there was a sexual component to his offense and the Static-99R only measures risk for sexual offenders. In addition, the one female offender (Mary Doe) could not be scored because the Static-99R does not apply to female offenders. I have included some general information about female offenders in this report.

**Summary of the Report**

The three cases that I scored using the Static-99R came out as follows: John Doe #2, John Doe #3, and John Doe #4 all earned a score of "two."

The Static-99R score for risk of reoffending is typically expressed as a percentage. Offenders from routine correctional samples with a score of two have been found to sexually reoffend at a rate of 5.0 percent in five years. Using a confidence interval of 95%, the range of the rate of reoffending would be 3.4 percent to 7.4 percent.

As to the female offender Mary Doe, the available information suggests that the five-year risk for reoffending in that population is extremely low, which means in the 2 percent range.

For all, the risk of sexual reoffending declines both with the passage of time (without a new offense) and with increasing age. Mr. Doe #2 has been in the community, offense free, for 15 years (since 1997), and Mr. Doe #3 has been in the community, offense free, for 11 years (since 2001). Previous data show that those in the Low and Low-Moderate nominal category for risk for re-offending have a significant decline in risk as time in the community increases. All three offenders here also earned one point for being under 35 years of age. When they turn 35 (absent new offenses) their Static-99R score will drop to "one." A score of "one" has a predicted recidivism rate of 3.8 percent with a 95% confidence interval from 2.5 percent to 5.8 percent.

1

**Overview**

In the following brief report I describe both the measures used and the interpretation of the results. The results presented are only for recidivism for sexual reoffending. Each Static-99R coding form will not be presented here, but is available for review. The score for each subject is attached as Exhibit 1. A copy of my CV is attached as Exhibit 2.

**Risk Assessment**

The Static-99 Revised (Static-99R) is an instrument designed to assist in the prediction of sexual (and violent) recidivism for male sexual offenders. The measure defines recidivism in terms of officially detected new offenses (charges or convictions). This instrument has been shown to be a moderate predictor of sexual re-offense potential. All risk assessment instruments are based on officially detected new offenses within the population, and therefore may understate risk to the extent that such offenses are underreported, or overstate risk to the extent that a charged offense may turn out to be mistaken or misattributed.

The Static-99R fully incorporates the relationship between age at release and sexual recidivism, whereas the original Static-99 scale did not (Helmus, 2009). Therefore, the developers of Static-99R recommend that the revised version of the scale (Static-99R) replace Static-99 in all contexts. Static-99R has shown moderate accuracy in ranking offenders according to their relative risk for sexual recidivism. The recidivism estimates provided by the Static-99R are group data and as such these estimates do not directly correspond to the recidivism risk of an individual offender. The accuracy in assessing relative risk with the Static-99R has been consistent across a wide variety of samples, countries, and unique settings (Helmus, 2009).

**Discussion of Static-99R Scores**

Of the three male cases that had sufficient data to develop a Static-99R score, they all scored a "two."

Percentile data for Static-99R scores are based on an international sample of sexual offenders from eight studies, including samples from Canada, the United States, England, Austria, and Sweden ($n = 4,040$). The samples used for percentile data were considered relatively unselected groups that would be representative of the population of all adjudicated sex offenders within a given correctional system. The norms are presented as percentile ranges, reflecting the observed percentage of offenders scoring at or below a specified score. Percentile rankings are useful in situations where the allocation of limited resources must be made, such as for treatment, community supervision, etc.

Absolute degrees of recidivism risk cannot be directly inferred from the percentile rankings. The appropriateness of applying these percentiles to sexual offenders in jurisdictions other than those listed above is not known.

Compared to a representative and international sample of adult male sexual offenders, a Static-99R score of "two" falls into the 39.7 – 54.4 percentile. This percentile range means that 39.7 – 54.4 of sex offenders in these samples scored at or below a score of "two." Conversely, 45.6 – 60.3 percent of this sample of sex offenders scored higher.

Relative risk refers to the ratio of two recidivism rates. Research has found the relative risk associated with different Static-99R scores to be consistent even when the overall base rate

of recidivism varies across samples. Information concerning relative risk for Static-99R scores were based on 22 samples of sexual offenders from Canada, the United States, the United Kingdom, Denmark, Holland, Austria, Sweden, Germany, and New Zealand ($n = 8,047$). The recidivism rate for sex offenders with a score of "two" would be expected to be approximately the same as the recidivism rate for the typical sexual offender (defined as median score of two).

There have been a large number of studies examining the absolute sexual recidivism rates associated with Static-99 scores. Helmus (2009) combined 28 Static-99 replication studies and was able to calculate Static-99R scores for 23 of these samples. The samples ($n = 8,139$) were drawn from Canada, the United States, United Kingdom, western Europe and New Zealand. Recidivism was defined as charges in about half of these studies and as convictions in the other half.

Although the relative risk was consistent across studies, the observed recidivism base rates varied considerably across samples based on factors not measured by Static-99R. Samples that were preselected to be high-risk/high-needs (6 samples) show the highest recidivism rates; samples preselected based on treatment need (6 samples) had intermediate recidivism rates; and routine correctional samples had recidivism rates substantially lower than the pre-selected groups (and also lower than the recidivism rates in the original development samples for Static-99).

Local recidivism norms applicable to the group of offenders to which a specific offender most closely resembles would be ideal, but are not available for these cases. The routine sample norms developed in the Static-99R research as considered appropriate to reflect recidivism rates as the routine sample norms were developed with typical sex offenders in correctional systems. A description of the routine correctional samples follows.

**Routine Correctional Samples**

This group consisted of eight samples of sex offenders from Canada, the United States, England, Austria and Sweden. These samples were relatively random (i.e., unselected) samples from a correctional system (as opposed to samples from specific institutions or subject to specific measures). In other words, they can be considered roughly representative of all adjudicated sex offenders. Some offenders in these samples would have been sub-sequently screened for treatment or other special interventions (e.g., psychiatric admission or exceptional interventions related to dangerousness), but these samples represent the full population of all offenders prior to any pre-selection processes. The recidivism norms for the unselected samples are the closest available to a hypothetical average of all sex offenders.

As noted in the summary above, offenders from routine correctional samples with a score of two have been found to sexually reoffend at a rate of 5.0 percent in five years. Using a con-fidence interval of 95%, the range of the rate of reoffending would be 3.4 percent to 7.4 per-cent.

All three offenders in this case earned a point due to their age of under 34.9 years. As with other types of criminal offenses, sexual offending tends to decrease steadily with age (Bar-baree & Blanchard, 2008; for research on general offending, see Hirschi & Gottfredson, 1983; Sampson & Laub, 2003). The offenders scored are all currently under 34 years old. They will therefore drop from a score of "two" to a score of "one" after their 35th birthday. A score of "one" has a predicted recidivism rate of 3.8 percent with a 95% confidence interval from 2.5 percent to 5.8 percent.

3

### Length of Follow-Up and Recidivism

In addition to the risk for sexual offense recidivism information provided above, two of the offenders in the ACLU sample have been in the community, offense free, for more than ten years. Mr. Doe #2 has been in the community since his conviction in 1997, and Mr. Doe #3 has been in the community since his conviction in 2001.

The original recidivism estimates for Static-99 included adjustments for time offense-free in the community, but the authors do not currently recommend using these estimates because they are outdated. The authors do endorse discussing the overall pattern of relative risk reduction that occurs as offenders spend more time offense-free in the community. Previous data show that those in the low and low-moderate nominal category for risk for re-offending have a significant decline in risk as time in the community continues to increase.

In general, longer follow-up periods for offenders in the community increase the recidivism base rate because recidivism accumulates over time. The increase in risk for recidivism, however, is not linear and the available data show that most re-offending occurs within the first five years in the community. The data indicate that the longer an offender is offense-free in the community, the more their individual probability of re-offending decreases (Harris & Hanson, 2004; A.J.R. Harris, Phenix, Hanson & Thornton, 2003).

Studies that directly compare the rate of sex offense charges versus convictions within a single sample do find differences in recidivism rates when charges versus convictions are compared (Epperson, 2003; Johansen, 2007; Langan, Schmitt, & Durose, 2003; Minnesota Department of Corrections, 2007). For example, of 9,691 sex offenders from 15 states, 5.3% were charged with a new sexual offense within three years, whereas only 3.5% were convicted, suggesting a small but nonetheless meaningful difference (Langan et al., 2003). A similar difference was found in a smaller study ($n = 280$) with a longer follow-up (average of seven years), where 6.8% of offenders were rearrested and only 3.9% were re-convicted (Johansen, 2007).

### Female Sexual Offenders

Risk assessment of female sex offenders is limited to statements about female sex offenders generally because instruments to assess risk have yet to be developed. A recent meta-analysis published in Sexual Abuse: A Journal of Research and Treatment by Cortoni, Hanson and Coache (2010) examined the findings of ten studies that included over 2400 female sex offenders with an average follow-up period of six and a half years. In summary, the sample group were found to have an "extremely low" rate of sexual recidivism (between one and three per cent). Violent recidivism (including sexual recidivism) remained extremely low and ranged from four to eight per cent. Thus, the results suggest that female sex offenders, after release from sanctions by the criminal justice system, tend to refrain from engaging in detected sexual offenses.

Thank you again for the opportunity assess your clients. Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury that the above statements are true and correct to the best of my knowledge, information, and belief.

*Janet Fay-Dumaine, Psy.D*
Janet Fay-Dumaine, Psy. D.
Licensed Psychologist

ATTACHMENT A

PLAINTIFFS' STATIC 99R SCORES

**Static-99R Scores**

| Name | Score | Items for which point(s) earned |
|---|---|---|
| JOHN DOE #2 | two | Aged 18 to 34.9<br>Any unrelated victims |
| JOHN DOE #3 | two | Aged 18 to 34.9 years<br>Any unrelated victims |
| JOHN DOE #4 | two | Aged 18 to 34.9 years<br>Any unrelated victims |

Unable to score JOHN DOE #1 (did not commit a sexual offense) and MARY DOE (female).

ATTACHMENT B

CURRICULUM VITAE

Curriculum Vitae

Janet Fay-Dumaine, Psy. D.
*PO Box 3263*
*Ann Arbor MI 48106*
*734/845-8872*

---

**Educational History**

Virginia Consortium Program in Clinical Psychology*
Virginia Beach, Virginia

*The College of William and Mary, Eastern Virginia Medical School, Norfolk
State University, Old Dominion University
Full APA Accreditation
Doctoral degree requirements completed August 31, 1994
Psy.D. awarded December 1994

University of Massachusetts/Boston
B.A., Summa Cum Laude with Honors in Psychology  May 1988

**Professional Employment History**

*Center for Forensic Psychiatry*
November 2010 to present

The Center for Forensic Psychiatry is a state facility that provides forensic evaluations and treatment services to criminal defendants throughout Michigan. Responsibilities include evaluations of competence to stand trial, criminal responsibility and other forensic issues; providing group therapy and participation in treatment team meetings; participation in the Path Oversight Committee for committed sex offenders and other duties as assigned.

*Diagnostic and Evaluation Center*
Nebraska Department of Correctional Services
March 2006 to November 2010

The Diagnostic and Evaluation Center is the initial classification center for inmates entering the Nebraska prison system.  Responsibilities as supervisor of mental health include supervision of five licensed, master level clinicians and an administrative assistant, development and implementation of assessment protocol for incoming inmates, monitoring and treatment of inmates on suicide prevention plans and inmates with major mental illness, evaluation and

assessment of pre-sentence and post-conviction sex offenders as assigned, clinical supervision of pre-licensed doctoral level psychology staff, participation Clinical Sex Offender Review Team, Clinical Violent Offender Review Team and Mentally Ill Review Team and various administrative duties.

*Legal Services Branch of Forensic Services Administration*
District of Columbia Department of Mental Health
May 1999 to February 2005

Legal Services Branch is a forensic evaluation public service in Washington, D.C., located at the St. Elizabeths Campus.  Evaluations are conducted at the D.C. Detention Facility, Correctional Treatment Facility, St. Elizabeths Campus, and the D.C. Superior Court cellblock.  Responsibilities as a clinical psychologist include conducting post-trial evaluations – probation, sex offender and aid at sentencing; pre-trail competency screenings at the field office at Superior Court, competency and criminal responsibility evaluations, and providing consultation to attorneys, probation officers, and clinical staff.  Responsibilities also include clinical supervision of unlicensed psychology staff and pre-doctoral psychology interns and post-doctoral residents, as well as providing the Ethics Seminar to pre-doctoral interns.

*Northern Virginia Mental Health Institute*
Falls Church, Virginia
June 1997 to May 1999

NVMHI is a state inpatient facility.  Responsibilities as senior psychologist included participation in treatment team, providing treatment services for inpatients including patients adjudicated not guilty by reason of insanity and conducting the competency education group.  Services included development of treatment plans, individual and group psychotherapy, and psychological assessment and evaluation.  Evaluation services for NGRI acquittees included reports to Forensic Review Panel to petition for privileges and annual reports to the court.  Supervised psychology externs for psychological assessment and psychotherapy.  Additional responsibilities included serving as Forensic Coordinator for the facility as of October 1998.  Responsibilities included risk assessment of forensic admissions, supervision of forensic evaluations, and administrative duties.

*Central State Hospital, Forensic Unit*
Petersburg, Virginia
October 1994 to May 1997

CSH Forensic Unit is the only maximum-security forensic mental health facility in Virginia. Responsibilities as senior psychologist included participating in treatment team and providing services for jail transfers, defendant's order for restoration to competency and defendants found not guilty by reason of insanity. Services included individual psychotherapy, psychological assessment, conducting community meeting and monitoring of point system on ward. Co-leader of competency education group for patients admitted for restoration to competency. Evaluation services included initial psychological evaluation, analysis of aggressive behavior, competency to stand trial, and mental status at the time of the offense. Provided clinical supervision of pre-doctoral interns from the Medical College of Virginia.

**Faculty Appointments**

December 2011 – present
Adjunct Faculty
Madonna University
Livonia, Michigan

December 1999 - January 2005
Adjunct Faculty
Argosy University
Washington, D.C.

August 1996 – May 1997
Assistant Clinical Professor of Psychiatry
Virginia Commonwealth University/Medical College of Virginia
Richmond, Virginia

**Presentations**

Symposium: Difficult Cases, Multiple Choices: A Few Forensic Dilemmas presented at the March 2006 Society for Personality Assessment Annual Meeting, San Diego, California.

Ethics Workshop
March 19, 2002 Pathways Homes, Inc. Fairfax, Virginia

Professional and Ethical Issues Workshop
December 7, 2001 St. Elizabeths Psychology Department Washington, D.C.

Mental Illness as a Risk Factor for Interpersonal Violence
October 2, 2001 Workplace Violence Conference Huntington, West Virginia

Ethical Issues in Forensics
March 2001 St. Elizabeths Campus, Washington, D.C.

Institute of Law, Psychiatry and Public Policy's Risk Assessment Training
April 1998 Participate in panel discussion highlighting risk assessment issues.

"Awareness of illness in Inpatients Diagnosed with Schizophrenia and Bipolar Disorder." Poster session at Southeastern Psychological Association 1997 Annual Meeting presented April 1997.

Institute of Law, Psychiatry and Public Policy's Insanity Acquittee Evaluation Training March 1997 Presentation, instruction, and discussion of not guilty by reason of insanity case illustrating forensic evaluation process.

**Training and Clinical Internship**

Institute of Law, Psychiatry and Public Policy
University of Virginia, Charlottesville
    March 2000 Juvenile Evaluation Update Training
    March 1995 Sex Offender Evaluation Training
    December 1994 Insanity Acquitte Evaluation Training
    November 1994 Basic Forensic Evaluation Training

Springfield Hospital Center Sykesville, Maryland
September 1993 through August 1994

SHC is an APA accredited internship program that includes two six-month inpatient rotations at the state hospital. Each rotation included individual and group psychotherapy, treatment team meetings, conducting ward community meetings, and completing at least one psychological assessment case per month. Staff psychologist for the ward supervised all ward activities. Group psychotherapy supervision and a weekly assessment seminar were conducted for the interns. During the year, completed one day a week outpatient practice at a community mental health center. Responsibilities for adolescent and child services included initial psychological evaluation of new referrals, individual psychotherapy for a caseload of three to four clients and participation in family therapy practice seminar. Throughout the internship year, interns and staff

participated in a series of seminars covering a broad array of psychotherapy and assessment topics.

**Doctoral Practica**

Eastern State Hospital – Mentally Ill/Chemical Abuse Recovery Unit
July 1992 to March 1993

Twenty hour per week advanced graduate training. Responsibilities included co-leader of group psychotherapy and substance abuse group, individual psychotherapy, participation in treatment team meetings, intake assessments, including administration of Addiction Severity Index interview, and other psychological testing as appropriate.

**Research Experience**

Research Assistant – College of William and Mary
September 1991 to May 1992

Responsibilities included conducting research investigating interaction styles of depressed/non-depressed female college students. Directed small groups in systematic relaxation, videotapes interpersonal interactions between subjects, and rated interactions. Conducted interviews with adult inpatients diagnosed with schizophrenia in a long term care unit at Eastern State Hospital. Rated interviews for positive and negative symptoms.

Research Assistant – College of William and Mary
September 1990 to May 1991

Assisted in clinical interview and administration of the Wisconsin Card Sort to adult inpatients diagnosed with schizophrenia in long term care unit at Eastern State Hospital. Rated interviews for positive and negative symptoms.

**Professional Licensure and Associations**

Licensed Psychologist - Michigan
Licensed Psychologist – Nebraska (inactive)
Licensed Clinical Psychologist – Virginia (inactive)
Licensed Psychologist - Washington, D.C. (inactive)
Society for Personality Assessment - Member

October 4, 2013

Clerk of the Court
Eastern District of Michigan
Via e-filing by the plaintiffs' counsel

      Re: *John Does #1-5 and Mary Doe v. Rick Snyder and Col. Kriste Etue*
           E.D. Mich. No. 12-cv-11194
           Amendment to Janet Fay-Dumaine's expert report,

To Whom It May Concern:

    I am writing today to ensure that my original expert report, filed with the court on March 15, 2012 on behalf of the plaintiffs, is in full compliance with Federal Rule of Civil Procedure 26(a)(2)(B).

    Rule 26(a)(2)(B)(v) requires an expert report to contain a list of all other cases in which the witness has testified as an expert in the previous four years. I have attached a list of these cases to be included as an appendix to my original report.

    I would also note that my original report did not include a statement of compensation for my work on this case. At that time, I was not receiving compensations for my work on this case. Nothing has changed since. In addition, the CV attached to my original report is still up-to-date.

                                    Sincerely,

                                    Janet Fay-Dumaine, Psy. D.
                                    Licensed Psychologist

encl: case list

cc: by e-filing notice to all counsel (w/ encls)

**List of Cases for Janet Fay-Dumaine**

Regarding Competence to Stand Trial:

      Defendant: M. Coolidge 52-3 Judicial District Court of Oakland County 04-20-2012

      Defendant: D. Pollard Third Judicial Circuit Court of Wayne County 09-17-2012

Regarding Criminal Responsibility:

      Defendant: W. Woods 52-3 Judicial District Court of Oakland County 05-24-2012