# EXHIBIT 25

FIRST EXPERT REPORT OF PETER WAGNER, J.D.

**John Doe #1, *et al.*, v. Richard Snyder, *et al.*

**EXPERT REPORT/DECLARATION OF
PETER WAGNER, J.D.**

## 1. Introduction

I am an attorney and Executive Director of the Prison Policy
Initiative, a non-profit research organization based in Easthampton,
Massachusetts. The Prison Policy Initiative focuses on the
intersection of criminal justice policy and other social issues.

I have been retained by plaintiffs as a geographic expert to address
and quantify the impact of Michigan's laws that prohibit registered
sex offenders from living, working, or loitering within 1,000 feet
of a school.

## 2. Relevant experience

As further detailed in my c.v., I regularly make maps that analyze
Census and other demographic data in relation to statutory
restrictions that impose geographic limits for criminal justice
purposes.[1] My experience includes:

- I testified in *Whitaker v. Perdue* (U.S. Dist. Ct., N.D.
  Georgia, 4:06-cv-00140-CC) in 2006 and 2008 regarding
  the impact of HB1059, Georgia's sex offender residency
  restriction law. I prepared maps of 1,000 foot exclusion
  zones around schools, day-care centers, bus stops, parks
  and other areas listed in the statute as places that people on
  the sex offender registry cannot live. I initially prepared
  analyses of the law's effect in 6 counties, and subsequently
  prepared detailed maps of the exclusion zones in two
  additional counties.

- From 2006 to 2009, I led a project that involved mapping
  1,000 foot zones around schools — and a smaller distance
  around parks — in Hampden County, Massachusetts and
  then analyzing the Census populations of the affected areas.
  The purpose was to evaluate the efficacy and socio-
  economic implications of a sentencing law that gave higher

---

[1] A copy of my c.v. is attached.

sentences for certain drug offenses committed in prohibited areas. These findings were published in reports I co-authored entitled *The Geography of Punishment: How Huge Sentencing Enhancement Zones Harm Communities, Fail to Protect Children*[2] and *Reaching too far, coming up short: How large sentencing enhancement zones miss the mark.*[3]

•   In 2006, I prepared a detailed study for the Massachusetts Committee for Public Counsel Services of a sex offender residence ordinance in Revere, Massachusetts, which prohibited offenders from living within 1,000 linear feet of a school, nursery school, day care center, kindergarten, or playground.

•   I have performed similar analyses in Massachusetts in the city of Lynn (2009 and 2011)**,** the city of Waltham (2010) and the town of Barnstable (2009).

## 3. Methodology

The methodology in all of these research projects was to use a Geographic Information Systems software package called ArcView to map each protected property by drawing a 1,000 foot "buffer" around each. For my socio-demographic analysis, I would then overlay that map with U.S. Census data and calculate the population that lived within and outside the zones. For housing analyses, I then determined which properties in the jurisdiction were within the exclusion zones.

Identifying each protected place is a time-consuming but straight-forward process. The key ingredient for each of these analyses is the ability to obtain the complete geographic coordinates of every property parcel *boundary* in the jurisdiction. It is not sufficient to perform such an analysis with only the address of the protected property/building.

---

[2] *The Geography of Punishment: How Huge Sentencing Enhancement Zones Harm Communities, Fail to Protect Children*, by Aleks Kajstura, Peter Wagner and William Goldberg, Prison Policy Initiative, July 2008 available at http://www.prisonpolicy.org/zones/
[3] *Reaching too far, coming up short: How large sentencing enhancement zones miss the mark*, by Aleks Kajstura, Peter Wagner and Leah Sakala, Prison Policy Initiative, January, 2009, available at http://www.prisonpolicy.org/toofar/

For example, the residence restrictions for sex offenders that I analyzed in Georgia and Massachusetts were measured on a property line to property line basis. Similarly, the drug sentencing enhancement statute I analyzed in Massachusetts was measured from the property line of the school parcels. To be accurate, such analyses must account for the fact that laws are enforced based on distance from a property boundary line, rather than from a building. This analysis produces a result that encompasses significantly more area than non-geographers would expect.

**4.      The Difficulties Created by Mapping Exclusion Zones.**

In my work mapping criminal justice exclusion zones in other states, I have identified several significant problems with the use of such zones:

>   A.  It is extremely difficult if not impossible to identify the areas that are inside and outside the exclusion zones, even with sophisticated mapping technology;

>   B.  Exclusion zones cover a huge area, much of which is not actually "near" schools as we think of distance in human terms;

>   C.  Exclusion zones have the practical effect of severely restricting access to housing and employment, and of limiting the ability to engage in normal human activity for those subject to exclusion.

**A.      Identifying areas that are inside and outside of the zones is extremely difficult if not impossible.**

Geographic exclusion zones can only function to keep individuals out of prohibited areas if individuals know where the exclusion zones are.[4] However, in practice it is extremely difficult if not impossible for an individual to determine, at any given time, whether he or she is within an exclusion zone because:

---

[4] My research on the Massachusetts school zones law showed that it has been ineffective at moving drug activity away from schools and that, *as currently designed it can never work*, because individuals do not know where the zones are.

- **The protected areas are unmarked.** Moreover, because protected areas bisect private property, their boundaries are impossible to mark.

- **Long distances are extremely hard to estimate.** Most people have a very hard time estimating distances, and the only experience most people have with quantifying the distance of 1,000 feet is when approaching work construction zones at highway speeds. Experiments conducted for my reports demonstrated that very few people can estimate large distances reliably.

- **Protected locations are difficult to locate.** Even if people can recognize 1,000 feet, they need to know where the protected locations are in order to mentally measure that distance. This is often difficult and frequently impossible. Even if one knows where a school is, one is unlikely to know where its property line is (e.g., see the strange shapes below in Figures 3, and 4). Further, in both urban and rural locales, it is generally difficult to see 1,000 feet in a single direction without visual obstructions.

- **Protected zones will have irregular shapes and be difficult to recognize and avoid.** The zones are measured from the irregularly shaped property boundaries of the protected places, making for an irregularly shaped zone. Then, they frequently overlap with other zones, making an even more irregular shape that is difficult to recognize and avoid.

- **Exclusion zones in dense areas frequently intersect and overlap, blanketing communities with multiple zones.** This has the effect of making it impossible for an individual to determine when he or she is inside the boundaries of a zone, or of multiple zones that *simultaneously extend from multiple locations*.[5] The most critical finding in our

---

[5] In New Jersey, the Sentencing Commission explained the problem in particularly colorful language exploring the impact of the state's then-existing statute creating a 1,000-foot sentencing enhancement zone for certain drug offenses: "Simply stated, New Jersey's densely populated urban areas have been literally transformed into massive, unsegmented 'drug free' zones. Consequently, the protected areas demarcated by the statutes no longer exist, having merged with contiguous zones." The New Jersey Commission to Review Criminal Sentencing, *Supplemental Report on New Jersery's Drug Free Zone Crimes and Proposal for Reform*, April 2007 at 4, available at http://sentencing.nj.gov/downloads/supplemental%20schoolzonereport.pdf.

Massachusetts school zone report was that the law —
which mandated a single unmarked zone around numerous
protected places — resulted in a massive overlapping zone
that covered a majority of the urban parts of our study area.
One of our recommendations was to reduce the size of the
zones to 100 feet, allowing distinct and identifiable zones
to be created.



**Figure 1.** *Note the overlapping shapes of the zones in Holyoke
Massachusetts from the* Geography of Punishment report. *This detail
view is a good explanation of the strange shapes that multiple 1,000
feet exclusion zones will create.*

- **Accurately mapping exclusion zones, even with
  sophisticated technology *and* access to the relevant
  parcel boundary data is very time consuming.** For
  example, after obtaining the parcel boundary data for my
  analysis of the Massachusetts town of Barnstable, it took
  more than 15 hours to produce my map. And as discussed
  below, given the unavailability of the parcel boundary data
  in Michigan, an individual on the registry would not be
  able to determine the boundaries of the prohibited areas
  even if they had the required time, expertise and tools to
  map the exclusion zone.

The difficulty — or impossibility — of determining what areas are inside or outside exclusion zones is relevant to Michigan's laws prohibiting registrants from residing, working, or loitering within 1,000 feet of school property. I did not find any evidence that the Michigan legislature knew where the boundaries would be when it passed this legislation. Moreover, I was unable to identify any state agency that maintains a state-wide map of the exclusion zones.

While it is possible to use specialized tools to evaluate individual locations one at a time, there is no systematic way to map an entire area short of the research methodology outlined above. The process of determining whether a particular property is within a protected area is burdensome in the context of the employment and residence restrictions. In the context of a prohibition on "loitering," which requires moment-to-moment knowledge of whether one is within an exclusion zone, it is likely impossible for a registrant to comply.

**B.    Exclusion zones cover a huge area, much of which, in conventional human terms, is not actually "near" schools.**

- **1,000 feet is actually quite far.** For the *Geography of Punishment* report, we set out to discover whether people can be seen 1,000 feet from a school under ideal circumstances. We sought out a school on a flat, straight and unobstructed road, but we had considerable difficulty finding such a location. We eventually found a street in West Springfield that fit our criteria and then, because common household tools are incapable of measuring such large distances, we purchased a measuring wheel typically used for surveying. While standing on the school's property line, I took pictures of my co-author at various distances from the property. (See images in Figure 2 below.) Despite picking a day in early spring before the trees had leaves, *and* despite picking the flattest street we could find, *and* despite my co-author carrying a huge white sign, it was nearly impossible to see my co-author at the longer distances.









Figure 2.

- **The laws restrict access to areas that, in human terms, are not at all close to schools.** The distances are measured as the crow flies, not as human beings travel. Measuring the exclusion zone in a straight line, regardless of obstruction, puts many distant areas under the law's jurisdiction. Below in Figure 3 is an example of a single 1,000 foot school zone from the *Geography of Punishment* report illustrating how a 1,000 foot zone can apply to housing that, in human terms, is significantly further away. The map below shows a single school zone that abuts a large pond and a cemetery. Given the arrangement of properties, a person living in the marked house would need to travel 3,200 feet to get to the closest part of the school property (without trespassing or navigating major obstacles). Getting to the closet part of the actual school building would require a total travel distance of 4,200 feet. Yet the law requires that the exclusion zone be measured in a straight line from the edge of the property, regardless of the obstacles in between.



**Figure 3.**

Another example from my *Geography of Punishment* report is even more extreme: The 1,000 foot zone from a high school reaches across the Connecticut River (the largest river in all of New England) to reach a different town. (See Figure 4.) Although the legislature assumed that all people within 1,000 feet of the school would have

proximity to children, the driving distance between the two points in this example is 4.4 miles, which would take about 11 minutes to travel by car.



**Figure 4.**

- **Schools are not a single point at the front entrance, but instead tend to be large complexes that include playing fields, auditoriums, etc.** A single 1,000 foot zone around a school is generally considerably larger than a circle with a 1,000 foot radius and will render off limits far more housing and employment opportunities than a simple 1,000 foot circle.

- **Residence and workplaces are considerably larger than the single point at their entrance.** As can be seen in the below illustration prepared for the *Whitaker v Perdue* case, even when the zone is centered around an actual point (a bus stop) the resulting exclusion zone is considerably larger than a simple circle. The 1,000 foot distance is itself a circle around a bus stop, but the properties that are within the zone (in peach) make the exclusion area significantly larger.

## HB1059 exclusion reaches beyond 1,000 feet



**Figure 5.** This illustration shows that drawing simple circles with a radius of 1,000 feet understates the actual impact of the exclusion zones.

**C.     Exclusion zones have the practical effect of severely restricting access to housing and employment, and of limiting the ability to engage in normal human activity.**

My work mapping exclusion zones has shown that such zones render large portions of the affected jurisdiction off-limits. As a result, whatever activity is limited (e.g. housing, employment, spending time in parks, etc), is significantly restricted for those subject to exclusion. For example, my prior research has shown:

- In the *Whitaker v. Perdue* case, I demonstrated that Georgia's HB1059, in large part due to the inclusion of school bus stops on the list of prohibited places, rendered all urban areas, all suburban areas, and most of the inhabitable portions of rural areas off limits to people on the registry.

- In my study of the Revere Massachusetts city ordinance[6] which prohibited certain offenders from living within 1,000 linear feet of a public or private school, nursery school, day care center, kindergarten, or playground, I found that at least 99% of the city's residential properties were off limits

---

[6] See my affidavit of August 14, 2006 at http://www.prisonpolicy.org/articles/affidavit08142006.html and the accompanying map at http://www.prisonpolicy.org/atlas/revere528060.html.

to people on the registry. I did not perform a formal analysis of the impact on employment opportunities, but it is relevant here to note that the only parts of the city not within 1,000 feet of a protected place were parts of a fuel oil terminal, parts of a race track, undeveloped woodlands and a marsh.

• My research on Massachusetts' 1,000 foot sentencing enhancement zones showed that these zones disproportionately cover lower-income and lower-rent areas off-limits to people on the registry.[7]

The key factors in evaluating the scope of an exclusion zone are the combination of the size of the zones and the number of places that are to be protected. While large-sized zones and multiple protected places can make entire cities and towns off-limits, even smaller zones around one or two protected places can make significant portions of a city or town off-limits.

## 5.        Efforts to conduct similar research in Michigan

Despite my considerable experience developing methodologies to study how legislation that regulates activities in special geographic zones operates, I have been unable to secure the data needed to perform a similar analysis of Michigan's laws in a sample city or county.

As a preliminary matter, there do not appear to be any unified maps of the prohibited areas. Michigan state and local law enforcement claim to measure the distance of potential properties to protected places one at a time in an online system roughly equivalent to using the measuring tool in Google Earth. This is insufficient to tell someone on the registry which places they should avoid. Similarly, there is not even one centralized list of protected places under the statute, although one could be built from other data sources with a reasonable likelihood of being mostly complete.

---

[7] See the section in *The Geography of Punishment* entitled "An 'urban effect': Interlocking sentencing enhancement zones blanket urban areas and barely touch rural populations" for my research on density, poverty and educational attainment as it relates to Massachusetts' sentencing enhancement zone statute available at http://www.prisonpolicy.org/zones/urban.html .

I attempted to prepare an analysis of how the sex offender registry law is applied in two counties in Michigan: Kent and Ingham. These counties were chosen for their diversity in density and land uses and would have been representative samples to apply to the state as a whole. Unfortunately, the counties refused to make available the necessary data showing the property lines of each property, making it impossible to prepare accurate maps of the exclusion zones.[8]

The difficulties I encountered while attempting to map Michigan's exclusion zones speaks to the difficulty that registrants face in complying with the exclusion zone laws. If I, despite my specialized skills and software, cannot develop a map of exclusion zones for two counties, it is highly unlikely that a typical registrant would be able to determine what places she or he must avoid around the state.

**6.      Analysis of Michigan Statutes during Discovery.**

Assuming that it is possible to obtain the necessary parcel data through the discovery process, I plan to show the Court the number, size, and scope of sample exclusion zones in Michigan. I would then be able to overlay the protected areas over U.S. Census data and other data to demonstrate the portion of the sample county that is rendered off-limits by Michigan's sex offender registry law. I would be able to do this by analyzing factors such as:

- Portion of the county's population;
- Portion of the county's housing stock;
- Portion of the county's affordable housing stock.

Based on my experience with performing similar analyses of school zones elsewhere, I anticipate that the analysis will show that Michigan's sex offender residence exclusion zones cover large portions of urban and suburban areas and somewhat smaller portions of rural areas. Many of the areas that are theoretically

---

[8] The data that I sought exists as government records held by Kent and Ingham Counties. Both counties make this data available in a free online mapping system designed for typical uses like identifying abutters. This is insufficient for identifying how 1,000-foot zones around hundreds or thousands of protected places overlap. The only way to answer that question is by accessing the parcel database in a mapping program with more features.

available will likely be industrial or agricultural in nature, and therefore not appropriate for housing.

I also expect that the exclusion zones will be irregular shapes. If this is the case, it would support a finding that it is difficult or impossible to identify and avoid the exclusion zones when moving about the state.

Once I am able to build a geographic database of the exclusion areas in sample counties, I will apply this map to existing datasets on employment patterns (if they can be obtained) to produce estimates of the size and nature of the employment impact of the law. I would expect to find that a significant number of jobs are rendered off-limits to people on the registry due to the exclusion zones.

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury that the above statements are true and correct to the best of my knowledge, information, and belief.

Peter Wagner
Executive Director
Prison Policy Initiative
PO Box 127
Northampton MA 01061
(413) 961-0002
pwagner@prisonpolicy.org
March 13, 2012

ATTACHMENT A

CURRICULUM VITAE

# PETER J. WAGNER

69 Garfield Ave, Floor 1, Easthampton MA 01027
pwagner@prisonpolicy.org  (413) 527-0845

---

**EDUCATION**

**Western New England College School of Law**                **Springfield, MA**
**Juris Doctor, May 2003**

**University of Massachusetts at Amherst,**                **Amherst, MA**
**B.A., August 1994**
Major: Social Thought and Political Economy
Minor: African-American Studies

**WORK**
**EXPERIENCE**

**Prison Policy Initiative**                **Springfield, Easthampton, MA**
**Co-Founder, Exec. Director, Asst. Director**        **September 2001 – Present**

Co-founded organization committed to documenting how mass incarceration affects individuals, communities, and the national welfare. Lead a national movement to change the way that the Census Bureau counts people in prison, and the way that state and local governments use Census prison counts to draw legislative districts.

**Civil Liberties Union of Massachusetts**                **Boston, MA**
**Mapping Consultant**                **June 2009 – Present**

Assist litigators with evaluating potential challenges to overly broad city ordinances in Barnstable, Lynn and Waltham, showing that city overreached and rather than regulating where people on the sex offender registry could live, the cities barred people on the registry from living anywhere.

**Southern Center for Human Rights**                **Atlanta, GA**
**Mapping Consultant**                **June  2006 – September 2009**

Prepared maps and analysis, and testified twice for plaintiffs in federal court in the case *Whitaker v. Perdue.* The case challenged Georgia's ban on people on the sex offender registry from living within 1,000 feet of schools, churches and a long list of other places including school bus stops. My testimony showed that because almost every tract of habitable housing in Georgia was served by one of 350,000 school bus stops, the legislature unwittingly declared all urban areas, all suburban areas and most rural areas off limits to people on the registry.

**Open Society Institute Fellowship Program**                **New York City**
**Consultant**                **January – June 2007**

Assist Soros Justice Fellows with a range of research and technical support needs, including combing databases, developing educational materials and using quantitative research to tell stories and illustrate problems to diverse audiences.

**Prison Policy Initiative**                    **Cincinnati, OH; Northampton, MA**
**Open Society Institute Soros Justice Fellow**          **June 2003 – May 2005**

Conducted a national research and advocacy project to quantify, publicize, and reform the current practice of utilizing the Census to shift political power away from poor and minority communities and into the hands of prison expansion proponents. Conducted state-specific analyses of the impact of prison-based gerrymandering on state legislative redistricting and develop both national and state-specific solutions.

**Center for First Amendment Rights**                          **Hartford, CT**
**Webmaster**                          **December 2000 – May 2003**

**Law Clerk**                                               **Springfield, MA**
**Magistrate Judge Kenneth P. Neiman**                 **January – May 2003**

**Jessup International Moot Court Team**                    **Springfield, MA**
**Member**                          **October 2002 – February 2003**

**Anti-Discrimination Clinic**                             **Springfield, MA**
**Student Attorney**                    **August 2002 – December 2002**
Represented victims of employment discrimination and public accommodations discrimination in proceedings before the Massachusetts Commission Against Discrimination. Performed research for the Attorney General's Office on housing discrimination cases.

**Capital Defender Office**                                  **Albany, NY**
**Legal Intern**                          **June 2002 – August 2002**
Performed legal research on the constitutionality of a jury "life qualification" statute. Digitized and organized mitigation evidence. Transcribed witness interviews.

**Massachusetts Correctional Legal Services**              **Boston, MA**
**Legal Intern**                          **May 2001 – October 2001**
Investigated prisoner complaints of poor medical care; conducted medical advocacy and prepared referrals to outside attorneys for potential medical malpractice litigation. Investigated a major disturbance at a super-maximum facility and represented the alleged ring-leader against 54 charges at his disciplinary hearing and on administrative appeal.

**TEACHING**       **Smith College**                          **Northampton, MA**
**EXPERIENCE**     **Instructor**          **January 2003, 2005, 2006, 2011, 2012**
Designed and taught "Prison Industrial Complex Through Film" non-credit course.

**Smith College**                          **Northampton, MA**
**Instructor**                          **January 2002, 2004, 2008**
Designed and taught "Constitutional Law Through Film" non-credit course.

Peter Wagner                                                                        page 3

| | |
|---|---|
| **HONORS & AWARDS** | Soros Justice Postgraduate Fellow, 2003-2005<br>Massachusetts Bar Foundation Legal Intern Fellow, Summer 2001<br>Partial tuition academic scholarship, 1999-2003<br>Recipient, Law Alumni Scholarship, Fall 2002<br>Recipient, Katherine M. Connell Scholarship, Fall 2001<br>Deans' List, Spring 2002 |
| **PUBLISHED REPORTS** | Primer for reporters on county or municipal redistricting & prison-based gerrymandering, by Peter Wagner, Prison Policy Initiative, March 2011 |
| | Preventing Prison-Based Gerrymandering in Redistricting: What to Watch For, by Peter Wagner and Brenda Wright, Prison Policy Initiative and Dēmos, February 23, 2011 |
| | Aleks Kajstura and Peter Wagner, *Importing Constituents: Incarcerated People and Political Clout in California*, Prison Policy Initiative, March 2010 |
| | Peter Wagner and Christian de Ocejo, *Importing Constituents: Incarcerated People and Political Clout in Connecticut*, Prison Policy Initiative, March 2010 |
| | Peter Wagner, Aleks Kajstura, Elena Lavarreda, Christian de Ocejo, and Sheila Vennell O'Rourke, *Fixing prison-based gerrymandering after the 2010 Census: A 50 state guide*, Prison Policy Initiative, March 2010 |
| | Peter Wagner and Olivia Cummings, *Importing Constituents: Incarcerated People and Political Clout in Maryland*, Prison Policy Initiative, March 4, 2010 |
| | Brett Blank and Peter Wagner, *Importing Constituents: Prisoners and Political Clout in Illinois*, Prison Policy Initiative, February 2010 |
| | Elena Lavarreda, Peter Wagner and Rose Heyer, *Importing Constituents: Prisoners and Political Clout in Massachusetts*, Prison Policy Initiative, October 6, 2009 |
| | Peter Wagner and Elena Lavarreda, *Importing Constituents: Prisoners and Political Clout in Oklahoma*, Prison Policy Initiative, September 21, 2009 |
| | Peter Wagner and Elena Lavarreda, *Importing Constituents: Prisoners and Political Clout in Pennsylvania*, Prison Policy Initiative, June 26, 2009 |
| | Aleks Kajstura, Peter Wagner and Leah Sakala, *Reaching too far, coming up short: How large sentencing enhancement zones miss the mark*, Prison Policy Initiative, January, 2009 |
| | Peter Wagner, *Phantom Constituents in Maine's Regional School Unit 13: How the Census Bureau's outdated method of counting prisoners harms democracy*, Prison Policy Initiative, January 15, 2009 |

Aleks Kajstura, Peter Wagner and William Goldberg, *The Geography of Punishment: How Huge Sentencing Enhancement Zones Harm Communities, Fail to Protect Children*, Prison Policy Initiative, July 2008

John Hejduk and Peter Wagner*, Importing Constituents: Prisoners and Political Clout in Wisconsin*, Prison Policy Initiative, March, 2008

Peter Wagner and JooHye DellaRocco, *Phantom Constituents in Tennessee's Boards of County Commissioners*, Prison Policy Initiative, February 21, 2008

Brenda Wright and Peter Wagner, *Report to U.N. Committee for the Elimination of Racial Discrimination that U.S. Census practices dilute votes of minority populations*, Prison Working Group, December 2007

Peter Wagner, Meghan Rudy, Ellie Happel and Will Goldberg, *Phantom constituents in the Empire State: How outdated Census Bureau methodology burdens New York counties*, Prison Policy Initiative, July 18, 2007

Peter Wagner, *Democracy Toolkit: Interactive tools to help rural citizens determine if prison populations in legislative districts are diluting their right to equal representation*, Prison Policy Initiative, April 2007

Peter Wagner, Eric Lotke and Andrew Beveridge*, Why the Census Bureau can and must start collecting the home addresses of incarcerated people*, Prison Policy Initiative, February 10, 2006

*Brenda Wright and Peter Wagner, Brief Amici Curiae In Support Of Plaintiff-Appellant Jalil Abdul Muntaqim, a/k/a/Anthony Bottom, Urging Reversal Of The District Court,* Prison Policy Initiative and National Voting Rights Institute, January 28, 2005

Peter Wagner, *Importing Constituents: Prisoners and Political Clout in Nevada* Prison Policy Initiative and the Progressive Leadership Alliance of Nevada, December 15, 2004

Peter Wagner, *Importing Constituents: Prisoners and Political Clout in Montana,* Prison Policy Initiative, December 14, 2004

Peter Wagner and Rose Heyer, *Importing Constituents: Prisoners and Political Clout in Texas*, Prison Policy Initiative, November 8, 2004

Peter Wagner, *Jim Crow in Massachusetts? Prisoner disenfranchisement,* Prison Policy Initiative, October 31, 2004

Peter Wagner, *Actual Constituents: Students and Political Clout in New York,* Prison Policy Initiative, October 6, 2004

*Peter Wagner and Rose Heyer, Importing Constituents: Prisoners and Political Clout in Ohio*, Prison Policy Initiative, July 6, 2004

Rose Heyer and Peter Wagner, *Too big to ignore: How counting people in prisons distorted Census 2000*, Prison Policy Initiative, April 13, 2004

Peter Wagner, *The Prison Index: Taking the Pulse of the Crime Control Industry*, Prison Policy Initiative and Western Prison Project, April 2003

Peter Wagner, *Importing Constituents: Prisoners and Political Clout in New York*, Prison Policy Initiative, April 22, 2002.

**BOOK CHAPTERS**  Gary Hunter and Peter Wagner, Prisons, Politics and the Census, in *Prison Profiteers: Who Makes Money from Mass Incarceration*, edited by Tara Herivel and Paul Wright, The New Press (2008)

Peter Wagner, Skewing Democracy: Where the Census Counts Prisoners, in *The Emerging Agenda: Poverty and Race in America*, edited by Chester Hartman, Lexington Books (2006)

**EDITED ARTICLES**  Peter Wagner, Breaking the Census: Redistricting in an era of mass incarceration, William Mitchell Law Review, Spring 2012 (forthcoming)

Peter Wagner, Prison Populations Create Complications at Redistricting Time, *Missouri Municipal Review*, January 2012

Eric Lotke and Peter Wagner, Prisoners of the Census: Electoral and Financial Consequences of Counting Prisoners Where They Go, Not Where They Come From, *Pace Law Review*, Volume 24, Number 2 (Spring 2004)

**FILM APPEARANCES**  *Gerrymandering*, directed by Jeff Reichert, Green Film Company (2010)

**PRESENTATIONS (SELECT)**  Keynote address: *Prison Branches: The Untapped Resource*, 101st NAACP Convention Adjunct Event, Crossroads Correctional Center, (Cameron, MO) July 11, 2010

Presentation: *Prisons, Redistricting, and the Census: New Options for States and Localities*, Congressional briefing, Rayburn Congressional Office Building, (Washington, D.C.) April 27, 2010

Panelist: *Census and Redistricting*, NAACP Continuing Legal Education Seminar, 100th NAACP Convention, (New York City) July 13, 2009

Panelist: *Technical solutions to avoid prison-based gerrymandering*, National Conference of State Legislature's Legislative Summit, (Philadelphia, PA) July 21, 2009

Workshop: *Legislative options to avoid prison-based gerrymandering*, Legislative Black Caucus of Maryland, (Annapolis, MD) October 2, 2009

Keynote address: *The U.S. Prison System: Community and Political Impacts*, Brown University (Providence, RI) December 3, 2005

Keynote address: *Coming Home: Addressing the Issues Faced by Prisoners as They Re-enter the Community*, Community Service Society of New York (New York City) December 10, 2005

Panel presentation: *Prisoners of the Census: Criminal Justice Populations in Census Data*, Crime Mapping Research Conference, National Institute of Justice (Savannah, GA), September 9, 2005

Panel presentation: *Felony disenfranchisement and its impact on the Voting Rights Act*, 40 Years After the Voting Rights Act, The Democracy Project, (Selma, AL) August 5, 2005

Panel presentation: *Protecting and expanding voting rights*, NAACP Continuing Legal Education Seminar, NAACP Convention (Milwaukee, WI) July 11, 2005

Presentation: *Changing how prisoners are counted in the Census*, presentation to the Residence Rules in the Decennial Census Panel at the National Academy of Sciences (Washington, D.C.) June 2, 2005

Presentation: *Prisoners, the Census and the Political Geography of Mass Incarceration,* Prisons 2004: Prisons and Penal Policy: International Perspectives (City University London, England) June 25, 2004

Panel presentation: *Prisoners and Redistricting, Accuracy Counts: Incarcerated People & the Census* Congressional Briefing (Washington, D.C.) April 14, 2004

Panel presentation: *Prisoners and the Census*, History's Scorecard: The Role of the Census Bureau in America's Development, Census Bureau (Washington D.C.) March 5, 2004

Presentation: *Prisoners and the Census*, U.S. Census Policy and Prisoners Working Meeting, Ford Foundation (New York City) June 30, 2003

Panel presentation: *Felon Disenfranchisement: Black Codes in the 21st Century*, Africana Studies Against Criminal Injustice Conference (New York City) April 11, 2003

Panel presentation: *What's in a Number: Diluted Census and Voting Representation*, National Summit on the Impact of Incarceration on Black and Latino Families and Communities (Washington D.C.) June 29, 2002

Keynote address: *Unlocking Prisons: Re-Thinking the Crisis, Creating a Network for Action Conference*, Harvard University (Cambridge, MA) April 27, 2002

Panel presentation: Felon Disenfranchisement and the Three-Fifths Clause, Rebellious Lawyering Conference, Yale University (New Haven, CT) February 18, 2001

**LEGISLATIVE TESTIMONY**

Testimony in support of SB400, the "No Representation Without Population Act" before the Education, Health & Environmental Affairs Committee of the Maryland State Senate (Annapolis, MD) March 4, 2010

Testimony on the 2010 Census: Enumerating People Living in Group Quarters, before the Subcommittee on Information Policy, Census and National Archives, Committee on Oversight and Government Reform, United States House of Representatives (New York, NY) February 22, 2010

Testimony in support of the Census Correction Amendment, before the Committee on State Affairs and Homeland Security, Wisconsin House of Representatives (Madison, WI) September 15, 2009

Testimony in support of ending prison-based gerrymandering, before the Assembly Standing Committee on Governmental Operations and the Assembly Legislative Task Force on Demographic Research and Reapportionment, New York State Assembly (Albany, NY) October 24, 2007

Testimony in support of ending prison-based gerrymandering, before the Assembly Standing Committee on Governmental Operations and the Assembly Legislative Task Force on Demographic Research and Reapportionment, New York State Assembly (New York, NY) October 17, 2006

Testimony on Adjusting Prisoner Census Enumeration for Purposes of State Legislative Redistricting, New York State Legislative Task Force on Demographic Research and Reapportionment (Bronx, NY) March 14, 2002

**PROFESSIONAL ASSOCIATIONS**

Member of Massachusetts Bar, BBO# 662207