# EXHIBIT 26

SECOND EXPERT REPORT OF PETER WAGNER, J.D.

**John Doe #1, _et al._, v. Richard Snyder, _et al._**

### EXPERT REPORT/DECLARATION OF PETER WAGNER, J.D.

**Executive Summary**

The Michigan Sex Offender Registration Act (SORA) prohibits individuals on the registry from engaging in certain activities within any "student safety zone." How a "student safety zone" is defined and measured determines the shape and extent of the protected areas, and therefore controls whether or not a registrant is engaging in unlawful behavior.  The major findings of this report include:

1. In Michigan, the size, shape and boundaries of "student safety zones" are effectively unknowable, even for experts with specialized software and relevant training, because:

   - Different measurement methodologies significantly affect shape of exclusion zones, and can impact the size of the protected area by a factor of 3.5 or more.

   - Michigan law does not specify how safety zones are to be measured, leaving these decisions to local law enforcement agencies.  This lack of uniformity likely results in significant measurement variation around the state, based on how local law enforcement officials choose to interpret the law.

   - The state of Michigan does not make available even the most basic information about school locations that is needed for registrants to determine in advance whether residing/working/visiting a particular location is illegal.  Some methodologies for application of the law further require specialized parcel data that is also not publically available.

   - Most people are unable to accurately determine 1,000-foot distances. Tools that have the capability to measure 1,000-foot distances are not appropriate for measuring the prohibited zones. Mapping software and tools that can be used to determine the area of the zones are generally not

accessible to laypeople, and require data that are prohibitively expensive.

2. Despite the unavailability of critical data, I have produced an admittedly under-inclusive map for the City of Grand Rapids that illustrates the "student safety zones" that the law creates. That map shows that at least **46% of Grand Rapids property parcels lie within exclusion zones**. Many of the "permissible" areas, furthermore, are likely not appropriate for living, working, or spending time, for example because they are industrial areas.

This analysis concludes that there is no reasonable way for a person who seeks to comply with the law to be able to identify and avoid the protected areas.

**Table of Contents**

I. Introduction ................................................................ 1

II. Relevant experience ................................................. 1

III.   Overview of factors in exclusion zone mapping .................... 3

IV.   The nature of the prohibited activity affects how the
        exclusion zone is measured .................................................... 3

V.   Determining a specified distance:  Different measurement
        methods affect the size and boundaries of exclusion zones ... 4

    A.   Measuring as the crow flies results in the creation of
            exclusion zones that are, for the purposes of human travel,
            far more than 1,000 feet away from a school ..................... 5

    B.   Variation in the methodology used to measure the protected
            distance results in dramatically disparate applications of the
            law, and can impact the size of an exclusion zone by a
            factor of 3.5 or more. ........................................... 7

VI.   The practicalities of measuring distance:  How to actually
        measure 1,000 feet. ............................................... 15

VII.  1,000 feet is actually quite far. ........................................ 16

VIII. Defining the specified place:  Without the necessary data, it
        is difficult or impossible to determine what areas are within
        1,000 feet of a school. ............................................ 19

    A.   The Michigan State Police does not make public a list of
            schools or school properties, making it difficult or
            impossible to accurately determine what areas are within
            exclusion zones. .............................................. 19

    B.   Parcel data is required in order to comply with the
            exclusion zone law. ........................................... 21

    C.   Michigan does not make parcel data publicly available,
            making it difficult or impossible to accurately determine
            what locations are within exclusion zones ...................... 22

IX.   Exclusion zones make large areas off-limits ...................... 24

A.   Methodology and data sources used to map exclusion
      zones. ................................................................... 24

B.   In Grand Rapids, 46% of Properties Fall within an
      Exclusion Zone. ................................................... 28

C.   Exclusion zones expand significantly if the number of
      protected places increases. ................................. 28

X.   People on the registry cannot reliably know what areas are
      within 1,000 feet of a school. ................................. 33

XI.   Statement of compensation ................................. 35

## I. Introduction

I am an attorney and the Executive Director of the Prison Policy Initiative, a nonprofit research organization based in Easthampton, Massachusetts. The Prison Policy Initiative focuses on the geographic implications of criminal justice policy.

I have been retained by the plaintiffs as a geographic expert to quantify and comment on the impact of Michigan's laws that prohibit registered sex offenders from living, working, or loitering within 1,000 feet of a school.

## II. Relevant experience

As further detailed in my attached C.V., I regularly make maps that analyze U.S. Census and other demographic data in relation to statutory restrictions that impose geographic limits for criminal justice purposes.  My experience includes:

- I testified in *Whitaker v. Perdue* (U.S. Dist. Ct., N.D. Georgia, 4:06-cv-00140-CC) in 2006 and 2008 regarding the impact of HB1059, Georgia's sex offender residency restriction law. I prepared maps of 1,000-foot exclusion zones around schools, day-care centers, bus stops, parks and other areas listed in the statute as places that people on the sex offender registry cannot live. I initially prepared analyses of the law's effect in 6 counties, and subsequently prepared detailed maps of the exclusion zones in two additional counties.

- I testified in *Ryals v. City of Englewood* (U.S. Dist. Ct., Colo., 12-cv-02178-RBJ) in July 2013 regarding the impact of a city ordinance that prevented certain people on the sex offender registry from residing within 2,000 feet of schools, parks, and playgrounds, and within 1,000 feet of child care centers, recreation centers, swimming pools, and other locations.[1]

- In September 2013, I submitted an expert report/declaration in the case *McGuire vs. City of Montgomery,* Case No. 2:11-CV-1027 (M.D.Ala.) regarding the impact in

---

[1] This is the only case that I have testified as an expert at trial or by deposition in the last four years.

Montgomery of a state statute that prohibits sex offenders from living or working within 2,000 feet of schools or childcare facilities.

• I prepared an expert report/declaration in the Massachusetts state court case of *Five Registered Sex Offenders v. the City of Lynn* on April 10, 2012, analyzing an ordinance prohibiting registered sex offenders from residing within 1,000 feet of schools and parks.

• In 2006, I prepared a detailed study for the Massachusetts Committee for Public Counsel Services of a sex offender residence ordinance in Revere, Massachusetts, which prohibited offenders from living within 1,000 linear feet of a school, nursery school, day care center, kindergarten, or playground. I have performed similar unpublished analyses in the city of Waltham (2010) and the town of Barnstable (2009).

• From 2006 to 2009, I led a project that involved mapping 1,000-foot zones around schools — and a smaller distance around parks — in Hampden County, Massachusetts and then analyzing the Census populations of the affected areas. The purpose was to evaluate the efficacy and socio-economic implications of a sentencing law that gave higher sentences for certain drug offenses committed in prohibited areas. These findings were published in reports I co-authored entitled *The Geography of Punishment: How Huge Sentencing Enhancement Zones Harm Communities, Fail to Protect Children*[2] and *Reaching too far, coming up short: How large sentencing enhancement zones miss the mark.*[3]

• I prepared a prior expert report in the present case: Docket 11-1.

---

[2] *The Geography of Punishment: How Huge Sentencing Enhancement Zones Harm Communities, Fail to Protect Children*, by Aleks Kajstura, Peter Wagner and William Goldberg, Prison Policy Initiative, July 2008 available at http://www.prisonpolicy.org/zones/
[3] *Reaching too far, coming up short: How large sentencing enhancement zones miss the mark*, by Aleks Kajstura, Peter Wagner and Leah Sakala, Prison Policy Initiative, January, 2009, available at http://www.prisonpolicy.org/toofar/

### III.     Overview of factors in exclusion zone mapping.

The Michigan Sex Offender Registration Act (SORA) prohibits registrants from engaging in certain activities within any "student safety zone." My analysis finds that four significant variables radically affect the interpretation of the law:

1. The activity (reside, work, or "loiter," as defined in M.C.L. § 28.733(b))
2. The measurement of the distance (as the crow flies or along the road)
3. What point the distance is measured from (the building, the property line, etc.)
4. What point the distance is measured to (your person, your building, your property line, etc.)

Analysis of each of these factors shows that mapping the exclusion zones – and hence determining the extent of the prohibition – is extremely complicated.  Any variations in any of these factors leads to dramatically different results in the size, shape and boundaries of the exclusion zones, and therefore, in whether or not an individual is engaging in lawful behavior.

### IV.     The nature of the prohibited activity affects how the exclusion zone is measured.

It is obvious that in order for a registrant to comply with an exclusion zone, the registrant must be able to clearly understand which activities are prohibited within the restricted area.[4]  Less obvious is that the very *nature* of the prohibited activity can affect how one measures distance from that activity, making it even more difficult for a registrant to determine whether or not his or her location *and* activity are in compliance with the statute.

Michigan law prohibits three activities within the protected zones: residing, working, and "loitering."  The fact that working or "loitering" are not necessarily stationary activities that take place in a single, fixed location means that determining whether or not a registrant is in compliance with the law would often involve real-time mapping of the distance between a fixed protected area and an ambulatory person going about his or her daily business.

---

[4] Whether it is clear exactly what conduct constitutes residing, working and "loitering" is beyond the scope of this report.

While in most cases people reside at a fixed location, many people do not work at a fixed location. For example, an office or factory worker likely works in one place, but a bus driver, mail carrier, or construction worker does not.  Furthermore, "loitering" – which the statute defines as "remain[ing] for a period of time and under circumstances that a reasonable person would determine is for the primary purpose of observing or contacting minors," M.C.L. § 28.733(b) – can occur anyplace a person goes. For example, a parent supervising her young child would be "loitering" any time she remains with her child at any place for a period of time.

While it is possible to agree on a standard method of mapping the distance between two stationary points, such as between a registrant's house and a particular school, measuring the distance between a moving person and all protected locations in the area in a standard manner is far more complex.  For example, measuring from parcel boundary to parcel boundary might make sense to determine the distance between two fixed points (e.g. a school property boundary and a residential property boundary), but it is much more difficult to measure from parcel boundary to parcel boundary if one is measuring between a fixed point (e.g. a school property boundary) and a moving point (e.g. a parent walking through town with her child).

**V.    Determining a specified distance:  Different measurement methods affect the size and boundaries of exclusion zones.**

1,000 feet is an objective distance.  In order to determine if a particular point is within 1,000 feet of a protected place, one needs to know:

- Does one measure the distance as the crow flies or as a person actually could travel?
- Between which two points does one measure?

It is impossible to accurately determine the locations of exclusion zones without knowing the answers to these questions.  Moreover, the answers to these two questions have a significant impact on the size, shape and boundaries of those zones.

**A. Measuring as the crow flies results in the creation of exclusion zones that are, for the purposes of human travel, far more than 1,000 feet away from a school.**

There are two main ways to measure 1,000 feet for the purposes of determining compliance with the law. One way to measure 1,000 feet is "as the crow flies" in a straight line between two points. Alternatively, one can measure 1,000 feet as human beings actually travel, such as via the distance Google Maps reports a person must travel to get from one point to another.

If exclusion zones for registrants are measured as the crow flies, then Michigan's sex offender registration act restricts access to areas that, in practical terms, are not at all close to schools. Measuring the exclusion zone in a straight line, regardless of obstruction, renders many areas off limits that are, for all practical purposes, distant from the protected area.

Below in Figure 1 is an example of a single 1,000-foot school zone from the Prison Policy Initiative's *Geography of Punishment* report illustrating how a 1,000-foot zone can apply to housing that, in human terms, is significantly further away. The map below shows a single school zone that abuts both a large pond and a cemetery. Given the arrangement of properties, a person living in the marked house would need to travel 3,200 feet to get to the closest part of the school property (without trespassing or navigating major obstacles). Getting to the closest part of the actual school building would require a total travel distance of 4,200 feet — far beyond the 1,000-foot scope of the area the legislature intended to protect.



**Figure 1.**

Another example from my *Geography of Punishment* report is even more extreme: The 1,000-foot zone from a high school reaches across the Connecticut River (the largest river in all of New England) to reach a different town. (See Figure 2.) Although the legislature assumed that all people within 1,000 feet of the school would have proximity to children, the driving distance between the two points in this example is 4.4 miles, which would take about 11 minutes to travel by car.



**Figure 2.**

In sum, if Michigan's sex offender registration act requires that exclusion zones be measured as the crow files, regardless of the obstacles between the registrant's location and the school, the

distance – understand in human terms of how one actually travels – can be much more than 1,000 feet.

**B. Variation in the methodology used to measure the protected distance results in dramatically disparate applications of the law, and can impact the size of an exclusion zone by a factor of 3.5 or more.**

To measure distance, one must decide not only how to measure (the linear distance versus actual travel distance), but also where to start and end that measurement. As discussed above, if the registrant is engaging in an ambulatory activity, it becomes even more difficult to determine from which point one should measure.[5] Therefore, for the purposes of this discussion, I will focus on measurement between two fixed locations, such as between a school and a registrant's home.

There are at least four possible ways to measure the distance:

- From the school building to the home building.
- From the school property line to the home property line.
- From the school property line to the home building.
- From the school building to the home property line.

The MSP's Sex Offender Registration Unit itself does not know or provide guidance on the appropriate starting and ending point criteria to use to measure 1,000 feet. As Leslie Wagner, Michigan's Sex Offender Registry Coordinator, testified:

> A: We don't know and I don't know in the registry if it's supposed to be from one parcel to a point or parcel to parcel or point to point…
> Q. You yourself are not sure whether it should be measured parcel to parcel or point to point?
> A. Correct.[6]

Ms. Wagner further testified that, although the SOR Unit is considering establishing a mapping feature in an upgraded version of its database in the future, whether mapping will be done from

---

[5] For example, should the distance be measure on a parcel to parcel basis when a registrant crosses into a corner of a very large parcel that may abut, many thousands of feet away, a school property?

[6] Wagner Deposition Transcript, 28:2-10.

point to point or from parcel to parcel has yet to be decided, and will depend on whether the SOR unit can access parcel data.[7]

The Michigan State Police has left the decision about how to measure up to local law enforcement agencies. As a result, different law enforcement agencies may make different decisions about where the 1,000 feet starts and stops.  For example, the following exchange occurred during the deposition of Sgt. Bruce Payne, Michigan's Sex Offender Registry Enforcement Coordinator:

> Q.  But it would be the local law enforcement decision whether to measure from the building to the property line or whether to measure from the property line to property line?
> A.  Absolutely, yes.[8]

Although Michigan's Sex Offender Registration Unit is itself unclear how distances should be measured, the decision about which measurement methodology to use has a tremendous impact on the size, shape, and boundaries of exclusion zones, and hence a tremendous impact on whether registrants are in fact residing, working, or visiting a place unlawfully.  The following example illustrates the large geographic differences that result from variations in measurement methods.

Figure 3 shows an example area that contains the George Washington Carver High School in Montgomery, Alabama.[9] The school's green roofed buildings, the baseball fields and the large track are visible:

---

[7] Wagner Deposition Transcript, 28:11 – 29:2.
[8] Payne Deposition Transcript, 35:14-18.
[9] Due to the difficulty of obtaining parcel data in Michigan, I used parcel data from Montgomery, Alabama to create this example.



**Figure 3.**

Figure 4 shows, in successively darker colors, a school symbol for the front entrance to the school, the school building's outline in orange, and the school's property line in brown:



**Figure 4.**

Figure 5 shows 1,000-foot exclusion zones drawn around each of three nested protected areas: the school's entrance, the school

building and the school property.  Notably, the area covered by the same 1,000-foot distance around the school property perimeter is much more extensive than the area that extends from either the school entrance or the perimeter of the building itself:



Figure 5.

In fact, the sizes of the three distinct areas can be quantified and directly compared:

| Starting point for the protected area | Area of 1,000-foot exclusion zone around protected place |
|---|---|
| School Entrance | 3,140,214 square feet |
| School Building | 5,367,492 square feet |
| School Property | 11,068,275 square feet |

Table 1.

In this example, the area of the 1,000-foot exclusion zone is 3.5 times larger if the zone is measured from the property line than if it is measured from a single point at the entrance of the school.  The differential created by the two measurement techniques would be even greater for a larger parcel, and consequently would be smaller for a smaller parcel.[10]

---

[10] There is not a clear mathematical formula for this relationship, but it is analogous to the calculation for the area of a circle where the area equals π times the square of the radius. Doubling the radius of a circle results in increasing the area by *four* times. Since drawing 1,000-foot exlusion zones around an irregular shape does not produce a circle — but rather a rounded version of the irregular shape — a simple formula like $\pi r^2$ is not

Obviously, the sizes of school buildings and the properties they sit on vary from school to school depending on many factors including the number of students, the number of ball fields, and so forth.  However, as a general rule, zones extending from school property lines are significantly larger than the zones measured from the buildings themselves.

Not only does measuring from the property line rather than a single point significantly increase the size of the exclusion zone, it also affects the shape. Measuring 1,000 feet from a fixed point produces a circle.  Measuring 1,000 feet from a parcel boundary will produce an irregular shape (unless the parcel itself is a circle).

Furthermore, if the zones are measured based on property lines, drawing simple "buffers"[11] around protected places, regardless of how they are measured, still understates the scope of the exclusion zones.  If the 1,000-foot distance is measured to the home property line, rather than to the home itself, the entire parcel of the home becomes off limits even if the home itself is outside the 1,000-foot distance.

Figures 6a, 6b and 6c show the properties that are bisected by the 1,000-foot school buffers as measured around the school's front door, the building and the property:

---

appropriate. The same underlying principle applies, though, that increasing the distance by which the zone is measured by a certain percent necessarily increases the protected area by more than that percent.

[11] "Buffers" are a technical term used in mapping software to draw a shape with contours that are a defined by given distance from another shape. Many mapping technicians incorrectly draw only the buffer zones, neglecting to include the area of the bisected parcels, when determining the extent of an exclusion zone.



**Figure 6a.  Exclusion zone measured from school entrance to home property line.**



**Figure 6b.  Exclusion zone measured from school building perimeter to home property line.**



**Figure 6c. Exclusion zone measured from school property line to home property line.**

Again, the size of the exclusion zone depends on which measurement method one chooses. Moreover when the zones are measured based on parcel lines, the size of the parcels that intersect the 1,000-foot line significantly impacts the total size of the exclusion zone. If the intersecting parcels are large, the exclusion zone will be much larger than if the intersecting parcels are small.

Figures 6a, 6b, and 6c also illustrate the bizarre shapes created by exclusion zones that are measured parcel-to-parcel. In this context it is critical to note that if parcel-to-parcel measurement is used for all prohibited conduct, registrants must be able to identify these oddly-shaped exclusion zones and structure their lives accordingly, not just when making larger decisions such as where to live, but also when engaging in everyday activities such as taking their children to the park.

Finally, the question of whether distance should be measured as the crow flies, or as human beings actually travel, also significantly impacts the size, shape and boundaries of the exclusion zone. Figure 7a shows the Carver High School property and 1,000-foot distances along streets that connect to the school property.[12]  Figure

---

[12] It is also possible that the 1,000-foot distances could be measured along the road on the ground from either the building or the front entrance, although in this case, given the

7b shows the properties that are adjacent to the 1,000-foot distances as measured along the roads in Figure 7a.



**Figure 7a.**



**Figure 7b.**

large size of the parcel and the long school driveway, the lines would reach even less of the residential areas.

In sum, in Michigan the decision about which measurement method to use to determine the protected zones is left to each individual law enforcement agency. Yet the particular measurement methodology will determine the size, shape and boundaries of the exclusion zone. Therefore, in many circumstances, whether or not a person is violating the law will depend on which measurement method an individual law enforcement agency chooses to use.

## VI.   The practicalities of measuring distance:  How to actually measure 1,000 feet.

Assuming that one knows both the starting and ending point of the distance to be measured, and also that one also knows whether the distance should be measured linearly or as humans travel, a separate question remains of how – as a practical matter – to actually measure the distance.  1,000 feet is not a distance that the average person can accurately approximate visually (as compared to, for example, an inch or a foot, which are familiar to most people and relatively easy to approximate).

There are two basic methods that are appropriate for calculating distances of 1,000 feet. Neither of them are common or easy, and both produce results that non-geographers tend to find surprising.

Those two methods are:
- Using mapping software like Google Earth, or more specialized software like ArcView to measure the given distance in a straight line as the crow flies.
- Using specialized equipment to measure the given distance on the ground.

Both of these methods require the ability to locate the parcel boundaries, be it electronically or on the ground.  I've only rarely — and never in Michigan — seen parcel data available in a format that can be directly used in Google Earth. Parcel data is theoretically available for ArcView and similar programs, but it is not available for all areas, and where it does exist, it is often prohibitively expensive to obtain. Standard licenses for specialized software such as ArcView start at $1,500, and using the software requires considerable training and experience. Further, as I explain below, this data in Michigan can cost up to $125,000 for a single county.

It is simply unreasonable to require registrants to purchase expensive mapping software and geographic data, acquire the technical skills to use such programs, and effectively become mapping experts in order to simply go about their daily business in manner that complies with state law.

Furthermore, it is impossible to measure 1,000 feet on the ground with ordinary consumer tools.[13] A common carpentry tape measure extends only 16 or 30 feet.[14]  Even more expensive consumer tools cannot measure 1,000 feet.  Home Depot, for example, sells very large tape measures that come on a spool and extend to 100 or 300 feet[15], as well as a laser range finder that measures up to 650 feet.[16] But all of these tools fall far short of reaching the 1,000 feet required to determine the scope of a protected zone.

Registrants could potentially buy a measuring wheel, which contains an odometer similar to the one in a car and measures feet instead of miles. This tool, however, only works on pavement and other smooth surfaces and is not capable of measuring distances "as the crow flies" if there are any obstructions (e.g. other buildings) between the two points of measurement.

## VII.    1,000 feet is actually quite far.

In our experience, 1,000 feet is farther than most people assume. For our *Geography of Punishment* report, we set out to discover whether people can be seen at 1,000 feet from a school under ideal circumstances. We sought out a school that was located on a flat, straight and unobstructed road, but we had considerable difficulty finding such a location. We eventually found a street in West Springfield, Mass. that fit our criteria and then, because common household tools are incapable of measuring such large distances,

---

[13] By contrast professional equipment, such as those used by surveyors, would accurately measure distances, but most registrants to not have access to such equipment, nor know how to use it.

[14] See http://www.homedepot.com/b/Tools-Hardware-Hand-Tools-Measure-Layout-Tools-Measuring-Tools/N-5yc1vZc24n

[15] See the available "long tapes" listed at http://www.homedepot.com/b/Tools-Hardware-Hand-Tools-Measure-Layout-Tools-Measuring-Tools-Tape-Measures/Long-Tape/N-5yc1vZc256Z1z0zwja

[16] The Hilti PD 40 Laser Range Meter retails for $359. One serious challenge with using this device is that you aim the laser at a target, meaning that while it could be used to measure *from* a property line, it couldn't measure *to* a property line. http://www.homedepot.com/p/Hilti-PD-40-Laser-Range-Meter-320280/100619110?N=c24n#.Um49XyhIfd6

we purchased a measuring wheel typically used for surveying.
While standing on the school's property line, I took pictures of my
co-author at various distances from the property. (See images in
Figure 8 below.) Despite having picked a day in early spring
before the trees had leaves, *and* despite being on the flattest street
we could find, *and* despite my co-author carrying a huge white
sign, it was nearly impossible to see my co-author at 500, let along
1,000 feet.









Figure 8.

**VIII.  Defining the specified place:  Without the necessary data, it is difficult or impossible to determine what areas are within 1,000 feet of a school.**

Assuming, for the sake of argument, that all the other issues with measurement could be resolved, it would still be difficult or impossible – even for individuals with sophisticated mapping technology – to determine the contours of Michigan's exclusion zones because the necessary data are not readily available.

**A.  The Michigan State Police does not make public a list of schools or school properties, making it difficult or impossible to accurately determine what areas are within exclusion zones.**

Michigan defines "student safety zones" as "the area that lies 1,000 feet or less from school property." M.C.L. § 28.733(f).  "School property" is defined as:

> a building, facility, structure, or real property owned, leased, or otherwise controlled by a school, other than a building, facility, structure, or real property that is no longer in use on a permanent or continuous basis, to which either of the following applies:
> (i) It is used to impart educational instruction.
> (ii) It is for use by students not more than 19 years of age for sports or other recreational activities. M.C.L. § 28.733(e).

A "school" is defined as "a public, private, denominational, or parochial school offering developmental kindergarten, kindergarten, or any grade from 1 through 12. School does not include a home school." M.C.L. § 28.733(d).  Thus, unless one knows where schools and school properties are, one cannot start to determine where "student safety zones" are.

As the complexity of the above definitions suggests, it is not always obvious whether a particular property qualifies as a school property, and therefore whether it triggers creation of an exclusion zone.  While a registrant may well know where the local high school is, it may not be immediately apparent whether a particular baseball diamond on which the school's team practices is owned

by the school or the town.[17] Even determining whether a particular educational program qualifies as a school can be difficult.  For example, when asked whether a particular Grand Rapids educational program located in a zoo qualifies as a school, Sgt. Bruce Payne, Michigan's Sex Offender Registry Enforcement Coordinator, testified that this was a question that local law enforcement would decide.[18]

The Michigan State Police does not provide the public with a list of schools or school properties that meet the definitions in SORA. In discovery, plaintiffs' counsel requested that defendants provide such a list for two sample counties so that I could map exclusion zones in those two jurisdictions.  Defendants responded that no such lists exist. Defendants did have in their possession a statewide list of schools.  But defendants refused to provide that document, maintaining that it was for use only by the Sex Offender Registration Unit staff. Defendants also indicated that the undisclosed list was *not* a comprehensive list of locations that qualify as "school property" for the purposes of M.C.L. § 28.733(e), because it "does not include all buildings, facilities, structures, or real property owned, leased, or otherwise controlled by the school."[19]

After negotiations between plaintiffs' counsel and defendants' counsel, the State Police eventually agreed to produce the aforementioned list. Because this list was only obtained by plaintiffs' counsel through this litigation, and even then not produced initially, it seems clear that ordinary registrants are unlikely to have access to the necessary information to map exclusion zones.

Despite the fact that the State Police's list does not apparently include all "school properties," as defined in SORA, I have used that list as a foundation to make the Michigan maps included in this report, since I have been unable to identify — and defendants have been unable to produce — a comprehensive list.

---

[17] *See also* Payne Deposition Transcript, 51:15-20:
      Q.   What if the property is owned by the township and regularly used by the school for sport, the school leases it for sports?
      [Objection omitted.]
      A.   That I don't know.
[18] Payne Deposition Transcript, 52:24 – 54:6.
[19] Defendants' Responses to Plaintiffs' First Set of Interrogatories, No. 6.

Accordingly, I supplemented this list with schools identified by Kent County as discussed in the methodology section, but I believe the list continues to be under-inclusive.

At the same time it is important to note that if the State Police's Sex Offender Registration Unit itself does not have comprehensive information on the location of all school properties, registrants who seek to comply with the SORA requirements cannot reasonably be expected to have it either.

### B. Parcel data is required in order to comply with the exclusion zone law.

If exclusion zones are measured from school property lines, rather than from schools themselves, then it is not enough to know where the schools are — one must also know the parcel boundaries both for the schools and for the surrounding parcels. Moreover, in order to accurately map exclusion zones, one must also be able to access property ownership data. For example, Figure 9 shows that the Carver High School is actually located on *two* parcels. The school building sits on the larger blue parcel, but a ball field owned by a school is located on a separate parcel marked by the pink area. The blue area is a single parcel, even though it is bisected by Oak Street and there is no visible indication that the eastern portion is a part of the school's property. The only way to determine the extent of the school's property is to use ownership data for all parcels in the area to determine which parcels are owned by schools – and thus should serve as the basis for determining protected areas – and which are not.



**Figure 9.**

Moreover, because Michigan's statute prohibits registrants from residing, working *and* "loitering" in exclusion zones, a registrant must know the parcel boundaries of every place where he or she could possibly reside, work, or spend time.

### C. Michigan does not make parcel data publicly available, making it difficult or impossible to accurately determine what locations are within exclusion zones.

Parcel boundaries are, of course, not marked on the ground.[20] The following exchange in the deposition of Sgt. Payne illustrates the problem:

> Q.  But if you're measuring property line to property line you have to know where the property line is?
> A.  Right, yes.
> Q.  So how would a registrant know where the property line is?
> A.  I don't know.  I don't have that answer.

---

[20] It would be impossible to physically demarcate the exclusion zones completely enough to allow people on the registry to choose to avoid them. While it might be possible to place identifying markers on public land, this would be particularly difficult in areas that contain multiple overlapping zone areas. Furthermore, many zones bisect private property where such identifiers would be almost certainly be unwelcome.

> Q.  But it's not like -- I mean, you can see a corner of a
>     building, right?  You can see where that is, right?
> A.  Right.
> Q.  But you can't necessarily see where a property line is;
>     is that accurate?
> A.  That could be accurate, yes.
> Q.  Do you know if there's any publicly available maps
>     showing parcel data that are available to registrants?
> A.  Personally I do not, no.[21]

Parcel data is not readily available in Michigan.  Indeed the
Michigan State Police Sex Offender Registration Unit itself does
not have access to parcel data, and has thus far been unable to
obtain it, despite attempting to do so through the Geographic
Information Systems office.[22] Neither I nor plaintiffs' counsel were
able to identify a source for statewide parcel data, nor was the
Michigan State Police able to provide any information on where
we might obtain such parcel data.[23]

Plaintiffs' counsel and I also engaged in extensive efforts, starting
in 2011, to obtain local parcel data.  These efforts included calling
police departments, contacting local information offices and
private vendors, sending Freedom of Information Act requests, and
speaking with Michigan experts regarding potential sources for this
data.  Some jurisdictions, such as Kent County and Sparta, told us
that they did not have such data.  Other jurisdictions and agencies
indicated that they did have parcel data, but the cost they quoted us
to obtain it was prohibitive. For example, my staff called the
following counties, and was quoted the following prices for parcel
data:

| | | |
|---|---|---|
| • | Macomb County: | $48,000 |
| • | Oakland County: | approximately $9,000, or just $4,299 for the parcel shapes without any of the descriptive attribute information |
| • | Genesee County: | $28,200 |
| • | Ingham County: | $9,651 |
| • | Kent County: | $125,000[24] |

---

[21] Payne Deposition Transcript, 57:9-23.
[22] *See* Deposition of Leslie Wagner, Registry Coordinator, 27:13-28:7; Deposition of
Karen Johnson, Manager of the MSP's Sex Offender Registration, 61:5-7.
[23] Johnson Deposition Transcript, 61:5-7.
[24] In January 2012 Kent County told me that they don't have the parcel data and they
denied a FOIA request for it, instead referring me to REGIS, an agency of the Grand

Shortly before this report was due, one of my staff discovered that although Kent County had responded to a Freedom of Information Act request indicating that it did not have parcel data, it is in fact possible to download the shapes of most parcels in Kent County from the county for free.[25] To date, I have been unable to identify any other sources of free parcel data for other Michigan jurisdictions.

## IX.    Exclusion zones make large areas off-limits.

Using data from Kent County — the only parcel data I was able to obtain — I was able to create a map of exclusion zones in the city of Grand Rapids.  Although, for the reasons set out above and below, that map is significantly under-inclusive, it shows that more than 46% of parcels in Grand Rapids are in exclusion zones.

### A.  Methodology and data sources used to map exclusion zones.

Although the process of mapping an exclusion zone is time-consuming, it is possible for someone with the relevant technical skills to do so, *provided one can obtain the necessary data.*[26]  If an

---

Valley Regional Metropolitan Council that sells the parcels for $1.25 each, or $125,000 for the county. See the REGIS price list at http://gvmc-regis.org/data/ordering.html
[25] See http://gis.kentcountymi.gov/public/kcviewerweb/
[26] To make my maps, I used a variety of data sources:

- Schools
    - A list of schools from the Michigan State Police, received in discovery. I had this spreadsheet list of addressed turned into a map of points for two purposes: to get a list of places considered to be schools by the MSP; and to access their approximate locations.  My staff and I then used the Kent County Parcel Viewer at http://gis.kentcountymi.gov/public/kcviewerweb/ to explore the ownership of individual parcels in that area. This allowed us to determine the boundaries of school property.
    - Kent County's GIS Data Library at https://www.accesskent.com/GISLibrary/#Administration has a point shapefile of schools in the County. My staff and I examined this list for schools that we believed were covered by the statute, removing places such as colleges and adult education centers from the list. Once the list was pared down to schools offering grades K-12, we once again used the Kent County Parcel Viewer at http://gis.kentcountymi.gov/public/kcviewerweb/ to explore the ownership of individual parcels in that area. This allowed us to determine the boundaries of school property.
    - Kent County's GIS Data Library also provides a downloadable shapefiles of parcel data at https://www.accesskent.com/GISLibrary/#Parcels&Streets.  These

exclusion zone is measured parcel-to-parcel, then the most critical ingredient is the complete geographic coordinates of every property parcel *boundary* in the jurisdiction.   For this reason, I focused on schools that were either located within the city of Grand Rapids, or within 1,000 feet of the city's border.

Using ArcView mapping software, I started with the Michigan State Police's list of schools that I received through discovery. I had demographer Bill Cooper geocode (transfer street addresses to map coordinates) all of the schools on the State Police's list to determine a preliminary location. Then, after excluding all of the schools that the State Police records indicated were closed, my staff used the Kent County's Parcel Viewer application[27] to determine the ownership and exact location(s) of each school which I then marked on the map.

Then, I used a shapefile of schools distributed by the Kent County GIS Department. This file already had the schools in a map format, but included colleges and some facilities that appeared to be day cares, which would not be subject to the statute. Then we used the internet to gather additional information about each school on the

---

files contain the boundary and address of every parcel in the County, but provide none of the other information necessary to confirm whether the property was a school. This is the same data that Kent County denied possessing in December 2011.

o  As discussed above, my staff and I used the Kent County Parcel Viewer at http://gis.kentcountymi.gov/public/kcviewerweb/ to explore the ownership of individual parcels around schools we identifed in the city of Grand Rapids and surrounding border areas. The Parcel Viewer included attributes that were not included with the County's downloadable shapefiles, such as the owner and address of the parcel.  The Parcel Viewer also allowed for a visual confirmation of buildings on the property through aerial imagery.

o  Where I could not conclusively determine the location of a school on one of the lists I conducted open web searches using Google (https://www.google.com/) to find supplemental information directly from the school's websites.

o  *Google Maps (https://maps.google.com/) was used where Parcel Viewer did not find an address on one of the school lists. Once I had the general location of the school provided by Google Maps I was able to manually find the school's location and corresponding parcel in the County's Parcel Viewer. Google Maps was also used when Street View feature was necessary to confirm school locations where there were ambiguities in the County's aerial imagery.

•  The shapefile I used to illustrate measurement methods using the George Washington Carver High School in Montgomery, Alabama was produced by and purchased from the Montgomery County Mapping Department, showing the boundaries and ownership of all properties in Montgomery County as of August 28, 2013.

[27] See https://www.accesskent.com/GISLibrary/#Parcels&Streets

county's schools list.[28] My staff used the Parcel Viewer application to determine the ownership and exact location(s) of each K-12 school, which I then marked on the map.

Critically, this methodology surely produces an under-inclusive map. My map does not reflect the exclusion zones created by schools that are neither on the State Police's list nor the county's list, and also schools on the county's list that had a K-12 function we were not immediately aware of. We may also have missed schools that are spread across multiple, non-adjoining parcels, or schools that rent separate parcels of land from different owners. Since neither the State Police nor the County GIS department are directly responsible for regulating or tracking schools, it is reasonable to assume that new schools, particularly small or private schools, will be missing from their lists. Furthermore, I excluded some schools from my map that are identified on the county's list because I decided that they were ambiguous in character, such as the Godfrey-Lee Adult & Alternative Education Station at 1530 Grandville Ave SW.

Finally, I then used the software to identify all parcels that were within 1,000 feet of each school property. See Figure 10 for my map.

I have significant expertise making maps and have made dozens of maps of exclusion zones in many states, allowing me to develop an efficient methodology. Despite this fact, I spent many hours over the course of almost 2 years looking for a place in Michigan where I could make a single map like this, and the map of Grand Rapids took approximately 6 hours of my time plus 10 hours of research support from my staff. It is reasonable to assume that generating a map such as this one would take far more time for a mapmaker with less experience, and would be impossible for a lay person on the registry who has no mapmaking experience or tools whatsoever.

---

[28] I did not evaluate the Michigan State Police's determination of what constitutes a school under the statute. The State Police said that they did not consider their list complete, so I looked only to supplement their list.

# "School safety zones" in the city of Grand Rapids



## Legend

**City of Grand Rapids Parcels**

☐ Parcels that may not be within 1,000 feet of a school parcel

■ Parcels within 1,000 feet of a school parcel

**Figure 10.**

### B. In Grand Rapids, 46% of Properties Fall within an Exclusion Zone.

I found that 30,316 out of 65,650 parcels in the city were within 1,000 feet of a school property. Based on this under-inclusive methodology, more than 46% of the city of Grand Rapids is off limits to people on the registry for living, working or spending time.

Based on my experience performing similar analyses of school zones elsewhere, I anticipate that many of the areas that the map shows as theoretically available will likely be unavailable in practice. For example, of the areas not in exclusion zones, some may not be suitable for housing or work because they are industrial or forested areas. Nor does the map account for whether or not the available areas include affordable housing.

### C. Exclusion zones expand significantly if the number of protected places increases.

Finally, it is worth reviewing two other Michigan maps, as they demonstrate some important geographic principles regarding exclusion zones.

The overall area covered by exclusion zones depends, generally, on the following factors:
- How distance is measured (from where to where, and whether it is linear distance or human travel distance);
- The distance used to measure from the protected place (here 1,000 feet);
- The number and distribution of the protected places, in this case school properties.

The Michigan legislature has considered expanding the categories — and therefore number of protected places — which could dramatically increase the total area covered by exclusion zones. This legislative session the Michigan Senate passed S.B. 76 and 77, which would criminalize "loitering" not only within a "student safety zone", but also within 1,000 feet of a child care center or daycare center.

There are approximately 10,729 day care providers in Michigan.[29] By contrast, there are 4,253 schools in Michigan.[30]  If Michigan adopted S.B. 76/77, or similar legislation, the number of places that trigger exclusion zones would exponentially increase, rendering even larger portions of the state off limits.

I created a detailed map showing 1,000-foot circles around just two dozen licensed day cares in the Lansing area.  The map shows that large portions of Lansing are within 1,000 feet of a day care center. Significantly, this map understates the size of the exclusion zones in Lansing within the application of this bill for three separate reasons:

- It does not include daycare providers that are not licensed by or registered with the state.
- It does not include school properties, which of course also create exclusion zones.
- Because parcel data for Lansing is not freely available to the public, the map is based on each day care center as a single point, whereas in reality, the property boundaries for each day care facility are much larger. The exclusion zone would therefore extend an unknown but significant amount beyond the simple 1,000-foot circles shown on the map.

---

[29] How one defines "day care center" could itself affect the size of the exclusion zones. A definition that includes licensed centers, registered family providers, and non-registered family providers, for example, would create larger exclusion zones than one limited to licensed center-based care.  I was unable to obtain any list showing all the locations where childcare is provided, i.e. a list including non-registered providers. The number of daycare centers is drawn from a list of providers who are licensed by or registered with the Michigan Department of Human Services. *See* Department of Human Services, Statewide Search for Childcare Centers and Homes, at http://www.dleg.state.mi.us/brs_cdc/sr_lfl.asp.  However, it is not immediately apparent exactly what types of child care providers are included on that list, or how many providers of each type there are.

[30] The number of schools is drawn from the list provided in discovery by the Michigan State Police.



**Figure 11.**

Finally, I also made a map showing how, if day cares are added to the list of protected places, that would instantly affect 75% of the city of Grand Rapids. See Figure 12.

# Most of Grand Rapids is within
# 1,000 feet of a school or day care property



0   2,000 4,000 6,000 8,000 Feet

## Legend

### City of Grand Rapids Parcels

Parcels that may not be within 1,000 feet of a
school or day care parcel

Parcels within 1,000 feet of a school parcel

Parcels within 1,000 feet of a day care parcel

**Figure 12.**

### X.    People on the registry cannot reliably know what areas are within 1,000 feet of a school.

It is important to remember that from the perspective of both registrants and law enforcement officials charged with enforcing exclusion zones, the operative question is "Is specific location X permissible?"  But, that question cannot be reliably answered in a straightforward manner. The only efficient way to answer the question is to first map all of the protected areas and then measure out from those protected areas.

In order to map, and thus avoid exclusion zones, a registrant needs to be able to simultaneously do all of the following:

A.  Be familiar with *all* schools and school properties and know the exact location of *each* one.
B.  Know how the distance from each school property should be measured.
C.  If distances are to be measured from property line to property line, know the property lines both of all school properties and of all other properties in the area.
D.  Be able to measure 1,000-foot distances in a matter consistent with how the statute is being enforced.
E.  Be able determine how different individual exclusion zones intersect and overlap.

The first four points have been addressed above.  The final point is illustrated by the map in Figure 13 below, which I prepared for a study of a Massachusetts drug sentencing statute, showing exclusion zones around parks, schools, head start facilities, and licensed day care centers.[31]   Each zone is colored a different color to illustrate how the various zones overlap.

---

[31] The then existant, and since changed, Massachusetts statute set distances of 1,000 feet for all of these properties except for 100 foot distances around parks.



**Figure 13.**

(Notably, this map was drawn based on the property line of the school or other protected places, but the map does not show the property line of the locations subject to the statute.)

If the goal of an exclusion zone is to have registrants avoid living, working, or spending time in particular locations, then the registrant must be able to determine where those locations are. Yet, for the reasons outlined above, the areas and edges of those zones are unknowable.

Exclusion zones in Michigan are not only unknowable for the average person on the street.  They are also unknowable to trained geographers with special software, access to specialized data and expertise in criminal justice mapping.  For example, even though I was fortuitously able to obtain parcel data for Kent County, the Grand Rapids map does not include all protected areas, for the reasons discussed in that section.

In sum, there is simply no good way in Michigan for experts, much less registrants, to determine exactly what areas are subject to SORA's "student safety zone" provisions.

### XI.    Statement of compensation

My standard hourly rate for preparing expert reports is $130.  My standard hourly rate for testifying is $250. For research and presentation assistance, my two colleagues, Aleks Kajstura, JD, and Leah Sakala, are paid at $80/hr and $40/hr, respectively.

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury that the above statements are true and correct to the best of my knowledge, information, and belief.

Peter Wagner
Executive Director
Prison Policy Initiative
PO Box 127
Northampton MA 01061
(413) 961-0002
pwagner@prisonpolicy.org

October 28, 2013

# PETER J. WAGNER

69 Garfield Ave, Floor 1, Easthampton MA 01027
pwagner@prisonpolicy.org (413) 961-0002

---

**EDUCATION**

**Western New England College School of Law**                    **Springfield, MA**
**Juris Doctor, May 2003**

**University of Massachusetts at Amherst,**                    **Amherst, MA**
**B.A., August 1994**
Major: Social Thought and Political Economy
Minor: African-American Studies

**WORK
EXPERIENCE**

**Prison Policy Initiative**                    **Springfield, Easthampton, MA**
**Co-Founder, Exec. Director, Asst. Director**          **September 2001 – Present**

Co-founded organization committed to documenting how mass incarceration affects individuals, communities, and the national welfare. Lead a national movement to change the way that the Census Bureau counts people in prison, and the way that state and local governments use Census prison counts to draw legislative districts.

**McGuire & Associates LLC**                    **Montgomery, AL**
**Mapping Consultant**                    **September 2013 – Present**

Serve as an expert witness in *McGuire vs. City of Montgomery, et. al.* a case challenging a state law restricting where people on the sex offender registry may live and work.

**Civil Liberties Union of Massachusetts**                    **Boston, MA**
**Mapping Consultant**                    **June 2009 – Present**

Assist litigators with evaluating potential challenges to overly broad city ordinances in Barnstable, Lynn and Waltham, showing that cities overreached and rather than regulating where people on the sex offender registry could live, the cities barred people on the registry from living anywhere.

**Faegre Baker Daniels LLP**                    **Denver, CO**
**Mapping Consultant**                    **January 2013 – July 2013**

Serve as an expert witness in *Ryals v. Englewood*, challenging a city ordinance banning certain people on the sex offender registry from almost anywhere in the city of Englewood. I made a map of the city's exclusion zones and calculated that, as Judge R. Brooke Jackson ruled, that the ordinance "leaves essentially no place for offenders to live" and pushes sex offenders into neighboring cities.

**Southern Center for Human Rights**                    **Atlanta, GA**
**Mapping Consultant**                    **June  2006 – September 2009**

Prepared maps and analysis, and testified twice for plaintiffs in federal court in the case *Whitaker v. Perdue*. The case challenged Georgia's ban on people on the sex offender registry from living within 1,000 feet of schools, churches and a long list of other places including school bus stops. My testimony showed that because almost every tract of habitable housing in Georgia was served by one of 350,000 school bus stops, the legislature unwittingly declared all urban areas, all suburban areas and most rural areas off limits to people on the registry.

**Open Society Institute Fellowship Program**                    **New York City**
**Consultant**                                                                **January – June 2007**

Assist Soros Justice Fellows with a range of research and technical support needs, including combing databases, developing educational materials and using quantitative research to tell stories and illustrate problems to diverse audiences.

**Prison Policy Initiative**                          **Cincinnati, OH; Northampton, MA**
**Open Society Institute Soros Justice Fellow**                    **June 2003 – May 2005**

Conducted a national research and advocacy project to quantify, publicize, and reform the current practice of utilizing the Census to shift political power away from poor and minority communities and into the hands of prison expansion proponents. Conducted state-specific analyses of the impact of prison-based gerrymandering on state legislative redistricting and develop both national and state-specific solutions.

**Center for First Amendment Rights**                              **Hartford, CT**
**Webmaster**                                                      **December 2000 – May 2003**

**Law Clerk**                                                              **Springfield, MA**
**Magistrate Judge Kenneth P. Neiman**                              **January – May 2003**

**Jessup International Moot Court Team**                              **Springfield, MA**
**Member**                                                        **October 2002 – February 2003**

**Anti-Discrimination Clinic**                                      **Springfield, MA**
**Student Attorney**                                        **August 2002 – December 2002**

Represented victims of employment discrimination and public accommodations discrimination in proceedings before the Massachusetts Commission Against Discrimination. Performed research for the Attorney General's Office on housing discrimination cases.

**Capital Defender Office**                                              **Albany, NY**
**Legal Intern**                                                  **June 2002 – August 2002**

Performed legal research on the constitutionality of a jury "life qualification" statute. Digitized and organized mitigation evidence. Transcribed witness interviews.

**Massachusetts Correctional Legal Services**                          **Boston, MA**
**Legal Intern**                                                  **May 2001 – October 2001**

Investigated prisoner complaints of poor medical care; conducted medical advocacy and prepared referrals to outside attorneys for potential medical malpractice litigation. Investigated a major disturbance at a super-maximum facility and represented the alleged ring-leader against 54 charges at his disciplinary hearing and on administrative appeal.

| | | |
|---|---|---|
| **TEACHING EXPERIENCE** | **Smith College** <br> **Instructor** | **Northampton, MA** <br> **January 2003, 2005, 2006, 2011, 2012** |

Designed and taught "Prison Industrial Complex Through Film" non-credit course.

| | | |
|---|---|---|
| | **Smith College** <br> **Instructor** | **Northampton, MA** <br> **January 2002, 2004, 2008** |

Designed and taught "Constitutional Law Through Film" non-credit course.

**HONORS & AWARDS**

Recipient, Champion of State Criminal Justice Reform Award, National Association of Criminal Defense Lawyers, 2013

Finalist, Maria Leavey Tribute Award, 2012

Recipient, Soros Justice Postgraduate Fellowship, 2003-2005

Recipient, Massachusetts Bar Foundation Legal Intern Fellowship, Summer 2001

Recipient, Law Alumni Scholarship, Fall 2002

Recipient, Katherine M. Connell Scholarship, Fall 2001

**PUBLISHED REPORTS**

*Please Deposit All of Your Money: Kickbacks, Rates, and Hidden Fees in the Jail Phone Industry,* by Drew Kukorowski, Peter Wagner and Leah Sakala, Prison Policy Initiative, May 8, 2013

*Imported "Constituents": Incarcerated People And Political Clout In Connecticut,* by Peter Wagner, Prison Policy Initiative and Common Cause Connecticut,April 17, 2013.

*One Last Chance to Avoid Prison-Based Gerrymandering in Kansas,* by Peter Wagner and Brenda Wright, Prison Policy Initiative and Dēmos, May 28, 2012.

*Primer for reporters on county or municipal redistricting & prison-based gerrymandering,* by Peter Wagner, Prison Policy Initiative, March 2011

*Preventing Prison-Based Gerrymandering in Redistricting: What to Watch For,* by Peter Wagner and Brenda Wright, Prison Policy Initiative and Dēmos, February 23, 2011

Aleks Kajstura and Peter Wagner*, Importing Constituents: Incarcerated People and Political Clout in California,* Prison Policy Initiative, March 2010

Peter Wagner and Christian de Ocejo*, Importing Constituents: Incarcerated People and Political Clout in Connecticut,* Prison Policy Initiative, March 2010

Peter Wagner, Aleks Kajstura, Elena Lavarreda, Christian de Ocejo, and Sheila Vennell O'Rourke, *Fixing prison-based gerrymandering after the 2010 Census: A 50 state guide,* Prison Policy Initiative, March 2010

Peter Wagner and Olivia Cummings, *Importing Constituents: Incarcerated People and Political Clout in Maryland,* Prison Policy Initiative, March 4, 2010

Brett Blank and Peter Wagner*, Importing Constituents: Prisoners and Political Clout in Illinois,* Prison Policy Initiative, February 2010

Elena Lavarreda, Peter Wagner and Rose Heyer, *Importing Constituents: Prisoners and Political Clout in Massachusetts,* Prison Policy Initiative, October 6, 2009

Peter Wagner and Elena Lavarreda, *Importing Constituents: Prisoners and Political Clout in Oklahoma*, Prison Policy Initiative, September 21, 2009

Peter Wagner and Elena Lavarreda, *Importing Constituents: Prisoners and Political Clout in Pennsylvania*, Prison Policy Initiative, June 26, 2009

Aleks Kajstura, Peter Wagner and Leah Sakala, *Reaching too far, coming up short: How large sentencing enhancement zones miss the mark*, Prison Policy Initiative, January, 2009

Peter Wagner, *Phantom Constituents in Maine's Regional School Unit 13: How the Census Bureau's outdated method of counting prisoners harms democracy*, Prison Policy Initiative, January 15, 2009

Aleks Kajstura, Peter Wagner and William Goldberg, *The Geography of Punishment: How Huge Sentencing Enhancement Zones Harm Communities, Fail to Protect Children*, Prison Policy Initiative, July 2008

John Hejduk and Peter Wagner, *Importing Constituents: Prisoners and Political Clout in Wisconsin*, Prison Policy Initiative, March, 2008

Peter Wagner and JooHye DellaRocco, *Phantom Constituents in Tennessee's Boards of County Commissioners*, Prison Policy Initiative, February 21, 2008

Brenda Wright and Peter Wagner, *Report to U.N. Committee for the Elimination of Racial Discrimination that U.S. Census practices dilute votes of minority populations*, Prison Working Group, December 2007

Peter Wagner, Meghan Rudy, Ellie Happel and Will Goldberg, *Phantom constituents in the Empire State: How outdated Census Bureau methodology burdens New York counties*, Prison Policy Initiative, July 18, 2007

Peter Wagner, *Democracy Toolkit: Interactive tools to help rural citizens determine if prison populations in legislative districts are diluting their right to equal representation*, Prison Policy Initiative, April 2007

Peter Wagner, Eric Lotke and Andrew Beveridge, *Why the Census Bureau can and must start collecting the home addresses of incarcerated people*, Prison Policy Initiative, February 10, 2006

Brenda Wright and Peter Wagner, *Brief Amici Curiae In Support Of Plaintiff-Appellant Jalil Abdul Muntaqim, a/k/a/ Anthony Bottom, Urging Reversal Of The District Court*, Prison Policy Initiative and National Voting Rights Institute, January 28, 2005

Peter Wagner, *Importing Constituents: Prisoners and Political Clout in Nevada* Prison Policy Initiative and the Progressive Leadership Alliance of Nevada, December 15, 2004

Peter Wagner, *Importing Constituents: Prisoners and Political Clout in Montana*, Prison Policy Initiative, December 14, 2004

Peter Wagner and Rose Heyer, *Importing Constituents: Prisoners and Political Clout in Texas*, Prison Policy Initiative, November 8, 2004

Peter Wagner, *Jim Crow in Massachusetts? Prisoner disenfranchisement,* Prison Policy Initiative, October 31, 2004

Peter Wagner, *Actual Constituents: Students and Political Clout in New York,* Prison Policy Initiative, October 6, 2004

*Peter Wagner and Rose Heyer, Importing Constituents: Prisoners and Political Clout in Ohio,* Prison Policy Initiative, July 6, 2004

Rose Heyer and Peter Wagner, *Too big to ignore: How counting people in prisons distorted Census 2000*, Prison Policy Initiative, April 13, 2004

Peter Wagner, *The Prison Index: Taking the Pulse of the Crime Control Industry,* Prison Policy Initiative and Western Prison Project, April 2003

Peter Wagner, *Importing Constituents: Prisoners and Political Clout in New York*, Prison Policy Initiative, April 22, 2002.

**BOOK CHAPTERS**   Gary Hunter and Peter Wagner, Prisons, Politics and the Census, in *Prison Profiteers: Who Makes Money from Mass Incarceration*, edited by Tara Herivel and Paul Wright, The New Press (2008)

Peter Wagner, Skewing Democracy: Where the Census Counts Prisoners, in *The Emerging Agenda: Poverty and Race in America*, edited by Chester Hartman, Lexington Books (2006)

**EDITED ARTICLES**   Peter Wagner, Breaking the Census: Redistricting in an era of mass incarceration, *William Mitchell Law Review*, Spring 2012

Peter Wagner, Prison Populations Create Complications at Redistricting Time, *Missouri Municipal Review*, January 2012

Eric Lotke and Peter Wagner, Prisoners of the Census: Electoral and Financial Consequences of Counting Prisoners Where They Go, Not Where They Come From, *Pace Law Review*, Volume 24, Number 2 (Spring 2004)

**FILM APPEARANCES**   *Gerrymandering*, directed by Jeff Reichert, Green Film Company (2010)

**PRESENTATIONS (SELECT)**   Presentation: Fees and Commissions in the prison telephone industry, Federal Communications Commission, (Washington, D.C.)  July 10, 2013.

Keynote address: *Prison Branches: The Untapped Resource*, 101st NAACP Convention Adjunct Event, Crossroads Correctional Center, (Cameron, MO) July 11, 2010

Presentation: *Prisons, Redistricting, and the Census: New Options for States and Localities*, Congressional briefing, Rayburn Congressional Office Building, (Washington, D.C.) April 27, 2010

Panelist: *Census and Redistricting*, NAACP Continuing Legal Education Seminar, 100th NAACP Convention, (New York City) July 13, 2009

Panelist: *Technical solutions to avoid prison-based gerrymandering*, National Conference of State Legislature's Legislative Summit, (Philadelphia, PA) July 21, 2009

Workshop: *Legislative options to avoid prison-based gerrymandering*, Legislative Black Caucus of Maryland, (Annapolis, MD) October 2, 2009

Keynote address: *The U.S. Prison System: Community and Political Impacts*, Brown University (Providence, RI) December 3, 2005

Keynote address: *Coming Home: Addressing the Issues Faced by Prisoners as They Re-enter the Community*, Community Service Society of New York (New York City) December 10, 2005

Panel presentation: *Prisoners of the Census: Criminal Justice Populations in Census Data*, Crime Mapping Research Conference, National Institute of Justice (Savannah, GA), September 9, 2005

Panel presentation: *Felony disenfranchisement and its impact on the Voting Rights Act*, 40 Years After the Voting Rights Act, The Democracy Project, (Selma, AL) August 5, 2005

Panel presentation: *Protecting and expanding voting rights*, NAACP Continuing Legal Education Seminar, NAACP Convention (Milwaukee, WI) July 11, 2005

Presentation: *Changing how prisoners are counted in the Census*, presentation to the Residence Rules in the Decennial Census Panel at the National Academy of Sciences (Washington, D.C.) June 2, 2005

Presentation: *Prisoners, the Census and the Political Geography of Mass Incarceration,* Prisons 2004: Prisons and Penal Policy: International Perspectives (City University London, England) June 25, 2004

Panel presentation: *Prisoners and Redistricting, Accuracy Counts: Incarcerated People & the Census* Congressional Briefing (Washington, D.C.) April 14, 2004

Panel presentation: *Prisoners and the Census*, History's Scorecard: The Role of the Census Bureau in America's Development, Census Bureau (Washington D.C.) March 5, 2004

Panel presentation: *Felon Disenfranchisement: Black Codes in the 21st Century*, Africana Studies Against Criminal Injustice Conference (New York City) April 11, 2003

Panel presentation: *What's in a Number: Diluted Census and Voting Representation*, National Summit on the Impact of Incarceration on Black and Latino Families and Communities (Washington D.C.) June 29, 2002

Keynote address: *Unlocking Prisons: Re-Thinking the Crisis, Creating a Network for Action Conference*, Harvard University (Cambridge, MA) April 27, 2002

Panel presentation: Felon Disenfranchisement and the Three-Fifths Clause, Rebellious Lawyering Conference, Yale University (New Haven, CT) February 18, 2001

**LEGISLATIVE TESTIMONY (SELECT)**

Testimony in support of SB400, the "No Representation Without Population Act" before the Education, Health & Environmental Affairs Committee of the Maryland State Senate (Annapolis, MD) March 4, 2010

Testimony on the 2010 Census: Enumerating People Living in Group Quarters, before the Subcommittee on Information Policy, Census and National Archives, Committee on Oversight and Government Reform, United States House of Representatives (New York, NY) February 22, 2010

Testimony on Adjusting Prisoner Census Enumeration for Purposes of State Legislative Redistricting, New York State Legislative Task Force on Demographic Research and Reapportionment (Bronx, NY) March 14, 2002

**PROFESSIONAL ASSOCIATIONS**

Member of Massachusetts Bar, BBO# 662207