**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

_____

JOHN DOES #1-5 and MARY DOE,

     Plaintiffs,

v.                                    Case No. 12-11194

RICHARD SNYDER and COL. KRISTE ETUE,

     Defendants.

_____/

### OPINION AND ORDER RESOLVING MOTIONS FOR JUDGMENT

Plaintiffs John Does #1-5 and Mary Doe bring the instant action against Governor Richard Snyder and Director of the Michigan State Police Colonel Kriste Etue, named in their official capacities, challenging Michigan's Sex Offenders Registration Act ("SORA"), as amended in 2011 and 2013.  Both parties have filed Rule 52 motions for judgment on the stipulated facts and records submitted by the parties.  (*See* Dkt. ## 90-95).  Plaintiffs seek a declaratory judgment and permanent injunction, and ask the court to grant judgment in their favor on Counts IV, V, VI, VII, and IX of their First Amended Complaint.  (Dkt. #  96, 5669-70.)  Defendants move the court to find Plaintiffs' challenges without merit and grant judgment in their favor.  (Dkt. # 97, Pg. ID 5721.) The parties have willingly waived their right to a full trial in their Rule 52 motions and have stipulated that the court may enter judgment based on the record submitted by the parties.   For the reasons set forth below, Plaintiffs' motion will be granted in part and denied in part and Defendants' motion will be granted in part and denied in part.

# I. BACKGROUND

## A. Statutory History

Michigan enacted SORA in 1994.  1994 Mich. Pub. Acts 295.  The 1994 Act established a confidential database containing information about sex offenders that was available only to law enforcement.  94 Mich. Pub. Acts 295, § 10.  SORA has been amended numerous times.  *See* 1996 Mich. Pub. Acts 494; 1999 Mich. Pub. Acts 85; 2002 Mich. Pub. Acts 542; 2004 Mich. Pub. Acts 238, 239, 240; 2005 Mich. Pub. Acts 121, 127, 132; 2006 Mich. Pub. Acts 46; 2011 Mich. Pub. Acts 17, 18; 2013 Mich. Pub. Acts 149.  As of April 1997, SORA requires law enforcement agencies to make certain registration information available for public inspection, 1996 Mich. Pub. Acts 494, § 10(2), and following the 1999 amendments to SORA, registry information became available through the Internet.  *See* 1999 Mich. Pub. Acts 85, §§ 8(2), 10(2), and 10(3).  The amendments between 2002 and 2006, *inter alia*, increased reporting requirements for registrants; introduced a one-time registration fee; removed the registration requirement for certain individuals assigned to youthful trainee status; prohibited registrants from working, residing, or loitering within 1,000 feet of a school; and created a program whereby members of the public could be notified electronically when a sex offender moved into a particular zip code.  *See generally* 2002 Mich. Pub. Acts 542; 2004 Mich. Pub. Acts 238, 239, 240; 2005 Mich. Pub. Acts 121, 127, 132; 2006 Mich. Pub. Acts 46.

The 2011 amendments significantly altered SORA to comply with the federal Sex Offender Registration and Notification Act ("SORNA"), 42 U.S.C. § 16901 *et seq.*  In its current form, SORA categorizes registrants into three tiers which determine the length

2

of time that individuals must register and the frequency with which they must report. Mich. Comp. Laws §§ 28.722(r)-(w); 28.725(10)-(13). Tier classifications are based solely on a registrant's offense and do not factor in an individualized determination of risk. Tier I offenders must register and comply with SORA obligations for fifteen years; Tier II offenders must register and comply with SORA obligations for twenty-five years; and Tier III offenders must register and comply with SORA for life. Mich. Comp. Laws §§ 28.725(10)-(13). The most recent amendments became effective while this case was pending and now require registrants to pay a pay a $50 annual registration fee. 2013 Mich. Pub. Acts 149.

## B.  Plaintiffs

All six Plaintiffs are Michigan residents who are Tier III offenders and thus required by law to register as sex offenders and comply with SORA for life. (Dkt. # 90, Pg. ID 3729.) Following are brief descriptions of Plaintiffs and their offenses.

In 1990, after losing his job at McDonald's, Doe #1 attempted to rob his former employer. (*Id.* at 3737.) During the robbery, Doe #1 forced the McDonald's manager and her fourteen-year-old son into the restaurant; when the manager did not open up the safe, Doe #1 struck the manager and kicked her son. (*Id.*) The manager and her son were able to escape. (*Id.*) Doe #1 was charged with eleven felony counts. He pleaded no contest to kidnapping (for holding the fourteen-year-old child against his will) and pleaded guilty to the other charges, including armed robbery. (*Id.*) In 1991, Doe #1 was sentenced to twenty-two to forty years in prison. (*Id.* at 3738.) He was paroled in November 2009 and completed his parole in November 2011. (*Id.* at 3739.) Although Doe #1's criminal offense lacked an overtly sexual component, under the 2011

3

amendments to SORA, he is classified as a Tier III offender and is required to comply with SORA for life because he was convicted of kidnapping a minor. (*Id.*) He has two adult children and one toddler, and he co-parents his fiancée's teenage daughter. (*Id.*)

Doe #2 pleaded guilty under the Holmes Youthful Trainee Act ("HYTA"), Mich. Comp. Laws § 750.520d(1)(a), to criminal sexual conduct III after having a sexual relationship with his fourteen-year-old "girlfriend" in 1996 when he was eighteen years old. (*Id.* at 3741.) His plea was based on the prosecutor's promise that his records would be sealed. (*Id.* at 3743.) Under the HYTA, Doe #2 was assigned the status of "youthful trainee" and sentenced to two years probation. (*Id.* at 3742.) After completing his probation, his case was dismissed without conviction being entered pursuant to Mich. Comp. Laws § 762.14(1). Designation as a "youthful trainee" is included in the definition of "convicted" under SORA, Mich. Comp. Laws § 28.722(b). Doe #2 is classified as a Tier III offender and must therefore comply with SORA for life. (*Id.* at 4745.) Doe #2 currently has a teenage daughter. The daughter's mother has full custody, and Doe #2 has weekend visitation rights. (*Id.* at 3747.)

In 1998, at the age of nineteen, Doe #3 had a sexual relationship with a fourteen year old. (*Id.* at 3748.) Doe #3 pleaded guilty to attempted criminal sexual conduct and was sentenced to four years of probation under the HYTA. (*Id.* at 3750.) During his last year on probation, Doe #3 failed to timely register under SORA. (*Id.* at 3751.) His HYTA status was revoked, and a conviction was entered. (*Id.*) Doe #3 has a nine-year-old son, a six-year-old son, and an infant son. (*Id.*) He was originally required to

4

register for a period of twenty-five years on a non-public registry, but was reclassified as a Tier III offender in 2011.  (*Id.* at 3750, 3752.)

Doe #4 pleaded guilty to attempted criminal sexual conduct III in 2006 after having a sexual relationship with a female under the age of sixteen, who he met in a nightclub restricted to those aged eighteen years and older.  (*Id.* at 3752-53.)  He was twenty three years old at the time.  (*Id.* at 2752.)  Doe #4 was sentenced to five years probation, which he completed.  (*Id.* at 3753.)  He is currently involved in a romantic relationship with his victim, who is now over eighteen years old.  They have a seven-year-old daughter and an infant child, and Doe #4 has two other children as well.  (*Id.* at 3754.)  In 2011, Doe #4 was classified as a Tier III offender, extending his period of registration from twenty-five years to life.  (*Id.*)

Doe #5 was added to this action by a stipulated order entered on August 27, 2013.  (Dkt. # 34.)  In 1980, he was convicted of criminal sexual conduct III and sentenced to two to fifteen years of imprisonment.  (Dkt. # 90, Pg. ID 3757.)  At the time of the conduct, Doe #5 was twenty one years old and the victim was seventeen years old.  (*Id.*)  The victim testifed at trial that the sexual conduct was nonconsenual, and Doe #5 and his sister testifed that it was consensual.  (*Id.*)  Doe #5 served approximately twenty-one months of his sentence.  (*Id.*)  He was not required to register as a sex offender until 2011 after he pleaded guilty to larceny pursuant to SORA's "recapture" provisions, added by the 2011 amendments, which require registration for eligible recidivists who are convicted of any additional felony after July 2011.  *See* Mich. Comp. Laws § 28.724(5).  (Dkt. # 90, Pg. ID 375.)  Doe #5 did not timely register and

5

was therefore cited for a probation violation and jailed for ninety days.  (*Id.* at 3759.)  He has children and grandchildren.  (*Id.* at 3761)

Ms. Doe was convicted in Ohio of one count of unlawful sexual conduct with a minor in 2003 for having a sexual relationship with a fifteen-year-old male when she was twenty-nine years old.  (*Id.* at 3761-62.)  She was sentenced to three years in prison, but was granted judicial release after serving less than eight months of her sentence.  (*Id.* at 3763-65.)  Ms. Doe was assigned to the lowest risk level of Ohio's sex offender registry, which required address verification once a year for ten years.  (*Id.* at 3763-64.)  She moved to Michigan in 2004 after her judicial release.  She was initially required to register quarterly for twenty-five years, but was reclassified as a Tier III offender in 2011.  (*Id.* at 3765-66.)  Ms. Doe has a teenage daughter, step-children, and three grandchildren under the age of ten, and she is expecting another grandchild.  (*Id.*)

### C.  The Constitutional Challenges

Plaintiffs claim that the retroactive nature of SORA, its extensive reporting requirements and prohibitions, and its broad application violate their constitutional rights.  Their First Amended Complaint seeks declaratory and injunctive relief enjoining Defendants from enforcing certain provisions of SORA and barring the retroactive application of the 2011 and 2013 amendments to Plaintiffs.  (Dkt. # 46, Pg. ID 903-04, 911.)  The complaint alleges nine counts: (1) violation of the *Ex Post Facto* Clause by the retroactive application of the 2011 amendments (Count I); (2) violation of Plaintiffs' fundamental rights to travel protected by the Due Process Clause (Count II); (3) violation of Plaintiffs' fundamental right to engage in common occupations of life protected under the Due Process Clause (Count III); (4) violation of Plaintiffs' right to

direct the education and upbringing of their children under the Due Process Clause
(Count IV); (5) violation of Plaintiffs' right to free speech as protected by the First
Amendment incorporated through the Fourteenth Amendment (Count V); (6) violation of
the Due Process Clause because the Act is retroactive and "harsh or oppressive or []
violates principles of fundamental fairness" (Count VI); (7) violation of the Due Process
Clause because certain provisions are vague, impossible to comply with, or wrongly
impose strict liability (Count VII); (8) violation of the Headlee Amendment to the
Michigan Constitution which prohibits the state legislature from requiring local
governments to increase their level of participation in a state program unless the
increase is fully funded by the state (Count VIII); and (9) violation of the *Ex Post Facto*
Clause by the retroactive application of the 2013 amendments (Count IX).  (Dkt. # 46,
Pg. ID 896-902, 910-11.)

Defendants filed a motion to dismiss Plaintiffs' original complaint.  The court
granted in part and denied in part the motion, dismissing with prejudice Counts I, II, and
III, dismissing with prejudice VI inasmuch as it applies to the retroactive application of
SORA to Does ##1 and 2, and dismissing without prejudice Count VIII.  The motion was
denied with respect to Counts IV, V, and VII.  It was denied with respect to Count VI
inasmuch as it applies to the retroactive extension the lifetime registration requirement
to Does ##3 and 4 and Ms. Doe.  (Dkt. # 27, Pg. ID 703-04 (published at *Does v.
Snyder*, 932 F. Supp. 2d 803, 824 (E.D. Mich. 2013)).  Count IX was added to the
Amended Complaint after the court entered its order disposing of Defendants' motion to
dismiss.

## II.  STANDARD

7

Both parties have moved for a summary bench trial on the records submitted by the parties, in the form of a joint statement of facts and accompanying exhibits (Dkt. ## 90-95). "[A] district court may decide a case by summary bench trial upon stipulation of the parties as long as the parties have willingly foregone their right to a full trial." *Acuff-Rose Music, Inc. v. Jostens, Inc.*, 155 F.3d 140, 142-43 (2d Cir. 1998); *see May v. Evansville-Vanderburgh Sch. Corp.*, 787 F.2d 1105, 1115-16 (7th Cir. 1986); *Nielsen v. W. Elec. Co.*, 603 F.2d 741, 743 (8th Cir. 1979); *Starksy v. Williams*, 512 F.2d 109, 112-13 (9th Cir. 1975). Here, Plaintiffs and Defendants willingly waived their right to a full trial in their motion papers and have requested that the court enter judgment based on the record before it. (Dkt. ## 96, 97.) When reviewing Rule 52 motions, "the court does not view the evidence in the light most favorable to the nonmoving party, as it would in passing on a Rule 56 motion for summary judgment or a Rule 50(a) motion for judgment as a matter of law; instead, it exercises its role as a factfinder." *United States v. $242,484.00*, 389 F.3d 1149, 1172 (11th Cir. 2004).

## III. DISCUSSION

### A. Count VII: Vagueness, Impossibility, and Strict Scrutiny

In Count VII, Plaintiffs claim SORA violates the Due Process Clause of the Fourteenth Amendment because provisions of SORA are improperly vague, impossible to comply with, and/or wrongly impose strict liability. In particular, Plaintiffs challenge (1) the prohibition on working within a student safety zone, Mich. Comp. Laws §§ 28.733-734; (2) the prohibition on loitering within a student safety zone, Mich. Comp. Laws §§ 28.733-734; (3) the prohibition on residing within a student safety zone, Mich. Comp. Laws §§ 28.733, 28.735; (4) the requirement to immediately report changes in

8

personal data, Mich. Comp. Laws § 28.725; (5) the requirement to report educational information, Mich. Comp. Laws § 28.724a; and (6) the requirement to maintain a driver's license or state personal identification card with a current address, Mich. Comp. Laws § 28.725a(7).  (Dkt. # 46, Pg. ID 900-01.)

### 1. Void for Vagueness

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined."  *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).  The Supreme Court's vagueness doctrine has two primary goals: (1) "to ensure fair notice to the citizenry" and (2) "to provide standards for enforcement by the police, judges, and juries."  *Columbia Natural Res., Inc. v. Tatum*, 58 F.3d 1101, 1104 (6th Cir. 1995).  In light of these goals, courts have developed a two-part test to determine if a statute is unconstitutionally vague.  First, the court must determine whether the law gives a person "of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly."  *Grayned*, 408 U.S. at 108.  In reviewing a vagueness challenge, the court considers whether "ordinary people, exercising ordinary common sense, can understand [a statutory prohibition] and avoid conduct which is prohibited, without encouragement of arbitrary and discriminatory enforcement.  *United States v. Salisbury*, 983 F.2d 1369, 1378 (6th Cir. 1993).   Second, the court must evaluate whether the statute provides sufficiently "explicit standards for those who apply them" or whether, due to a statute's vagueness, it "impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis."  *Grayned*, 408 U.S. at 108-09.  "The standards of enforcement must be precise enough to avoid 'involving so many factors of varying effect that neither the person to

decide in advance nor the jury after the fact can safely and certainly judge the result.'"
*Columbia Natural Res.*, 58 F.3d at 1105 (quoting *Cline v. Frink Dairy Co.*, 274 U.S. 445,
465 (1927)).

"The degree of vagueness that the Constitution tolerates . . . depends in part on
the nature of the enactment." *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
455 U.S. 489, 498 (1982). "The [Supreme] Court has expressed greater tolerance of
enactments with civil rather than criminal penalties . . . , recognized that a scienter
requirement may mitigate a law's vagueness . . . , [and stated that] perhaps the most
important factor affecting the clarity that the Constitution demands of a law is whether it
threatens to inhibit the exercise of constitutionally protected rights." *Id.* at 498-99. The
challenged provisions of SORA impose criminal sanction for non-compliance, Mich.
Comp. Laws §§ 28.729, 734(2), 735(2), make Plaintiffs strictly liable for failure to comply
with certain requirements and prohibitions, Mich. Comp. Laws §§ 28.725a, 729(2), 734-
735, and implicate Plaintiffs' First Amendment right to free speech and their
fundamental right to participate in the education and upbringing of their children, *see
infra* Sections III.B and III.C. Accordingly, the court's standard for vagueness will be
more exacting.

On the other hand, the rule of lenity reduces the risk of unfair notice and unclear
enforcement standards. "[A]s a sort of 'junior version of the vagueness doctrine,' the
canon of strict construction of criminal statutes, or rule of lenity, ensures fair warning by
so resolving ambiguity in a criminal statute as to apply it only to conduct clearly
covered." *United States v. Lanier*, 520 U.S. 259, 266 (1997). Where possibly
ambiguous provisions of SORA are made clear when construed in light of the rule of

10

lenity, the vagueness doctrine would not void those provisions.  Therefore, the court applies the two-part test for vagueness with due consideration to SORA's enhanced need for definiteness and SORA's reduced risk of vagueness.

It is unclear from Plaintiffs' complaint whether their vagueness claim was intended as a facial or as applied challenge.  However, "it is well established that vagueness challenges to statutes which do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand."  *United States v. Krumrei*, 258 F.3d 535, 537 (6th Cir. 2002) (quoting *United States v. Powell*, 423 U.S. 87, 92 (1975)); *see also Chapman v. United States*, 500 U.S. 453, 467 (1991) ("First Amendment freedoms are not infringed by [the statute at issue], so the vagueness claim must be evaluated as the statute is applied to the facts of this case."); *United States v. Kernell*, 667 F.3d 746, 750 (6th Cir. 2012) ("For challenges to the statute that do not implicate First Amendment concerns, the defendant bears the burden of establishing that the statute is vague as applied to his particular case, not merely that the statute could be construed as vague in some hypothetical situation." (internal quotation marks and citation omitted)).  *But see City of Chicago v. Morales*, 527 U.S. 41, 55 (1999) (plurality) (finding that a facial vagueness challenge was appropriate against "a criminal law that contains no *mens rea* requirement and infringes on constitutionally protected rights") (citation omitted); *Belle Maer Harbor v. Charter Twp. of Harrison*, 170 F.3d 553, 557 (6th Cir. 1999) ("[E]ven in cases not involving First Amendment rights, we have recognized that courts may engage in a facial analysis where the enactment imposes criminal sanctions.").  Plaintiffs' void for vagueness challenges only invoke the First Amendment with regard to the Internet use reporting requirements.  (*See* Dkt. # 46, Pg.

11

ID 900-01; Dkt. # 96, Pg. ID 5678-90; Dkt. # 99, Pg. ID 5816-23).  With regard to all of

the other vagueness challenges, "[Plaintiffs] bear[] the burden of establishing that the

statute is vague as applied to this particular case, not merely that the statute could be

construed as vague in some hypothetical situation."  *Krumrei*, 258 F.3d at 537 (citing

*United States v. Avant*, 907 F.2d 623, 625 (6th Cir. 1990)).  Nonetheless:

> When contesting the constitutionality of a criminal statute, it is not necessary
> that [the plaintiff] first expose himself to actual arrest or prosecution to be
> entitled to challenge [the] statute that he claims deters the exercise of his
> constitutional rights.  When the plaintiff has alleged an intention to engage in
> a course of conduct arguably affected with a constitutional interest, but
> proscribed by a statute, and there exists a credible threat of prosecution
> thereunder, he should not be required to await and undergo a criminal
> prosecution as the sole means of seeking relief.

*Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979) (internal

quotation marks and citations omitted).  Thus, to the extent that Plaintiffs have curtailed

their conduct, because it is unclear whether such conduct violates SORA, the court

finds a constitutional vagueness challenge proper.


### i. Geographic Exclusion Zones

Plaintiffs first challenge SORA's geographic exclusion zones as void for

vagueness.  SORA makes it a crime for a registrant to work, "loiter," or reside "within a

"student safety zone."  Mich. Comp. Laws §§  28.734(1)(a)-(b), 28.735(1).  SORA

defines "school safety zone" as "the area that lies 1,000 feet or less from school

property."  Mich. Comp. Laws § 28.733(f).  SORA defines "school property" to mean:

> [A] building, facility, structure, or real property owned, leased, or otherwise
> controlled by a school, other than a building, facility, structure, or real

> property that is no longer in use on a permanent or continuous basis, to which either of the following applies: (I) [i]t is used to impart education instruction[, or] (ii) [i]t is for use by students not more than 19 years of age for sports or other recreational activities.

Mich. Comp. Laws § 28.733(e).

Plaintiffs contend that the term "school safety zone" is unconstitutionally vague because SORA provides insufficient guidance for how the 1,000 feet zones should be measured. (Dkt. # 96, Pg. ID 5681-86.) Plaintiffs note that the zones are not physically marked, and registrants are not provided with maps demarking the boundaries. Without demarcation or maps, the typical registrants are unable to identify the zones because they lack the software and data to map the zones, and Michigan has not provided a list of school properties or parcel data to registrants or law enforcement. (Dkt. # 96, Pg. ID 5681-82.) Additionally, Plaintiffs argue that the term is vague because there is no guidance as to whether the 1,000 feet distance should be measured "point to point" or "property-line to property line" nor whether it should be measured "as the crow flies or as people actually travel." (Dkt. # 96, Pg. ID 5681-82.)

"Because plaintiffs cannot know where the zones are, they must 'over-police' themselves, erring on the side of caution." (*Id.* at 5684.) For example, Doe #4's partner testified that Doe #4 does not live with her and their two children because their house is down the street from a school, and she was not sure if the school was within 1,000 feet of her home. (Dkt. # 90, Pg. ID 3863.) Likewise, Doe #1, Doe #3, and Ms. Doe testified that they had difficulties searching for new homes because they were unable to accurately calculate the 1,000 feet distances. (*Id.* at 3831-42.) Ms. Doe testified that

13

she looked at properties farther than 1,000 feet from schools "so that I know that I'm okay." (*Id.* at 3842.)

While a prescribed distance may appear concrete on its face, without adequate guidance about how to measure the distance, such provisions are suspectible to vagueness concerns.  For example, in *Cunney v. Bd. of Trustees*, 660 F.3d 612 (2d Cir. 2011), the Second Circuit considered whether a zoning ordinance that prohibited the building of structures "over two stories tall or four and one-half feet above the easterly side of River Road" was void for vagueness.  *Id.* at 621.  The court held that, while the ordinance "affords a reasonable person adequate notice of what it generally prohibits (e.g., three-story buildings will be in violation), it is remarkably unclear with respect to how the four and a half foot limitation is defined."  *Id.*  The ordinance did not specify "from what adjacent elevation point on River Road the height of a building must be measured . . . .  Consequently, this shortcoming not only fails to give specific notice of how a permit applicant should design his site plan so that the proposed building complies with that restriction, but it also fails to provide an objective standard that Village itself can apply . . . ."  *Id.*  Similarly, the geographic exclusion zone provisions in SORA generally inform Plaintiffs that they may not reside, work, or loiter within 1,000 feet of a school zone but, like the ordinance at issue in *Cunney*, SORA does not clarify how to measure the 1,000 feet.

It is unclear whether SORA's exclusion zones should be measured from only the real property on which educational instruction, sports, or other recreational activities take place—excluding the parking lot, administrative buildings, and other real property used for other purposes—or whether the zone should be measured from the school

14

property line even when some of the real property is not used for one of the stated purposes. An attorney with the Prosecuting Attorneys' Association of Michigan testified that prosecutors share "a pretty strong consensus that [the 1,000 feet distance] is measured property line to property line." (Dkt. # 90, Pg. ID 3830.) Even assuming that this reflects SORA's intended meaning, it nonetheless would be difficult for law enforcement and registrants to parse through school-owned real property to determine which is used for instruction, sports, or recreation, and which is not. However, the prosecutors' alleged consensus does not reflect a literal reading of SORA. A literal reading of SORA would exclude from the definition of "school property" parking lots, school administrative buildings, and other parts of a school's real property where no instruction, sports, or other recreational activcities occur. This literal, but arguably less practical, reading of SORA is bolstered by the rule of lenity because it reads the statute's ambiguity in the registrants' favor.

Assuming the 1,000 feet zones were measured from the property line, registrants would still be unable to reasonably determine the boundaries of the exclusion zones, resulting in the sort of "over-policing" described by Doe #4's partner. Michigan has not provided registrants with a map of exclusion zones or a list of all school properties. Defendants suggest that registrants can rely on Google maps (www.google.com/maps) and phone books to determine if their potential address is within 1,000 feet of an exclusion zone. (Dkt. # 97, Pg. ID 5767.) However, such tools do not eliminate many of the sources of vagueness. First, neither Google maps nor phone books provide parcel data or clearly mark property lines. Second, while Google maps can provide helpful estimates as to distances between two properties, it would not provide a registrant with

15

the necessary detail to determine whether a property that is close to 1,000 feet away from a school property line falls within an exclusion zone.

Furthermore, Defendants acknowledge that neither the Michigan State Police nor current registrants have the necessary data to precisely determine the geographic exclusion zones. Michigan is developing software called Offender Watch that reportedly will provide law enforcement with a standardized guideline for determining exclusion zones, but Offender Watch cannot currently conduct parcel to parcel measurements because the State Police do not have the necessary data. (Dkt. # 90, Pg. ID 3831 ("The [Michigan State Police's Sex Offender Registration] Unit has tried but been unable to obtain parcel data . . . .").) Moreover, Offender Watch will not include all properties as defined by SORA, but only "active schools according to the Michigan Department of Education." (Dkt. # 90, Pg. ID 3830-31.) Nothing in Defendants' Rule 52 motion or the Joint Statement of Facts suggests that law enforcement has the means to calculate the exclusion zones if a court should determine that the 1,000 feet distance should be measured from only the parts of a school's real property used for instruction, sports, or other recreational activities.

SORA does not provide sufficiently definite guidelines for registrants and law enforcement to determine from where to measure the 1,000 feet distance used to determine the exclusion zones, and neither the registrants nor law enforcement have the necessary data to determine the zones even if there were a consensus about how they should be measured. Accordingly, due to SORA's vagueness, registrants are forced to choose between limiting where they reside, work, and loiter to a greater extent than is required by law or risk violating SORA.

16

### ii. Loitering

Next, Plaintiffs contend that SORA's prohibition against "loiter[ing]" within 1,000 feet of school property is unconstitutionally vague because the meaning of "loiter" is "totally unclear." (Dkt. # 96, Pg. ID 5686.)  SORA defines "loiter" to mean "to remain for a period of time and under circumstances that a reasonable person would determine is for the primary purpose of observing or contacting minors." Mich. Comp. Laws        § 28.733(b).  Plaintiffs argue that it is unclear "whether they are permitted to attend parent-teacher conferences, go to a school movie night, or take their children to a school play-ground on the weekend." (Dkt. # 96, Pg. ID 5687.)  Defendants counter that the term is clear, and describe Plaintiffs' argument as "making some kind of 'as-applied' challenge without the statute actually having been applied in the manner they argue." (Dkt. # 97, Pg. ID 5770.)  But Plaintiffs' challenges are more than hypothetical.  As discussed above, they need not risk violating SORA in order to challenge the law; Plaintiffs may challenge the definition of "loiter" to the extent that it has curtailed their conduct.  *Cf. Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979).

SORA's prohibition on loitering has curtailed Plaintiffs' conduct.  For example, in order to avoid risking a SORA violation, Doe #3 does not "attend school activities like movie nights, math nights, bingo nights, open house/meet the teacher, talent shows, musicals, concerts or plays." (Dkt. # 90, Pg. ID 3861.)  Likewise, Doe #3's wife suggests that Doe #3 avoids "waiting for [her] children to come out of school and talk to his niece or nephew or observe his own children walking down from school" for fear that this conduct would violate the prohibition on loitering.  (Dkt. # 90, Pg. ID 3853.)  Thus,

2:12-cv-11194-RHC-DRG   Doc # 103   Filed 03/31/15   Pg 18 of 73   Pg ID 5892

the court construes the vagueness challenge against the definition of "loiter" as an as applied challenge.

The definition of "loiter" contains two parts: (1) "remain[ing] for a period of time" and (2) "under circumstances that a reasonable person would determine is for the primary purpose of observing or contacting minors."  Mich. Comp. Laws § 28.733(b). As this is an as applied challenge, the court will review the vagueness of this term as it relates to the activities from which Plaintiffs claim to have refrained.  First, "ordinary people, exercising ordinary common sense can understand" the meaning of the phrase "remain for a period of time."  *States v. Salisbury*, 983 F.2d 1369, 1378 (6th Cir. 1993). *Webster's Third New International Dictionary* 1919, 2394 (3d ed. 1981) defines "remain" to mean "to stay in the same place or with the same person or group," and it defines "time" to mean "a period during which something (as an action, process, or condition) exists or continues."  Whether or not the phrase "period of time" embodies a degree of ambiguity by itself, the phrase "remain for a period of time" refers to staying in a school zone for any duration.  Driving one's child to school and then immediately leaving the school zone does not involve "remain[ing]" in the school zone for any period of time; meanwhile, waiting at the school to pick up one's child after school does involve "remain[ing]" in the school zone for a period of time.  Ordinary people using common sense can deduce that, to "attend parent-teacher conferences, go to a school movie night, or take their children to a school play-ground on the weekend" (Dkt. # 96, Pg. ID 5686-87), a registrant would need to "remain for a period of time" in a school zone. Likewise, Doe #3's abstention from waiting for his wife's children after school and observing his children walking from school is not the result of unconstitutional

18

vagueness in the phrase "remain for a period of time" because such activities fall within the meaning of the phrase.

The second component of the definition of "loiter" raises a more difficult question. In *City of Chicago v. Morales*, 527 U.S. 41 (1999), the Supreme Court considered whether an ordinance prohibiting criminal street gang members from loitering was unconstitutionally void for vagueness. A plurality of the court found that the definition of the term "loiter" was ambiguous. The ordinance at issue in *Morales* defined "loiter" as "to remain in any one place with no apparent purpose." *Id.* at 56. The plurality reasoned, "It is difficult to imagine how any citizen of the city of Chicago standing in a public place with a group of people would know if he or she had an 'apparent purpose.'" *Id.* at 57.

Similarly, just as it would be difficult to determine if a Chicagoan were standing in a place with *no* apparent purpose, in many circumstances, it would be difficult—perhaps not as difficult, but difficult nonetheless—to determine if a Michigander were standing in an exclusionary zone "apparently" for the specific, primary purpose of observing or contacting minors. Conduct such as a registrant starting a conversation with a minor, videotaping a minor, or standing on a playground by himself watching minors, would likely fall within the definition of "loitering" with little room for a registrant to argue ambiguity. However, it remains ambiguous whether a registrant may attend a school movie night where he intends only to watch the screen, or a parent-teacher conference where students may be present. The *Morales* plurality explained that "the purpose of the fair notice requirement is to enable the ordinary citizen to conform his or her conduct to the law [because] '[n]o one may be required at peril of life, liberty or property to

19

speculate as to the meaning of penal statutes.'" *Id.* (quoting *Lanzetta v. New Jersey*, 306 U.S. 451 (1939)).  SORA's present definition of "loiter" is sufficiently vague as to prevent ordinary people using common sense from being able to determine whether Plaintiffs are, in fact, prohibited from engaging in the conduct from which Plaintiffs have refrained.

### iii. Reporting Requirements

Plaintiffs also argue that SORA's reporting requirements are unconstitutionally vague.  In particular, Plaintiffs challenge the requirement that a registrant must "report in person and notify the registering authority . . . immediately after . . . the individual purchases or begins to regularly operate any vehicle," Mich. Comp. Laws § 28.725(1)(g), and the requirements that a registrant must report (1) "[a]ll telephone numbers registered to the individual or routinely used by the individual," (2) "[a]ll electronic mail addresses and instant message addresses assigned to the individual or routinely used by the individual," and (3) "[t]he license plate number, registration number, and description of any motor vehicle, aircraft, or vessel owned or regularly operated by the individual and the location at which the motor vehicle, aircraft, or vessel is habitually stored or kept."  Mich. Comp. Laws § 727(1)(h)-(j).  Plaintiffs assert that the terms "routinely used," "regularly operated," and "habitually stored and kept" are vague and undefined.  (Dkt. # 96, Pg. ID 5687-88.)

The requirements to report telephone numbers and e-mail and instant message addresses implicate First Amendment free speech rights and are, therefore, subject to facial vagueness challenges.  The requirement to report vehicles does not implicate First Amendment rights, but Plaintiffs adequately articulate how alleged vagueness in

the term "regularly operate" has caused certain Plaintiffs to choose between potentially over-reporting information or risk violating SORA.  For example, Doe #1's employer owns a fleet of vehicles, and Doe #1 testified that he is unsure whether he must report all of the vehicles (and inform his employer that all of the vehicles have been reported) because there is a chance he may drive any particular vehicle at some point.  (Dkt. # 90, Pg. ID 3933.)  Likewise, Doe #2 drives his girlfriend's car "once a quarter to go register and maybe two or three other times in that period."  (*Id.*)  Doe #2 does not know if this constitutes "regular use" for the purposes of SORA.  The court interprets the record as setting forth a vagueness challenge to the vehicle reporting requirement as applied to Does ##1 and 2.  For the same reasons, Plaintiffs may also challenge the telephone reporting provision as applied to Doe #4.  Doe #4 is unsure whether he must register his mother's telephone number, which he uses "on occasion."  (Dkt. # 90, Pg. ID 3936.)  *See Babbitt*, 442 U.S. at 298 (internal quotation marks and citations omitted) ("When the plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder, he should not be required to await and undergo a criminal prosecution as the sole means of seeking relief.").  For both the as applied challenges and facial challenges, the vagueness in these provisions renders them constitutionally infirm for the reasons discussed below.[1]

SORA does not define "regularly" or "routinely" as used in §§ 28.725(1)(g) and 727(1)(h)-(j).  "Unless they are otherwise defined, the words in a statute 'will be

---

[1]Plaintiffs have not alleged an as applied challenge to the phrase "habitually stored and kept," and the court will not consider a facial challenge to this phrase.

interpreted as taking their ordinary, contemporary, common meaning.'" *Deutsche Bank Nat'l Trust Co. v. Tucker*, 621 F.3d 460, 463 (6th Cir. 2010) (quoting *United States v. Plavcak*, 411 F.3d 655, 660 (6th Cir. 2005)).  Webster's Third New International Dictionary 1913 (3d ed. 1981) defines "regularly" as "in a regular, orderly, lawful, or methodical way," and it defines "regular," in relevant part, as "steady or uniform in course, practice, or occurrence" and "returning, recurring, or received at stated, fixed, or uniform intervals."  In the court's March 18, 2014 Opinion and Order Granting in Part and Denying in Part Defendants' Amended Motion to Dismiss, the court denied Defendants' motion to dismiss as to Count VII, finding that a similar dictionary definition of the term "regularly" does not "appear to provide an individual of ordinary intelligence a reasonable opportunity to know when he or she must report their use of a vehicle.  Nor does the word 'regularly,' without some additional elaboration of its meaning, constitute a precise enough standard so as to avoid arbitrary enforcement by the State." (Dkt. # 27, Pg. ID 699.)  Regarding this second point, the court explained in its previous order:

> This second point is illustrated by the complaint's averment that John Doe IV was told by police officials that borrowing a car three times is the threshold for regular operation.  (*See* Compl. ¶ 31.)  There is no explanation in either the complaint or the attached exhibits, and Defendants offer none in their briefing, of how police could have arrived at the conclusion that the borrowing of a vehicle three times equals regular operation.  If the individual police officers arrived at this conclusion on their own, the reporting provision certainly raises red flags.  On the other hand, and only hypothetically, if police based this three-event standard on some formal guidance published by the State and made available to the public, the vagueness objection to § 28.725(1)(g) may be obviated.  A more robust factual record is essential in this regard.  However, the court cannot dismiss Count VII simply because Defendants contend that the challenged provisions have been in effect for several years and Plaintiffs have allegedly satisfied the provisions.

22

(Dkt. # 27, Pg. ID 699-700.)

In their Rule 52 motion, Defendants reassert the same argument made in their motion to dismiss that "none of the Plaintiffs expressed any doubt or uncertainty over what 'regularly' means."  (Dkt. # 97, Pg. ID 5765.)  Defendants also note that the phrase "regularly operate" was introduced into SORA at the request of the ACLU (*Id.* at 5766); however, this is inapposite to whether the is phrase is unconstitutionally vague.  The Joint Statement of Facts indicates that Plaintiffs and law enforcement are unsure as to the meaning of the term "regularly"  (Dkt. # 90, Pg. ID 3930-37), and nothing in Defendants' motion alleviates the court's concern, expressed in its previous order, that the term "regularly' is vague under both parts of the vagueness test.

The term "routinely" implicates the same vagueness concerns as the term "regularly."  Webster's Third New International Dictionary 1981 (3d ed. 1981) defines "routine" as, *inter alia*, "a standard practice," "the habitual method of performance of established procedures," and "of a commonplace or repetitious character."  Both of these terms indicate to registrants and police officers that some degree of normal repetition is needed to be deemed to have regularly or routinely engaged in an activity. But these terms are not sufficiently concrete (1) "to ensure fair notice to the citizenry" or (2) "to provide standards for enforcement by the police, judges, and juries." *Columbia Natural Res., Inc. v. Tatum*, 58 F.3d 1101, 1104 (6th Cir. 1995).

The court's analysis of these terms is guided by *Belle Maer Harbor v. Charter Twp. of Harrison*, 170 F.3d 553 (6th Cir. 1999).  In *Belle Maer Harbor*, the Sixth Circuit struck down an ordinance regulating "bubbling devices," which "extract relatively warmer water from the bottom of a waterway and bring that water to the surface, creating an

23

area of open water which otherwise would be covered by ice." *Id.* at 555 n.2. The ordinance provided in relevant part:

> D. The amount of open water created by a bubbling system shall be controlled as follows:
>
> 1. In canals one hundred ten (110') feet or less in width, a person choosing to bubble shall operate, maintain and periodically inspect the bubbling system apparatus so as to maintain an open water radius surrounding the bubbled object not to exceed five (5') feet, or as determined by the inspecting officer to be a reasonable radius.

*Id.* at 555 n.3.

The plaintiffs in *Belle Maer Harbor* challenged the ordinance as void for vagueness, and the Sixth Circuit focused on whether the term "reasonable" "bound[ed] the inspection officer's enforcement decisions sufficiently to prevent ad hoc, discriminatory enforcement of the open water restriction. *Id.* at 558. The court noted that "a failure to define a term within a statute or ordinance does not render the statute unconstitutionally vague, where the common meaning of the word provides both adequate notice of the conduct prohibited and of the standards for enforcement." *Id.* The court concluded that "a commonly accepted meaning [did not] exist[] for the term 'reasonable' which would provide an inspection officer with guidance in interpreting the Ordinance and in executing his or her enforcement duties with any uniformity." *Id.* The court found that the Black's Law Dictionary definition of reasonable "demonstrates that a standard grounded on reasonableness in this context is susceptible to a myriad of interpretations conferring on the inspectors 'a virtually unrestrained power to arrest and charge persons with a violation.'" *Id.* (quoting *Kolender*, 461 U.S. at 360). Thus, the court held that the ordinance was unconstitutionally vague because it entrusted the

24

enforcement of the ordinance "to the moment-to-moment judgment of the policeman on his beat" and because "the court [could not] conclude that a person of ordinary intelligence could determine from this standard the proscribed conduct." *Id.* at 559.

Similar to the ordinance's use of the word "reasonable" in *Belle Maer Harbor*, the commonly accepted meaning of the terms "regularly" and "routinely" do not provide sufficient guidance to law enforcement or registrants to survive a due process challenge both generally and as applied to Plaintiffs. The frequency and consistency with which Doe #1 must drive his employers' vehicles in order to trigger the registration requirement is unclear. Likewise, it is ambiguous whether Doe #2's use of his girlfriend's car a few times a quarter constitutes regular use, particularly in light of the rule of lenity, and a reasonable person and well-intentioned law enforcement officer would struggle to determine whether Doe #4's occasional use of his mother's phone was "routine." The ambiguity in the reporting requirements is further highlighted by officers' and prosecutors' responses to an informal telephonic survey questions conducted by volunteers for Plaintiffs, law enforcement officers' answers to deposition questions, and law enforcement officers' guidance to Plaintiffs.

Volunteers for Plaintiffs asked local law enforcement agencies and prosecutors' offices how often a registrant could use a vehicle before triggering SORA's reporting requirements. "[S]ome respondents did not know the answer, and others provided answers ranging from once or twice, to six or seven times, to 'whatever is reasonable.'" (Dkt. # 90, Pg. ID 3931.) When asked during a deposition whether a registrant who used a vehicle once during a three-month period had to report the vehicle, the law

enforcement officer testified, "That would be probably a judgment call by the prosecutor or the law enforcement agency."  (Dkt. # 60-8, Pg. ID 1853.)  He answered in the affirmative when asked if "each law enforcement agency might come to a different conclusion about what regular use means."  (*Id.*)  Furthermore, law enforcement told Doe #4 that "if he borrows a car more than three times he must immediately report in person," but such use does not clearly trigger SORA's reporting requirements.  (Dkt. # 90, Pg. ID 3935.)  Similarly, a local police department informed Ms. Doe that she had to register a vehicle "if she was driving it or if it was parked in her driveway."  (*Id.* at 3936.)

The disparate views of the meaning of the term "regularly use" exemplify the lack of a standardized guidelines for the enforcement of SORA's reporting provisions.  The *Belle Maer Harbor* court emphasized, "although we do not require impossible clarity in standards governing conduct, the court must apply a relative strict standard of scrutiny here where criminal sanctions apply."  *Belle Maer Harbor*, 170 F.3d at 559 (citing *Kolender*, 461 U.S. at 361).  Here, SORA subjects registrants to criminal sanctions if they do not comply with the registration requirements, but SORA's vagueness leaves law enforcement without adequate guidance to enforce the law and leaves registrants of ordinary intelligence unable to determine when the reporting requirements are triggered.

### iv. Additional Terms and Phrases Challenged by Plaintiffs

In Plaintiffs' Response to Interrogatory 11, Plaintiffs challenge several additional terms and phrases as unconstituionally vague, including, *inter alia*, the terms "employee," "immediately," "residence," "student," and many others.  (*See* Dkt. # 64-1, Pg. ID 2137-42.)  In addition to the other terms discussed in this Section, Plaintiffs' Rule

52 Motion specifically identifies as vague the terms "immediate," "employer," "temporarily reside," and "designation used in Internet communications," and it incorporates the other terms listed in the Response to Interrogatory 11 by reference. (Dkt. # 96, Pg. ID 5687-88.)

Plaintiffs may challenge SORA on vagueness grounds only as applied to Plaintiffs unless the challenges implicate the First Amendment.  As stated above, the parties challenging the statutes "bear[] the burden of establishing that the statute is vague as applied to [their] particular case, not merely that the statute could be construed as vague in some hypothetical situation."  *Kerneli*, 667 F.3d at 750.  Plaintiffs have not carried this burden for the majority of terms and phrases listed in their Response; rather, their Motion asserts the sort of facial challenge that is reserved for laws implicating First Amendment rights.  Two terms or phrases identified by Plaintiffs as vague implicate Plaintiffs' First Amendment rights and are therefore subject to facial challenges: the term "immediately" and the phrase "any other designations used in internet communications or postings."  *See infra* Section III.C.  Therefore, the court may review Plaintiffs' facial vagueness challenge of this term and phrase.

Section 28.725(1)(f) requires registrants to "report in person and notify the registering authority . . . immediately after . . . [t]he individual establishes any electronic mail or instant message address, or any other designations used in internet communications or postings."  SORA defines "Immediately" to mean "within 3 business days."  Mich. Comp. Laws § 28.722(g).  This definition provides registrants with adequate notice and law enforcement with adequate guidance as to the immediacy with

27

which Plaintiffs must report new Internet designations.  Black's Law Dictionary (10th ed. 2014) defines "business day" as "[a] day that most institutions are open for business, usu[ally] a day on which banks and major stock exchanges are open, excluding Saturdays, Sundays, and certain major holidays."  Courts regularly use the term "business days" as defined in Black's.  *E.g., Ohio v. Akron Ctr. for Reproductive Health*, 497 U.S. 502 (1990) (distinguishing "business days" from "calendar days").  Plaintiffs attempt to insert ambiguity into the term by suggesting that "it is unclear what 'business days' means in the context of reporting to law enforcement authorities that provide service seven days a week."  (Dkt. # 64-1, Pg. ID 2137.)  But as evident in Black's definition, the term refers to days that *most* institutions are open for business and most institutions are not open on weekends.  SORA's use of the term "immediately" is in no way vague or ambiguous.

Likewise, the phrase "designation used in Internet communications or postings," when given the narrowing construction discussed below, is sufficiently clear to give fair notice to registrants as to what information must be reported and adequate guidance to law enforcement and the courts to provide standard enforcement of the law.  *See Columbia Natural Res.,* 58 F.3d at 1104.  It is an intrinsic aspect of language that every word contains some degree of ambiguity.  *Cf. Johnson v. United States*, 559 U.S. 133, 139 (2010) (Scalia, J.) ("[C]ontext determines meaning.").  "You're bad!" can be an insult or a particularly nice compliment; "this is Steven Spielberg's last film" can mean that it is the most recent one he directed or it could mean that it is the final film that he will ever direct; and "Mark Twain" can refer to Samuel Langhorne Clemens, the author of *The Adventures of Tom Sawyer* (1876), a crater on Mercury, or the nautical term for two

28

fathoms (twelve feet).  In *Green v. Block Laundry Mach. Co.*, 490 U.S. 504 (1989), the

Supreme Court explored the ambiguity in the word "defendant" as used in a former

version of Federal Rule of Evidence 609(a)(1):[2]

> The word ["defendant"] might be interpreted to encompass all witnesses, civil
> and criminal, parties or not.  It might be read to connote any party offering a
> witness, in which event Rule 609(a)(1)'s balance would apply to civil, as well
> as criminal, cases.  Finally, "defendant" may refer only to the defendant in a
> criminal case.

*Id.* at 511 (citations omitted).  The Court rejected "an interpretation [of the Rule] that

would deny a civil plaintiff the same right to impeach an adversary's testimony that it

grants to a civil defendant," *id.* at 510, and held that Rule 609(a) "requires a judge to

permit impeachment of a civil witness with evidence of prior felony convictions

regardless of ensuant unfair prejudice to the witness or the party offering the testimony."

*Id.* at 527.  In a separate opinion, Justice Scalia—a strong advocate for giving statutes

their plain meaning, *see INS v. Cardoza-Fonseca*, 480 U.S. 421, 452-55 (1987) (Scalia,

J, concurring)—joined the majority in advocating interpreting the word "defendant"

against its literal meaning to avoid "produc[ing] an absurd, and perhaps unconstitutional,

result."  *Green*, 490 U.S. at 527 (Scalia, J., concurring); *id.* at 528-29 ("The word

---

[2] In 1989, Rule 609(a) provided in relevant part:

> General Rule. For the purpose of attacking the credibility of a witness,
> evidence that the witness has been convicted of a crime shall be admitted if
> elicited from the witness or established by public record during
> cross-examination but only if the crime (1) was punishable by death or
> imprisonment in excess of one year under the law under which the witness
> was convicted, and the court determines that the probative value of admitting
> this evidence outweighs its prejudicial effect to the defendant, or (2) involved
> dishonesty or false statement, regardless of the punishment.

*Green*, 490 U.S. at 509.

'defendant' in Rule 609(a)(1) cannot rationally (or perhaps even constitutionally) mean to provide the benefit of prejudice-weighing to civil defendants and not civil plaintiffs. Since petitioner has not produced, and we have not ourselves discovered, even a snippet of support for this absurd result, we may confidently assume that the word was not used (as it normally would be) to refer to all defendants and only all defendants.").

As with the seemingly unambiguous words "bad," "last," and "defendant," the phrase "any other designations used in internet communications or postings" includes some degree of ambiguity. Webster's Third New International Dictionary 612 (3d ed. 1981) defines "designation," *inter alia*, to mean "distinguishing name." Law enforcement and registrants of ordinary intelligence would reasonably understand this phrase to include Internet aliases used to convey and exchange information. *See* Webster's Third New International Dictionary 460 (3d ed. 1981) (defining "communicate" to mean "to make known," "inform a person of," and "convey the knowledge or information of"); Webster's Third New International Dictionary 1771 (3d ed. 1981) (defining "post" to mean "to affix . . . to a post, wall or other usual place for public notice); *Post*, Merriam-Webster's Online Dictionary http://www.merriam-webster.com/dictionary/post (last visited Mar. 30, 2015) (defining "post" as "to publish (as a message) in an online forum (as an electronic bulletin board)").

While the phrase uncontroversially includes social media aliases and other aliases used for the primary purpose of exchanging information with other Internet users, there are many Internet aliases that individuals use that involve some degree of Internet communication but do not clearly fall within SORA. Plaintiffs ask, "Must an

30

individual report when setting up a new on-line bank account, Amazon account, Mlive account, gaming account, etc.?" (Dkt. # 64-1, Pg. ID 2139.)  Through an alias created for a massively multiplayer online role-playing game ("MMORPG"), a registrant would likely engage in substantial communication with other individuals, including minors. Through an Ebay account, a registrant might post items for sale, communicate bids, and engage in private communications with sellers or buyers about the status of a transaction.  Individuals use online banking primarily to access their financial information, pay bills, deposit funds, and engage in other economic activity, but these accounts may also be used to communicate with bankers to facilitate such activities.  In the broadest sense, virtually all online accounts are Internet designations used for some sort of communication.

In order to alleviate ambiguity and in light of the rule of lenity, the court interprets SORA's catch-all Internet designation phrase to apply to Internet designations that are *primarily* used in Internet communications or postings.  This construction is consistent with a plain reading of the statute.  "[U]nder the established interpretive canons of *noscitur a sociis* and *ejusdem generis*, '[w]here general words follow specific words in statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words.'"  *Wash. State Dept. of Soc. and Health Servs. v. Guardianship Estate of Keffeler*, 537 U.S. 371, 384 (2003) (quoting *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 114-15 (2001)); *see Yates v. United States*, 135 S. Ct. 1074, 1086-87 (2015) (plurality) (applying the canon of *ejusdem generis* in holding that fish do not fall within the Sarbanes-Oxley Act of 2002's, 18 U.S.C. § 1519, prohibition against knowingly destroying "tangible object[s]"

31

because that term is limited to objects "used to record or preserve information").  "Any other designation used in internet communications or postings" is a general phrase which follows the more specific terms "electronic mail" and "instant message address" in § 28.725(1)(f).  E-mail and instant message addresses are used primarily for the purpose of communicating with other individuals online.  Therefore, applying the canon of *ejusdem generis*, the court construes "other designations used in internet communications or postings" to refer only to designations used *primarily* for the purposes of Internet communications or postings.

This construction excludes designations used primarily to engage in e-commerce and online banking, or to read content like online newspaper accounts even though registrants may post comments at the end of online newspaper articles or "chat" with Amazon representatives.  Meanwhile, a MMORPG alias is created for the primary purpose of interacting with other online gamers and engaging in a substantial amount of communications.  Such aliases are "similar in nature" to e-mail and instant message addresses and fall within the Internet designation provision.

This narrowing construction also has the virtue of being consistent with how law enforcement is currently trained to enforce § 28.725(1)(f).  The manager of Michigan's sex offender registry testified that Michigan State Police's Sex Offender Registration Unit trains law enforcement to record e-mail addresses and social media screen names, but not online banking information.  (Dkt. # 60-6, Pg. ID 1800.)  The manager also testified that online gaming screen names fall within SORA.  (*Id.* at 1801.)

In sum, using this narrowing construction, § 28.725(1)(f) is sufficiently clear to provide fair notice to registrants and adequate guidance to law enforcement.

32

**2. Strict Liability**

Plaintiffs further contend that SORA violates the Due Process Clause because it imposes strict liability for many reporting and exclusion zone violations.  (Dkt. # 46, Pg. ID 900; Dkt. # 96, Pg. ID 5690-92.)  Defendants do not address Plaintiffs' strict liability arguments in their responses to Plaintiffs' Rule 52 Motion.

Similar to the void for vagueness doctrine, strict liability in the context of criminal statutes raises concerns of fair notice.  "[E]ven when a statute is specific about which acts are criminal, [the] due process analysis is not complete.  When . . . predicate acts which result in criminal violations are commonly and ordinarily not criminal, [courts] must ask the fair notice question once again."  *United States v. Apollo Energies, Inc.*, 611 F.3d 679, 687 (10th Cir. 2010).  "It is . . . the general rule of law, and the dictate of natural justice, that to constitute guilt there must be not only a wrongful act, but a criminal intention."  *Morissette v. United States*, 342 U.S. 246, 274 (1952).

In *Liparota v. United States*, 471 U.S. 419 (1985) the Supreme Court held that, to be convicted for violating a statute governing food stamp fraud, the government must provide that the defendant knew that the acquisition or possession of food stamps was in an unauthorized manner.  *Id.* at 433.  The Court explained that, for most criminal statutes imposing strict liability, "Congress has rendered criminal a type of conduct that a reasonable person should know is subject to stringent public regulation and may seriously threaten the community's health or safety;" meanwhile, the acquisition or possession of food stamps is not so obviously against the public interest that a reasonable person should be expected to know it is regulated.  *Id.*  Plaintiffs insist that taking one's children to a park near a school or failing to report a new e-mail account

33

are similarly not inherently blameworthy activities, and, therefore, the court should read a knowledge requirement into SORA violations. The court agrees.

SORA imposes myriad restrictions and reporting requirements that affect many aspects of registrants' lives. Ambiguity in the Act, combined with the numerosity and length of the Act's provisions, make it difficult for a well-intentioned registrant to understand all of his or her obligations. Moreover, law enforcement officers' disparate answers to survey and deposition questions about what SORA's reporting requirements and prohibitions highlight SORA's imperfect ability to provide fair notice to all persons who it covers. The frequency with which SORA is amended, as well as today's highly mobile population, make a knowledge requirement even more important to ensure due process of law.

The court's decision is guided by *Lambert v. California*, 355 U.S. 225 (1957), in which the Supreme Court considered whether a Los Angeles ordinance making it "unlawful for 'any convicted person' to be or remain in Los Angeles for a period of more than five days without registering" and "requir[ing] any [convicted] person having a place of abode outside the city to register if he comes into the city on five occasions or more during a 30-day period." *Id.* at 226. The particular question before the Court was "whether a registration act of this character violates due process where it is applied to a person who has no actual knowledge of his duty to register, and where no showing is made of the probability of such knowledge." *Id.* at 227. The Court added a knowledge requirement to the ordinance and held that "[w]here a person did not know of the duty to register and where there was no proof of the probability of such knowledge, he may not be convicted consistently with due process. *Id.* at 229-30.

34

Recognizing a knowledge requirement in SORA does not defang the legislation. Instead, it shifts responsibility to courts, law enforcement, and probation officers to make sure persons convicted of sex offenses are informed of their legal obligations. Such a sharing of responsibility is grounded in the text of SORA.  SORA directs the department of corrections to "mail a notice to each individual registered under [SORA] who is not in a state correctional facility explaining the individual's duties under this act as amended."  Mich. Comp. Laws § 28.725a(1).  The Act also directs the department of corrections to "provide written notice to [an] individual [upon the individual's release from a state correctional facility] explaining his or her duties under [SORA] and the procedure for registration, notification, and verification and payment of registration fee."  Mich. Comp. Laws § 28.725a.  SORA was not enacted to serve as a trap for individuals who have committed sex offenses in the past (and who already have served their sentences).  Rather, the goal is public safety, and public safety would only be enhanced by the government ensuring that registrants are aware of their obligations.

### 3. Impossibility

Plaintiffs also allege that "SORA . . . contains provisions with which compliance is impossible," rendering the Act in violation of the Due Process Clause. (Dkt. # 46, Pg. ID 900.)  Their Rule 52 motion identifies two such provisions.

First, Plaintiffs contend that the requirement for registrants to report *in person* makes compliance with SORA impossible because it may be infeasible for persons subject to SORA who are ill or injured or facing an emergency to timely report in person. (Dkt. # 96, Pg. ID 5692.)  Were Plaintiffs' reasoning applied to all legislation, no law that imposes an affirmative duty on an individual to perform a task would be consistent with

35

due process of law because it would always be the case that some individuals could be too infirm to perform the affirmative duty.  If the court interprets Plaintiffs' argument as applying exclusively to laws involving strict liability, adopting such an argument would still call into question the constitutionality of any strict liability statute or regulation imposing a duty to act.

Plaintiffs' impossibility argument raises a serious constitutional issue, but it is unaccompanied by any allegations that persons have been penalized for failing to report in person when required under SORA, due to illness, injury, or emergency.  Plaintiffs cite to an incident in 2001 when Doe #3 failed to comply with the quarterly in-person reporting requirement because "Doe #3 came back from a vacation near the end of the 15-day registration period," and "[t]he police station was closed from Friday, Saturday, and Sunday for a long weekend."  (Dkt. # 90, Pg. ID 3750-51.)  As a consequence of Doe #3's subsequent late reporting, he was found in violation of his probation, and his HYTA status was revoked.  (*Id.* at 3751.)  This is not an incident in which a registrant's compliance with SORA was impossible.  Defendants note that "it is not clear why Doe #3 chose to return from vacation at that time, or if he made any effort to check the police station's availability before going on vacation, or if he attempted to go to any other police agency to report once he learned that his local police station was closed."  (*Id.*)  Requiring an individual to slightly alter his vacation plans is a far cry from a due process violation.

"It is the duty of federal courts to avoid the unnecessary decision of the constitutional questions."  *Tower Realty v. City of E. Detroit*, 196 F.2d 710, 724 (6th Cir.1952); *see United States v. Elkins*, 300 F.3d 638, 647 (6th Cir. 2002) ("Courts

should avoid unnecessary constitutional questions."); *Ashwander v. TVA*, 297 U.S. 288,

347 (1936) (Brandeis, J., concurring) ("It is not the habit of the court to decide questions

of a constitutional nature unless absolutely necessary to a decision of the case."

(citation omitted)).  This principle of constitutional avoidance counsels against resolving

the question of whether SORA may penalize persons who fail to report in person due to

illness, injury or emergency where, as here, there is no indication that the law has ever

been enforced in such a manner.  Furthermore, as will be discussed *infra*, the "in

person" reporting requirement places an unnecessarily burdensome obstacle that limits

protected First Amendment speech and, therefore, renders that provision

unconstitutional.  Accordingly, the legislature will have cause to revisit SORA's

requirement that registrants report *in person*.  Under the circumstances, it is prudent for

the court to abstain from ruling on this issue.

Second, Plaintiffs argue that SORA violates the Due Process Clause because

Doe #4 "is automatically and unpreventably in violation" of SORA because "he is

homeless [and] cannot update his driver's license to match his registration address

(which is 'homeless')."  (Dkt. # 96, Pg. ID 5692.)  Mich. Comp. Laws § 28.725a(7)

provides:

> An individual required to be registered under this act shall maintain either a
> valid operator's or chauffeur's license issued under the Michigan vehicle
> code, 1949 PA 300, MCL 257.1 to 257.923, or an official state personal
> identification card issued under 1972 PA 222, MCL 28.291 to 28.300, with
> the individual's current address. The license or card may be used as proof
> of domicile or residence under this section. In addition, the officer or
> authorized employee may require the individual to produce another document
> bearing his or her name and address, including, but not limited to, voter
> registration or a utility or other bill. The department may specify other
> satisfactory proof of domicile or residence.

A violation of § 28.725a(7) subjects an individual to "imprisonment for not more than 2 years or a fine of not more than $2,000.00, or both."  Mich. Comp. Laws § 28.729(2).  Plaintiffs do not allege that Doe #4 has been charged with violating SORA due to his failure to update his driver's license or identification card.  However, the court acknowledges that Doe #4 is left in the unenviable position of fearing that he may, at any moment, be arrested and sentenced to imprisonment for violating SORA.  Here, there is a credible threat of prosecution, and Doe #4 need not wait until he faces criminal prosecution to seek relief.  *See Babbitt*, 442 U.S. at 298.

Absent from the record is information about if and how homeless persons may obtain state identification cards.  The Supreme Court of Michigan has held that "homelessness is not a bar to compliance with SORA because homelessness does not preclude an offender from entering a police station and reporting to a law enforcement agency regarding the offender's residence or domicile."  *People v. Dowdy*, 802 N.W.2d 239, 242 (Mich. 2011).  While the majority in *Dowdy* noted that SORA directs registrants to maintain a driver's license or state identification card, it did not address whether it is feasible for homeless registrants to obtain such identification.  *Id.* at 245.  To the contrary, the majority implicitly acknowledges that homeless registrants may have difficulty obtaining a driver's license or state identification card by emphasizing that "those are not the *exclusive* means by which an offender may prove residence or domicile to law enforcement" and that, "if a sex offender is unable to provide any of the statutorily specified documents . . . , the Michigan State Police is empowered to formulate alternative methods . . . to verify the offender's residence or domicile."  *Id.*

38

The *Dowdy* dissent insisted that § 28.725a(7)'s (then § 28.725a(8)) requirement for registrants to maintain a driver's license or state personal identification card with their current address was unlawful because compliance is impossible for homeless registrants.  Justice Kelly, writing for herself and two other justices, explained:

> [T]o obtain a driver's license or state identification card, the Secretary of State requires an applicant to provide at least two documents "with [his or her] name and Michigan residence address.  Hence, by the Secretary of State's own requirements, an individual cannot obtain a state identification card absent a valid residential address, which defendant did not have. Nor does the majority, the Michigan State Police, or the prosecutor indicate how a homeless sex offender like defendant could obtain an identification card without a permanent address, much less change an address to reflect transient accommodations.

*Id.* at 259 (Kelly, J., dissenting) (footnote omitted).

In order for the court to determine whether SORA's requirement for registrants to maintain a driver's license or state personal identification card is constitutional, as applied to Doe #4 and other homeless registrants, the court needs additional briefing on how and if homeless registrants can obtain such identification.  The court will reserve ruling on the constitutionality of this provision until the parties have submitted additional briefing.

### B. Count IV: The Fundamental Right to Participate in the Education and Upbringing of Children

In Count IV, Plaintiffs claim that SORA's geographic exclusion zones violate the Due Process Clause of the Fourth Amendment because they (1) substantially interfere with Plaintiffs' ability to participate in the upbringing and education of their children, (2) do not provide for individualized consideration before restricting this right, and (3) are not narrowly tailored to serve a compelling state interest.  (Dkt. # 46, Pg. ID 897-98.)  In

39

particular, Plaintiffs first contend that SORA's prohibition on loitering within 1,000 feet of a school safety zone does allow registrants to contact or observe their own children within the zones and thus prevent registrants from "observ[ing] or contact[ing their] children in half the city." (Dkt. # 96, Pg. ID 5694.)  Second, Plaintiffs argue that, even if the loitering ban does not apply to one's own children, the ban nonetheless unconstitutionally restricts parental rights because registrants cannot take their children to locations within the school safety zones where other children are likely to be. (Dkt. # 96, Pg. ID 5694-95.)

Defendants argue that the loitering ban "does not implicate a fundamental right, [and therefore] it need only rationally advance some legitimate government purpose." (Dkt. # 97, Pg. ID 5760.)  They contend that this standard is met because the loitering ban advances a state interest in protecting children.  (*Id.*)  Further, Defendants assert that, [e]ven were the student safety zones established by SORA to implicate a fundamental right, this claim still fails because the [loitering ban] is narrowly tailored to advance the State's compelling interest in protecting children." (*Id.* at 5760-61.)

"The substantive component of the Due Process Clause protects 'fundamental rights' that are so 'implicit in the concept of ordered liberty' that 'neither liberty nor justice would exist if they were sacrificed.'" *Doe v. Mich. Dep't of State Police*, 490 F.3d 491 (6th Cir. 2007) (quoting *Palko v. Connecticut*, 302 U.S. 319, 325 (1937)).  The right to "direct the education and upbringing of one's children" is one such fundamental right. *Id.* (quoting *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997).  "The government cannot infringe on [a fundamental liberty interest] 'unless the infringement is narrowly tailored to serve a compelling state interest.'" *Johnson v. City of Cincinnati*, 310 F.3d

40

484, 502 (6th Cir. 2002) (quoting *Glucksberg*, 521 U.S. at 721).  But where the law does not infringe on a fundamental right, the court "analyze[s] its constitutionality under the rational basis test," *Walker v. Bain*, 257 F.3d 660, 667-68 (6th Cir. 2001), upholding the law "so long as it bears a rational relation to some legitimate end."  *Romer v. Evans*, 517 U.S. 620, 631 (1996).

"[T]he interest of parents in the care, custody, and control of their children . . . is perhaps the oldest of the fundamental liberty interests recognized by [the Supreme] Court." *Troxel v. Granville*, 530 U.S. 57, 65 (2000).  The liberty interest includes a parent's right to "the companionship, care, custody and management of his or her children." *Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18, 27 (1981) (quoting *Stanley v. Illinois*, 405 U.S. 645, 651 (1972)).  However, "the Supreme Court has yet to articulate the parameters of this right," and the Sixth Circuit has recognized that the right "is neither absolute nor unqualified" and "is limited by an equal[ly] compelling governmental interest in the protection of children, particularly where the children need to be protected from their own parents." *Kottmyer v. Maas*, 436 F.3d 684, 690 (6th Cir. 2006).

In the court's previous opinion granting in part and denying in part Defendants' motion to dismiss, the court found that the loitering ban "appears to prevent Plaintiffs from engaging in a plethora of activities closely related to the upbringing of their children" and that Defendants failed to "demonstrate that the loitering prohibition is actually narrowly tailored to the State's interest and fails to explain why a less restrictive prohibition . . . would not effectively achieve the State's interest."  (Dkt. # 27, Pg. ID 693-95.)  The court informed the parties that "[f]actual development is warranted" in order for the court to determine whether the loitering ban leaves Plaintiffs with sufficient

41

involvement in their children's lives to warrant rational basis review and, if not, to determine when the ban is narrowly tailored to achieve a compelling governmental interest.  (*Id.* at 695.)

Because of the geographical exclusion zones' unconstitutional vagueness, the court is ill-equipped to evaluate whether the loitering ban does in fact infringe on parents' rights to participate in the upbringing and education of their children. Defendant contends that the loitering ban does not infringe on this right because "the [geographic exclusion zone] provisions do[] not outright ban an offender's presence on school property."  (Dkt. # 97, Pg. ID 5756-57.)  They note that registrants may drop off and pick up their children, go to a public library, and attend a parent-teacher conference.  However, as previously discussed, ambiguity in the exclusion zones and in the term "loiter" leave registrants of ordinary intelligence unable to determine what behavior is prohibited by SORA.  Due to SORA's vagueness, it is unclear whether a registrant may visit a public library or attend a parent-teacher conference where minors are present without risking arrest from law enforcement.  Furthermore, because it is unclear how the geographic exclusion zones are measured, the court is unable to determine the extent to which SORA infringes on a registrant's ability to find a place to live with his children and the extent to which SORA prevents a registrant from accompanying his children to parks, playgrounds, movie theaters, restaurants, and other establishments and places in the state.  Defendants do not themselves provide any viable means for determining how much of Michigan falls within the exclusion zones, and SORA is too vague for the court, registrants, and law enforcement to make this determination.

42

Defendants rely on *Doe v. Miller*, 405 F.3d 700 (8th Cir. 2005) in which the Eighth Circuit found that a statute prohibiting sex offenders from living within 2,000 feet of a school did "not infringe upon a constitutional liberty interest relating to matters of marriage and family in a fashion that require[d] heightened scrutiny." *Id.* at 711. The Eighth Circuit reached this conclusion on the ground that "the statute does not directly regulate the family relationship or prevent any family member from residing with a sex offender in a residence that is consistent with the statute." *Id.* But a statute need not directly regulate family relations in order to infringe on a person's right to associate with his family. In *Johnson v. City of Cincinnati*, 310 F.3d 484 (6th Cir. 2002), the Sixth Circuit struck down as unconstitutional an ordinance that excluded individuals arrested, taken into custody, or convicted of an enumerated drug offense from "drug-exclusion zones" which were defined as "areas where the number or arrests for . . . drug-abuse related crimes for the twelve (12) month period preceding the original designation is significantly higher than that for other similarly situated/sized areas of the city." *Id.* at 487-88. The Sixth Circuit held that the ordinance "plainly infringed on [a grandmother's] right to participate in the rearing of her grandchildren" because it "effectively banished" her from the neighborhood in which her grandchildren resided "and precluded . . . her regular role in caring for her grandchildren." *Id.* at 505. Furthermore, at least one court has held that a similar ordinance, which "prohibits registered sex offenders from residing or loitering within 500 feet of any school, park, playground, recreation area, or day care facility or within 25 feet of a school bus stop," infringes on fundamental parental rights. *Elwell v. Township of Lower*, 2006 WL 3797974, at *1 (N.J. Super. Ct. 2006). The *Elwell* court concluded:

43

The geographical restrictions on where the plaintiff (or any other sex offenders for that matter) may reside or "loiter," substantially intrude upon significant family matters involving private and personal choices about how to raise and care for children, and decision-making about where to reside. The Ordinance restricts Elwell, a low risk offender, from accompanying his children to the school bus stop, going into a school or to a public park with his children, for fear of being charged with "loitering" because he is a convicted sex offender. The rights affected are significant, and are unnecessarily burdened by the Ordinance.

*Id.* at *15.

It is well-settled that Michigan has a compelling interest in protecting minors from violence and sexual abuse.  (Dkt. # 90, Pg. ID 3767.)  If the Michigan legislature amends SORA to provide effective clarity to the loitering ban, perhaps the court could find that the ban does not infringe on Plaintiffs' associational rights and/or that the ban is narrowly tailored to achieve a compelling state interest.  However, SORA's vagueness leaves the court unable to determine to what extent SORA infringes on Plaintiffs' right to participate in the upbringing and education of their children, or whether SORA is narrowly tailored to achieve that interest.

### C. Count V: Violation of the First Amendment

In Count V, Plaintiffs allege that SORA's "requirements to report information about on-line accounts and activity is invalid under the First Amendment both on its face and as applied because it is not narrowly tailored to serve a compelling state interest and because it prohibits a substantial amount of protected speech."  (Dkt. # 46, Pg. ID 898.)  Plaintiffs specifically challenge the constitutionality of two of SORA's provisions, Mich. Comp. Laws §§ 28.727(1)(I) and 28.726(1)(f).  Section 28.727(1)(I) provides that a registrant must report "[a]ll electronic mail addresses and instant message addresses assigned to the individual or routinely used by the individual and all login names or other

identifiers used by the individual when using any electronic mail address or instant messaging system."  Section 28.725(1)(f) requires registrants to "report in person and notify the registering authority . . . immediately after . . . [t]he individual establishes any electronic mail or instant message address, or any other designations used in internet communications or postings."

Defendants argue that the registration and reporting requirements do not prevent Plaintiffs' access to the Internet or regulate the content of their online speech.  They maintain that the requirements "no more regulate[] speech than does the collection of other required information such as the offenders' names, addresses, vehicle identification, or employer data."  (Dkt. # 97, Pg. ID 5746.)

The court denied Defendants' motion to dismiss as it related to Count V, explaining that, "[w]ithout additional briefing and further information on the operation of the provisions, the court is unable to determine whether the provisions implicate registrants' First Amendment rights."  (Dkt. # 27, Pg. ID 702.)  The court expressed that the contention that SORA chills registrants' speech "deserves more considered reflection" especially given that "at least one of the Plaintiffs refus[ed] to use the internet" in light of the reporting requirements.  (*Id.* at 701 quoting Compl. ¶ 204 (" [John Doe IV] does not use the Internet because he would be required . . . to register all email and Internet identifiers, and would need to report constantly in order to use different websites with different user-names.").)  Specifically, the court stated that "it is not at all clear to the court how the provisions interact with registrants' ability to use the internet as a medium to engage in protected speech.  Particularly of interest is what the State does with the information provided."  *Id.*  Furthermore, the court noted that "additional

45

information on the actual operation of the provisions is necessary to determine whether they are narrowly tailored." (*Id.* at 701-02.)

The First Amendment, as applied to the states through the Fourteenth Amendment, protects individuals from laws abridging the freedom of their speech. U.S. Const. amend. I. The Supreme Court has extended the First Amendment's free speech protections to the Internet. *Reno v. ACLU*, 521 U.S. 844, 870 (1997) ("[O]ur cases provide no basis for qualifying the level of First Amendment scrutiny that should be applied to [the Internet]."). Any law burdening the exercise of free speech "must be narrowly drawn and represent a considered legislative judgment that a particular mode of expression has to give way to other compelling needs of society." *Broadrick v . Oklahoma*, 413 U.S. 601, 611-12 (1973). "[T]he government may impose reasonable restrictions on the time, place, or manner of protected speech," provided the restrictions are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (internal quotation marks omitted). The Supreme Court clarified this standard, explaining:

> A regulation of the time, place, or manner of protected speech must be narrowly tailored to serve the government's legitimate, content-neutral interests but that it need not be the least restrictive or least intrusive means of doing so. Rather, the requirement of narrow tailoring is satisfied "so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation."

*Id.* at 798-99 (quoting *United States v. Albertini*, 472 U.S. 675, 689 (1985)).

SORA's Internet reporting provisions are content neutral in that they restrict

46

speech without reference to the [speech's] content." *Doe v. Prosecutor, Marion County, Indiana*, 705 F.3d 694, 698 (2013); *see Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 643 (1994) ("As a general rule, laws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content based. By contrast, laws that confer benefits or impose burdens on speech without reference to the ideas or views expressed are in most instances content neutral." (citations omitted)). Accordingly, applying the standard set forth in *Ward*, the court must determine whether the restrictions are (1) narrowly tailored, (2) to serve a significant government interest, while (3) leaving ample alternative channels for communicating information.

Both parties concede, and it is beyond cavil, that the state has a compelling interest in protecting minors from violence and sexual abuse. (Dkt. # 90, Pg. ID 3767.) The parties, however, vigorously dispute whether the Internet reporting provisions are narrowly tailored to achieve this interest.

Plaintiffs contend that SORA's Internet provisions are not narrowly tailored because "they do nothing beyond what is accomplished by existing laws to protect minors from sexual crime" and note that "those [minor solicitation] laws did a much better job at narrowly targeting the behavior the state wanted to curtail" than SORA does.[3] (Dkt. # 96, Pg. ID 5698.) *See* Mich. Comp. Laws § 750.145d (prohibiting the

---

[3]In arguing that SORA's Internet provisions are not narrowly tailored, Plaintiffs cite to *Doe v. Prosecutor, Marion County, Indiana*, 705 F.3d 694 (7th Cir. 2013). In that case, the Seventh Circuit struck down an Indiana statute that prohibited most registered sex offenders from using social networking websites, instant messaging services, and chat programs. *Id.* at 695. The Seventh Circuit concluded that, although the statute was content neutral, they were not narrowly tailored to serve the state's interest inasmuch as "[i]t broadly prohibits substantial protected speech rather than specifically targeting the evil of improper communications to minors." *Id.* However, the statute at

solicitation of minors over the Internet).  However, SORA does go beyond the existing

laws and provides further protection of minors from sexual crimes in two ways.  First,

whereas § 750.145d prohibits the online solicitation of minors, SORA's Internet

provisions create a database of online identities of persons convicted of sex offenses

which makes easier the investigation of crimes in which a minor (or adult) has been

contacted through an online alias.  Second, as the Department of Justice's Office of Sex

Offender Sentencing, Monitoring, Apprehending, Registering, and Tracking ("SMART")

aptly suggests, "knowledge that their Internet identifiers are known to the authorities

may deter registered sex offenders from engaging in criminal behavior on the Internet."

(Dkt. # 90, Pg. ID 3877.)  Plaintiffs note that law enforcement has yet to use the Sex

Offender Registration database to search for registrants' Internet information to solve a

crime.  (Dkt. # 96, Pg. ID 5698.)  But this in no way affects whether SORA is narrowly

tailored to achieve the state's significant and compelling interest in protecting minors.

Next, Plaintiffs attack SORA's Internet provisions on the ground that they

unconstitutionally restrict Plaintiffs' right to anonymous speech. (Dkt. # 96, Pg. ID 5698-

99.)  The Supreme Court has recognized that "an author's decision to remain

anonymous, like other decisions concerning omissions or additions to the content of a

publication, is an aspect of the freedom of speech protected by the First Amendment."

*McIntyre v. Ohio Elections. Comm'n*, 514 U.S. 334, 342 (1995).  The First Amendment's

protection of anonymous speech extends to the Internet as well.  *See, e.g.*, *Doe v.*

---

issue in *Marion County* is distinguishable from SORA.  Whereas the Indiana statute
*prohibited* certain registrants from using social networking websites, SORA does not bar
any speech on the Internet, but rather imposes reporting requirements.

48

*Harris*, 772 F.3d 563, 574 (9th Cir. 2014); *Doe v. Shurtleff*, 628 F.3d 1217, 1222 (10th Cir. 2010); *Doe v. 2TheMart.com Inc.*, 140 F. Supp. 2d 1088, 1092 (W.D. Wash. 2001) ("The right to speak anonymously extends to speech via the Internet."). "[A]nonymity may be motivated by fear of economic or official retaliation, by concern about social ostracism, or merely by a desire to preserve as much of one's privacy as possible," *McIntyre*, 514 U.S. at 341-42, and the Ninth Circuit has suggested that anonymity may be particularly important to sex offenders engaged in protected speech because it "provides a way for a writer who may be personally unpopular to ensure that readers will not prejudge her message simply because they do not like its proponent." *Harris*, 772 F.3d at 581 (quoting *McIntyre*, 514 U.S. at 342).

Two recent circuit court opinions provide helpful guidance in addressing Plaintiffs' argument. *See Doe v. Shurtleff*, 628 F.3d 1217 (10th Cir. 2010) and *Doe v. Harris*, 772 F.3d 563 (9th Cir. 2014). The court ultimately concludes that requiring Plaintiffs to disclose their Internet designations to law enforcement does not unconstitutionally infringe on their right to *anonymous* speech. However, the requirement that Plaintiffs' report new designations *in person* as well as the Internet provisions' aforementioned vagueness render these provisions unconstitutionally overbroad.

In *Shurtleff*, the Tenth Circuit considered whether a Utah law requiring registered sex offenders to report their "internet identifiers" violated the First Amendment. 628 F.3d 1217. In holding that the law did not violate registrants' First Amendment rights, the Tenth Circuit narrowly read the statute in order to dispel the registrant's concerns that the public would have access to his reported information and that law enforcement would be unhindered from constant surveillance of his activities. To that end, the court

49

"read th[e] statute as permitting sharing only among law-enforcement agencies, not the public at large, and only for [] recited law-enforcement purposes." *Id.* at 1225. Likewise, in explaining its holding "that the statute includes sufficient restrictions so as not to unnecessarily chill [the registrant's] speech," the court read the statute "as only allowing state actors to look beyond the anonymity surrounding a username in the course of an investigation after a new crime has been committed." *Id.* The Tenth Circuit also noted that, "[a]lthough there is a possibility that a government agent would have access to Doe's identity at the time he was speaking—as, for example, if an undercover [officer] sought him out in a chat room in the course of investigating a sex crime—we are not persuaded that this possibility imposes a constitutionally improper burden on speech." *Id.*

Meanwhile, in *Doe v. Harris*, 772 F.3d 563 (9th Cir. 2014), the Ninth Circuit enjoined provisions of the Californians Against Sexual Exploitation Act, which required sex offenders to report "[a] list of any and all Internet identifiers established or used by the person" and "[a] list of any and all Internet service providers used by the person," as well as requiring registrants to send written notice to law enforcement within 24 hours of any additions or changes to this information. *Id* at 567-68 (quoting Cal. Penal Code §§ 290.014(b), 290.015(a)(4), (5)). Applying intermediate scrutiny, the Ninth Circuit concluded that the Act "unnecessarily chills protected speech in at least three ways: the Act does not make clear what sex offenders are required to report, there are insufficient safeguards preventing the public release of the information sex offenders do report, and the 24-hour reporting requirement is onerous and overbroad." *Id.* at 578.

50

In particular, the Ninth Circuit found that "ambiguities in the statute may lead registered sex offenders either to overreport their activity or underuse the Internet to avoid the difficult questions in understanding what, precisely, they must report." *Id.* at 579. "This uncertainty undermines the likelihood that the [Act] has been carefully tailored to the [State's] goal of protecting minors." *Id.* (quoting *Reno*, 521 U.S. at 871.). Second, the Ninth Circuit held that "the Act . . . chills anonymous speech because it too freely allows law enforcement to disclose sex offenders' Internet identifying information to the public" because the Act provides that "any designated law enforcement entity may provide information to the public about a person required to register as a sex offender . . . when necessary to ensure the public safety based upon information available to the entity concerning that specific person." *Id.* at 580 (quoting Cal. Penal Code § 290.45(1)(1)). The court noted that this provision "contains no standard for judging what is 'necessary to ensure the public safety,'" and that, "[w]ithout such standard, the Act impermissibly 'places unbridled discretion in the hands of a government official or agency.'" *Id.* (quoting *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750 (1988)). Thus, "registered sex offenders are unnecessarily deterred from engaging in anonymous online speech." *Id.* at 581. Third, the Ninth Circuit found the twenty-four-hour update requirement to be a substantial and undeniable burden on First Amendment activities, explaining that "anytime registrants want to communicate with a new identifier, they must assess whether the message they intend to communicate is worth the hassle of filling out a form, purchasing stamps, and locating a post office or mailbox." *Id.* at 582. The court further explained that "[t]he mail-in requirement is not only psychologically chilling, but physically inconvenient, since

51

whenever a registered sex offender obtains a new ISP or Internet identifier, he must go somewhere else within 24 hours to mail that information to the State." *Id.*

While neither of these cases are controlling, they are instructive. Both courts were concerned with who would have access to the reported information. In this regard, SORA is more akin to the Utah legislation than the enjoined California statutes. Both parties concede that "registrants' internet identifiers are not made available to the general public." (Dkt. # 90, Pg. ID 3875.) SORA explicitly provides:

> The following information shall not be made available on the public internet website . . . (e) Any electronic mail addresses and instant message addresses assigned to the individual or routinely used by the individual and any login names or other identifiers used by the individual when using any electronic mail address or instant messaging system.

Mich. Comp. Laws § 28.728(3).

Thus, SORA neither prohibits registrants from engaging in any particular speech on the Internet, nor does it unmask registrants' anonymity to the public. SORA does unveil registrants' anonymity to law enforcement; however, this does not, by itself, infringe upon Plaintiffs' First Amendment rights. In *Laird v. Tatum*, 408 U.S. 1 (1972) the Supreme Court noted:

> In recent years this Court has found in a number of cases that constitutional violations may arise from the deterrent, or 'chilling,' effect of governmental regulations that fall short of a direct prohibition against the exercise of First Amendment rights. In none of these cases, however, did the chilling effect arise merely from the individual's knowledge that a governmental agency was engaged in certain activities or from the individual's concomitant fear that, armed with the fruits of those activities, the agency might in the future take some other and addition[a]l action detrimental to that individual. Rather, in each of these cases, the challenged exercise of governmental power was regulatory, proscriptive, or compulsory in nature, and the complainant was either presently or prospectively subject to the regulations, proscriptions, or compulsions that he was challenging.

52

*Id.* at 11.

The Sixth Circuit has construed *Laird* to stand for the proposition that, "to allege a sufficient injury under the First Amendment, a plaintiff must establish that he or she is regulated, constrained, or compelled directly by the government's actions, instead of by his or her own subjective chill." *ACLU v. Nat'l Sec. Agency*, 493 F.3d 644 (6th Cir. 2007). Here, given that registrants' anonymity remains intact with regard to the public, any chilling effect caused by the limited removal of Plaintiffs' anonymity would be caused by the sort of subjective fear of future government action discounted in *Laird*.

However, there are two aspects of SORA's Internet reporting provisions that are particularly onerous on registrants and render the Internet reporting requirements unconstitutionally burdensome. First, just as ambiguity in the California statute contributed to its chilling effect on speech, so too does the ambiguity in SORA's Internet reporting provisions discussed above. Ambiguity as to the meaning of "routinely used" would likely result in both overreporting and under use of permissible speech activities. It is uncertain whether a registrant would need to register her husband's email account were she to occasionally respond to emails from his address. For example, if the registrant were to send holiday emails from her husband's account in December, pay a bill using his email account in March, and then share photos with a family member from his email account in May, she would be left to determine whether such use was "routine." Reasonable persons could either avoid using another person's email account or report the account out of a sense of caution even though this usage may not appear to fall within the dictionary definition of routine. *See supra* Section III.A.1.iii. As with the California law, "[t]his uncertainty undermines the likelihood that the [Act] has been

53

carefully tailored to the [State's] goal of protecting minors." *Harris*, 772 F.3d at 579 (quoting *Reno*, 521 U.S. at 871).

More problematic is § 28.725(1)'s requirement that registrants report "in person" immediately (i.e., within three business days) whenever they establish "any electronic mail or instant message address, or any other designation used in internet communications or postings." Mich. Comp. Laws § 28.725(1)(f). The requirement to report in person is surely more burdensome to registrants than the California law's requirement to report new Internet identifiers *by mail* within twenty-four hours. In concluding that the "24-hour reporting requirement . . . undoubtedly chills First Amendment Activity," the Ninth Circuit explained:

> [A]nytime registrants want to communicate with a new identifier, they must assess whether the message they intend to communicate is worth the hassle of filling out a form, purchasing stamps, and locating a post office or mailbox. The mail-in requirement is not only psychologically chilling, but physically inconvenient, since whenever a registered sex offender obtains a new ISP or Internet identifier, he must go somewhere else within 24 hours to mail that information to the State.

*Harris* at 581-82.

This court need not—and does not—agree that putting a stamp on an envelope and walking it to one's front door or roadside mailbox constitutes a notable "hassle," let alone one that "undoubtedly chills" a person's ability to freely speak. It remains, however, that SORA's "in person" reporting requirement imposes a substantially greater, and apparently unnecessary, burden on protected First Amendment speech. Accordingly, while SORA's Internet reporting provisions serve the significant governmental interest of protecting minors and investigating sexual crimes, the

54

ambiguity in the reporting requirements and the requirement to report "in person" render the provisions not narrowly tailored and, therefore, unconstitutional.

### D. Count VI: Retroactive Application of Lifetime Registration Requirement

Plaintiffs claim that the 2011 SORA amendments' imposition of retroactive lifetime registration violates the Due Process Clause of the Fourteenth Amendment. (Dkt. # 46, Pg. ID 898-99; *see* Dkt. # 96, Pg. ID 5699-700 ("The due process question before this Court is not whether myriad amendments to SORA over the last 20 years can be applied retroactively, but rather whether one particular change—the imposition of retroactive lifetime registration—violates due process.").)  In their complaint, Plaintiffs specifically identify three manners in which the lifetime registration amendment contravenes the Due Process Clause:  (1) the application of SORA to Doe #1 who was not required to register as a sex offender upon his conviction for kidnapping in 1990;  (2) the application of SORA to Doe #2 who pleaded guilty in 1997 under the HYTA with the expectation that his case would be dismissed and his records sealed; and (3) the 2011 amendment's retroactive extension of Doe #3's, Doe #4's, and Ms. Doe's registration periods from twenty-five years to life "without any individualized showing that such an extension is warranted."  (Dkt. # 46, Pg. ID 898-99.)

The court held in its previous opinion that, "as a matter of law . . . , retroactively applying SORA to [Does ##1 and 2] is justified by a legitimate legislative purpose" and dismissed Count VI as it relates to the retroactive application of SORA to those Plaintiffs.  (Dkt. # 27, Pg. ID 696.)  However, the court found that, "at this early stage of the litigation, the court is unable to determine whether retroactively extending the registration period of Plaintiffs from twenty-five years to life is justified by a legitimate

55

legislative purpose" and, accordingly, denied "Defendants' motion as it applies to the extension of Plaintiffs' registration periods." (*Id.* at 697.) The court now considers this issue and concludes that the retroactive application of SORA's lifetime registration requirement is constitutional.

### 1. Level of Scrutiny

Generally, "[r]etroactivity is not favored in the law." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988). As the Supreme Court explained in *Landsgraf v. USI Film Prods.*, 511 U.S. 244 (1994), "[t]he Due Process Clause . . . protects the interests in fair notice and repose that may be compromised by retroactive legislation; a justification sufficient to validate a statute's prospective application under the Clause 'may not suffice' to warrant its retroactive application." *Id.* at 266. Yet, "[i]n general, due process is satisfied 'simply by showing that the retroactive application of the legislation is itself justified by a rational legislative purpose.'" *Franklin Cnty. Convention Facilities Auth. v. Am. Premier Underwriters, Inc.*, 240 F.3d 534, 550 (6th Cir. 2001) (quoting *Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 730 (1984)).

Whereas *Franklin County* involves an act that "adjust[s] the burdens and benefits of economic life," *id.*, Plaintiffs argue that the court should apply strict scrutiny rather than rational basis review because SORA burdens fundamental rights—namely Plaintiffs' fundamental right to parenting and free speech rights. (Dkt. # 96, Pg. ID 5701.)

It is well settled that "[g]overnment actions that burden the exercise of . . . fundamental rights or liberty interests are subject to strict scrutiny, and will be upheld only when they are narrowly tailored to a compelling governmental interest." *Seal v.*

56

*Morgan*, 229 F.3d 567, 574 (6th Cir. 2007). Defendants cite to no controlling precedent

in which a court applied a heightened level of scrutiny for a law's prospective application

but then applied rational basis review to a law's retrospective application.[4]  Instead,

Defendants rely solely on the doctrine of the law of the case to argue that the court is

obligated to apply rational basis review in determining whether the retroactive

application of SORA's lifetime registration violates due process.  (Dkt. # 100, Pg. ID

5846 (citing *Christianson v. Colts Indus. Operating Corp.*, 486 U.S. 800, 815-16 (1988)

("[T]he doctrine [of the law of the case] posits that when a court decides upon a rule of

law, that decision should continue to govern the same issues in subsequent stages in

the same case."  (citation omitted))).)

The court has not previously decided whether a heightened level of scrutiny or

rational basis review applies to the determination of whether the 2011 Amendments'

retroactive extension of Doe #3's, Doe #4's, and Ms. Doe's registration periods from

twenty-five years to life violates the Due Process Clause.  In denying Defendants'

motion to dismiss as to this claim, the court found that, "at this early stage of litigation,

the court is unable to determine whether retroactively extending the registration period

of Plaintiffs from twenty-five years to life is justified by a legitimate legislative purposes."

 (Dkt. # 27, Pg. ID 697.)  The court did not need to consider whether a heightened level

of scrutiny applied because it found that the motion to dismiss standard was not met

---

[4]The District of Nebraska rejected a due process challenge to the retroactive
application of Nebraska's sex offender registration laws holding that retroactive
application of the laws "is itself justified by a rational legislative purpose," being public
safety.  *Doe v. Nebraska*, 734 F. Supp. 2d 882, 932 (D. Neb. 2010).  But that court did
not consider whether a heightened level of scrutiny was warranted for this
determination.

even applying rational basis review and because the parties did not litigate the proper standard of review.  While it is true that the court granted the motion as to the retroactive application of SORA to Does ##1 and 2 on the ground that such application "is justified by a legitimate legislative purpose," (Dkt. # 27, Pg. ID 696), this ruling is separate from the court's analysis of the retroactive application to the other Plaintiffs, as evidenced by the court's disparate dispositions of the claim as applied to Does ##1 and 2 and the other Plaintiffs.  Moreover, in recognizing the doctrine of the law of the case, the Supreme Court made clear that, despite this doctrine, "[a] court has the power to revisit prior decisions of its own or of a coordinate court in any circumstance." *Christianson*, 486 U.S. at 817.  Even if the doctrine applied here, in light of the fact that the standard of review was not litigated during the motion to dismiss phase, the court would find it appropriate to consider in the first instance whether a higher level of scrutiny was warranted.

As discussed above, SORA's Internet reporting requirements implicate Plaintiffs' First Amendment free speech right rights and, due to SORA's vagueness, the court is unable to determine whether the prohibition against loitering and residing in the geographical exclusion zones infringe on a Plaintiffs' fundamental right to participate in the upbringing and education of their children.  For the reasons discussed in Sections III.B and III.C, the court will enjoin the geographic exclusion zone provisions and the majority of the Internet reporting provisions.  The court, however, will not enjoin Mich. Comp. Laws § 28.727(1)(f) inasmuch as it requires registrants to report "[a]ll electronic mail addresses and instant message addresses assigned to the individual . . . and all login names or other identifiers used by the individual when using any electronic mail

58

address or instant messaging system."  The retroactive application of the lifetime

registration requirement implicates the First Amendment only to the extent that it

incorporates this reporting requirement—thus retroactively extending the length of time

that certain individuals must report their e-mail addresses, instant message addresses,

and related information.  The court will apply intermediate scrutiny in considering the

lifetime registration requirement's incorporation of this reporting requirement.  In all

other respects, the retroactive application of the lifetime registration requirement does

not implicate Plaintiffs' First Amendment rights or right to participate in the upbringing

and education of their children.

Plaintiffs also contend that the retroactive application of SORA's lifetime

registration should be subject to higher scrutiny because it alters the terms of plea

agreements.  (Dkt. # 96, Pg. ID 5701-02 (citing *Lynch v. United States*, 292 U.S. 571,

579 (1934)).)  Under this theory, plea agreements are government contracts, and

breaches of governmental contracts implicate the Fifth Amendment's Takings Clause.

*See Lynch*, 292 U.S. at 579 ("Valid contracts are property, whether the obligor be a

private individual, a municipality, a state, or the United States.  Rights against the

United States arising out of a contract with it are protected by the Fifth Amendment.").

"Plea agreements are contractual in nature."  *United States v. Robinson*, 924

F.2d 612, 613 (6th Cir. 1991); *see Puckett v. United States*, 556 U.S. 129, 137 (2009)

("Although the analogy may not hold in all respects, plea bargains are essentially

contracts.").   "Plea agreements involve a quid pro quo between a criminal defendant

and the government.  In exchange for some perceived benefit, defendants waive

several of their constitutional rights (including the right to a trial) and grant the

59

government numerous tangible benefits, such as promptly imposed punishment without the expenditure of prosecutorial resources." *INS v. St. Cyr*, 533 U.S. 289, 321 (2001) (internal quotation marks and citations omitted). "When a defendant agrees to a plea bargain, the Government takes on certain obligations. If those obligations are not met, the defendant is entitled to seek a remedy." *Puckett*, 556 U.S. at 137.

Plaintiffs argue that retroactively applying the lifetime registration requirement is unconstitutional because it offends fundamental fairness by altering a factor that may have affected Plaintiffs' willingness to enter their plea agreements. (Dkt. # 96, Pg. ID 5703-05 (relying on *St. Cyr*, 533 U.S. at 323, in which the Supreme Court held that changes to immigration laws which repealed discretionary relief from deportation did not apply retroactively for a number of reasons, including the role such relief may have played in defendants' plea bargaining).) However, Plaintiffs have not raised breach of contract or Fifth Amendment Takings claims, nor do they cite to any case law supporting a higher degree of scrutiny when reviewing the retroactive application of a law that may affect the government's contractual obligations (including those established by plea agreements). Because Plaintiffs provide no basis for reviewing the retroactive application of SORA's lifetime registration requirement using a heightened level of scrutiny—except as to the lifetime registration requirement's incorporation of the Internet reporting provision—the court will uphold the general retroactive application of the legislation if it is justified by a rational legislative purpose.'" *Franklin Cnty. Convention Facilities Auth.*, 240 F.3d at 550 (6th Cir. 2001) (quoting *Pension Benefit Guar. Corp.*, 467 U.S. at 730).

### 2. Rational Legislative Purposes Justifying Retroactivity

60

Defendants proffer three governmental purposes for the retroactive application of SORA: to enhance public safety, to conform with federal law and avoid losing federal funding, and to create a uniform nation-wide sex offender registration system. (Dkt. # 97, Pg. ID 5738-41.) The retroactive application of the lifetime registration requirement is justified by all three purposes.

### i. Public Safety

Plaintiffs conceded that public safety is an "important interest," and the Sixth Circuit has found that states have a compelling interest in protecting public safety. *E.g.*, *Grider v. Abramson*, 180 F.3d 739, 749 (6th Cir. 1999); *Tanks v. Greater Cleveland Reg. Transit Auth.*, 930 F.2d 475, 480 (6th Cir. 1991). Defendants argue that the retroactive application of the lifetime registration requirement helps achieve this goal because "the public safety concerns posed by sex offenders are much the same, regardless of when they were convicted." (Dkt. # 97, Pg. ID 5741 (citation omitted).) Plaintiffs disagree, arguing that lifetime registration does not serve public safety but rather is a detriment to public safety. Although opinions about sex offender registries' effects on public safety may differ (*cf.* Dkt. # 90, Pg. ID 3843), it was reasonable for the Michigan legislature to "determine[] that a person who has been convicted of committing an offense covered by this act poses a potential serious menace and danger to . . . the people, and particularly the children, of this state," and SORA's registration requirements would enhance public safety by "provid[ing] law enforcement and the people of this state with an appropriate, comprehensive, and effective means to monitor those persons who pose such a potential danger." Mich. Comp. Laws § 28.721a. Just as providing the public and law enforcement with the means to monitor sex offenders

who were convicted twenty years ago is rationally related to protecting public safety, so too is providing the public and law enforcement with the means to monitor sex offenders who were convicted thirty years ago, or more.

### ii. Conform with Federal Law

In enacting the Sex Offender Registration and Notification Act ("SORNA"), 42 U.S.C. §§ 16901 *et seq.*, Congress hoped "to protect the public from sex offenders and offenders against children" by "establishing a comprehensive national system for the registration of those offenders."  42 U.S.C. § 16901.  "Rather than establishing a federal agency to implement SORNA, Congress, through its spending power, U.S. Const. Art. I, § 8, directed all states and the District of Columbia to create local registries that comply with specific national standards.  42 U.S.C. §§ 16911(10), 16912(a)."  *United States v. Felts*, 674 F.3d 599, 602 (6th Cir. 2012).  For Michigan to comply with SORNA and receive full funding under the Omnibus Crime Control and Safe Street Act of 1968, 42 U.S.C. §§ 3750 *et. seq.*, Michigan must "substantially implement" SORNA.  *See* 42 U.S.C. § 16925(a) ("For any fiscal year after the end of the period for implementation, a jurisdiction that fails, as determined by the Attorney General, to substantially implement this subchapter shall not receive 10 percent of the funds that would otherwise be allocated for that fiscal year to the jurisdiction under subpart 1 of part E of title I of the Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C. 3750 et seq.).").  Retroactivity is one factor in determining substantial implementation.  SORNA "appl[ies] to all sex offenders, including sex offenders convicted of the offense for which registration is required prior to the enactment of the Act," 28 C.F.R. § 72.3,  and the SMART office published a "Substantial Implementation Checklist" which lists

retroactivity as one of the factors in determining substantial compliance.  (Dkt. # 93-33, Pg. ID 5489.)  Thus, even if the retroactive application of SORA's lifetime registration requirement is not *necessary* for achieving substantial implementation of SORNA, it is undoubtedly justified by the goal of substantial implementation.  In fact, the parties disclosed that "[t]he Substantial Implementation Review conducted by SMART indicated that Michigan's retroactivity provisions substantially complied with SORNA."  (Dkt. # 90, Pg. ID 3787.)

Plaintiffs assert that the desire to conform with federal law does not provide a rational basis for the retroactive application of the lifetime registration requirement for because SORNA does not *compel* Michigan to implement SORNA. (Dkt. # 96, Pg. ID 5710 (citing *Printz v. United States*, 521 U.S. 898, 924 (1997) ("[E]ven where Congress has the authority under the Constitution to pass laws requiring or prohibiting certain acts, it lacks the power directly to compel the States to require or prohibit those acts . . . .")).)  This argument is unpersuasive.  The Sixth Circuit has interpreted SORNA as a directive to states to comply with federal standards, and the desire to aid in achieving that goal is a rational justification for trying to achieve substantial implementation.  *Felts*, 674 F.3d at 602.  Likewise, failing to substantially comply with SORNA would result in lost federal funding.  Plaintiffs claim that the lost funding cannot justify retroactivity because the cost of substantially implementing SORNA exceeds the lost federal funding.  The parties estimate that Michigan would lose about $1 to $2 million a year in federal funding if Michigan is not substantially compliant with SORNA.

Plaintiffs argue that the cost of SORNA compliance significantly outweighs the potential loss in federal funding.  (Dkt. # 96, Pg. ID 5711-12.)  This is not an easy

calculation, in part because Michigan obtains other benefits from implementing a sex offender registry besides the federal funding, including enhanced public safety.  This is evident because Michigan had enacted its offender registry before SORNA. Defendants urge the court that "[t]he only costs that can reasonably be considered costs of 'SORNA compliance' are the . . . costs of the OffenderWatch software, which amount to only $260,000 for annual maintenance and support." (Dkt. # 100, Pg. ID 5850.) Defendants' suggestion is both overinclusive and underinclusive for the purposes of determining whether federal funding is a rational justification for applying the lifetime registration requirement retroactively.  It is overinclusive in that major portions of the cost of the OffenderWatch software are unattributable to the retroactive application of the lifetime registration requirement.  It is underinclusive because it does not include the cost of training and other personnel costs related to implementing SORNA.  Yet, Michigan presumably would need to invest in substantially the same amount of overhead and training whether SORA's lifetime registration requirement applies retroactively or merely prospectively.  The court cannot determine the specific cost of applying the lifetime registration requirement retroactively, but it seems highly likely that it amounts to less than $1 to $2 million dollars per year.  Increasing the likelihood of receiving full funding under the Omnibus Crime Control and Safe Street Act of 1968 is a rational legislative purpose justifying the retroactive application of the lifetime registration requirement.

### iii. Contributing to National Uniformity of Sex Registration Laws

The desire to contribute to the goal of national uniformity of sex registration laws is a legitimate government purpose, too.  Congress enacted SORNA specifically to

64

"establish[] a comprehensive national system for the registration of [sex] offenders," 42 U.S.C. § 16901 out of an "awareness that pre-Act registration law consisted of a patchwork of federal and 50 individual state registration systems." *Reynolds v. United States*, 132 S. Ct. 975, 978 (2012). Uniformity across jurisdictions can enhance public safety and reduce the burden on registrants by making it easier for registrants (and the public) to be aware of the reporting requirements in any given jurisdiction. The retroactive application of the lifetime registration requirement helps further the goal of uniformity. Seventeen states, three territories, and sixty-one tribes substantially complied with SORNA as of July 2014. (Dkt. # 90, Pg. ID 3776.) Although this falls short of uniformity, the substantial number of jurisdictions that have complied contribute to fair notice and enhanced public safety by normalizing reporting requirements.[5]

In sum, the court finds that the retroactive application of SORA's lifetime registration requirement is justified by rational government purposes and is therefore constitutional. The court, however, reiterates that this finding does not apply to those SORA provisions which the court finds constitutionally infirm.

### 3. The Lifetime Registration Requirement's Incorporation of the Internet Reporting Provision

By applying the lifetime registration requirement retroactively, SORA also extends its Internet reporting requirement retroactively. The requirement to report "[a]ll

---

[5]Plaintiffs note that some aspects of SORA are not directly consistent with SORNA and therefore cannot contribute to national uniformity. (Dkt. # 99, Pg. ID 5812.) Not all of Michigan's policy decisions must be related to achieving every one of its goals; this is impossible wherever goals conflict. The retroactive application of SORA may be justified by the goal of national uniformity even though some of SORA's provisions do not contribute to uniformity.

electronic mail addresses and instant message addresses assigned to the individual . . .
and all login names or other identifiers used by the individual when using any electronic
mail address or instant messaging system" has a minimal impact on Plaintiffs' First
Amendment rights.  Because of this minimal impact, the court must consider whether
the reporting requirement's retroactive application, due to its incorporation through the
retroactive lifetime registration requirement, is narrowly tailored to serve a significant
government interest, while leaving ample alternative channels for communicating
information.  *Ward*, 491 U.S. at 791.

As discussed *supra* in Section III.C, the reporting requirement is content-neutral,
it does not prohibit any protected speech, and it does not interrupt Plaintiffs' right to
anonymous speech by unveiling their identities to the public.  Its impact on Plaintiffs'
free speech rights is minimal, and Michigan has a robust interest in protecting the
individuals, especially children, from online predators.  Nonetheless, Defendants have
not briefed whether the retroactive application of the Internet reporting provision,
through its incorporation in the lifetime registration requirement, survives intermediate
scrutiny.  Additional briefing would be helpful in resolving this issue.  The court will
reserve ruling on this question.

### E.  Count IX: Violation of the Ex Post Facto Clause

Plaintiffs assert that the November 2013 amendment to SORA instituting a
requirement that registrants pay a $50.00 annual registration fee violates Article I,
Section 9, Clause 3 of the Constitution of the United States, which states, "No Bill of
Attainder or ex post facto Law shall be passed."  Mich. Comp. Laws § 28.725a(6) (eff.
Apr. 1, 2014).

66

Before determining whether the annual registration fee violates the Ex Post Facto Clause, the court must determine whether its review of this claim is barred by the Tax Injunction Act, 28 U.S.C. § 1341.  The Tax Injunction Act provides: "The district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State."  28 U.S.C. § 1341.

The purpose of the Tax Injunction Act is "to promote comity and to afford states the broadest independence, consistent with the federal constitution, in the administration of their affairs, particularly revenue raising."  *Wright v. McClain*, 835 F.2d 143, 144 (6th Cir. 1987).  "It is elemental . . . that the label given an assessment by state law is not dispositive of whether the assessment is a 'tax under state law.'  Rather, the definition of the term 'tax' is a question of federal law, and the issue here is whether the assessment is a tax within the meaning of that term as employed by Congress in the Tax Injunction Act."  *Hedgepeth v. Tennessee*, 215 F.3d 608, 612 (6th Cir. 2000) (quoting *Wright*, 835 F.2d at 144).  To determine whether an assessment constitutes a tax, courts utilize a three-factor test: "(1) the entity that imposes the assessment; (2) the parties upon whom the assessment is imposed; and (3) whether the assessment is expended for general public purposes, or used for the regulation or benefit of the parties upon whom the assessment is imposed."  *Id.* at 612 (quoting *Am. Landfill, Inc. v. Stark/Tuscarawas/Wayne Joint Solid Waste Mgmt. Dist.*, 166 F.3d 835, 837 (6th Cir. 1999)).  If "the assessment falls near the middle of the spectrum between a regulatory fee and a classic tax, the predominant factor is the revenue's ultimate use.  When the ultimate use is to provide a general public benefit, the assessment is likely a tax, while

67

an assessment that provides a more narrow benefit to the regulated [entities] is likely a fee." *Id.* (quoting *Am. Landfill*, 166 F.3d at 838). "Fees can serve regulatory purposes as distinguished from general public purposes in two ways: either by discouraging particular conduct through the device of making it more costly, or by generating income ear marked to cover the cost of the regulation." *Id.*

Plaintiffs argue that, although the first factor suggests that the registration fee is a tax because it was imposed by the Michigan legislature, the latter two factors support the alternate conclusion. The registration fee is imposed exclusively on registrants, and, pursuant to SORA, 60% of the fee goes to the Michigan State Police to be deposited in the sex offenders registration fund and the other 40% is "retained by the court, local law enforcement agency, sheriff's department, or departmental post." Mich. Comp. Laws. § 28.725b. The money credited to the fund may only be used for training and law enforcement purposes related to SORA. Mich. Comp. Laws § 28.725b. In sum. Plaintiffs insist that the fee is not a tax because:

> It is imposed only upon a tiny fraction of the state's population; the clear purpose is to help defray the agency's regulation-related expenses; the charge discourages particular conduct or makes it more expensive; the bulk of the money is segregated in a specially created account; none of the money is paid to general state funds unrelated to SORA's added costs; and unused SOR funds cannot lapse to the general fund.

(Dkt. # 99, Pg. ID 5838.) Plaintiffs' argument is supported by *Mueller v. Raemisch*, 740 F.3d 1128 (7th Cir. 2014), in which the Seventh Circuit considered an ex post facto challenge against the annual registration fee for Wisconsin's sex offender registry. Without explicitly addressing the Tax Injunction Act, the Seventh Circuit noted that the

68

parties "acknowledged in this case that if the $100 annual fee is not a bona fide fee, it is a fine rather than a tax." *Id.* at 1133.

Sixth Circuit precedent, however, precludes the court from categorizing the annual registration fee as anything but a tax. In *Wright*, the Sixth Circuit considered whether a Tennessee law requiring parolees to make monthly payments to a supervision fund and a victim's compensation fund imposed a tax within the meaning of the Tax Injunction Act. 835 F.2d 143. The Sixth Circuit concluded that the charges were taxes, reasoning that:

> Although the levies imposed under the statute are earmarked for the Corrections Department budget and not the general fund, they are no less for revenue raising purposes as distinguished from license or privilege fees, or punitive assessments. The purposes of the charges are to defray the cost to the general public of monitoring and supervising the behavior of convicted offenders and to compensate, in some measure, victims of criminal misconduct. Those purposes relate directly to the general welfare of the citizens of Tennessee and the assessments to fund them are no less general revenue raising levies simply because they are dedicated to a particular aspect of the commonwealth.

*Id.* at 145.

Similarly, although the annual registration fee is earmarked for the administration of SORA, SORA is hardly a privilege that registrants pay for their own benefit. Instead, the registration fee was implemented to "offset the loss of grant funding and other budget shortfalls" (Dkt. # 96, Pg. ID 5715) and fund the administration of SORA which serves the general welfare by protecting the general population from future sex crimes. Mich. Comp. Laws § 28.721a.

Plaintiffs ask the court to disregard *Wright* because it was decided before the Sixth Circuit adopted the three-part test articulated in *Hedgepeth* and *American Landfill*.

69

(Dkt. # 99, Pg. ID 5836.)  Under Plaintiff's theory, SORA's annual registration fee is not a tax because, although the purpose of SORA's annual registration fee is to serve the general welfare by administering SORA, "the assessment is . . . used for the *regulation* . . . of the parties upon whom the assessment is imposed."  *Hedgepeth,* 215 F.3d 608, 612 (emphasis added).  Nevertheless, this reasoning conflicts with *Wright*, and "[i]t is firmly established that one panel of [the Sixth Circuit] cannot overturn a decision of another panel; only the court sitting en banc can overturn such a decision."  *United States v. Lanier*, 201 F.3d 842, 846 (6th Cir. 2000).

*Wright* is directly on point; the purpose of the $50 registration fee is "to defray the cost to the general public of monitoring and supervising the behavior of [sex] offenders." and to compensate, in some measure, victims of criminal misconduct.  *Wright*, 835 F.2d at 145.  The Sixth Circuit has not overturned *Wright*; in fact, both *Hedgepeth* and *American Landfill* rely on *Wright* to hold that the assessments at issue are taxes under the Tax Injunction Act.  *See Hedgepeth*, 215 F.3d at 613 ("The State's assessments are allocated in a manner that make it clear the ultimate purpose of the assessments is to benefit the general public of the State of Tennessee.  As such, the assessment must constitute a tax under the [Tax Injunction Act].  The State's highway fund, the general fund, the police pay supplement fund, and the trooper safety fund 'relate directly to the general welfare of the citizens of Tennessee and the assessments to fund them are no less general revenue raising levies simply because they are dedicated to a particular aspect of the commonwealth.'  *Wright*, 835 F.2d at 145.") (internal quotation mark omitted); *Am. Landfill*, 166 F.3d at 839 ("Analyzing the assessments in question in this case under the case law above leads to the conclusion that the assessments are

70

'taxes.'  Under *Wright v. McClain* . . . , the assessments are placed in a fund that, while separate from the general fund, serves public purposes benefitting the entire community.").  Therefore, to the extent that *Wright* conflicts with later Sixth Circuit case law, *Wright* controls and dictates that the court treat the registration fees as a tax rather than a privilege fee.  Because the annual registration fee constitutes a tax for the purposes of the Tax Injunction Act, the court does not have jurisdiction to decide whether Mich. Comp. Laws § 28.725a(6) violates the Ex Post Facto Clause.

## IV.  CONCLUSION

For the reasons stated above,

IT IS ORDERED that Plaintiffs' Rule 52 Motion for Judgment on the Papers (Dkt. # 96) is GRANTED IN PART and DENIED IN PART.

IT IS FURTHER ORDERED that Defendants' Rule 52 Motion for Judgment on the Papers (Dkt. # 97) is GRANTED IN PART and DENIED IN PART.

IT IS FURTHER ORDERED that the Sex Offender Registration Act, Mich. Comp. Laws §§ 28.721 *et seq.*, shall be construed consistently with this opinion.

IT IS FURTHER ORDERED that SORA's geographic exclusion zones provisions, Mich. Comp. Laws §§ 28.734, 28.735, are declared unconstitutional and their enforcement is enjoined, as applied to Plaintiffs.

IT IS FURTHER ORDERED that the requirement "to report in person and notify the registering authority . . . immediately after . . . [t]he individual . . . begins to regularly operate any vehicle," Mich. Comp. Laws § 28.725(1)(g), is declared unconstitutional and its enforcement is enjoined, as applied to Plaintiffs.

IT IS FURTHER ORDERED that the requirement "to report in person and notify the registering authority . . . immediately after . . . [t]he individual establishes any electronic mail or instant message address, or any other designations used in internet communications or postings," Mich. Comp. Laws § 28.725(1)(f), is declared unconstitutional and its enforcement is enjoined.

IT IS FURTHER ORDERED that the requirement to report "[a]ll telephone numbers . . . routinely used by the individual," Mich. Comp. Laws § 28.727(1)(h), is declared unconstitutional and its enforcement is enjoined.

IT IS FURTHER ORDERED that the requirement to report "[a]ll electronic mail addresses and instant message addresses . . . routinely used by the individual," Mich. Comp. Laws § 28.727(1)(I), is declared unconstitutional and its enforcement is enjoined.

IT IS FURTHER ORDERED that the requirement to report "[t]he license plate number, registration number, and description of any motor vehicle, aircraft, or vessel . . . regularly operated by the individual," Mich. Comp. Laws § 28.727(1)(j), is declared unconstitutional and its enforcement is enjoined, as applied to Plaintiffs.

IT IS FURTHER ORDERED that the court reserves judgment on whether Mich. Comp. Laws § 28.725a(7) is unconstitutional as applied to John Doe #4 and will request additional briefing in a forthcoming order.

IT IS FURTHER ORDERED that the court reserves judgment on whether it is constitutional for the lifetime registration requirement's incorporation of the requirement to report "[a]ll electronic mail addresses and instant message addresses assigned to the individual . . . and all login names or other identifiers used by the individual when using any electronic mail address or instant messaging system," Mich. Comp. Laws §

28.727(1)(i), to be applied retroactively and will request additional briefing in a

forthcoming order.

IT IS FURTHER ORDERED that the court reserves judgment on Plaintiffs'

request for costs and attorneys' fees pursuant to 42 U.S.C. § 1988 and Mich. Const. Art.

9, § 32, pending the resolution of the remaining issues in this case.

IT IS FURTHER ORDERED that judgment is entered in Defendants favor in all

other respects.

s/Robert H. Cleland
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated:  March 31, 2015

I hereby certify that a copy of the foregoing document was mailed to counsel of record
on this date, March 31, 2015, by electronic and/or ordinary mail.

s/M. Beauchemin
Deputy Clerk
(313) 234-5525